Daniel J. O'Connor, Jr., Bar No. 010081
Karen J. Stillwell, Bar No. 022711
Travis B. Hill, Bar No. 021133
**O'CONNOR & DYET, P.C.**
7955 South Priest Drive
Tempe, Arizona 85284
daniel.oconnor@occlaw.com
karen.stillwell@occlaw.com
travis.hill@occlaw.com
(602) 241-7000

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mussalina Muhaymin as Personal Representative of the Estate of Muhammad Abdul Muhaymin Jr., | Case No.: 17-cv-04565-PHX-SMB |
| Plaintiff, | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| City of Phoenix, an Arizona Municipal Corporation; Antonio Tarango; Officer Oswald Grenier; Officer Kevin McGowan; Officer Jason Hobel; Officer Ronaldo Canilao; Officer David Head; Officer Susan Heimbigner; Officer James Clark; Officer Dennis Leroux; Officer Ryan Nielson; Officer Steven Wong; and Doe Supervisors 1-5, | **(TO BE FILED UNDER SEAL)** **Oral Argument Requested** Assigned to the Honorable Susan B. Brnovich |
| Defendants. | |

Pursuant to Rule 56, Fed. R. Civ. P., Defendants City of Phoenix ("City of Phoenix"), Antonio Tarango ("Tarango"), Officer Oswald Grenier, Officer Kevin McGowan, Officer Jason Hobel, Officer Ronaldo Canilao, Officer David Head, Officer Susan Heimbigner, Officer James Clark, Officer Dennis Leroux, Officer Ryan Nielsen and

Sergeant Steven Wong ("Phoenix Defendants" or "Phoenix Officers") respectfully move for summary judgment on Plaintiff's remaining claims in her First Amended Complaint.

This Motion is supported by the following Memorandum of Points and Authorities and Phoenix Defendants' Separate Statement of Facts ("SOF").

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Plaintiff Mussalina Muhaymin ("Plaintiff"), as the Personal Representative for the Estate of her brother, Muhammad Muhaymin, Jr. ("Muhaymin"), filed a wrongful death lawsuit against the Phoenix Defendants, alleging civil rights violations under 42 U.S.C. §1983 ("§1983") and various state law claims stemming from the death of Muhaymin – an individual the Phoenix Officers were attempting to arrest pursuant to an outstanding warrant.

The Phoenix Officers are entitled to qualified immunity on Plaintiff's federal civil rights claims because their actions were reasonable and because no precedent under comparable facts had clearly established that their conduct would be unlawful.  Plaintiff's claim under the Americans with Disabilities Act ("ADA") is the only other claim that presents a federal question and, for the reasons discussed below, it also fails.

Because qualified immunity and dismissal of the ADA claim dispense of this Court's federal question jurisdiction, it should not retain supplemental jurisdiction over Plaintiff's remaining state law claims.  If the Court does elect to exercise supplemental jurisdiction and assess Plaintiff's state law claims, those counts should also be dismissed because the Phoenix Officers used reasonable force, have immunity under Arizona law, and Plaintiff is unable to prove the essential elements of the remaining state claims.

## II.   STATEMENT OF FACTS

### A.   Factual Summary of Events

On January 4, 2017, Muhaymin entered the Maryvale Community Center ("Center") in Phoenix, Arizona. **SOF ¶1.** Muhaymin had a Chihuahua dog with him named "Chiquita," which was unleashed and not under his control. **SOF ¶2.** Arizona law requires all dogs over the age of three months to be licensed and vaccinated against rabies. **SOF ¶3.** Chiquita was not licensed and records from Maricopa County Animal Care and Control show no animals registered to Muhaymin. **SOF ¶4**.

Muhaymin brought Chiquita unleashed to the Center before and, on those occasions, Chiquita was aggressive, uncontrolled, and even attempted to bite staff members. **SOF ¶5**. When Muhaymin and his dog entered the Center that morning, Tarango, the Center manager, told Muhaymin that he could use the restroom if he left the dog outside. **SOF ¶6.** Notably, Tarango had previous interactions with Muhaymin at the Center, where Muhaymin threatened physical harm. **SOF ¶7.** Tarango and Muhaymin argued about the dog as Muhaymin tried to force his way past Tarango toward the restroom and Muhaymin made physical contact with Tarango. **SOF ¶8.** Tarango then directed an employee, Hannah Glemba, to call the police. **SOF ¶9.**

The Phoenix Officers responded to a call identified as an assault at the Center.[1] **SOF ¶10.** Immediately before the Phoenix Officers arrived, Muhaymin picked up the dog and was holding Chiquita in his arms. **SOF ¶11.** Officer Grenier, Officer Hobel, Officer Canilao, and Officer Head began arriving at 9:32 a.m. **SOF ¶12.** The officers and Tarango agreed to permit Muhaymin to use the restroom, provided that he held his dog. **SOF ¶13.** Before entering the restroom, Muhaymin gave his identification information to the officers.

---

[1] Ms. Glemba reported that Muhaymin pushed Tarango. The call was dispatched as an assault. When asked by the officers at the scene, and later by Plaintiff's counsel in this case, if he was "assaulted," Tarango explained that it was a "bump." **SOF ¶10.**

**SOF ¶14.** While he was in the restroom for over six (6) minutes, the officers discovered Muhaymin had an outstanding misdemeanor warrant. **SOF ¶15**.

Absent exceptional circumstances, the Phoenix Officers were required to arrest Muhaymin on the warrant.[2] **SOF ¶16**. While Muhaymin was in the restroom, the officers discussed how to care for the dog and transport Muhaymin for the warrant. **SOF ¶18**. When Muhaymin exited the restroom, the Phoenix Officers walked with him outside the Center. Once outside, Officer Grenier and Officer Canilao informed Muhaymin about the warrant and advised him that he was under arrest.[3] **SOF ¶19**.

Muhaymin immediately resisted arrest, refused to put Chiquita down, refused to put his hands behind his back, and told the officers to call his "sensei," i.e., a martial arts instructor. **SOF ¶22**. When the officers heard Muhaymin ask for his "sensei," they grew concerned Muhaymin had martial arts training. **SOF ¶23**. When Muhaymin expressed concern over Chiquita, the officers told him they would take care of the dog. **SOF ¶24**.

Yet, Muhaymin still refused to comply with the officers' orders to put Chiquita down and place his hands behind his back. Instead, he locked his hands together, tensed and stiffened his body, flailed his extremities, twisted, thrashed back and forth, pulled left and right, squatted and otherwise resisted the arrest, including grabbing the officers' hands and squeezing with tremendous strength. **SOF ¶25**. Although he did not punch, kick or strike the officers, Muhaymin was actively and defensively resisting arrest and repeatedly struggled against the officers' efforts to detain him. **SOF ¶26**.

---

[2]  Plaintiff's expert, Scott DeFoe, testified that the Phoenix Officers had a lawful right to take Muhaymin into custody on the warrant, and that the Phoenix Officers were, in fact, detaining Muhaymin for the warrant. **SOF ¶17.**

[3]  Officer Ronaldo Canilao is crisis intervention trained ("CIT"), which means he has training on identifying and interacting with individuals with mental health concerns. Officer Canilao testified he did not know Muhaymin had any mental health concerns. **SOF ¶20**. Moreover, Plaintiff's experts, Dr. Bennet Omalu and Dr. Ali Taqi, both testified the body camera videos do not show that Muhaymin was experiencing a mental health crisis; rather, he appeared calm, stable, and conversed intellectually. **SOF ¶21**.

Muhaymin refused to comply with the officers' orders and continued to resist arrest. The officers placed Muhaymin against a glass wall in an effort to get him to let go of the dog so that his hands could be handcuffed behind his back. **SOF ¶27**. Officer Canilao, with Officer Hobel's assistance, was forced to use a baton under Muhaymin's right arm as leverage to pry his interlocked hands free and to release the dog. **SOF ¶28**. Once the dog was freed, Muhaymin continued to resist and refused to put his hands behind his back, which forced the officers to take him to the ground where he was eventually "double-cuffed" behind his back (i.e., using two sets of handcuffs with one set of handcuffs on each wrist and the two sets linked together in the middle) after a brief struggle that lasted approximately two (2) minutes. **SOF ¶29**. During this initial encounter, Officer Grenier delivered one elbow strike to the rear lateral muscle in Muhaymin's left shoulder to release his arms from underneath his body so he could be handcuffed. **SOF ¶30**.

In resisting the detention, Muhaymin displayed incredible strength and it took four officers to finally gain control of Muhaymin and get him into the double-cuffs. **SOF ¶31**. Once Muhaymin was double-cuffed, the officers assisted Muhaymin to his feet and escorted him to a police SUV. **SOF ¶32**. He continued to resist. At one point, Muhaymin refused to walk and the officers lifted him to his feet to encourage him to walk. **SOF ¶33**.

Before placing Muhaymin into the police SUV, the officers attempted to search him for drugs or weapons. **SOF ¶34**. Officer Hobel had prior encounters with Muhaymin, including an incident when Muhaymin was in possession of a knife. **SOF ¶35**. While being searched, Muhaymin actively attempted to prevent the officers from searching his back pants pockets. **SOF ¶36**. Muhaymin was obstructing the search, so Officer Hobel slightly raised Muhaymin's arms to allow for the search of his back pockets. **SOF ¶37**. During this search, Muhaymin raised his double-cuffed arms, up and over his head, and positioned his cuffed hands in front of his body, which presented a safety concern to the officers. **SOF ¶38**. Muhaymin then used his hands to push away from the police SUV and the officers

had to take him to the ground a second time. **SOF ¶39**. Once again, Muhaymin exhibited extreme strength and resistance to the officers' attempts to secure him. **SOF ¶40**.

Additional officers were dispatched for assistance and several arrived at the scene while Muhaymin was on his side and on the ground. **SOF ¶41**. Muhaymin continued to actively resist arrest and flailed his body around, attempted to roll over onto his back, tensed, thrashed, twisted, kicked his legs, pulled, pushed back against the officers, and showed incredible strength that prevented officers from repositioning his arms and handcuffs behind his back. Most officers described Muhaymin's resistance as "defensive resistance" or "active resistance" and felt he was under the influence of drugs.[4] **SOF ¶42**.

A few officers used a portion of their body weight, for brief periods of time, adjusting their weight often, and placing it on extremities, the hip area, the shoulders, the legs, etc., in response to Muhaymin's resistance and the strength he displayed throughout the encounter.[5] **SOF ¶44**. The officers pleaded with Muhaymin to stop resisting, but he refused and continued to resist with extreme strength.[6] **SOF ¶46**. Although Muhaymin yelled "I can't breathe," he was still exerting tremendous strength in his resistance and the officers assessed his breathing, observed that he was breathing and there was nothing obstructing his ability to breathe. **SOF ¶50**. Throughout this second encounter, not only were the officers continuously adjusting their weight and position, Muhaymin was also adjusted from his side to his stomach. **SOF ¶51**.

---

[4] A few officers testified that Muhaymin's resistance was "passive;" meaning that he was not trying to assault the officers. **SOF ¶43.**

[5] Phoenix Officers also held onto Muhaymin's hair and/or head to prevent him from injuring himself or using his head to gain more resistance against the officers. Phoenix Officers are trained to control a subject's head in this situation. **SOF ¶45.**

[6] Muhaymin's dog repeatedly barked and lunged at the Phoenix Officers. **SOF ¶47**. Officer Head removed his Taser and "cycled" it (or "sparked" it) to scare Chiquita away. **SOF ¶48**. The Taser was <u>not</u> deployed against Muhaymin or the dog. **SOF ¶49**.

Plaintiff's police practices expert, Scott DeFoe, testified that in his experience as a police officer, he has personally applied his own body weight on subjects in a prone position while securing handcuffs. **SOF ¶52.** In fact, he noted that *some* type of force is used to handcuff a subject. Mr. DeFoe further testified using some force is within policy and if the subject physically resists, officers must use reasonable force to overcome the resistance displayed by the subject. **SOF ¶52.**

With the assistance of additional officers, the double set of handcuffs was disconnected from in front of his body, and the officers were able to re-handcuff Muhaymin with a single pair of cuffs behind his back. **SOF ¶53.** A RIPP restraint (also referred to as a "hobble") was utilized to restrain his feet to prevent him from kicking.[7] **SOF ¶54.** The officers did <u>not</u> "hog-tie" Muhaymin – the application of a RIPP restraint is not considered a hog tie or a "use of force." **SOF ¶56.** Plaintiff's expert, Mr. DeFoe, agrees that Muhaymin was not placed in a hog-tie position. **SOF ¶57.**

Once Muhaymin was secured with the handcuffs behind his back, the Phoenix Officers immediately ceased contact. It was at this point that Muhaymin simultaneously vomited. **SOF ¶58.** The officers quickly rolled Muhaymin onto his side to clear his airway, but he had stopped breathing. **SOF ¶59.** The officers immediately requested medical support and initiated resuscitative efforts. **SOF ¶60.** The officers continued to clear Muhaymin's airway and perform chest compressions until paramedics arrived. **SOF ¶61.** Paramedics arrived and took over Muhaymin's care. **SOF ¶62.** He was transported to Maryvale Hospital where he was pronounced deceased at 10:39 a.m. **SOF ¶63.**

The second encounter with Muhaymin lasted approximately eight (8) minutes, with less than three (3) minutes in the prone position. Throughout, Muhaymin continued to yell,

---

[7] A RIPP restraint is a nylon material with a loop that goes around the ankles, and a hook on the other end to attach to the handcuffs. An individual can still stand and walk (with assistance) while a RIPP restraint is applied. **SOF ¶55.**

physically resist, and refused to comply with directions until approximately one (1) minute before he vomited. Muhaymin vomited within seconds of being properly secured and restrained in handcuffs. With the exception of one elbow strike to a rear lateral muscle during the initial encounter, none of the Phoenix Officers used any additional force. None of the Phoenix Officers punched, struck or kicked Muhaymin. **SOF ¶64**. No Tasers, pepper spray or electrical restraints were used against Muhaymin. **SOF ¶65**.

The autopsy pathologist determined that Muhaymin died of "cardiac arrest in the setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual." **SOF ¶66**. Phoenix Defendants' expert, Dr. Michael Graham, concurred with the autopsy findings, and opined Muhaymin died of cardiac asystole precipitated by marked agitation and physical exertion on a background of methamphetamine use and schizophrenia. He further noted methamphetamine use and schizophrenia are each associated with an increased risk of sudden death. **SOF ¶67.** The toxicology results showed Muhaymin had over five (5) times the toxic (potentially fatal) level of methamphetamine in his system at his death. **SOF ¶68.**

Dr. Amanda Maskovyak, the Maricopa County Medical Examiner/Pathologist, testified there is no "safe" level of methamphetamine because it has unpredictable effects and always has a potential of being fatal. **SOF ¶69.** Plaintiff's expert, Dr. Omalu, testified that, although he disagreed with the Medical Examiner's findings, Muhaymin ingested methamphetamines within hours of his death, as his levels were "high." **SOF ¶70.** Phoenix Defendants' toxicology expert, Dr. Binh Ly, opined that the concentrations detected in Muhaymin were within the range of being fatal according to medical literature, and that Muhaymin may have ingested additional methamphetamines while in the restroom in an effort to conceal the drugs from the officers. Methamphetamines are known for their stimulant effects – increased energy, endurance, strength, and aggression. **SOF ¶71.** Plaintiff's expert, Dr. Taqi, testified that the most prevalent cause of death in

methamphetamine overdoses is cardiac-related issues, and that methamphetamine can kill a healthy person. **SOF ¶91.**

## B. Each Officer's Individual Actions

As the primary basis of this motion is that the Phoenix Officers are entitled to qualified immunity, the Court must separately assess each officers' conduct before reaching a determination as to whether he or she violated clearly established law. *See e.g., Cunningham v. Gates*, 229 F.3d 1271, 1287 (9th Cir. 2000), as amended ("[I]n resolving a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual defendant."); *K.J.P. v. City of Santee*, 748 F. App'x 133, 134 (9th Cir. 2019) (remanding case where "the district court did not conduct an individualized assessment of the conduct of each of the various defendants in their myriad roles" with instructions to "make an individualized determination of whether summary judgment based on qualified immunity may be proper as to each defendant" by "individually evaluat[ing] each defendant's specific actions and omissions to determine whether that conduct violated clearly established rights."). Accordingly, in order to facilitate this process, each of the Phoenix Officers' individual roles in this case are discussed below, in the same order as he or she arrived at the scene.[8]

### 1. Officer Oswald Grenier[9]

Officer Grenier, a Phoenix Police Officer for 18 years at the time, is sued in his individual capacity. Grenier was the first officer to respond to the call for service. He listened to Muhaymin and Tarango discuss what had transpired and, although Muhaymin made some interesting comments, Grenier did not believe he was suffering any mental

---

[8] Antonio Tarango is not an officer. He is the manager of the Center and played no role in the arrest. It appears Plaintiff named him as a defendant in relation to her state claims, as well as the ADA and AzDA discrimination claims discussed *supra*.

[9] Grenier wore a body camera during the encounter; however, it was dislodged during the first encounter so only a portion of the footage is available.

health crisis. **SOF ¶90.** Grenier volunteered to transport Muhaymin to meet Mesa Police for the warrant and discussed options to care for Muhaymin's dog. **SOF ¶18.** Grenier and Officer Canilao walked with Muhaymin outside the Center and Grenier advised Muhaymin he had a warrant and to place his hands behind his back. **SOF ¶19.** During the first encounter, Grenier attempted to move Muhaymin's arm from under his body and secure it behind his back; however, Muhaymin exhibited extreme strength and resistance. **SOF ¶22, 25-27, 29.** Grenier delivered a single elbow strike to Muhaymin's left lateral rear muscle in an effort to "interrupt his bio-computer" and release his arms from underneath his body to be handcuffed. **SOF ¶30.** Although Grenier helped escort Muhaymin to the police SUV, he was not involved in searching Muhaymin's pockets, but held Muhaymin's right bicep while the search was being conducted. **SOF ¶36.**

After Muhaymin moved his cuffed arms to the front of his body and pushed off the police SUV, the four officers brought Muhaymin to the ground the second time and radioed for additional officers. **SOF ¶38-41.** The second encounter was dynamic with Muhaymin's continued resistance and changing positions, as well as the officers' changing positions in response to Muhaymin's continued physical resistance and movements, and additional officers arriving on scene. **SOF ¶41, 42, 44.**

Grenier held Muhaymin's head to the ground to prevent Muhaymin from rubbing his face into the concrete and injuring himself. **SOF ¶45.** While Muhaymin was on his side, Grenier testified that because of Muhaymin's continuous movement and resistance, his shin slipped from Muhaymin's shoulder to near the side of his neck for a brief period of time.[10] Notably, Officer Grenier maintained his other foot on the ground to distribute

---

[10] Phoenix Defendants' medical expert, Dr. Gary Vilke, opined this would not have affected Muhaymin's ventilation and would not cause asphyxiation. **SOF ¶73.** Dr. Vilke opined that none of the officers' actions would have caused asphyxiation or death. **SOF ¶74.**

weight off of Muhaymin, and applied very little weight just to hold Muhaymin in place, as Muhaymin continued fighting, screaming and yelling. **SOF ¶72.**

Grenier had no physical contact with Muhaymin for approximately three (3) minutes prior to Muhaymin vomiting. Grenier was one of the first officers to begin lifesaving efforts, e.g., clearing airway and compressions. **SOF ¶60.** He testified: "In 18 years, I've never had anything like that in my life. . . That guy has been the strongest guy I've ever had in my life or my police career . . . I've never had anybody that strong." **SOF ¶31, 42.**

## 2. Officer Jason Hobel[11]

Officer Jason Hobel, a Phoenix Police Officer for 18 years at the time, is sued in his individual capacity. Hobel was the second officer on scene and was involved in the initial discussions and investigation into whether an assault occurred or whether Muhaymin would be trespassed from the Center. **SOF ¶10.** Hobel walked outside the Center with Muhaymin and the other officers. **SOF ¶19.** During the first encounter, Hobel attempted to get Muhaymin's arms behind his back to place him in handcuffs; however, Muhaymin refused to let go of his dog, interlocked his hands together in front of his body, and the dog attempted to bite Hobel.[12] **SOF ¶25-29.** Hobel stated Muhaymin was "thrashing back and forth and pulling all over the place." **SOF ¶28.** The officers were forced to take Muhaymin to the ground, to secure Muhaymin's hands in two interlocked sets of handcuffs[13] and escort him to the police vehicle. **SOF ¶29, 33.**

Based on his prior encounters with Muhaymin, during which he had knives in his pocket, Hobel searched Muhaymin's pockets before placing him in the vehicle. **SOF ¶35.** Hobel testified that he went from lifting his arms to search his pockets, to trying to pull

---

[11] Hobel wore a body camera during the encounter; however, it stopped at one point, turned back on, and was later dislodged. Accordingly, Hobel has two body camera videos.
[12] The dog chased Hobel during an encounter with Muhaymin the month before. **SOF ¶35.**
[13] The interlocked sets of handcuffs gave Muhaymin an extra eight inches of space between his wrists, which gave him an opportunity to move his arms more freely. **SOF ¶29.**

them down, as Muhaymin rotated his arms from behind his back, up and over his head, to in front of him. **SOF ¶36, 37, 38.** The officers were again forced to take Muhaymin to the ground to try to gain control of him. **SOF ¶39.** Muhaymin continued to resist with extreme strength[14] and was on his side, "thrashing about" as the officers tried to re-handcuff his arms behind his back. **SOF ¶41-42.** Hobel had his hands on Muhaymin's hips, with his own knees on the ground, trying to keep Muhaymin from flipping over onto his back. **SOF ¶44.** Hobel used no other force. **SOF ¶64.**

### 3. Officer Ronaldo Canilao[15]

Officer Canilao, a Phoenix Police Officer for 15 years at the time, is sued in his individual capacity. Canilao is CIT-trained and used his training in de-escalation and talked to Muhaymin prior to (and during arrest). **SOF ¶20.** Canilao also engaged with Muhaymin outside the Center, when the officers announced the warrant and told Muhaymin he was under arrest. **SOF ¶19.** When Muhaymin refused to let go of his dog and place his arms behind his back, and Muhaymin's dog tried to bite the officers, Canilao used his baton in the crease of Muhaymin's elbow, as leverage to allow the release of the dog and to move Muhaymin's arm behind his back to handcuff him.[16] **SOF ¶28.** Once at the police vehicle, Canilao assisted in the attempted search of Muhaymin's pockets. **SOF ¶36.** Canilao was holding onto Muhaymin's arms, when Muhaymin rotated his arms from behind his back, up and over his head, and to the front of his body. **SOF ¶38.** Canilao testified that he had

---

[14] Hobel also testified "I'm absolutely shocked that he was putting up as much of a fight as he is because I'm a bit bigger than he is, and I'm fairly strong, and it was everything that I could do to get his hand behind his back." **SOF ¶46.**

[15] Canilao wore a body camera during the encounter; however, it was dislodged during the first encounter so only a portion of the footage is available.

[16] Canilao stated "I was thinking the baton was going to bend – the baton was going to bend because this guy's hold was strong… Man, this guy is strong as a mule… He's just very strong. I'm just surprised by how strong he is." **SOF ¶25, 46.**

no idea how Muhaymin did this and that Canilao's arms were now right in front of Muhaymin's mouth and he was concerned Muhaymin was trying to bite him. **SOF ¶38.**

After Muhaymin and the officers went to the ground the second time, Canilao secured Muhaymin's arms to the ground as the double-set of handcuffs were still in place, while they waited for additional officers to arrive. **SOF ¶39, 40, 41, 42, 44.** Once additional officers arrived, Canilao applied some body weight on Muhaymin's right forearm, while another officer disconnected the first set of handcuffs from each other and began moving Muhaymin's left arm behind his back. **SOF ¶44.** After the other officers took control of Muhaymin's right arm to place it behind his back, Canilao stood up and had no further contact with Muhaymin. **SOF ¶53, 58.** Muhaymin vomited two minutes and thirty seconds later and Canilao then assisted with resuscitation efforts. **SOF ¶58-61.** Canilao used no other force in the arrest. **SOF ¶64.**

### 4. Officer David Head[17]

Officer Head, a Phoenix Police Officer for 21 years at the time, is sued in his individual capacity. Head assisted in handcuffing Muhaymin in the first encounter outside the Center's doors. **SOF ¶19, 22, 25-29, 31.** Head described Muhaymin as actively resisting, but not assaultive toward the officers. **SOF ¶25.** After the first encounter, Head remained behind picking up body cameras, keys, etc. by the Center's doors and was not involved in escorting Muhaymin to the police SUV or searching his pockets. **SOF ¶33, 39.**

When Head arrived at the police SUV, Muhaymin was twisting, turning, and pushing officers back from the vehicle, which led the officers and Muhaymin to the ground a second time. **SOF ¶39, 42.** Muhaymin continued to twist, turn, flail and use his legs as leverage to get up, so Head laid across Muhaymin's calves to control his legs. **SOF ¶40, 42, 44**. Other officers described that, although Head was holding Muhaymin's legs,

---

[17] Head wore a body camera during the encounter; however, it stopped at one point, and turned back on. Accordingly, Head has two body camera videos.

Muhaymin exhibited such extreme strength that he was able to "toss" Head around. **SOF ¶44.** Head remained holding Muhaymin's legs until the RIPP restraint was applied around his ankles. **SOF ¶40.** Once the RIPP restraint was applied, he had no contact with Muhaymin and Muhaymin vomited approximately two minutes later. Head used no other force. **SOF ¶64.**

### 5. Officer Susan Heimbigner[18]

Officer Heimbigner, a Phoenix Police Officer for 21 years at the time, is sued in her individual capacity. Heimbigner was a School Resource Officer for a nearby school when she heard the call for additional officers. **SOF ¶41.** She drove to the Center and observed Officers Grenier, Hobel, Canilao, and Head on the ground with Muhaymin. **SOF ¶41.** Heimbigner went next to Muhaymin (who was positioned on his side) and placed her hands on his side to help control him due to his strength. **SOF ¶41, 44.** She directed Muhaymin to "stop" and "don't resist." **SOF ¶46.** Aside from placing her hands (open palm only) on Muhaymin's side for a short duration, she used no other force. **SOF ¶64.** Heimbigner was on scene for approximately three minutes and thirty seconds before Muhaymin vomited.

### 6. Officer Ryan Nielsen[19]

Officer Nielsen, a Phoenix Police Officer for 13 years at the time, is sued in his individual capacity. Nielsen and his partner, Officer McGowan, responded to the call for additional officers and request for a RIPP restraint. **SOF ¶41.** Nielsen arrived on scene approximately three minutes before Muhaymin vomited. Upon Nielsen's arrival, Muhaymin was initially on his side and was then placed in the prone position while the handcuffs were re-positioned behind his back. **SOF ¶42.** Nielsen was near the left of Muhaymin's head and assisted in disconnecting the first set of handcuffs from each other.

---

[18] Heimbigner was not equipped with a body camera at the time of the incident.

[19] Nielsen wore a body camera during the encounter; however, it stopped on two occasions, and turned back on. Accordingly, Nielsen has three body camera videos.

**SOF ¶53.** With the assistance of another officer, they were able to overcome Muhaymin's resistance and strength and re-position Muhaymin's left arm behind his back. **SOF ¶42, 53.** Nielsen then used his hand to hold the back of Muhaymin's head, to prevent him from rubbing his face into the concrete.[20] **SOF ¶44.** Nielsen's feet and knees remained on the ground the entire time and he used no other force. **SOF ¶44, 64.**

### 7. Sergeant Steven Wong[21]

Sergeant Wong, a Phoenix Police Officer for 17 years at the time, is sued in his individual capacity. Wong responded to the call for additional officers and arrived on scene approximately two minutes and thirty seconds before Muhaymin vomited. **SOF ¶41.** Wong assisted in holding Muhaymin's right bicep and giving commands to stop fighting. **SOF ¶46.** Muhaymin did not comply.[22] **SOF ¶42.** Wong applied a portion of his body weight to Muhaymin's right upper back for approximately one minute while he assisted in bringing Muhaymin's right arm behind his back, and while officers cut off the rope bracelet interfering with the cuffs on Muhaymin's right wrist, and finally secured the handcuffs properly, behind Muhaymin's back. **SOF ¶44, 53, 58, 64.** Wong used no other force and immediately assisted in chest compressions after Muhaymin vomited. **SOF ¶61, 64.**

### 8. Officer Dennis Leroux[23]

Officer Leroux, a Phoenix Police Officer for 15 years at the time, is sued in his individual capacity. Leroux responded to the call for additional officers and arrived on scene within a few seconds of Wong's arrival. **SOF ¶41.** Leroux took Officer Grenier's place, and with the assistance of another officer, was able to overcome Muhaymin's

---

[20] Nielsen stated "for somebody to get that like super human strength, my first thought was there's got to be some sort of drugs on board." **SOF ¶46.**

[21] Wong was not equipped with a body camera video at the time of the incident.

[22] Wong stated "I ran across it in my career before, but very, very, few times… And yeah, this is one of those where I – he was – he was definitely a lot stronger than what he should have been." **SOF ¶46.**

[23] Leroux was not equipped with a body camera at the time of the incident.

resistance to move his right arm behind his back to be handcuffed. **SOF ¶42, 44, 53.** In his effort to move Muhaymin's arm behind his back, Leroux applied a portion of his body weight by placing his shin on Muhaymin's right shoulder blade area, while his other foot remained on the ground. Leroux maintained this position for approximately twenty (20) seconds. **SOF ¶44, 53.** As Muhaymin's arm was being brought behind his back, and while the rope bracelet was cut so the handcuff could be placed, Leroux adjusted his own position and switched shins on Muhaymin's right shoulder blade area, with his other foot on the ground for approximately twenty (20) seconds. **SOF ¶42, 44.** Leroux indicated Muhaymin was extremely strong and continued to physically resist throughout the encounter. **SOF ¶42.** Leroux used no other force and had no physical contact with Muhaymin in the one minute prior to Muhaymin vomiting. **SOF ¶64.**

### 9. Officer James Clark[24]

Officer Clark, a Phoenix Police Officer for 23 years at the time, is sued in his individual capacity. Clark responded to the call for assistance and arrived approximately two minutes prior to Muhaymin vomiting. **SOF ¶41.** During the attempt to reposition Muhaymin's handcuffs and overcome Muhaymin's resistance and extreme strength, Clark applied a portion of his body weight with his left knee/shin to Muhaymin's right lower back for less than one (1) minute. **SOF ¶44, 54.** Clark assisted another officer in bringing Muhaymin's left arm behind his back, and applying the RIPP restraint to Muhaymin's ankles. **SOF ¶53.** As Clark attached the RIPP restraint clip to the handcuffs, Muhaymin simultaneously vomited. **SOF ¶58.** Clark assisted in lifesaving measures. **SOF ¶60-61.** Clark used no other force. **SOF ¶64.**

---

[24] Clark wore a body camera during the encounter and has one video.

### 10. Officer Kevin McGowan[25]

Officer McGowan, a Phoenix Police Officer for 19 years at the time, is sued in his individual capacity. McGowan and his partner, Nielsen, responded to the call for assistance and McGowan brought the RIPP restraint to the scene. **SOF ¶41.** McGowan lifted Officer Head off of Muhaymin's calves and applied the loop of the RIPP restraint around Muhaymin's ankles. **SOF ¶54.** McGowan also cut a rope bracelet from Muhaymin's right wrist so the handcuffs could be secured. **SOF ¶53.** McGowan used no force, had no further physical contact with Muhaymin, and was on scene for approximately two minutes prior to Muhaymin vomiting. **SOF ¶64.**

## III. <u>PROCEDURAL BACKGROUND AND CAUSES OF ACTION AT ISSUE</u>

Phoenix Defendants' filed a Motion to Dismiss in March 2018. On February 20, 2019, the Court dismissed §1983 *Monell*-related claims: Count IV for Supervisor Liability; Count V for Municipal Liability and Failure to Train; Count VI for Municipal Liability and Unlawful Policies, Practices and/or Customs; and Civil Conspiracy. *See* Dkt No. 67.

On October 31, 2019, following Plaintiff's Notice of Voluntary Dismissal, the Court also dismissed Plaintiff's loss of income and services claims. *See* Dkt No. 96.

Plaintiff's remaining claims against Phoenix Defendants are as follows:

- Count I: §1983 Claim for Excessive Force;
- Count II: §1983 Claim for Failure to Protect and Intervene;
- Count III: 42 U.S.C. §12131 Claim for ADA Discrimination;
- Count VII: State Law Claim for Wrongful Death and Survival Action under Excessive Force;
- Count VIII: State Law Claim for Wrongful Death and Survival Action Battery;
- Count IX: State Law Claim for Wrongful Death and Survival Action with Intentional Inflection of Emotional Distress;
- Count X: State Law Claim for Wrongful Death and Survival Action with Intentional Inflection of Emotional Distress;

---

[25] McGowan wore a body camera during the encounter and has one video.

- Count XI: State Law Claim for Wrongful Death and Survival Action for Negligence;
- Count XII: State Law Claim for Wrongful Death and Survival Action for Gross Negligence;
  Count XIII: State Law Claim for ACRA Discrimination; and
- Count XIV: State Law Claim for Wrongful Death and Survival Action for Negligent Hiring, Supervision, Retention and/or Training.

On June 10, 2020, Plaintiff filed a Motion for Leave to Amend the Complaint to include a *Monell* claim (Municipal Liability and Unlawful Policies). *See* Dkt. No. 192. Although the Motion has been fully briefed, the Court has not ruled on Plaintiff's Motion and, therefore, no additional claims have been added. This Motion for Summary Judgment addresses all of Plaintiff's current remaining claims and, for reasons set forth below, each of these Counts should be summarily dismissed as a matter of fact and established law.

## IV.  <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

A party moving for summary judgment initially must demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325. The moving party merely needs to point out to the Court the absence of evidence supporting its opponent's claim; it does not need to disprove its opponent's claim. *Id.*; *see also* Fed. R. Civ. P. 56(c). If a moving party has made this showing, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see also* Fed. R. Civ. P. 56(e*); Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995).

# V. **LEGAL ARGUMENT**

## A. **The Phoenix Officers are Entitled to Qualified Immunity on Plaintiff's Federal § 1983 Claims**

### 1. Qualified Immunity Should be Decided as Early as Possible in Order to Avoid Subjecting an Immune Defendant to Trial

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights…" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted). Qualified immunity recognizes that subjecting government officials to litigation and trial based on their good faith decisions would result in "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public services." *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982). For this reason, the Supreme Court has repeatedly stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citation omitted); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation" that "is effectively lost if a case is erroneously permitted to go to trial.").

Qualified immunity should be decided on summary judgment whenever possible. *See Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017) ("[Q]ualified immunity was conceived as a summary judgment vehicle, and the trend of the Court's qualified immunity jurisprudence has been toward resolving qualified immunity as a legal issue before trial whenever possible."). To that end, summary judgment based on qualified immunity is proper **even if** material facts are in dispute; in such cases, courts are instructed to conduct the inquiry "assuming that the version of the material facts asserted by the non-moving party is correct." *Bingue v. Prunchak*, 512 F.3d 1169, 1172-73 (9th Cir. 2008); *see also Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001) ("Where disputed facts exist… we can

determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct.").

### 2. The Phoenix Officers are Immune From § 1983 Liability Unless They Violated 'Clearly Established' Law

A plaintiff overcomes qualified immunity only by showing **both**: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011), *citing Harlow*, 457 U.S. at 818. "When this test is properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132-33 (9th Cir. 2018) (internal quotations omitted).

The second ("clearly established") prong of the qualified immunity analysis is satisfied only if "at the time of the challenged conduct, the contours of a right are sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Ashcroft,* 563 U.S. at 741 (emphasis added).[26] In other words, to show a violation of **clearly established** law, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

### 3. To Show a Violation of 'Clearly Established' Law, Plaintiffs Must Identify Precedent 'Precisely on Point.'

The burden of identifying clearly established law falls squarely on the plaintiff. *See Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) ("It is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established."). But that burden will not be met by generalized statements of the law; rather, "police officers [especially] are entitled to qualified immunity unless existing precedent

---

[26] Thus, even if <u>some</u> reasonable officials might believe their peer acted unlawfully, qualified immunity applies unless **all** reasonable officials in that position would agree that his or her actions were unlawful. *See Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1078 (9th Cir. 2011).

squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53 (2018) (internal quotations and citations omitted).

Thus, to overcome qualified immunity, a § 1983 plaintiff must identify precedent wherein a government employee acting under similar circumstances as those in the case at bar was held to have violated the same constitutional right(s) at issue. *White v. Pauly*, 137 S. Ct. 548, 552 (2017). The "[p]rior precedent must articulate 'a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful.'" *West v. City of Caldwell*, 931 F.3d 901, 911 (9th Cir. 2019) (Italics in original), *quoting Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017); *see also S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1015-16 (9th Cir. 2017) (clearly established law arises out of precedent putting law enforcement officers on "clear notice" that their conduct "in these particular circumstances" would violate the Constitution).

Indeed, the Ninth Circuit recently reiterated the stringency of this requirement:

> "[C]learly established" means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. Courts must define the clearly established right at issue on the basis of the specific context of the case. Thus, liability will not attach unless there exists a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. A plaintiff bears the burden of showing that the right at issue was clearly established. [Plaintiff] cited several cases that he believes clearly establish that [defendant] used excessive force. **Those cases, however, do not present sufficiently similar factual circumstances to have placed the constitutional question beyond debate. ... Given the Court's admonition, we are unable to find a case so *precisely on point* with this one as to satisfy the Court's demand for specificity. [Defendant] is therefore entitled to qualified immunity.**

*Emmons v. City of Escondido*, 921 F.3d 1172, 1174-75 (9th Cir. 2019) (emphasis added; internal quotations and citations omitted).

**B.**   **The Phoenix Officers are Entitled to Qualified Immunity on Plaintiff's Excessive Force Claim Because the Uses of Force Were Reasonable and did not Violate any 'Clearly Established' Law**

Claims that law enforcement used excessive force in the course of seizing a person are analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v.*

*Connor,* 490 U.S. 386, 395 (1989). "Determining whether the force used is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396. This balancing test entails consideration of the **totality of the facts and circumstances** in the particular case. *Id*.

The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation. *Id.* at 396-97. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the benefit of 20/20 hindsight. *Id.* at 395. Reasonableness is assessed by weighing the type and amount of force used against:

(1) The severity of the crime at issue;

(2) Whether the suspect posed an immediate threat to the safety of the officers or others; and

(3) Whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

*See Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003), *citing Chew v. Gates*, 27 F.3d 1432 at 1440 (9th Cir. 1994) and *Graham*, 490 U.S. at 396. These are commonly referred to as the *Graham* factors. *See id*. at 1441. "Of all these factors, the 'most important' one is 'whether the suspect posed an immediate threat to the safety of the officers or others.'" *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (citations omitted); *see also Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005).

At each decision point where a Phoenix Officer chose to use force, we must remember that: the arrest was lawful;[27] Muhaymin was actively and physically resisting

---

[27] The Phoenix Officers were making the arrest pursuant to an outstanding arrest warrant. **SOF ¶17.**

arrest throughout both encounters;[28] Muhaymin was in the process of committing a felony;[29] and Muhaymin posed a threat to his own safety and to those around him, including the Phoenix Officers. The threat was not resolved until Muhaymin was secured with the handcuffs behind his back. Notably, once the handcuffs were secured, the Phoenix Officers immediately ceased contact. **SOF ¶58**.

    1.   <u>The Phoenix Officers Restraints on Muhaymin were Reasonable Under the Circumstances.</u>

The Phoenix Officers responded to a reported assault at the Center. **SOF ¶10.** Upon arrival, they calmly spoke to Muhaymin and attempted to de-escalate the situation. **SOF ¶12, 13.** The Phoenix Officers allowed Muhaymin to use the restroom[30] and, upon additional questioning, determined Muhaymin would not be charged or arrested for the reported assault. It was discovered while Muhaymin was in the restroom that he had an outstanding misdemeanor arrest warrant from City of Mesa. **SOF ¶15**. Phoenix Police Department Operating Order No. 4.10 provides that, absent extraordinary circumstances, a Phoenix Officer must execute the warrant. Accordingly, it was the Phoenix Officers' duty and responsibility to arrest Muhaymin pursuant to the warrant. **SOF ¶76.** Thus, the Phoenix Officers' decision to arrest Muhaymin on the outstanding warrant was lawful.

The next undisputed fact is critical. At the time of the encounter, Muhaymin was under the influence of methamphetamines. **SOF ¶66, 67, 68, 70 and 71.** When confronted with the warrant and arrest, Muhaymin failed to comply with the officers' orders and, instead, immediately resisted arrest. **SOF ¶22, 25, 26, 27, 28, 29, 33, 36, 40, 42, 44, 45,**

---

[28] Plaintiff's own expert agrees Muhaymin resisted arrest. **SOF ¶75**.

[29] Resisting arrest is a class 6 felony in the State of Arizona. *See* A.R.S. § 13-2508.

[30] Muhaymin was in the restroom for over six (6) minutes and with knowledge that the Phoenix Officers were waiting outside the door. Muhaymin may have used any remaining methamphetamines in his possession while he was in the restroom, which may have contributed to additional toxicity. **SOF ¶15, 71.**

**46.** Each officer involved testified about the "extreme" or "super-human" strength exhibited by Muhaymin in his resistance. **SOF ¶25, 31, 40, 42, 44, 46, 50.**

The toxicology report indicated that the level of methamphetamines in Muhaymin's blood was .81 mg/L, which is more than five (5) times higher than the expected "toxic" (i.e., potentially fatal) level of the drug at .15 g/L – a fact that is acknowledged by the experts, including Plaintiff's experts. **SOF ¶67, 68, 69, 70, 71.** Setting aside the dispute as to whether that extreme level of methamphetamine intoxication caused or substantially contributed to Muhaymin's subsequent cardiac arrest and death, the undisputed fact for purposes of this Motion is that Muhaymin was under the influence of large quantities of an illegal drug known for its stimulant effects – increased energy, endurance, strength, and aggression – all of which were evident that morning at the Center. **SOF ¶71.**

Despite Muhaymin's resistance, it is further undisputed that the Phoenix Officers never utilized a Taser or punched, hit, or kicked Muhaymin (except for a single elbow strike to his shoulder). **SOF ¶64.** In fact, the Phoenix Officers only used "holds" in their efforts to subdue and arrest Muhaymin -- who resisted with extreme strength. The Phoenix Officers used only the minimum amount of force necessary to control Muhaymin, secure his handcuffs, and effect the arrest. Once Muhaymin was secured with the handcuffs behind his back, the Phoenix Officers immediately ceased contact. **SOF ¶44, 58, 72.**

After years of litigation, Plaintiff can point to no violation of "clearly established law" that occurred. To the contrary, the facts demonstrate that the Phoenix Officers were making a lawful arrest using the minimal level of force necessary under the circumstances. Those circumstances, i.e., the physical struggle that occurred and the duration of that struggle, are directly and solely attributable to Muhaymin's actions. Muhaymin used large amounts of methamphetamine and committed a felony by resisting arrest.

On the body camera videos, the Phoenix Officers can be heard repeatedly pleading with Muhaymin to "calm down," to "stop resisting," and to "give [his] hands." **SOF ¶77.**

The officers frequently adjusted their holds and application of body weight as they attempted to get Muhaymin's arms behind his back to be handcuffed. **SOF ¶¶44, 51.** Although Muhaymin yelled at one point that he was having difficulty breathing, he continued to yell, resist, and struggle against the officers' efforts to get his hands behind his back and, even during this struggle where Muhaymin demonstrated tremendous strength, the officers assessed his breathing, adjusted their weight and positions, and continued to plead with Muhaymin to stop resisting. **SOF ¶¶46, 50, 51, 53.**

There are no facts to support the allegation that the use of force employed by the Phoenix Officers was so extreme as to prove that the officers were "plainly incompetent" or "knowingly violating the law." *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986). The Phoenix Officers' use of force was objectively reasonable under a totality of the circumstances.[31] Not a **single expert** retained by Plaintiff[32] can identify: (1) the officer involved; (2) the location of weight applied; (3) the amount of weight applied; or (4) the duration that weight was applied – which allegedly caused asphyxiation and death.[33]

The undisputed facts show that Muhaymin: (a) ignored commands (that, if complied with, would have resulted in no use of force); (b) actively and continuously resisted the lawful arrest and physically struggled with the officers, showing tremendous strength and endurance against their efforts of subdual; and (c) was intoxicated on methamphetamine at

---

[31] Indeed, Muhaymin's level of resistance proved nearly too much for four officers to control. **SOF ¶¶31, 40**. Thus, the four officers requested backup and assistance of additional officers to control Muhaymin. **SOF ¶41.**

[32] Plaintiff's expert, Dr. Omalu, testified he could not quantify how much weight was placed on Muhaymin in each and every exposure; that he was not paying attention to that because it was of "no significant forensic consequence" because in his opinion it is about a spectrum of cumulative exposure, despite the Phoenix Officers and Muhaymin changing positions dynamically. **SOF ¶78.**

[33] Plaintiff's expert, Mr. DeFoe, testified he did not know how long Muhaymin was in prone position, did not time the length of any application of body weight, that he could not tell how long and how much weight was applied. **SOF ¶79.**

levels more than five (5) times the toxic or fatal level of the drug. **SOF ¶25-26, 31, 40, 42, 44, 46, 66-68, 70-71.** The undisputed facts further show that the Phoenix Officers: (a) never employed a Taser against Muhaymin; (b) never struck him with a baton; (c) never punched, kicked or struck him (except for an elbow strike against his shoulder); (d) never used a "hog-tie" restraint; and (e) only utilized partial body weights, sporadically at that, against primarily the extremities of his body (feet, legs and arms) with only temporary, short-duration and partial body weight applied to his lower back and shoulder **only** until such time as Muhaymin was properly secured in handcuffs. **SOF ¶44, 49, 51, 53, 56, 64, 65.**

Moreover, the Phoenix Police Department conducted both an internal and criminal investigation into this incident. It was investigated by the Phoenix Police Department's Professional Standards Bureau and was reviewed by the Department's Use of Force Board. The Board determined each of the ten officers involved acted in accordance with Department policy. **SOF ¶80.** The incident was also investigated by the Phoenix Police Department's Special Investigation Unit ("SIU"). SIU forwarded its investigation, along with the thirteen body worn camera videos of the incident, to the Maricopa County Attorney's Office for potential criminal prosecution of the officers. On February 22, 2018, the Maricopa County Attorney's Office announced its decision, that the officers did not commit any act that warranted criminal prosecution. **SOF ¶81.**

*Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1095- 1100 (9th Cir. 2006) is factually analogous. In *Tatum*, the Ninth Circuit held that a police officer's use of force preceding an arrest was objectively reasonable, despite the suspect's death during the arrest. In *Tatum*, the officer asked the plaintiff, who was high on cocaine, to present identification and to cease kicking a police station door. The plaintiff did not respond and evaded arrest when the officer tried to place him in handcuffs. Several officers arrived to help arrest the plaintiff. The officers kept the plaintiff on his stomach with his face on the ground. The plaintiff's heart stopped, and he died. *Id*. at 1093. The Ninth Circuit held

that the officers' use of force to arrest the plaintiff was objectively reasonable, despite the minimal severity of the crime and the fact of his eventual death. *Id*. at 1096.

*Tatum* instructs that the Phoenix Officer's actions **did not** violate the Constitution:

> The officers needed to incapacitate [decedent], both to protect themselves and to protect him. As the district court noted, the summary judgment record did not contain evidence that any officer applied crushing pressure to [decedent's] back or neck as he lay prone… The officers' conduct underlying [plaintiffs] claims did not deprive [decedent] of a constitutional right. Consequently, [plaintiff] was not entitled to recover damages from the arresting officers under 42 U.S.C. § 1983 and the district court correctly granted summary judgment to the defendants.

*Tatum* at 1097-1100; *see also Henderson v. City of San Diego*, 2019 WL 11684755, at *11 (S.D. Cal. 2010) (*Tatum* compelled a finding "that the Defendant officers acted reasonably in light of the circumstances and did not use excessive force in violation of the Fourth Amendment" by "handcuffing Decedent in response to his aggressive posture and 911 domestic violence phone call, bringing him to the floor in a prone position, and applying (albeit unsuccessfully) maximum restraint[s], all while Decedent continued to struggle, kick and yell profanity with some brief pauses to ask for what while, undisputedly threatening the safety of the officers."); *Goldsmith v. Snohomish County*, 558 F. Supp. 2d 1140, 1151-53 (W.D. Wash. 2008) (use of handcuffs, tasers, punches, pain-compliance techniques, body weight, and hobble restraints to control a man who apparently had a panic attack at home held "objectively reasonable and therefore constitutional.").

> 2. <u>No Prior Precedent Holds that the Phoenix Officers' Uses of Force Were Unlawful Under These Circumstances and, Therefore, They Did Not Violate "Clearly Established Law"</u>

The Phoenix Officers' use of partial body weight on Muhaymin's extremities and the application of less than maximum restraints under the totality of the circumstances presented here is **not** a violation of "clearly established law." It is not the Phoenix Officers' burden to demonstrate to the Court that what transpired fits squarely within the facts of particular case where qualified immunity was granted – although it is respectfully submitted that the Phoenix Officers have provided such authority with the qualified

immunity cases cited *supra*. Rather, it is Plaintiff's burden to demonstrate to this Court with citation to "clearly established law" (i.e., binding precedent that existed **prior to** January 4, 2017) that the actions taken by the Phoenix Officers had been previously recognized as clearly unlawful and unconstitutional.

Under the totality of the facts and circumstances of this case, and applying an objective reasonableness standard, the Phoenix Officers' actions did not violate any clearly established law. For this reason, the Phoenix Officers are entitled to qualified immunity and summary judgment on all of Plaintiff's claims pursuant to federal law under § 1983.

## C. Plaintiff's Claim for Failure to Intervene Fails as a Matter of Law

Plaintiff's claim that the Phoenix Officers are liable for an alleged failure to intervene (Count II) should likewise be dismissed because the arrest was not "unjustifiable" and "excessive force" was not utilized, both of which are essential elements of that claim. "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994) (citations omitted).

Plaintiff's expert, Mr. DeFoe, conceded if no excessive or unreasonable force was used, there is no duty to intervene. **SOF ¶82.** Accordingly, because there was no excessive or unreasonable force, Plaintiff's claim for failure to intervene fails and must be dismissed.

## D. Plaintiff's Claim under the ADA Fails as a Matter of Fact and Law

Count III of the Amended Complaint asserts a claim under the Americans with Disabilities Act ("ADA"). The factual premise for Plaintiff's ADA claim[34] is that Muhaymin was allegedly denied access to the Center because of his "service dog," a

---

[34] The same applies to Plaintiff's claim under Arizonans with Disability Act ("AzDA").

Chihuahua named "Chiquita." **SOF ¶83.** Yet, Plaintiff has no evidence that Muhaymin was, in fact, deemed disabled. That alone is dispositive of this claim. Moreover, even assuming *arguendo* that Muhaymin had a recognized disability under the ADA, Chiquita was not a "service animal" as defined.

A "service animal" is specifically defined as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. § 35.104. The dog must be specifically trained to perform certain tasks for the benefit of the person with the disability. *Id.* Emotional support, therapy or comfort animals are not considered service animals. *Id.*; *see also* A.R.S. § 11-11024(A).

In this case, there is no evidence that Chiquita is a "service animal" as defined by law. In fact, Chiquita was unregistered, unlicensed and had no vaccinations, including for rabies. **SOF ¶3-4.** Moreover, Plaintiff's expert, Mr. DeFoe, testified that he was aware of no evidence to show that Chiquita was a "service animal" and, instead, merely based that erroneous conclusion on what Muhaymin said to the officers. **SOF ¶84.**

Finally, even if Muhaymin had a recognized disability (which there is no evidence) and Chiquita was a "service animal" as defined under law (which she was not), the Center was fully within its legal rights to exclude an unleashed and uncontrolled dog from entry. Pursuant to 28 C.F.R. 35.136(b) and A.R.S. §11-1024(B), a service animal must be leashed (absent extraordinary circumstances) and the handler must have effective control of the animal. In this case, the Center's reluctance to allow entry was because Chiquita was unleashed. **SOF ¶2, 5-6, 8.** As noted above, not only was the dog unleashed, Chiquita had no vaccinations and was unlicensed. Furthermore, in the Center's prior encounters with Chiquita, the dog was known to be aggressive and had actually attempted to bite staff

members.  **SOF ¶5.** For these reasons, Count III (ADA) of the Amended Complaint should be summarily dismissed with prejudice.[35]

### E. Because Dismissal of Plaintiff's § 1983 and ADA Claims Disposes of Federal Question Jurisdiction, the Court Should Deny Supplemental Jurisdiction Over Plaintiff's State Law Claims

"[A] district court has discretion to elect not to exercise supplemental jurisdiction over state claims if it has dismissed the federal claims over which it had original jurisdiction." *Brown v. Lucky Stores, Inc.*, 246 F. 3d 1182, 1189 (2001) (citing 28 U.S.C. § 1367(c)(3)). And "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-- judicial economy, convenience, fairness, and comity-- will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 at fn. 7 (1988).

Here, the Court's jurisdiction in this matter is derived from federal questions presented with respect to Plaintiff's causes of action under §1983 and the ADA.  But because the Phoenix Officers are entitled to qualified immunity on all of the § 1983 claims, and the ADA claim fails, the Court's federal question jurisdiction is dissolved. Accordingly, it is respectfully submitted this Court should decline to continue exercising supplemental jurisdiction over Plaintiffs' state law claims against the Phoenix Defendants.

### F. The Evidence Does Not Support the Phoenix Officers' Liability under Arizona Law

In the event that the Court retains supplemental jurisdiction of Plaintiff's state law claims, summary judgment is also warranted on those claims for reasons set forth below.

1. The Phoenix Officers have Immunity under Arizona law

In Arizona, A.R.S. § 13-409 provides a justification defense for law enforcement officers who use physical force in making an arrest:

---

[35] Plaintiff's state law discrimination claim (Count XIII) also should be dismissed.

A person is justified in threatening or using physical force against another if in making or assisting in making an arrest or detention or in preventing or assisting in preventing the escape after arrest or detention of that other person, such person uses or threatens to use physical force and all of the following exist:

1. A reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape.

2. Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.

3. A reasonable person would believe the arrest or detention to be lawful.

If the officer's use of force is justified under §13-409, the officer is **immune** from any civil liability pursuant to A.R.S. § 13-413.  Civil liability cannot be imposed on a law enforcement officer for "engaging in [justified] conduct" and this immunity applies "**regardless of the theory of recovery.**" *Ryan v. Napier*, 245 Ariz. 54, 63, 425 P.3d 230, 236 (2018), *citing* A.R.S. § 13-413.

The Phoenix Officers' decision to arrest Muhaymin on a warrant was lawful. Once Muhaymin resisted arrest, the Phoenix Officers needed to use force to effect the arrest.[36] It is further undisputed that the Phoenix Officers continuously pleaded with Muhaymin to "stop resisting." Accordingly, the Phoenix Officers' conduct was justified pursuant to A.R.S. § 13-409 and the Phoenix Officers are immune from civil liability on all claims, regardless of the theory of recovery pursuant to A.R.S. § 13-413.  *Id.*

In addition, the Phoenix Officers' conduct was justified pursuant to A.R.S. § 12-716.  The statute provides, specifically, as follows:

A. If the court finds by a preponderance of the evidence that a plaintiff is harmed while the plaintiff is attempting to commit, committing or fleeing after having committed or attempted to commit a felony criminal act or if a person intentionally or knowingly caused temporary but substantial disfigurement or temporary but substantial impairment of any body organ

---

[36] Plaintiff's expert, Mr. DeFoe testified that Muhaymin physically resisted the Phoenix Officers' attempts to detain him. **SOF ¶75.**

or part or a fracture of any body part of another person, the following presumptions apply to any civil liability action or claim:

1. A victim or peace officer is presumed to be acting reasonably if the victim or peace officer threatens to use or uses physical force or deadly physical force or a police tool product to either:

   (a) Protect himself or another person against another person's use or attempted use of physical force or deadly physical force.

   (b) Effect an arrest or prevent or assist in preventing a plaintiff's escape.

2. This state or a political subdivision of this state is presumed to have reasonably hired and trained its peace officers to use physical force or deadly physical force if a peace officer threatens to use or uses physical force or deadly physical force to either:

   (a) Protect himself or another person against another person's use or attempted use of physical force or deadly physical force.

   (b) Effect an arrest or prevent or assist in preventing a plaintiff's escape.

B. If a party files a motion to dismiss or a motion for summary judgment pursuant to this section and the court grants the motion, the court shall award the moving party costs and attorney fees.

C. For the purposes of this section:

1. "Costs" means all costs that are reasonably incurred in connection with the motion, including filing fees, record preparation and document copying fees, time away from employment, expert witness fees, travel expenses and any other costs that the court deems appropriate.

2. "Plaintiff" includes the heir or estate of a deceased person who was attempting to commit, committing or fleeing after having committed or attempting to commit a felony or misdemeanor criminal act or was under the influence of an intoxicating liquor or a drug.

3. "Police tool product" means any weapon, safety equipment or product that is used by law enforcement.

As detailed previously, Muhaymin's arrest was indisputably lawful. There is also no question that Muhaymin was engaged in the commission of a felony by resisting a lawful arrest and that Muhaymin was intoxicated on drugs with over five (5) times the fatal level of

methamphetamine in his system.[37] **SOF ¶68.** The Phoenix Officers' use of force was in response to Muhaymin's resistance of a lawful arrest, while under the influence of drugs.

Pursuant to A.R.S. § 13-409, the Phoenix Officers' physical contact with Muhaymin was justified as a matter of Arizona law. Pursuant to A.R.S. § 13-413, the Phoenix Officers are immune from any civil liability arising out of that physical contact with Muhaymin, regardless of the legal theory. Moreover, pursuant to A.R.S. § 12-716(A), Muhaymin's death occurred during his commission of a felony and, as a matter of law, the Phoenix Officers are "presumed to have [been] reasonably hired and trained" and are "presumed to have acted reasonably" under these circumstances. *See Ryan*, 245 Ariz. at 62-63, 425 P. 3d at 238-39.

For these reasons, all of Plaintiff's claims against the Phoenix Officers based on Arizona law (Counts VII, VIII, IX, X, XI, XII, XIII and XIV) should be dismissed.

2. Plaintiff's Claims Based in Negligence Fail as a Matter of Law

In addition to immunity under A.R.S. § 13-413, which is dispositive of all Plaintiff's state law claims, Plaintiff's negligence claims also fail because Arizona does not recognize claims for negligent use of intentionally inflicted force. *Ryan*, 245 Ariz. at 59–60, 425 P.3d at 235–36 (emphasis added). "Negligence ... claims differ from intentional tort claims… each has different elements and different requirements of proof." *Wells Fargo Bank v. Ariz. Laborers, Local No. 395 Pension Tr. Fund*, 201 Ariz. 474, 483, 38 P.3d 12, 21 (2002). The fundamental distinction between negligence and an intentional tort is whether the act was intentional or unintentional, and thus "negligence and intent are mutually exclusive

---

[37] Ariz. Rev. Stat. § 12-711 states: "In any civil action, the finder of fact may find the defendant not liable if the defendant proves that the claimant or, if the claimant is an heir or the estate of a deceased person, ***the decedent was under the influence of an intoxicating liquor or a drug*** and as a result of that influence the claimant or decedent was at least fifty percent responsible for the accident or event that caused the claimant's or decedent's harm." *See also Franklin v. Clemett*, 240 Ariz. 587, 382 P.3d 802 (App. 2016) (emphasis added).

grounds for liability." *Ryan*, 245 Ariz. at 60, 425 P.3d at 235–36 (emphasis added). "It follows that if a defendant acts with the intent to cause a harmful or offensive touching (battery), that same act cannot constitute negligence." *Id.* (emphasis added).

In this case, the entire factual basis for the Amended Complaint (including negligence claims) is premised on intentional actions taken by the Phoenix Officers to effect the arrest of Muhaymin. Similar to the scenario in *Ryan*, this is tantamount to the difference between the police officer inadvertently dropping the leash of the K-9 attack dog or intentionally releasing that K-9 dog to attack. *Id.* at 63-64, 425 P. 3d at 239-40.

As set forth in *Ryan*, negligence and intentional tort claims are mutually exclusive. *Id.* at 60, 425 P. 3d at 236. As such, Plaintiff cannot simultaneously claim that the Phoenix Officers' use of force was both intentional and negligent. *Id.* Accordingly, Plaintiff's claims based in negligence fail as a matter of law because the factual basis for these claims is premised on intentional acts, not unintentional acts. For these reasons, all of Plaintiff's causes of action based in negligence should be dismissed, i.e., Count XI (Negligence), XII (Gross Negligence), Count XIV (Negligent Hiring, Supervision and/or Training)[38] and Count X (Negligent Infliction of Emotional Distress).

### 3. Plaintiff's Infliction of Emotional Distress Claims Fail

In addition to immunity under A.R.S. § 13-413, Plaintiff's claims for infliction of emotional distress also fail because neither Plaintiff, nor Muhaymin's children, were physically present to witness the arrest. The tort of intentional infliction of emotional distress requires a plaintiff to prove: (1) the conduct by the defendant was "extreme" and "outrageous;" (2) "the defendant either intend[s] to cause emotional distress or recklessly disregard[s] the near certainty that such distress will result from his conduct;" and (3)

---

[38] This claim also fails because an employer cannot be held liable under that theory if the underlying negligence claim against the employee fails. *Mulhern v. City of Scottsdale*, 165 Ariz. 395, 398, 799 P.2d 15, 18 (App. 1990).

"severe emotional distress occur[s] as a result of defendant's conduct." *McKee v. State*, 241 Ariz. 377, 383–84, ¶ 25, 388 P.3d 14, 20–21 (App. 2016), *quoting Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987); *Cont'l Life & Acc. Co. v. Songer*, 124 Ariz. 294, 304–05, 603 P.2d 921, 931-32 (App. 1979).

For a plaintiff to recover for intentional infliction of emotional distress arising from death or injury to a family member, the plaintiff must allege she was **present** at the time of the extreme and outrageous conduct. *Id.* (emphasis added), *citing* RESTATEMENT (SECOND) OF TORTS § 46(2) & **21 *384 cmt. l (limiting liability for intentional infliction of emotional distress to plaintiffs that are present at the time of the conduct "as distinguished from those who discover later what has occurred"); *see also Ford v. Revlon*, 153 Ariz. at 43, 734 P.2d 580, 585 (stating that Arizona follows the elements set out in Restatement (Second) of Torts).

In this case, neither Plaintiff nor Muhaymin's children were physically present to witness the allegedly "extreme" and "outrageous" conduct. This is an essential element to any claim for Intentional Infliction of Emotional Distress (Count IX). It is also an essential element to a claim for Negligent Infliction of Emotional Distress (Count X).[39]

4.  There is No Evidence to Support Award of Compensatory Damages

Even if the Court finds that Plaintiff's state-based claims are not subject to summary dismissal for reasons set forth above, Plaintiff has presented no evidence to support an award of compensatory damages.

A wrongful-death claim is "an original and distinct claim for the damages sustained by named statutory beneficiaries; [i]t is not derived from nor is it a continuation of claims

---

[39] A claim for negligent infliction of emotional distress based upon an injury/death to a closely related person requires that the plaintiff actually "witness the injury" and "be within the zone of danger" so as to be subject to an unreasonable risk of bodily harm. *Guerra v. State*, 237 Ariz. 183, 186, ¶ 12, 348 P.3d 423, 426 (2015), *quoting Villareal v. Ariz. Dep't of Transp.*, 160 Ariz. 474, 481, 774 P.2d 213, 220 (1989).

which formerly existed in a decedent." *Duenas v. Life Care Centers of Am., Inc.*, 236 Ariz. 130, 138, ¶ 25, 336 P.3d 763, 771 (App. 2014) *quoting Huebner v. Deuchle*, 109 Ariz. 549, 549–50, 514 P.2d 470, 470–71 (1973). The damages that may be recovered are the beneficiaries', not the decedent's. *Estate of DeCamacho v. La Solana Care & Rehab, Inc.*, 234 Ariz. 18, 24, 316 P.3d 607, 613 (App.2014).

In the context of a wrongful death claim, the trier of fact is asked to "give such damages as it deems fair and just with reference to the injury resulting from the death to the surviving parties who may be entitled to recover." *Vasquez v. State*, 220 Ariz. 304, 310, 206 P.3d 753, 759 (App. 2008), *quoting* A.R.S. § 12–613. Allowable items of injury for which damages may be claimed and recovered "are loss of love, affection, companionship, consortium, personal anguish and suffering." *Id. quoting Mullen v. Posada del Sol Health Care Ctr.*, 169 Ariz. 399, 400, 819 P.2d 985, 986 (App.1991).

Plaintiff is Muhaymin's sister and the Personal Representative of Muhaymin's Estate. **SOF ¶85.** As a matter of law, she is merely acting as the Personal Representative and is entitled to no damages in this case. It is only Muhaymin's children who have standing under A.R.S. §12–613 to claim damages such as alleged loss of "love, affection, companionship, consortium." *See Mullen,* 169 Ariz. at 400, 819 P.2d at 986.

In this case, however, there is no evidence to support these damage claims. Plaintiff bears the burden of proof and, despite the length of discovery in this case, has offered no factual support for any alleged damages. In fact, when asked directly to provide the factual basis and all supporting documents for Muhaymin's daughter's claimed damages in this lawsuit, Plaintiff responded that such information was not within Plaintiff's "knowledge" and, moreover, argued that "*[p]ursuant to Arizona law, the only aspect of this case that the statutory plaintiff necessarily establishes for the represented statutory beneficiaries is liability, not their damages.*" **SOF ¶86.** Plaintiff then directed Defendants to the deposition of Muhaymin's daughter for proof of damages but no such proof was offered at

her deposition. In addition, legal counsel appointed to represent Muhaymin's minor daughter has likewise failed to provide any evidence to support damages allegedly sustained by his client as a result of Muhaymin's death.

The unfortunate truth is that the children's relationship with their father ended many years before January 4, 2017. Muhaymin was homeless for many years, spent several years in prison,[40] and was otherwise long estranged from his children. **SOF ¶¶87-89.** Muhaymin's daughter (currently 14 years of age) has spent the majority of her life in foster care due to her father's absence (and her mother's). The last time she lived with Muhaymin was nine (9) years ago, in 2011, for approximately three months. She testified that she rarely, if ever, saw her father from 2011 to the time of his death.[41] **SOF ¶87.** Muhaymin's adult son (currently 27 years of age) did not see his father once in the ten (10) years prior to his death and testified that he had no relationship with his father. **SOF ¶88.**

It is certainly tragic what these children endured in their young lives. However, the loss of their father's love, affection and companionship had occurred for many years prior to his death and for the vast majority of their lives. Any emotional harm suffered by Muhaymin's children occurred long before Muhaymin's death as a result of their father's

---

[40] a) Muhaymin was sentenced to prison on 05/25/2011 for one (1) year, for first degree criminal trespassing, a Class 6 Felony that occurred on 03/20/2010, Maricopa Superior Court, CR2010-115235;

b) Muhaymin was sentenced to prison on 05/25/2011 for one and a half (1.5) years, for aggravated assault, a Class 5 Felony that occurred on 10/09/2010, and he was released from prison on 03/22/2012, Maricopa Superior Court, CR2010-154704;

c) Muhaymin was sentenced to prison on 07/02/2012 for one (1) year, for resisting arrest, a Class 6 Felony that occurred on 05/04/2012, and he was released from prison on 03/14/2013, Maricopa Superior Court, CR2012-123479; and

d) Muhaymin was sentenced to prison on 07/15/2013 for two and half (2.5) years, for dangerous drug violation, a Class 4 Felony that occurred on 04/18/2013, and he was released from prison on 02/03/2016, Maricopa Superior Court, CR2013-417410.

[41] She testified that she spent a few hours with Muhaymin at the park a few days before his death on January 4, 2017. **SOF ¶88.**

absence – which was a direct consequence of his choices and lifestyle. Absent evidence to support an award of compensatory damages, all claims in the Amended Complaint fail on the essential element of damages and should be summarily dismissed.

5.   Any "Claim" for Punitive Damages Should be Dismissed

Plaintiff did not plead a separate claim for punitive damages and it is unclear whether Plaintiff is trying to assert a federal claim or state claim for punitive damages. Phoenix Defendants respectfully request the Court deny Plaintiff's purported claim for punitive damages based on her failure to adequately plead the claim.  To the extent the Court allows Plaintiff to pursue a punitive damage claim, and because Plaintiff requested punitive damages in the "request for relief" portion of the Amended Complaint, Defendants respectfully request that Plaintiff's purported claim be dismissed.

a.   Plaintiff has no punitive damages claim for her state claims.

Public employees acting within the scope of their employment are *immune* from punitive damages claims. A.R.S. § 12-820.04 ("Neither a public entity nor a public employee acting within the scope of his employment is liable for punitive or exemplary damages."). Here, there is no question that the Phoenix Officers were acting within the scope of their employment during the arrest of Muhaymin. In fact, the Amended Complaint specifically alleges that the "acts or omissions were conducted within the scope of the [Phoenix Officers'] official duties or employment" in virtually every claim listed in the Amended Complaint. *See* Dkt. No. 16. Accordingly, the Phoenix Officers are entitled to immunity from punitive damages under Arizona law. A.R.S. § 12-820.04.

b.   There is no evidence to support punitive damages on Plaintiff's federal claims.

Similarly, Plaintiff is not entitled to punitive damages on her federal claims. There is no evidence that any of the Phoenix Defendants acted with an evil motive or intent, or a reckless or callous indifference to the constitutional rights of others. *Davis v. Mason Cty.*, 927 F.2d 1473, 1485 (9th Cir. 1991); *Smith v. Wade*, 461 U.S. 30, 56 (1983). Plaintiff has

not provided any evidence that any of the Phoenix Defendants acted with an evil motive or intent, were motived by spite or ill will, or acted with reckless and callous indifference to constitutional rights that would support any purported claim to punitive damages. Accordingly, to the extent alleged or sought, Phoenix Defendants respectfully request that any alleged punitive damages claim be dismissed.

### G. Plaintiff's Claims Against City of Phoenix are Exclusively Based on Theory of Vicarious Liability

The bulk of this Motion is focused on the Phoenix Officers because it is well settled that the City of Phoenix cannot be held vicariously liable under Plaintiff's federal § 1983 claims. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (there is no *respondeat superior* liability under § 1983); *Jeffers v. Gomez,* 267 F.3d 895, 915 (9th Cir. 2001).

Under § 1983, the City of Phoenix cannot be held vicariously liable for the wrongful acts of its employees. *See Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) ("*Respondeat superior* or vicarious liability will not attach under § 1983."). Rather, municipal liability for any alleged civil rights' violations (a/k/a, a "*Monell*" claim) is limited to specific claims, none of which has been plead in this case.[42] With respect to the ADA claim (and also the AzDA claim), it fails against the City of Phoenix for the same reasons noted herein, i.e., that there is no evidence that Muhaymin had a recognized disability and certainly no evidence that Chiquita was a "service animal" as defined by law.

Finally, with regard to Plaintiff's remaining state law claims based upon Arizona's wrongful death statute, negligence, and intentional torts, all of those counts against the City

---

[42] Plaintiff filed a motion to amend to assert a §1983 "*Monell*" claim, but the Court has not granted the motion. *See* Dkt No. 192. In the event that motion to amend is later granted (and Defendants respectfully submit it is far too late and should be denied), Defendants will request the opportunity to address that claim in a future dispositive motion.

of Phoenix are premised on a theory of vicarious liability for the actions of the Phoenix Officers. Consequently, because the Phoenix Officers are not individually liable on the underlying claims, the claim for *respondeat superior* liability fails against the City of Phoenix. *Mulhern v. City of Scottsdale*, 165 Ariz. 395, 398, 799 P.2d 15, 18 (App. 1990).

## VI. <u>CONCLUSION</u>

The Phoenix Defendants move for Summary Judgment on all of Plaintiff's remaining federal claims under the Amended Complaint and respectfully ask the Court to decline to exercise supplemental jurisdiction of Plaintiff's state law claims. In the event the Court exercises supplemental jurisdiction, the Phoenix Defendants also move for summary judgment on all of Plaintiff's state law claims for reasons set forth herein.

Dated: December 17, 2020.

**O'CONNOR & DYET, P.C.**

By: _/s/ Karen J. Stillwell_
    Daniel J. O'Connor, Jr.
    Karen J. Stillwell
    Travis B. Hill
    *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2020, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court, District of Arizona, using the CM/ECF System. A Notice of Electronic Filing will be served to the following registered participants:

David A. Chami                           Haytham Faraj
PRICE LAW GROUP, APC                     LAW OFFICES OF HAYTHAM FARAJ
8245 N. 85th Way                         1935 W Belmont Ave.
Scottsdale, AZ 85258                      Chicago, IL 60657
*Attorney for Plaintiff*                 *Attorney for Plaintiff*

Brian J. Theut
THEUT, THEUT & THEUT
5150 North 16th Street
Phoenix, AZ 85016
*Guardian Ad Litem and Statutory*
*Representative for A. M.*


By: /s/ Dara J. Wilson