**EXHIBIT 47**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

MUSSALINA MUHAYMIN, as
Personal Representative of
the Estate of Muhammad Abdul
Muhaymin, Jr.,

      Plaintiff,

vs.

CITY OF PHOENIX, an Arizona
municipal corporation;
ANTONIO TARANGO; OFFICER
OSWALD GRENIER; OFFICER KEVIN
MCGOWAN; OFFICER JASON HOBE;
OFFICER RONALDO CANILAO;
OFFICER DAVID HEAD; OFFICER
SUSAN HEIMBINGER; OFFICER
JAMES CLARK; OFFICER DENNIS
LEROUS; OFFICER RYAN NIELSON;
OFFICER STEVEN WONG; and Doe
Supervisors 1-5,

      Defendants.

Case No. 17-cv-04565
PHX-SMB

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF SCOTT DEFOE

Irvine, California

Friday, October 23, 2020

REPORTED BY: Marlene Apodaca, CSR No. 6579
            Job No. 108055

1  Q  Now, in addition to Mr. Murray's incident
2  report and statement about Mr. Muhaymin's conduct at
3  the hospital, do you recall receiving a document from
4  Maricopa County Animal Care and Control report, where
5  Maricopa Animal Care and Control indicates that that
6  they were contacted on January 4th, 2017?
7  A  No.
8  Q  That would certainly affect your opinion
9  regarding the animal.  Correct?
10  A  Well, it would.  If they were contacted prior
11  to the use of force, it would have.  But at the time in
12  which force was used, they were not at scene.  They
13  should have been contacted before, if they were going to
14  take Mr. Muhaymin into custody, and to coordinate that.
15  Especially the fact that it was a service animal, and
16  especially due to the fact there was apparently some
17  anxiety and obviously mental health conditions that were
18  occurring.  I think their approach to that could have
19  been quite different.
20  Q  Okay.  We're going to break that down a little
21  bit.
22     How do you know that the animal was a service
23  animal?
24  A  Because he said it was.
25  Q  Because Mr. Muhaymin you said that it was a

107

1  service animal?
2  A   Yes.
3  Q   You understand that it was not registered with
4  Maricopa County as an animal.  Correct?
5  A   I don't know that.
6  Q   Do you understand that it was never trained as
7  a service animal?
8  MR. CHAMI:  Object to foundation, misstates,
9  assumes facts not in evidence.
10 THE WITNESS:  Well, I don't know what its
11 training was.  Service animals, depending on the type
12 of illness the person may have, are trained in a
13 variety of different ways.  So sometimes it's just
14 comfort, and sometimes it's formal training, formal K9
15 training, depending on what the person's situation is.
16 BY MS. STILLWELL:
17 Q   And you understand, under the ADA, a comfort
18 animal does not amount to a service animal?
19 MR. CHAMI:  Objection; foundation.
20 THE WITNESS:  They're two different animals,
21 have two different functions as animals.  They may have
22 the same functions; but they are trained differently,
23 yes.
24 BY MS. STILLWELL:
25 Q   And the ADA covers service animals, not

1  comfort animals.  Do you understand that?
2          MR. CHAMI:  Object to foundation.
3          THE WITNESS:  I believe so, yes.
4  BY MS. STILLWELL:
5      Q   Now, contacting Maricopa County Animal Care
6  and Control, you indicated that the officers should
7  have contacted them prior to any use of force.
8          Is that your testimony?
9      A   Well, if they were going to arrest him for the
10 misdemeanor paraphernalia warrant for failure to appear,
11 if they were going to do that for that Mesa warrant,
12 yes, I think that would have been reasonable.
13     Q   Okay.
14     A   That's no different than if you're arresting
15 someone, and they're in the possession of a child.  You
16 contact the Department of Social Services.
17         So I think that yes, if they were going to do
18 that, is to simply de-escalate, let them know that
19 you're going to be taking him into custody, you're going
20 to go ahead and get that animal brought.  You're going
21 to have an Animal Control come and pick up the animal.
22 Or, if he had a friend or relative he could drop the
23 animal off with, that would have been reasonable.
24     Q   And you recall that the officers spoke for
25 several minutes, number one prior to Mr. Muhaymin using

BY MS. STILLWELL:

Q  Now, Mr. DeFoe, you said earlier that no crime had been committed.

You understand Mr. Muhaymin had an active warrant out of the City of Mesa.  Correct?

A  I'm aware of that.  But I meant a crime had been committed as it relates -- not the failure to appear out at Mesa.

I'm talking about on the day of the response, we found out that there was a mutual bump involving Mr. Tarango, and then there was no other crime at the time.  So -- other than the warrant.

Q  And you would agree with me that the warrant provides the basis for an arrest?

A  Sure.  I agree.  I mean, they had a lawful right to take him into custody.  And that's, once again, based on their policy, they opted not to do that, which is the discretion of the officer, and could have gotten supervisor approval, based on the totality of the circumstances.

Q  Now, have you ever, in your experience as a law enforcement officer, have you ever, you know, advised a suspect that you have -- that they have a warrant, and you want to take them into custody, and they run?

```
1    possessing any super, you know, human strength.
2    Especially we know that he was a martial arts expert
3    and pretty -- with extensive experience.  And he never
4    once tried to strike or hurt the officers in any way.
5    BY MS. STILLWELL:
6         Q    But you agree that he physically resisted
7    their attempts to detain him?
8         A    Yes.  Initially, with the dog.  And I think on
9    the ground over there, I can't tell if he was physically
10   resisting.
11            I know that they physically, based on my
12   looking at the video, I believe that the arms were
13   pushed over to the head, in addition to what
14   Officer Grenier stated when they reviewed the body-worn
15   camera, forced the arms over the head, to the front,
16   which I believe is unreasonable.
17        Q    Now back to my original question about
18   Mr. Muhaymin's extreme strength.  And I think you may
19   have said it in your report, too.
20            The officers commented on the extreme strength
21   that he had.  Do you recall that?
22        A    Yes.
23        Q    Okay.  If the officers had told him that
24   instead of, you know, being taken into custody for a
25   warrant, if they told him that, "We're taking you to a
```

150

BY MS. STILLWELL:

Q   By reminding the person, "Stop resisting"?

A   If they're resisting, yes.

Q   Okay. Now, in your opinion number three, you opine -- and I think we touched base on this -- but you opine and even underline that he did not commit a crime that necessitated detention or arrest.

And you base that opinion on trespass. Correct?

A   Or assault. Everything but the warrant. Take the warrant out of the equation, there is no crime.

Q   So in your opinion, you go through the trespass statute. Correct?

A   I do.

Q   And Mr. Muhaymin was not arrested for trespass. Right?

A   He was not.

Q   And he was not arrested for assault. Correct?

A   No. He died at the scene. He wasn't arrested for anything.

Q   He was being arrested, though. He was being detained for a warrant. Correct?

A   Yes.

Q   Okay. You do not mention Mr. Muhaymin's warrant in this opinion, though.

1    Q    Okay. And in your opinion, it says: "It is
2 my opinion that the Basic Physiology of a Struggle is
3 applicable in this matter."
4         Did I read that correctly?
5    A    Yes.
6    Q    And you have -- that is the 1995 publication
7 by the U.S. Department of Justice?
8    A    Yes.
9    Q    And you'd agree with me that that publication
10 now, now, in 1995, that it's 25 years old. Correct?
11   A    Yes. It's 25 years old.
12   Q    And there have been several additional studies
13 and/or articles or publications regarding asphyxiation
14 and struggles and detaining individuals. Correct?
15   A    There have been.
16   Q    Now, on page 2 of the Basic Physiology of a
17 Struggle, do you see how it provides the advisory
18 guidelines for care of subdued subjects?
19   A    Yes.
20   Q    And it says in there, in the first paragraph:
21 "Where possible, avoid the use of maximally prone
22 restraint techniques (e.g., hogtying)."
23        Do you see that?
24   A    Yes.
25   Q    Now, it's not your testimony or your opinion

1  that Mr. Muhaymin was hogtied. Correct?
2       A    That's correct.
3       Q    And it also says: "As soon as the subject --"
4  and I'll direct your attention to the second column, at
5  the top. "As soon as the subject is handcuffed, get
6  him off his stomach."
7            Did I read that right?
8       A    You did.
9       Q    Now, we agree that the -- when the second
10 struggle occurred, you've already told me that it's
11 safer for a suspect to have his arms handcuffed behind
12 his back. Correct?
13      A    Typically, yes.
14      Q    And it's safer for everybody, for the officers
15 as well. Correct?
16      A    Yes.
17      Q    And so when Mr. Muhaymin was now with his arms
18 in front, and had pushed off the vehicle, he needed to
19 be re-cuffed, to be appropriately handcuffed. Correct?
20           MR. CHAMI: Objection; misstates the evidence,
21 and it's testifying. Move to strike.
22           THE WITNESS: Yes. Possibly, you need to --
23 you should try to adjust those handcuffs, if possible,
24 depending on the subject's actions.
25           ///

190

1  the officers that were present, on the back, holding
2  the legs, on the neck, on the head, during the time in
3  which until he went unconscious.
4  BY MS. STILLWELL:
5      Q    Not one officer maintained a specific position
6  for more than a few minutes.  Correct?
7          MR. CHAMI:  Objection; misstates the evidence.
8          THE WITNESS:  I didn't time, other than the
9  fact that what the officers testified to as to where
10 and what each other individual officer did when they
11 arrived, what their observations were, as well as what
12 their own observations were and their testimony in
13 their depositions.
14 BY MS. STILLWELL:
15     Q    In rendering your opinion number six, you did
16 not time or quantify the length of any application of
17 body weight?
18     A    Just the body weight in itself, the entire
19 time.  It was hard to tell, you know, how long, you
20 know, someone's knee was on the neck, how long the
21 weight was on his shoulders, how long the weight was --
22 but there was continuous weight, as you can see on the
23 body-worn camera, the entire time.
24         And it coincides with what the officers were
25 saying as well, as they arrived.  There were still three

1   to four officers holding him down. Right? So there
2   was -- that was -- and his head was pinned down to the
3   ground by his dreadlocks, and there was body weight and
4   force holding him down, and coupled with the fact that,
5   you know, specifically when Officer Grenier said "yes,
6   he was pinned", was a clue to me that that he was pinned
7   to the ground during the entire time preceding his
8   death.
9       Q    You do not know -- back to my original
10  question, you do not know how long any one officer was
11  in a position. Correct?
12      A    No. Just that they were all on top of him.
13  And it coincides with Grenier's statement at his
14  interview actually, on 1/4/17.
15      Q    You do not know how much body weight was
16  applied to any specific area. Correct?
17      A    There is -- no one can be able to determine how
18  much body weight some of the officers, other than the
19  fact that, you know, the end result was that he vomited
20  and passed away.
21      Q    Have you had anyone die in your custody?
22      A    People that I've shot, yes.
23      Q    Any others?
24      A    No.
25      Q    When a suspect says that they can't breathe,

1  Q    Now, I know you claim later on in one of the
2  opinions that the officers' actions amounted to deadly
3  force.  I just need a better understanding of how you
4  reached that conclusion.
5       Clearly, just because someone dies in police
6  custody, it doesn't mean that anything ill happened.
7  There wasn't any wrongdoing.  Correct?
8       MR. CHAMI:  Object to form, foundation.
9       THE WITNESS:  At times, yes.
10 BY MS. STILLWELL:
11 Q    I mean, a person can die in police custody
12 without anyone's involvement.  Correct?
13 A    They can commit suicide.  They can do a number
14 of things.
15 Q    And it can be a heart attack, where someone is
16 being put into handcuffs in police custody.  Correct?
17 A    It can.
18 Q    And you already indicated that, in your
19 experience as an officer, the people who have died in
20 custody at your hands was because of a shooting.  Is
21 that right?
22 A    Shootings, yes.
23 Q    And I think we talked about this earlier.  In
24 your years of experience, you have had individuals who
25 didn't want to be arrested or who tried to run and

203

1  evade?
2  A  Yes.
3  Q  And so you've had to use your body weight to
4  adjust and get the handcuffs secured. Correct?
5  A  Yes. I mean, most people in a prone position
6  have to use some type of force to get someone
7  handcuffed.
8  Q  So that's not abnormal. That's within policy.
9  That's something you guys are trained on?
10  A  Well, it depends. You say "policy".
11     It has to be, if you look at the effective
12  handcuffing technique, it doesn't mean you have to lay
13  on the back or put knees in the back.
14     You just simply handcuff the hands, put them in
15  a seated or standing or recumbent position, after doing
16  that.
17  Q  What happens if they physically resist?
18  A  You use reasonable force to overcome their
19  resistance.
20  Q  In response to the resistance that is shown?
21  A  Correct.
22  Q  Now, what officers do you claim used deadly
23  force? Because you identified them as defendants.
24  A  Yes.
25  Q  Which ones?

leg by the torso, by the upper thigh area, then possibly.

Q    But that wouldn't restrict anybody's breathing, by holding down an arm or a hand?

MR. CHAMI:    Object to form.

BY MS. STILLWELL:

Q    Or an ankle.  Correct?

MR. CHAMI:    Object to form, improper expert testimony.

THE WITNESS:    People are attempting to breathe, and they're trying to create space between the ground and their body, is they're going to try to move their legs and whatnot, to try to grab, you know, get whatever air they can into their lugs.

So once again, by holding down their legs in the torso area, in the waist and the legs area could prevent or restrict them from doing that.

BY MS. STILLWELL:

Q    How long do you believe -- did you quantify how long Mr. Muhaymin was on his stomach?

A    No.

Q    So you don't know how long he was in a prone position?

A    Ultimately, I do not.

Q    And is it your opinion that Mr. Muhaymin had

1  Q   Okay. And I'm going to move to strike the
2  entire answer.
3      My question was: If there is no -- if the
4  force was reasonable, then there is no duty to
5  intervene. Correct?
6      MR. CHAMI: Object to the form.
7      THE WITNESS: Well, if the force is
8  reasonable, yes.
9  BY MS. STILLWELL:
10 Q   Okay. In opinion number eight, you opine that
11 there was a failure to provide training on seven
12 different areas. The first is proper response and
13 interaction with mentally ill, working as a team,
14 verbal strategies, active listening skills, crisis
15 intervention training, defusing and de-escalation
16 techniques, and positional asphyxia.
17     Is that right?
18 A   Yes.
19 Q   Now, you would agree with me that -- you've
20 received all the training records for each of the ten
21 police officers. Correct?
22 A   Yes.
23 Q   And I'm sure, in your experience, when you
24 have the training records, the description of the
25 training is summarized in just a few words. Is that