David A. Chami, AZ #027585
PRICE LAW GROUP, APC
8245 N. 85th Way
Scottsdale, AZ 85258
T: (818) 600-5515
F: (818) 600-5415
david@pricelawgroup.com

Haytham Faraj
LAW OFFICES OF HAYTHAM FARAJ
1935 W Belmont Ave.
Chicago, IL 60657
T: (312) 635-0800
F: (202) 280-1039
haytham@farajlaw.com
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Mussalina Muhaymin as Personal Representative of the Estate of Muhammad Abdul Muhaymin Jr., <br><br> Plaintiff, <br><br> v. <br><br> City of Phoenix, an Arizona Municipal Corporation, *et al.*, <br><br> Defendants. | Case No.: CV-17-04565-PHX-SMB <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br><br> Assigned to Honorable Susan M. Brnovich |

Plaintiff, Mussalina Muhaymin ("Plaintiff" or "Ms. Muhaymin"), through undersigned counsel, hereby submits her Opposition to Defendants' City of Phoenix ("City of Phoenix"), Antonio Tarango ("Tarango"), Officer Oswald Grenier, Officer Kevin McGowan, Officer Jason Hobel, Officer Ronaldo Canilao, Officer David Head, Officer Susan Heimbigner, Officer James Clark, Officer Dennis Leroux, Officer Ryan Nielsen and Sergeant Steven Wong's ("Defendant Officers") (together as "Defendants") Motion for Summary Judgment.

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

II.  FACTUAL BACKGROUND ............................................................................. 1

III. LEGAL STANDARD ........................................................................................ 10

IV.  ARGUMENT ..................................................................................................... 10

   A.  Defendants Are Not Entitled To Qualified Immunity ....................................... 10

      1.  Applicable Standard For Resolving Qualified Immunity At Summary Judgment ...................................................................................... 11

      2.  The Facts Of The Case, Taken In The Light Most Favorable To Plaintiff, Support A Reasonable Finding That The Defendant Officers' Conduct Violated Muhaymin's Fourth Amendment Rights .................. 11

      3.  Plaintiff May Present Evidence To The Jury That Each Defendant Officer Was An Integral Participant In The Violation Of His 4th Amendment Rights ................................................................................. 20

      4.  At The Time Of The Defendant Officers' Violation, Muhaymin's Rights Were Clearly Established Constitutional Rights Of Which A Reasonable Person Would Know ........................................................... 21

   B.  PLAINTIFF'S CLAIM FOR FAILURE TO INTERVENE SURVIVES SUMMARY JUDGMENT ................................................................................. 29

   C.  PLAINTIFF'S AMERICANS WITH DISABILITIES ACT CLAIM SURVIVES SUMMARY JUDGMENT ............................................................ 30

   D.  PLAINTIFF'S ARIZONA STATE LAW CLAIMS SURVIVE SUMMARY JUDGMENT ................................................................................. 34

      1.  The Defendant Officers Are Not Entitled To Immunity ....................... 34

      2.  Plaintiff Is Entitled To Present Alternative Theories Of Liability .......... 37

      3.  Testimony Regarding Damages Are To Be Weighed By The Jury ........ 38

      4.  Plaintiff's Claim for Punitive Damages Under Federal Law Survives Summary Judgment ................................................................. 39

      5.  Plaintiff's State Law Claims Against The City Of Phoenix Survive ...... 40

V.   CONCLUSION .................................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**

*Abdi v. Lovell*,
  No. CV-08-0321-PHX-GMS, 2009 WL 976503 (D. Ariz. Apr. 9, 2009) .................... 38

*Abston v. City of Merced*,
  506 Fed.Appx. 650 (9th Cir. 2013) ......................................................... 24

*Andrich v. Kostas*,
  470 F. Supp. 3d 1048 (D. Ariz. 2020) ................................................. 17, 18

*Arce v. Blackwell*, 294 F. App'x 259 (9th Cir. 2008) ......................... 14, 22

*Ashcroft v. al–Kidd*,
  563 U.S. 731, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ............................. 21

*Bodett v. CoxCom, Inc.*,
  366 F.3d 736 (9th Cir. 2004) ............................................................. 34

*Boyd v. Benton Cty.*,
  374 F.3d 773 (9th Cir. 2004) ............................................................. 20

*Bronk v. Ineichen*,
  54 F.3d 425 (7th Cir.1995) ............................................................... 31

*Brosseau v. Haugen*,
  543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) ................................. 28

*Bushell-McIntyre v. City of San Jose*,
  252 F. App'x 810 (9th Cir. 2007) ........................................................ 28

*Chuman v. Wright*,
  76 F.3d 292 (9th Cir.1996) ............................................................... 20

*Cunningham v. Gates*,
  229 F.3d 1271 (9th Cir. 2000), as amended (Oct. 31, 2000) .................................. 21, 30

*Davis v. Ma*,
  848 F. Supp. 2d 1105 (C.D. Cal. 2012), aff'd, 568 F. App'x 488 (9th Cir. 2014) .......... 31

*Deorle v. Rutherford*,
  272 F.3d 1272 (9th Cir. 2001) ............................................................ 12

*Drummond ex rel. Drummond v. City of Anaheim*,
  343 F.3d 1052 (9th Cir. 2003) ....................................................... passim

*Estate of Dunlap*,
  38 Ariz. 525 (Ariz. 1931) ................................................................ 39

*Fernandez v. Virgillo,*
    No. 2:12-CV-02475 JWS, 2014 WL 2930749 (D. Ariz. June 30, 2014), aff'd, 651 F.
    App'x 692 (9th Cir. 2016) ............................................................................................ 30

*Gabales v. Cty. of San Joaquin,*
    No. CIV. S-07-1346LKKDAD, 2009 WL 2923037 (E.D. Cal. Sept. 4, 2009) ............. 29

*Garlick v. Cty. of Kern,*
    167 F. Supp. 3d 1117 (E.D. Cal. 2016) ......................................................................... 20

*Graham v. Connor,*
    490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ................................... 11, 12, 21

*Harper v. Cty. of Merced,*
    No. 118CV00562LJOSKO, 2018 WL 5880786 (E.D. Cal. Nov. 8, 2018) ................... 31

*Hope v. Pelzer,*
    536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ........................................ 11, 26

*Marsall v. City of Portland,*
    No. CV-01-1014-ST, 2004 WL 1048127 (D. Or. May 7, 2004) .................................. 22

*Mattos v. Agarano,*
    661 F.3d 433 (9th Cir. 2011) .................................................................................. 28, 29

*Miller v. Clark Cty.,*
    340 F.3d 959 (9th Cir. 2003) .................................................................................. 12, 13

*Miller v. Ladd,*
    No. CV 08-05595 NJV, 2010 WL 2867808 (N.D. Cal. July 20, 2010) ................. 31, 32

*Moreno v. Baca,*
    431 F.3d 633 (9th Cir. 2005) ........................................................................................ 21

*Mullenix v. Luna,*
    577 U.S. 7, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015) ............................................ 21, 28

*Paz v. City of Tucson,*
    No. 2 CA-CV 2019-0209, 2020 WL 7488180 (Ariz. Ct. App. Dec. 18, 2020) ............ 35

*Robbins v. United States,*
    No. CIV03-1224PCT-JAT, 2006 WL 359948 (D. Ariz. Feb. 14, 2006) ...................... 38

*Ryan v. Napier,*
    245 Ariz. 54, 425 P.3d 230 (2018) .......................................................................... 35, 37

*Saucier v. Katz,*
    533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ............................................. 11

*Savage v. Boies,*
    77 Ariz. 355, 272 P.2d 349 (1954) .............................................................................. 38

*Scott v. Harris*,
   550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) ............................................. 12

*Smith v. Wade*,
   461 U.S. 30, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983) ......................................... 39, 40

*Sorrels v. McKee*,
   290 F.3d 965 (9th Cir.2002) ...................................................................................... 22

*State ex Rel. Goddard v. DHL Express (Usa), Inc.*,
   No. CV-06-2611-PHX-FJM (D. Ariz. May 8, 2008)................................................. 39

*Tolan v. Cotton*,
   572 U.S. 650, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014) ..................................... 10, 11

*Tucker v. Las Vegas Metro. Police Dep't*,
   470 Fed.Appx. 627 (9th Cir. 2012) ........................................................................... 24

*United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159 (9th
   Cir. 2016).................................................................................................................... 10

*United States v. Place*,
   462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) .............................................. 12

*Wallisa v. City of Hesparia*,
   369 F. Supp. 3d 990 (C.D. Cal. 2019)........................................................................ 22

*Zetwick v. Cty. of Yolo*, 850 F.3d 436 (9th Cir. 2017).......................................... 10, 32

*Zhang v. American Gem Seafoods, Inc.*,
   339 F.3d 1020 (9th Cir. 2003) .................................................................................... 39

**Statutes**

A.R.S. § 12-716 ................................................................................................................ 35

A.R.S. § 12-716(A).......................................................................................................... 36

A.R.S. § 13-2508 ............................................................................................................. 36

A.R.S. § 13-2508(A)(3).................................................................................................... 36

A.R.S. § 13-2508(B)-(C) ................................................................................................. 36

A.R.S. § 13-409 ......................................................................................................... 34, 35

A.R.S. § 13-413 ............................................................................................................... 35

Arizona Civil Rights Act ("ACRA"), A.R.S. § 41-1498, *et seq.* ....................................... 34

**Other Authorities**

235080 dementia praecox, Stedmans Medical Dictionary 235080 .................................... 31

National Criminal Justice Reference Service (NCJRS), U.S. Department of Justice,
National Law Enforcement Technology Center, "Positional Asphyxia-Sudden Death",
https://www.ncjrs.gov/pdffiles/posasph.pdf (last visited Jan 21, 2020) ........................ 26

**Regulations**

28 CFR § 36.104 ............................................................................................................. 31

28 CFR § 36.105(b)(1)(ii) .............................................................................................. 30

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## I.    **INTRODUCTION**

Defendants' Motion for Summary Judgment [doc. 273] ("Motion"), requests that the Court find, as a matter of law, that (1) Defendants did not violate Muhaymin's 4th Amendment rights when they surrounded him and kneeled on his back while he lay prone and helpless, (2) Muhaymin's constitutional right not to asphyxiate under the weight of multiple officers was not "clearly established" at the time of his death, (3) the Defendants' did not violate the ADA when they refused Muhaymin entry to public restrooms because of his service dog, (4) the Defendant Officers are protected from civil liability by Arizona statutory "immunity," (5) Plaintiff is not entitled to present alternative theories of liability to the jury, (6) the loss of a parent does not cause emotional damages if that parent had a mental disability, and (7) Defendants did not act with reckless or callous disregard of Muhaymin's rights. Because Defendants' arguments fail for a multiplicity of factual and legal reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion and allow her to present her claims to the finder of fact.

## II.    **FACTUAL BACKGROUND**

On January 4, 2017, Muhammad Abdul Muhaymin, Jr. ("Muhaymin") entered the Maryvale Community Center ("Center") in Phoenix, Arizona in order to use the restroom. [*Plaintiff's Statement of Facts in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's SOF"), ¶1*]. Muhaymin suffered from Schizophrenia, and he owned a small Chihuahua dog named "Chiquita," trained to assist Muhaymin in alleviating the symptoms of his mental disability. [*Plaintiff's SOF, ¶¶2-3*]. On January 4, 2017, Chiquita accompanied Muhaymin into the Center. [*Plaintiff's SOF, ¶4*]. Defendant Tarango, the Center supervisor, told Muhaymin that he could not bring Chiquita into the Center, and asked Muhaymin to leave. [*Plaintiff's SOF, ¶5*]. Muhaymin told Defendant Tarango that he needed to use the restroom, and that Chiquita was a service dog. [*Plaintiff's SOF, ¶6*]. Defendant Tarango asked Muhaymin to produce Chiquita's "papers." [*Id.*]. Muhaymin told Defendant Tarango that Chiquita's papers had been stolen, along with the dog's collar, but

that Defendant Tarango could check with his counselor and gave Defendant Tarango the name of his mental facility. [*Plaintiff's SOF, ¶7*].

Muhaymin then informed Defendant Tarango that he needed to use the restroom, and attempted to enter the Center's restroom facilities. [*Plaintiff's SOF, ¶8*]. Defendant Tarango stepped in front of Muhaymin initiating a bump between the two of them. [*Id.*]. Defendant Tarango instructed Hannah Glemba ("Ms. Glemba"), a staff member at the Center, to call the police. [*Plaintiff's SOF, ¶9*]. Ms. Glemba did so. [*Id.*]. Ms. Glemba falsely reported that Muhaymin had assaulted Mr. Tarango. [*Defendants' SOF, ¶10; Plaintiff's SODF, ¶10*].

Defendant Officers Grenier, Hobel, Canilao, and Head were the first to arrive at the Center in response to the reported "assault." [*Plaintiff's SOF, ¶10*]. Upon entering the Center, Defendant Officer Grenier approached Defendant Tarango and Muhaymin. [*Plaintiff's SOF, ¶11*]. Defendant Tarango and Muhaymin were standing adjacent to the Center bathroom, approximately five feet apart, and were in discussion about Muhaymin's dog, Chiquita (which Muhaymin was holding). [*Plaintiff's SOF, ¶12*]. Muhaymin greeted Officer Grenier, and informed him that Chiquita was his service dog, and that he wanted to use the restroom. [*Plaintiff's SOF, ¶13*]. Officer Grenier asked to see Chiquita's "paperwork" proving that it was a service dog, and Muhaymin told Officer Grenier that it had been stolen, along with multiple other of his personal items. [*Id.*]. Officer Grenier testified later that Chiquita was entirely restrained while in the Center. [*Plaintiff's SOF, ¶14*].

Muhaymin then (again) asked if he could use the restroom, and Officer Grenier told him that he could not, and instructed him to "hang tight." [*Plaintiff's SOF, ¶15*]. Defendant Tarango and Muhaymin continued to discuss whether Muhaymin should be allowed to bring Chiquita into the Center, with Muhaymin insisting that the Chiquita was his service animal and that he should not be denied the natural need for restroom facilities because he had a service animal. [*Plaintiff's SOF, ¶16*].

Officer Grenier observed Defendant Tarango and Muhaymin's discussion for approximately seven minutes and ten seconds. Suddenly, Officer Hobel walked over from the Center lobby, forcefully interjected himself into the conversation, and threatened to "book" Muhaymin for assault. [*Plaintiff's SOF, ¶17*]. He then asked Defendant Tarango whether Muhaymin assaulted Defendant Tarango. [*Id.*]. Defendant Tarango told Officer Hobel, "No. […] He was trying to get in, and I didn't let him in, so we bumped into each other." [*Id.*]. Defendant Tarango, Officer Hobel, and Muhaymin continued to discuss whether Muhaymin should be allowed to bring Chiquita with him into the Center when Muhaymin needed to use the restroom, and finally, Defendant Tarango and Officer Hobel allowed Muhaymin to use the restroom, after Muhaymin provided his name for identification. [*Plaintiff's SOF, ¶18*].

While Muhaymin was in the restroom, Officer Grenier called in Muhaymin's name with the police dispatch, and was informed that Muhaymin had a misdemeanor warrant in Mesa, AZ. [*Plaintiff's SOF, ¶19*]. Officer Grenier did not verify the warrant with the Mesa Police Department. [*Plaintiff's SOF, ¶20*]. Officer Grenier then told Officer Hobel that Muhaymin had "a Mesa warrant." [*Plaintiff's SOF, ¶21*]. Officer Hobel responded by stating, "Oh, well then let's hook him." [*Id.*]. Officer Grenier asked whether Officer Hobel "want[ed] to take him all the way out to Mesa?" and Officer Hobel responded with, "Yeah, I don't fuckin' care." [*Id.*].

Defendant Officers Grenier, Hobel, and Head discussed how to arrest Muhaymin while waiting for him to finish in the bathroom, deciding to wait until Muhaymin was outside of the Center. [*Plaintiff's SOF, ¶22*]. Officer Hobel then remarked to Officers Grenier, Head, and Canilao that Muhaymin was "a little 918." [*Plaintiff's SOF, ¶23*]. (Officer Hobel testified at his deposition that "918" is "a common phrase" used by police officers to describe "people that are mentally unstable."). [*Plaintiff's SOF, ¶24*].

When Muhaymin exited the restroom and began walking towards the Center exit, Officers Grenier, Hobel, Canilao, and Head fell in behind him. [*Plaintiff's SOF, ¶25*]. Upon

exiting the Center, Officers Grenier and Canilao grabbed Muhaymin, told him to stop walking, and instructed him to put his hands behind his back because he was under arrest. [*Plaintiff's SOF, ¶26*]. Confused, Muhaymin asked why, and the Officers informed him that he had a warrant. All four Officers began putting hands upon Muhaymin's body and telling him to drop Chiquita. [*Plaintiff's SOF, ¶27*]. Muhaymin can be heard on the bodycam footage saying "wait, wait, wait, wait" and asking, "A warrant? For what?" [*Id.*].

Muhaymin informed the Officers that he did not have anyone to watch or take care of Chiquita. [*Plaintiff's SOF, ¶28*]. Muhaymin begged them to call his "sensei" to take care of the dog. [*Plaintiff's SOF, ¶29*]. Ignoring Muhaymin's concerns about Chiquita, Officer Hobel forced a baton under Muhaymin's arm and against Chiquita, applying enough pressure to make Chiquita cry out in pain. [*Plaintiff's SOF, ¶30*]. When Muhaymin refused to drop Chiquita, Officer Hobel asked the other Officers whether they were ready to "take him down." [*Plaintiff's SOF, ¶31*]. Muhaymin said "No. Don't do that. This is my son, sir." [*Id.*]. All four of the Officers grabbed Muhaymin and physically forced him to double over against a glass wall, making him drop Chiquita. [*Plaintiff's SOF, ¶32*].

Muhaymin cried out, "OK!" and yelled out in pain as the four Officers forced him to the ground. [*Plaintiff's SOF, ¶33*]. One of the Officers told Muhaymin, "Now you're gonna be going for a felony now, dumbass. Now it's a felony...". [*Plaintiff's SOF, ¶34*]. During the struggle, Officer Grenier used his elbow to strike Muhaymin in the back. [*Plaintiff's SOF, ¶35*]. The Officers kneeled on Muhaymin while he was laying prone, forcing his arms behind his back and applying handcuffs as he continued to scream and yell. [*Plaintiff's SOF, ¶36*]. The Officers together, and Officer Hobel in particular, continued to apply body weight to Muhaymin while he was prone on the sidewalk for approximately one minute and thirty-one seconds. [*Plaintiff's SOF, ¶37*]. During this time, Officer Hobel placed his knee directly on Muhaymin's head and leaned over his body, placing substantial weight on Muhaymin's head. [*Plaintiff's SOF, ¶38*]. Officer Hobel's knee remained on Muhaymin's head for approximately forty seconds. [*Id.*].

After the handcuffs were applied, Officer Hobel told Muhaymin, "You're misbehavin' bud. You're misbehavin'." [*Plaintiff's SOF, ¶39*]. The Officers then rolled Muhaymin over, lifted him up by his arms, and began marching him towards the Police SUV. [*Plaintiff's SOF, ¶40*]. Muhaymin continued to plead with the Officers, telling them that he considered Chiquita to be his "child" and expressing concern over what was going to happen to the dog. [*Plaintiff's SOF, ¶41*]. About halfway to the Police SUV, the Officers lifted Muhaymin up by his arms (which were cuffed behind his back) and underarms, causing Muhaymin to cry out in pain, and told him, "Stand your ass up." [*Plaintiff's SOF, ¶42*].

Upon arriving at the Police SUV, Officer Hobel said, "Let's search him first," and the Officers physically lifted Muhaymin and shoved him over the hood of the Police SUV. [*Plaintiff's SOF, ¶43*]. When Muhaymin was shoved over the hood of the Police SUV, either Officer Hobel or Officer Canilao forced Muhaymin's arms up, almost perpendicular to the ground (both Officers had their hands on Muhaymin's cuffed arms and wrists), causing Muhaymin to scream. [*Plaintiff's SOF, ¶44*]. Officer Hobel and Officer Canilao forced Muhaymin's cuffed arms even further up his back, over his head, and down the front again, causing Muhaymin to scream, yell out, and finally cry. [*Plaintiff's SOF, ¶45*]. In response to Muhaymin's cries of pain, the Officers told him to "just fucking relax, dumbass." [*Plaintiff's SOF, ¶46*].

When Muhaymin continued to squirm in pain, an Officer instructed the others to take Muhaymin "to the ground." [*Plaintiff's SOF, ¶47*]. As Muhaymin said, "Please stop," the Officers shoved him to the concrete and called for "another unit." [*Plaintiff's SOF, ¶48*]. Muhaymin landed on his side, and the Officers began immediately placing body weight on his torso, attempting to uncuff him and re-cuff his arms behind his back [*Plaintiff's SOF, ¶49*].

While the bodycam footage is unsteady and it is difficult to track the movements of each Defendant Officer throughout the time wherein Muhaymin was laying on the ground, the following movement chronologies are possible to discern:

**Officer Grenier:** At 5:04 of Officer Hobel's Bodycam, Officer Grenier can be seen placing his knee on Muhaymin's upper torso, while Muhaymin is on his side. It remained in that position until 6:10, where Officer Grenier shifted to extend his opposite leg out, exerting substantial body weight onto Muhaymin's shoulder/neck. At 6:59, Officer Grenier again shifted to fully extend his opposite leg, exerting nearly all of his body weight to Muhaymin's neck and head. It is at this point that the video clearly shows Officer Grenier's knee fully on Muhaymin's neck. (Officer Grenier's knee can also be seen to be fully on Muhaymin's neck in Officer Nielson's bodycam footage.) At 7:30 of the Hobel Bodycam video, Officer Grenier actively pushed off of his opposite leg to again add force and weight on Muhaymin. Officer Grenier's knee remained in this position until the Officers rolled Muhaymin from his side to his stomach at 8:36. Combined, the total time wherein Officer Grenier's knee was on Muhaymin's upper torso/neck while Muhaymin was on his side, with no adjustments other than to **increase** pressure, was three minutes and thirty-two seconds. Officer Grenier then immediately put his knee back on Muhaymin's body, where he remained for approximately 39 seconds, until Officer Hobel tells him that Officer Leroux had arrived and to "go get that hobble." This interaction can more clearly be seen by reviewing Officer Aker's bodycam footage, which, at 24:00, shows Officer Grenier being replaced by Officer Leroux, who steps in and places his knee on Muhaymin. Officer Grenier leaves to check his vehicle for a hobble, but does not find one and returns less than a minute later, staying to observe while the other Defendant Officers continue to apply weight to Muhaymin's prone body.

**Officer Head:** After Muhaymin was thrown to the concrete and landed on his side, Officer Head got up, walked around Muhaymin, and laid bodily across Muhaymin's legs. He stayed there until Officer McGowan arrived, applied a hobble to Muhaymin's legs, and lifted

Officer Head off of Muhaymin the rip restraint to Muhaymin's ankles. [*Plaintiff's SOF, ¶50(b)*].

**Officer Hobel:** After Muhaymin was thrown to the ground, Office Hobel placed weight on Muhaymin's lower torso/hips. Officer Hobel remained there for approximately three minutes and six seconds, at which point he moved lower on Muhaymin's body to grasp his pants. Officer Hobel then instructed Officer Heimbigner to place weight on Muhaymin's back, and stood up. Officer Hobel then placed his hands back on Muhaymin's torso and leaned forward over Officer Heimbigner for approximately one minute and four seconds, at which point Officer Heimbigner stood back up. Officer Hobel remained on Muhaymin's torso, applying weight, until Muhaymin vomited. [*Plaintiff's SOF, ¶50(c)*].

**Officer Nielson:** After Muhaymin was thrown to the ground, and after Officer Head moved around to lay across Muhaymin's legs, Officer Nielson arrived, running from the direction of the Center. At 0:10-0:12 of his bodycam footage, Officer Nielson walked around Muhaymin to the opposite side. At 0:20, Officer Nielson grasped Muhaymin's arm, which was trapped under Muhaymin's side. At 0:30-0:31, Officer Nielson handed off Muhaymin's arm to Officer Grenier. At 0:53-1:22, Officer Nielson removed the cuffs from Muhaymin's hands while instructing an unidentified Defendant Officer to step on Muhaymin's wrists "as hard as you can there, ok…" At 1:35-1:45, Officer Nielson helped an unidentified Defendant Officer pull Muhaymin's arm behind his back, while other Defendant Officers continued to apply weight to Muhaymin's upper torso. At 1:54, Officer Nielson grabbed the back of Muhaymin's head/hair. Officer Nielson continued to hold Muhaymin's head until approximately 3:33 (after Muhaymin had vomited), when he moved his hand to Muhaymin's upper back. At 3:45-4:09, Officer Nielson stood up and walked away. [*Plaintiff's SOF, ¶50(d)*].

**Officer Heimbigner:** Officer Heimbigner arrived at approximately 7:34 of Officer Hobel's bodycam footage, asking, "What do you need guys? At 7:37 Officer Hobel told her to "hold right there," indicating Muhaymin's upper torso. At 7:38, Officer Heimbigner placed her

right hand upon Muhaymin's upper torso. At 7:44-7:46, Officer Heimbigner placed her left forearm across Muhaymin's lower back and proceeded to lay on top of him. Officer Heimbigner remained in this position until Muhaymin was rolled over at 8:36. Combined, the total time wherein Officer Heimbigner's body weight was on Muhaymin's mid/lower back with no adjustments was fifty-two second. [*Plaintiff's SOF, ¶50(e)*].

**Officer McGowan:** Officer McGowan arrived after Muhaymin had been thrown to the ground, running from the direction of the Center and applying a hobble to Muhaymin's legs, and then pulling Officer Head off of Muhaymin. After applying the hobble, Officer McGowan grabbed Muhaymin's arm and pulled it behind Muhaymin's back. [*Plaintiff's SOF, ¶50(f)*].

**Officer Leroux:** Officer Leroux arrived after Muhaymin had been turned to his stomach. He then kneeled down on Muhaymin's torso, replacing Officer Grenier. He remained there for approximately thirty-nine seconds and shifted from his knee to his side, still applying weight to Muhaymin's torso. He shifted his weight again at 24:57, and maintained weight on Muhaymin's upper back/neck with his knee while Muhaymin's hands were cuffed. [*Plaintiff's SOF, ¶50(g)*]; *Exhibit J, Deposition Transcript of Arizona Smith, Eyewitness ("SMITH DEPO"), 16:8-17.*

**Officer Wong:** At 23:48 of Officer Aker's bodycam footage, Officer Wong was kneeling, watching the other Defendant Officers apply force to Muhaymin as he is laying prone on the ground. At 24:15-24:24, Officer Wong moved around Muhaymin's body to continue watching. At 24:47, Officer Wong knelt down again, this time to place his hands on Muhaymin. At 25:25-30:00, Officer Wong readjusted, and this is the final moment in Officer Aker's bodycam footage where Officer Wong's actions are clearly ascertainable until 26:34, after Muhaymin has vomited and the Officers are rolling him over. [*Plaintiff's SOF, ¶50(g)*].

*** 

At 23:50-26:48, Officer Aker's bodycam footage provides a general view of multiple Defendant Officers applying substantial body weight onto Muhaymin's torso for an

extended period of time. [*Plaintiff's SOF, ¶51*]. At multiple points in the available bodycam footage while the Defendant Officers were applying pressure to Muhaymin's torso and neck, Muhaymin can be heard screaming out, "I can't breathe!" [*Plaintiff's SOF, ¶52*]. The Defendant Officers ignored Muhaymin and continued to apply body weight, while Muhaymin gasped for air. [*Plaintiff's SOF, ¶53*].

While Muhaymin was face-down, the Defendant Officers removed Muhaymin's handcuffs and forced his arms behind his back. [*Plaintiff's SOF, ¶54*]. At this point, Muhaymin could no longer resist, as Defendant Officers were sitting on his legs, had his arms behind his back, and Officer Nielson was grasping Muhaymin's hair, pulling his head up. [*Id.*]. Muhaymin ceased struggling for air and began to moan quietly. [*Plaintiff's SOF, ¶55*]. The Officers continued to apply pressure to Muhaymin's upper torso while they applied handcuffs. [*Plaintiff's SOF, ¶56*].

After Muhaymin's arms were securely behind his back and he stopped struggling for air, the Defendant Officers continued to apply weight to his body. [*Plaintiff's SOF, ¶57*]. From the moment when Muhaymin went completely limp and began moaning incoherently to when the Defendant Officers removed their weight from Muhaymin's prone torso (and the Defendant Officers only moved when Muhaymin vomited) was approximately one minute and sixteen seconds. [*Id.*].

From the moment Muhaymin is thrown to the ground to the moment when he vomits is approximately seven minutes and forty-seven seconds. [*Plaintiff's SOF, ¶58*]. During this period, the **combined** amount of time wherein Muhaymin can be seen to physically move his body on the bodycam footage, struggling to breathe and yelling out, was approximately one minute and twenty-eight seconds. [*Id.*]. The remainder of the time, Muhaymin did not move. [*Id.*]. Therefore, out of the approximately seven minutes and forty-seven seconds that the Defendant Officers were on top of Muhaymin prior to him vomiting, Muhaymin was still for approximately six minutes and nineteen seconds. [*Id.*].

The Officers left Muhaymin face-down in his own vomit for approximately twenty-five seconds before rolling him over and attempting to resuscitate him. [*Plaintiff's SOF, ¶59*]. After the Officers rolled Muhaymin out of his vomit , Officer Nielsen callously said, "Yeah, he's dead" [*Plaintiff's SOF, ¶64*]. Thereafter, Officer Nielson twice told Officer Head that he "knew that was going to happen." [*Id.*]. Officer Head responded by saying, "yeah." [*Id.*].

When the EMT's arrived, one of them can be heard on bodycam footage asking the Defendant Officers, "was he pinned?" and "you guys were on top of him?" to which questions the Defendant Officers answered affirmatively. [*Plaintiff's SOF, ¶60*]. The EMT's checked Muhaymin's throat and noted  vomitus that had collected in his airway. [*Plaintiff's SOF, ¶61*]. Muhaymin did not have a pulse. [*Plaintiff's SOF, ¶61*]. Muhaymin was taken by ambulance to Maryvale Hospital and pronounced deceased at approximately 10:39 a.m. [*Plaintiff's SOF, ¶62*].

Throughout the entirety of his interactions with the Defendant Officers on January 4, 2017, Muhaymin never harmed, or threatened to harm, anyyone. [*Plaintiff's SOF, ¶63*].

**III.   LEGAL STANDARD**

"The standard for summary judgment is familiar: 'Summary judgment is [only] appropriate when, **viewing the evidence in the light most favorable to the nonmoving party**, there is no genuine dispute as to any material fact.'" *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016) (emphasis added). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Zetwick*, 850 F.3d at 441 (further citation omitted). "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)) (further citations omitted).

**IV.   ARGUMENT**
   ***A. Defendants Are Not Entitled To Qualified Immunity***

### 1. Applicable Standard For Resolving Qualified Immunity At Summary Judgment

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, [t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right." *Tolan*, 572 U.S. at 655–56 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (brackets in original). "When a plaintiff alleges excessive force during an […] arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan*, 572 U.S. at 656 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). "The inquiry into whether this right was violated requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tolan*, 572 U.S. at 656 (internal quotation marks omitted) (further citations omitted).

"The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Tolan*, 572 U.S. at 656 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "Governmental actors are shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Tolan*, 572 U.S. at 656 (internal quotation marks omitted) (further citations omitted). "[T]he salient question ... is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged [conduct] was unconstitutional." *Id.* (internal quotation marks omitted) (further citations omitted).

"Courts have discretion to decide the order in which to engage these two prongs. […] But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. *Id.* (further citations omitted).

### 2. The Facts Of The Case, Taken In The Light Most Favorable To Plaintiff, Support A Reasonable Finding That The Defendant Officers' Conduct Violated Muhaymin's Fourth Amendment Rights

"In determining the reasonableness of the manner in which a seizure is effected, '[the court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983). "[F]orce, [even if] less than deadly, is not to be deployed lightly." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003) (further citation omitted) (brackets in original).

Reasonableness is assessed by weighing the type and amount of force used against "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003) (citing *Graham*, 490 U.S. at 396)). Plaintiff first analyzes the three *Graham* factors, and then presents evidence of the unreasonableness of the type and amount of force used against Muhaymin, resulting in his death.

First, there is no reasonable argument that the "crime" at issue was severe. Muhaymin attempted to use the restroom at a community center, was stopped by Defendant Tarango because he had a service dog, and when he tried to walk by Defendant Tarango, Tarango stepped in front of him, initiating contact. [*Plaintiff's SOF, ¶¶8, 17*]. When the Officers arrived, Muhaymin used the restroom. [*Plaintiff's SOF, ¶¶13-18*]. When Muhaymin voluntarily walked out of the Center, the Defendant Officers attempted to arrest Muhaymin on an unverified warrant. [*Plaintiff's SOF, ¶¶19-21, 26-27*].

Defendants attempt to manufacture severity by describing Muhaymin's obvious confusion and fear at the prospect of leaving Chiquita alone with no way of finding her again as extreme resistance, and invent the "fact" that Muhaymin transformed into a Marvel character, resisting with "super-human" strength. *Motion, p. 23-24*. However, without making necessary credibility determinations regarding the Defendant Officers' testimony, this claim is unverifiable (and, worse, unfalsifiable). Even if the Court were to find that

Muhaymin's alleged resistance constituted a "crime" as contemplated by the *Graham* factors, multiple Defendant Officers testified that the resistance was "passive." [*Plaintiff's SODF, ¶26*]. There is no reasonable argument that passive resistance is a "severe crime."[1] In any case, Plaintiff disputes that Muhaymin was resisting *arrest* at any time after Defendant Officers dog-piled on top of him, placed substantial weight on his neck, back, head, and other parts of his body, and caused him to die by asphyxiation, as opined by Dr. Bennet Omalu. [*Plaintiff's SODF, ¶26*].

Second, there is simply no argument that Muhaymin posed a threat to the safety of the Defendant Officers or anyone else. Multiple Officers testified that Muhaymin **never** harmed or threatened to harm the Defendant Officers. [*Plaintiff's SOF, ¶63*]. Nothing in the available bodycam footage supports a finding that Muhaymin was a threat to anyone (*Exhibits 61-73 to Defendants' SOF*), and there is eyewitness testimony that Muhaymin never engaged in any aggressive behavior whatsoever. *See SMITH DEPO, 18:3-17*. Third, as stated above, the parties disagree on whether Muhaymin was "actively" resisting arrest. Plaintiff disputes the same, and her position is supported by the testimony of multiple Defendant Officers describing Muhaymin's resistance as "passive." [*Plaintiff's SODF, ¶26*].

Considering the *Graham* factors together, it is obvious that Muhaymin's action warranted very little in the way of force. At most, he was passively resisting the Officers' attempts to arrest him by tensing his arms and legs at first, but even this did not last long. Upon being thrown to the ground the second time, Muhaymin barely moved, as he was crushed under the weight of more and more Defendant Officers, trying to tell them that he could not breathe. [*Plaintiff's SOF, ¶¶49-58*]. These actions are to be weighed against the type and amount of force used by the Defendants. *Miller*, 340 F.3d at 964. The different

---

[1] See section D(1), below, for analysis of Arizona law regarding resisting arrest.

forces used by Defendants are analyzed in turn below, keeping in mind that Defendants' actions resulted in Muhaymin's death.[2]

i. _Application Of Substantial Weight On Muhaymin's Prone Body_

There exists evidence on the record to support a reasonable finding that Defendant Officers applied significant body weight to Muhaymin's head, neck, and torso for extended periods of time while he lay prone on two separate occasions. First, after knocking Chiquita out of Muhaymin's hands, Officer Hobel knelt directly on Muhaymin's head for approximately one minute and thirty-one seconds. [_Plaintiff's SOF, ¶¶36-37_]. Second, after calling for backup and throwing Muhaymin to the concrete beside the police SUV, multiple Officers placed their knees on Muhaymin's head, neck, shoulders, upper-back, and lower-back. [_Plaintiff's SOF, ¶50-51_]. This force was applied despite actual knowledge that it was restricting Muhaymin's ability to breathe, notice of which was given by Muhaymin's multiple cries for help, gasps for air, and exclamations of "I can't breathe!". [_Plaintiff's SOF, ¶52; Plaintiff's SODF, ¶50_].

As the Ninth Circuit has clearly stated, "keeping an individual who is in a state of excited delirium restrained with his chest to the ground while applying pressure to his back and ignoring pleas that he cannot breathe […] constitute[s] excessive force under the Fourth Amendment." _Arce v. Blackwell_, 294 F. App'x 259, 261 (9th Cir. 2008).

Defendants argue that Muhaymin's cries for help (and resulting notice to the Officers that he could not breathe) were disingenuous by asserting that the Officers "assessed his breathing, observed that he was breathing and there was nothing obstructing his ability to breathe." _Motion, p. 6_. Aside from Defendant testimony, there is absolutely nothing in the record supportive of the assertion that the Officers checked whether or not Muhaymin could breathe. [_Defendants' SOF, ¶50; Plaintiff's SODF, ¶50_]. Beyond being a blatant request that the Court construe the evidence in Defendants' favor, the assertion that "nothing [was]

---

[2] It is an indisputable fact that Muhaymin's death was caused, at least in part, by Defendant Officers' actions. [_Plaintiff's SOF, ¶68_].

obstructing his ability to breathe" is preposterous unless the Court completely disregards the weight of multiple Defendant Officers on Muhaymin's back. [*Plaintiff's SODF, ¶50*].

That Defendants' actions in applying weight to Muhaymin's body were unreasonable is supported by the testimony of Defendants' own expert witnesses. Defendants' police policies expert testified that if an unarmed suspect says he cannot breathe, the officers should check to see if that is true. *Exhibit C, Deposition Transcript of Greg Meyer, Police Procedures Expert Witness for Defendants ("MEYER DEPO")*, 133:7-134:20. Further, Defendants' medical expert testified that Muhaymin's cries of "I can't breathe" could have been signs of a medical emergency involving Muhaymin's heart. [*Plaintiff's SOF, ¶67*]. That no available bodycam footage proves that **any** of the Defendant Officers stopped to check Muhaymin's vitals or assess his actual ability to breathe during the entire ordeal, despite his multiple cries for help, creates a triable issue of fact as to whether Defendants' actions were unreasonable.

Further, Plaintiff's medical experts have testified expressly that the application of weight on Muhaymin's back by Defendant Officers inherently caused increased risk of asphyxiation and death, and in fact resulted in the same.

    A. There is a reason why it is dangerous to place human beings prone on the ground with any amount of pressure on their backs or head or neck or even knees. Because for respiratory activity to function respiration is not just breathing. The chest and abdomen, they need a give. Not just that. The diaphragm itself, they need a give. When you have somebody prone on the ground and apply pressure on the back, it is not just the energy of the pressure, per se. It is also compromised functioning of injury to the nerves in the neck and the head and in the trunk. There is a very vital system of nerves that run [sic] on both sides of the back. It's called a parasympathetic system. They control the heart. They control the blood pressure. And even around the chest and neck there are what we call plexuses, plexuses, and ganglia that control blood pressure, respiratory functioning, and heart function. Okay. And also control blood pressure of blood that reaches the brain. So when we use the word "asphyxia," which is many times the community and legal professionals, their minds only go to physical compression of the body. No. It is the entirety of the compromise of all physiological processes that could result in asphyxial injury of the brain.

*Exhibit O, First Deposition Transcript of Dr. Bennet Omalu ("OMALU DEPO"), 127:11-128:18; 133:23-25 ("[A]sphyxial brain injury is traumatic brain injury. So [Muhaymin's] cumulative exposure beginning from the moment they had him on the ground to the moment he died."); 126:7-14 ("[T]he cumulated actions of all the police officers were substantial and significant contributory factors to [Muhaymin's] sudden and unexpected death."); See also Exhibit P, Deposition Transcript of Dr. Ali Taqi ("TAQI DEPO"), 114:7-8 ("[T]he pressure on [Muhaymin's] back caused him to asphyxiate.").*

Even if the evidence on the record were construed (inappropriately) in Defendants' favor, and even if the ultimate medical conclusion of Defendants' medical expert, Dr. Vilke (that Muhaymin died of a heart attack, not asphyxia) was accepted, a reasonable jury could still find that Muhaymin died of a heart attack resulting partially from the stress involved in being manhandled and dog-piled by the Defendant Officers. *See Exhibit 55 to Defendants' SOF, COP 015485 (Expert Report-Dr. Vilke)* ("What was likely happening is that Muhaymin was having a cardiac event…") (including as a cause of the cardiac event "physical exertion").

Completely disregarding the appropriate standard on a motion for summary judgment, Defendants argue that "the physical struggle that occurred and the duration of the struggle" were "directly and solely attributable" to Muhaymin's own actions, i.e., his alleged use of "large amounts of methamphetamine" and commission of "a felony by resisting arrest." *Mot., p. 24*. Contrary to Defendants' assertion, however, the cause of Muhaymin's "physical exertion" and the question of whether he was resisting (or continued to resist) <u>arrest</u> while he was being pinned face-down into the concrete by officers, is a question of fact for the jury to determine. There is ample evidence in the record for a reasonable jury to find that Muhaymin's "physical exertion" during the second takedown was not a resistance to a lawful arrest, but a resistance to being asphyxiated to death by those officers attempting to effect that arrest. [*Plaintiff's SODF, ¶42*].

To the extent the Defendants sensed a resistance, it was Muhaymin's attempt to grasp for air, a reasonable reaction to being asphyxiated to death. Muhaymin's physical exertions, his pleas of "I can't breathe," and his accompanying moans indicate a person who was so overpowered by Defendants and so totally immobilized and compressed by their combined weight, that his movements were feeble desperate attempts to take in air. [*Plaintiff's SODF, ¶¶52-57*]. The Officers failed to give any consideration to his pleas. Instead, they assumed the death throes of a man they are slowly killing by asphyxiation is resistance to arrest. Even a loyal dog, if held down and asphyxiated by its owner, would understandably struggle to find oxygen to avoid death. Defendants take the position that Muhaymin is not entitled to do that. This assertion must be rejected. Muhaymin had every right to struggle to avoid being killed. He, like every person in these United States, has a constitutional right to life may only be forfeited to the state after an exhaustive legal process, a process that was unjustifiably bypassed in this case. Everyone experiencing the unimaginably cruel process of death by asphyxiation has a right to struggle and resist to preserve one's life. A wrongdoer cannot justify his own wrongdoing by relying on the victim's resistance to the wrongdoers' crimes.[3]

Regardless, a reasonable jury could determine that, in light of the minimal force warranted by Muhaymin's non-threatening, passive resistance, employment of a restraint technique which carried the inherent risk of (and in fact resulted in) asphyxiation (or a heart attack) and death was not warranted and was therefore a violation of Muhaymin's 4th Amendment rights.

ii.    <u>Forcing Muhaymin's Arms Backwards Over His Head</u>

Plaintiff, as administrator of Muhaymin's estate, is entitled to recover damages for pain and suffering incurred by Muhaymin as a result of the Defendant's pre-death application of force, regardless of the ultimate conclusion as to cause of death. *See Andrich v. Kostas*, 470 F. Supp. 3d 1048, 1055–59 (D. Ariz. 2020); This case, like *Andrich*,

---

[3] Asphyxiating someone to death is, at best, a negligent homicide, a crime

"involves a common fact pattern—police officers stand accused of engaging in different forms of excessive force during an encounter that ultimately resulted in death." *Id.*, at 1058. As this Court explained, "[d]isallowing liability for some of the excessive force, simply because the final administration of excessive force was the cause of death, would undermine § 1983's goal of deterring law enforcement officers from engaging in any type of excessive force." *Id.* Thus, Plaintiff is entitled to present her "claim for pain and suffering damages arising from the [officers' initial use of unreasonable force] that preceded [Muhaymin]'s death" (*Id.* at 1059), regardless of the limitations set forth by A.R.S. § 14-3110, which otherwise "preclude[] an estate from seeking recovery for the decedent's pre-death pain and suffering" (*Id.* at 1055).

Plaintiff's claim for Muhaymin's pain and suffering includes the assertion that Defendant Officers employed excessive force when they forced Muhaymin's hand-cuffed arms up behind his back so far as to make them come over his head. The parties agree that such conduct would be excessive force. Even Defendants' police policies expert admits that treating Muhaymin in this manner would be "an improper use of force and a very stupid thing to do." [*Plaintiff's SODF, ¶38*]. The parties do dispute, however, the **factual** question of whether the Defendant Officers engaged in the violative behavior. [*Defendants' SOF,¶¶37-38*; *Plaintiff's SODF, ¶¶37-38*; *Plaintiff's SOF, ¶¶44-46*].

The evidence on record supports a reasonable finding that either Officer Hobel or Officer Canilao, upon throwing Muhaymin across the hood of the police SUV, forced Muhaymin's handcuffed arms nearly perpendicular to the ground, and then continued to force them up until they were over Muhaymin's head and in front of him. [*Plaintiff's SODF, ¶¶37-38*; *Plaintiff's SOF, ¶¶44-46*]. The evidence supports a reasonable finding that this move caused Muhaymin considerable pain and anguish as his shoulders were forced to move incorrectly, because the bodycam footage clearly shows Muhaymin scream as the move is done, and break down crying once his arm have completed their unnatural path from front to back. [*Plaintiff's SOF, ¶¶44-46*]. In response to Muhaymin's tears, the Defendant Officers told him to "just fucking relax, dumbass." [*Plaintiff's SOF, ¶44*].

Defendants assert that Muhaymin, while shoved up against the police SUV, moved his own arms, handcuffed behind his back, up and over his own head, against the Defendant Officers' active attempt to stop him from doing so. [*Defendants' SOF, ¶39*; *Plaintiff's SODF, ¶39*]. In asking the Court to make this factual determination, Defendants implicitly request that the Court completely ignore (1) bodycam footage showing Muhaymin scream in pain as his arms are forced over his head (*Exhibit 64 to Defendants' SOF, 3:05-3:10*; *Exhibit 66 to Defendants' SOF, 16:11-16:20*), (2) Defendant Grenier's explicit testimony that the footage shows Muhaymin's arms being "pull[ed] up" and "torqu[ed]" (*Exhibit E, Deposition Transcript of Defendant Grenier ("GRENIER DEPO"), 69:12-70:22*), and (3) the common sense conclusion that it would be nearly impossible for a handcuffed individual to lift his own arms from behind his back, up and over his head, against the active force of a larger police officer pushing the arms down.

If the jury does determine that Defendant Officers intentionally forced Muhaymin's arms over his head, even Defendants' police procedures expert agrees that the maneuver would be excessive use of force. *Exhibit C, Deposition Transcript of Greg Meyer, Police Procedures Expert Witness for Defendants ("MEYER DEPO")*, 131:25-133:6. However, the fact is disputed, and Defendants' version of events is supported only by the Defendant Officers' testimony, rendering the question "ultimately a credibility issue for jury to decide." *Id.*, at 158:19-22.

       iii.     <u>When Muhaymin Vomited, The Officers Should Have Immediately Rolled Him Over</u>

The Officers left Muhaymin face-down in his own vomit for approximately twenty-five seconds before rolling him over and attempting to resuscitate him. [*Plaintiff's SOF, ¶59*]. During this time, vomitus collected in Muhaymin's airways, further restricting his ability to breathe. [*Plaintiff's SOF, ¶61*]. There is sufficient medical evidence to conclude that Muhaymin's death was partially a result of being left, unconscious, to choke on his own vomit.

    A.   [W]hen I examined his lung sections, the specific type of airways we call bronchioles were completely occluded. […] And he vomited and it went

down into his lungs which also could have caused an acute pulmonary hypertension that will increase his likelihood of death.

*OMALU DEPO, 134:3-9.*

    A.  The fact that he vomited even further occluded or complicated his respiratory status leading him to not breathe even more. So what happened was he aspirated, which he had gastric contents obstructing into the lung. And then I felt the officers should have rolled Muhaymin to his side and cleared his airway when he vomited because that further led to decreased oxygenation. And then he should have had CPR started quicker.

*TAQI DEPO, 55:8-16.* On such evidence, a reasonable jury could conclude that leaving Muhaymin face-down and unconscious in a pool of vomit for half a minute was unreasonable, and a violation of Muhaymin's 4th Amendment rights.

      **3.  Plaintiff May Present Evidence To The Jury That Each Defendant Officer Was An Integral Participant In The Violation Of His 4th Amendment Rights**

Defendants insist that "the Court must separately assess each officers' conduct before reaching a determination as to whether he or she violated clearly established law." Motion, p. 9. However, in the Ninth Circuit, "[a] plaintiff may hold multiple law enforcement officers liable based on an 'integral participant' theory of liability when at least one officer violates the plaintiff's constitutional rights." *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1158 (E.D. Cal. 2016) (citing *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir.1996)). An officer is an integral participant "where he or she 'participated in some meaningful way' in the actions which gave rise to the constitutional violation." *Garlick*, 167 F. Supp. 3d at 1159 (quoting *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004)). And "an officer who is an integral participant in unlawful conduct may be held liable even if the officer's isolated actions do not rise to the level of a constitutional violation." Martinez v. City of Pittsburg, No. 17-CV-04246-RS, 2019 WL 1102375, at *4 (N.D. Cal. Mar. 8, 2019), aff'd, 809 F. App'x 439 (9th Cir. 2020) (citing *Blankenhorn v. Cty. of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007)).

Each Defendant Officer participated in the violation of Muhaymin's rights, whether by actively applying force to Muhaymin's back, assisting other officers who were doing so, retrieving restraint equipment to be used on Muhaymin, or by standing around to give general assistance while Muhaymin asphyxiated and died on the ground. Plaintiff is therefore entitled to present evidence to a jury that each Officer was an "integral participant" in the violation of Muhaymin's rights. *Chuman,* 76 F.3d at 295.

### 4. At The Time Of The Defendant Officers' Violation, Muhaymin's Rights Were Clearly Established Constitutional Rights Of Which A Reasonable Person Would Know

In considering qualified immunity, courts recognize that "[a] police officer's right to make an arrest necessarily includes the right to use some degree of force." *Cunningham v. Gates*, 229 F.3d 1271, 1290 (9th Cir. 2000), as amended (Oct. 31, 2000) (citing *Graham*, 490 U.S. at 396). However, "[a]n officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury." *Cunningham*, 229 F.3d at 1290 (further citation omitted). "Defendants bear the burden to prove they are entitled to qualified immunity." *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1106 (N.D. Cal. 2017) (citing *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005)).

Government officials are not entitled to qualified immunity if, at the time of the violative action, it was "sufficiently clear that every reasonable official would have understood that what he is doing violates [the victim's] right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). The Supreme Court has expressly stated that it does "<u>not</u> require a case directly on point," but only that "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011); *See also Drummond*, 343 F.3d at 1060–61 ("...it is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness was apparent in light of existing law.") (further citations omitted). The Ninth Circuit has noted that "[e]ven unpublished decisions of district courts may inform [the] qualified immunity analysis." *Id.*

(quoting *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir.2002)) (internal quotation marks omitted).

"'[T]he ordinary framework for deciding motions for summary judgment" applies to motions for summary judgment based on official immunity." <u>Moreno v. Baca</u>, 431 F.3d 633, 638 (9th Cir. 2005) (quoting *Butler v. San Diego Dist. Attorney's Office,* 370 F.3d 956, 963 (9th Cir. 2004)). "Because the moving defendant bears the burden of proof on the issue of qualified immunity, he or she must produce sufficient evidence to require the plaintiff to go beyond his or her pleadings." *Id.* (further citations omitted). The defendants' burden is to demonstrate the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Because the Fourth Amendment reasonableness analysis "requires a balancing of interests, however, summary judgment should be granted sparingly in excessive force cases." <u>Martinez v. City of Pittsburg</u>, No. 17-CV-04246-RS, 2019 WL 1102375, at *5 (N.D. Cal. Mar. 8, 2019), <u>aff'd,</u> 809 F. App'x 439 (9th Cir. 2020) (citing *Lolli v. Cty. of Orange*, 351 F.3d 410, 415–16 (9th Cir. 2003) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

### i. Application Of Weight To A Prone Individual's Back

Defendants cannot meet their burden of proving entitlement to qualified immunity on summary judgment. It has been "beyond debate" for over a decade in the Ninth Circuit that "keeping an individual who is in a state of excited delirium restrained with his chest to the ground while applying pressure to his back and ignoring pleas that he cannot breathe […] constitute[s] excessive force under the Fourth Amendment." *Arce*, 294 F. App'x at 261 ("We have had similar cases in the past…"); *see also Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990, 1014 (C.D. Cal. 2019) ("It is also clearly established law that pressing weight onto the back of a prone and helpless arrestee, particularly as he begs for air, constitutes excessive force."); *Marsall v. City of Portland*, No. CV-01-1014-ST, 2004 WL 1048127, at *13 (D. Or. May 7, 2004) ("the use of the maximum restraint while two officers pressed their weight on an individual's neck and torso as he begged for air is a severe use of force that is only permissible when compelled by a strong governmental interest.")

The Ninth Circuit case which established this legal reality was *Drummond ex rel. Drummond v. City of Anaheim* (343 F.3d 1052). In *Drummond*, the plaintiff "claim[ed] that two officers continued to press their weight on his neck and torso as he lay handcuffed on the ground and begged for air." *Id.* The Ninth Circuit held that, "[a]lthough the officers […] did not shoot or beat [plaintiff], the force allegedly employed was severe and, under the circumstances, capable of causing death or serious injury."

In this case, like in *Drummond*, the Defendant Officers maintained body weight on Muhaymin's head, neck, and torso while he was first on his side, and later on his stomach. During the ordeal, Muhaymin cried out multiple times that he could not breathe, and can be heard raggedly gasping for breath in the available bodycam footage. Unlike *Drummond*, where only two officers placed weight on the plaintiff during the arrest, as many as five of the Defendant Officers placed substantial weight on Muhaymin's prone body at a time. [*Plaintiff's SODF, ¶44*; *Plaintiff's SOF, ¶51*]. If two officers on the back of a prone individual crosses the line into a violation of the 4th Amendment, five officers doing the same certainly does.[4]

The reasoning and holding in *Drummond* are particularly impactful because the court expressly found that the officer's actions were so obviously violative of the 4th Amendment that they had "fair warning" "even absent a Ninth Circuit case presenting the same set of facts." *Drummond*, 343 F.3d at 1061. In fact, the court stated explicitly that "[t]he officers— indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Id.*, at 1059.

> We need no federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in

---

[4] It should further be noted that the plaintiff in *Drummond* was revived, and entered into a coma. The Ninth Circuit in *Drummond* was therefore considering a constitutional violation less severe than the one before the Court, where Muhaymin ultimately lost his life as a result of Defendants' actions.

need of air violates clearly established law, and that reasonable officers would have been aware that such was the case.

*Id.*, at 1062.

Further, there have been numerous Ninth Circuit decisions expounding upon the obvious violation described in *Drummond* which include factual aspects directly relevant to this case. Defendants argue that Muhaymin's "resistance" (described as "passive" by multiple Officers) warranted the crushing weight applied to his back. This argument was summarily disposed of in *Tucker v. Las Vegas Metro. Police Dep't*, 470 Fed.Appx. 627 (9th Cir. 2012), where the Ninth Circuit noted that "[the plaintiff], unlike Drummond, continued to resist the officers after handcuffs were applied, but this distinction does not, by itself, suffice to bring this case out of Drummond's orbit." *Id.*, at 629. The court went on to reiterate that "existing law recognize[s] a Fourth Amendment violation where two officers use their body pressure to restrain a delirious, prone, and handcuffed individual who poses no serious safety threat." *Id.*

Also, in *Abston v. City of Merced* (506 Fed.Appx. 650 (9th Cir. 2013)), on summary judgment, the Ninth Circuit was presented with a fact pattern involving an individual who was in a prone position, restrained, and "surrounded by numerous officers." Like *Abston*, the present case involves "numerous" police officers surrounding Muhaymin while he lay prone and helpless on the ground, with up to five of the officers kneeling, laying, or pushing down on his body at a time. [*Plaintiff's SODF, ¶45*]. In this situation, "[a] reasonable fact-finder could conclude that defendants' use of body compression as a means of restraint was unreasonable and unjustified by any threat of harm or escape." *Abston*, at 652–53.

Although Defendants conveniently avoid making any reference to this line of well-known cases, they will undoubtedly argue that this case is distinguishable because, as they disingenuously claim, "[o]nce Muhaymin was secured with the handcuffs behind his back, the Phoenix Officers immediately ceased contact." *Mot., p. 24* (citing Def. SOF ¶44, 58, 72]. This claim, however, is patently and provably false. Indeed, Muhaymin was *already* securely handcuffed behind his back when one or more of the Officers forced Muhaymin's

cuffed arms even further up his back, over his head, and down the front again, causing Muhaymin to scream, yell out, and finally cry. [*Plaintiff's SOF, ¶45].* He continued to remain handcuffed, albeit in the front of his body, when he was initially taken to the ground at the SUV, before Officers began immediately piling their collective weight on Muhaymin's torso, head, neck, back, and other parts of his body while he laid first on his side, then face-down into the concrete. [*Plaintiff's SOF, ¶47-54].* Indeed, even after Mr. Muahymin's arms were securely behind his back for the second time, and Mr. Muahymin stopped struggling for air, the Defendant Officers continued to apply substantial weight to Muhaymin's body. [*Plaintiff's SOF, ¶57].*

That Defendants themselves forced Muhaymin's arms over his head to the front of his body, gang tackled him to the ground, and decided unnecessarily to uncuff and then recuff him, does bring this case outside the scope of *Drummond* and its progeny. As the Ninth Circuit has explained, "[i]n assessing the reasonableness of an officer's conduct where there is no case law directly on point, 'the salient question that the Court of Appeals ought to ... ask[ ] is whether the state of the law [at the time of the alleged wrong] gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" <u>Arce v. Blackwell</u>, 294 F. App'x 259, 261 (9th Cir. 2008) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741, (2002) (rejecting requirements that previous cases be either "fundamentally similar," or have "materially similar" facts). It did. Whether the officers' collective use of force was objectively reasonable under the facts and circumstances of this case is a question of fact for the jury.

Even if the Ninth Circuit had not clearly established that Defendant Officers' actions violated Muhaymin's 4th Amendment rights (it did), police officers throughout the United States have been on notice of the fatal dangers of restraint techniques involving application of weight on the back of a prone suspect for over two and a half decades. In June 1995, the U.S. Department of Justice issued a bulletin entitled "Positional Asphyxiation—Sudden

Death" ("Bulletin")[5], major portions of which were drawn from a report prepared by the International Association of Chiefs of Police for the National Institute of Justice (NIJ).[6] The 1995 DOJ Bulletin highlighted the importance of understanding how "preexisting risk factors, combined with the subject's body position when subdued or in transit, can compound the risk of sudden death."

As the Bulletin explains, a person lying on his stomach has trouble breathing when pressure is applied to his back. "To help ensure subject safety and minimize the risk of sudden in-custody death, officers should learn to recognize factors contributing to positional asphyxia." Bulletin, p. 2. The Bulletin concluded with the following advice: "To help minimize the risk of positional asphyxia, [...] the use of maximal, prone restraint techniques should be avoided. If prone positioning is required, subjects should be closely and continuously monitored. By implementing such procedural protocols, the potential for in custody deaths may be lessened." *Id.* at p. 3.

A memorandum to U.S. law enforcement, published by the DOJ and substantially prepared by the International Association of Chiefs of Police, expressly describing the dangers of asphyxia caused by restraint techniques involving the placement of body weight on the back of a prone suspect, is more than sufficient to provide "fair warning" to any reasonable officer that employment of such a technique risked Muhaymin's life. *See Drummond*, 343 F.3d at 1061 ("[T]he salient question...is whether the state of the law [at the time of the alleged wrong] gave respondents fair warning that their alleged treatment of [the petitioner] was unconstitutional.") (quoting *Hope*, 536 U.S. at 741) (brackets in

---

[5] National Criminal Justice Reference Service (NCJRS), U.S. Department of Justice, National Law Enforcement Technology Center, "Positional Asphyxia-Sudden Death", https://www.ncjrs.gov/pdffiles/posasph.pdf (last visited Jan 21, 2020).

[6] The NIJ report was based on research conducted by Dr. Charles S. Petty, Professor of Forensic Pathology, University of Texas, and Dr. Edward T. McDonough Deputy Chief Medical Examiner, State of Connecticut, and reviewed by the Less-Than-Lethal Liability Task Group

original); see also <u>Hope v. Pelzer</u>, 536 U.S. 730, 744, 122 S. Ct. 2508, 2518, 153 L. Ed. 2d 666 (2002) ("Our conclusion that 'a reasonable person would have known' of the violation is buttressed by the fact that the DOJ specifically advised the ADOC of the unconstitutionality of its practices before the incidents in this case took place.").

Furthermore, multiple Officers expressly admitted that they received training on the dangers of asphyxia, and the City of Phoenix's 30(b)(6) representative confirmed that such training is given. [*Plaintiff's SOF, ¶65*]. The Ninth Circuit has clearly stated that a police department's "training materials are relevant not only to whether the force employed in this case was objectively unreasonable, [...] but also to whether reasonable officers would have been on notice that the force employed was objectively unreasonable." *Drummond*, 343 F.3d at 1062. In *Drummond*, the court found that "training from [defendants'] own police department" on the dangers of positional asphyxia provided an independent source of "fair warning" of the unconstitutional risk of applying weight to a prone individual. *Id.*, at 1061-62. The same reasoning applies here. Defendant Officers had actual notice from police department training that their actions risked Muhaymin's life, and that such a risk was not warranted by Muhaymin's passive resistance.

Finally, there is evidence on the record to support a reasonable finding that a number of the Defendant Officers had actual notice of the risk to Muhaymin's life caused by the Officers' collective actions. After Muhaymin had rolled out of his vomit, Officer Head walked to the back of a police SUV where Officer Nielson twice stated clearly that he "knew that was going to happen." [*Plaintiff's SOF, ¶64*]. Officer Head responded by saying, "yeah," indicating that he too was fully aware of the risks to Muhaymin's life. [*Id.*]. Further, Officer Canilao testified that he was personally aware through life experience that weight applied to a prone individual's back can cause difficulty breathing. [*Plaintiff's SOF, ¶66*]. Finally, Officer Grenier testified that he knew placing his body weight on an individual's head would be illegal. *GRENIER DEPO, 77:18-25*.

The Defendant Officers received "fair warning" of the unconstitutionality of their actions through multiple Ninth Circuit decisions, a federal notice to police enforcement of the dangers of positional asphyxia in police interaction, department training on the same issue, and basic common sense that crushing weight applied to a prone person's back causes severe difficulty in breathing. Further, there is evidence that at least two Officers consciously considered the risk and yet failed to intervene to save Muhaymin's life. Under these circumstances, any reasonable officer should have "understood that what he [was] doing violate[d] [the victim's] right." *Mullenix*, 577 U.S. at 11. None of the Defendants are entitled to qualified immunity.

ii.    *Manhandling An Individual, Causing Unnecessary Pain*

It is well established in the Ninth Circuit that physically manhandling an individual while effecting arrest is considered excessive force if the *Graham* factors do not fully support the use of force. In *Bushell-McIntyre v. City of San Jose* (252 F. App'x 810, 812 (9th Cir. 2007)), the court found that a reasonable jury could determine that the shoving and slamming of the plaintiff against a car by the defendant officer was excessive force where "the crime at issue was not severe" and the plaintiff "did not pose a threat to the officers." *Id.* (applying the *Graham* factors). The Ninth Circuit further stated that such manhandling, even absent a fact pattern directly on point, was a "constitutional violation" and "was clearly established at the time of the arrest." *Id.* Summing up, the Ninth Circuit stated, "force is justified only when there is a need for it […] Viewing the evidence in a light most favorable to [plaintiff], there was no need for it here." *Id.*

Even if Ninth Circuit precedent was not sufficient to give a reasonable officer notice that needlessly physically manhandling an individual is a constitutional violation (it was), "in an obvious case, [the *Graham*] standards can 'clearly establish' the answer [of whether officer conduct is unconstitutional], even without a body of relevant case law." *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198–99, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)) (further citations omitted). There is no reasonable argument that needlessly forcing Muhaymin's handcuffed arms backwards over

his head, while he was surrounded by multiple officers and forced over the hood of a police SUV, was warranted under the *Graham* standards, and Defendants do not dispute this reality.[7]

  *iii.*   <u>Leaving An Individual Face-Down In Vomit</u>

  As the Ninth Circuit has noted, "[e]ven unpublished decisions of district courts may inform [the] qualified immunity analysis." *Drummond*, 343 F.3d at 1060. In *Gabales v. Cty. of San Joaquin* (No. CIV. S-07-1346LKKDAD, 2009 WL 2923037, at *11 (E.D. Cal. Sept. 4, 2009)), the Eastern District of California analyzed a situation, similar to the one before this Court, under the *Graham* factors. In addition to restating the common Ninth Circuit determination that "officers [are] on notice of the potentially lethal effect of kneeling on or compressing a suspect's back while he [is] prone," the court noted that the victim had been left face-down in his own vomit, which may have caused his death. *Id.* In determining that the officers had violated the victim's 4th amendment rights, the court stated, "It appears to make no difference to this analysis that the decedent here died from aspiration of his vomit while lying prone, rather than suffocation. The hazard appears the same." *Id.* It was clearly established at the time of Muhaymin's death that leaving an unconscious individual face-down in vomit increases the likelihood that the individual will aspirate and die.[8]

### B. PLAINTIFF'S CLAIM FOR FAILURE TO INTERVENE SURVIVES SUMMARY JUDGMENT

  "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen […] if they had an opportunity to

---

[7] Even Defendants' police policies expert testified that forcing an individual's cuffed hands up from behind the back and over the head would be "an improper use of force and a very stupid thing to do." [Plaintiff's SODF, ¶38].

[8] Plaintiff reiterates that "in an obvious case, [the *Graham*] standards can 'clearly establish' the answer [of whether officer conduct is unconstitutional], even without a body of relevant case law." *Mattos*, 661 F.3d at 442. It should have been obvious to every Officer involved that leaving Muhaymin face-down in his vomit, while he was unconscious and unable to move, carried an outsized risk that Muhaymin would aspirate. This risk of death was not warranted by the *Graham* factors.

intercede." *Cunningham*, 229 F.3d at 1289 (9th Cir. 2000), as amended (Oct. 31, 2000) (internal quotation marks omitted) (further citation omitted). As this Court has stated, "If an officer merely stands by without trying to assist the victim, that officer may be held liable as a tacit collaborator." *Fernandez v. Virgillo*, No. 2:12-CV-02475 JWS, 2014 WL 2930749, at \*6 (D. Ariz. June 30, 2014), aff'd, 651 F. App'x 692 (9th Cir. 2016) (further citation omitted).

All of the Defendant Officers either directly participated in the violation of Muhaymin's rights, or stood by and watched such violation occur without attempting to assist Muhaymin as he died. [*Plaintiff's SOF, ¶50(a)-(g)*]. Defendants' argument for dismissal on Plaintiff's failure to intervene claims rests entirely on their erroneous conclusion that the offending officers did not use excessive or unreasonable force in attempting to effect Muhaymin's' arrest. Defendants do not argue that they did not have a reasonable opportunity to intervene. Thus, because a question of fact remains as to the officers' use of excessive or unreasonable force, Plaintiff's failure to intervene claim must also survive.

## C. *PLAINTIFF'S AMERICANS WITH DISABILITIES ACT CLAIM SURVIVES SUMMARY JUDGMENT*

Defendants assert that Plaintiff's claims under the Americans with Disabilities Act ("ADA") must fail as a matter of law because (1) there is no evidence that Muhaymin was disabled, (2) there is no evidence that Chiquita was Muhaymin's "service animal," and (3) Tarango's violations of the ADA were excusable because, in Defendants' opinion, Chiquita was not under Muhaymin's control. All three of these propositions fail.

First, Defendants' bald assertion that "Plaintiff has no evidence that Muhaymin was, in fact, deemed disabled" is verifiably false. The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Federal regulations further define "a physical or mental impairment" as "[a]ny mental or psychological disorder" (with exceptions not relevant here). 28 CFR § 36.105(b)(1)(ii). Muhaymin's mental health records (produced in

discovery by Defendants) mention Muhaymin's schizophrenia diagnosis no less than eighty separate times. [*Plaintiff's SOF, ¶2*]. Schizophrenia is a psychological disorder. *See Harper v. Cty. of Merced*, No. 118CV00562LJOSKO, 2018 WL 5880786, at *1 (E.D. Cal. Nov. 8, 2018) ("Plaintiff suffers from mental health disorders, including schizophrenia…"); 235080 dementia praecox, Stedmans Medical Dictionary 235080.

Second, there is evidence on the record supportive of a reasonable finding that Chiquita was a "service animal" as defined by the ADA.[9]

> Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. […] Examples of work or tasks include, but are not limited to, […] helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors.

28 CFR § 36.104.

> Courts that have considered the training requirement for service animals recognize that federal regulations do not set forth any standards or requirements specifying the amount or type of training that an animal must receive to qualify as a service animal, nor the type or amount of work a service animal must provide for the disabled person.

*Miller v. Ladd*, No. CV 08-05595 NJV, 2010 WL 2867808, at *4 (N.D. Cal. July 20, 2010) (citing *Bronk v. Ineichen*, 54 F.3d 425, 430–31 (7th Cir.1995) (federal law does not require the service animal to be trained at an accredited training school).

As other Ninth Circuit districts have stated, "[t]he relevant question for the court is whether the animal helps the disabled person perform tasks to ameliorate the ADA disability." *Ladd*, 2010 WL 2867808, at *4; *See also Davis v. Ma,* 848 F. Supp. 2d 1105, 1114 (C.D. Cal. 2012), aff'd, 568 F. App'x 488 (9th Cir. 2014). This is necessarily a fact-intensive inquiry. The *Sadler v. Fred Meyer Stores, Inc.* and *Miller v. Ladd* cases, cited above, are instructive.

---

[9] Defendants assertion that Chiquita was "unregistered, unlicensed, and had no vaccinations" is completely irrelevant to Plaintiff's civil claim under the ADA, and Defendants provide not case law to the contrary.

In *Sadler* (2018 WL 4854064), the only relevant evidence on the record at summary judgment was the plaintiff's testimony that the animal at issue had been personally trained by plaintiff (and her husband) to lick plaintiff's face when plaintiff showed signs of anxiety. *Id.* The District of Oregon denied the defendant's motion for summary judgment, finding that "[d]rawing all reasonable inferences in [plaintiff's] favor, a rational trier of fact could find that Annabelle qualifies as a service animal." *Id.*, at *3. In *Ladd* (2010 WL 2867808), the plaintiff testified that she purchased her dog from an animal shelter and began training it to alert her when she was having a panic attack. *Id.*, at *5. The plaintiff's testimony was "deemed sufficient to present a genuine issue as to whether Plaintiff's dog qualifies as a service animal" by the Northern District of California. *Id.*

As illustrated by the above examples, most cases involving an ADA claim where the subject dog's status as a "service animal" is questioned involve a plaintiff who can testify as to the training of the alleged "service animal." Here, however, that is obviously impossible. The Court, and eventually the jury, must therefore necessarily weigh and draw inferences from the documentary and video evidence on record. Regarding this record, the following evidence exists to support a reasonable finding that Chiquita "help[ed] [Muhaymin] perform tasks to ameliorate [his] ADA disability." *Ladd*, 2010 WL 2867808, at *4.[10]

Muhaymin's Terros medical records contain multiple references to Chiquita's role in helping Muhaymin navigate his mental illness. [*Plaintiff's SOF, ¶3*]. Those references include 1) records of Muhaymin self-reporting that Chiquita was of assistance in living with schizophrenia, (2) observations by Muhaymin's mental health caregivers that Chiquita was an asset in his struggle with mental illness, (3) and an explicit note that Muhaymin's case manager had informed him that he could get a doctor's note for Chiquita and bring her in to the clinic. [*Id*]. Furthermore, while Muhaymin is unable to testify to the precise training

---

[10] Plaintiff notes that such evidence must be viewed "in the light most favorable to the nonmoving party" *Zetwick*, 850 F.3d at 440.

he gave Chiquita (as were the plaintiffs in *Sadler* and *Miller*), the available bodycam footage contains multiple examples of Muhaymin repeatedly asserting that Chiquita was his service dog and that she was "disciplined." [*Id*]. Muhaymin can further be heard comparing Chiquita to dogs in TV shows, which at least would allow a jury to draw the reasonable inference that Chiquita had been trained. *See Exhibit 62 to Defendants' SOF, 8:55-9:03.*

Third, Defendants' final attempt to escape liability under the ADA fails at its thesis sentence: "[T]he Center was fully within its legal rights to exclude an unleashed and uncontrolled dog from entry." *See Motion, p. 29*. Contrary to Defendants' implicit contention, the **only** evidence on the record supportive of the assertion that Chiquita was "uncontrolled" while in the Center on January 4, 2017, is the testimony of Defendant Tarango, statements of other Center employees, and an "incident report" that was created after the fact. [*Plaintiff's Statement of Disputed Facts ("Plaintiff's SODF"), ¶5*]. The only video footage of Chiquita inside the Center on January 4, 2017 shows Muhaymin (1) holding her, and (2) maintaining complete control over her. [*Id.*]; [*Plaintiff's SOF, ¶14*]. Therefore, determination of Chiquita's actions while in the Center prior to the arrival of the Defendant Officers relies on the credibility of Defendant Tarango and the other Center employees. It is, therefore, necessarily a question of fact for jury determination.[11] [12]

Finally, even beyond Defendants' refusal to allow Muhaymin access to the public restroom facilities solely due to his service animal, Defendants completely fail to address

---

[11] Defendants' further contention that Chiquita's alleged lack of vaccination and licensing was contemporaneous justification to violate Muhaymin's rights under the ADA is also nonsense. Proof of current vaccination and/or licensing is not a requirement to state a claim under the ADA (Defendants cite to no contrary authority), and there is absolutely no evidence on the record to support the proposition that Tarango (or anyone else at the center) thought that Chiquita was unvaccinated or unlicensed when they denied Muhaymin entry to the bathroom.

[12] Defendants' assertion that prior encounters with Chiquita proved her status as a danger to Center employees is both (1) unsubstantiated by the facts on record [*Plaintiff's SODF, ¶5*], and (2) completely irrelevant to the determination of Chiquita's behavior on January 4, 2017, and the Defendants' actions under the ADA.

the undisputed fact that Defendant Tarango unambiguously admitted to asking Muhaymin to provide proof of Chiquita's status as a service animal prior to the Defendant Officers' arrival. [*Plaintiff's SOF, ¶6*]. Such a request is expressly prohibited by federal ADA regulation.[13] There exists on the record evidence sufficient to support a reasonable finding the Defendants violated Plaintiff's federal rights under the ADA. There is, therefore, a genuine issue of fact for jury determination, and Defendants are not entitled to summary judgment as a matter of law.[14]

### D. *PLAINTIFF'S ARIZONA STATE LAW CLAIMS SURVIVE SUMMARY JUDGMENT*

#### 1. The Defendant Officers Are Not Entitled To Immunity

Defendants present two theories of immunity under Arizona statute. As both theories present questions of fact, neither preclude Plaintiff from presenting her claims to a jury. Further, even if the Court were to (inappropriately) weigh evidence and make credibility determinations at Defendants' request, Defendants cannot prove by a preponderance of the evidence that they are entitled to immunity.

First, as noted by Defendants, A.R.S. § 13-409 makes available to law enforcement a defense for utilizing physical force in effectuating an arrest where the arrestee uses or threatens to use physical force and all of the following exist:

1. A reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape.
2. Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.
3. A reasonable person would believe the arrest or detention to be lawful.

---

[13] 28 C.F.R. § 36.302 ("A public accommodation shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal.")

[14] As indicated by Defendants' Motion, Plaintiff's Arizona Civil Rights Act ("ACRA"), A.R.S. § 41-1498, *et seq.*, claim (Count XIII) should be analyzed in parallel with her ADA claim. *See Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004). Therefore, because Plaintiff's ADA claim survives summary judgment, her ACRA claim likewise survives.

A.R.S. § 13-409. If the requirements of § 13-409 are met, the defendant is immune from civil liability. *See* A.R.S. § 13-413.

However, it is the "defendant [who] bears the burden of proving a justification defense by a preponderance of the evidence in a civil case." *Ryan v. Napier*, 245 Ariz. 54, 65, 425 P.3d 230, 241 (2018). Furthermore, whether, under this standard, Defendants have proven the § 13-409 elements is a question of fact for the jury. *Paz v. City of Tucson*, No. 2 CA-CV 2019-0209, 2020 WL 7488180, at *1 (Ariz. Ct. App. Dec. 18, 2020) (affirming a lower court's determination that "whether the state had proven the elements of § 13-409 was a question for the jury.")

However, even if the Court were to weigh evidence on summary judgment, Defendants cannot possibly prove the foundational requirement of § 13-409. There is absolutely no evidence that Muhaymin "use[d] or threaten[ed] to use physical force" against the Defendant Officers, and there is significant deposition testimony to the contrary. Four of the Defendant Officers expressly testified that Muhaymin never harmed, or threatened to harm, **any** of the Defendant Officers [*Plaintiff's SOF, ¶63*] and **none** of the Defendant Officers testified otherwise. This alone precludes application of § 13-409.

Second, Defendants rely on A.R.S. § 12-716, which provides for a presumption that a police officer acted reasonably in using physical force to effect an arrest

> [i]f the court finds by a preponderance of the evidence that a plaintiff is harmed while the plaintiff is attempting to commit, committing or fleeing after having committed or attempted to commit a felony criminal act or if a person intentionally or knowingly caused temporary but substantial disfigurement or temporary but substantial impairment of any body organ or part or a fracture of any body part of another person…

A.R.S. § 12-716. The first factor, therefore, that Defendants must prove "by a preponderance of the evidence" is that Muhaymin was harmed "while […] attempting to commit, committing[,] or fleeing after having committed or attempted to commit a felony

criminal act…" A.R.S. § 12-716(A).[15] Defendants attempt to satisfy this burden by asserting that "Muhaymin's arrest was indisputably lawful." *See Motion, p. 25*. This, however, is not the question. The question is whether Muhaymin was harmed while committing a felony. A.R.S. § 12-716(A). This question, Defendants assert, is answered in the affirmative because (1) Muhaymin's alleged resistance to arrest, and (2) the status of being intoxicated with methamphetamine, are per se felonies under Arizona law. *See Motion, pgs. 32-33*. This is false.

First, Arizona law only classifies "resisting arrest" as a felony if the same is done "[u]sing or threatening to use physical force against the peace officer or another" or "[c]reating a substantial risk of causing physical injury to the peace officer or another." A.R.S. § 13-2508. The statute expressly provides that engaging in "passive resistance" is **not** a felony, but a misdemeanor. A.R.S. § 13-2508(A)(3); 13-2508(B)-(C). "Passive resistance" is defined as "a nonviolent physical act or failure to act that is intended to impede, hinder or delay the effecting of an arrest." *Id.* As referenced above, the evidence on the record fully supports a reasonable finding that Muhaymin was engaged in "passive resistance" (in fact, this is the precise description used by multiple Defendant Officers under oath [*Defendants' SOF, ¶43; Plaintiff's SODF, ¶26*]). [*Plaintiff's SOF ¶63*]. Even if this were not the case, and even if the majority of Defendants' erroneous version of events were accepted as true, Defendants have completely failed to show by a preponderance of the evidence that Muhaymin "threaten[ed] to use physical force" or "create[ed] a substantial risk of causing physical injury" by simply stiffening his body, refusing to drop his dog, or going limp while being frog-marched to the police vehicle. [*Defendants' SOF, ¶¶22, 27,*

---

[15] The remainder of this requirement addresses situations where the arrestee intentionally caused "substantial disfigurement" or "impairment of any body organ or part or a fracture of any body part of another person." A.R.S. § 12-716. This is not applicable here, where there is no evidence that Muhaymin harmed or attempted to harm anyone.

*29, 42-43*; *Plaintiff's SODF, ¶¶22, 27, 29, 42-43*; Plaintiff's *SOF, ¶¶26-30, 32-33, 40-42, 44-46, 5-58*].

Second, it is "use" or "possession" of a "dangerous drug" (including methamphetamine) that is a felony under Arizona law, not the status of being intoxicated. A.R.S. § 13-3407(A). There is no sincere allegation (or evidence to support the same) that Muhaymin was in possession of methamphetamine on his person at the time of his death, or that he was in the process of using methamphetamines upon his arrest. Even Defendants admit that the evidence regarding Muhaymin's methamphetamine use on record supports only a finding that he had ingested the drug at some point in the few hours prior to his incident with the police. [*Defendants' SOF, ¶70*; *Plaintiff's SODF, ¶70*]. Therefore, there is no evidence on the record (much less a preponderance of the evidence) to support a finding that Muhaymin was either (1) in the process of committing a drug felony or (2) attempting to run away after committing a drug felony at the time of his death. As a matter of plain language interpretation, A.R.S. § 12-716(A) does not provide a presumption of reasonableness for Defendants' actions.

### 2. Plaintiff Is Entitled To Present Alternative Theories Of Liability

The entirety of Defendants' argument regarding Plaintiff's claims of negligence rests on the erroneous assumption that litigants are not allowed to present alternative theories of liability to a jury. As the Arizona Supreme Court has made clear, "plaintiffs may plead a negligence claim for conduct that is independent of the intentional use of force or plead negligence and battery as alternate theories if the evidence supports each theory." *Ryan*, 245 Ariz. at 62. "It is the jury's role (or the judge's in a bench trial) to establish what occurred and then apply the correct legal theory to arrive at a verdict." *Id.*

Defendants contort *Ryan* beyond recognition. *Ryan* did not hold that litigants could not bring separate claims under theories of both intentional and negligent violation. *Id.*, at 62. Instead, *Ryan* determined the nonexistence of a common law claim in Arizona **combining** intent and negligence. *Id.*, at 59. Plaintiff is entitled to present evidence of both willful and negligent behavior to the jury. *Id.*, at 62.

### 3. Testimony Regarding Damages Are To Be Weighed By The Jury

As the personal representative of Muhaymin's estate, Plaintiff may "recover non-economic damages" and "compensation for the pain and suffering of the decedent's surviving [...] children." *Robbins v. United States*, No. CIV03-1224PCT-JAT, 2006 WL 359948, at *6 (D. Ariz. Feb. 14, 2006). On summary judgment, "[i]nitially, it is for the court to determine whether on the evidence severe emotional distress can be found." *Abdi v. Lovell*, No. CV-08-0321-PHX-GMS, 2009 WL 976503, at *7 (D. Ariz. Apr. 9, 2009) (citation omitted). "However, it is for the jury to determine whether severe emotional distress actually exists and whether the defendant caused it. *Abdi*, 2009 WL 976503, at *7 (citing *Savage v. Boies*, 77 Ariz. 355, 359, 272 P.2d 349, 351 (1954)). Therefore, it is Defendants' burden to show that no evidence of emotional distress exists on the record. If it cannot, Plaintiff's compensatory damage claims are a question for the jury.

Defendants assert that Plaintiff "has offered no factual support for any alleged damages," ostensibly relying on Plaintiff's interrogatory responses. *Motion, p. 36*. However, instead of actually including Plaintiff's full response, Defendants quote only Plaintiff's counsel's **objections** to the interrogatory, which is (1) incredibly misleading, and (2) completely irrelevant to the Court's consideration of a summary judgment motion. In reality, Plaintiff's interrogatory response pointed Defendants to the deposition of Muhaymin's surviving daughter, AM.[16] [*Plaintiff's SODF, ¶86*]. This deposition testimony provides evidence of the following:

AM was 10 years old when she learned of her father's death. *Exhibit S, Deposition Transcript of AM ("AM DEPO"), 34:24-25*. AM saw Muhaymin two days prior to his death, when she visited him at the park. *Id.,* at 26:18-20. They played on the park equipment and visited for four hours together. *Id.,* at 28:6-29:95. AM testified to feeling happy at the time. *Id.,* at 36:5-7. Upon learning that Muhaymin had been killed, MA became depressed

---

[16] Muhaymin's daughter is a minor. Plaintiff refers to her by her initials.

and started engaging in self-harm. This included "cutting" and an attempted suicide, resulting in hospitalization. *Id.*, at 36:8-10; 36:10-12; 36:13-37:1. AM had never engaged in self-harm prior to this event, and her depression required ongoing therapy. *Id.,* at 37:2-4.70; 40:8-41:19.

Also on the record is the testimony of Muhaymin's surviving son, Muhammad Muhaymin III ("Muhammad"). He testified that he had recently found out that Muhaymin was in the area, but had not had a chance to see him prior to his death. *Exhibit T, Deposition Transcript of Muhammad Muhaymin III, Decedent's Son ("MUHAMMAD III DEPO"), at 54:2-8, 54:20-56:16.* Muhammad testified to his personal grief upon the lost opportunity to rekindle his relationship with his father. *Id.*, 91:8-18. Finally, he testified that his father's death, and the knowledge that he could watch the final minutes of his father's life on the internet, had traumatized him. *Id.*, at 96:19-20, 97:5-8.

The testimony of AM and Muhammad are sufficient alone to support a reasonable finding of emotional damages, and thus preclude summary judgment. *State ex Rel. Goddard v. DHL Express (Usa), Inc.*, No. CV-06-2611-PHX-FJM, at *6 (D. Ariz. May 8, 2008) ("A plaintiff's 'testimony alone is enough to substantiate the jury's award of emotional distress damages.'") (quoting *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003)); *See also Estate of Dunlap*, 38 Ariz. 525, 531 (Ariz. 1931). Defendants' entire counterargument is that if a close family member struggles with a debilitating mental illness, that family member's death should not cause grief to those who remain. Not only does this argument fail to address the actual standard identified in *Abdi*, but it is also disgustingly dehumanizing.

### 4. Plaintiff's Claim for Punitive Damages Under Federal Law Survives Summary Judgment

Plaintiff may recover punitive damages under 42 U.S.C. § 1983 if the jury determines that Defendants' actions were made with "reckless or callous disregard" for Muhaymin's Constitutional rights. *Smith v. Wade*, 461 U.S. 30, 51 (1983). As described above, the evidence on record supports a reasonable finding that the Defendant Officers (1)

knew that Muhaymin was suffering from mental illness (2) repeatedly berated Muhaymin with profanity and insulting names such as "mother-fucker" and "dumbass," (3) dragged Muhaymin to a police vehicle and threw him over hood, (4) physically pulled Muhaymin's hand-cuffed arms from behind his back up and over his head, causing Muhaymin to cry, (5) took Muhaymin to the ground and dog-piled on top of him while he was on his side and stomach on concrete, (6) ignored multiple pleas from Muhaymin telling them that he could not breathe, and (7) continued to apply substantial weight to his back even after he went limp, only moving when he vomited. [*Plaintiff's SOF, ¶¶26-59*]. All of this was done despite the undisputed fact that Muhaymin never harmed, threatened to harm, or attempted to harm the Defendants or anyone else. [*Plaintiff's SOF, ¶63*]. These actions, if reasonably found by the jury, would certainly fulfill the Supreme Court's "reckless or callous disregard" standard. *Smith,* 461 U.S. at 51. Defendants are therefore not entitled to summary judgment on Plaintiff's punitive damages request.

**5. Plaintiff's State Law Claims Against The City Of Phoenix Survive**

Defendants assert that Plaintiff's state law claims against the City of Phoenix are dependent upon the survival of Plaintiff's state law claims against the individual Defendants. *Motion, pp. 39-40*. For the reasons set forth above, Plaintiff's state law claims against the individual Defendants survives summary judgment, therefore, Plaintiff's state law claims against the City of Phoenix likewise survive summary judgment.

**V.   CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment and allow Plaintiff to present her claims and supporting evidence to a jury.

Respectfully submitted: February 1, 2021

PRICE LAW GROUP, APC

*/s/David A. Chami*
David A. Chami, AZ Bar No. 027585
david@pricelawgroup.com
Attorneys for Plaintiff

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 |      I hereby certify that on February 1, 2021, I electronically filed the foregoing with the |
| 3 | Clerk of the Court using the ECF system, which will send notice of such filing to all |
| 4 | attorneys of record in this matter. The documents are being filed with the Court under seal, |
| 5 | therefore, hard copies of the foregoing have been provided via personal delivery or by postal |
| 6 | mail. |
| 7 | |
| 8 |                    PRICE LAW GROUP, APC |
| 9 |                    */s/Florence Lirato* |