1  David A. Chami, AZ #027585
2  PRICE LAW GROUP, APC
   8245 N. 85th Way
3  Scottsdale, AZ 85258
   T: (818) 600-5515
4  F: (818) 600-5415
5  david@pricelawgroup.com

6  Haytham Faraj
   LAW OFFICES OF HAYTHAM FARAJ
7  1935 W Belmont Ave.
   Chicago, IL 60657
8  T: (312) 635-0800
   F: (202) 280-1039
9  haytham@farajlaw.com
10 Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Mussalina Muhaymin as Personal Representative of the Estate of Muhammad Abdul Muhaymin Jr., <br><br> Plaintiff, <br><br> v. <br><br> City of Phoenix, an Arizona Municipal Corporation, *et al.*, <br><br> Defendants. | Case No.: CV-17-04565-PHX-SMB <br><br> **PLAINTIFF'S STATEMENT OF DISPUTED FACTS AND STATEMENT OF FACTS IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Assigned to Honorable Susan M. Brnovich |

### PLAINTIFF'S STATEMENT OF DISPUTED FACTS

Plaintiff Mussalina Muhaymin, ("Plaintiff") submits the following facts in opposition to Defendants City of Phoenix ("City of Phoenix"), Antonio Tarango ("Tarango"), Officer Oswald Grenier, Officer Kevin McGowan, Officer Jason Hobel, Officer Ronaldo Canilao, Officer David Head, Officer Susan Heimbigner, Officer James Clark, Officer Dennis Leroux, Officer Ryan Nielsen and Sergeant Steven Wong's ("Defendant Officers") (together as "Defendants") Motion for Summary Judgment, and

specifically Defendants' Separate Statement of Facts, filed in support thereof ("Defendants' Statement of Facts" or "SOF").

## **OBJECTIONS**

In an effort to simplify Plaintiff's response to Defendants' factual statement, Plaintiff lays out the following evidentiary and procedural objections to various claims made in Defendants' statement, including specific citations to the objections in the responses below:

**a.** Plaintiff objects to multiple paragraphs below on the ground that they violate Local Rule 56.1 in that they present facts which are not material to the Court's determination of Defendants' Motion for Summary Judgment. They are, at best, "background" facts which "should not be included in the separate statement of facts." L.R.Civ.P. 56.1(a).

**b.** Plaintiff objects to multiple paragraphs below to the extent that they cite to inadmissible hearsay in support. *Anheuser-Busch v. Natural Beverage Distributors*, 69 F.3d 337, 345 (9th Cir. 1995) ("[I]nadmissible hearsay evidence may not be considered on a motion for summary judgment.").

## **DISPUTED FACTS**

**1.** Not disputed. *See objection b.*

**2.** Disputed in part. *See objection b.* Mr. Muhammad Abdul Muhaymin Jr. ("Deceased" or "Muhaymin") did have his service dog, "Chiquita" (a Chihuahua) with him on January 4, 2017 when he entered the Maryvale Community Center ("Center"). However, Chiquita was under Muhaymin's control at all times while in the Center on January 4, 2017. Descriptions of Chiquita's behavior by Tarango (supervisor at the Center) support only a factual conclusion that Chiquita was walking from "side to side" down the Center hall in front of, and staying within "two feet of," Muhaymin. Tarango explicitly admits that Chiquita was not "acting aggressive at any point on" January 4, 2017. *Exhibit 3 to Defendants' SOF, 109:18-110:6.* In fact, none of the exhibits cited by Defendants in support of paragraph two actually indicate anything about Chiquita's behavior while inside the Center on January 4, 2017, prior to the incident with the Defendant Officers, other than the fact that the dog was walking closely in front of Muhaymin until Muhaymin picked the dog up. *See generally*

*Exhibits 1, 2, 5, 6, 8, 9, and 61 to Defendants' SOF*. Furthermore, the **only** footage of Chiquita while in the Center is that of her in Muhaymin's arms and under control. *Exhibit 62 to Defendants' SOF, 1:15-11:40*. Defendants are not entitled to the Court's acceptance of such assertions in their Statement of Facts, because the same has not been established on the record. *See Elliot v. Google Inc.*, 45 F. Supp. 3d 1156, 1161 (D. Ariz. 2014) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment.").

**3.** Not disputed. *See objection a.*

**4.** Not disputed. *See objection a.*

**5.** Disputed in part. *See objection a. See objection b.* While Muhaymin had previously been accompanied by Chiquita when visiting the Center, there is no evidence on the record supportive of the contention that Chiquita was aggressive or uncontrolled. To the contrary, even if statements by Tarango and Center staff, and "incident reports" created after Muhaymin's death (including "summaries" of previous incidents, the actual reports of which were never produced in discovery), were accepted as fully accurate (which Plaintiff will not be doing at trial), they only support a factual finding that on the one occasion where Chiquita exhibited signs of combativeness, it was in response to being approached by Center staff attempting to "shoo" Chiquita away, while wielding furniture, separating Chiquita from Muhaymin. *Exhibit 1 to Defendants' SOF, 4:11* ("...the dog attempted, the one time, to bite Hanna..."); *Exhibit 12 to Defendants' SOF, COP 011520* ("I remember seeing Zahira grab a chair...as she tried to 'shoo' the dog...as she approached the dog, he began to growl, bark and bite at her...I came and tried to help her 'shoo' the dog, but it did the same thing...").

**6.** Disputed for completeness. *See objection b.* None of the Exhibits cited support the assertion that Tarango "told Muhaymin that he could use the restroom if he left the dog outside" on January 4, 2017. Instead, Tarango stated simply, "Sir, you cannot bring your dog in here" (*Exhibit 5 to Defendants' SOF, COP 011522*) and "asked [Muhaymin] to leave…" (*Exhibit 6 to Defendants' SOF, COP 011239*). The only reference to leaving Chiquita outside made by Tarango was at his deposition where he describes asking whether Muhaymin could

leave Chiquita with "other people out there" and where he tells Muhaymin that if he were to come to the Center without Chiquita, he would not "have a problem with that." *Exhibit 1 to Defendants' SOF, 18:20-19:3.*

**7.** Disputed in part. *See objection b.* While Tarango had previous interactions with Muhaymin on occasions prior to January 4, 2017, the **alleged** "threat[s] [of] physical harm" were comprised entirely of puffery such as "you better watch out" (*Exhibit 3 to Defendants' SOF, 37:15-28:11*) which Tarango expressly admits were not threatening (*Exhibit 9 to Defendants' SOF, COP 011512, ¶6* ["*I had concerns about Muhaymin, **but did not feel threatened by him.***"] [*emphasis added*]). As further proof that Defendant Tarango perceived Muhaymin' puffery as non-threatening, Defendant Tarango never called law enforcement on Muhaymin (prior to the January 4, 2017 incident) (*Exhibit A, Deposition Transcript of Defendant Antonio Tarango ("TARANGO DEPO"), 40:16-41:5*), and further never indicated to the Defendant Officers at the time that Muhaymin had been threatening on any prior occasion. *See generally Exhibits 62, 64, 66, 68, 72, and 73 to Defendants' SOF.*

**8.** Disputed. *See objection b.* Tarango's statements to the Defendant Officers, captured by bodycam, clearly establish that Muhaymin was attempting to enter the restroom and Defendant Tarango stepped in his way, initiating the "bump," thereby assaulting Muhaymin. *Exhibit 62 to Defendants' SOF, 9:43-9:52.*

**9.** Not disputed.

**10.** Disputed in part. *See objection b.* The situation with Muhaymin was described as a "confrontation" by the Center employee during the 911 call. *Exhibit B, COP 000239, 911 Call Audio Recording ("911 CALL RECORDING").* Furthermore, Tarango expressly admitted to the Officers that Muhaymin did not "assault" him. *See Exhibit 62 to Defendants' SOF, 9:43-9:52 ([Defendant Tarango] "He was trying to get in [to the bathroom] and I didn't let him in, so we bumped into each other.").*

**11.** Disputed. *See objection b.* Defendants' are not entitled to the Court's acceptance of such assertions in their Statement of Facts, because the same has not been established on the record. *See Elliot*, 45 F. Supp. 3d at 1161. The only video footage of Chiquita in the Center shows Muhaymin holding the dog. *Exhibit 62 to Defendants' SOF, 1:15-11:40.*

**12.** Not disputed.

**13.** Not disputed. *See objection b.*

**14.** Not disputed. *See objection b.*

**15.** Not disputed. *See objection b.*

**16.** Disputed in part. *See objection a.* Even accepting Defendant Hobel's testimony as wholly accurate, it is unclear why "supervisor approval" is described as an "exceptional circumstance" in Defendants' SOF. *Exhibit 4 to Defendants' SOF, 135:18-19*; *See also* Plaintiff's dispute of paragraph 76, below.

**17.** Not disputed. *See objection a.*

**18.** Disputed for completeness. In reality, the comments made about "car[ing]" for Chiquita involved Officer Grenier asking what Muhaymin would "do with the rat dog" upon being arrested, and Officer Hobel merely presenting the option of dropping Chiquita off at the pound. *Exhibit 62 to Defendants' SOF, at 15:01-16:00; Exhibit 63 to Defendants' SOF, at 8:08-9:05.* The only further discussion of "car[ing]" for Chiquita occurred minutes later when Officer Head mentioning that he might have a leash in his car, and Officer Grenier discussing the possibility of using Chiquita to obtain leashes from an animal rescue. *See Exhibit 66 to Defendants' SOF, at 10:26-10:55.*

**19.** Disputed in part. *See objection b.* While Defendant Officers technically told Muhaymin about the warrant, he was neither "advised" nor "informed" as to the basis of the warrant despite multiple requests. *See Exhibit 62 to Defendants' SOF, 18:22-18:31*; *Exhibit 63 to Defendants' SOF, 11:36-11:44*; *Exhibit 65 to Defendants' SOF, 9:24-9:33*; *Exhibit 66 to Defendants' SOF, 11:35-11:45.*

**20.** Disputed. *See objection a. See objection b.* First, aside from Defendant testimony, there is no evidence on record proving that CIT training involves "identifying and interacting with individuals with mental health concerns." In fact, Defendants' police procedures expert testified that CIT training "basically [teaches] active listening and empathy; it's not a whole lot more than that." *Exhibit C, Deposition Transcript of Greg Meyer, Police Procedures Expert Witness for Defendants ("MEYER DEPO"), 146:1-147:2.* Second, Defendant Canilao had actual knowledge of Muhaymin's mental health issues. Defendant Hobel can be

heard describing Muhaymin as "a little 918" to Officers Grenier, Head, and Canilao, to general agreement. *Exhibit 63 to Defendants' SOF, 10:25-10:30.* During his deposition, Defendant Hobel testified that the phrase "918" is used to describe "people that are mentally unstable." *Exhibit D, Deposition Transcript of Defendant Hobel ("HOBEL DEPO"), 104:11-12.*

**21.** Disputed. Plaintiff objects to Defendants' mischaracterization of Dr. Taqi's testimony. Dr. Omalu and Dr. Taqi were describing Muhaymin's actions as they perceived them while Muhaymin was inside the community center. Dr. Ali Taqi continued on to testify that Muhaymin began exhibiting mental health crisis symptoms upon being accosted by Defendant Officers outside of the Center. *Exhibit 49 to Defendants' SOF, 118:8-14.*

**22.** Disputed. *See objection b.* While Muhaymin did not immediately drop Chiquita and present himself for arrest, it is inaccurate to state that he "immediately resisted arrest." For completeness, Plaintiff states that Muhaymin, upon being informed that the Defendant Officers were placing him under arrest, began asking the grounds for the arrest (as was his Constitutional right). Muhaymin then began pleading with the Defendant Officers to wait until his "sensei" could be called to take care of Chiquita. The bodycam video clearly establishes that Muhaymin was concerned with what would happen to Chiquita if he were to be arrested without someone to take the dog. His so-called "refus[al] to put Chiquita down" (and the resulting so-called "refus[al] to put his hands behind his back") was the result of Muhaymin's known mental health issues. *Exhibit 62 to Defendants' SOF, at 18:30-19:29; Exhibit 63 to Defendants' SOF, at 11:50-12:30; Exhibit 65 to Defendants' SOF, at 9:24-10:00; Exhibit 66 to Defendants SOF, at 11:30-12:16.*

**23.** Disputed. *See objection b.* Plaintiff maintains that it is preposterous for four armed police officers to "gr[o]w concerned" that a single man of less-than-average weight and height would pose a physical threat. Further, **only** one of the four primary Defendant Officers testified under oath to "growing concerned" that Muhaymin had martial arts training (and only mentions such on redirect, after testifying for hours on direct examination). *Exhibit E, Deposition Transcript of Defendant Grenier ("GRENIER DEPO"), 128:21-129:9.* The remainder of Defendant's citations in support of this paragraph are to Officer Canilao's

interviews, not given under oath. *See Exhibits 19 & 24 to Defendants' SOF*. However, Officer Canilao made no mention of such a fear at his deposition, and in fact testified under oath only to recognizing the word "sensei" as being related to martial arts. *Exhibit F, Deposition Transcript of Defendant Canilao ("CANILAO DEPO"), 33:12-18*. Furthermore, determination of the Defendant Officers' subjective beliefs regarding the threat that Muhaymin posed is inherently tied to reasonableness and is therefore a question of credibility for jury determination. Defendants are not entitled to the Court's acceptance of such assertions in their Statement of Facts, because the same has not been established on the record. *See Elliot*, 45 F. Supp. 3d at 1161.

24. Disputed for completeness. *See objection b.* Officer Hobel told Muhaymin that the Officers would "find somebody to watch" Chiquita. *Exhibit 63 to Defendants' SOF, at 11:55-12:30*

25. Disputed in part. *See objection b.* Muhaymin did not "flail[] his extremities," or "twist[], thrash[] back and forth, pull[] left and right, [or] squat[]." Muhaymin simply refused to drop his dog to present his arms for arrest. When he refused, Defendant Hobel shoved a baton under Muhaymin's right arm to force him to drop Chiquita (Chiquita can be heard on the bodycam to cry out as Defendant Hobel baton is shoved under Muhaymin's arm). *Exhibit 62 to Defendants' SOF, at 18:30-19:03; Exhibit 63 to Defendants' SOF, at 11:50-12:13*.

26. Disputed. *See objection b.* At ¶43 of Defendants' SOF, Defendants define the term "passive" (in the context of resistance to police) as "not trying to assault the officers." Therefore, by inverse implication of Defendants' own definition, Muhaymin never "actively" resisted Defendant Officers, as all of the available bodycam evidence conclusively proves that Muhaymin never tried to assault any of the Defendant Officers. *See generally Exhibits 62 – 74 to Defendants SOF*. It should also be noted that after the first few officers testified that Muhaymin's level of resistance would be considered "passive" under the City's Department Order, the deposition testimony of subsequent officers coincidently escalated, describing the level of resistance as "defensive" and later as "active." *See CANILAO DEPO, 37:17-21, 54:6-12, 84:9-12 and GRENIER DEPO, 31:10-32:4, 145:10-15 (testimony that Muhaymin only provided "passive" resistance); HOBEL DEPO, 74:25 and Exhibit G,*

*Deposition Transcript of Defendant Head ("HEAD DEPO"), 35:10-18 (testimony that Muhaymin provided "defensive" resistance); Exhibit H, Deposition Transcript of Defendant Wong ("WONG DEPO"), 32:10-16 (testimony that Muhaymin provided "active" resistance).*

**27.** Not disputed. *See objection b.*

**28.** Disputed for completeness. *See objection b.* Plaintiff states that whether Officer Hobel was "forced" to utilize a baton is a conclusion as to reasonableness, within the purview of the jury, and therefore disputes the same. Furthermore, Officer Canilao is a CIT trained officer and understood that he had other options, such as calmly talking to Muhaymin to gain compliance. *Exhibit 20 to Defendants' SOF, 115:17-116:22.*

**29.** Disputed. *See objection b.* When Chiquita fell from Muhaymin's arms, he can be heard in the bodycam video footage saying, "OK" at least seven times, indicating his willingness to comply. *Exhibit 62 to Defendants' SOF, 19:43-19:56.* Further, Plaintiff objects to Defendants' description of the double-cuffs as providing an extra eight inches between Muhaymin's wrists. Officer Hobel's bodycam clearly shows that the hinge cuff added, at most, an extra four inches of space. *Exhibit 66 to Defendants' SOF, 14:54-14:56.* Finally, Plaintiff states that whether Defendant Officers were "forced" to take Muhaymin to the ground is a conclusion as to reasonableness, within the purview of the jury, and therefore disputes the same.

**30.** Disputed in part. *See objection to c.* Officer Grenier's self-described reasons for striking Muhaymin in the back is a subjective belief, tied to reasonableness and is therefore a question of credibility for jury determination.

**31.** Disputed. *See objection b.* The bodycam footage supports only the assertion that four Defendant Officers struggled with Muhaymin. The available bodycam footage does not support the assertion that Muhaymin "displayed incredible strength" or that he required the strength of "four officers to finally gain control" of Muhaymin. *See generally Exhibits 63, 64, and 66 to Defendants SOF.* Furthermore, stating that Muhaymin's "incredible strength" necessitated the force utilized is a conclusion of reasonableness. Determination of the Defendant Officers' subjective beliefs regarding reasonableness is a question of credibility

for jury determination. Defendants are therefore not entitled to the Court's acceptance of such assertions in their Statement of Facts, because the same has not been established on the record. *See Elliot*, 45 F. Supp. 3d at 1161.

**32.** Disputed in part. *See objection b.* The connotations associated with the term "escorted" are wholly inaccurate descriptors of the Defendant Officers' actions. Muhaymin was forcibly marched, and at times carried by his arms, to the police SUV. *See Exhibit 64 to Defendants' SOF, 1:59-2:08*; *Exhibit 66 to Defendants' SOF, 14:46-15:15*.

**33.** Disputed. *See objection b.* The bodycam footage shows only that Muhaymin was walked to the parking lot as some of the Defendant Officers lifted him by the arms. *Exhibit 66 to Defendants' SOF, 15:36-16:05*. Furthermore, Plaintiff objects to Defendants' citation to *Exhibit 74* (Officer Miller's bodycam footage). Officer Miller's bodycam footage did not start until after Muhaymin died, and is therefore irrelevant to Defendants' assertion that Muhaymin refused to walk. Plaintiff also objects to Defendants' reliance on the exaggerated statements of Jimmy Yee, given while not under oath and being interviewed by a uniformed officer. Mr. Yee has since given under-oath deposition testimony regarding the moments where Defendant Officers escorted Muhaymin from the Center, and will testify to the same if called at trial. *Exhibit I, Deposition Transcript of Jimmy Yee, Eyewitness ("YEE DEPO"), 25:1-24*. Importantly, Mr. Yee's under-oath position is that he does not recall whether the Officers were dragging Muhaymin or whether he was walking on his own. *Id.* The recording and transcription of Mr. Yee's interview are therefore inadmissible hearsay, contradicted by under-oath testimony, and may not be considered on a motion for summary judgment. *Anheuser-Busch v. Natural Beverage Distributors*, 69 F.3d 337, 345 (9th Cir. 1995) ("[I]nadmissible hearsay evidence may not be considered on a motion for summary judgment.").

**34.** Disputed for completeness. *See objection b.* Plaintiff states that the bodycam footage only supports the assertion that the Defendant Officers attempted to search Muhaymin (none of the Officers in the footage mention drugs or weapons [*See Exhibit 64 to Defendants' SOF, 2:57-3:00*.], and the cited interviews only mention a specific desire to search for weapons, not drugs.

**35.** *Disputed for completeness. See objection a.* Officer Hobel testified that he had never found Muhaymin with **any** illegal knives. *HOBEL DEPO, 16:1-9.*

**36.** *Disputed. See objection b.* Bodycam footage proves that Muhaymin could not possibly have "actively attempted to prevent the officers from searching his back pants pocket." At 2:58 of *Exhibit 64 to Defendants' SOF*, before placing Muhaymin in the police vehicle, a Defendant Officer states, "let's search him first." At 3:04 (*Id.*), Defendant Officers lift Muhaymin and throw him across the hood of the police vehicle, holding his arms behind his back, nearly perpendicular to the ground. At 3:05-3:10 (*Id.*), Muhaymin screams in pain as his arms are forced up behind his back and above his head. At no point during this interaction are Muhaymin's hands below his waist. *Exhibit 64 to Defendants' SOF, at 2:58-3:28.*

**37.** *Disputed. See objection b.* To describe the forcing of Muhaymin's hands, cuffed together behind his back, up above his head as "slightly raised" is, at best, a gross misstatement of the facts. When Officer Hobel and Officer Canilao forced Muhaymin's arms up behind his back and above his head, Muhaymin can be heard screaming in pain. *Exhibit 64 to Defendants' SOF, 3:05-3:10.*

**38.** *Disputed. See objection b.* Defendants' assertion that *Exhibit 64 to Defendants' SOF, 3:05-3:10* shows Muhaymin screaming in pain as he forces his own arms, cuffed behind his back, up and over his head, against the weight of two Defendant Officers who were holding his wrists down, is preposterous. *See also Exhibit 66 to Defendants' SOF, 16:11-16:20.* The bodycam footage fully supports the (only reasonable) finding that Muhaymin's arms were forced up and over his head by Defendant Hobel and Defendant Canilao. *Exhibit 64 to Defendants' SOF, 3:05-3:10*; *Exhibit 66 to Defendants' SOF, 16:11-16:20.* This is so obvious that Defendant Grenier, upon watching the relevant bodycam footage, testified that he could see Muhaymin's arms being "pull[ed] up" and "torqu[ed]" by other Defendant Officers, and testified that such a move was "legal." *GRENIER DEPO, 69:12-70:22.* Contrary to Officer Grenier's testimony, Defendants' police procedures expert testified that if an officer were to take a handcuffed suspect's hands from behind the back and rotate them to the front, this would be "an improper use of force and a very stupid thing to do." *MEYER*

*DEPO, 131:25-133:6.* Finally, there is eyewitness testimony that the Defendant Officers forced Muhaymin's arms over his head. *Exhibit J, Deposition Transcript of Arizona Smith, Eyewitness ("SMITH DEPO"), 14:19-15:1.*

**39.** Disputed. *See objection b.* First, the cited bodycam footage does not support the assertion that Muhaymin "pushed away from the police SUV." *Exhibit 64 to Defendants' SOF, 3:20-30.* In fact, one Defendant Officer can be heard stating, "to the ground, to the ground" well before Muhaymin left the police SUV hood, indicating that it was Defendant Officers who initiated the movement. *Id., 3:25-3:28.* Second, Plaintiff states that whether the Defendant Officers "had to take [Muhaymin] to the ground" is a conclusion as to reasonableness, within the purview of the jury, and therefore disputes the same.

**40.** Disputed. *See objection b.* The available bodycam footage does not support the assertion that Muhaymin "exhibited extreme strength." *See generally Exhibits 62, 64, 66, 68, 72, and 73 to Defendants SOF.* Furthermore, stating that Muhaymin's "incredible strength" necessitated the force utilized is a conclusion of reasonableness. Determination of the Defendant Officers' subjective beliefs regarding reasonableness is a question of credibility for jury determination. Defendants are therefore not entitled to the Court's acceptance of such assertions in their Statement of Facts, because the same has not been established on the record. *See Elliot*, 45 F. Supp. 3d at 1161.

**41.** Disputed in part. *See objection b.* Muhaymin was in the prone position, face down, when multiple of the officers arrived. *See Exhibit 68 to Defendants' SOF, 0:00-0:31; Exhibit 73 to Defendants' SOF, 23:40-26:20; Exhibit 43 to Defendants' SOF, COP 003357, Section (I)(D)(2-4).*

**42.** Disputed. *See objection b.* First, Plaintiff disputes that Muhaymin continued to resist the officers while on the ground or that any apparent resistance was "active[e]." At ¶43 of Defendants' SOF, Defendants define the term "passive" (in the context of resistance to police) as "not trying to assault the officers." Therefore, by inverse implication of Defendants' definition, Muhaymin never "actively" resisted Defendant Officers, as the available bodycam evidence proves that Muhaymin never tried to assault any of the Defendant Officers at any time during the entire interaction with the officers. Moreover,

whether Muhaymin was resisting (or continued to resist) arrest while he was being pinned face-down into the concrete by officers must be considered in the context of the probability that Muhaymin was in medical duress after having just been subjected to a criminal assault by officers unjustifiably forcing his handcuffed arms over his head to the front of his body. Once officers are on top of him, Muhaymin was clearly suffering from severe distress due to his mental condition and the limitation of oxygen intake which begins the lengthy process of asphyxiation. Muhaymin's "physical exertion" during the second takedown was not a resistance to a lawful arrest, but a resistance to being asphyxiated to death by those officers. *See generally Exhibits 62 – 74 to Defendants SOF*. Second, nothing in the available bodycam footage supports the assertion that Muhaymin "showed incredible strength." *See generally Exhibits 62, 64, 66, 68, 72, and 73 to Defendants SOF*. Third, none of the available bodycam footage supports the assertion that Muhaymin attempted to kick, thrash, or flail his body around. *See generally Exhibits 62, 64, 66, 68, 72, and 73 to Defendants SOF*. To the contrary, there are so many Defendant Officers on Muhaymin's body that he could not move (*Id.*) and multiple Defendant Officers testified that Muhaymin never harmed or attempted to harm anyone. *See CANILAO DEPO, 82:2-11; Exhibit K, Deposition Transcript of Defendant Clark ("CLARK DEPO"), 31:6-16; GRENIER DEPO, 10:4-24, 29:2-10, 39:17-24; HEAD DEPO, 35:6-9, 39:7-15*. Furthermore, the implication that Muhaymin's "incredible strength" necessitated the force utilized is a conclusion of reasonableness. Determination of the Defendant Officers' subjective beliefs regarding reasonableness is a question of credibility for jury determination. Defendants are therefore not entitled to the Court's acceptance of such assertions in their Statement of Facts, because the same has not been established on the record. *See Elliot*, 45 F. Supp. 3d at 1161. Finally, Plaintiff disputes specifically Defendants' assertion that "[m]ost officers […] felt he was under the influence of drugs." Of the twenty exhibits cited by Defendants' as supportive of this statement, only Officer Wong's recorded interview asserts that an Officer (Officer Wong) felt that Muhaymin was under the influence of drugs. *See Exhibit 34 to Defendants' SOF, 13:9*-18.

**43.** Disputed for completeness, Plaintiff states that the **first** officers to testify at depositions described the resistance as passive. It was not until subsequent depositions that

the description coincidentally began changing from "passive" to "defensive" or "active." *CANILAO DEPO, 37:17-21, 54:6-12, 84:9-12 and GRENIER DEPO, 31:10-32:4, 145:10-15 (testimony that Muhaymin only provided "passive" resistance); HOBEL DEPO, 74:25 and HEAD DEPO, 35:10-18 (testimony that Muhaymin provided "defensive" resistance); WONG DEPO, 32:10-16 (testimony that Muhaymin provided "active" resistance).* This raises serious credibility issues to be weighed by the jury. *Elliot*, 45 F. Supp. 3d at 1161.

**44.** Disputed. *See objection b.* First, bodycam footage shows that as many as five of the Defendant Officers, at a time, placed substantial weight upon Muhaymin's prone body for extended periods of time. *See Exhibit 66 to Defendants' SOF, 16:50-17:20; Exhibit 68 to Defendants' SOF, 0:05-3:20; Exhibit 73 to Defendants' SOF, 23:48-25:40.* Further, eyewitness testimony exists supportive of a finding that there were up to four officers at a time. *SMITH DEPO, 17:4-8.* Second, the assertion that Defendant Officers' actions were done "in response to Muhaymin's resistance and [] strength" is a conclusion of reasonableness. Determination of the Defendant Officers' subjective beliefs regarding reasonableness is a question of credibility for jury determination. Defendants are therefore not entitled to the Court's acceptance of such assertions in their Statement of Facts, because the same has not been established on the record. *See Elliot*, 45 F. Supp. 3d at 1161.

**45.** Disputed. *See objection b.* The assertion that Defendant Officers' actions were done "to prevent him from injuring himself or using his head to gain more resistance against the officers" is a question for the finder of fact, as contravening evidence exists on the record. For example, Defendant Officers also used Muhaymin's hair to force his face into the concrete, causing facial abrasions. *Exhibit 68 to Defendants' SOF, 0:28-0:35; Exhibit 43 to Defendants' SOF, COP 003357.* Furthermore, Plaintiff's police procedure's expert testified that controlling an individual's head by grabbing their hair is warranted where the individual is attempting self-harm, but that there was no bodycam evidence that Muhaymin was attempting self-harm while he was being suffocated to death and pleading that he cannot breathe while being arrested by the Officers. *Exhibit L, Deposition Transcript of Scott Defoe, Police Procedures Expert Witness for Plaintiff ("DEFOE DEPO"), 207:24-210:6.*

PLAINTIFF'S L.R.CIV. 56.1
STATEMENT OF FACTS

**46.** Disputed for completeness. *See objection b.* Plaintiff restates that the bodycam footage does not support Defendants' continued assertion that Muhaymin exhibited "extreme strength." *See generally Exhibits 62–74 to Defendants SOF*. Plaintiff further states that the connotations associated with the term "pleading" are wholly inaccurate descriptors of the Defendant Officers' actions. Throughout the exchange, despite Muhaymin's screams of pain and repeated statements that he could not breathe, Defendant Officers yelled at him to "stop resisting," "relax," "stop moving, mother-fucker," "stop moving…shut up," and told him that he was "going for a felony, dumbass." *See generally, Exhibit 64 to Defendants' SOF.* Describing such comments as "pleading" is rank editorializing to which Plaintiff objects.

**47.** Disputed. *See objection a.* None of the available bodycam footage shows Chiquita "lunge" at the Officers. *See generally Exhibits 62, 64, 66, 68, 72, and 73.*

**48.** Not disputed. *See objection b.*

**49.** Not disputed. *See objection b.*

**50.** Disputed. For completeness, Plaintiff states that Muhaymin told the officers that he could not breathe on multiple occasions, cried out in frustration and terror throughout the entire process, and audibly gasped for air as multiple of the Defendant Officers applied body weight to his back, neck, and head. *Exhibit 64 to Defendants' SOF, 4:40-4:44; 4:48-4:50; Exhibit 66 to Defendants' SOF, 16:40-19:00.* Plaintiff further states that assertions regarding the Defendant Officers' subjective observations are questions of creditability for the jury to determine. Finally, Plaintiff disputes outright that "nothing [was] obstructing [Muhaymin's] ability to breath. Multiple Defendant Officers were dog-piled on top of Muhaymin's prone body, and their combined weight hindered his ability to inhale and exhale. *See e.g. Exhibit 66 to Defendants' SOF, 16:50-17:20; Exhibit 68 to Defendants' SOF, 0:05-3:20; Exhibit 73 to Defendants' SOF, 23:48-25:40; See also Exhibit M, Dr. Bennet Omalu Expert Report ("OMALU REPORT"), pg. 20 ("Compression of [Muhaymin's] trunk and body…decreased respiration…"); Exhibit N, Dr. Ali Taqi Expert Rebuttal Report ("TAQI REBUTTAL REPORT"), pg. 3 ("When the chest is compressed on the ground with weight on the back, there is an absolute decrease in tidal volume/O2 entering the lungs."); Exhibit O, First*

*Deposition Transcript of Dr. Bennet Omalu ("OMALU DEPO"), 126:7-14, 127:11-128:18;*
*Exhibit P, Deposition Transcript of Dr. Ali Taqi ("TAQI DEPO"), 114:7-8.*

**51.** Disputed in part. While Muhaymin was moved from his side to his stomach, the Defendant Officers were not "continuously" adjusting their weight and position throughout the exchange. Multiple of the Defendant Officers placed their body weight on Muhaymin, both while he was on his side and later while he was prone, for extended periods of time. To take only one example, Officer Grenier testified that he placed his leg "on [Muhaymin's] shoulder, and then it moved down to his neck area." *Exhibit 14 to Defendants' SOF, 75:23-76:2.* Despite Officer Grenier's assertion that he "wasn't using a whole lot of weight" (*Id., 76:2-3*), Officer Hobel's bodycam footage clearly shows Officer Grenier place substantial weight on Muhaymin's upper torso and neck for an extended period of time. *Exhibit 64 to Defendants' SOF, 5:04-8:36.* At 5:04, Officer Grenier's knee is placed on Muhaymin's upper torso, while Muhaymin is on his side. It remains in that position until 6:10, where Officer Grenier shifts to extend his opposite leg out, exerting substantial body weight onto Muhaymin's shoulder/neck. At 6:59, Officer Grenier again shifts to fully extend his opposite leg, exerting nearly full body weight. It is at this point that the video clearly shows Officer Grenier's knee fully on Muhaymin's neck. At 7:30, Officer Grenier can be seen to actively push off of his opposite leg and add force to his knee on Muhaymin. Officer Grenier's knee remains in this position until the Officers roll Muhaymin over at 8:36. Combined, the total time wherein Officer Grenier's knee was on Muhaymin's upper torso/neck, with no adjustments other than to **increase** pressure, was three minutes and thirty-two seconds (*Exhibit 64 to Defendants' SOF, 5:04-8:36*), a substantial portion of which Officer Grenier's knee was directly on Muhaymin's neck. *SMITH DEPO, 16:8-17, 24:12-22.* Even beyond this specific example (which alone disproves paragraph fifty-one of Defendants' SOF), the available bodycam footage supports a finding that multiple of the Defendant Officers placed substantial body weight on Muhaymin's torso and head for extended periods of time, and did not "continuously" adjust the placement of weight on Muhaymin's body throughout the exchange. *Exhibit 64 to Defendants' SOF, 3:50-9:47; Exhibit 66 to Defendants' SOF, 16:45-*

*19:14; Exhibit 68 to Defendants' SOF, 0:05-3:20; Exhibit 72 to Defendants' SOF, 0:20-0:38; Exhibit 73 to Defendants' SOF, 23:47-27:00.*

**52.** Disputed. This paragraph mischaracterizes the testimony of Plaintiff's police procedures expert, Scott DeFoe, includes legal conclusions, and improperly relies on Mr. DeFoe's past personal experience. Mr. DeFoe is a witness in this case only to provide expert opinion on police procedures. Past personal experiences are not proper subject matter for expert testimony. Nonetheless, when asked if he has, in his "experience as an officer," ever "had to use [his] body weight to adjust and get the handcuffs secured" on a person who "didn't want to be arrested or who tried to run and evade," Mr. DeFoe responded "Yes. I mean, most people in a prone position have to use some type of force to get someone handcuffed." *DEFOE DEPO*, 203:18-204:7. The defense followed up by asserting that it is "within policy" and asking whether "[t]hat's something *you guys* are trained on?" Mr. DeFoe responded, "Well, it depends. You say 'policy.' It has to be, if you look at the effective handcuffing technique, it doesn't mean you have to lay on the back or put knees in the back. You just simply handcuff the hands, put them in a seated or standing or recumbent position, after doing that" and if the suspect physically resists, "[y]ou use reasonable force to overcome their resistance." *Id.*, 204:3-21. Even if, at some time during his 28-year career in law enforcement beginning in 1988, Mr. DeFoe had "personally applied his own body weight on subjects in a prone position while securing handcuffs," said testimony is wholly irrelevant and inadmissible to show that such conduct was reasonable under the circumstances facing the defendant officers on January 4, 2017. Any other purported opinion that can be gleaned from this paragraph constitutes inadmissible legal opinions upon which the defense may not rely.

**53.** Not disputed. *See objection b.*

**54.** Disputed. *See objection b.* The subjective reasoning for the use of a RIPP restraint is a consideration of reasonableness, which is a question of credibility for jury determination. Defendants are therefore not entitled to the Court's acceptance of such assertions in their Statement of Facts, because the same has not been established on the record. *See Elliot*, 45 F. Supp. 3d at 1161.

**55.** Not disputed.

**56.** Disputed in part. While the Exhibit sections cited by Defendants support the assertion that Defendant Officers did not "hog-tie" Muhaymin (assuming "hog-tie" refers specifically to the act of tying an individual's hands and feet together closely behind the back, so that the hands and feet nearly touch), the cited Exhibit sections do not support the assertion that application of a RIPP restraint is not considered "use of force." *Exhibit 4 to Defendants' SOF, 76:20-77:5; Exhibit 15 to Defendants' SOF, 36: 9-25; Exhibit 20 to Defendants' SOF, 127:23-128:9; Exhibit 23 to Defendants' SOF, 84:12-85:9; Exhibit 31 to Defendants' SOF, 65:11-25, 117:24-118:2; Exhibit 35 to Defendants' SOF, 21:3-22.* Further, the vague language utilized renders Defendants' assertion impossible to confirm or rebut. By whom is application of a RIPP restraint not considered "use of force"? If Defendants mean to state that the City of Phoenix Police Department does not consider application of a RIPP restraint "use of force," Defendants need to cite to proof of such a policy determination on the record. If Defendants mean to state that "no one" considers application of a RIPP restraint to be "use of force," this is a conclusion of reasonableness. Determination of reasonableness is a question for jury determination. Defendants are therefore not entitled to the Court's acceptance of such assertions in their Statement of Facts, because the same has not been established on the record. *See Elliot*, 45 F. Supp. 3d at 1161.

**57.** Not disputed.

**58.** Disputed. *See objection b.* Upon handcuffing Muhaymin, multiple of the Defendant Officers maintained body weight on Muhaymin's back. Specifically, Officer Nielson's bodycam footage shows that the Defendant Officers secured Muhaymin's hands in handcuffs at 3:16 and did not remove body weight until Muhaymin vomited at 3:20. *Exhibit 68 to Defendants' SOF, 3:16-3:20.* Even after Muhaymin vomited, the officers did not "immediately cease[] contact." Multiple of the Defendant Officer maintained physical contact with Muhaymin's head, back, arms, and hands for an additional twenty-five seconds. *Id., 3:20-3:45.*

**59.** Disputed. *See objection b.* While the Defendant Officers did eventually roll Muhaymin onto his side after he vomited, the same was certainly not done "quickly."

Muhaymin spent twenty-five seconds face-down in his own vomit before the Defendant Officers rolled him over. *Exhibit 68 to Defendants' SOF, 3:20-4:45; Exhibit 73 to Defendants' SOF, 26:17-26:37.*

60. Disputed to extent that Defendants assert that they "immediately" requested medical support and initiated resuscitative efforts. *See objection b.* This assertion is vague, as Defendants fail to assert after what point they "immediately" took action. As mention at the previous paragraph, Muhaymin spent twenty-five seconds face-down in his own vomit before the Defendant Officers rolled him over. *Exhibit 68 to Defendants' SOF, 3:20-4:45; Exhibit 73 to Defendants' SOF, 26:17-26:37.*

61. Disputed in part. *See objection b.* None of the cited bodycam footage actually shows any of the Officers make an attempt to clear Muhaymin's airways.

62. Not disputed. *See objection b.*

63. Not disputed. *See objection b.*

64. Disputed in part. *See objection b.* While the Defendant Officers did not "punch[], str[i]k[e], or kick[]" Muhaymin (with the exception of Officer Grenier's elbow strike to Muhaymin's back), the Defendant Officers most certainly employed "additional force." The available bodycam footage shows multiple Defendant Officers (1) force Muhaymin's handcuffed hands up from behind his back over his head, (2) take Muhaymin to the ground, (3) apply substantial body weight for extended periods of time to Muhaymin's head, neck, shoulders, mid-back, lower back, legs, and arms. See generally *Exhibits 64, 66, 68, 72, and 73*. Furthermore, it is not disputed that the Defendant Officers used force to effectuate the arrest of Muhaymin. Whether that force was excessive or reasonable is the subject of this lawsuit and an ultimate question of fact for the jury. It is wholly inaccurate (and more than mildly derisible) to assert that no additional force was used aside from an elbow strike. Such an assertion is directly contradicted by the Defendant Officers' own testimony, describing force well beyond a simple elbow strike, including (but not limited to) physically taking Muhaymin to the ground, applying weight to Muhaymin's neck and torso, and holding Muhaymin by his hair. *See CANILAO DEPO, 37:4, 53:22-23, 59:20-60:25, 67:11-14; GRENIER DEPO, 82:12-13, 85:6-12, 94:11-18; HEAD DEPO, 33:21-34:2, 41:16-19,*

*69:12-14; HOBEL DEPO, 58:8-59:14, 67:9-11, 68:1-10; 69:17-22, 81:23-82:11, 120:15-19.*

**65.** Not disputed. *See objection b.*

**66.** Not generally disputed, but, for completeness, Plaintiff states that the medical examiner's determination regarding the cause of Muhaymin's death is disputed, and has been thoroughly rebutted by an industry-leading neuropathologist who has determined, through examination of tissue samples from Muhaymin's lungs, heart, spinal cord, and brain (among other organs), that Muhaymin's cause of death was asphyxiation, not cardiac arrest. *See OMALU REPORT, pgs. 21-22.*

**67.** Not generally disputed, but, for completeness, Plaintiff states that Defendants' expert's determination regarding the cause of Muhaymin's death is disputed, and has been thoroughly rebutted by an industry-leading neuropathologist who had determined, through examination of tissue samples from Muhaymin's lungs, heart, spinal cord, and brain (among other organs), that Muhaymin's cause of death was asphyxiation, not cardiac arrest. *See OMALU REPORT, pgs. 21-22.*

**68.** Disputed in part. As explained by Plaintiff's expert witness, Defendants' inclusion of the parenthetical "potentially fatal" is misleading. Muhaymin was a chronic Methamphetamine user, with a resultant dependence and tolerance. *Exhibit Q, Terros Medical Records ("TERROS RECS"), COP 015246.* The level of Methamphetamine in Muhaymin's blood was within the National Highway Traffic Safety Administration's reported range of non-toxic levels for individuals who use Methamphetamine for recreational purposes. *OMALU REPORT, pg. 16.* Further, as Plaintiff's expert witness stated in his report, "the level of Methamphetamine detected in the blood of Muhammad was of no significant forensic consequence, was not expected to kill him and did not kill him." *Id.*

**69.** Not generally disputed, but, for completeness Plaintiff objects to the assertion as irrelevant to the issues before the Court and speculative as to the "potential" effects of unspecified amounts of meth in an unidentified person. For completeness, Plaintiff again notes that Plaintiff's expert witness stated in his report that "the level of Methamphetamine

detected in the blood of Muhammad was of no significant forensic consequence, was not expected to kill him and did not kill him." *OMALU REPORT, pg. 16.*

**70.** Not generally disputed, but, for completeness, Plaintiff again notes that Plaintiff's expert witness stated in his report that "the level of Methamphetamine detected in the blood of Muhammad was of no significant forensic consequence, was not expected to kill him and did not kill him." *OMALU REPORT, pg. 16.*

**71.** Disputed in part. First, Plaintiff again notes that Plaintiff's expert witness stated in his report that "the level of Methamphetamine detected in the blood of Muhammad was of no significant forensic consequence, was not expected to kill him and did not kill him." *OMALU REPORT, pg. 16.* Second, there is absolutely no evidence on the record supportive of Dr. Binh Ly's purely speculative opinion regarding the possibility of Muhaymin "ingest[ing] additional methamphetamines while in the restroom in an effort to conceal the drugs from the officers." Including an assertion in Defendants' Statement of Facts which has in no way been established on the record is highly inappropriate, and such assertion should be disregarded by the Court in considering Defendants' request for summary judgment. *See Elliot*, 45 F. Supp. 3d at 1161.

**72.** Disputed in part. While Defendants' descriptions of Officer Grenier's testimony are not inaccurate, and Defendants' assertion that Muhaymin continued to scream and yell (in pain) is supported by bodycam footage, Defendants' assertion that Officer Grenier "applied very little weight" is verifiably false. Officer Hobel's bodycam footage clearly shows Officer Grenier place substantial weight on Muhaymin's upper torso and neck for an extended period of time. *Exhibit 64 to Defendants' SOF, 5:04-8:36.* At 5:04, Officer Grenier's knee is placed on Muhaymin's upper torso, while Muhaymin is on his side. It remains in that position until 6:10, where Officer Grenier shifts to extend his opposite leg out, exerting substantial body weight onto Muhaymin's shoulder/neck. At 6:59, Officer Grenier again shifts to fully extend his opposite leg, exerting nearly full body weight. It is at this point that the video clearly shows Officer Grenier's knee fully on Muhaymin's neck. At 7:30, Officer Grenier can be seen to actively push off of his opposite leg and add force to his knee on Muhaymin. Officer Grenier's knee remains in this position until the Officers roll Muhaymin over at 8:36.

Combined, the total time wherein Officer Grenier's knee was on Muhaymin's upper torso/neck, with no adjustments other than to **increase** pressure, was three minutes and thirty-two seconds. *Exhibit 64 to Defendants' SOF, 5:04-8:36.* Furthermore, Defendants' assertions that Officer Grenier's actions were done "just to hold Muhaymin in place [while he] continued fighting" are conclusions of reasonableness. Determination of the Defendant Officers' subjective beliefs regarding reasonableness is a question of credibility for jury determination. Defendants are therefore not entitled to the Court's acceptance of such assertions in their Statement of Facts, because the same has not been established on the record. *See Elliot*, 45 F. Supp. 3d at 1161.

**73.** Not generally disputed, but, for completeness, Plaintiff states that Defendants' expert's determination regarding the possibility of Muhaymin's cause of death being asphyxiation is disputed, and has been thoroughly rebutted by an industry-leading neuropathologist who has determined, through examination of tissue samples from Muhaymin's lungs, heart, spinal cord, and brain (among other organs), that Muhaymin's cause of death was asphyxiation. *OMALU REPORT, pgs. 21-22; See also OMALU REPORT, pg. 20 ("Compression of [Muhaymin's] trunk and body…decreased respiration…"); TAQI REBUTTAL REPORT, pg. 3 ("When the chest is compressed on the ground with weight on the back, there is an absolute decrease in tidal volume/O2 entering the lungs.").*

**74.** Not generally disputed, but, for completeness, Plaintiff states that Defendants' expert's determination regarding the possibility of Muhaymin's cause of death being asphyxiation is disputed, and has been thoroughly rebutted by an industry-leading neuropathologist who had determined, through examination of tissue samples from Muhaymin's lungs, heart, spinal cord, and brain (among other organs), that Muhaymin's cause of death was asphyxiation. *OMALU REPORT, pgs. 21-22; 26.* Further, Plaintiff's medical expert witnesses have both stated that the Defendant Officers' actions not only could have caused Muhaymin's death, but that their actions did cause Muhaymin's death, to a reasonable degree of medical certainty/probability. *See OMALU REPORT, pgs. 20-22; TAQI REBUTTAL REPORT, pgs. 2-4.*

**75.** Disputed for completeness. Mr. DeFoe restricted his description of Muhaymin "physically resisting" to only "[i]nitially, with the dog." *Exhibit 47 to Defendants' SOF, 150:6-10*. Mr. DeFoe then explicitly stated that, "on the ground […], I can't tell if he was physically resisting." *Id.* Further, Mr. DeFoe's use of the undefined word "physically" is subject to interpretation and not appropriate for consideration on summary judgment.

**76.** Disputed. The cited Phoenix Police Department Order 4.10 simply provides that Phoenix officers must verify the existence of warrants and thereafter execute verified warrants. *Exhibit 42 to Defendants' SOF, at COP 011474-75*. The "extraordinary exception" (that terminology is not utilized in the Order) identified, where "extradition is denied" on a valid warrant, applies after the individual has been booked. *Id., at COP 011475*. In fact, nowhere in any of the exhibits cited as supportive of paragraph seventy-six is the phrase "extraordinary circumstances" used, or such circumstances actually described. *Exhibit 4 to Defendant's SOF, 43:14-22, 47:9-48:6, 134:8-136:1; Exhibit 14 to Defendants' SOF, 123:7-124:17; Exhibit 23 to Defendants' SOF, 31:10-32:7; Exhibit 42 to Defendants' SOF, at COP 011474-011475*. The **only** reference to an exception to the described police policy is the "supervisor approval" described by Officer Hobel. *Exhibit 4 to Defendants' SOF, 135:18-19*. It is entirely unclear from the cited exhibits why "supervisor approval" is an "exceptional circumstance," or what "exceptional circumstances" must be present for a supervisor to give such approval.

**77.** Not generally disputed, but, for completeness, Plaintiff states that the connotations associated with the term "pleading" are wholly inaccurate descriptors of the Defendant Officers' actions. Throughout the exchange, despite Muhaymin's screams of pain and repeated statements that he could not breathe, Defendant Officers yelled at him to "stop resisting," "relax," "stop moving, mother-fucker," "stop moving…shut up," and told him that he was "going for a felony, dumbass." *See generally, Exhibit 64 to Defendants' SOF*. Describing such comments as "pleading" is rank editorializing to which Plaintiff objects.

**78.** Disputed. Dr. Omalu did not testify that "he was not paying attention to" "quantify[ing] how much weight was placed on Muhaymin in each and every exposure" because the same was of "no significant forensic consequence." Defendants' counsel's actual

question was, "[w]ould you agree with me, Dr. Omalu, that the officers' **placement** was changing […] That the officers changed **positions** in **placement** […] during the encounters with Muhaymin." *See Exhibit 56 to Defendants' SOF, 203:20-204:19 (emphasis added)*. Dr. Omalu's response of "I did not pay attention to it in this case because it is of no significant forensic consequences" was explicitly cabined to the change in **placement** of the officer's weight, not the **amount** of weight, as evidenced by his follow-up response: "You expect their bodies to change, yes." *Id. at 204:9-19*. Plaintiff further notes that Dr. Omalu has testified that the weight of the Defendant Officers on Muhaymin's body, combined with the amount of time the weight was applied over the exchange (as evidenced by the bodycam footage) and the tissue sample evidence studied by Dr. Omalu, fully support a conclusion that Muhaymin's cause of death was "Asphyxia Brain Injury due to Mechanical-Positional Asphyxiation." *OMALU REPORT, pgs. 20-22*.

**79.** Disputed in part. Mr. DeFoe testified specifically that the bodycam footage and Defendant Officer interviews were "a clue […] that [Muhaymin] was pinned to the ground during the entire time preceding his death." *Exhibit 47 to Defendants' SOF, 198:15-199:8*. Further, Mr. DeFoe was not hired to determine cause of death, and in fact he has no medical expertise in pathology.

**80.** Disputed in part. *See objection a.* In actuality, the Use of Force Review Board "recommend[ed]" that the Defendant Officers' actions "be designated as in accordance with the Department's policy." Further, the implication that Defendants' own internal and criminal investigations justify the Defendant Officers' actions in a civil claim is a conclusion of reasonableness, which is a question for jury determination. Finally, Plaintiff objects to the exhibit cited as inadmissible to show that the Defendant Officers actually acted in conformity with internal investigative findings. Defendant Officers' actions are a question of fact for the jury.

**81.** Disputed for completeness. *See objection a.* The Maricopa County Attorney subsequently told new organizations that she would reinvestigate the case if it were resubmitted. *Lauren Castle, Maricopa County attorney candidate Julie Gunnigle calls for 'common sense reforms' The Arizona Republic (2020),*

*https://www.azcentral.com/story/news/local/phoenix/2020/10/14/maricopa-county-attorney-candidate-julie-gunnigle-calls-reform/3519452001/ (last visited Jan 23, 2021).* Further, the implication that such determinations regarding criminal investigations justify the Defendant Officers' actions in a civil claim is a conclusion of reasonableness, which is a question for jury determination. Finally, Plaintiff objects to the exhibit cited as inadmissible for any purpose in this case.

**82.** Disputed in part. Mr. DeFoe testified only that, "if the force is reasonable, [there is no duty to intervene]." *Exhibit 47 to Defendants' SOF, 217:3-8.* Further, even if Mr. DeFoe had testified to a lack of excessive or unreasonable force (he did not), the same would be a legal conclusion not requiring expert opinion. Whether the force used was reasonable or unreasonable in this case is a question for the jury.

**83.** Not disputed.

**84.** Disputed. *See objection a.* Mr. DeFoe did not testify that his conclusions were "erroneous." *Exhibit 47 to Defendants' SOF, 107:22-109:3.* Defendants' editorializing of Mr. DeFoe's testimony is inappropriate.

**85.** Not disputed.

**86.** Disputed as misleadingly incomplete. After including all other appropriate objections to Defendants' interrogatory, Plaintiff noted that such information had already been provided at the deposition of Muhaymin's daughter and that any "further information" "could have and should have been elicited from her at that time or sought through other means prior to the close of fact discovery." Finally, Plaintiff directed Defendants to December 11, 2019 deposition testimony of Muhaymin's daughter ("AM")[1] which included information responsive to Defendants' requests. *Exhibit R, Plaintiff's Responses to Defendants' Second Interrogatories and Requests for Production, pgs. 4-5.* Plaintiff further objects to this "evidence" as inadmissible. Counsel's objections to discovery requests are not admissible as evidence, either at trial or on summary judgment.

**87.** Not disputed. *See objection a.*

---

[1] Muhaymin's daughter is a minor. Plaintiff refers to her by her initials.

**88.** Not generally disputed, but, for completeness, Plaintiff states that Muhaymin's daughter has spent the majority of her life living with family members (including aunts and her grandmother) due to Muhaymin's mental illness. *Exhibit S, Deposition Transcript of AM ("AM DEPO"), 12:7-17:15, 22:17-18, 30:24-31:6, 32:18-33:1.* She spent a year of her life in a group home. *Id.*, 12:7-8.

**89.** Disputed in part. While Muhaymin's son testified that the last time he saw his father was when he was sixteen, he did not testify "that he had no relationship with his father." *Exhibit 45 to Defendants' SOF, 48:1-58:25.* His testimony about his relationship with Muhaymin was that it had dwindled since his sixteenth birthday, that his grandfather had recently approached him to ask whether he wanted to rekindle the relationship with Muhaymin, that he had been both hesitant and excited to see Muhaymin, and that he regretted not "jumping at the chance" to do so prior to Muhaymin's death. *Exhibit T, Deposition Transcript of Muhammad Muhaymin III, Decedent's Son ("MUHAMMAD III DEPO"), 54:2-8, 54:20-56:16.*

**90.** Disputed. *See objection b.* First, the section of *Exhibit 14 to Defendants' SOF* cited by Defendants includes absolutely no indications as to Officer Grenier's belief regarding Muhaymin's mental health. Second, in *Exhibit 17 to Defendants' SOF*, cited by Defendants, Officer Grenier is asked by Sergeant Tad Kline whether there were "[a]ny indicators that he might have had mental health issues going on?" In response, Officer Grenier explicitly states, "[a] little bit, the way he was rambling on." *Exhibit 17 to Defendants' SOF, 15:20-23.* That Officer Grenier went on to change his mind later in the interview does not obviate the fact that there exists on the record evidence contrary to the assertion made in  paragraph ninety. Thus, including such assertions in a "statement of facts" for the Court to accept on consideration of summary judgment is inappropriate. *Elliot*, 45 F. Supp. 3d at 1161. In addition to Grenier's explicit statements about Muhaymin's mental health condition, he was involved in a conversation with other Defendant Officers wherein Muhaymin's mental health was called into question. Bodycam footage shows Defendant Hobel describing Muhaymin as "a little 918" to Officer Grenier. *Exhibit 63 to Defendants' SOF, 10:25-10:30.* During his deposition, Defendant Hobel testified that "918" issued to describe "people that are mentally

unstable." *HOBEL DEPO, 104:11-12.* Finally, assertions regarding Officer Grenier's subjective beliefs regarding Muhaymin's mental health are inherently tied the reasonableness of his actions. Determination of the Defendant Officers' subjective beliefs regarding reasonableness is a question of credibility for jury determination. Defendants are therefore not entitled to the Court's acceptance of such assertions in their Statement of Facts, because the same has not been established on the record. *See Elliot*, 45 F. Supp. 3d at 1161.

**91.** Not generally disputed, but, for completeness further states that Dr. Taqu did not opine that Muhaymin died of a methamphetamine overdose. *TAQI REBUTTAL REPORT, pg. 2.* In fact, his testimony was just the opposite. *Id.* Further, Defendants' are not entitled to have the Court construe inferences in Defendants' favor. Inclusion of the "fact" that methamphetamines "can" kill a healthy person is irrelevant, unhelpful, and speculative.

## PLAINTIFF'S STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff submits the following further facts in opposition to Defendants' Motion for Summary Judgment.

**1.** On January 4, 2017, Muhammad Abdul Muhaymin, Jr. ("Muhaymin") entered the Maryvale Community Center ("Center") in Phoenix, AZ in order to use the restroom. *See TARANGO DEPO, 14:7-10, 21:11-25, 27:5-16.*

**2.** Muhaymin suffered from Schizophrenia (Disorganized Type). *TERROS RECS, COP 01243.* Muhaymin's medical records from Terros Health, produced by Defendants in discovery, mention his schizophrenia no less than eighty times. *Id., at COP015222-015398.*

**3.** Muhaymin carried a small Chihuahua dog named "Chiquita," trained to assist Muhaymin in alleviating the symptoms of his mental disability. *See Exhibit 62 to Defendants' SOF, 1:10-1:20 ([Muhaymin] "Good morning Officer. This is my service dog."), 8:54 ([Muhaymin] "This dog is disciplined."); TERROS RECS, COP 015245 ("Muhammad reports his dog helps him mentally..."), COP 015246 ("Muhammad has support from his dog."), COP 015315 ("CM [case manager] informed Muhammad of getting a letter from a doctor for his services dog...").*

**4.** On January 4, 2017, Chiquita accompanied Muhaymin into the Center. *See Exhibit 62 to Defendants' SOF, 1:15-1:20*; *Exhibit 65 to Defendants' SOF, 1:02-2:40*; *TARANGO DEPO, 21:19-22:2, 27:5-10.*

**5.** Defendant Tarango, the supervisor at the Center, told Muhaymin that he could not bring Chiquita into the Center, and asked Muhaymin to leave. *TARANGO DEPO, 27:5-14, 30:12-14.*

**6.** When Muhaymin repeated that he needed to use the restroom, and told Defendant Tarango that the dog was a service dog, Defendant Tarango asked Muhaymin to produce Chiquita's "papers." *Exhibit U, Interview Transcript of Defendant Tarango ("TARANGO INTERVIEW"), 16:17-24.*

**7.** Muhaymin told Defendant Tarango that Chiquita's papers had been stolen, along with the dog's collar, but that Defendant Tarango could check with his counselor and gave Defendant Tarango the name of his mental facility. *TARANGO INTERVIEW, 16:24-17:5.*

**8.** Muhaymin again informed Defendant Tarango that he needed to use the restroom, and attempted to enter the Center's restroom facilities. Defendant Tarango stepped in front of Muhaymin, initiating a "bump." *See Exhibit 62 to Defendants' SOF, 9:43-9:52 ([Defendant Tarango] "He was trying to get in [to the bathroom] and I didn't let him in, so we bumped into each other.").*

**9.** Defendant Tarango instructed Hannah Glemba ("Ms. Glemba"), a staff member at the Center, to call the police. *TARANGO DEPO, 30:15-23.* Ms. Glemba did so. *Exhibit V, Interview Transcript of Hannah Glemba, Center Employee ("HANNAH GLEMBA INTERVIEW"), 10:4-5; 911 CALL RECORDING, COP 000239.*

**10.** Defendant Officers Grenier, Hobel, Canilao, and Head were the first to arrive at the Center in response to the 911 call, between 9:20 a.m. and 9:40 a.m. *HANNAH GLEMBA INTERVIEW, 27:23-28:22; See generally Exhibits 62, 63, 65, and 66 to Defendants' SOF.*

**11.** Upon entering the Center, Defendant Officer Grenier approached Defendant Tarango and Muhaymin. *See Exhibit 62 to Defendants' SOF, 0:01-1:10.*

**12.** Defendant Tarango and Muhaymin were standing adjacent to the Center bathroom, approximately five feet apart, and were in discussion about Muhaymin's dog, Chiquita (which Muhaymin was holding). *See Exhibit 62 to Defendants' SOF, 1:10-1:12.*

**13.** Muhaymin greeted Officer Grenier, and informed him that Chiquita was his service dog, and that he wanted to use the restroom. *See Exhibit 62 to Defendants' SOF, 1:14-1:18.* Officer Grenier asked to see Chiquita's "paperwork" proving that it was a service dog, and Muhaymin told Officer Grenier that it had been stolen, along with multiple other of his personal items. *Id., at 1:18-1:25.*

**14.** Officer Grenier testified that Chiquita was entirely restrained while in the Center. *GRENIER DEPO, 39:25-40:4.*

**15.** Muhaymin then (again) asked if he could use the restroom, and Officer Grenier told him that he could not, and instructed him to "hang tight." *See Exhibit 62 to Defendants' SOF, 1:28-1:50.*

**16.** Defendant Tarango and Muhaymin continued to argue over whether Muhaymin should be allowed to bring Chiquita into the Center, with Muhaymin insisting that the Chiquita was his service animal and that he should not be denied the natural need for restroom facilities because he had a service animal. *See Exhibit 62 to Defendants' SOF, 2:10-9:20.*

**17.** After Officer Grenier observed Defendant Tarango and Muhaymin's discussion for approximately seven minutes and ten seconds, Officer Hobel walked over from the Center lobby, forcefully interjected himself into the conversation, threatened to "book" Muhaymin for assault, and asked Defendant Tarango whether Muhaymin had assaulted him. Defendant Tarango told Officer Hobel, "No. […] He was trying to get in, and I didn't let him in, so we bumped into each other." *See Exhibit 62 to Defendants' SOF, 2:10-9:20, 9:28-9:52*; *Exhibit 63 to Defendants' SOF, 2:41-3:04*; *Exhibit 65 to Defendants' SOF, 0:32-0:53.*

**18.** Defendant Tarango, Officer Hobel, and Muhaymin continued to discuss whether Muhaymin should be allowed to bring Chiquita with him into the Center when Muhaymin needed to use the restroom. After a few moments, Defendant Tarango and Officer Hobel allowed Muhaymin to use the restroom, after Muhaymin provided his name to Officer

Grenier for identification. *See Exhibit 63 to Defendants' SOF, 3:04-4:55*; *Exhibit 62 to Defendants' SOF, 9:52-11:43*.

19. While Muhaymin was in the restroom, Officer Grenier called in Muhaymin's name with the police dispatch, and was informed that Muhaymin had a misdemeanor warrant in Mesa, AZ. *See Exhibit 62 to Defendants' SOF, 11:43-15:00*; *GRENIER DEPO, 29:11-21*.

20. None of the Officers, including Officer Grenier, verified the warrant with the Mesa Police Department before Muhaymin's death. *GRENIER DEPO, 29:21, 30:9-12*.

21. Officer Grenier then told the other Officer Hobel that that Muhaymin had "a Mesa warrant." Officer Hobel responded by stating, "Oh, well then let's hook him." Officer Grenier asked whether Officer Hobel "want[ed] to take him all the way out to Mesa?" and Officer Hobel responded with, "Yeah, I don't fuckin' care." *See Exhibit 62 to Defendants' SOF, 14:59-15:06*; *Exhibit 63 to Defendants' SOF, 8:10-8:18*; *Exhibit 66 to Defendants' SOF, 8:12-8:19*.

22. Defendant Officers Grenier, Hobel, and Head discussed how to arrest Muhaymin while waiting for him to finish in the bathroom, deciding to wait until Muhaymin was outside of the Center. *See Exhibit 62 to Defendants' SOF, 15:07-16:53*; *Exhibit 63 to Defendants' SOF, 8:18-10:05*; *Exhibit 66 to Defendants' SOF, 8:13-10:06*.

23. Officer Hobel remarked to Officers Grenier and Head that Muhaymin was "a little 918." *Exhibit 63 to Defendants' SOF, 10:16-10:28*.

24. Officer Hobel testified at his deposition that "918" is "a common phrase" used by police officers to describe "people that are mentally unstable." *HOBEL DEPO, 104:11-12*.

25. When Muhaymin exited the restroom and began walking towards the Center exit, Officers Grenier, Hobel, Canilao, and Head fell in behind him. *See Exhibit 62 to Defendants' SOF, 17:48-18:00*; *Exhibit 63 to Defendants' SOF, 11:02-11:20*; *Exhibit 65 to Defendants' SOF, 8:45-9:10*; *Exhibit 66 to Defendants' SOF, 11:04-11:15*.

26. Upon exiting the Center, Officers Grenier and Canilao grabbed Muhaymin, told him to stop walking, and instructed him to put his hands behind his back because he was under arrest *See Exhibit 62 to Defendants' SOF, 18:15-18:22*; *Exhibit 65 to Defendants' SOF, 9:17-9:24*.

**27.** Muhaymin asked why he had to put his hands behind his back, and the Officers informed him that he had a warrant, and all four laid hands upon Muhaymin's body and telling him to drop Chiquita. Muhaymin can be heard saying "wait, wait, wait, wait" and asking, "A warrant? For what?" *See Exhibit 62 to Defendants' SOF, 18:22-18:31*; *Exhibit 63 to Defendants' SOF, 11:36-11:44*; *Exhibit 65 to Defendants' SOF, 9:24-9:33*; *Exhibit 66 to Defendants' SOF, 11:35-11:45*.

**28.** Muhaymin informed the Officers that he did not have anyone to watch or take care of Chiquita. *See Exhibit 62 to Defendants' SOF, 18:31-18:47*; *Exhibit 63 to Defendants' SOF, 11:44-11:59*; *Exhibit 65 to Defendants' SOF, 9:33-9:48*; *Exhibit 66 to Defendants' SOF, 11:46-12:00*.

**29.** Muhaymin begged the Officers to call his "sensei" to take care of the dog. *See Exhibit 62 to Defendants' SOF, 18:47-19:00*; *Exhibit 63 to Defendants' SOF, 12:00-12:11*; *Exhibit 65 to Defendants' SOF, 9:48-10:00; Exhibit 66 to Defendants' SOF, 12:01-12:12*.

**30.** Officer Hobel forced a baton under Muhaymin's arm and against Chiquita, applying enough pressure to make Chiquita cry out in pain. *See Exhibit 62 to Defendants' SOF, 18:58-19:01*; *Exhibit 63 to Defendants' SOF, 12:05-12:12*; *Exhibit 65 to Defendants' SOF, 9:54-10:01*; *Exhibit 66 to Defendants' SOF, 12:10-12:14*.

**31.** Officer Hobel asked the other Officers whether they were ready to "take him down." *See Exhibit 62 to Defendants' SOF, 19:02-19:10*. Muhaymin said "No. Don't do that. This is my son, sir." *Exhibit 62 to Defendants' SOF, 19:11-19:16*; *Exhibit 63 to Defendants' SOF, 12:12-12:28*; *Exhibit 65 to Defendants' SOF, 10:10-10:17*; *Exhibit 66 to Defendants' SOF, 12:22-12:29*.

**32.** All four of the Officers grabbed Muhaymin and physically forced him to double over against a glass wall, making him drop Chiquita. *See Exhibit 62 to Defendants' SOF, 19:17-19:36 (Officer Grenier's bodycam fell off at 19:35)*; *Exhibit 63 to Defendants' SOF, 12:29-12:46*; *Exhibit 65 to Defendants' SOF, 10:18-10:32*; *Exhibit 66 to Defendants' SOF, 12:29-12:45*.

**33.** Muhaymin screamed, "OK!" multiple times and yelled out as the four Officers forced him to the ground. *Exhibit 63 to Defendants' SOF, 12:47-12:58*; *Exhibit 64 to Defendants'*

*SOF, 0:00-0:07*; *Exhibit 65 to Defendants' SOF, 10:33-11:02 (Officer Canilao's bodycam falls off at 10:40 and is picked up again at 13:16, and dropped again at 13:58. The audio remains available.)*; *Exhibit 66 to Defendants' SOF, 12:46-13:13.*

**34.** One of the Officers told Muhaymin, "Now you're gonna be going for a felony now, dumbass. Now it's a felony. You understand? You understand?" *See Exhibit 64 to Defendants' SOF, 0:17-0:26*; *Exhibit 65 to Defendants' SOF, 11:12-11:21*; *Exhibit 66 to Defendants' SOF, 13:24-13:33.*

**35.** During the struggle, Officer Grenier used his elbow to strike Muhaymin in the back. *GRENIER DEPO, 61:9-20; Exhibit W, Interview Transcript of Defendant Grenier ("GRENIER INTERVIEW"), 29:4-24.*

**36.** The Officers kneeled on Muhaymin while he was laying prone, forcing his arms behind his back and applying handcuffs as he continued to scream and yell. *See Exhibit 64 to Defendants' SOF, 0:13-56*; *Exhibit 66 to Defendants' SOF, 13:12-14:10.*

**37.** The Officers together, and Officer Hobel in particular, continued to apply body weight to Muhaymin while he was prone on the sidewalk for approximately one minute and thirty-one seconds. *See Exhibit 66 to Defendants' SOF, 13:12-14:43.*

**38.** During this time, Officer Hobel placed his knee directly on Muhaymin's head and leaned over his body, placing substantial weight on Muhaymin's head. *See Exhibit 66 to Defendants' SOF, 14:03-14:13.* Officer Hobel's knee remained on Muhaymin's head for approximately forty seconds. *Id., 14:03-14:43.*

**39.** Officer Hobel told Muhaymin, "You're misbehavin' bud. You're misbehavin'." *See Exhibit 64 to Defendants' SOF, 1:31-1:36*; *Exhibit 66 to Defendants' SOF, 14:38-14:42.*

**40.** The Officers rolled Muhaymin over, lifted him up by his arms, and began marching him towards the Police SUV. *See Exhibit 64 to Defendants' SOF, 1:59-2:08*; *Exhibit 66 to Defendants' SOF, 14:46-15:15.*

**41.** Muhaymin continued to plead with the Officers, telling them that he considered Chiquita to be his "child" and expressing concern over what was going to happen to the dog. *See Exhibit 64 to Defendants' SOF, 2:04-2:25.*

**42.** About halfway to the Police SUV, the Officers lifted Muhaymin up by his arms (which were cuffed behind his back) and underarms, causing Muhaymin to cry out, and told him, "Stand your ass up." *See Exhibit 64 to Defendants' SOF, 2:25-2:40.*

**43.** Upon arriving at the Police SUV, Officer Hobel said, "Let's search him first," and the Officers Hobel, Grenier, and Canilao lifted Muhaymin and threw him on top of the hood of the Police SUV. *See Exhibit 64 to Defendants' SOF, 2:57-3:05*; *Exhibit 66 to Defendants' SOF, 16:06-16:16*; *SMITH DEPO, 14:19-22.*

**44.** When Muhaymin was thrown on top of the hood of the Police SUV, either Officer Hobel or Officer Canilao forced Muhaymin's arms up, almost perpendicular to the ground, and Muhaymin screamed. *See Exhibit 64 to Defendants' SOF, 3:04-3:07; Exhibit 66 to Defendants' SOF, 16:10-16:17.*

**45.** Either Officer Hobel or Officer Canilao, or both working in tandem with one another, then forced Muhaymin's cuffed arms even further up his back, over his head, and down the front again, causing Muhaymin to scream, yell out, and finally cry. *See Exhibit 64 to Defendants' SOF, 3:07-3:17; Exhibit 66 to Defendants' SOF, 16:17-16:24*; *SMITH DEPO, 14:19-15:1.*

**46.** In response to Muhaymin's cries, the Officers told him to "just fucking relax, dumbass." *See Exhibit 64 to Defendants' SOF, 3:17-3:20; Exhibit 66 to Defendants' SOF, 16:24-16:25.*

**47.** Officer Grenier instructed the others to take Muhaymin "to the ground, to the ground." *See Exhibit 64 to Defendants' SOF, 3:25-3:27; Exhibit 66 to Defendants' SOF, 16:25-16:34.*

**48.** As Muhaymin said, "Please stop," the Officers shoved him to the concrete and called for "another unit." *See Exhibit 64 to Defendants' SOF, 3:32-3:40; Exhibit 66 to Defendants' SOF, 16:35-16:45.*

**49.** Muhaymin landed on his side, and the Officers began immediately placing body weight on his torso, attempting to uncuff him and re-cuff his arms behind his back. *See Exhibit 64 to Defendants' SOF, 3:40-9:47; Exhibit 66 to Defendants' SOF, 16:45-19:14.*

**50.** While the bodycam footage is unsteady and it is difficult to track the movements of each Defendant Officer throughout the time wherein Muhaymin was laying prone the ground, the following movement chronologies are possible to discern:

*a.* Officer Grenier's actions can be ascertained through a combination of Officer Hobel's bodycam footage and Officer Aker's bodycam footage. *Exhibit 64 to Defendants' SOF, 5:04-8:36*; *Exhibit 73 to Defendants' SOF, 24:00-25:15.* At 5:04, Officer Grenier's knee is placed on Muhaymin's upper torso, while Muhaymin is on his side. It remains in that position until 6:10, where Officer Grenier shifts to extend his opposite leg out, exerting substantial body weight onto Muhaymin's shoulder/neck. At 6:59, Officer Grenier again shifts to fully extend his opposite leg, exerting nearly full body weight. It is at this point that the video clearly shows Officer Grenier's knee fully on Muhaymin's neck. (Officer Grenier's knee can also be seen to be fully on Muhaymin's neck in Officer Nielson's bodycam footage. *See Exhibit 68 to Defendants' SOF, 1:40-1:*45.) At 7:30, Officer Grenier can be seen to actively push off of his opposite leg and add force to his knee on Muhaymin. Officer Grenier's knee remains in this position until the Officers roll Muhaymin to his stomach at 8:36. Combined, the total time wherein Officer Grenier's knee was on Muhaymin's upper torso/neck while Muhaymin was on his side, with no adjustments other than to **increase** pressure, was three minutes and thirty-two seconds. *Exhibit 64 to Defendants' SOF, 5:04-8:36.* Officer Grenier then immediately put his knee back on Muhaymin's body, where he remains for approximately 39 seconds, until Officer Hobel tells him that Officer Leroux had arrived and to "go get that hobble." *Id., at 8:36-9:20.* This interaction can more clearly be seen by reviewing Officer Aker's bodycam footage, which, at 24:00, shows Officer Grenier being replaced by Officer Leroux, who places his knee on Muhaymin. *See Exhibit 73 to Defendants' SOF, 24:00-24:15.* Officer Grenier leaves to check his vehicle for a hobble, but does not find one and returns less than a minute later, staying to observe while the other Defendant Officers continue to apply weight to Muhaymin's prone body. *Id., 24:15-24:55; 25:05-25:15.*

*b.* Part of Officer Head's actions be ascertained by reviewing a combination of his own bodycam footage, Officer Nielsen's bodycam footage, and Officer McGowan's bodycam

footage. After Muhaymin was thrown to the concrete and landed on his side, Officer Head got up, walked around Muhaymin, and laid bodily across Muhaymin's legs. *See Exhibit 66 to Defendants' SOF, 16:48-19:*14. He stayed there until Officer McGowan arrived, applied a hobble to Muhaymin's legs, and lifted Officer Head off of Muhaymin. *See Exhibit 68 to Defendants' SOF, 0:01-0:07*; *Exhibit 72 to Defendants' SOF, 0:01-0:35*.

    *c.* Officer Hobel's actions can be ascertained by reviewing a combination of his own bodycam footage and Officer Aker's bodycam footage. After Muhaymin was thrown to the ground, Office Hobel placed weight on Muhaymin's lower torso/hips. *See Exhibit 64 to Defendants' SOF, 3:50-3:55*. Officer Hobel remains there for approximately three minutes and six seconds, when he moves lower on Muhaymin's body to grasp his pants. *Id., 7:01-7:11*. Officer Hobel then instructs Officer Heimbigner to place weight on Muhaymin's back, and stands up. *Id., 7:37-7:43*. Officer Hobel then placed his hands back on Muhaymin's torso and leaned forward over Officer Heimbigner for approximately one minute and four seconds, when Officer Heimbigner stands back up. *Id., 7:44-8:48*. He remained on Muhaymin's torso until Muhaymin vomited. *See Exhibit 73 to Defendants' SOF, 23:48-26:22*;

    *d.* Officer Nielson's actions can be ascertained by reviewing his bodycam footage. *See generally Exhibit 68 to Defendants' SOF*. After Muhaymin was thrown to the ground, and after Officer Head moved around to lay across Muhaymin's legs, Officer Nielson arrived, running from the direction of the Center. *Id., 0:01-0:08*. At 0:10-0:12, Officer Nielson walked around Muhaymin to the opposite side. At 0:20, Officer Nielson grasped Muhaymin's arm, which was trapped under Muhaymin's side. At 0:30-0:31, Officer Nielson handed off Muhaymin's arm to Officer Grenier. At 0:53-1:22, Officer Nielson removed the cuffs from Muhaymin's hands while instructing an unidentified Defendant Officer to step on Muhaymin's wrists "as hard as you can there, ok…" At 1:35-1:45, Officer Nielson helped an unidentified Defendant Officer pull Muhaymin's arm behind his back, while other Defendant Officers continued to apply weight to Muhaymin's upper torso. At 1:54, Officer Nielson grabbed the back of Muhaymin's head/hair. Officer Nielson continued to hold Muhaymin's head until approximately 3:33 (after Muhaymin had vomited), when he moved

his hand to Muhaymin's upper back. At 3:45-4:09, Officer Nielson stood up and walked away.

*e.* Officer Heimbigner's actions can be partially ascertained by reviewing Officer Hobel's bodycam. *Exhibit 64 to Defendants' SOF, 7:34-8:47.* Officer Heimbigner arrived at approximately 7:34, asking, "What do you need guys? At 7:37 Officer Hobel tells her to "hold right there," indicating Muhaymin's upper torso. At 7:38, Officer Heimbigner places her right hand upon Muhaymin's upper torso. At 7:44-7:46, Officer Heimbigner places her left forearm across Muhaymin's lower back and lays on top of him. Officer Heimbigner remains in this position until Muhaymin is rolled over at 8:36. Combined, the total time wherein Officer Heimbigner's body weight was on Muhaymin's mid/lower back with no adjustments was fifty-two seconds. *Exhibit 64 to Defendants' SOF, 7:44-8:36.*

*f.* Officer McGowan arrived after Muhaymin had been thrown to the ground, running from the direction of the Center and applying a hobble to Muhaymin's legs, and then pulling Officer Head off of Muhaymin. *See generally Exhibit 72 to Defendants' SOF*. After applying the hobble, Officer McGowan grabbed Muhaymin's arm and pulled it behind Muhaymin's back. *See Exhibit 73 to Defendants' SOF, 24:25-24:30.*

*g.* Officer Leroux arrived after Muhaymin had been turned to his stomach. *See Exhibit 73 to Defendants' SOF, 23:50.* (In the footage, Officer Leroux is bald and is wearing sunglasses on top of his head.) He then kneeled down on Muhaymin's torso, replacing Officer Grenier. *Id., 24:02-24:06.* He remained there for approximately thirty-nine seconds and shifted from his knee to his side, still applying weight to Muhaymin's torso. *Id., 24:45.* He shifted his weight again at 24:57, and maintained weight on Muhaymin's back while Muhaymin's hands were cuffed. *Id., 24:57-26:18.*

*h.* Officer Wong's actions can be partially ascertained by reviewing Officer Aker's bodycam footage. *See Exhibit 73 to Defendants' SOF, 23:47-26:55.* At 23:48, Officer Wong was kneeling, watching the other Defendant Officers apply force to Muhaymin as he is laying prone on the ground. At 24:15-24:24, Officer Wong moved around Muhaymin's body to continue watching. At 24:47, Officer Wong knelt down again, this time to place his hands on Muhaymin. At 25:25-30:00, Officer Wong readjusted, and this is the final moment in

Officer Aker's bodycam footage where Officer Wong's actions are clearly ascertainable until 26:34, after Muhaymin has vomited and the Officers are rolling him over.

51. Officer Aker's bodycam footage provides a general view of multiple Defendant Officers applying substantial body weight onto Muhaymin's torso for an extended period of time. *See Exhibit 73 to Defendants' SOF, 23:50-26:48.*

52. At multiple points in the available bodycam footage while the Defendant Officers were applying pressure to Muhaymin's torso and neck, Muhaymin can be heard screaming out, "I can't breathe!" *See Exhibit 64 to Defendants' SOF, 4:40-4:51 (During these eleven seconds, Muhaymin tells the Defendant Officers that he cannot breathe three separate times. The Officers respond by saying, "Stop moving. Shut up.")*

53. The Defendant Officer ignored Muhaymin's cries for help and continued to apply body weight, while Muhaymin gasped for air. *See Exhibit 64 to Defendants' SOF, 4:40-5:00*; *Exhibit 68 to Defendants' SOF, 0:18-28*;

54. While Muhaymin was face-down, the Defendant Officers removed Muhaymin's handcuffs and forced his arms behind his back. *See Exhibit 68 to Defendants' SOF, 1:15-2:10.* At this point, Muhaymin could no longer resist, as Defendant Officers were sitting on his legs, had his arms behind his back, and Officer Nielson was grasping Muhaymin's hair, pulling his head up. *See Exhibit 66 to Defendants' SOF, 16:48-19:*14; *Exhibit 68 to Defendants' SOF, 0:01-0:07*; *Exhibit 72 to Defendants' SOF, 0:01-0:*35; *Exhibit 68 to Defendants' SOF, 1:15-2:10.*

55. Muhaymin ceased struggling for air and began to moan. *See Exhibit 68 to Defendants' SOF, 2:05-2:35.*

56. The Officers continued to apply pressure to Muhaymin's upper torso while they applied handcuffs. *See Exhibit 68 to Defendants' SOF, 2:05-2:35*; *Exhibit 73 to Defendants' SOF, 25:05-26:16.*

57. After Muhaymin's arms were securely behind his back and he stopped struggling for air, the Defendant Officers continued to apply substantial weight to his body. *See Exhibit 68 to Defendants' SOF, 2:05-3:21.* From the moment when Muhaymin went completely limp and began moaning incoherently to when the Defendant Officers removed their weight from

Muhaymin's prone torso (and the Defendant Officers only moved when Muhaymin vomited) was approximately one minute and sixteen seconds. *Id.*

**58.** From the moment Muhaymin is thrown to the ground to the moment when he vomits is approximately seven minutes and forty-seven seconds. *See Exhibit 64 to Defendants' SOF, 3:42-9:47; Exhibit 68 to Defendant's SOF, 1:37-3:20. (There exists no bodycam footage which shows the entirety of the incident. However, Officer Hobel's bodycam footage shows when Muhaymin was taken to the ground (3:42), and the end of the footage (9:47) can be correlated with a point in Officer Nielson's bodycam footage (1:37) by the ambient noise, and Officer Nielson's bodycam footage clearly shows when Muhaymin vomited (3:20).)* During this period, the **combined** amount of time wherein Muhaymin can be seen to physically move his body on the bodycam footage, struggling to breathe and yelling out, was approximately one minute and twenty-eight seconds. *See Exhibit 64 to Defendants' SOF, 3:49-3:54, 4:21-4:24, 4:40-5:02; 5:08-5:10; 5:34-5:45; 6:05-6:11, 6:34-6:38, 7:02-7:05, 7:42-7:48; Exhibit 68 to Defendants' SOF, 1:42-2:08.* The remainder of the time, Muhaymin did not move. *See Exhibit 64 to Defendants' SOF, 3:42-9:47; Exhibit 68 to Defendant's SOF, 1:37-3:20.* Therefore, out of the approximately seven minutes and forty-seven seconds that the Defendant Officers were on top of Muhaymin prior to him vomiting, Muhaymin was still for approximately six minutes and nineteen seconds. *See Exhibit 64 to Defendants' SOF, 3:42-9:47; Exhibit 68 to Defendant's SOF, 1:37-3:20.*

**59.** The Officers left Muhaymin face-down in his own vomit for approximately twenty-five seconds before rolling him over and attempting to resuscitate him. *See Exhibit 68 to Defendants' SOF, 3:20-3:45, Exhibit 73 to Defendants' SOF, 26:18-26:48.*

**60.** When the EMT's arrived, one of them can be heard on bodycam footage asking the Defendant Officers, "was he pinned?" and "you guys were on top of him?" *Exhibit 70 to Defendants' SOF, 2:47-2:55.* The Defendant Officers answered with various "yes" and "yeah" affirmative answers. *Id.*

**61.** When the EMT's arrived, Muhaymin did not have a pulse. *See Exhibit 43 to Defendants' SOF, COP003360 ("When emergency personnel arrived Muhammad was in*

*asystole.")*. The EMT's checked Muhaymin's throat and noted vomitus that had collected in his airway. *See Exhibit 43 to Defendants' SOF, COP003360.*

**62.** Muhaymin was taken by ambulance to Maryvale Hospital and pronounced deceased at approximately 10:39 a.m. *See Exhibit 28 to Defendants' SOF, 17:22-18:2.*

**63.** Throughout the entirety of his interactions with the Defendant Officers on January 4, 2017, Muhaymin never harmed, or threatened to harm, any of the Defendant Officers. *CANILAO DEPO, 82:2-11; CLARK DEPO, 31:6-16; GRENIER DEPO, 10:4-24, 29:2-10, 39:17-24; HEAD DEPO, 35:6-9, 39:7-15; SMITH DEPO, 18:3-17.*

**64.** After the Officers rolled Muhaymin out of his vomit, Officer Neilson said, "Yeah, he's dead." *See Exhibit 68 to Defendants' SOF, 4:12-4:17.* Thereafter, Officer Nielson twice told Officer Head that he "knew that was going to happen," and Officer Head responded with "yeah." *Exhibit 67 to Defendants' SOF, 00:35-00:50*; *HEAD DEPO, 64:19-65:11; 65:17-18.*

**65.** Multiple of the Defendant Officers testified that they received training on the dangers of asphyxiation from the police department, and the City of Phoenix's corporate representative testified that such training is given. *CANILAO DEPO, 65:21-66:7; CLARK DEPO, 54:16-19; Exhibit X, Deposition Transcript of Defendant Heimbigner ("HEIMBIGNER DEPO"), 21:7-9; Exhibit Y, Deposition Transcript of Defendant McGowan ("MCGOWAN DEPO"), 36:21-37:1; Exhibit Z, Deposition Transcript of James Ward, City of Phoenix 30(b)(6) Witness ("30(b)(6) DEPO"), 23:15-25, 54:16-55:15.*

**66.** Officer Canilao testified that he was personally aware through life experience that weight applied to a prone individual's back can cause difficulty breathing. *CANLIAO DEPO, 67:4-8.*

**67.** Defendants' medical expert witness, Dr. Gary Vilke, testified that Muhaymin's cries of "I can't breathe" could have been signs of a medical emergency involving Muhaymin's heart. *See Exhibit AA, Deposition Transcript of Dr. Gary Vilke, Medical Expert Witness for Defendants ("VILKE DEPO"), 40:22-41:8.*

**68.** Muhaymin's death was caused, at least in part, by Defendant Officers' actions. *See Exhibit 43 to Defendants' SOF, COP 003356 ("CAUSE OF DEATH: Cardiac arrest in the*

*setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual" "MANNER OF DEATH: Homicide"); OMALU DEPO, 126:7-14 ("[T]he cumulated actions of all the police officers were substantial and significant contributory factors to [Muhaymin's] sudden and unexpected death."); TAQI DEPO, 114:7-8 ("[T]he pressure on [Muhaymin's] back caused him to asphyxiate."); Exhibit 55 to Defendants' SOF, COP 015485, (including as a cause of the cardiac event "physical exertion" while being arrested).*

Respectfully submitted: February 1, 2021

PRICE LAW GROUP, APC

/s/David A. Chami
David A. Chami, AZ Bar No. 027585
david@pricelawgroup.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter. The documents are being filed with the Court under seal, therefore, hard copies of the foregoing have been provided via personal delivery or by postal mail.

PRICE LAW GROUP, APC

*/s/Florence Lirato*