

EXHIBIT D

**In The Matter Of:**

*Mussalina Muhaymin v.*
*City of Phoenix*

---

*Jason Hobel*
*September 18, 2019*
*Confidential*

---

*Valley Court Reporting, LLC*
*4802 East Ray Road, Suite 23-200*
*Phoenix, AZ 85044*
*(602) 710-1148*
*www.valleycr.com*

Min-U-Script®

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Mussalina Muhaymin,      )
                         )
     Plaintiff,      )
                         )
      vs.            ) Civil Action No.
                         ) CV-17-04565-PHX-SMB
City of Phoenix, at el.,  )
                         )
     Defendants.     )
_____)


VIDEOTAPED DEPOSITION OF JASON HOBEL



Scottsdale, Arizona
September 18, 2019
9:29 a.m.







PREPARED BY:
PAMELA JOY GIFFIN, RPR
AZ CR #50106
CA CSR #8651

1                          I N D E X

2                  E X A M I N A T I O N

3                                              PAGE

4    JASON HOBEL

5        BY MR. CHAMI . . . . . . . . . . .    5
         BY MR. SCARBROUGH . . . . . . . . . 133
6

7

8

9                      E X H I B I T S

10   1     Copy of City of Phoenix Police              126
           Department, Training Bureau, Academy
11         Training Record, Employee Name: Hobel,
           Jason P

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE VIDEOTAPED DEPOSITION OF JASON HOBEL,

2

3    taken at 9:29 a.m. on September 18, 2019, at the law

4    offices of Price Law Group, APC, 8245 North 85th Way,

5    Scottsdale, Arizona, before PAMELA JOY GIFFIN, a

6    Certified Reporter, #50106, in and for the State of

7    Arizona.

8

9                 A P P E A R A N C E S

10

11   FOR THE PLAINTIFF:

12   PRICE LAW GROUP, APC
     BY:  DAVID CHAMI, ESQ.
13   8245 North 85th Way
     Scottsdale, Arizona  85258
14
     FOR THE DEFENDANTS:
15
     O'CONNOR & CAMPBELL, P.C.
16   BY:  JARED SCARBROUGH, ESQ.
     7955 South Priest Drive
17   Tempe, Arizona  85284

18
     Also present:  Bill Marinakis, Videographer; Tiffany
19   Gill; Jenna Dakroub

20

21

22

23

24

25

1                                    Scottsdale, Arizona

2                                    September 18, 2019

3                                    9:29 a.m.

4

5              THE VIDEOGRAPHER:  We're on the record.

6    Today's date is Wednesday, September 18th, 2019.  The

7    time on the video monitor is 9:29 a.m.

8              This is the video recorded deposition of

9    Jason Hobel noticed by counsel for the plaintiff in the

10   matter of Mussalina Muhaymin versus City of Phoenix;

11   et al., in the United States District Court for the

12   District of Arizona, Case No. CV-17-04565-PHX-SMB.

13              Our location today is the Price Law Group in

14   Scottsdale, Arizona.

15              The certified court reporter is Pam Giffin of

16   Valley Court Reporting located at 4802 East Ray Road,

17   Suite 23-200, Phoenix, Arizona, 85044.

18              Counsel, will you please identify yourselves

19   and state whom you represent for the record at this

20   time, please, starting with plaintiff's counsel.

21              MR. CHAMI:  David Chami on behalf of

22   Mussalina Muhaymin.

23              MR. SCARBROUGH:  Jared Scarbrough on behalf

24   of defendants.

25              THE VIDEOGRAPHER:  Thank you, Counsel.

1            For the record also in attendance today is

2   Jenna Dakroub and Tiffany Gill.

3            The witness may be sworn in at this time,

4   please.

5

6                    JASON HOBEL,

7   called as a witness herein, having been first duly

8   sworn, was examined and testified as follows:

9

10                   EXAMINATION

11  BY MR. CHAMI:

12      Q.    Officer Hobel, can you state your full name

13  for the record, please.

14      A.    Jason Hobel.

15      Q.    Have you ever had your deposition taken

16  before, Officer Hobel?

17      A.    No, sir.

18      Q.    Okay.  I'm going to go through some of the

19  admonitions for the deposition.  Your counsel, your

20  lawyer, may have already talked about some of this with

21  you, but just in case, we'll go through some of the --

22  call them rules of the road.

23            I'm going to be asking you questions about

24  January -- well, in relation to an incident that

25  occurred on January 4th, 2017, which is basically the

1    basis for the claims brought against you and other

2    officers and the City of Phoenix.

3                    Sometimes my questions may be worded in such

4    a way that it may not be clear to you what it is that

5    I'm asking.  You may not understand the question, and

6    if that happens, I don't want you to guess.  So if you

7    don't understand my question or you need me to rephrase

8    the question for whatever reason, I'd ask you to let me

9    know so that I can try to phrase it more clearly for

10   you, okay?

11       A.    Okay.

12       Q.    All right.  However, if you go ahead and

13   answer my question without asking for a clarification,

14   I'm going to assume that you understood my question.

15   Is that fair?

16       A.    That's fair.

17       Q.    All right.  So far so good.  You're giving me

18   audible responses using words:  yes; no; you know,

19   sentences.  In a deposition we have a court reporter

20   who's taking down everything we say.  Uh-huh, uh-uh,

21   nodding of the head, while I may understand those and

22   they may be appropriate in a normal conversation, they

23   don't work in depositions, so if that happens, I'm

24   going to ask is that a yes?  Is that a no?  I'm not

25   trying to suggest an answer.  I'm just trying to make

1  sure we get a clear record, okay?

2      A.    Okay.

3      Q.    All right.  From time to time your lawyer may

4  object to my question.  He may not like something that

5  I'm saying, the way I'm saying it.  What he's doing is

6  making a record.  However, at the conclusion of his

7  objection, if you can, you still need to try to answer

8  the question unless he specifically instructs you not

9  to answer, okay?

10     A.    Okay.

11     Q.    All right.  In the event that you need a

12 break, use the restroom, stretch your legs, I'm okay

13 with that.  We'll take a break.  The only caveat would

14 be that if I'm in the middle of a question or a line of

15 questioning, I may ask that we complete that before we

16 take the break, okay?

17     A.    Yes, sir.

18     Q.    All right.  Normal conversations, you hear a

19 question coming, you know -- you know what I'm asking,

20 you know what it is I'm asking, and you may start to

21 answer my question before I've actually completed the

22 question.  That may work in a normal conversation.  In

23 a deposition it doesn't work because, again, like I

24 said, the court reporter is taking down everything.  So

25 later if somebody were reading the deposition

1  transcript, my question would be incomplete.  So if you

2  start to answer my question before I've completed the

3  question, I may interrupt you and say, hold on, I

4  haven't finished the question.  I'm not trying to be

5  rude.  I'm just trying to make sure I get a clear

6  record, okay?

7      A.    Okay.

8      Q.    All right.  Similarly, you may be answering a

9  question; you may pause; I may think you're done and I

10 may start asking the next question.  If you haven't

11 completed the answer to my question, let me know, and

12 I'll try -- and I'll go ahead and pause and let you

13 finish, okay?

14     A.    Okay.

15     Q.    All right.  What did you do to prepare for

16 the deposition here today?

17     A.    I read through the reports.

18     Q.    Okay.  When you say "the reports," are you

19 referring to the incident report?

20     A.    The incident report and then the -- the FI's

21 and then the arrest.

22     Q.    Okay.  Did you watch any videos?

23     A.    We briefly watched the video.

24     Q.    Okay.  Now, there are -- there were two

25 videos -- maybe one video but there were two separate

1   attachments of video that are purported to have come

2   from your body cam.  Did you watch those?

3       A.    Yes.

4       Q.    Did you watch any other videos?

5       A.    Not that I recall.

6       Q.    Okay.  Do you recall at any point in time

7   during the incident discontinuing the recording from

8   your body cam?

9       A.    No.

10      Q.    Okay.  So is it your testimony here today

11  that from the time you arrived on the scene and

12  activated your body cam to the time the incident

13  concluded, Mr. Muhaymin was given CPR, CPR began,

14  that's the complete footage of your entire presence on

15  that scene?

16      A.    As far --

17            MR. SCARBROUGH:  Foundation, form.

18            THE WITNESS:  As far as me turning my camera

19  on and off, I turned it on, and then after he was

20  handcuffed and we were doing CPR and stuff, I believe I

21  shut it off for that.

22      Q.    BY MR. CHAMI:  Okay.  Did you provide a

23  recorded statement after the incident?

24      A.    I was interviewed, did a walk-through with a

25  homicide detective.

1     Q.    Was that the same day of the event?

2     A.    Yes, it was.

3     Q.    Okay.  Have you listened to that recorded

4  statement?

5     A.    I have not.

6     Q.    Okay.  Is there anything in that recorded

7  statement that you recall -- well, let me ask you a

8  different question.  Strike that.

9           Do you recall what you said in that recorded

10  statement?

11     A.    No.

12     Q.    Do you have any reason to believe that

13  anything you said in that statement would have been

14  untrue?

15     A.    No.

16     Q.    Okay.  So if we were to listen to that

17  statement today, it would be fair to say that you would

18  say that everything you said in that statement was

19  accurate as you recalled it at the time?

20     A.    Yes, that would be fair.

21     Q.    Okay.  Before I start talking about

22  January 4th, 2017, I do want to get a little bit of

23  information about you as a police officer, your

24  history, training, and so I'm going to try not to

25  belabor that part of this deposition, but I do need to

1  get a better understanding of your background.

2           When did you graduate from the police

3  academy?

4      A.    In July of '99.

5      Q.    And did you -- was working for the Phoenix PD

6  your first job?

7      A.    No.

8      Q.    Who did you start working for in 1999?

9      A.    I -- I did construction for Continental Homes

10 here in the Valley when I moved here from New York.

11 That was my first job here.

12     Q.    Okay.  And I apologize.  My question was

13 probably poorly worded.  Was the Phoenix PD your first

14 police officer job?

15     A.    Yes, it was.

16     Q.    Okay.  And that was in 1999?

17     A.    Yes, it was.

18     Q.    All right.  And what did you start out as

19 upon graduation from the academy?

20     A.    As a police officer but you have to go

21 through the FTO phase.

22     Q.    Okay.  And were you assigned to patrol or --

23     A.    I was assigned to patrol.

24     Q.    All right.  And are you still in patrol?

25     A.    I am.

1       Q.      Have you been in patrol the entire time?

2       A.      I have been.  I've been an FTO, field

3    training officer.  I've worked all three shifts, but

4    I've been in patrol the whole time.

5       Q.      Okay.  And so as of today, you've been a

6    police officer for approximately 20 years?

7       A.      For over 20 years, yes.

8       Q.      Okay.  I'd like to talk a little bit about

9    your training.  Do you recall the first time during any

10   of your training, the first time you actually were

11   provided training regarding mental health?

12      A.      Do I recall?

13      Q.      Yeah.

14      A.      I know that I've received training for mental

15   health, but as far as the in depth details, no.

16      Q.      Okay.  Do you -- and when I say "mental

17   health," I mean encountering people with mental health

18   illnesses in the field.  Did you get that kind of

19   training?

20      A.      Yes.

21      Q.      Okay.  Was that something that you learned

22   about early on as a police officer or did that come

23   later?

24      A.      It came later.

25      Q.      Okay.

1      A.    You'd have to look at the records to get the

2  exact dates.

3      Q.    And I have some of those for you and we'll

4  look at those together, but I want to -- my

5  understanding overall, the field -- the law enforcement

6  field training regarding mental health illnesses has

7  evolved dramatically in the last 20 years.  Would you

8  agree with that?

9      A.    Yes, I would.

10          MR. SCARBROUGH:  Foundation.

11      Q.    BY MR. CHAMI:  Okay.  Learning how to

12  identify people with mental health illnesses is

13  something that is more prevalent in -- in your training

14  now than it was 20 years ago.  Would you agree with

15  that?

16      A.    Yes.

17      Q.    Why would you say that being able to identify

18  somebody with mental health problems is important to

19  you as a police officer?

20      A.    It might help you understand what they're

21  going through at the time that you're there.

22      Q.    Okay.  Would it affect the way you talk to

23  them if you knew they had a mental health problem or

24  possibly had a mental health problem?

25      A.    Yes.

1      Q.      Is that something you've learned in training
2   or is that just common sense for you?
3      A.      Probably both.
4      Q.      Okay.  You would agree that you would talk to
5   a child differently than you would an adult, right?
6      A.      Yes.
7      Q.      Somebody with a lower I.Q. or a -- I guess a
8   lesser ability to comprehend or understand, you've
9   heard the -- strike that.
10            You've heard of the saying, you know, you
11   talk to someone like -- you shouldn't talk to someone
12   like they're a baby?
13      A.      That's not something that I've heard, no.
14   You may need to reword that.
15      Q.      Yeah.  So I talk to my child different than I
16   talk to my wife because they just have a different
17   capacity to -- to understand what it is I'm saying as
18   an adult.  You would agree with that --
19      A.      Yes.
20      Q.      -- generally speaking?
21            All right.  Is that the same dealing with
22   people you encounter in the community?  If you're
23   dealing with a 10-year-old or a 12-year-old, you're
24   going to speak to them differently than you would if
25   you were dealing with an adult, right?

1      A.     Sometimes demeanor of the person may dictate

2   how you speak to them.

3      Q.     Okay.  You had met Mr. Muhaymin on multiple

4   occasions, right, prior --

5      A.     Yes.

6      Q.     -- prior to January 4, 2017?

7      A.     Yes.

8      Q.     Okay.  You had arrested him multiple times?

9      A.     Just once.

10            MR. SCARBROUGH:  Form.

11     Q.     BY MR. CHAMI:  You'd encountered him multiple

12  times and arrested him just once?

13     A.     Yes, sir.

14     Q.     Okay.  You knew him to be transient, right?

15     A.     I did.

16     Q.     And you also knew then from your training

17  that a lot of transient people have mental health

18  issues, right?

19            MR. SCARBROUGH:  Form, foundation.

20            THE WITNESS:  Some of them do, yes.

21     Q.     BY MR. CHAMI:  You knew Mr. Muhaymin from

22  your past experiences -- strike that.

23            Nothing about your past experiences with

24  Mr. Muhaymin led you to believe that he was a violent

25  person, did they?

1  A.    He was not violent with me in the past.

2  Q.    Okay.  In the past had you ever encountered

3  Mr. Muhaymin with a weapon?

4  A.    I remember him having knives.

5  Q.    Knives, plural?

6  A.    Yes.

7  Q.    Was he ever carrying knives that were illegal

8  to carry?

9  A.    Not that I recall, no.

10 Q.    And I've listened to the videos.  I've

11 watched the videos.  At no point in time do I ever hear

12 you talk about that with anybody.  Did you tell anybody

13 about Mr. Muhaymin having knives while you were on the

14 scene?

15 A.    I don't recall telling anybody that -- that

16 he had knives, no.

17 Q.    Okay.  Is it possible that you mentioned it

18 after the fact?

19 A.    It is possible, but I don't recall if I did

20 or not.

21 Q.    Have you talked to Officer Canilao at all

22 about his deposition?

23 A.    I have talked to him but not in depth about

24 the questions that were asked.

25 Q.    Understand, and that wasn't my question.  I

1  wasn't trying to infer that or imply that you had done

2  anything improper.  I guess -- you guys are partners?

3      A.    No.  That was the first time that we'd ever

4  ridden together.

5      Q.    Okay.  So Officer Canilao and yourself were

6  riding together on January 4th, 2017, correct?

7      A.    Correct.

8      Q.    Have you ridden together since?

9      A.    Maybe once or twice.

10     Q.    Okay.  And do you guys work out of the same

11 precinct?

12     A.    We do.

13     Q.    Are you friends?

14     A.    Yes.

15     Q.    Okay.  Associate with one another socially?

16     A.    You know, I don't -- I don't we don't do a

17 whole lot of social stuff.  We work and that's about

18 it.  I -- I don't do a whole lot with anybody other

19 than family.

20     Q.    Barbecues?  Officers?  Parks?

21     A.    No.

22           MR. SCARBROUGH:  Form.

23     Q.    BY MR. CHAMI:  Okay.  I found it strange

24 because Officer Canilao described in his deposition

25 that -- or discussed in his deposition that you told

1  him that Mr. Muhaymin had previously had knives on him

2  or a knife on him and that's why you guys searched him

3  before putting him into the vehicle.  Do you recall

4  saying that to Officer Canilao?

5          MR. SCARBROUGH:  Form.

6          THE WITNESS:  I don't recall saying that to

7  him.  However, it's very well that I did.

8     Q.    BY MR. CHAMI:  Okay.  Is it likely that you

9  said it to him after Mr. Muhaymin had died?

10    A.    I don't recall if I said it to him after or

11 during or before but it very well could have.

12    Q.    All right.  You'd agree that you listened to

13 your 20 or so minutes of audio and video from your body

14 cam, right?

15          MR. SCARBROUGH:  Form.

16          THE WITNESS:  Yes.

17    Q.    BY MR. CHAMI:  Okay.  Did you hear yourself

18 in any of that 20-plus minutes of video tell anybody,

19 including Officer Canilao, about any prior encounters

20 with Mr. Muhaymin where he had a knife?

21    A.    I don't remember hearing myself say that, no.

22    Q.    Okay.  And the prior encounter where

23 Mr. Muhaymin had a knife, was that the time you booked

24 him?

25    A.    You know, I don't recall if he had one then,

1   but when we were at the post office, I remember him

2   having pocket knives.

3        Q.    Okay.  Multiple knives?

4        A.    I remember at least one.

5        Q.    All right.  And describe that -- that scene

6   for me at the post office with Mr. Muhaymin.  When was

7   that?

8        A.    Was that in December, a few weeks prior to

9   this incident.

10       Q.    And which post office was that?

11       A.    The one on the Maryvale Parkway just north of

12   Indian School.

13       Q.    Okay.  And where did you see Mr. Muhaymin at

14   the post office?  Was it inside or outside?

15       A.    No.  It was in back by an entrance.

16       Q.    So behind the post office building?

17       A.    Well, the post office butts up against the

18   sidewalk and there are several access points to the

19   building, and he was sleeping in the covered area next

20   to the door for the maintenance and where the

21   investigators go in.

22       Q.    Okay.  Is there video -- are there video

23   cameras back there?

24       A.    You know, I don't recall if there are or not.

25       Q.    And what caused you to engage Mr. Muhaymin

1    that day?

2         A.    It was a call for service.

3         Q.    You mean somebody at the post office called

4    because he was there?

5         A.    That's correct.

6         Q.    All right.  Was he trespassing?

7         A.    They wanted him trespassed from the property.

8         Q.    Okay.  Was he on the post office property?

9         A.    Yes, he was.

10        Q.    And did you trespass him?

11        A.    I did.

12        Q.    All right.  What's involved in issuing a

13   trespass to someone?

14        A.    Contact him, get his information, run him and

15   make sure he doesn't have any warrants and then tell

16   him you're not allowed to be here.  If you come back,

17   you'll be arrested.

18        Q.    Is that what happened?

19        A.    That's what happened.

20        Q.    Do you actually have to write that up

21   somewhere?

22        A.    We don't have to but generally I do an

23   incident report.  A field interrogation card is what we

24   used to call them, but since we went to this system,

25   it's named something different.  But it's -- it's a

1    little report.  Just document who we talked to, what we

2    told -- what he told us, what we told him, and he goes

3    on his way and it's just saved.

4         Q.    Okay.  Did that happen in this case?

5         A.    It did.

6         Q.    All right.  Have you trespassed Mr. Muhaymin

7    from any other locations?

8         A.    Yes.  The very first time I contacted him, I

9    trespassed him from -- I can't remember the address,

10   but it's over at 67th Avenue and Thomas.  There's a --

11   like a strip mall, a grocery store, a hair salon,

12   businesses.

13        Q.    Okay.  Is that -- is it a Fry's or --

14        A.    No, I don't think that's the Fry's.  The

15   Fry's is on Indian School.

16        Q.    Okay.  And I wanted to ask about the pocket

17   knife.  Was he holding the pocket knife when you

18   trespassed him?

19        A.    No.

20        Q.    Did you search him?

21        A.    No.

22        Q.    Where was the pocket knife?

23        A.    It was in his pocket, like clipped on.

24        Q.    So there was like a chain and it was in his

25   pocket?

1    A.    No.  It's a clip.  It was a clip that was in

2  his -- a knife -- would you like me to show you one?

3    Q.    I know what a pocket knife looks like.  I

4  just don't know --

5    A.    It has -- it has a little clip on the bottom

6  of it and you can attach it to your pocket.

7    Q.    Okay.  So like -- sort of like the clips that

8  hold your money and wallet?

9    A.    Yes.

10    Q.    Okay.  So this was like something that was

11  attached to a back of a pocket knife that was just

12  clipped to his outer pants?

13    A.    Yes.

14    Q.    And how did you determine that it wasn't an

15  illegal knife?

16    A.    They have to be so large for them to be

17  illegal, and it didn't appear to me bulging out like it

18  was that large.

19    Q.    Okay.  So it looked like just a regular

20  pocket knife that might even have like a bottle opener,

21  one of those --

22    A.    Yes.

23    Q.    -- Swiss Army knives?

24    A.    Yes.

25    Q.    Okay.  Nothing that caused you concern that

1   you thought you needed to take it from him or check it?

2        A.    No.

3        Q.    Okay.  And was that before you had booked him

4   the first time or after?

5        A.    That was at the post office, which was after.

6        Q.    Okay.  So you had previously booked -- when I

7   say "booked," I mean arrested.  Is that your

8   understanding?

9        A.    That's correct.  Yes, I understand what

10  you're saying.

11       Q.    All right.  So when did you arrest

12  Mr. Muhaymin in relation to the post office incident?

13            MR. SCARBROUGH:  Form.

14            THE WITNESS:  A few months earlier.  I

15  can't -- I'm not great with dates, but it all happened

16  within a six-month period of time.

17       Q.    BY MR. CHAMI:  Okay.  And I -- I didn't say

18  this.  Sometimes I'm asking for dates or times and

19  I'm -- I'm not expecting you to be able to tell me the

20  day or even the month and I don't expect you to pull

21  answers out of thin air, but if you have an idea, you

22  can give me estimates.  You can say, look, I don't know

23  exactly when, like you did, but it was within a

24  six-month window.  That's acceptable.

25            I would imagine you would recall, however, if

 1    it was, you know, in the middle of summer when you met

 2    him at the Fry's -- or, I'm sorry, at that shopping

 3    center.

 4        A.    I want to say it was towards the end of

 5    summer.

 6        Q.    Okay.  And during that arrest, did you

 7    actually take him down to the station?

 8        A.    Yes.

 9        Q.    So you -- you approached him -- why don't you

10    go ahead and just tell me -- tell me how that encounter

11    went down.

12        A.    I received a call for service of

13    trespassing.  I checked the parking lot.  Went in the

14    back of the business and were contacted by the -- the

15    property manager who had told us about the trespasser,

16    pointed him out.  We went back to the location where --

17    where he was at.  I recognized him.  We took him into

18    custody and my partner impounded the property that he

19    had.

20        Q.    Okay.  And you said you recognized him.  Is

21    that because you had seen him even before that day?

22        A.    I want to say like a week earlier I

23    trespassed him from that property, him and two other

24    individuals.

25        Q.    Okay.  So sort of like the post office

1   incident.  You got a call -- the first post office

2   incident that you just described for me, you got a call

3   similar to that at the same shopping center on Thomas

4   and --

5       A.    67th.

6       Q.    -- 67th Avenue --

7       A.    Yeah.

8       Q.    -- area, and you went -- you took

9   Mr. Muhaymin's information, identified him, and told

10  him he wasn't allowed back at that location anymore.

11  Is that accurate?

12      A.    That is correct.

13      Q.    All right.  And there would have been a

14  record of that -- that trespass as well?

15      A.    Yes.  I wrote up --

16      Q.    Okay.

17      A.    -- an incident report.

18      Q.    Okay.  So there's an incident report for this

19  summertime, end of summertime-ish, 2016 trespass.  A

20  week later you're called back out to that same

21  property; is that correct?

22      A.    That's correct.

23      Q.    All right.  So you go back out.  Are you

24  alone or with a partner?

25      A.    With a partner.

1      Q.    Same partner from the week before?

2      A.    Yes.

3      Q.    Who was that?

4      A.    Officer Grosskopf.

5      Q.    Okay.  So you show up at this business and

6    you find Mr. Muhaymin.  How does your encounter take

7    place?  Describe it for me.

8      A.    Well, the property manager pointed out a back

9    cove.  You could hardly see it was even there.  And as

10   we walked -- there's a walkway to it -- we noticed

11   there's trespassing signs on the walkway, and as we

12   were coming up, there's two shopping carts, and he's on

13   the other side.  I can't remember exactly what he was

14   doing.  But we contacted him and advised him, you know,

15   we trespassed you last week; you're under arrest, and

16   we took him into custody.  He --

17     Q.    All right.  I'm sorry.  Go ahead.

18     A.    He had told me that, well, I just came back

19   to get my stuff.  So we placed him in handcuffs and we

20   walked him back to the car.

21     Q.    Okay.  So when you -- when you approached him

22   and you advised him that he wasn't allowed to be there,

23   did you tell him that you were going to arrest him?

24     A.    Told him that he was under arrest and we were

25   taking him into custody.

1    Q.    Okay.  And how did that -- how did that

2    arrest happen?  Did you cuff him?

3    A.    Yes.  Put his hands behind his back.

4    Q.    Okay.  Did he have his dog with him?

5    A.    He did not have the dog at that -- that

6    occasion.

7    Q.    Okay.  And on prior occasions did he have the

8    dog?

9    A.    At the post office he did.

10    Q.    Okay.  So the two incidents at this shopping

11    center on 67th Avenue and Thomas, he did not have the

12    dog, right?

13    A.    Correct.

14    Q.    Okay.  But later in December when you

15    encounter him he does have the dog, right?

16    A.    He does.

17    Q.    Same dog that you saw him with in January,

18    right?

19    A.    Yes.

20    Q.    Okay.  Did you -- when you saw him at the

21    post office, did you get out of your car?

22    A.    Yes.

23    Q.    Did you search him?

24    A.    No.

25    Q.    Did you have any -- was there any conflict

1  between the two of you that day?

2       A.    He wasn't happy --

3            MR. SCARBROUGH:  Form.

4            THE WITNESS:  -- to see us, but, no, no real

5  conflict.

6       Q.    BY MR. CHAMI:  Okay.  Anything about that

7  incident at the post office that was memorable?

8       A.    The dog chasing me as I was walking back to

9  the car to -- to run his information on the computer.

10      Q.    The dog chased you?

11      A.    Um-hmm.  Yes.

12      Q.    How far from the car were you from

13 Mr. Muhaymin?

14      A.    15, 20 yards.  Parked on the side of the road

15 and had to walk around the corner to get to him.

16      Q.    Did the dog bite you?

17      A.    No, but I thought he was going to.

18      Q.    Do you recall when you approached

19 Mr. Muhaymin in the Maryvale Community Center that he

20 was already engaging with the supervisor from the

21 community center at that time?

22      A.    I do recall.

23      Q.    All right.  And Officer Grenier was already

24 there?

25      A.    I do.

 1        Q.    And he was holding the dog, right?

 2        A.    He was.

 3              MR. SCARBROUGH:  Form.

 4        Q.    BY MR. CHAMI:  In the entire time that

 5   Mr. Muhaymin is holding the dog while he was inside the

 6   community center the dog didn't bark, did it?

 7        A.    I don't recall if it barked.

 8        Q.    It didn't snip at anybody, didn't bark,

 9   didn't growl in the ten or whatever so minutes that he

10   was talking to Mr. Tarango and both you and Officer

11   Grenier were there.  Do you have any recollection of

12   that dog barking, snipping, barking, growling in any

13   way?

14        A.    Yeah, I don't recall.  I don't remember.  We

15   could watch the video and see if he did or not.

16        Q.    I mean, I've watched the video.  When did you

17   watch the video last?

18        A.    Last week.

19        Q.    Okay.  Obviously I've heard -- I've read some

20   of the reports of accusations that that dog had

21   previously acted aggressively, and so I looked very

22   carefully for how that dog was reacting while in the

23   arms of Mr. Muhaymin.

24              And so it didn't bark, growl, snip at anybody

25   while he was in the hallway waiting for the bathroom,

1  and I just want to know if your recollection from
2  watching the video last week, if you recalled seeing
3  any of the behavior you had previously described about
4  that dog in that portion of the video.
5      A.   Well, Mr. Muhaymin was holding onto him so he
6  wasn't running around.  I do not recall if he barked or
7  growled or yipped or anything.
8      Q.   Okay.  And there was no record of any prior
9  complaints by the community center that you've ever
10 discovered prior to this January 4th incident regarding
11 Mr. Muhaymin, right?
12     A.   Not that I'm aware of.
13     Q.   Okay.  He had not been trespassed from the
14 Phoenix Maryvale Community Center, right?
15     A.   Not that I'm aware of.
16     Q.   Well, had he been, you would know that now,
17 right?
18     A.   I would assume so, yes.
19     Q.   Okay.  There was nothing unlawful about
20 Mr. Muhaymin's presence in the community center, was
21 there?
22     A.   We responded to a call of an assault and that
23 would have been unlawful.
24     Q.   Had that occurred it would have been
25 unlawful, right?

1          MR. SCARBROUGH:  Form.

2          THE WITNESS:  Yes.

3     Q.    BY MR. CHAMI:  All right.  But within

4    probably a minute of your arrival, you asked

5    Mr. Tarango whether he had been assaulted, right?

6     A.    Correct.

7     Q.    And he said he had not, right?

8     A.    He said that they had bumped into each other.

9     Q.    Right.  He said -- I'm sorry.  Go ahead.

10    A.    He said they had bumped into each other and,

11   no, there wasn't an assault.

12    Q.    Right.  So he said, no, he had not been

13   assaulted, that Mr. Muhaymin was trying to go to the

14   bathroom, that he stepped in the way of Mr. Muhaymin

15   and then they bumped into each other, right?

16    A.    I don't recall that exact but you could be

17   correct.

18    Q.    Okay.  And when you got there, Mr. Tarango

19   was actually blocking the entrance to the bathroom,

20   right?

21    A.    He was standing into the entrance of the

22   bathroom, yes.

23    Q.    Right.  And Mr. Muhaymin was standing, facing

24   the entrance, trying to go into the bathroom, right?

25          MR. SCARBROUGH:  Form.

 1              THE WITNESS:  Yes.

 2       Q.    BY MR. CHAMI:  Okay.  So -- and then after a

 3  minute or so, Mr. Muhaymin was allowed to go into the

 4  bathroom, right?

 5       A.    Correct.

 6       Q.    After giving his name, right?

 7       A.    Correct.

 8       Q.    All right.  And then you pulled Mr. Tarango

 9  off to the side and spoke to him privately about his

10  encounters with Mr. Muhaymin, right?

11       A.    Correct.

12       Q.    All right.  And he didn't tell you at that

13  point that Mr. Muhaymin had assaulted him, did he?

14       A.    He did not.

15       Q.    He didn't change his story when Mr. Muhaymin

16  was no longer around, right?

17       A.    He did not.

18       Q.    So you knew at that point that there had not

19  been an assault.

20       A.    Correct.

21       Q.    So by that point you knew that there had not

22  been a crime, right?

23       A.    Correct.

24       Q.    All right.  Had you previously formed any

25  opinions about Mr. Muhaymin's mental status?

1      A.    No.

2      Q.    Did you ever have conversations with him?

3      A.    Just once regarding the incidents that we

4   were with.

5      Q.    All right.  And when you got to the community

6   center, he was -- I think the words that were

7   describing his -- his demeanor was that he was ranting

8   and raving, right?

9      A.    Yes.

10     Q.    He was speaking nonsense; he wasn't making

11  any sense, right?

12     A.    I'm not sure I used those words.  I don't

13  really recall specifically paying too much attention to

14  exactly what he was saying.

15     Q.    Okay.  You've been trained on de-escalation

16  tactics, right?

17     A.    Yes.

18     Q.    Do you think you -- when you approached

19  Mr. Muhaymin, do you think you de-escalated or

20  escalated the situation?

21     A.    (Cell phone rang.)  Sorry.

22     Q.    That's all right.

23     A.    I thought I turned that off.  I apologize for

24  that.  Can you repeat the question for me?

25     Q.    That's all right.  Do you believe that --

1  that the way you handled your approach with

2  Mr. Muhaymin, was that consistent with your

3  de-escalation training?

4          MR. SCARBROUGH:  Form.

5          THE WITNESS:  I don't think I de-escalated or

6  escalated it.

7      Q.   BY MR CHAMI:  Did you ever ask Mr. Muhaymin

8  what happened between him and Mr. Tarango to get his

9  side of the story?

10     A.   No, I did not.

11     Q.   Mr. Muhaymin was shocked when you -- you said

12  that he had been accused of an assault, was he not?

13          MR. SCARBROUGH:  Form.

14          THE WITNESS:  I don't know if he was shocked

15  or not.

16     Q.   BY MR. CHAMI:  He denied assaulting

17  Mr. Tarango, right?

18     A.   He did.

19     Q.   That was right before Mr. Tarango

20  acknowledged that there had not been an assault, right?

21     A.   I don't recall if it was before or after --

22     Q.   Okay.

23     A.   -- but he --

24     Q.   That's fine.  I will represent to you that it

25  was within a matter of seconds but it's not that

1    important.

2              So why at that point, when you understood

3    that there had not been an assault, and this was just a

4    simple issue of Mr. Muhaymin trying to go to the

5    bathroom, why didn't you just let him go to the

6    bathroom and leave?

7              MR. SCARBROUGH:  Form.

8              THE WITNESS:  I let him go to the bathroom

9    and had he not come up with a warrant we would have let

10   him leave.

11      Q.    BY MR. CHAMI:  But you knew who he was

12   already, right?  You had previously booked him.

13      A.    I couldn't remember his name.  I'm not good

14   with names.

15      Q.    No, I understand, but the reason you asked

16   him for his name, you said you were investigating a

17   crime, right?

18      A.    Yes.

19      Q.    But before -- you knew even before he gave

20   you his name that no crime had been committed, right?

21      A.    We knew the assault had been committed.

22      Q.    No.  You knew the assault had not been

23   committed.

24      A.    Had not.  Sorry.  I misspoke.  Had not been

25   committed.

 1      Q.    Okay.  What crime, then, were you

 2   investigating?

 3      A.    I was going to do the trespassing like we

 4   normally do.

 5      Q.    Why?

 6      A.    Because the manager, and I can't remember his

 7   name either, didn't want him there.

 8      Q.    Okay.  You accused Mr. Muhaymin of lying

 9   about having a service dog, right?

10      A.    No, I don't believe I did.

11      Q.    You said, "That dog is not a service dog,"

12   right?

13      A.    I don't recall saying that.

14      Q.    Okay.  But if you said it on the video, you

15   wouldn't deny that you said what you said on the video,

16   right?

17      A.    Correct.  And I'm not denying it now.  I just

18   don't recall saying it.

19      Q.    Okay.  And then who asked Mr. Muhaymin for

20   his papers for the service dog?  Was that you?

21      A.    No.

22      Q.    Do you know who did that?

23      A.    I don't know.

24      Q.    Do you remember that happening?

25      A.    No.

1      Q.    Okay.  You understand that you're not allowed
2   to ask --
3      A.    I do.  Sorry.
4      Q.    It's all right.  It's all right.  You've been
5   doing great.
6            You understand that you're not allowed to ask
7   somebody for papers to confirm whether a dog qualifies
8   as a service dog, right?
9      A.    Correct.  I do understand that.
10     Q.    All right.  If I told you now that that dog
11  was actually -- that Mr. Muhaymin was being treated by
12  a psychologist and that dog was a comfort dog for him
13  and being prescribed by his counselor, would that
14  surprise you?
15           MR. SCARBROUGH:  Form.
16           THE WITNESS:  No.
17     Q.    BY MR. CHAMI:  Did you know that
18  Mr. Muhaymin's sister moved from Georgia here to help
19  get him off the street and get him back on his
20  medications?
21     A.    No.
22     Q.    Did you know that he had at the time an
23  11-year-old daughter who used to come visit him at that
24  park?
25     A.    No.

1      Q.    Did you know that he had a at the time

2   23-year-old son who had just graduated from ASU and was

3   trying to rebuild his relationship with his dad?

4      A.    No.

5      Q.    Did you think anybody cared about

6   Mr. Muhaymin?

7              MR. SCARBROUGH:  Form.

8              THE WITNESS:  The thought never crossed my

9   mind.

10     Q.    BY MR. CHAMI:  Have you ever looked at the

11  dispatch records regarding the -- the call that went

12  out to police to respond?

13     A.    I have not looked at the dispatch records,

14  no.

15     Q.    Okay.  When you got -- when you got to the

16  community center, how many other officers were there

17  prior to your arrival?

18     A.    Just one.

19     Q.    Was it Officer Grenier?

20     A.    Officer Grenier.

21     Q.    Okay.  Can you tell me how many times you've

22  transported someone from Phoenix to Mesa for a failure

23  to appear warrant?

24     A.    Quite a few but I can't give you a number.

25     Q.    Okay.  Are you familiar with the police

1  department's use of force policy?

2      A.    I am.

3      Q.    Did Mr. Muhaymin on January 4th, 2017 ever

4  cause you to fear for your health or safety?

5      A.    Yes.

6      Q.    Tell me how.

7      A.    For 20 years I've been a police officer and

8  I've been in conflicts with people in all of those 20

9  years, and when you're struggling with somebody, if

10 they get the upper hand, it can be detrimental to you.

11     Q.    I understand.  I want to know what did

12 Mr. Muhaymin physically do to cause you to fear for

13 your safety.

14     A.    Whenever someone is resisting arrest, I fear

15 for my safety.

16     Q.    All right.  So far every officer that we've

17 deposed in this case has said that they would describe

18 Mr. Muhaymin's resistance as passive resistance.  Do

19 you disagree with that?

20            MR. SCARBROUGH:  Form.

21            THE WITNESS:  I completely disagree with

22 that.

23     Q.    BY MR. CHAMI:  All right.  So you think

24 Mr. Muhaymin was more than passively resisting, right?

25     A.    Yes.

1      Q.    All right.  Officer Canilao testified and
2   actually described it himself as passive resistance.
3   You would disagree with that?
4             MR. SCARBROUGH:  Form.
5             THE WITNESS:  I would.
6      Q.    BY MR. CHAMI:  Officer Grenier also described
7   it as passive resistance.  You would disagree with
8   that, right?
9             MR. SCARBROUGH:  Form.
10            THE WITNESS:  I would.
11     Q.    BY MR. CHAMI:  Did he punch you?
12     A.    No.
13     Q.    Did he throw a punch at you?
14     A.    No.
15     Q.    Did he knee you?
16     A.    No.
17     Q.    Did he elbow you?
18     A.    No.
19     Q.    Did he bite you?
20     A.    No.
21     Q.    Did he tell his dog to bite you?
22     A.    I don't know what he was telling his dog but
23   his dog was going to bite me.
24     Q.    Did his dog bite you?
25     A.    No, because I stayed away.

1      Q.    You mean -- you were on top of Mr. Muhaymin

2    at different points in this altercation, were you not?

3              MR. SCARBROUGH:  Form.

4              THE WITNESS:  I was holding him down and

5    trying to put his hands behind his back to cuff him and

6    control him, yes.

7      Q.    BY MR. CHAMI:  Okay.  And while you were

8    on -- holding him down, the dog didn't bite you, right?

9      A.    It was running around, acting like it was

10   going to.

11     Q.    Do you know that if somebody is hurting the

12   owner of a dog that dogs react that way?  Is that -- is

13   that not known to you?

14             MR. SCARBROUGH:  Form.

15             THE WITNESS:  I do.

16     Q.    BY MR. CHAMI:  Okay.  A dog can't necessarily

17   understand that you're a police officer arresting

18   somebody, right?

19     A.    True.  At least as far as I know.

20     Q.    There may be some smart dogs out there, but

21   that would be really special if they could distinguish

22   between a lawful physical altercation and an unlawful

23   one.

24             So --

25             MR. SCARBROUGH:  Form.

1      Q.    BY MR. CHAMI:  -- you wouldn't be surprised

2    that the little Chihuahua was barking while you guys

3    were on top of its owner, right?

4              MR. SCARBROUGH:  Form.

5              THE WITNESS:  I would not be surprised, but I

6    still don't want to get bit by it.

7      Q.    BY MR. CHAMI:  Okay.  And you didn't get bit,

8    right?

9      A.    I didn't.

10     Q.    All right.  And as far as you can remember,

11   you don't have any recollection of Mr. Muhaymin

12   ordering his dog to attack, right?

13     A.    I have no recollection of that.

14     Q.    All right.  Did Mr. Muhaymin ever kick you?

15     A.    He was twisting around, thrashing, throwing

16   his elbows.  I did not get kicked.

17     Q.    Okay.  You and Officer Canilao were the ones

18   who took Mr. Muhaymin by the arms right outside the

19   community center, correct?

20              MR. SCARBROUGH:  Form.

21              THE WITNESS:  By the patrol car are you

22   referring to?

23     Q.    BY MR. CHAMI:  I'm talking about right when

24   you exited the community center, did you engage with

25   Mr. Muhaymin in an attempt to cuff him?

1     A.    Yes, I did.

2     Q.    Okay.  And who advised Mr. Muhaymin that he

3   was being placed under arrest?

4     A.    You know, I think it was Officer Grenier but

5   I'm not for certain.

6     Q.    Okay.  And it wasn't you?

7     A.    No.  I don't think so.

8     Q.    Do you remember how Mr. Muhaymin reacted?

9     A.    He reacted like he didn't want to be

10  arrested.

11    Q.    He asked why he was being arrested, right?

12    A.    If we look through the tape and he asked why,

13  then, yes.  I don't recall for sure.

14    Q.    All right.  Someone told him he had a warrant

15  and he asked what the warrant was for; he didn't know,

16  right?

17              MR. SCARBROUGH:  Form.

18              THE WITNESS:  Yeah, we don't normally know

19  unless -- until we actually see it.

20    Q.    BY MR. CHAMI:  All right.  So you actually

21  have to verify the warrant, right?

22    A.    We do verify the warrant, yes.

23    Q.    All right.  In your past experiences with

24  Mr. Muhaymin, you had no reason to believe that he was

25  going to run away, did you?

1      A.    The past experience, I grabbed hold of him

2   and told him he was under arrest so he didn't have the

3   opportunity to run away.

4      Q.    Did he try to run away in those past

5   experiences?

6      A.    He did not.

7      Q.    Did he -- did he pull away from you when you

8   grabbed him?

9      A.    He was not happy.

10     Q.    Well, I don't know anybody who would be happy

11  when they're being arrested and someone has their hands

12  on them.  My question was different.

13           Did he pull away from you previously when you

14  tried to arrest him?

15     A.    I don't recall him pulling away, no.

16     Q.    Okay.  Do you recall him trying to get away

17  in any way?

18     A.    I recall him tensing up his muscles and not

19  wanting to put them behind his back when we first

20  grabbed ahold of him.

21     Q.    Are we talking about at the shopping center?

22     A.    At the shopping center.

23     Q.    Okay.  Did he resist arrest there?

24     A.    No.

25     Q.    So you don't consider someone tensing up to

1   be resisting arrest?

2        A.    No.  I was able to put his hands behind his

3   back and he went with us.

4        Q.    Okay.  In this case he was holding his dog

5   when -- when you guys approached him, right?

6        A.    Yes.

7              MR. SCARBROUGH:  Form.

8        Q.    BY MR. CHAMI:  And he said -- he said he was

9   worried about his dog, right, what was going to happen

10  to his dog?

11       A.    He may have.  I don't recall exactly what he

12  said.

13       Q.    How many officers were surrounding

14  Mr. Muhaymin at the time you exited the community

15  center?

16       A.    There was four of us there.

17       Q.    All right.  How tall are you, Officer Hobel?

18       A.    Six-three.

19       Q.    How much do you weigh?

20       A.    About 270.

21       Q.    Similar to what you were height and weight --

22  probably height is the same.  How about weight from two

23  years ago?

24       A.    Pretty close.

25       Q.    Okay.  Mr. Muhaymin is five-six, 145 pounds,

1    right?

2        A.    Yes.

3              MR. SCARBROUGH:  Form.

4        Q.    BY MR. CHAMI:  How about Officer Grenier?  Do

5    you recall how tall he is?

6              MR. SCARBROUGH:  Form.

7              THE WITNESS:  He's -- he's close to the same

8    height as I am.

9        Q.    BY MR. CHAMI:  Okay.  And he's not a petite

10   man either, right, as far as his frame?

11       A.    I would not say he's a large-framed guy, no.

12       Q.    He's not as -- he's not as thick maybe or

13   muscular as you might be or as you are, but he's also

14   not a thin-framed guy, right?

15             MR. SCARBROUGH:  Form.

16             THE WITNESS:  I would -- I would say he's --

17   he's not thick.

18       Q.    BY MR. CHAMI:  All right.  Then Officer

19   Canilao and Officer Head, how about them?  Are they

20   smaller than Mr. Muhaymin?

21       A.    Officer Head is -- is larger than Muhaymin,

22   and Officer Canilao is not a very large individual.  I

23   would say comparable, maybe a little heavier.

24       Q.    Okay.  And at the time there were no known

25   weapons on Mr. Muhaymin, right?

1     A.     We had not searched him yet.

2     Q.     Okay.  There had been no identification of

3  any weapons on him, correct?

4     A.     Correct.

5     Q.     And when the call came in, it was also

6  confirmed, at least that they had no idea -- that there

7  was no complaint that a weapon was present, right?

8     A.     Not to my knowledge.

9     Q.     Okay.  So why not just have a conversation

10  with Mr. Muhaymin and explain to him about the bench

11  warrant and why you had to arrest him before you laid

12  hands on him?

13     A.     Because that's not how it works.

14     Q.     So the policy is to what?  Physically make

15  contact with somebody and grab ahold of them when you

16  notify them that there's a warrant?

17     A.     And put them in handcuffs.

18     Q.     Okay.  How about for -- well, let me ask

19  you.  What were you arresting him for?  Was it for the

20  failure to appear in Mesa?

21     A.     Yes.

22     Q.     So is it the policy that you put someone in

23  handcuffs before you verify the warrant?

24     A.     Yes.

25     Q.     Okay.  Isn't it possible that Mr. Muhaymin

1  could have confirmed that he didn't appear and he may

2  have just agreed that -- that he didn't appear at

3  that -- for that Mesa hearing?

4          MR. SCARBROUGH:  Form.

5          THE WITNESS:  It could have been possible but

6  he still would have been in handcuffs.

7      Q.    BY MR. CHAMI:  Okay.  So you guys get the dog

8  out of his hand and then you take him to the ground,

9  right?

10     A.    That's correct.

11     Q.    How long did it take you from the time you

12  took him to the ground to get him cuffed?

13     A.    I don't know.  Not a long time but longer

14  than it should have.

15     Q.    You mean longer than it should have if he

16  would have just put his arms behind his back, right?

17     A.    Yes.

18     Q.    Okay.  And then you guys escorted him towards

19  Officer Grenier's patrol vehicle, right?

20     A.    I wouldn't say escorted.

21     Q.    What would you describe it as?

22     A.    He would not walk.  He was doing everything

23  that he could to prevent us from taking us -- taking

24  him to the car to the point where he dropped and

25  wouldn't use his legs at all and we had to carry him.

1      Q.     And you guys carried him by holding him by

2    his arms, right?

3      A.     Underneath his shoulders.

4      Q.     Okay.

5      A.     Hoisting him up.

6      Q.     All right.  Were you one of the -- you and

7    Officer Grenier holding him up?

8      A.     Yes, sir.

9      Q.     All right.  You guys are both roughly

10   six-three, right?

11     A.     Correct.

12     Q.     And he's five-six, right?  Ish.

13     A.     Ish.  I -- I don't know his exact height, if

14   you want to know the truth.  He's not a large man.

15     Q.     Right.  The ME's report described him as

16   five-six, 145 pounds.

17            So if you and Officer Grenier have your arms

18   underneath him and you're escorting him, wouldn't that

19   cause him to not be able to walk?

20            MR. SCARBROUGH:  Form.

21            THE WITNESS:  He could have walked at any

22   point in time he wanted to.

23     Q.     BY MR. CHAMI:  I listened to the -- to the

24   footage; I watched the footage, and I never heard

25   anyone say, "Stop dragging your feet; stop" -- you

1    know, "Walk.  You need to walk yourself there."  Did

2    you hear anything like that in the -- in the body cam

3    footage?

4              MR. SCARBROUGH:  Form.

5              THE WITNESS:  Not that I recall, no.

6        Q.    BY MR. CHAMI:  Okay.  Nobody instructed him

7    to walk, right?  Nobody said, "You need to walk

8    yourself to the car; don't make us hold you," right?

9              MR. SCARBROUGH:  Form.

10             THE WITNESS:  No, but he's a grown adult.  I

11   shouldn't have to tell him to walk to the car.

12       Q.    BY MR. CHAMI:  If he was a child you would

13   have told him to walk to the car, right?

14             MR. SCARBROUGH:  Form.

15             THE WITNESS:  I honestly don't think a child

16   would have behaved that way.

17       Q.    BY MR. CHAMI:  How about somebody with mental

18   health issues, like schizophrenia?  Maybe they would?

19             MR. SCARBROUGH:  Form.

20             THE WITNESS:  Maybe.

21       Q.    BY MR. CHAMI:  So Officer Grenier opens the

22   back door to his vehicle and he's going to put him in

23   the back and you guys say, "Hold on.  Let's search

24   him."  Was that you or Officer Canilao that said that?

25       A.    I believe that was me.  I could be wrong on

1  that too but that sounds like something that I would

2  say.

3      Q.    All right.  Did you tell Mr. Muhaymin, hey,

4  Mr. Muhaymin, we're just going to check you before we

5  put you in the car?

6      A.    No --

7            MR. SCARBROUGH:  Form.

8            THE WITNESS:  -- but if I said we're going to

9  search you, I'd think he would know that I was talking

10  to him.

11      Q.    BY MR. CHAMI:  All right.  So then you guys

12  took him and you -- I've heard it described as slammed

13  him up against the hood of the vehicle.  How would you

14  describe it?

15      A.    I would say we put him up against the hood of

16  the vehicle and he used his legs to jump up on top of

17  the vehicle.

18      Q.    You're saying he jumped on top of the

19  vehicle?

20      A.    Not jumped like his feet were on the car but

21  pushed off the ground so that his waist went up to

22  the -- to the hood of the car.

23      Q.    So you're saying as you and another officer

24  went to place him up against the hood of the car --

25  this is a five-six guy, by the say, so he's five-six.

1    You're putting him up against the car.  He jumped up to

2    cause it so that his waist was what, over the wheel of

3    the vehicle so that he could lay against the hood?

4        A.    Yes.

5        Q.    You guys didn't do that to him?

6        A.    No.

7        Q.    All right.  And you guys didn't take his arms

8    and pull them up near his shoulders?

9        A.    I pushed his arms up to get into his pocket.

10   I did.

11       Q.    All right.  You pushed his arms up so high

12   that he was screaming in pain, wasn't he?

13             MR. SCARBROUGH:  Form.

14             THE WITNESS:  He was screaming.  I didn't

15   push them up that high.

16       Q.    BY MR. CHAMI:  Well, we're going to look at

17   the video.  You pushed them up all the way up to the

18   top of his head and over his head, didn't you?

19             MR. SCARBROUGH:  Form.

20             THE WITNESS:  No, I did not.

21       Q.    BY MR. CHAMI:  Did you ever take your hands

22   off of his hands?

23       A.    I was trying to pull his hands back down.

24       Q.    So the man who had cuffs behind his back was

25   strong enough while his arms were being pulled up to

1  his shoulders, was strong enough to force his arms over

2  while you were trying to pull them back down uncuffed?

3      A.    Yes, sir.

4      Q.    Okay.  How much do you bench press,

5  Officer Hobel?

6            MR. SCARBROUGH:  Form.

7            THE WITNESS:  Right now not much.  Back then

8  300.

9      Q.    BY MR. CHAMI:  Okay.  So you could bench

10 press more than twice Mr. Muhaymin's body weight, and

11 what you're saying here is that you lifted his arms up,

12 and then he was able to outpower you to take his arms

13 from behind his back as they were cuffed and pull them

14 over his head while you were simultaneously trying to

15 pull them back down?

16           MR. SCARBROUGH:  Form.

17           THE WITNESS:  Yes.

18     Q.    BY MR. CHAMI:  It's because of this that the

19 arms went over his head and in front of his body that

20 you then had to take him back to the ground to recuff

21 him, right?

22     A.    Because he pulled his hands out in front of

23 him, yes.

24     Q.    Do you remember after you -- after you took

25 his arms up and his arms ended up in front of his head

1  while he was screaming, he said, "I can't believe

2  this.  I can't believe you guys."  Do you remember

3  that?

4      A.    I do.

5            MR. SCARBROUGH:  Form.

6      Q.    BY MR. CHAMI:  At the time -- at the time

7  Mr. Muhaymin's hands were -- went from behind his head,

8  behind his back, to in front of his body, how many

9  officers were there?

10     A.    I think it was just Officer Canilao and I.

11     Q.    Officer Grenier was there as well, right?

12     A.    I think he had stepped away, but I -- I can't

13  be certain.

14     Q.    Well, he's the one who in the video opens the

15  back door when you say, "Let's search him."

16     A.    Yes, but I think it was Officer Canilao and I

17  that were actually conducting the -- trying to conduct

18  the search.

19     Q.    All right.  So then you guys take him to the

20  ground and he ends up on his side, right?

21     A.    He does.

22     Q.    And he ends up on his side; his hands are

23  still cuffed, right?

24     A.    His hands are cuffed in front of him, yes.

25     Q.    Right.  Actually, they're cuffed basically

1    over his head while he's laying on the ground, right?

2              MR. SCARBROUGH:  Form.

3              THE WITNESS:  Not at first.  At first he puts

4    them underneath him and uses them for leverage.

5        Q.    BY MR. CHAMI:  Okay.  How long did it take

6    from the time you got him to the ground by the --

7    Officer Grenier's vehicle to get his arms secure on the

8    ground?

9        A.    I'm not sure that you can say we had them

10   secure.

11       Q.    They were cuffed, right?

12       A.    They were cuffed.

13       Q.    And Officer Canilao was on top of his arms,

14   holding his arms down, right?

15             MR. SCARBROUGH:  Form.

16             THE WITNESS:  He was on his shoulder, I

17   believe.

18       Q.    BY MR. CHAMI:  Okay.

19       A.    He was -- he was twisting and kicking his

20   legs and trying to fight us at every point.

21       Q.    Do you recall Mr. Muhaymin letting you guys

22   know that he was having a hard time breathing?

23       A.    He did say that he had a hard time breathing.

24       Q.    He said -- he said, "Can I breathe?  I can't

25   breathe," right?

1      A.    I can't remember the exact verbiage, but he

2    did indicate that he was having problems breathing,

3    yes.

4      Q.    Yeah.  So I was watching your video, Bates

5    labeled Hobel 3, and I was just counting the number of

6    times he said he couldn't breathe and pleaded for

7    help.  Please help me, please help me, please help me.

8            At least on your video, Hobel 3, I counted

9    six times where he said he couldn't breathe at

10   different points.  What are you supposed to do when

11   somebody let's you know they're having trouble

12   breathing?

13     A.    I'm not sure he was having trouble

14   breathing.  I could see his chest rising.  He was able

15   to talk.

16     Q.    He died, right?

17     A.    That's indication that he was breathing.

18     Q.    He died, right?

19            MR. SCARBROUGH:  Form.

20            THE WITNESS:  He did die.

21     Q.    BY MR. CHAMI:  Okay.  Probably was having

22   trouble breathing now, easy to say that now, right?

23            MR. SCARBROUGH:  Form.

24            THE WITNESS:  I'm not sure --

25            MR. SCARBROUGH:  Foundation.

1          THE WITNESS:  -- why he died.

2     Q.    BY MR. CHAMI:  Okay.  You were on top of him,

3   on his hips, lower torso, while -- once he was taken to

4   the ground, right?

5     A.    I had my hands on his hips; my knees were on

6   the ground, and I was pushing his hips down to keep him

7   from flipping over, yes.

8     Q.    Okay.  And Officer Head was holding his legs?

9     A.    Yes.

10    Q.    And his arms were cuffed, right?

11    A.    His hands were cuffed.

12    Q.    Hands were cuffed.

13          Where was Officer Grenier?

14    A.    He was on his shoulder.

15    Q.    On his shoulder or on his head?

16    A.    I don't recall him being on his head.  I

17  remember him trying to keep his shoulders down as he

18  was just twisting free.

19    Q.    It's your testimony that Mr. Muhaymin, while

20  four strong officers were holding him down, that he was

21  twisting his body to prevent you guys from doing what?

22          MR. SCARBROUGH:  Form.

23          THE WITNESS:  Taking him back into custody

24  with his hands behind his back, and that is my

25  testimony.

1      Q.    BY MR. CHAMI:  Okay.  We're going to watch

2  some of the video.  Do you recall seeing Officer

3  Grenier with his knee resting on Mr. Muhaymin's -- the

4  side of Mr. Muhaymin's head?

5              THE WITNESS:  I don't recall --

6              MR. SCARBROUGH:  Form.

7              THE WITNESS:  -- seeing that.

8      Q.    BY MR. CHAMI:  What were you doing when you

9  were holding Mr. Muhaymin down?  Just looking straight

10  at the ground?

11     A.    I tend to get tunnel vision in stressful

12  situations.

13     Q.    Some of your training is about not getting --

14  how to not get tunnel vision, right?

15     A.    Yes, but it's very hard to get out of it.

16     Q.    So you knew Mr. -- Officer Hobel was on his

17  legs, right?

18              MR. SCARBROUGH:  Form.

19              THE WITNESS:  I was on his hips.

20     Q.    BY MR. CHAMI:  And you knew Officer Hobel was

21  on his -- I'm sorry, Officer Head was on his legs,

22  right?

23     A.    Yes.

24     Q.    And you knew Officer Canilao was on his arms,

25  right?

1       A.      Yes.

2       Q.      And you knew --

3       A.      One of his arms.

4       Q.      And you knew that -- his arms were

5    handcuffed, right?

6       A.      His hands were handcuffed, yes.

7       Q.      His hands are connected to his arms, right?

8       A.      They are.

9       Q.      So they're connected together, right?

10      A.      Yes.

11      Q.      All right.  And Officer Grenier was, you

12   said, on his shoulder.  So you knew generally where

13   each officer was, right?

14      A.      Yes.

15      Q.      How -- how do you remember Officer Grenier,

16   his position?  How was it?  His knee on his shoulder?

17   How was he positioned?

18      A.      Well, it was dynamic because everybody was

19   moving; he was moving, so it changed.  You can't say

20   that he just stood there in one spot the whole time.

21   That's just not how it worked.

22      Q.      Okay.

23      A.      He was in that region of his right shoulder

24   area --

25      Q.      Okay.

1    A.    -- having to adjust.

2    Q.    Let me ask you, what is code four?

3    A.    Code four is a term that we use to say, okay,

4  everything is all right.

5    Q.    All right.  A minute into your body cam

6  footage, roughly a minute into your body cam footage,

7  you called into dispatch, said, yeah, we're code four

8  here, right?

9    A.    Yes, I believe so.

10    Q.    We can clear it I think were the words you

11  used in the -- in the footage.  What does that mean?

12    A.    Well, when you're going to priority radio

13  traffic, you switch to a different channel so there's

14  less stuff going on, less people there, and you have a

15  dispatcher monitoring one or two calls as opposed to,

16  you know, 20, and once you feel that you're safe, you

17  switch the channel back to the original channel.

18    Q.    All right.  So pretty quickly you determined

19  that there was no safety concern, right?

20    A.    I cleared it, yes.

21    Q.    You weren't afraid of Mr. Muhaymin, right?

22    A.    Once we got the handcuffs on, no.

23    Q.    You cleared it within a minute of arrival

24  because you saw who it was and you had prior

25  experiences with him, right?

 1                MR. SCARBROUGH:  Form.

 2                THE WITNESS:  I think I'm confused.  When I

 3     arrived on scene initially is when I cleared it?

 4         Q.    BY MR. CHAMI:  Yep.

 5         A.    Okay.  I cleared it because there was nobody

 6     fighting at that time.

 7         Q.    All right.  And you had determined that there

 8     had been no assault by that point as well, right?

 9         A.    I don't remember if I determined if there was

10     an assault there or not at that time, but there was no

11     active crime taking place when I cleared it.

12         Q.    Okay.  Do you know what the Phoenix PD's

13     policy is regarding the sanctity of life?

14         A.    I can't spit it out to you verbatim, but I am

15     aware we have the policy and we cherish it, for lack of

16     better words.

17         Q.    And are you familiar with how the City -- how

18     the police department defines excessive force?

19         A.    Not verbatim, no.

20         Q.    Did you have -- did you believe that the

21     public -- when you encountered Mr. Muhaymin, do you

22     believe that the public was in any danger?

23         A.    When I first contacted him?

24         Q.    Yeah.

25         A.    When we were all there?

1      Q.    Yeah.

2      A.    No.

3      Q.    Do you believe that any of the officers'

4    safety was in danger?

5      A.    Not at that point, no.

6      Q.    All right.  And in the minute or so it took

7    you to get cuffs on him -- once you got the cuffs on

8    him, did you believe anybody's life was in danger?

9      A.    At that point, no.

10      Q.    Did you believe that he posed a threat to any

11    of the officers or the public once you had cuffs on

12    him?

13      A.    No.

14      Q.    All right.  Did he reach for your gun?

15      A.    No, but I did not give him the opportunity.

16      Q.    Of course not.  Did he -- did he reach for

17    anybody's gun?

18      A.    Not that I know of.

19      Q.    Okay.  Describe -- what kind of resistance

20    would you describe Mr. Muhaymin engaged in?

21      A.    Defensive resistance.

22      Q.    All right.  What is defensive resistance?

23    How do you define that?

24      A.    He was making -- he had physical acts, trying

25    to prevent us from taking him into custody.

1      Q.    So he got tense.

2            MR. SCARBROUGH:  Form.

3      Q.    BY MR. CHAMI:  Would that be one of the ways

4   you would describe physical resistance?

5            MR. SCARBROUGH:  Form.

6            THE WITNESS:  He was doing much more than

7   being tense.

8      Q.    BY MR. CHAMI:  Earlier you said he didn't

9   strike you in any way, right?

10     A.    Well, that would be aggravated aggression;

11  however, I'm not going to let him do that either if I

12  can prevent it.

13     Q.    Okay.  So -- were you able to control

14  Mr. Muhaymin?

15     A.    Somewhat.

16     Q.    You were able to get cuffs on him, right?

17     A.    We did get cuffs on him.

18     Q.    Okay.  And he didn't -- he didn't make any --

19  he didn't commit any acts that you would have deemed an

20  attempt at an assault, right?

21     A.    I didn't let him go that far --

22     Q.    All right.

23     A.    -- and...

24     Q.    Go ahead.

25     A.    And who knows if he would have, but I felt

1    that it -- had we not controlled him in the fashion

2    that we did, it may have gone that way.  We're always

3    concerned about that.

4        Q.    Okay.  So the force you used was an attempt

5    to control him, right?

6        A.    Yes.

7        Q.    And to ensure that he didn't even have the

8    chance to undertake active aggression or aggravated

9    aggression, right?

10       A.    Yes.

11       Q.    So even before he could even consider those

12   things, you just made sure it wasn't going to happen,

13   right?

14       A.    I always try to do my best.

15       Q.    Okay.  Did he attempt to harm any officers as

16   far as you were aware?

17       A.    I didn't give him the opportunity to.

18       Q.    Okay.  Does the level of force you use change

19   based on the conduct of the person you're trying to

20   arrest?

21       A.    Yes.

22       Q.    Right.  So you don't get to use deadly force

23   just because you think he might use deadly force,

24   right?

25       A.    Correct.

1        Q.    Right.  He has to actually cause you to be an

2    imminent threat of deadly force before you can use

3    deadly force, right?

4        A.    I think the term is --

5              MR. SCARBROUGH:  Form.

6              THE WITNESS:  -- fear of death.

7        Q.    BY MR. CHAMI:  Any tactic or use of force

8    that creates a substantial risk of causing death or

9    serious physical injury such as use of a firearm.

10   That's deadly force, right?

11       A.    It is.

12       Q.    Okay.  And before you can use deadly force,

13   you have to have the fear of imminent risk of death or

14   serious bodily injury to yourself or the public, right?

15             MR. SCARBROUGH:  Form.

16             THE WITNESS:  Yes.

17       Q.    BY MR. CHAMI:  All right.  You don't get to

18   say, well, just in case I'm going to use deadly force

19   now, right?

20       A.    Correct.

21       Q.    All right.  That would apply all the way down

22   the line, right?  You don't get to use more force just

23   in case you think he might become more aggressive,

24   right?

25             MR. SCARBROUGH:  Form.

1          THE WITNESS:  We use the force to control the

2    suspect so he doesn't become aggressive.

3        Q.    BY MR. CHAMI:  Did Mr. Muhaymin ever provide

4    you any verbal statements of noncompliance?  Did he

5    ever say I will not let you arrest me?

6        A.    Not that I recall, no.

7        Q.    Did he ever say I refuse to be arrested?

8        A.    Not that I recall, no.

9        Q.    Did he ever say I will not get in the back of

10   that police car?

11       A.    Not that I recall, no.

12       Q.    Did he ever say I will not let you search me?

13       A.    Not that I recall, no.

14       Q.    Okay.  In fact, he repeatedly said, "Okay,

15   okay.  Please, no," right?

16          MR. SCARBROUGH:  Form.

17          THE WITNESS:  I don't recall him saying that.

18       Q.    BY MR. CHAMI:  You never heard him say,

19   "Okay, okay?"

20       A.    I'm not saying I didn't hear him.  I just

21   don't recall.

22       Q.    Okay.  And you don't recall that from

23   watching the video from last week either, right?

24       A.    I don't recall that, no.

25       Q.    Okay.  Do you have any recollection of --

1  well, let me just show you the video, and I'm going to

2  play body cam video from Officer Nielsen, which is

3  COP 8.  I'm going to pause it for a second.

4          I'm going to pause it for a second while I

5  turn it around, and I'm going to start the footage at

6  20 seconds.  This is from Officer Nielsen's body cam,

7  and this is labeled by the department.

8          (Video played.)

9      Q.    All right.  Do you see that knee on top of

10  Mr. Muhaymin's head?

11      A.    I do.

12      Q.    Do you know who that is?

13      A.    I have no idea.

14      Q.    Okay.  Well, you know who was there at that

15  time, right?

16      A.    I know Officer Grenier was in that mix, yes,

17  but at that time other officers had come to help.

18      Q.    All right.  We'll eventually see his face but

19  I just -- you do recall that that's where Officer

20  Grenier was, in that general area while you were

21  restraining Mr. Muhaymin, right?

22      A.    Yes.

23      Q.    And you would have been right next to him,

24  essentially on his hip, right?

25      A.    Yes.

1    Q.    Now, I want you to watch as I continue to

2    play from the same spot where we just stopped -- I'm

3    going to go on a little further -- you'll see Officer

4    Grenier, or whoever that officer is, knee slip off of

5    the head and then that officer literally puts it back

6    on, and I just want you to watch and tell me if that's

7    what you see as well.

8              (Video played.)

9    Q.    Did you see that?

10   A.    I did.

11   Q.    Okay.  So the officer's knee comes off of the

12   head and then rather than repositioning it to a legal

13   place, like his shoulder, he puts it back on top of the

14   head, right?

15             MR. SCARBROUGH:  Form.

16             THE WITNESS:  I'm not sure what you mean by

17   legal place.

18   Q.    BY MR. CHAMI:  Well, you'd agree that you're

19   not allowed to place the weight of your body on a

20   suspect's head while they're on the ground, right?

21             MR. SCARBROUGH:  Form.

22             THE WITNESS:  No.  No, actually we've been

23   taught to use the head to control the body.

24   Q.    BY MR. CHAMI:  So you've been told to put

25   your knees on a restrained subject's head while they're

1    on the ground?

2              MR. SCARBROUGH:  Form.

3              THE WITNESS:  Hands, knees, and if you have

4    to control them, that's a place that you use.  We're

5    taught you control the head, you control the body.

6         Q.   BY MR. CHAMI:  Okay.  So why couldn't you

7    guys arrest Mr. Muhaymin if someone is sitting on his

8    head and he's handcuffed?

9              MR. SCARBROUGH:  Form.

10             THE WITNESS:  If he can't -- he's continually

11   moving around, thrashing his legs and kicking, so

12   sometimes you have to use more than one thing.

13        Q.   BY MR. CHAMI:  So Officer Hobel was -- I'm

14   sorry.  Officer Head was holding his legs, right?

15        A.   And he was being tossed around while he was

16   holding his legs.

17        Q.   So while Officer Grenier is sitting with his

18   knee on Mr. Muhaymin's head, his arms are cuffed above

19   his head with Officer Canilao holding his arms down and

20   you on his hips, Mr. Muhaymin is able to toss Officer

21   Head around while Officer Head is laying on his legs?

22             THE WITNESS:  Yes.

23             MR. SCARBROUGH:  Form.

24        Q.   BY MR. CHAMI:  And you saw that happening?

25        A.   I did.

1           MR. CHAMI:  Okay.  Let's take a short break.

2           THE VIDEOGRAPHER:  Going off the record.  The

3    time is 10:43 a.m.

4           (Recess was had from 10:43 a.m. to

5    10:59 a.m.)

6           THE VIDEOGRAPHER:  We're back on the record.

7    The time is 10:59 a.m.  Thank you.

8       Q.    BY MR. CHAMI:  Officer Hobel, are you

9    familiar with the escalation policy in the Phoenix PD

10   operations order regarding use of force?

11      A.    Yes.  I do not know it verbatim, but I'm

12   familiar with it.

13      Q.    Okay.  And you would agree that you're

14   supposed to assess each incident to determine based on

15   that policy and your training and experience which use

16   of force option will actually de-escalate the situation

17   and bring it under control, right?

18      A.    Yes.

19      Q.    And you're supposed to do that and assess it

20   before you use any specific type of force, right?

21      A.    Before and during --

22      Q.    Okay.

23      A.    -- and you can use force to de-escalate the

24   situation.

25      Q.    And you would agree that you have a duty to

1    intervene if you see any officer using force that is

2    excessive for the circumstances, right?

3        A.    Yes.

4        Q.    Okay.  So if you saw Officer Grenier on top

5    of Mr. Muhaymin, weight of his knee on top of

6    Mr. Muhaymin's head, that you'd have a duty to say,

7    hey, Man, you should get off his head.

8        A.    You can --

9              MR. SCARBROUGH:  Form.

10             THE WITNESS:  -- put force on his head to

11   control the suspect.

12       Q.    BY MR. CHAMI:  Okay.  How much force was

13   Officer Grenier placing on Mr. Muhaymin's head?

14             MR. SCARBROUGH:  Form, foundation.

15             THE WITNESS:  I have no idea how we would

16   even determine that.

17       Q.    BY MR. CHAMI:  Did you ask him?

18       A.    No, I did not, but I know he had feet on the

19   ground.

20       Q.    Well, he had toes on the ground, right?

21             MR. SCARBROUGH:  Form.

22             THE WITNESS:  He wasn't standing on them.

23       Q.    BY MR. CHAMI:  How much weight is too much

24   weight to put on someone's head?

25             MR. SCARBROUGH:  Form, foundation.

1          THE WITNESS:  I don't know.  In training you

2     could do a push-up with your hands close together on

3     someone's head.

4          Q.    BY MR. CHAMI:  So the Phoenix PD has trained

5     you --

6          A.    In training.

7          Q.    -- has trained you that in the event to

8     control someone you can place enough body weight on

9     their head that would allow you to use their head to do

10    a push-up?

11         A.    Yes.

12         Q.    How long can you maintain that level of force

13    on someone's head?  Is there a time limit?

14         A.    As long as it takes to contain compliance.

15         Q.    In watching the body cam -- your body cam

16    footage, did you see any evidence of thrashing in the

17    footage?

18         A.    He was twisting about, kicking his legs.

19         Q.    Listen to my question.  Watching the body cam

20    footage that you watched from your body cam, did you

21    see any of the thrashing and kicking that you've

22    described here today?

23         A.    I think so.

24         Q.    Okay.  And you watched that video last week,

25    right?

1    A.    Yes.

2    Q.    Were you ever holding his legs at any point

3  in time?

4    A.    No.

5    Q.    Were you facing his legs at any point in

6  time?

7    A.    No.

8    Q.    How would the body cam, camera, get footage

9  of his legs then?

10   A.    I don't know if it did or not.

11   Q.    Okay.

12   A.    I don't recall.  But just because the camera

13 was on it doesn't mean I didn't see it.

14   Q.    No, I understand you may have seen it

15 physically while it was happening, but have you -- you

16 realize other officers have -- had body cam.

17   A.    Yes.

18   Q.    All right.  And those body cameras may have

19 obtained footage of his feet, right?

20   A.    Sure.

21   Q.    Have you watched any of them to confirm

22 whether or not they show any kicking or thrashing?

23   A.    I don't recall watching those, no.

24   Q.    We're representing to you I've watched all

25 the videos that have footage and I have yet to see any

1    evidence of thrashing or kicking, but I guess that

2    doesn't mean it didn't happen, right?

3              MR. SCARBROUGH:  Form.

4              THE WITNESS:  That's correct.

5    Q.    BY MR. CHAMI:  He didn't kick you, did he?

6    A.    He did not.

7    Q.    And you weren't holding his legs, right?

8    A.    I was not.

9    Q.    Okay.  You'd agree that one of the things

10   you're supposed to consider in determining what type of

11   force you should be using would be the severity of the

12   crime that has been alleged against the suspect, right?

13   A.    That is true.

14   Q.    Okay.

15   A.    It also says that the resisting arrest

16   portion in the bottom of it as well.

17   Q.    That also determines the level of force,

18   right?

19   A.    Correct.

20   Q.    Right.  So if everyone else is right, it was

21   just passive resistance, that would impact how you're

22   supposed -- what amount of force you're supposed to

23   use, right?

24             MR. SCARBROUGH:  Form.

25             THE WITNESS:  It was defensive resistance.

1      Q.    BY MR. CHAMI:  I understand that you disagree

2   with every other officer who's been deposed, but I'm

3   just asking you if they were right and you were wrong,

4   it would impact the level of force you should have been

5   using, right?

6           MR. SCARBROUGH:  Form.

7           THE WITNESS:  I was right.

8      Q.    BY MR. CHAMI:  That's not my question.

9   Listen to my question.

10     A.    I'm sorry.

11     Q.    Okay.  My question was, if every other

12  officer is right -- so we're assuming for a second.

13  Assume that they're all right, that would change the

14  level of force that you should have been using, right?

15          MR. SCARBROUGH:  Form.

16          THE WITNESS:  No.

17     Q.    BY MR. CHAMI:  Okay.  Do you know what a

18  hobble is?

19     A.    It's a RIPP restraint.

20     Q.    Okay.  I heard them referring to use -- use

21  of a hobble in -- in respect to restraining

22  Mr. Muhaymin, right?

23     A.    Correct.  The hobble is a common term used

24  for the RIPP restraint.

25     Q.    Okay.  Did you guys ever connect the -- the

1    RIPP restraint from Mr. Muhaymin's arms to his legs?

2        A.    You know, I -- I believe they did, but I

3    don't think I saw it.  I think I had already stood up

4    before they made the connection.

5        Q.    Okay.  Once his arms were tied -- I'm sorry.

6    Once his arms were behind his back, there was no need

7    for anybody to be on top of him, right?

8              MR. SCARBROUGH:  Form.

9              THE WITNESS:  Once his hands were cuffed, we

10   all stood up as a sigh of relief.

11       Q.    BY MR. CHAMI:  Are you saying that people

12   didn't stay on him while they tried to put the RIPP

13   restraint in?

14       A.    I don't even recall them putting the RIPP

15   restraint on.

16       Q.    Okay.

17       A.    I know they did, but when I was there, I

18   don't recall.  I know only know it because I saw it on

19   the video.

20       Q.    Okay.  What's the difference between hobbling

21   somebody and hog-tying somebody?

22       A.    Hobble is -- is a generic term describing the

23   RIPP restraint.  I actually think when they did the

24   training, it's called the RIPP restraint hobble.  So

25   it's just a term for the actual RIPP restraint.

1              Hog-tying is forbidden.  I've never seen it

2    done, but it is when you take the feet and you bring

3    them close to the -- the hands and you hook them

4    together so that there's just a limited amount of space

5    between the feet and the hands, but that was not done.

6         Q.    How many times did you hear Mr. Muhaymin say

7    he couldn't breathe that you recall?

8         A.    I remember him saying it but I don't remember

9    how many times.

10        Q.    Multiple times, though, right?

11              MR. SCARBROUGH:  Form.

12        Q.    BY MR. CHAMI:  More than once?

13        A.    Maybe.

14        Q.    All right.  And is it your testimony here

15   today that if somebody can say I can't breathe that

16   means that they can breathe?

17              MR. SCARBROUGH:  Form.

18              THE WITNESS:  I could see his chest raising.

19   There's other indications besides not breathing besides

20   saying you can't breathe, and if you are saying you

21   can't breathe, you're inhaling, exhaling, as I'm doing

22   talking to you right now.

23        Q.    BY MR. CHAMI:  In your training as a police

24   officer, have you ever been put in a chokehold?

25        A.    Yes.

1          Q.     Is it hard to breathe?

2          A.     The chokeholds that we use apply pressure to

3     the carotid and you can breathe.

4          Q.     It makes it difficult to breathe.

5          A.     The carotid control technique that we use you

6     can breathe.

7          Q.     I understand that you can breathe.  Do you

8     understand the difference between being able to breathe

9     and having difficulty breathing?

10         A.     I do understand the difference.

11         Q.     Okay.  And if somebody is using a chokehold,

12    even the one that the officers use in their training,

13    it would make it difficult to breathe, right?

14         A.     No.

15         Q.     So you can't restrict -- you don't restrict

16    the airway at all when you put someone in a chokehold?

17         A.     If you're doing it --

18                MR. SCARBROUGH:  Form.

19                THE WITNESS:  If you're doing the carotid

20    control technique that way, you're doing it wrong.

21         Q.     BY MR. CHAMI:  Okay.  It can happen, though,

22    right?

23                MR. SCARBROUGH:  Form.

24                THE WITNESS:  I suppose it could.

25                MR. SCARBROUGH:  Foundation.

1      Q.    BY MR. CHAMI:  Well, you could still breathe

2   but you have difficulty breathing, right?

3              MR. SCARBROUGH:  Form.

4              THE WITNESS:  I suppose you could.

5      Q.    BY MR. CHAMI:  Did you ever play football,

6   high school football?

7      A.    Yes.

8      Q.    Ever get -- ever hear, you know, where people

9   pile on at the end of a play?

10     A.    Yes.

11     Q.    Have you ever been at the bottom of a pileup?

12     A.    I have.

13     Q.    You can breathe but you panic and you feel

14  like you can't breathe.  Have you ever -- have you ever

15  had that happen?

16             MR. SCARBROUGH:  Form.

17             THE WITNESS:  I have been at the bottom of a

18  pile, and I've had the ball under my chest, and I've

19  had the guys on top of me, but I don't ever recall

20  feeling like I couldn't breathe.

21     Q.    BY MR. CHAMI:  You patiently waited?

22     A.    I knew they were going to get off me.

23     Q.    That's right, unlike this situation where it

24  took, I don't know, 10, 15 minutes for people to get

25  off --

1      MR. SCARBROUGH:  Form.

2   Q.   BY MR. CHAMI:  -- right?

3      MR. SCARBROUGH:  Form.

4      THE WITNESS:  We weren't all on top of him.

5  We never dog-piled him.

6   Q.   BY MR. CHAMI:  You were on -- you were

7  holding down his waist, right, lower torso --

8   A.   Yes.

9   Q.   -- and waist area?

10   A.   Yes.

11   Q.   Okay.  Someone else was holding down his

12  legs, right?

13   A.   Yes.

14   Q.   And Officer Grenier was on his head, right?

15      MR. SCARBROUGH:  Form.

16      THE WITNESS:  His shoulder.

17   Q.   BY MR. CHAMI:  No, his head, right?

18   A.   The video that you showed me, there was

19  somebody with his knee on his head.  I don't know if

20  that was Officer Grenier or not.

21   Q.   Okay.  I promise it was Officer Grenier.

22  There's video that will show it.  But you saw video of

23  someone on his head, right?

24   A.   I saw a video with the knee on his head, yes.

25   Q.   Okay.  Did you at the conclusion of this

1   case, any point after this case, did you ever -- were

2   you ever required to take any post use of force

3   training?

4        A.    No.

5        Q.    Were you required to take any post use of

6   force counseling?

7        A.    No.

8        Q.    I'm going to continue to show video from

9   Officer Nielsen's body cam.  This is the same body cam

10  footage.  I'm going to start it at a minute and 32

11  seconds.

12              (Video played.)

13       Q.    Did you see an officer in that video with

14  their knee in his lower back?

15       A.    Go back.  I think I was looking at the wrong

16  thing.

17       Q.    It's in three seconds.

18              (Video played.)

19       A.    That looked like his shoulder, unless I'm

20  looking at the wrong thing.

21       Q.    My apologies.  That's his upper torso, right?

22       A.    Turn it -- turn it back around.

23       Q.    All right.  So this is at a minute and 44

24  seconds.  There's an officer with their knee in

25  Mr. Muhaymin's -- between his shoulder blades, right?

1      A.     I'm not --

2             MR. SCARBROUGH:   Form.

3             THE WITNESS:   I'm not seeing a knee in

4    anybody's shoulder.  I see a foot there.  I see a leg.

5    I see an arm, another leg.

6      Q.     BY MR. CHAMI:  Right there.  There's his

7    head; there's his shoulder, and there's a big blue

8    knee.

9      A.     Okay.

10     Q.     Do you see it?

11     A.     Yes.  I just wasn't getting that from here.

12     Q.     That's all right.

13            Okay.  I'm going to play some video from

14   your -- your body cam, but before I do, what was --

15   what are the legal requirements for you to trespass

16   someone from public property?

17     A.     The owner of the property or the manager of

18   the property wants the person trespassed and then we

19   tell them that they're trespassed.

20     Q.     I know but --

21     A.     So they give us the authority to trespass.

22     Q.     Okay.  Let me ask you, if he just said I

23   don't want black people here, he couldn't do that,

24   right?

25     A.     He'd have to have a reason.

1       Q.    Right, because you just said if the manager

2  of the property wants him trespassed he just has to

3  tell you, right?

4       A.    Right, but there's got to be a reason for it,

5  yes.

6       Q.    Okay.  And the reason for the trespass can't

7  be that, well, in the past we've never complained, but,

8  you know, he's kind of annoying.  He's a homeless guy

9  who comes in here and uses the restroom and it bothers

10 us.  That wouldn't be a reason you would trespass him,

11 right?

12            MR. SCARBROUGH:  Form.

13            THE WITNESS:  I would -- I would have to say

14 no on that one, but if he's coming in and causing

15 problems and creating disturbance and they want him to

16 be gone, then, yes, I would trespass him for it.

17      Q.    BY MR. CHAMI:  In this particular instance,

18 the complaint was Mr. Muhaymin had come in and

19 previously his dog had done things that -- that they

20 felt were threatening, right?

21            MR. SCARBROUGH:  Form.

22            THE WITNESS:  Well, it came in as a hot call

23 of an assault.

24      Q.    BY MR. CHAMI:  I get it, but you had already

25 determined by that point that there was no assault,

1   right?

2       A.    Well, technically there is an assault but we

3   weren't going to pursue it.

4       Q.    The assault potentially was caused by the

5   manager.

6       A.    Well, if the manager --

7             MR. SCARBROUGH:  Form.

8             THE WITNESS:  If the manager stops and he

9   bumps into him, there's an assault, but he had said,

10  no, so we weren't going to pursue that.

11      Q.    BY MR. CHAMI:  Well, hold on.  If you and I

12  are walking down the street and I accidentally bump

13  into you, that's not an assault, is it?

14            MR. SCARBROUGH:  Form.

15            THE WITNESS:  It could be construed as an

16  assault the way the code is written.

17      Q.    BY MR. CHAMI:  You say so intent doesn't

18  matter; is that what you're saying?

19            MR. SCARBROUGH:  Form.

20            THE WITNESS:  No, I'm not saying that.

21      Q.    BY MR. CHAMI:  Okay.  So intent matters, and

22  Mr. Muhaymin, at least the way that Mr. Tarango

23  described it, didn't describe it as an intentional --

24      A.    No.

25      Q.    -- act, right?

1     A.    That's -- that's why we were just going with

2  the trespassing.

3     Q.    Okay.  So -- and listening to Mr. Tarango, he

4  said, "We bumped."  He didn't say, "Mr. Muhaymin bumped

5  me," right?  He said, "He was trying to go to the

6  bathroom.  I got in his -- I was trying to stop him and

7  we bumped, right?

8     A.    I can't remember --

9           MR. SCARBROUGH:  Form.

10          THE WITNESS:  -- the exact verbiage but it's

11 on there.

12    Q.    BY MR. CHAMI:  All right.  Let's assume for a

13 second that -- that that's what he said.  That wouldn't

14 be evidence of an assault, right?

15    A.    Right.

16    Q.    Okay.

17    A.    If we're assuming, yeah.

18    Q.    Well, I'll play it but that's what he said.

19          And so -- and he said it directly to you

20 because you interviewed.

21    A.    Yes, I asked.

22    Q.    And you pulled him to the side and talked

23 about it.

24    A.    Yes.

25    Q.    All right.  Okay.  So -- so we've ascertained

1   there was no assault and they still -- you then pursued

2   Mr. Tarango, said, "Would you like to trespass him,"

3   right?

4       A.    Yes.

5       Q.    And he was waffling about it.  Well, I -- you

6   know, maybe; you know, I want to see how this goes, and

7   then he kind of said, sure, I want to trespass him,

8   right?

9               MR. SCARBROUGH:  Form.

10              THE WITNESS:  I don't know about waffling.

11  It seemed to me that he wanted him trespassed from the

12  property.

13              MR. CHAMI:  All right.  Well, let's just play

14  it, the whole conversation, and I'm just going to skip

15  to the part where you start asking about the assault,

16  which starts around two minutes and 40 seconds, but I'm

17  going to start it a little earlier, at 2:30.

18              MR. SCARBROUGH:  Which Hobel video is this?

19              MR. CHAMI:  This is Hobel 2.

20      Q.    BY MR. CHAMI:  And it's just audio that

21  matters here, so let's just listen to the conversation,

22  okay?

23      A.    Okay.

24          (Audio played.)

25      Q.    That's you talking, right?

1      A.    Yes.

2      Q.    Okay.

3            (Audio played.)

4      Q.    And that's you accusing him of ranting and

5  raving, right?

6      A.    Yes.

7      Q.    Okay.  And when you said, "Did he assault

8  you," he said, "Who said anything about assault?"  That

9  was Mr. Muhaymin responding to your question about

10  whether he had committed an assault, right?

11      A.    Yes.

12      Q.    He was surprised, that who said anything

13  about an assault, right?

14            MR. SCARBROUGH:  Form.

15            THE WITNESS:  I suppose he was surprised,

16  yes.

17      Q.    BY MR. CHAMI:  Okay.  You'd agree that --

18  that what he said and his expression on his face

19  together could make it easier to determine whether he

20  was surprised, right?

21      A.    Sure.

22      Q.    All right.  Do I need to show it to you?

23      A.    No.

24      Q.    All right.  So let's continue to listen to

25  the question and answer about assault.

1              (Audio played.)

2      Q.    So he says, "No," right?

3      A.    Right.

4      Q.    All right.  Let's hear what he continues to

5  explain.

6              (Audio played.)

7      Q.    "We bumped into each other," right?

8      A.    Yes.

9      Q.    That is -- in no way could you construe that

10  as Mr. Muhaymin committing an assault on Mr. Tarango,

11  could you, based on that statement?

12      A.    No.  I wasn't intending to do the assault

13  from there.

14      Q.    Okay.  Let's continue to listen because

15  you'll eventually go to the side with Mr. Tarango and

16  talk about trespassing him, and I'm just going to keep

17  playing it.  I may stop it but my intention is to keep

18  playing it.

19              (Audio played.)

20      Q.    Actually, I want to show you something.  I

21  want to show you Mr. Muhaymin lift his shirt up --

22      A.    I remember that.

23      Q.    -- and turn around to show that he didn't

24  have any weapons, right?

25      A.    Yes.

1      Q.    Okay.  And he didn't have any pocket knives

2   strapped to his waist, right?

3      A.    I didn't see anything in his waistband, no.

4      Q.    All right.  And he turned all the way

5   around.  Do you remember that as well?

6      A.    I do.

7      Q.    Okay.

8            (Audio played.)

9      Q.    That's not true, is it?

10     A.    Controlled.

11     Q.    Controlled, right?  So you told him he had to

12  have it on a leash but that's not actually accurate,

13  right?

14     A.    It needs to be controlled.

15     Q.    And he was holding the dog when you came in,

16  right?

17     A.    Remember, I had prior experience with the dog

18  chasing me to the car.  That's not controlled.

19     Q.    Well, that's -- that's not this experience,

20  is it?

21     A.    No.

22     Q.    Your prior experience has nothing to do with

23  this incident, does it?

24            MR. SCARBROUGH:  Form.

25            THE WITNESS:  No.

1      Q.    BY MR. CHAMI:  Okay.  The dog didn't assault

2  you or commit a battery against you in the last

3  incident, did it?

4      A.    I didn't let it.

5      Q.    Okay.  It's a Chihuahua, right?

6      A.    Do you want to be bit by a Chihuahua?

7      Q.    I don't want to be bit by anything, but it

8  was a Chihuahua, right?  You weren't afraid of the

9  Chihuahua, were you?

10     A.    I don't want to be bit.

11     Q.    I understand.  And the dog didn't bite you,

12  right?

13     A.    It did not.

14     Q.    Did you kick it?

15     A.    No.

16     Q.    Did you have to kick it to keep it from

17  biting you?

18     A.    No, but I did have to stamp my foot down.

19     Q.    Okay.  Like swatting at a bee, right?  Get

20  away.  You shooed it away and it went away.

21     A.    Yes.

22     Q.    Because it's a little dog that's afraid of

23  its own shadow, right?

24              MR. SCARBROUGH:  Form.

25              THE WITNESS:  I wouldn't say that.

1    Q.    BY MR. CHAMI:  You watched the video.  Your
2    own -- your own body cam video showed that dog coming
3    close and then running away as soon as somebody looked
4    at it, right?
5                MR. SCARBROUGH:  Form.
6                THE WITNESS:  I don't recall looking at it
7    and making it run, no.
8    Q.    BY MR. CHAMI:  All right.
9                (Audio played.)
10   Q.    And I just want to remind you again or ask
11   you again, in this whole time, and I know you can hear
12   it, but I'm not showing you the video so I want to be
13   fair.  If I need to turn it around, I'll play it for
14   you that way.
15               Do you recall the dog barking?  Are you even
16   hearing the dog bark or growl?
17   A.    No.
18   Q.    Okay.
19               (Audio played.)
20   Q.    And he's saying, "Okay," right?
21   A.    Yes.
22   Q.    And he said his leash got stolen, right?
23   A.    Yes.
24   Q.    And he was holding the dog, right?
25   A.    He was.

1    Q.    Okay.

2          (Audio played.)

3    Q.    And he asked if he could go in to use the

4    restroom and give you the name while he was using the

5    restroom, right?

6    A.    How did he say it?

7    Q.    Let me back it up just a second for you.

8          (Audio played.)

9    Q.    He said, "Can we do this while I go in and

10   use the restroom," right?

11   A.    I believe that's what he said.

12   Q.    Okay.  And then I think it's Officer Grenier

13   says, no, you can give me your name and then he can go

14   use the restroom, right?

15   A.    That's what Officer Grenier said, yes.

16   Q.    All right.  Why not let the man at this point

17   go into the restroom?  Was he going to escape from the

18   bathroom?  Was there an escape path for him --

19          MR. SCARBROUGH:  Form.

20   Q.    BY MR. CHAMI:  -- that you're aware of in

21   that restroom?

22   A.    No.  I just wanted his name --

23   Q.    Okay.

24   A.    -- so I could do a trespassing card.

25   Q.    So by this point you'd already decided to

1    trespass him?

2        A.    That's where it felt like it was going.

3        Q.    Okay.  So even though you said we're going to

4    let you go use the restroom and let you go on your way,

5    you actually intended to trespass him, right?

6        A.    Yes.

7        Q.    Even though nobody asked you at this point to

8    trespass him, right?

9        A.    Well, I was going to get the information

10   while he was going to the bathroom.

11       Q.    My understanding, though, from you and your

12   answer was you had already decided that that's where

13   you were heading with this, right?

14       A.    That's what I was thinking, yes.

15       Q.    Okay.  So you were thinking I'm going to

16   trespass this guy even though you had already

17   ascertained that the reason you were out there wasn't a

18   valid reason, right?

19              MR. SCARBROUGH:  Form.

20       Q.    BY MR. CHAMI:  There was no assault.

21       A.    There was no assault.

22       Q.    Okay.  And at this point nobody had

23   specifically said we want to trespass this man from the

24   property, right?

25       A.    Not yet, no.

1      Q.    All right.  And at least as of this moment,

2  you didn't hear anything that would have caused you to

3  trespass him legally, right?

4      A.    Not as of yet, no.

5      Q.    Okay.

6            (Audio played.)

7      Q.    That was you saying he doesn't have ID?

8      A.    Yeah, I remembered him not having an ID.

9      Q.    Okay.  Because you had just booked him and

10  trespassed him a few times in the last few months,

11  right?

12            MR. SCARBROUGH:  Form.

13            THE WITNESS:  Yes.

14      Q.    BY MR. CHAMI:  All right.

15            (Audio played.)

16      Q.    You were no longer investigating a crime at

17  this point, right?

18      A.    Well, we were there because the call came out

19  of a crime.

20      Q.    But you knew by this point no crime had been

21  committed, right?

22      A.    We knew that no crime had been committed.

23  The assault was not there but I was still thinking to

24  trespass him.

25      Q.    But that's not a crime either, right?

1      A.     Trespassing is a crime.

2      Q.     No, no, no, no.  He hasn't trespassed.  You

3   were going to trespass him which means the next time

4   would be a crime, right?

5      A.     The next time he would go to jail for

6   trespassing, yes.

7      Q.     Right.  Simply telling him he can't come

8   anymore is not a crime, right?

9      A.     Right.

10     Q.     All right.  So you were no longer

11   investigating a crime and even a trespass would have

12   just been a warning about potentially getting arrested

13   in the future if he didn't honor the trespass, right?

14     A.     Correct.

15     Q.     Okay.  And nobody requested a trespass at

16   this point, right?

17     A.     Not yet.

18     Q.     Okay.

19            (Audio played.)

20     Q.     Why was it still even a question about

21   whether he could use the restroom at this point?  This

22   is a public facility, right?

23            MR. SCARBROUGH:  Form.

24            THE WITNESS:  I thought he should be able to

25   use the restroom.

1      Q.    BY MR. CHAMI:  But why did you have to ask?

2   Hey, Guy, get out of his way; let him use the restroom;

3   this is a public facility, right?

4            MR. SCARBROUGH:  Form.

5            THE WITNESS:  He's in charge for the

6   facility.

7            (Audio played.)

8      Q.    BY MR. CHAMI:  You recall even after

9   Mr. Muhaymin completed his business in the restroom,

10  afterwards he cleaned it up; he wiped down after

11  himself, cleaned up the sink?

12     A.    Yeah, I don't know if I was aware of that or

13  not, but I'm not going to argue and say it didn't

14  happen.

15     Q.    Okay.  Are you aware that other officers said

16  that it happened?

17     A.    I believe so -- yes, I am aware, yes.

18     Q.    Okay.  You don't doubt that the --

19     A.    No, I'm not doubting that happened, no.

20     Q.    Okay.

21            (Audio played.)

22     Q.    I'm sorry.  Can you hear okay?

23     A.    Yes, I can hear okay.

24     Q.    Okay.  Because this is now you and

25  Mr. Tarango talking --

 1      A.      Manager.

 2      Q.      -- privately.  Well, privately but away from

 3   the other officers.

 4              (Audio played.)

 5      Q.      "In order to trespass him, do I just tell you

 6   he can't come in here," and you said, yes, right?  You

 7   said, "Um-hmm."

 8      A.      Um-hmm.

 9      Q.      Yes?

10      A.      Yes.

11      Q.      Okay.  So you told Mr. Tarango that all he

12   had to do was tell you he didn't want him in here and

13   you would trespass him, right?

14      A.      Yes, but he explained before that he had been

15   letting the dog run around and stuff.

16      Q.      Okay.  You understand and we would agree that

17   controlling of a dog doesn't mean physical control,

18   right?  You can control them with words.

19      A.      I do not agree --

20              MR. SCARBROUGH:  Form.

21              THE WITNESS:  -- with that.

22      Q.      BY MR. CHAMI:  Okay.  So have you ever seen a

23   dog that walks along the side of its master and obeys

24   every command?

25      A.      No.

1       Q.     You've never seen a dog that obeys --

2       A.     I've had dogs my whole life and they have a

3   mind of their own and sometimes they do things that you

4   don't want them to do.

5       Q.     Okay.  So what you're saying is that under

6   the law, it's your opinion as a police officer that a

7   dog that is controlled by a verbal command and isn't a

8   menace or menacing anybody, you would cite them for not

9   having control of the dog?

10              MR. SCARBROUGH:  Form.

11              THE WITNESS:  I would tell him to put him on

12  a leash.

13      Q.     BY MR. CHAMI:  Okay.  Would you tell them --

14  if they didn't have a leash, what would you do then?

15      A.     Pick him up.

16      Q.     Okay.  So Mr. Muhaymin had done that in this

17  case, right?  He was holding the dog, right?

18      A.     Yes.  Yes, when I got there he was holding

19  the dog.

20      Q.     All right.  And were you going to trespass

21  him based on the representations that in the past he

22  came in without controlling the dog?

23      A.     He -- the manager said that he's been having

24  problems with him coming in and not controlling the

25  dog.  Because of that I thought that was legitimate

1    reason to trespass him.

2        Q.    Okay.  So let's keep listening.

3              (Audio played.)

4        Q.    "I'm going to see what happens after this."

5    Isn't that what he said?

6        A.    He just said it, yes.

7        Q.    Yeah.  So Mr. Tarango wasn't sure how he

8    wanted to handle the situation, right?

9              MR. SCARBROUGH:  Form, foundation.

10             THE WITNESS:  As of that point, yes.

11       Q.    BY MR. CHAMI:  But you --

12       A.    I'm assuming.

13       Q.    Okay.  Well, I mean, that's what you would be

14   doing in a conversation like this, where you hear what

15   the other person is telling you; you draw some

16   assumptions from that, right?

17       A.    Yes.

18       Q.    And you drew the assumption that -- that you

19   could trespass him but that the manager was iffy about

20   whether he wanted to or not, right?

21       A.    That's not the assumption that I gathered.

22       Q.    Okay.  So when he said, "Well, I want to see

23   what happens after this," you didn't -- you took that

24   to mean I want to trespass him?

25             MR. SCARBROUGH:  Form.

```
 1              THE WITNESS:  I think the conversation goes
 2   on, doesn't it?
 3       Q.    BY MR. CHAMI:  It does go on, but when he
 4   said, "I want to see what happens after this" --
 5       A.    We continued to talk.
 6       Q.    Okay.  So let's listen.
 7             (Audio played.)
 8       Q.    How do you almost bite someone?
 9       A.    That might be a better question for the dog.
10       Q.    Well, I don't know.  You guys said, "He
11   almost bit me."  You said that, right?
12       A.    Yes.
13       Q.    How did he almost bite you?
14       A.    He came up, trying to chomp at me.
15       Q.    Maybe he was coming up to sniff you.
16       A.    No, when he's popping his teeth back together
17   like he's going to bite.
18       Q.    You mean barking?
19       A.    Without noise.
20       Q.    So --
21       A.    A bite is a bite.
22       Q.    He's never bit you, right?
23       A.    No, because I didn't let him.
24       Q.    And as far as you know, he never bit anybody
25   else.  He said, "He almost bit my staff," right?
```

1      A.      Yes, that's what he said.

2      Q.      Did you ask him to describe how that -- how

3   that happened, like how did he almost bite you?

4      A.      No, because I assumed I knew what a dog bite

5   was.

6      Q.      And you assumed that based on your prior

7   experience with this dog that he probably did something

8   similar to other people, right?

9      A.      That's right.

10     Q.      You never actually confirmed what type of --

11  for example, how the dog approached, who he approached,

12  what he did in that particular instance that lead the

13  person to believe the dog might bite.  You just drew

14  some assumptions, right?

15            MR. SCARBROUGH:  Form.

16            THE WITNESS:  I did not.  I drew some

17  assumptions, yes.

18     Q.      BY MR. CHAMI:  Okay.  In fact, you don't even

19  know from which employee Mr. Tarango is talking about

20  who was almost bitten, do you?

21            MR. SCARBROUGH:  Form.

22            THE WITNESS:  No, I do not.

23     Q.      BY MR. CHAMI:  And you didn't ask him, well,

24  who is this employee; let me go talk to them and see if

25  they can tell me about this prior situation, because

1  you don't know if Mr. Tarango actually saw it, right?

2          MR. SCARBROUGH:  Form.

3          THE WITNESS:  It's not a question that I

4  asked.

5      Q.    BY MR. CHAMI:  Okay.  Let's be honest.  You

6  knew Mr. Muhaymin was homeless, right?

7      A.    I did know he was homeless.

8      Q.    And you thought it would just be good to keep

9  homeless people out of the shelter, right?

10          MR. SCARBROUGH:  Form.

11          THE WITNESS:  Not at all.

12     Q.    BY MR. CHAMI:  All right.  Let's keep

13  listening.

14          (Audio played.)

15     Q.    So he said it's not a service dog.  You said,

16  no, but the laws -- then you explained the laws are

17  very liberal with what a service dog is, right?

18     A.    Yes.

19     Q.    Okay.

20     A.    Like I know that he doesn't have to have any

21  kind of proof that -- that it's a service dog.

22     Q.    Okay.  So the two of you had agreed that it

23  wasn't a service dog but you knew that you didn't have

24  any legal way to --

25     A.    It didn't -- it didn't matter to me if it was

 1    or it wasn't.

 2        Q.    Okay.  Well, it should matter, right, because

 3    if it is a service dog, that matters, right?

 4              MR. SCARBROUGH:  Form.

 5              THE WITNESS:  He was going to be asked to

 6    leave and trespassed from the property anyways.  I

 7    didn't want to take the dog from him.  I just wanted

 8    him to be controlled.

 9        Q.    BY MR. CHAMI:  All right.

10              (Audio played.)

11        Q.    So that was your advice.  "You're better off

12    just saying you can't come here anymore," right?

13        A.    That was what I said, yes.

14        Q.    All right.  So you want to keep this guy out

15    with his animal, we've just got to trespass him and

16    that will -- that will do the job for you, right?

17        A.    That -- that would trespass him from the

18    property and not allow him to come back, yes.

19        Q.    Okay.  So it was your recommendation that he

20    trespass him in order to keep him out of the building

21    altogether, right?

22        A.    It was my recommendation to trespass him,

23    yes.

24        Q.    Okay.

25        A.    Whether he chooses to call us back if he

1    shows back up is up to him.

2        Q.    Understood.  So I want to ask you because I

3    heard something later in the footage and I couldn't

4    understand what you were saying so I'm going to play it

5    for you.

6              I'm going to fast forward to ten minutes and

7    19 seconds only because I'm -- 15 seconds because I

8    want to make sure we get the context.

9              (Audio played.)

10       Q.    What does that mean?

11       A.    918 is a common phrase that we use for people

12   that are mentally unstable.

13       Q.    Okay.  So you said, "He's a little 918."  I

14   wrote that down and I said -- and I thought that's what

15   it meant but I wanted to hear it from you.

16             So -- so you knew that he had some mental

17   issues, right?

18             MR. SCARBROUGH:  Form.

19             THE WITNESS:  Not that he had mental issues,

20   but I've been a police officer on the street for 20

21   years and I've been dealing with transient people the

22   whole time, and they're not quite as normal as we are.

23   We get up.  We go to work.  They choose to sleep on the

24   street in the dirt.  That's -- that's not normal.

25       Q.    BY MR. CHAMI:  You think they choose that?

1    A.    Yes.

2    Q.    You don't think some people have real mental

3  health issues, that -- that it's not a choice that they

4  have mental health issues and without help that's where

5  they end up?

6          MR. SCARBROUGH:  Form.

7          THE WITNESS:  There is help there.  The City

8  has services.  They just have to be willing to take

9  them.

10   Q.    BY MR. CHAMI:  So it's their fault that

11  they're homeless, right?

12          MR. SCARBROUGH:  Form.

13          THE WITNESS:  I'm not sure whose fault it is.

14   Q.    BY MR. CHAMI:  Well, I mean, they're

15  saying -- they're saying -- hold on.  You're saying

16  there's help for them if they choose to -- if they

17  choose to accept that help, and if they don't, then

18  it's their fault that they're homeless, sleeping on the

19  dirt, right?

20          MR. SCARBROUGH:  Form.

21          THE WITNESS:  Who else could we blame it on?

22  We have to be responsible for our own actions.

23   Q.    BY MR. CHAMI:  Okay.  So you blame -- the

24  people who are homeless in this country, you blame

25  their homelessness on them, right?

1              MR. SCARBROUGH:  Form.

2              THE WITNESS:  It's a huge group.  I'm just

3    saying that homeless people have different behaviors

4    and they do things differently than normal people do.

5         Q.    BY MR. CHAMI:  So you agree that they're not

6    normal, right?  The majority of them have mental health

7    issues; they're not normal, right?

8              MR. SCARBROUGH:  Form.

9              THE WITNESS:  A bunch of them have mental

10   health issues, for sure.

11        Q.    BY MR. CHAMI:  And you said he's a little 918

12   because you recognized Mr. Muhaymin as having mental

13   health issues, right?

14             MR. SCARBROUGH:  Form.

15             THE WITNESS:  I'm not sure I would recognize

16   him as having mental health issues because a large

17   percentage of the population of homeless people are

18   also drug users.

19        Q.    BY MR. CHAMI:  Isn't that a form of mental

20   health issues?

21             MR. SCARBROUGH:  Form.

22             THE WITNESS:  I don't -- I don't know if that

23   is or not but I know that they go hand in hand --

24        Q.    BY MR. CHAMI:  All right.

25        A.    -- and it's very hard to tell the difference

1    between the two.

2        Q.    All right.  I am going to go to Hobel 3 body

3    cam video, and I'm going to start -- I'm going to start

4    it at two minutes and 50 -- actually, hang on.  I'm not

5    going to play the sound for a second.  I just want to

6    show you as you guys -- this is Hobel 3 -- as you guys

7    are escorting or carrying Mr. Muhaymin to the patrol

8    car.  I'll play the sound too.  Let's just look at the

9    dog.  Tell me if you see the dog doing anything

10   aggressive towards you or any of the officers.

11              (Video played.)

12       Q.    You heard him saying, "Hold on," right?  Did

13   you hear him say, "Hold on" as you guys --

14       A.    I'm not sure --

15       Q.    -- said, "Get your ass up"?  Did you hear

16   that?

17       A.    I'm not sure what he said.

18       Q.    Okay.  We'll play it back a little bit,

19   but -- but he was walking at some point, right?  Here

20   he's walking and then someone says, "Get your ass up."

21   You heard that, right?

22       A.    I did hear that.

23       Q.    Okay.  And then he says, "Hold on."  Did you

24   hear that?

25              MR. SCARBROUGH:  Form.

1                THE WITNESS:  I didn't -- I didn't hear that.

2      Q.    BY MR. CHAMI:  All right.  Let's play it

3  back.  And I don't -- and I'm not being sarcastic.

4      A.    No, I know you're not but -- and I'm telling

5  the truth.  Play it again.  Maybe I will recognize it.

6      Q.    I get it because there's multiple -- there's

7  a mic on you or whoever, but this is yours, but there's

8  different people talking and making sounds, so you're

9  not always going to catch everything that's being said

10  unless you're listening carefully for it, so I'm going

11  to play it back.

12              (Video played.)

13      Q.    Did you hear him say, "Hold on"?

14      A.    I do now.

15      Q.    Okay.  So is it you saying, "Get your ass

16  up"?

17      A.    No.

18      Q.    Okay.  You're one of the people that were

19  holding him by his arm, right?

20      A.    I'm breathing heavy.

21      Q.    Okay.  And -- and, by the way -- we can go

22  back and play it -- we're literally at two minutes and

23  32 seconds into this video.  The video starts and

24  within a minute and 20 seconds of this -- this video

25  you guys are picking up your keys.

1          So the altercation with Mr. Muhaymin lasted

2   less than two minutes in front of the community center

3   before you got him cuffed, right?  Approximately.

4          MR. SCARBROUGH:  Form.

5          THE WITNESS:  I -- I don't know the exact

6   amount of time.

7   Q.    BY MR. CHAMI:  Okay.  All right.  Let's keep

8   playing this because I just want you to -- if you can

9   show me anywhere in this video that we see where the

10  dog attacks anybody.

11         (Video played.)

12  Q.    All right.  So nobody -- you don't hear

13  yourself saying anything about, hey, he's had a weapon

14  before; we should search him first.  You just say let's

15  search him first, right?

16  A.    Keep playing.

17  Q.    I promise you you're not going to say it but

18  at least up to this point you haven't said it, right?

19  A.    I haven't said it yet.

20  Q.    Okay.

21         (Video played.)

22  Q.    He's asking you why you're doing this.  Does

23  anyone ever tell him why they're doing it?

24  A.    We told him he was under arrest before

25  because he had a warrant.

1      Q.    Right.  Why you're roughing him up, right?

2   Isn't that -- couldn't that be why -- what he's asking?

3                MR. SCARBROUGH:  Form, foundation.

4                THE WITNESS:  I don't see us roughing him up

5   at all.

6      Q.    BY MR. CHAMI:  Okay.  Well, here we go.

7                (Video played.)

8      Q.    So let's be clear.  You're saying he

9   jumped -- when you said, "Put him up against the car"

10  or whoever said that, you're saying he jumped up to the

11  car.

12               MR. SCARBROUGH:  Form.

13               THE WITNESS:  We put him up against the car

14  and then he jumped to his waist over the edge.

15     Q.    BY MR. CHAMI:  It's not you lifting his arms

16  here?

17     A.    No.

18     Q.    Who's lifting his arms?

19     A.    Oh, I lift his arm up, yes --

20     Q.    Okay.

21     A.    -- but I did not lift them up that high.

22     Q.    All right.

23     A.    I'm actively pulling them down.  I'm losing.

24     Q.    Okay.  So let's -- let's -- let's watch the

25  video, and I want to be clear that what you're saying

1  is he's cuffed behind his back; you're lifting his arms

2  up, and then at some point he through brute strength

3  takes his arms while you're holding them and actively

4  pushing them down, he lifts them over his head.  That's

5  your testimony?

6  　　A.　　Yes.

7  　　Q.　　Okay.  Let's watch.

8  　　　　　(Video played.)

9  　　Q.　　And you hear Mr. Muhaymin screaming at this

10  time, right?

11  　　A.　　Yes, but he's been making noises and saying

12  stuff the whole time.

13  　　Q.　　Oh, no, but he wasn't screaming the whole

14  time, right?

15  　　A.　　On and off.

16  　　Q.　　Yeah, while he was -- every time he's in pain

17  he screams, right?

18  　　　　　MR. SCARBROUGH:  Form, foundation.

19  　　　　　THE WITNESS:  I don't know if he was in pain

20  or not.

21  　　Q.　　BY MR. CHAMI:  Have you ever had your arms

22  cuffed behind your back and had your arms lifted up

23  over your shoulders?

24  　　A.　　And I've never pulled them over my shoulders

25  in front of me either, but that's what happened there.

1      Q.    Okay.  But I'm asking you a different

2   question, not whether you've ever pulled them over your

3   own shoulders.

4            Have you ever -- as part of your training, do

5   they show you these different moves, any legal moves

6   and how you should restrain people and what's allowed

7   and not allowed?

8      A.    I pulled his hands up to get into his pockets

9   because he was trying to keep me from doing it.

10     Q.    How high do his hands have to go for you to

11  get into his pockets?

12     A.    He pulled them up over the top of his

13  shoulders.  He had them in front of him.

14     Q.    All right.  Let's look back a little bit

15  because I want to see.  All right.  I'm going to turn

16  the sound back on.  I want you to show me the part, if

17  you can, where you -- where you can show me how

18  Mr. Muhaymin either jumps onto the car.  Do you see

19  that in the video anywhere, him jumping?

20     A.    Because we didn't see it doesn't mean it

21  didn't happen.

22     Q.    Okay.  And I want you to confirm for me

23  whether that is you holding his arms, lifting them up.

24     A.    I pushed his hands up.

25     Q.    All right.  So let's watch.

1              (Video played.)

2      Q.    Okay.  So that's you.  Is anyone else holding

3  his arm?

4      A.    I don't know if -- if anybody else is holding

5  his arm or not.

6      Q.    Okay.

7      A.    But I know that Canilao was on -- I'm pretty

8  sure Canilao was on the left-hand side but I don't know

9  if he was pushing or not.

10              (Video played.)

11      Q.    That's Canilao saying, "Relax, Dude," right?

12      A.    Yes.

13      Q.    And you said, "You're going to F'n fight me,

14  guess what," right?

15      A.    I don't -- I didn't even hear that in there.

16      Q.    All right.  Here we go.  Let me back it up a

17  little bit more.

18              (Video played.)

19      A.    No, that wasn't me.

20      Q.    That's not you?

21      A.    No.

22      Q.    Is that Canilao?

23      A.    I -- I don't know.  It could be, but I don't

24  know for sure, but it wasn't me.

25              (Video played.)

1      A.    But I was pulling on his arms to get them

2   back down.

3      Q.    He's crying, "I cannot believe this," right?

4            MR. SCARBROUGH:  Form.

5            THE WITNESS:  I was pulling them back down

6   and I couldn't get them back down.

7      Q.    BY MR. CHAMI:  Is that because you'd already

8   taken them all the way over?

9      A.    No.  I was fighting, trying to get him to

10  pull them back down well before that.

11     Q.    I'm just -- I wonder if you understand how

12  incredible that sounds.  Are you suggesting that

13  Mr. Muhaymin had superhuman strength?

14            MR. SCARBROUGH:  Form.

15            THE WITNESS:  Yes.

16     Q.    BY MR. CHAMI:  Okay.  You called for a

17  backup, right?

18     A.    I did.

19     Q.    You did?

20     A.    I did.

21     Q.    Okay.  So shortly after this you called for

22  another unit, right?

23     A.    Yes.

24     Q.    All right.  All right.  I'm going to get to

25  the first time I heard Mr. Muhaymin explain that he was

1   having -- he was having trouble breathing, and I'm

2   going to start on Hobel Video 2 -- I'm sorry, 3, COP 3,

3   at four minutes and -- I'm going to start it at 44

4   minutes and 33 seconds.

5               (Video played.)

6       Q.    All right.  Officer Canilao, that's him

7   talking, "You need to relax, Bro"?

8       A.    Yes.

9       Q.    Sounds pretty calm in his tone with

10  Mr. Muhaymin, right?  "You need to relax, Bro," right?

11      A.    Yes.

12      Q.    Doesn't sound like he's fighting Mr. Muhaymin

13  at this time, right?

14              MR. SCARBROUGH:  Form.

15              THE WITNESS:  Not at this time, no.

16      Q.    BY MR. CHAMI:  Okay.

17      A.    He's still on his side --

18      Q.    Right.

19      A.    -- and he's not going down on his waist and

20  letting us put his hands behind his back.  But while we

21  were dealing with him, he would take sighs, take deep

22  breaths, relax a minute, and then, boom, the fight was

23  back on again.  The struggle continued.

24      Q.    All right.  So he said, "Can I breathe"

25  here.  You heard him say that?

 1      A.    I did hear that.

 2      Q.    All right.

 3            (Video played.)

 4      Q.    You heard him say, "I can't breathe" again,

 5   right?

 6      A.    I did.

 7      Q.    Okay.

 8            (Video played.)

 9      Q.    Why are you having such trouble breathing?

10      A.    Because I have a vest that's strapped to my

11   chest and I can't breathe very well with it --

12      Q.    Okay.

13      A.    -- and we'd been struggling with him for

14   however long it was.

15      Q.    So you have a vest on your chest and it's --

16   it compresses you a little bit, right?

17      A.    Um-hmm.

18      Q.    And when you -- is that a yes?

19      A.    Yes.  Sorry.

20      Q.    And that chest compression makes it difficult

21   to breathe, right?

22      A.    Yes.

23      Q.    All right.  I know at five minutes and --

24   five minutes and 35 seconds we'll hear him say I can't

25   breathe again but I think it's a lot quieter.  So

1  listen carefully.  It's in six seconds.

2               (Video played.)

3     Q.    I'm sorry.  Were you shouting at the dog "Get

4  back"?

5     A.    Yeah.

6     Q.    Okay.  So just shout at the dog "Get back"

7  and you never had to talk to it again, right?

8     A.    Officer Head had taken his taser out and

9  sparked his taser to keep it away from him.

10    Q.    Okay.

11              (Video played.)

12    Q.    You hear him say "I can't breathe" again?

13    A.    Is that what he said?

14    Q.    Let's back it up a second.

15              (Video played.)

16    A.    Yes.

17    Q.    All right.  And then again at five minutes

18  and 56 seconds.

19              (Video played.)

20    Q.    "Can't breathe."  Did you hear it?

21    A.    Sounded like he said, "Please."

22    Q.    He says that too, but here he says, "Can't

23  breathe."  Listen.  I'll play it for you again.

24              (Video played.)

25    Q.    Two words, can't breathe.

1      A.     I'm not making it a hard time.  I'm not

2   saying that he didn't say it.  I'm just having a hard

3   time.

4      Q.     He says it again in five seconds.  Listen.

5             (Video playing.)

6      Q.     Very faintly though.

7             Hear him say, "Please, Allah"?

8      A.     No, I didn't hear that either.

9      Q.     "Please, Allah."  Do you hear that?

10     A.     I heard the please.

11     Q.     He says it twice back to back.  Then you'll

12   hear an officer respond.

13            (Video played.)

14     Q.     "Allah, he's not going to help you here."

15   Did you hear him?

16     A.     No, I didn't hear that either.

17     Q.     All right.  Listen carefully.

18            "Please, Allah.  Please, Allah."  Do you know

19   what that means?

20     A.     I'm not sure we're hearing the same thing.

21     Q.     That's all right.

22            Do you know what, "Please, Allah" means?

23     A.     No.

24     Q.     Do you know what Allah is?

25     A.     Is it Allah?

1      Q.    Allah.

2      A.    Is that what you're saying?

3      Q.    Yes.  God.

4      A.    It's God, yes.

5      Q.    You understood Muhammad was a Muslim, right?

6      A.    Yes.

7      Q.    Okay.

8      A.    Or at least that's what the name was.  I

9  don't know what his religion was.

10      Q.    Right.  And then he said, "Please, Allah."

11  That's you on top of him.  That's your body cam

12  footage, right?

13              MR. SCARBROUGH:  Form.

14              THE WITNESS:  I'm at his waist, yes.

15      Q.    BY MR. CHAMI:  And when you hear someone say,

16  "Please.  Please, Allah," you would have understood

17  what that meant, right?

18      A.    I'm not sure I heard it -- heard it when that

19  occurred.  I could barely hear it now.

20      Q.    I understand.  And so then there's an officer

21  that says, "Allah, he's not going to be able to help

22  you here."  You didn't hear that either?

23      A.    No, I did hear that.

24      Q.    Okay.  So God isn't going to be able to help

25  you.

1          Now I want you to look, because at six

2   minutes and 33 seconds you can see people on his head

3   still.

4          (Video played.)

5      Q.   And, by the way, that's Officer Grenier.  Do

6   you see how his feet are positioned?

7      A.   With his feet on the ground.

8      Q.   Well, with one foot extended and the other

9   one bent.  You'll see his knee here in a second where

10  his knee is on his head with his weight on the bent

11  knee.  You'd agree that his weight is shifted towards

12  the bent knee, right?

13          MR. SCARBROUGH:  Form, foundation.

14          THE WITNESS:  Yes.

15      Q.   BY MR. CHAMI:  Okay.  I mean, you can tell

16  when you're looking at this the positioning of the

17  body, where his weight is, right?  It's not a secret.

18      A.   Yes, he has weight on -- on his left knee,

19  yes.

20      Q.   Right.  And his left knee is the bent knee,

21  right?

22      A.   It is.

23      Q.   All right.

24          (Video played.)

25      Q.   You can see that his knee is not on the

1  shoulder; it's on something over the shoulder, right?

2  We're going to get further and it will be clearer.

3      A.    Let's get further and clearer before I say

4  yes.

5      Q.    (Video playing.)

6      A.    It still looks like the shoulder to me.

7            (Video played.)

8            Do you hear him saying, "Please help me"?

9      A.    Yes, I heard him say, "Please help me."

10      Q.    Multiple times, right?

11            Who is he talking to?

12            MR. SCARBROUGH:  Form, foundation.

13            THE WITNESS:  I don't know if I heard it then

14  but I hear it there.

15      Q.    BY MR. CHAMI:  So is what you're talking

16  about.  You get tunnel vision and -- and you get to a

17  place and you don't see and hear the things that are

18  happening around you?

19      A.    You focus in on -- on what you're doing.  I

20  may have heard it then.  I don't recall if I did or

21  didn't but I hear it now, yes.

22      Q.    Okay.  All right.  Let's -- let's move the

23  video forward -- well, I'm just going to play it.

24            (Video played.)

25      Q.    Nobody says stop kicking, right?

1    A.    Right now we're just holding onto him.

2    Q.    Right.  But in the whole video, you'll never

3  here anyone saying stop kicking.  You don't recall

4  hearing anyone say that, right?

5    A.    No.

6    Q.    You hear people say relax, right?

7    A.    Yes.

8    Q.    You hear people say stop moving, right?

9    A.    Yes.

10    Q.    No one says stop thrashing, right?

11    A.    That's just not what we would say.

12    Q.    No.  You would say stop resisting, right?

13          MR. SCARBROUGH:  Form.

14    Q.    BY MR. CHAMI:  Right?

15    A.    Yes.

16    Q.    You're trained to use that word, right?

17    A.    Yes.

18    Q.    Because when someone is resisting, it's

19  justification for force, right?

20    A.    Yes.

21    Q.    And you're trained to use that word,

22  "resisting."

23    A.    Not just that word.  Sometimes "resisting"

24  doesn't work.

25          (Video played.)

1      Q.    You see Mr. Muhaymin's hair underneath the

2    shin of that knee, right?

3      A.    I see hair.

4      Q.    Okay.

5            (Video played.)

6      Q.    And you see someone holding his shoulder and

7    his arm right there, right?

8      A.    I see an arm there.  I'm not sure what he's

9    grabbing onto.

10           (Video played.)

11     Q.    Now you can see it's Grenier, right?  Grenier

12   was wearing that baseball cap.  Let's play it.

13     A.    Play it.

14           (Video played.)

15     Q.    You're going to see hair the rest of the

16   time.

17           You doubt that that's Grenier there?

18     A.    No, I'm not doubting that.

19     Q.    Okay.  And earlier we saw the knee in the

20   head, just -- just -- just different footage from

21   different body cams of the same situation, right?

22     A.    Yes.

23     Q.    We can put it all together.  We can hear

24   Officer Sharon -- I think it's Susan or Susan?

25     A.    Susan.

1    Q.    Heimbigner, I believe.  I'm not sure --

2    A.    I don't think either one of us would say it

3 right.

4    Q.    All right.  So we can look at Nielsen's video

5 and your video, and it will just be the same scene from

6 different angles, hearing the voices; depending on

7 where they're at in relation to the cam, you'll pick up

8 different portions of it better than others, right?

9    A.    Yes.

10    Q.    All right.  So Officer Nielsen's video, he's

11 running from the community center towards the truck.

12 Heim -- the female officer is coming from the parking

13 lot, and so you're seeing her from a different angle,

14 and so you're getting different angles of the same

15 scene.  You'd agree with that, right?

16    A.    I would agree with that, yes.

17    Q.    Okay.  And earlier when we looked at

18 Nielsen's video, you could see the officer with his

19 knee on the head where it slipped off and then he put

20 it back on, right?

21    A.    He slipped off the head and he put it back

22 on?  Say that again.

23    Q.    Yeah.  Do you remember when we showed the

24 officer with his knee resting on the side of

25 Mr. Muhaymin's head and I said, "Continue to watch."

1  The knee came off and he put it back on his head.  Do
2  you remember that?
3      A.    Yes.
4      Q.    Okay.  Would you agree that you shouldn't put
5  the weight of your body on somebody if they're on their
6  stomach?
7      A.    No.
8            MR. SCARBROUGH:  Form.
9      Q.    BY MR. CHAMI:  You don't agree with that?
10     A.    No.  We were trained to do that.  That's how
11 we control people.
12     Q.    Okay.  When judges -- when judges make
13 rulings on police conduct, does that information get
14 relayed to you guys?  When, let's say, the Ninth
15 Circuit says that's excessive force; you can't do that,
16 do you guys get any training on -- on cases like that
17 when they come down?
18     A.    Yes.  They're always doing updating and
19 stuff, yes.
20     Q.    Okay.  And have you received any updated
21 training about the propriety of resting and placing the
22 body weight on a suspect while he is face down and
23 being controlled or restrained?
24     A.    I don't recall anything like that, but just
25 because I don't recall it doesn't mean it didn't

 1   happen.

 2        Q.    Okay.  You've had multiple hours of training

 3   around dealing with people with mental health issues,

 4   right?

 5        A.    I've had training dealing with people with

 6   mental health issues, yes.  I don't recall the hours.

 7             (Exhibit No. 1 marked for identification.)

 8        Q.    BY MR. CHAMI:  All right.  I'm handing you

 9   what's been marked -- sliding to you what's been marked

10   as Exhibit 1.  Do you recognize Employee Name as

11   Jason P. Hobel?

12        A.    Yes.

13        Q.    Do you have any reason -- see at the very

14   bottom, it says marked Confidential COP 5464?

15        A.    I see that, yes.

16        Q.    All right.  And then it's sequentially

17   labeled -- these are turned over -- these were turned

18   over as part of this lawsuit by your lawyers and are

19   purported to be the training that you've received since

20   becoming an officer.  Do you have any reason to dispute

21   that?

22        A.    No, I do not.

23        Q.    Okay.  And if you can look at COP 5467.  If

24   you can look down.  Tell me when you're there.

25        A.    I'm on 5467.

1      Q.    All right.  And near the bottom on

2   November 12th, the last November 12th, 2003 entry says,

3   "Module 2003-2004 The Mental Health System."  Do you

4   see that?

5      A.    Yes.

6      Q.    All right.  And it says you had a half an

7   hour --

8      A.    Yes.

9      Q.    -- of training on the mental health system,

10  right?

11     A.    Yes.

12     Q.    Okay.  And the first page has sort of, I

13  guess, the headers.  It says, "Hours" and then it says,

14  "POST Prof/AOT."  Do you know what that means?

15     A.    I'm sure that has to do with whether it's a

16  POST certified class.  POST does the certifications for

17  training for the law enforcement in Arizona.

18     Q.    And so would Prof be what?  Professor led?

19     A.    Maybe.  I don't know for sure.

20     Q.    Do you know what AOT is?

21     A.    No.

22     Q.    Okay.  And I only ask because sometimes I'll

23  see a Y, a slash Y, which --

24     A.    I think the AOT is Officer -- Annual Officer

25  Training.

1      Q.    All right.

2      A.    The p-r-o-f may be proficiency, maybe not.

3      Q.    Okay.  I didn't see anything prior to 2003

4   in -- in the training that even addressed mental

5   health, but do you recall what this 30-minute training

6   on the mental health system was about?

7      A.    From 2003?  I imagine it's the systems that

8   they have in place, but I -- I can't tell you.  It's

9   been a long time.

10      Q.    All right.  All right.  And I only you ask

11   because I feel like the other records are a little

12   clearer about what the training was about, so I'm going

13   to ask you to look at COP 5473.

14              And on 5473 I see six entries that I believed

15   were pertinent, and so I want to -- I want to talk

16   about those a little bit.  If you look down to the

17   25th -- section that says, "2015 Module Health and

18   Wellness" and then it says, "2015 Module PTSD Dealing

19   with," sort of sequentially, you know, in order.  Do

20   you see that?

21      A.    Yes.

22      Q.    All right.  There are four.  One says,

23   "Module Health and Wellness.  Then it says, "PTSD."

24   Then it says, "Mental Illness" and then it says,

25   "Crisis Communication."  Do you see those modules?

1      A.    Yes.

2      Q.    Were those like online, like

3  computer-generated trainings?

4      A.    They could have been.  Well, it says 2015

5  modules, so I don't think so.  I think those were

6  classes.

7      Q.    Okay.

8      A.    I don't think they started doing the -- I

9  could be wrong.  I'm not sure they did the -- the video

10  modules at that time.

11      Q.    If you look at the start date, it says,

12  "August 16, 2016," so this is, you know, six months,

13  roughly, before the --

14      A.    Yeah, so it could be that it was a -- the

15  module in the computer.

16      Q.    All right.  So the first one says, "Health

17  and Wellness," and that's a six-hour module.  Do you

18  remember taking any six-hour computer modules?

19      A.    I bet you this was a class at the academy.

20      Q.    All right.  Because there are three August

21  16th entries that total nine hours.  Actually, I'm

22  sorry.  Two August 16th and then the next two are

23  August 17th, and the first two are eight hours and the

24  second two are four and a half hours combined on the

25  17th.

1      A.     That sounds to me like it was a module at the

2   academy where we sat in a class.

3      Q.     All right.  So it's like an eight-hour class

4   session, right?

5      A.     Yeah.  Yes.

6      Q.     And these mental health trainings are

7   intended to what?  Help you understand how to deal with

8   people with mental illness?

9      A.     Sometimes it's for us and our mental health.

10     Q.     Okay.  Do you recall what these were in 2016?

11     A.     No.

12     Q.     What's -- what's crisis communication?

13     A.     That would be like you have a barricade

14  situation with someone inside the house.

15     Q.     So how to deal with somebody in a crisis,

16  right?

17     A.     Yeah.

18     Q.     All right.  Do you recall training

19  specifically about de-escalation related to dealing

20  with people with mental health issues, how to

21  communicate with people with mental health issues

22  differently than you would someone who doesn't have a

23  mental health issue?

24     A.     You know, I -- I do recall some of the

25  training, but they're not really relevant to this

1   situation because it has more to do with taking them to

2   a mental health facility as opposed to making an

3   arrest.

4       Q.    Okay.  Officer Hobel, hindsight being 20/20,

5   would you have done anything differently in dealing

6   with Mr. Muhaymin?

7               MR. SCARBROUGH:  Form.

8               THE WITNESS:  I would have put one set of

9   cuffs on him.

10      Q.    BY MR. CHAMI:  So you think the -- the only

11  thing you needed to do differently is to just single

12  cuff him the first time you had him on the ground.

13  That's it?

14      A.    That's it.

15      Q.    You don't think there's anything else you

16  could have done differently that would have prevented

17  his death?

18              MR. SCARBROUGH:  Form.

19              THE WITNESS:  We didn't cause death.

20      Q.    BY MR. CHAMI:  Well, you know the ME -- do

21  you know that the medical examiner said his death was a

22  homicide, right?

23      A.    Yeah.  I read the whole medical examiner's

24  report.  A homicide is a classification.

25      Q.    It means he was killed, right?

1      A.     It means he died.

2      Q.     No.  Death by natural causes or suicide or

3  homicide.  Those are different classifications, right?

4      A.     I think there's four classifications that

5  they have to list them under.

6      Q.     Okay.  And they classified this as a

7  homicide, right?

8      A.     They did.

9      Q.     All right.  Whether -- whether it's

10  justifiable or not is a different story, but it was a

11  homicide, right?

12      A.     That's the classification that she used,

13  yes --

14      Q.     All right.

15      A.     -- or he used.  I'm not sure if it was a male

16  or a female.

17      Q.     And if you read -- you read the report, then

18  you know that but for the force exerted during the

19  arrest, the ME's report attributes that death to the

20  force used against Mr. Muhaymin.

21      A.     I don't recall reading that --

22            MR. SCARBROUGH:  Form.

23            THE WITNESS:  -- in that at all.

24            MR. CHAMI:  Okay.  I don't have any further

25  questions.

1          MR. SCARBROUGH:  Can we take a short break?

2          MR. CHAMI:  Sure.

3          THE VIDEOGRAPHER:  We're going off the

4     record.  The time is 12:11 p.m.

5               (Recess taken from 12:11 p.m. to 12:31 p.m.)

6          THE VIDEOGRAPHER:  We're back on the record.

7     The time is 12:31 p.m.  Thank you.

8

9                    EXAMINATION

10    BY MR. SCARBROUGH:

11        Q.    Officer Hobel, do you recall what the -- the

12    call was for the encounter that you had with

13    Mr. Muhaymin on January 4th?

14        A.    It was priority radio traffic of an assault.

15        Q.    So what's the procedure when you respond to a

16    call like that?

17        A.    That the call is prioritized to highest

18    priority so you get there as fast as you can.

19        Q.    And what's your state of mind once you arrive

20    at the scene?

21        A.    To investigate an assault.

22        Q.    And is that what you did that day?

23        A.    Yes.

24        Q.    And how do you go about that?

25        A.    I ask some questions.

1    Q.    Of --

2    A.    Do an investigation.  Who was hit by who,

3    what happened, look for signs of injury, that kind of

4    stuff.

5    Q.    Okay.  And is that the procedure you followed

6    here?

7    A.    Yes.

8    Q.    And what's the procedure when you find out

9    that one of the people in the encounter has a warrant?

10   A.    You make the arrest.  Warrant is a probable

11   cause, so you contact them; you get ahold of him; you

12   tell him he's under arrest and you place him in

13   handcuffs.

14   Q.    When you say "contact them," do you mean

15   physically touch them?

16   A.    Yes.

17   Q.    Why do you do that?

18   A.    For control.  Because they can run; they can

19   fight, and you want to avoid both of those situations.

20   Q.    In your experience is it typical for someone

21   to run or fight when you tell them that they have a

22   warrant?

23   A.    You know, it happens.  It's happened a lot.

24   Typical might be a strong word, but it does happen.

25   Q.    Okay.  But is it your practice to always

1  place your hands on an individual that you're telling

2  has a warrant --

3      A.    Yes.

4      Q.    -- for an arrest?

5      A.    In 20 years of experience, it's better to

6  have ahold of them.

7      Q.    All right.  And for someone with a warrant,

8  once you have them in handcuffs, what's the procedure

9  after that?

10     A.    You take them to the car; you search them

11  before you put them in the back of the car, make sure

12  they don't have any weapons or any drugs or anything

13  like that, and then you verify the warrant.

14     Q.    Okay.  Do you have any discretion to ignore a

15  warrant?

16     A.    No.

17     Q.    What's the procedure for that?

18     A.    If -- in order to ignore a warrant you need a

19  supervisor's approval.

20     Q.    Okay.  So the procedures that you've just

21  described, were those the procedures that you intended

22  to follow on the date of this encounter?

23     A.    Yes.

24     Q.    And if Mr. Muhaymin -- Muhaymin had complied,

25  is that the procedure that you intended to follow?

1      A.      Yes.

2      Q.      I want to talk to you about the RIPP

3  restraints.  Can you describe for me how those are

4  attached to a suspect?

5      A.      The RIPP restraint is a long piece of

6  material, like a seat belt, and one side is a hook, and

7  the other side, there's a loop with a latch attached so

8  you can adjust the size of the loop.  The loop goes

9  around your feet, and you cinch it tight and then the

10  hook goes up to the handcuffs and there's plenty of

11  room to play.  You can hook me up in it and I'm

12  six-three and there would be a bunch of room in the

13  line.

14      Q.      So if I understand you correctly, the hands

15  are handcuffed behind a suspect's back?

16      A.      Yes.

17      Q.      And then the RIPP restraint is attached to

18  the ankles of the suspect?

19      A.      Yes.

20      Q.      And then there's a cord that goes between the

21  RIPP restraint and the handcuffs behind the person's

22  back?

23      A.      That's correct.

24      Q.      When the RIPP restraint is attached, are the

25  suspect's legs bent up behind them?

1      A.      They are not.

2      Q.      What position are they in?

3      A.      Straight down.

4      Q.      Okay.  Do they have the ability to walk if

5  the RIPP restraint is applied?

6      A.      You can shuffle your feet together or you can

7  bounce.

8      Q.      But you can move?

9      A.      But you can move, yes.

10      Q.      And can you move of your own volition?

11      A.      Yes, you can.

12      Q.      All right.  When you are -- when a suspect is

13  placed in the back of a police car with a RIPP

14  restraint attached, can they sit down?

15      A.      Yes.

16      Q.      All right.  There was some testimony about

17  the dog today.  Did you have a plan for the dog once

18  you took Mr. Muhaymin into custody?

19      A.      I did.

20      Q.      What was your plan?

21      A.      We were going to try to get the dog in the

22  back of the squad car, and we were going to transport

23  him to -- there's a facility.  It's either on 35th Ave

24  or 27th Ave -- it's a county facility -- where we can

25  take dogs, and once you get them there, you fill out

1  some forms, and if there's an owner that you know of,

2  you list their name and they'll hold it for them until

3  they get there.

4      Q.    Okay.

5      A.    Mr. Muhaymin had a misdemeanor warrant.  He

6  would have been out in a couple days and he would have

7  been able to pick up his dog.

8      Q.    So was that your plan for --

9      A.    That was my plan.  However, if he would have

10 said, hey, call my sister or call my son, now knowing

11 that he has one, I would have called them.

12     Q.    To come pick up the dog.

13     A.    To come pick up the dog.

14          MR. SCARBROUGH:  Okay.  All right.  Those are

15 all my questions.

16          I just want to reiterate the protective order

17 that's in place.  All of this testimony is confidential

18 and not to be disseminated until we've had a chance to

19 review.

20          MR. CHAMI:  Okay.  I have nothing further.

21          THE VIDEOGRAPHER:  This concludes the

22 deposition of Officer Jason Hobel.  The time is

23 2:36 p.m.

24          MR. SCARBROUGH:  12:36.

25          THE VIDEOGRAPHER:  Excuse me.  Thank you.

1　Correction for the record.  The time is 12:36 p.m.

2　　　　　　(Whereupon, the deposition concluded at

3　12:36 p.m.)

4

5　　　　　　　　　_____

　　　　　　　　　　　　JASON HOBEL
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF ARIZONA   )
                   )ss.
COUNTY OF MARICOPA)

         BE IT KNOWN that the foregoing proceedings
were taken before me, PAMELA JOY GIFFIN, Certified
Reporter No. 50106, that the witness before testifying
was duly sworn by me to testify to the whole truth;
that the foregoing pages are a full, true and accurate
record of the proceedings, all done to the best of my
skill and ability; that the proceedings were taken down
by me in shorthand and thereafter reduced to print
under my direction.

         [X] Review and signature was requested.
         [ ] Review and signature was waived.
         [ ] Review and signature not required.

         I CERTIFY that I am in no way related
to any of the parties hereto nor am I in any way
interested in the outcome hereof.

         I FURTHER CERTIFY that I have complied with
the ethical obligations set forth in ACJA 7-206.
DATED at Phoenix, Arizona, this 14th day of October,
2019.




                    _____
                    Pamela Joy Giffin, RPR
                    Certified Reporter
                    Certificate No. 50106

              *     *     *     *     *

         I CERTIFY that VALLEY COURT REPORTING, LLC
has complied with the ethical obligations set forth in
ACJA 7-206.




                    _____
                    Valley Court Reporting, LLC
                    Arizona RRF No. R1054