# EXHIBIT F

# In The Matter Of:

*Mussalina Muhaymin v.*
*City of Phoenix*

---

*Ronaldo Fernandez Canilao*
*July 30, 2019*

---

*Valley Court Reporting, LLC*
*4802 East Ray Road, Suite 23-200*
*Phoenix, AZ 85044*
*(602) 710-1148*
*www.valleycr.com*

**Min-U-Script®**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mussalina Muhaymin, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. |
| | ) CV-17-04565-PHX-SMB |
| City of Phoenix, et al., | ) |
| | ) |
|     Defendants. | ) |
| _____ | ) |

VIDEOTAPED DEPOSITION OF RONALDO FERNANDEZ CANILAO

Scottsdale, Arizona
July 30, 2019
10:37 a.m.

PREPARED FOR:
(COPY)

PREPARED BY:
SHERYL L. HENKE, RPR
Arizona CCR No. 50745

**Valley Court Reporting, LLC**
**www.valleycr.com**

1                         **I N D E X**

2                   **E X A M I N A T I O N**

3
                                              PAGE
4    RONALDO FERNANDEZ CANILAO

5        EXAMINATION BY MR. FARAJ

6

7                   **E X H I B I T S**

8

9
         (None were marked.)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE VIDEOTAPED DEPOSITION OF RONALDO FERNANDEZ CANILAO

2

3  taken at 10:37 a.m. on July 30, 2019, at the law

4  offices of Price Law Group, APC, 8245 North 85th Way,

5  Scottsdale, Arizona, 85258, before SHERYL L. HENKE, a

6  Certified Reporter, #50745, in and for the State of

7  Arizona.

8

9                    A P P E A R A N C E S

10

11  FOR THE PLAINTIFF:

12  THE LAW OFFICE OF HAYTHAM FARAJ
    BY:  HAYTHAM FARAJ, Esq.
13  1935 W. Belmont Avenue
    Chicago, Illinois  60657
14

15  FOR THE DEFENDANTS:

16  O'CONNOR & CAMPBELL
    BY:  JARED SCARBROUGH, ESQ.
17  7955 South Priest Drive
    Tempe, Arizona  85285
18
    Also present:  William Marinakis, Videographer
19                 Tiffany Gill

20

21

22

23

24

25

Ronaldo Fernandez Canilao - July 30, 2019            4

1              THE VIDEOGRAPHER:  We are on the record.

2    Today's date is Tuesday, July 30, 2019.  The time on

3    the video monitor is 10:37 a.m.  This is the recorded,

4    video-recorded deposition of Officer Ronaldo Canilao

5    noticed by counsel for the plaintiffs in the matter of

6    Mussalina Muhaymin versus City of Phoenix, et al., in

7    the United States District Court for the District of

8    Arizona, Case No. CV-17-04565-PHX-SMB.

9              Our location today is the Price Law Group

10   in Scottsdale, Arizona.

11             The certified court reporter is Sheryl

12   Henke of Valley Court Reporting located at 4802 East

13   Ray Road, Suite 23-200, Phoenix, Arizona, 85044.

14             My name is William Marinakis.  I am the

15   certified legal video specialist for the firm of

16   VideoDep, Incorporated located in Phoenix, Arizona.

17             Counsel, will you please identify

18   yourselves and state whom you represent for the record

19   at this time, please, starting with plaintiff's

20   counsel.

21             MR. FARAJ:  Good morning.  My name is

22   Haytham Faraj, and I'm appearing here on behalf of

23   plaintiffs.

24             MR. SCARBROUGH:  Good morning.  Jared

25   Scarbrough appearing on behalf of the defendant.

1              THE VIDEOGRAPHER:  Thank you, counsel.
2    For the record also in attendance today is Tiffany
3    Gill.
4              The witness may be sworn in at this time,
5    please.
6
7              RONALDO FERNANDEZ CANILAO,
8    a witness herein, having been first duly sworn by the
9    Certified Reporter to speak the truth and nothing but
10   the truth, was examined and testified as follows:
11
12             MR. SCARBROUGH:  Real quickly before we
13   get started, I just want to say on the record.  A
14   protective order is in place that has been stipulated
15   by the parties that allows both parties, or I'm sorry,
16   allows the defense to designate certain portions of the
17   deposition testimony as confidential.  And so we
18   reserve the right to enforce that at any point in the
19   future.
20             MR. FARAJ:  Do you plan to interject or
21   at least say something during the portions that you
22   believe are confidential as we are -- as the inquiry is
23   going?
24             MR. SCARBROUGH:  I don't.  I plan to wait
25   for the deposition transcript before designating any

1  portions, but I will be making regular objections.

2              MR. FARAJ:  Well, I'm sure.  Okay.  I

3  just wanted to be clear so that, you know, we should --

4  how we're going to look for it in the record when it's

5  confidential.  Are you going to let us know after?

6              MR. SCARBROUGH:  Yeah.  Once we get the

7  transcript we will review and --

8              MR. FARAJ:  Okay.

9              MR. SCARBROUGH:  -- we'll let you know.

10              MR. FARAJ:  All right.

11

12                    EXAMINATION

13  BY MR. FARAJ:

14      Q.   All right.  Well, good morning.

15      A.   Good morning, sir.

16      Q.   Please state your name.  I don't want to

17  butcher it as we go.

18      A.   Not a problem, sir.  My name is Ronaldo

19  Fernandez Canilao.

20      Q.   Canilao.  Okay.  Have you ever had your

21  deposition taken before?

22      A.   Yes.

23      Q.   Do you feel like you understand all the rules,

24  or do you need me to go through them?  Can we just

25  dispense with the normal admonitions, or would you like

1  me to go through the ground rules for a deposition?

2      A.   We should go over the ground rules just in

3  case.

4      Q.   Okay.  Fair enough.  So a deposition is simply

5  a question and answer.  I get to ask questions.  You

6  answer to the best of your abilities.  Counsel here has

7  a right to object.  I will tell you that there will

8  be -- I'm sure there will be many objections.  You

9  still have to answer unless he specifically advises you

10 not to answer.  So as we go back and forth just know

11 that you're going to have to answer anyway.

12     A.   Yes.

13     Q.   We do that so we can have a record.

14          I'm often going to ask you to give

15 estimates.  You're allowed to estimate based on your

16 knowledge.  You're not allowed to guess or you

17 shouldn't guess.  And so if you're not sure, you can

18 just ask me, and I'll clarify if there is something

19 that's unclear.

20          When I ask a question and you provide a

21 response, I'll assume that you understood the question.

22 And so your response will stand.  That doesn't mean

23 that you have to answer a question you don't

24 understand, though.

25     A.   Right.

1       Q.   So you should, if there's something you don't

2   understand, ask.  I'll rephrase, I'll try to do a

3   better job.  Because once you answer, that answer is on

4   the record based on the question that's asked.

5               We'll take regular breaks.  It's not a

6   marathon session.  You're not supposed to feel

7   uncomfortable.  If you need to take a break for any

8   reason, just let us know and we'll stop.  Okay.  That's

9   basically the ground rules.

10      A.   Yes, sir.

11      Q.   All right.  We're here for the incident that

12  occurred on January 4, 2017.  You're -- you're aware of

13  that?

14      A.   Yes.

15      Q.   Okay.  In preparation for your deposition

16  today, did you have any conversation besides that --

17  besides conversations with your lawyers, I don't want

18  to know about that.  Did you have any conversation with

19  anyone to prepare for your deposition beside your

20  lawyers?

21      A.   No.

22      Q.   You have not?

23      A.   No.

24      Q.   Did you review any documents, whether they

25  were provided by your lawyer or otherwise, to prepare

1   for your depositions?

2        A.   Yes, I have.

3        Q.   What documents did you review?

4        A.   The detective's walk-through with myself, the

5   overall report on that.  The initial questions sent to

6   me via e-mail that I went over with my attorneys.

7        Q.   Are those the interrogatory questions?

8        A.   Yes, they are, sir.

9        Q.   Okay.  So you reviewed the interrogatories and

10  your responses, and you reviewed the detective's

11  walk-through notes?

12       A.   Yes, sir.

13       Q.   Is that from the incident report?

14       A.   Yes, sir.

15       Q.   Okay.  Did you review everyone's portion or

16  your portion?

17       A.   Just my portions.

18       Q.   And who did you review those documents with?

19       A.   My attorney here seated to my right.

20       Q.   Okay.  Did you review those documents with

21  anyone else besides your attorney?

22       A.   No.

23       Q.   Since the -- since the date of this incident,

24  have you reviewed, not just prepared but reviewed these

25  same documents with anyone besides your attorney?

1      A.    No.   Just myself.

2      Q.    Okay.   You've reviewed these documents on your

3   own from time to time?

4      A.    Yes, sir.

5      Q.    Okay.   Do you recall the purpose of why you

6   may have looked them over?

7      A.    Yes, sir.

8      Q.    Tell me, please.

9      A.    To help me with my memory on my involvement;

10  basically that's what it comes down to.

11     Q.    Okay.   Was that in preparation for something,

12  or just because you wanted to?

13     A.    Because -- for preparation for this, yes.

14     Q.    Okay.   As you sit here today, do you believe

15  you have a clear memory of what happened on the date of

16  the incident in January -- on January 4, 2017, or have

17  you had to review documents from time to time to

18  refresh your recollection?

19     A.    I had to review documents.

20     Q.    Okay.

21     A.    So having a clear memory, it helped with

22  memory.

23     Q.    Okay.   Do you have any issues with memory?

24     A.    No, I do not.

25     Q.    Okay.   So let's talk about January 4, 2017.

1    And let's begin with the call that you received as the

2    sort of start point.  Okay.  And just take me through

3    it step by step.  I'll interrupt you as we go through

4    and ask you to explain things.  So did you receive a

5    call on January 4, 2017 to respond to the Maryvale

6    Community Center?

7         A.   Yes, sir, I did.

8         Q.   What do you recall?  Do you recall the

9    substance of that call?

10        A.   Yes, sir, I do.

11        Q.   And what was it, please?

12        A.   The call was for a trespasser.

13        Q.   Okay.  And what does that mean to you when you

14   hear someone is a trespasser?

15        A.   That means that as a complainant who is

16   usually our victim, they'll make a call saying that

17   they have an individual or individuals that will not

18   willfully leave the property.

19        Q.   Okay.  And is that -- is that the substance of

20   that call that day?

21        A.   Yes.

22        Q.   Okay.  Were you alone or did you have a

23   partner?

24        A.   I did have a partner.

25        Q.   Who was your partner?

Ronaldo Fernandez Canilao - July 30, 2019          12

```
 1        A.    Officer Hobel.
 2        Q.    Who is more senior, you or Officer Hobel?
 3        A.    He is more senior.
 4        Q.    At this point in your career as a police
 5  officer, how many years did you have in the police
 6  department?
 7        A.    At that point, 16 years on.
 8        Q.    And do you know how many years Officer Hobel
 9  had?
10        A.    I believe 19.
11        Q.    Okay.
12        A.    18 or 19.
13        Q.    All right.  Who was driving?
14        A.    I was driving.
15        Q.    Okay.  And so what did you do after you
16  received the call?
17        A.    We arrived on scene and we looked for Officer
18  Grenier, who was the first officer on scene.
19        Q.    Did you know that he had responded?
20        A.    Not until I looked at the call itself.
21        Q.    What do you mean?
22        A.    On our mobile data terminal.
23        Q.    Okay.  So you could look on the mobile data
24  terminal and see that someone is responding to the
25  call?
```

1     A.    Yes.

2     Q.    And how did you know he was there first?

3     A.    There's a designator saying that he arrived by

4  his call sign.

5     Q.    When Officer Grenier arrived, did you -- I'm

6  sorry.  When you arrived, did you see Officer Grenier's

7  vehicle?

8     A.    We did.

9     Q.    Was he near his vehicle?

10    A.    No, he was not.

11    Q.    Was there any conversation between you and

12 Officer Grenier before your first, your initial contact

13 with the alleged trespasser?

14    A.    No, there was not.

15    Q.    What did you do before you made contact with

16 Officer Grenier after you arrived at the Maryvale

17 Community Center?

18    A.    I stood by Mr. Muhaymin.

19    Q.    Did you walk around the community center?

20    A.    Around it, no.

21    Q.    Around the outside, I should say.

22    A.    We did just the actual entrance of the

23 community center.

24    Q.    I remember reading that somewhere.  I just

25 want to be clear.  Did you do that for a reason, or

```
 1   were you looking for -- were you looking for Officer
 2   Grenier or were you kind of clearing the area?
 3        A.   We were looking for -- I was looking for
 4   Officer Grenier.
 5        Q.   Okay.
 6        A.   Yes.
 7        Q.   So you're looking for Officer Grenier and then
 8   you -- did you go inside?
 9        A.   I did.
10        Q.   Okay.  From the time you received the call
11   until the time you entered and made the first contact
12   with the suspect, how much -- how much time do you
13   think had passed?
14        A.   About a minute.
15        Q.   Okay.  So you were nearby relatively?
16        A.   Yes.
17        Q.   All right.  And what do you recall observing
18   when you walked in, and what did you see first?
19        A.   Walked into the community center.  I saw
20   actually the community center reps, a couple of the
21   workers there, who pointed towards Officer Grenier,
22   Grenier's direction.
23        Q.   Okay.  When the call came -- I should have
24   asked you this earlier -- was there anything, any other
25   information besides trespasser?
```

```
 1      A.   Not that I can recall.

 2      Q.   Was the identity of the trespasser provided?

 3      A.   I believe there was a description, yes.

 4      Q.   Okay.  And do you recall the description that

 5 they provided?

 6      A.   From what I remember was just the camouflage

 7 shorts --

 8      Q.   Okay.

 9      A.   -- and the red shirt.  Yes.

10      Q.   When you arrived and were engaged in

11 conversation by the community center representatives,

12 what, if anything, did they tell you?

13      A.   They just pointed in Officer Grenier's

14 direction, and I -- that's where I stood by.

15      Q.   Okay.  So they didn't really say anything?

16      A.   No, they didn't say anything.

17      Q.   Did you know the community center reps?

18      A.   No.  As a matter of fact, that was the first

19 time I had ever been there.

20      Q.   Okay.  And so they pointed and they basically

21 oriented you -- oriented you to where Officer Grenier

22 is?

23      A.   Yes.

24      Q.   And could you see him?

25      A.   I did.  I was able to see him.
```

```
 1      Q.   What else did you see?
 2      A.   I saw Mr. Muhaymin in the entrance of the
 3   bathroom, and the community center rep that he was
 4   talking with.
 5      Q.   Okay.  I want you to go back in time to that
 6   day and give me your best description of the scene,
 7   please.
 8      A.   Best description of that scene; as I'm walking
 9   towards it, there's a Christmas tree, a large, about a
10   7-foot Christmas tree lit up on my left side of the
11   entrance of the bathrooms.  The female bathroom is on
12   the left side, the men's is on the right, that share
13   that initial entrance.  The -- let's see.  Other than
14   that, that's basically all I can remember from --
15      Q.   The scene from you would also include the
16   people you're seeing?
17      A.   Oh, where they're located.  Okay.
18      Q.   We're going to have to do it one at a time.
19      A.   Sure.
20      Q.   I appreciate you -- your answers, and I get
21   you, but she can't keep up with both of us talking.
22      A.   Okay.  Absolutely.
23      Q.   So if you would also describe the orientation
24   of Officer Grenier and Mr. Muhaymin, distances,
25   demeanors, --
```

```
 1      A.   Sure.
 2      Q.   -- anything that you would -- might -- might
 3   have noticed or --
 4      A.   Absolutely.
 5      Q.   -- thought about it.  Okay.
 6      A.   Absolutely, about that scene.  Officer Grenier
 7   was in the main entrance of that bathroom when I was
 8   behind him.  Mr. Muhaymin was farther in, probably 10
 9   to 15 feet to his right, farther into the men's
10   entrance into that portion of the bathroom.  And then I
11   remember seeing the -- the community center rep who is
12   probably 2, 3 feet in front of Mr. Muhaymin in -- in
13   actual entrance to the men's bathroom.
14      Q.   Was the -- was the community center rep
15   blocking the bathroom at that point?
16      A.   He was standing, yes, yes.
17      Q.   I don't mean -- he appeared to be blocking the
18   doorway?
19      A.   That's correct.
20      Q.   Okay.  And so Mr. Muhaymin would have been
21   between Officer Grenier and the community center
22   rep; --
23      A.   Yes.
24      Q.   -- is that right?
25      A.   That's correct.
```

1      Q.   Okay.  Did you know the community center rep?

2      A.   I do not.

3      Q.   So at that point, and you orient, you see the

4    seen, what are you thinking?

5      A.   I'm just assessing if anybody's gotten

6    physical, if there's any kind of physical injuries on

7    anyone, which there weren't.  And also demeanors.

8      Q.   Okay.

9      A.   Mr. Muhaymin and his demeanor was a little

10   agitated, I could tell from there, and Officer

11   Grenier's was calm.  He was just getting information.

12   The community center rep seemed a little agitated as

13   well.

14     Q.   Okay.

15     A.   So -- and I'm just there standing by.

16     Q.   Did you see -- did you say anything to anyone

17   at that point?

18     A.   No, I did not.

19     Q.   Okay.  Could you hear -- was there any

20   conversation between any of the people that were

21   already there --

22     A.   No.

23     Q.   -- that you could --

24     A.   I did not hear any of the conversation.

25     Q.   Okay.  So what happens next?

1       A.    What happens next; I get directed to stand by

2   Mr. Muhaymin and then once the community center rep let

3   him use the restroom.

4       Q.    Okay.  Who directed you?

5       A.    I believe Officer Grenier.

6       Q.    Okay.  Now at that point -- so you just got

7   called to this community center.  Based on your

8   observations, do you believe you've identified the

9   alleged trespasser?

10      A.    Yes, I do.

11      Q.    Do you do anything to determine why he's

12  trespassing in a community center?  Why is it a

13  trespass in a community center?

14      A.    At that point I wasn't getting that

15  information.  My partner was, Officer Hobel.

16      Q.    Okay.  Could you hear what Officer Hobel

17  was --

18      A.    No.

19      Q.    What information he was getting?

20      A.    He went off with the community center rep.

21      Q.    They went off together?

22      A.    Yes.  So I just stood by Mr. Muhaymin.

23      Q.    Was Mr. Muhaymin saying anything at that time?

24      A.    No.  He was just using the restroom.

25      Q.    Did you try to engage him in any conversation

1    before he went into the restroom?

2        A.   No, I didn't.

3        Q.   Okay.  How did you know he needed to use the

4    restroom?

5        A.   Officer Grenier basically told me to stand by.

6        Q.   So did Officer Grenier have some conversation

7    with -- well, you wouldn't know.

8        A.   Yeah.  I didn't hear that conversation.

9        Q.   After you arrived was there any conversation

10   between Officer Grenier and either Mr. Muhaymin or the

11   community center rep regardless of whether you heard it

12   or not?

13       A.   I don't know.

14       Q.   After you arrived?

15       A.   After I arrived.  It's possible, yes.

16       Q.   Okay.  So how far away were you at that point

17   from Grenier and Muhaymin?

18       A.   Actually, I was in between them now.  We kind

19   of switched places, Mr. Muhaymin and myself.  So as he

20   went into the men's bathroom, I stood basically the

21   place where he wanted to get into the bathroom.

22       Q.   Okay.  Now what did Officer Grenier tell you?

23       A.   Just to stand by.

24       Q.   Stand by what?

25       A.   Mr. Muhaymin as he used the restroom.  So --

1      Q.   Did he say he's going to use the restroom,
2    stand by him?
3      A.   I can't recall the exact words, but that was
4    what was relayed to me.
5      Q.   So just to be clear, you understood that you
6    were going to escort him into the bathroom based on a
7    conversation that took place; is that right?
8      A.   Yes.
9      Q.   All right.  And at this point did anyone
10   communicate to you anything that led you to suspect
11   that Mr. Muhaymin might pose any sort of danger?
12     A.   No.
13     Q.   Was he behaving --
14     A.   Or gave me any details that he posed any
15   danger at all.
16     Q.   So describe what happens when he goes into the
17   restroom.  Were you able to see him in the restroom?
18     A.   I was able to see him go to the last stall --
19     Q.   Okay.
20     A.   -- to the end.  And that was it.  He closed
21   the door in that stall and proceeded to do what he --
22   whatever it was he was doing.
23     Q.   Okay.  At some point he came back out,
24   obviously?
25     A.   Mm-hm.

1        Q.    All right.  And I guess he was wiping things

2    down and cleaning mirrors?

3        A.    Yes, he was.  He was tidying up.  And I was

4    like, okay, it's time to go.

5        Q.    Okay.  So what -- based on your -- again,

6    based on your understanding, your orientation to the

7    situation, why was it time for this man to leave?

8        A.    It was time -- evidently after he flushed the

9    toilet multiple times, and to me that just kind of

10   gives me an idea that he's stalling.

11       Q.    I understand.  But why, why do you believe

12   that he needs to leave the restroom?

13       A.    Going back to the original call, the

14   complainant who made the call to us, we just serve them

15   as best we can.  So we needed to get him, Mr. Muhaymin,

16   out so we can finish the -- finish the call.

17       Q.    Okay.  Did you understand this was a public

18   community center?

19       A.    Yes.

20       Q.    Did you determine why the community center rep

21   decided that Mr. Muhaymin is trespassing at that point?

22       A.    I didn't determine that at that point.

23       Q.    Okay.  And so you may not know the answer.

24   But were you curious as to why you had to -- did you

25   try to find out information of why he's trespassing,

 1  what he had done to become a trespasser?

 2      A.   I didn't find none of the details yet.

 3      Q.   Okay.  It sounds to me -- correct me if I'm

 4  wrong -- it sounds to me you got an order to get this

 5  man out.  There was someone senior to you on the scene,

 6  and you were just following orders at that point?

 7      A.   That's correct.

 8      Q.   Okay.  Again, I don't want to put words in

 9  your mouth.

10      A.   No, no.

11      Q.   That's what it sounds like.

12      A.   Usually the officer, whether he's senior or

13  not that arrives on scene, we're there to assist him

14  with the call.

15      Q.   Okay.

16      A.   And whether it's being putting up tape or

17  whatever, then, you know, we help each other.

18      Q.   Okay.  So I understand you guided Mr. --

19  either verbally or by directing him --

20      A.   Yes.

21      Q.   -- to leave the restroom.  What happens next?

22      A.   I follow him out of the men's entrance through

23  towards the front entrance of the community center.

24      Q.   Okay.  And throughout this period he is

25  carrying his dog, correct?

1     A.    Yes, he is.

2     Q.    And when he -- when he leaves the restroom,

3  what happens?

4     A.    We --

5     Q.    What happens next?

6     A.    We follow him out --

7     Q.    Okay.

8     A.    -- towards the front entrance of the community

9  center.

10     Q.    Okay.  Is there any conversation between you

11  and anyone at the community center between the time you

12  leave the restroom in the community center and the time

13  you leave the community center?

14     A.    There is a conversation.

15     Q.    With whom?

16     A.    With other officers --

17     Q.    Okay.

18     A.    -- who are in front of me behind Mr. Muhaymin.

19     Q.    Okay.  Tell me about that conversation.

20     A.    The conversation was about a warrant that

21  Mr. Muhaymin -- that he had an outstanding warrant.

22  And that the officers were coming up with a game plan

23  to take him into custody.

24     Q.    Okay.  At that point when -- well, let me back

25  up.  When did you -- when did you discover his name?

1      A.   When I discovered his name?  To tell you the

2   truth, I had so far did not know his name even as we're

3   coming out towards the front entrance.

4      Q.   So it would have been at the time that you're

5   having a conversation about the warrant maybe, is that

6   the first time?

7      A.   No, I didn't even know his name --

8      Q.   Okay.

9      A.   -- at that time.

10     Q.   The reason I ask you that is because I need to

11  understand if you developed, you personally developed

12  an understanding of who he is.  Maybe you've come

13  across him before, maybe you had arrested him before.

14  Was there anything of that sort at that point, at the

15  point he walks out of the bathroom?

16     A.   No.  I have not ever seen or had prior contact

17  with him.

18     Q.   So to be clear; you had never encountered Mr.

19  -- Mr. Muhaymin either in person or by reputation by

20  that point?

21     A.   That's correct.

22     Q.   Okay.  And so you hear the conversation that

23  there's a warrant, I believe out from Mesa, correct?

24     A.   From what I can recollect, yes.

25     Q.   All right.  Did you understand that this is a

1  bench warrant?

2      A.   No.

3      Q.   A no show bench warrant?

4      A.   I didn't hear any details about the warrant.

5      Q.   Did you know -- did you develop an

6  understanding that it was not a warrant for any kind of

7  violent crime, felony or anything of that nature?

8      A.   No.  I have no details on the type of warrant

9  or if it involved violent crime.

10     Q.   Who is discussing the warrant?

11     A.   I believe Officer Hobel, Officer Grenier were

12  going back and forth on that, the warrant, or that

13  Mr. Muhaymin actually had a warrant.  So --

14     Q.   Any other conversation about Mr. Muhaymin that

15  may not be related directly to the warrant?

16     A.   No.  No other conversation.

17     Q.   Meaning -- meaning any conversation that you

18  overheard based on what the community center

19  representative may have shared with the officers?

20     A.   No, not until after the scene was done.

21     Q.   Okay.  The community center representative

22  that we've been talking about, is it Mr. Tarango?

23     A.   I believe it is.

24     Q.   Okay.

25     A.   I'm not exactly sure on his last name.

```
 1      Q.   All right.  It's the guy in the videos.
 2  You've seen the videos?
 3      A.   Yes, some of the videos.
 4      Q.   All right.  Let me back up a little bit.  I
 5  asked you about things you reviewed.  Did you review
 6  the body cam videos?
 7      A.   I reviewed some of them, yes.
 8      Q.   Before -- in preparation for today?
 9      A.   That's correct.
10      Q.   Did you review your own?
11      A.   Yes, yes.
12      Q.   Okay.  And so did you recognize Mr. -- the
13  community center rep as the person that was blocking
14  the door?
15      A.   Yes.
16      Q.   And then later engaged the police officers?
17      A.   Yes.
18      Q.   That's who we're talking about?
19      A.   Yes.  If that's Mr. Tarango, yes.
20      Q.   All right.  And you did not know this
21  community center man -- person?
22      A.   No, I did not know him.
23      Q.   I may have asked you that already --
24      A.   Yes.
25      Q.   -- just to be clear.
```

Ronaldo Fernandez Canilao - July 30, 2019          28

```
 1                  So tell me the substance of the
 2     conversation.  There's a warrant out.  What's -- what
 3     are you all doing?
 4          A.   Like I said, we're coming up for a game plan
 5     to take him into custody.  And as we're moving from the
 6     front of the men's bathroom entrance to the entrance of
 7     the community center, we wanted to take him into
 8     custody outside the community center, as opposed to
 9     inside where there is more staff and personnel.
10          Q.   Okay.
11          A.   So we walked him through.
12          Q.   So when you talk about a game plan --
13          A.   Or course of action or whatever you want.
14          Q.   That's fine.  Whatever, COA, game plan,
15     whatever.  What assumptions did you all -- were you all
16     acting under at that point?  I'll give you an example
17     of where I'm getting at.  One thing we know, he's got a
18     dog, right?
19          A.   Right.
20          Q.   He -- maybe you made that determination or not
21     at that point, but he appears to be transient, someone
22     who may be homeless, but maybe you didn't?
23          A.   I didn't -- I didn't have that information.
24          Q.   But these are the kind of assumptions that may
25     have been made at the time.  Were there any assumptions
```

1    that you recall being made by either you or the other

2    police officers in order to formulate the game plan?

3                    MR. SCARBROUGH:  Objection, calls for

4    speculation.

5                    THE WITNESS:  Yeah, I can't -- that's --

6    the thing is, I don't try to assume or speculate.  If

7    there's information for -- like example, his warrant,

8    then that's what we discuss.  I don't try to assume

9    any.

10   BY MR. FARAJ:

11       Q.   I know.  But you're formulating a game plan at

12   this point.

13       A.   Mm-hm.

14       Q.   You can easily say, hey, Mr. Muhaymin, there

15   is a warrant out for your arrest.  We're going to

16   arrest you.  Please put your hands behind your head --

17   behind your back.

18       A.   Yeah.

19       Q.   You arrest him.  It's pretty straight forward.

20   You're developing a plan.

21       A.   Yes.

22       Q.   What were you -- what were some of the

23   assumptions?  Why did you have to develop a game plan

24   or a course of action for this particular arrest?

25       A.   Because we do it with all arrests.  I don't

1  know the violent tendency of him or whatnot.  Like I
2  said or like you asked before, I never had any contact
3  with him.  And when we came up with that game plan, or
4  that course of action, that's what I pretty much tried
5  to do, was actually just tell him to stop, that he had
6  a warrant, and that's what I did.
7      Q.   Okay.  So he's walking out, you're discussing
8  the plan with your fellow officers?
9      A.   Yes.
10     Q.   Tell me what happens next.
11     A.   Happens next, he stops walking, Mr. Muhaymin.
12  And I tell him to just put the dog down, because he has
13  a warrant.  And I discussed that with him.  And that,
14  you know, we're going to take him to go see the judge.
15     Q.   Okay.  Do you recall who decided to take him
16  in?  Who discovered the warrant and decided to take him
17  in first?
18     A.   I believe Officer Grenier.
19     Q.   Okay.
20     A.   Who got his -- initially got his information.
21     Q.   You have some discretion whether you take
22  somebody in for that type of warrant, true?
23     A.   At that point I didn't know what kind of
24  warrant it was.
25     Q.   Now that you know what it is, you have some

**Ronaldo Fernandez Canilao - July 30, 2019**          31

1   discretion in taking somebody in for that type of

2   warrant, true?

3       A.   We do.

4       Q.   You do.  How did you know to -- how do I want

5   to frame this?  Did you all discuss your roles, like

6   you would handcuff him, or did you just do it on your

7   own?

8       A.   Well, we do what we're trained to do like a --

9   it's called a fill and flow.  So basically if someone

10  takes an arm, I take the opposite, go the opposite

11  direction.  Or if they have arms, I was the one open to

12  take the legs.  Which that's the only way we were able

13  to.

14      Q.   Well, before -- before there was resistance --

15      A.   Okay.

16      Q.   -- there were four officers total at this

17  point?

18      A.   Yes.

19      Q.   How did you know that you were going to arrest

20  him?

21      A.   Oh, that's what was part of our COA as we move

22  forward.

23      Q.   Okay.  So tell me about that.

24      A.   As we move forward, I was all the way in the

25  back of the group.  And then I moved myself forward to

1    stop his forward movement.

2        Q.   Okay.  Did you all discuss that amongst

3    yourselves --

4        A.   No.

5        Q.   -- that you would go forward to stop him?

6        A.   No.  We -- we -- a few of us on the squad,

7    like that group, we actually worked together in the

8    past.  So we -- we have an idea of what we like to do

9    as a team.

10       Q.   Okay.

11       A.   So teamwork basically.

12       Q.   Assume for a minute that the arrest had gone

13   down without incident.  How long would you have driven

14   to get to Mesa detention facility?

15       A.   In that case probably 15, 20 minutes.

16   20 minutes, depending on the time of day.

17       Q.   At that point that you all decide to arrest,

18   and besides the warrant, have you discovered any other

19   information about Mr. Muhaymin at that point?

20       A.   No, I have not.

21       Q.   You personally have not?

22       A.   I have not.

23       Q.   If you know, have any of the other police

24   officers discovered something about Mr. Muhaymin,

25   either based on conversations with the community center

1  or amongst each other, maybe they knew him or
2  recognized him?
3              MR. SCARBROUGH:  Objection, calls for
4  speculation.
5              THE WITNESS:  Not at that time I didn't.
6  BY MR. FARAJ:
7      Q.   So describe then for me -- you told me you
8  moved up and asked him to put the dog down?
9      A.   Yes.
10     Q.   And then so describe the events, to the best
11  of your recollection, please.
12     A.   From there, he asked to call a sensei.  To me
13  a sensei is a master of martial arts.  So I'm thinking,
14  okay, well, we could not -- we can't let him make a
15  phone call right now.  'Cause the first thing we need
16  to do is just take him into custody.  And then we can
17  go from there whether we want to let him call a sensei
18  or anyone else.
19     Q.   Did he appear to be a reasonable person at
20  that point?
21     A.   He did.  He did.  And at that point I thought
22  he was just going to let the dog go --
23     Q.   Okay.
24     A.   -- and comply.
25     Q.   Okay.

1      A.   So there wasn't any --

2      Q.   Go ahead.

3      A.   You know, like I said, I didn't assume

4  anything until I get that information that, you know,

5  he's violent, or whatnot or the officers had prior

6  contact with him and, you know, any kind of prior

7  history that would prompt us to do anything else.

8      Q.   Well, let's fast forward a little bit.

9      A.   Okay.

10     Q.   Even -- even now, that he has no history of

11  violence that you know of, right?

12     A.   That I don't know.  Yes.  I don't know of any

13  history.

14     Q.   So he -- call my sensei, he doesn't comply

15  with your demands.  Do you believe, based on his

16  demeanor, that when you said there's a warrant out for

17  your arrest that he was understanding the information?

18     A.   Yes, I do.

19     Q.   Okay.  And why do you feel that?

20     A.   So after I asked him to put the dog down, he

21  refused.  And as my -- Officer Hobel and I tried to --

22  started getting in a position to take his right arm,

23  his dog was literally trying to bite us.  And at that

24  point it's like, okay, you should know the difference

25  when your animal is trying to bite others, and there's

 1  a threat there.
 2      Q.   And he didn't command the dog to attack or
 3  anything of that nature?
 4      A.   No.
 5      Q.   The dog was just responding to your advances?
 6      A.   Yes.
 7      Q.   Okay.  How were you feeling at that moment?
 8      A.   Again for myself, how I'm feeling, it's just
 9  try to remedy the situation.  So I would look at my
10  partners or the other officers and see what other game
11  plan we have.
12      Q.   Okay.  Did you have any conversation with the
13  officers about a game plan at that point that this guy
14  wasn't cooperating?
15      A.   Yes.
16      Q.   What did you discuss?
17      A.   Not necessarily discuss, but I took initiative
18  and I took my baton out.  And I discussed with Officer
19  Hobel the last time I used my baton was to actually pry
20  his hands open or apart, which worked in a similar
21  situation.  And evidently worked in this situation.
22      Q.   Did you have a plan for the dog once he
23  dropped it?
24      A.   Actually, we were talking about that, yes.
25      Q.   And did anyone call animal control?

```
 1        A.    No.   Didn't have an opportunity to at the
 2   time.
 3        Q.    You all knew you were going to arrest him in
 4   the community center, correct?
 5        A.    Yes.   Yes.
 6        Q.    And you weren't just going to leave the dog on
 7   the street?
 8        A.    No, not at all.
 9        Q.    And I don't think you were going to put it in
10   the car.
11        A.    Well, if the dog usually comes with us, we'll
12   put it in the car.
13        Q.    Normally, procedurally you would call animal
14   control if there's an animal?
15        A.    Yes, yes.
16        Q.    Did anyone call animal control?
17        A.    Not that I --
18             MR. SCARBROUGH:  Objection, calls for
19   speculation.
20   BY MR. FARAJ:
21        Q.    Any of the officers with you call animal
22   control to your knowledge?
23        A.    The officers I was on scene with, no.
24        Q.    Okay.   What's -- so you took out the baton,
25   you pried his arms open?
```

1      A.   Yes.  We pried his right arm away from a

2    clasped, yeah, his clasped fist.

3      Q.   Okay.  And then what did you do?

4      A.   We decided to take him to the ground.

5      Q.   Okay.

6      A.   Because we still didn't have his hands.  He

7    still didn't comply and put his hands behind his back.

8      Q.   At this point is the dog -- has he dropped the

9    dog?

10     A.   Excuse me.

11     Q.   At this point has he dropped the dog?

12     A.   Yes, he has.

13     Q.   Okay.  And so I know that you eventually got

14   some handcuffs on him after some -- a bit of a

15   struggle?

16     A.   Yes.

17     Q.   During that struggle he never attacked any of

18   the officers, correct?

19     A.   No, he didn't.

20     Q.   He just refused to cooperate?

21     A.   Yes.  What we call passive resistance.

22     Q.   Was he speaking?

23     A.   Yes.

24     Q.   What was he saying?

25     A.   Again, I think he asked to call a sensei.  And

```
 1    I believe he asked us to stop or something to that
 2    effect.
 3         Q.   Did he ask to call his sister?
 4         A.   No, he did not.
 5         Q.   You don't recall that?
 6         A.   I don't recall any family members or anything
 7    that he requested.
 8         Q.   Any other things that he was saying?
 9         A.   No, that was it, that I can recall.
10         Q.   And at that moment, I know you were struggling
11    and adrenalin was probably flowing.  Have you made any
12    assumptions about this guy at this point besides he's
13    resisting?
14         A.   No.  That's just it, just the resistance.
15         Q.   All right.  Now describe how you put the
16    handcuffs on.
17         A.   After we were able to pry the right arm with
18    the baton, we threw, I threw the baton away from us.
19    Officer Hobel and I were able to put a cuff on his
20    right wrist.  And simultaneously, he and I were able to
21    get the right arm towards his thigh, his right thigh.
22    So that's how we got the cuff on his right arm.
23         Q.   Okay.  And then you put another set of
24    handcuffs on the left arm, or not you, but -- is that
25    right?
```

```
 1        A.   The others -- yeah, there was another set of
 2    handcuffs put on by the other officers --
 3        Q.   Okay.
 4        A.   -- on the left side.
 5        Q.   Did you have -- what type of handcuffs did you
 6    have?
 7        A.   A --
 8        Q.   What kind of handcuffs did you put on him?
 9        A.   I can't -- I can't recall whether they're
10    Peerless or Smith & Wesson.
11        Q.   Okay.
12        A.   Whatever it was, I had it in my hand.
13        Q.   Okay.  What about the other officers?
14        A.   I can't recall what kind of handcuffs they
15    had.
16        Q.   Now did you --
17        A.   You mean as opposed to like the type of
18    handcuff or --
19        Q.   The type.
20        A.   Like, for example, hinged or unhinged --
21        Q.   Yes.
22        A.   -- or chain?
23        Q.   Yes.
24        A.   Oh, okay.  It was a chain handcuff.
25        Q.   Okay.  And then if I read the report
```

```
 1   correctly, you connected the handcuffs to one
 2   another --
 3        A.   Just --
 4        Q.   -- so you had two sets of handcuffs on him?
 5        A.   Yes, sir.
 6        Q.   Why is that?
 7        A.   We wanted to be able to get speed, to get
 8   control of his arms.
 9        Q.   Okay.
10        A.   And due to his broad shoulders, his build,
11   trying to get his arms behind him was pretty, pretty
12   vigorous.
13        Q.   Okay.  Once you got the handcuffs on, what
14   happened next?
15        A.   Okay.  We were able to roll him on his side, I
16   believe his right side, and lift him up.  So --
17        Q.   Okay.  Was the plan to still take him to Mesa,
18   or were you going to process him in Phoenix now for
19   resisting?
20        A.   As far as I know, just to take him to Mesa.
21        Q.   Okay.
22        A.   As far as I can recollect, just get him to see
23   the judge for his warrant.
24        Q.   Once you got the handcuffs on and you rolled
25   him over to his side, did you have to lift him up or
```

```
 1   did he stand?
 2       A.   We had to lift him up.
 3       Q.   Okay.  Did you do any -- did you perform any
 4   compliance holds to get him to stand up?
 5       A.   Usually with arms behind the back we're able
 6   to use his arms and support him as we lifted him up.
 7       Q.   Okay.  Is that what you did?
 8       A.   We did.
 9       Q.   Have you ever had that -- had that maneuver
10   performed on you in training?
11       A.   Yes.
12       Q.   You agree it's pretty painful?
13       A.   It can be painful, but it's -- it's definitely
14   a controlling measure --
15       Q.   Okay.
16       A.   -- or technique.
17       Q.   Well, it's controlling.  It forces people to
18   comply because of the pain they experience from the way
19   you understood it?
20       A.   From what I can recollect from the academy or
21   from the training it's -- there is really not much pain
22   at all.
23       Q.   Okay.  And just to be clear, the move we're
24   talking about, if you could please push your chair
25   back, stand up and demonstrate what it would look like
```

1   if someone is handcuffed.

2       A.   Sure.  Sure.  This way, if he's handcuffed

3   like this, you could just move them up and just move

4   them forward.

5       Q.   All right.

6       A.   I mean, I can do this without any pain right

7   now.

8       Q.   So I'm talking about something different.

9       A.   Oh.

10      Q.   There's a move where the arms are lifted up so

11  that the shoulders hinge back.

12      A.   Okay.  Like this?

13      Q.   Right.

14      A.   Like this.

15      Q.   You've seen that happen?

16      A.   Yes.

17      Q.   Did you all do that that day?

18      A.   We had to, yes.

19      Q.   Okay.  And that one does cause pain?

20      A.   It can.  It can.

21      Q.   All right.  So you begin to walk him, move him

22  towards whose vehicle?

23      A.   Officer Grenier's vehicle.

24      Q.   Okay.  Is Officer Grenier riding alone or does

25  he have a partner that day?

```
1       A.   I believe he was riding alone that day.
2       Q.   And was it decided that he was the one -- he's
3   the one that's going to drive him, or is anyone else
4   going with him?
5       A.   That was the decision, yes.
6       Q.   So you were just -- go ahead.  I'm sorry.  I
7   cut you off.
8       A.   That he was going to be driving, yes.
9       Q.   Driving to Mesa and drop him off in Mesa?
10      A.   Yes, sir.
11      Q.   To your knowledge had any calls been made at
12  that point that you have -- you've arrested a suspect
13  and that you are going to transport him to Mesa
14  pursuant to a warrant?
15      A.   I can't recall who made the call; if there was
16  a call by officers to declare that we had somebody in
17  custody.
18      Q.   Okay.  When you learned from Mesa -- when you
19  learned -- I'm sorry.  When you learned that there was
20  a warrant, is there anything procedurally that you know
21  of that would require you or encourage you to call Mesa
22  to say we've got a suspect for you?
23      A.   Oh, absolutely.  We verify that warrant.
24      Q.   Did you do that?
25      A.   I did not do that.
```

1     Q.   Okay.  Do you know if anyone did that?

2     A.   Not that I know of, no.

3     Q.   Okay.  So let me -- let me -- those are one of

4  those bad questions that I asked.  You may not know if

5  anyone did or did not, or you may not know that no one

6  did?

7     A.   To verify the warrant, I believe Officer

8  Grenier did.

9     Q.   Okay.  And then -- so he would have made the

10 call?

11    A.   Okay.  So can I clarify?

12    Q.   Yes.

13    A.   So what happens is when we get information

14 from a subject, we do run their information against

15 our -- our DPS database or NCIC.  And that's when we'll

16 get a hit whether there is a warrant out for that

17 subject.  To verify it, we usually call the agency to

18 verify if it's a valid warrant, which at that point we

19 didn't have to get.

20    Q.   Okay.  And that was my point, is I know you

21 learned of the warrant.  Did anyone call Mesa to verify

22 it?

23    A.   Not that I know of.

24    Q.   Okay.  Now you also -- when you run someone's

25 name, you also get his rap sheet if he's got one?

```
 1        A.   Well, with our new system now we don't have
 2   access to much of the history.  Our new system
 3   doesn't -- well, it's not even new.  We have to go into
 4   a different database.  And that takes more time to get
 5   into that database to look at more history on our
 6   subject.
 7        Q.   On this particular subject, at that time did
 8   you -- did you -- did you or any of the officers that
 9   were there, if you know, run his criminal history?
10        A.   No, we didn't.  Or not that -- I did not.
11        Q.   Okay.
12        A.   I don't know if any of the officers were able
13   to.
14        Q.   Okay.  Why do officers do that?  Why do they
15   run someone's criminal name through a criminal database
16   check?
17        A.   Well, for warrants, for example, one of the
18   main reasons.  And for someone that -- with that
19   information, we get that information, sometimes it will
20   tell us violent tendencies, things like that.
21        Q.   So that's almost an act of prudence?
22        A.   Yes.
23        Q.   You want to know if someone has a tendency to
24   be violent?
25        A.   Yes.
```

1      Q.   Maybe possibly possessed weapons before?

2      A.   Yes.

3      Q.   In addition to being wanted or not wanted?

4      A.   That's correct, yes.

5      Q.   Okay.  But to your recollection we know you

6   did not run it?

7      A.   That's correct.

8      Q.   The history.  And you're not sure if any of

9   the other officers did?

10     A.   Yes, sir.  That's correct.

11     Q.   Fair to say, based on your 17-plus years of

12   experience, that if someone had run the history and

13   discovered something noteworthy about this person, you

14   would have talked amongst each other like, hey, he's

15   got a --

16     A.   Yes.  Yes, that's correct.

17     Q.   Yeah.  Nothing -- no conversation of that sort

18   took place?

19     A.   No, it didn't.

20     Q.   All right.  So back to the -- back to the area

21   outside the community center.  Mr. Muhaymin is now

22   cuffed.  And you all are starting to walk him towards

23   Officer Grenier's vehicle, correct?

24     A.   Yes.

25     Q.   Tell me how that went.

```
 1      A.   Initially he took -- started to walk.  And
 2  from the -- the distance from the entrance to the
 3  Officer Grenier's vehicle, half the distance he decided
 4  to lift his legs up and not voluntarily come with us.
 5  So we had to lift him to the car or actually
 6  technically drag him to the car.
 7      Q.   Okay.  Was there any conversation of any sort
 8  among the officers at that point?
 9      A.   No.
10      Q.   Was there any conversation of any sort between
11  Mr. Muhaymin and any of the officers at that point?
12      A.   Not that I can recollect.
13      Q.   Were there any commands or orders being
14  directed by the officers to Mr. Muhaymin at that point?
15      A.   Not that I can recollect.  Unless -- not that
16  I can recollect.
17      Q.   So where is the dog?
18      A.   The dog is running around the front of the
19  community center.
20      Q.   Okay.  And all four officers are basically
21  getting Mr. Muhaymin to the vehicle?
22      A.   No, just three of us.
23      Q.   I'm sorry.  Yeah, you did say Hobel, Grenier
24  and yourself?
25      A.   Myself, yes.
```

1        Q.    Were there any other officers at the time
2    besides you three?
3        A.    Mr. -- or Officer Head.
4        Q.    Okay.
5        A.    Dave Head was there.
6        Q.    When did he arrive?
7        A.    He arrived approximately the same time Officer
8    Hobel and I arrived.
9        Q.    Okay.  And what was he doing?
10       A.    Assisting with the standing by, just like I
11   did on the initial.
12       Q.    During the period of taking Mr. Muhaymin from
13   the community center to the vehicle, what was Officer
14   Head doing?
15       A.    As far as I know, collecting all our loose
16   gear like cameras, my baton and things like that.
17       Q.    Was Mr. Muhaymin saying anything?
18       A.    From movement from the front of the --
19       Q.    During the movement.
20       A.    Not that I can remember, recollect.
21       Q.    Okay.  What happens next?
22       A.    So as we're getting to the vehicle, to Officer
23   Grenier's patrol Tahoe, I do remember Officer Hobel
24   saying that he had prior contact with Mr. Muhaymin.
25   And during that contact, Mr. Muhaymin had knives on

```
 1   him.  So Officer Hobel and I decided to do a pat down
 2   of weapons.
 3       Q.   Have you since learned that Officer Hobel has
 4   never filed any kind of report about these knives?
 5       A.   No, I have not.  Not --
 6       Q.   Are you aware --
 7       A.   -- to my knowledge.
 8       Q.   -- of any reports that -- prepared by Officer
 9   Hobel that Mr. Muhaymin had knives previously?
10       A.   No reports, no.
11       Q.   Okay.  Do you know if it's illegal to possess
12   any type of knife in Phoenix?
13       A.   A certain length, yes.
14       Q.   Any type of knife?
15       A.   No.
16       Q.   What is the length of knives that are illegal
17   in Phoenix to be possessed in Phoenix on the body of a
18   person?
19       A.   What is the length of knife?
20       Q.   Yes.
21       A.   Three inches and below is legally to carry.
22       Q.   Three-inch blade?
23       A.   Yes, sir.
24       Q.   Okay.  Any other characteristics of these
25   knives that are not allowed?  For example, some states
```

**Ronaldo Fernandez Canilao - July 30, 2019**          50

```
 1   have switchblades that aren't allowed.

 2       A.    That is correct.

 3       Q.    Is that one of the --

 4       A.    That's one of them, yes.  We go by the federal

 5   laws as well.

 6       Q.    I'm actually not familiar with them.  So --

 7       A.    Yes.

 8       Q.    Is it --

 9       A.    Switchblades.

10       Q.    -- switchblades or anything like that?

11       A.    Yes, sir.

12       Q.    Okay.  So a three-inch blade or a switchblade?

13       A.    Yes, sir.  Or anything over three inches

14   usually cannot be carried on the body, on the person.

15       Q.    Okay.

16       A.    For example, a Bowie knife or something like

17   that.

18       Q.    Okay.  Okay.  So when Officer Hobel said he's

19   had prior contact with Muhaymin, was there any

20   conversation with Hobel about the type of contacts or

21   was it just a statement?

22       A.    He told me that Mr. Muhaymin was cooperative

23   last time he had contact with him.

24       Q.    Okay.  Sorry.  Going back to the knives.

25       A.    Yes.
```

1      Q.   The rule on something larger than a three-inch

2  blade, are there any exceptions if it's carried in a

3  sheath or in a -- you know, in a holster in the pocket,

4  or is that a you can't have it in your possession at

5  any time?

6      A.   At any time.

7      Q.   In any form?

8      A.   Yes.

9      Q.   Okay.  And so what is your understanding of

10  why Officer Hobel told you about the prior contact and

11  the knives?

12      A.   Especially when we do take someone into

13  custody in lieu of detention or the custody, we do a

14  search on that person, whether it's knives, contraband

15  or illegal drugs, whatnot.

16      Q.   Okay.  Now you --

17      A.   Especially before we put them into a vehicle.

18  So --

19      Q.   Yeah.  So you understand, and I think this is

20  what you just said, that anytime you take someone into

21  custody you have a right to search that person?

22      A.   That's correct.

23      Q.   For weapons or contraband?

24      A.   Yes, sir.

25      Q.   So you would have had the right to search

 1   Mr. Muhaymin given that you were going to take him in
 2   for this warrant regardless if he had had knives before
 3   or not?
 4        A.   Yes, sir.  That's correct.
 5        Q.   And so that was kind of the basis of my
 6   question.
 7        A.   Yes, sir.
 8        Q.   What was the purpose of Mr. -- I'm sorry,
 9   Officer Hobel's comment to you, if you know?  Did you
10   discuss it further?
11        A.   Just at that instant it was about officer
12   safety.
13        Q.   Okay.  And so I'm assuming that was sort of
14   the trigger to search him?
15        A.   Yes, sir.
16        Q.   Who is going to conduct the search?
17        A.   Either he or I.
18        Q.   Okay.  And so what did you do to engage or to
19   begin the search?
20        A.   We put that subject or the individual against
21   the vehicle.  That will enable us to pin him and able
22   to search his pockets or any part that he may be --
23   might have a knife on him.
24        Q.   And did you do that with Mr. Muhaymin?
25        A.   We weren't able to have the opportunity to do

1    that.

2        Q.   What -- describe what happened next.

3        A.   As we -- Officer Hobel and I decided to --

4    another course of action to put him on the hood of the

5    car to do the search.  Mr. Muhaymin was able to put --

6    bring his arms from the rear to the front.

7        Q.   Okay.  Was -- were either you or Officer Hobel

8    lifting his arms up --

9        A.   We were.

10       Q.   -- to get him to comply by going onto the

11   hood?

12       A.   Yes, sir.

13       Q.   Okay.  And that maneuver that we just saw a

14   few minutes ago?

15       A.   Yes, sir.

16       Q.   To get him to comply?

17       A.   Yes, sir.

18       Q.   And I think that's how he managed to bring his

19   shoulders over?

20       A.   Yes, sir.

21       Q.   Okay.  And so now what?

22       A.   And since he wasn't complying at that time, we

23   decided again to take him to the ground.

24       Q.   Was there any conversation?

25       A.   Yes.  I mean, me and Officer Hobel -- well,

1  again, I initiate, said yes, let's go to ground.

2      Q.   Okay.

3      A.   The thing is, we realize that the longer we

4  have a suspect on his feet, the more he's able to fight

5  or to resist us.

6      Q.   Now, we're still -- we're still in agreement

7  that he never attacks any of the officers --

8      A.   No.

9      Q.   -- at any time?

10     A.   Passive resistance still.

11     Q.   He's just resisting arrest?

12     A.   Yes, sir.

13     Q.   Okay.  I want to ask you about a conversation.

14  I'm also wondering about if Mr. Muhaymin had said

15  anything.

16     A.   Not that I can recollect at that time.

17     Q.   How was he behaving?  I mean, he brings his

18  arms over.  How was he behaving, what was he doing,

19  what was his demeanor?

20     A.   Oh, he still wasn't complying.  He was till

21  tensing up his muscles and trying to squat again to

22  where we can't get him on the ground.

23     Q.   So before you take him down is my point, is he

24  saying anything, is he commenting, is he --

25     A.   Not that I can recollect.

1      Q.   Okay.  So you're saying he's tensing and

2  squatting?

3      A.   Yes.

4      Q.   Is this before or after he brings his arms

5  forward?

6      A.   This is during that time, yes.

7      Q.   Okay.  Is there any attempt at that point to

8  talk to him and reason with him?

9      A.   Not until we have him on the ground.

10     Q.   Before that, any attempt to say, hey, man, you

11  know, just cooperate, it's a basic warrant, not a big

12  deal?

13     A.   I do remember telling him not to bite me --

14     Q.   Okay.

15     A.   -- as he brought his hands forward.  Which

16  I've been -- there's plenty attempts on me in prior

17  incidences where suspects tried to bite me.

18     Q.   He didn't try to bite you?

19     A.   He did not.  He did not.

20     Q.   Okay.  I understand what you're saying.

21          Fair to say, though, that there wasn't,

22  either by you or other officers, any attempt to sort of

23  reason with him at that point?

24     A.   No.  It's just to control him.

25     Q.   So how do you decide to take him to ground?

1   You commented we're going to ground; is that right?

2       A.   Yes.  Yes.

3       Q.   And I'm assuming that means something to the

4   other officers?

5       A.   Yes.

6       Q.   What does that mean?

7       A.   Someone has to take his legs out.

8       Q.   Okay.  And so walk me -- walk me and talk me

9   through that.

10      A.   I believe I went to take one of his legs

11  again.

12      Q.   Okay.  And who took the other leg?

13      A.   I think I was able to get one leg or so, and

14  then the other officers like Officer Head and Grenier

15  were able to help us put -- place him on the ground.

16      Q.   All right.  So I need to understand the

17  orientation.  Is he facing the car at the time he

18  brings his arms forward?

19      A.   That's correct.

20      Q.   The Tahoe?

21      A.   Yes.

22      Q.   Okay.

23      A.   The patrol Tahoe.

24      Q.   And then does he turn around, or do you all

25  decide to take him to ground while he is still facing

1   the Tahoe?

2       A.    Since he isn't complying and placing or being

3   let onto the hood of the vehicle so we could do the

4   search, he's basically resisting that maneuver, and

5   almost practically pushing us off the vehicle so he

6   could stand independently on his own.  From there, I

7   either -- I believe I swept him with one of my legs and

8   the other officers helped us to take him down.

9       Q.    I understand.  My question is, was he facing

10  the Tahoe or was he facing the officer?

11      A.    Oh, he was facing the Tahoe --

12      Q.    Okay.

13      A.    -- away from us.

14      Q.    Okay.  And so when you sweep his legs, he --

15  does he fall back?

16      A.    I can't recall.  From what I can remember, I

17  believe he falls on his side.

18      Q.    On his side.  Okay.

19      A.    Yes.

20      Q.    Does he -- does he fall on his -- when he goes

21  to his side, does he roll over on his back or does he

22  stay on his side?

23      A.    I believe he stays on his side.

24      Q.    Okay.  And then what happens next?

25      A.    From that point, I'm able to take control of

```
 1   his arms.  Officer Hobel I believe is on his hip,
 2   behind him on his hip.  Officer Head I believe is on
 3   his legs.
 4       Q.   Okay.  And he's on his side?
 5       A.   Yes.
 6       Q.   And what's the plan?
 7       A.   The plan is to from that point get more
 8   officers on scene to help me or us to get
 9   Mr. Muhaymin's hands behind him again so we can cuff
10   them behind him.
11       Q.   How were you going to do that?
12       A.   With the help of other officers.
13       Q.   No, I understand.  But how were you going to
14   do it?  How were you going to get his hands behind his
15   back again?
16       A.   Okay.  We would have to open the cuffs and
17   physically move his hands back towards his rear.
18       Q.   Okay.  And so how much do you weigh?
19       A.   175.
20       Q.   At the time I should say.
21       A.   About the same.
22       Q.   Same thing?
23       A.   About the same.
24       Q.   Do you know how -- how -- can you estimate
25   Officer Head's size?
```

**Ronaldo Fernandez Canilao - July 30, 2019**          59

```
 1        A.    Maybe 180.

 2        Q.    And Officer Grenier?

 3        A.    Officer Grenier is about 5'9, 5'10, about 170.

 4        Q.    Okay.  And is Hobel involved in this or no?

 5        A.    He is.

 6        Q.    So all four of you are subduing him at this

 7   point?

 8        A.    Yes.

 9        Q.    All right.

10        A.    Or trying to, yes, sir.

11        Q.    Okay.  So I know you gave me three.  You said

12   -- I know you were on his legs, if I remember right.

13        A.    No, I was not.  Officer -- I believe Officer

14   Head was on his legs.

15        Q.    Who was on his hip?

16        A.    Officer Hobel.

17        Q.    Okay.  And where were you?

18        A.    I was on his arm, on his arms.

19        Q.    Okay.  How were you on his arms?

20        A.    I had a knee on his arm which was able to --

21   which I was able to put my weight on.

22        Q.    So the handcuffs are still on?

23        A.    Yes.

24        Q.    They're in front of his body?

25        A.    Yes.
```

 1      Q.    Okay.  And so he's laying on his side?

 2      A.    Yes, sir.

 3      Q.    And if I understand this, you've just kind of

 4  -- your knees are keeping his arms down?

 5      A.    Yes.  On I believe his right arm.

 6      Q.    Okay.  And -- okay.  Where is Hobel?

 7      A.    Is on his back hip.

 8      Q.    And Head?

 9      A.    Head is on his -- Officer Head is on his feet.

10      Q.    Okay.  And Grenier?

11      A.    I believe Officer Grenier is opposite me,

12  either behind Mr. Muhaymin's head or so.

13      Q.    Okay.  His knee was on his head?

14      A.    Behind -- I can't -- I can't --

15              MR. SCARBROUGH:  Objection, misstates the

16  testimony.

17              THE WITNESS:  I can't recollect where

18  his -- his knee was.

19  BY MR. FARAJ:

20      Q.    Okay.  Well, how was he subduing him?  How was

21  Grenier subduing or preventing him from moving?  How

22  was Grenier helping out, I should say.  Let's do it

23  that way.

24      A.    I believe he was helping me pin his hand, his

25  arm from moving.

```
 1        Q.    Okay.  Was he bent over?

 2        A.    He was bent over.  We were bent in towards

 3   each other, yes.

 4        Q.    So is it your testimony that Grenier did not

 5   have his knees on Mr. Muhaymin's head or neck?

 6        A.    I -- I can't recall on that.

 7        Q.    Okay.  Your recollection is he was just bent

 8   over?

 9        A.    Yes, yes.

10        Q.    And when you say "bent over," meaning he's

11   hinged at the waist, but his knees are not on the

12   ground, correct?

13        A.    Not that I can recollect.

14        Q.    Okay.

15        A.    I just tried to focus on pinning

16   Mr. Muhaymin's arm down.

17        Q.    Were you -- were you facing -- were you facing

18   Muhaymin's -- were you oriented towards Muhaymin's

19   body --

20        A.    Yes.

21        Q.    -- or was your back towards Muhaymin's body

22   when you were dealing with --

23        A.    No.  I was facing, facing him.

24        Q.    Okay.  And --

25        A.    That I can recollect.  That's, yeah, from what
```

1   I can recollect.

2       Q.   I'm imagining it could be you're kind of off

3   to the side if you're on his arms.  And that's okay.

4   I'm just trying to understand it.

5       A.   Yes.

6       Q.   Were you oriented in a way that you could see

7   Officer Head and Officer Hobel?

8       A.   No.  I could not see them.

9       Q.   At all?

10      A.   No, I didn't.

11      Q.   And you also couldn't see Grenier?

12      A.   I could see his profile, yes, Officer

13  Grenier's profile.

14      Q.   So at this point would you say that

15  Mr. Muhaymin is under control?

16      A.   Not completely.

17      Q.   I understand the handcuffs aren't on, but is

18  -- do you all have them?

19      A.   Oh, he does have his handcuffs on.

20      Q.   I'm sorry.  His handcuffs aren't in the --

21  aren't where you want them behind his back?

22      A.   That's correct, yes.

23      Q.   But besides that, is he subdued?

24      A.   No, not completely.

25      Q.   Okay.  What's he doing?

1      A.   He is actually pulling his arms in and moving

2  my whole body -- my whole weight as he's doing that.

3  And I believe I tell him to stop at that time.

4      Q.   Now if I understand your testimony, at that

5  point no one is on -- none of the four officers is on

6  Mr. Muhaymin's upper torso, correct?

7      A.   That's -- yeah, from what I can recollect,

8  yes.

9      Q.   Okay.  And based on your testimony, my

10  understanding of your testimony is no one is physically

11  on top or controlling Mr. Muhaymin's head?

12      A.   That's correct.

13      Q.   Based on your training, would it be okay to

14  use body weight to put pressure on someone's upper

15  torso?

16      A.   To subdue them?

17      Q.   Yes.

18      A.   Yes.  There's some circumstances where that

19  would be the case, yes.

20      Q.   Okay.  Is that something you've been trained

21  on?

22      A.   Yes.

23      Q.   And when you received that training were you

24  also made aware of the danger of asphyxiation when that

25  happens?

1      A.    Yes.

2      Q.    Tell me about that.

3      A.    Asphyxiation usually is related after the fact

4  that a suspect is taken into custody.  And back then it

5  used to be called the hogtying thing, or he's placed on

6  his stomach after taken into custody with his legs up

7  and his hands behind him.  The technique used on his

8  upper torso, again, it's just controlling techniques.

9  And that's basically the limbs, not necessarily in his

10  chest or --

11      Q.    Yeah.  I'm specifically referring -- I get the

12  limbs.

13      A.    Mm-hm.

14      Q.    That's what you described --

15      A.    Yes.

16      Q.    -- as you and your other fellow officers were

17  doing.

18      A.    Yes.

19      Q.    I'm specifically focused on the upper torso.

20      A.    Yes.

21      Q.    The upper body, not the limbs.

22      A.    Yes.

23      Q.    Not the upper limbs, but the torso itself.

24      A.    Yes.

25      Q.    If I understand your testimony correctly, is

1   that there is a procedure, sometimes it's allowed,

2   where you can put someone's weight on a suspect's upper

3   torso to control them.  Did I understand that right?

4        A.   I'm trying to recollect the technique.  Not

5   necessarily on his chest, but on his back.  For

6   example, if there's a suspect that is trying to get up

7   from a seated position, we do use our weight on his

8   back to keep him pinned on the ground.

9        Q.   Okay.

10       A.   Other than that, there's no other technique

11  that I know of that we use directly on his chest.

12  Unless it's like an impact push or something like that.

13       Q.   All right.

14       A.   A defensive measure.

15       Q.   So I want to be clear.  I'm not talking about

16  somebody's sitting.

17       A.   Oh, okay.

18       Q.   Someone is laying on the ground on either

19  their chest or their back.

20       A.   Okay.

21       Q.   Okay.  Is there a technique where officers are

22  permitted to use their body weight to subdue an

23  individual by placing their weight, the officer's

24  weight on the upper torso of that person?

25       A.   Not necessarily a technique, but yes.

1      Q.   Okay.  And -- and when that is used, either --
2  either because you intended to or you wind up that way
3  as a result of a struggle, have you also been made
4  aware in your training of the danger of asphyxiation?
5      A.   Yes.
6      Q.   To be aware of it?
7      A.   Yes, we're aware of it.
8      Q.   You've heard and I'm sure you've read of
9  situations where people have died because they couldn't
10  breathe as a result of weight while they're being
11  arrested?
12            MR. SCARBROUGH:  Objection, calls for
13  speculation.
14  BY MR. FARAJ:
15      Q.   You're aware of that, right?
16      A.   I am aware of it.
17      Q.   There have been -- maybe not with you, --
18      A.   Right.
19      Q.   -- I'm not suggesting it, --
20      A.   Right.
21      Q.   -- but there have been instances where
22  officers pile on somebody and that person dies because
23  they can't breathe; you're aware of that?
24      A.   I'm not aware of specific situations or
25  instances.  I am aware of the asphyxiation where after

1    the struggle that certain individuals are hogtied, or

2    they're put in a restraint where they asphyxiate being

3    on their stomach.

4        Q.   Mm-hm.  You're aware that, that just based on

5    your life experience, that if you put a bunch of weight

6    on someone, they may not be able to breathe if they're

7    laying down, facedown?

8        A.   Oh, absolutely, yes.

9        Q.   Okay.

10       A.   Yes.

11       Q.   All right.  So the four of you have

12   Mr. Muhaymin on the ground.  And you told me that you

13   decided that you needed extra help.

14       A.   Yes.

15       Q.   Who called for the extra assistance, if

16   anyone?

17       A.   I believe myself and Officer Hobel cleared on

18   the radio.

19       Q.   Go ahead.

20       A.   Cleared on the radio for extra help.

21       Q.   Did you do that before or after you all went

22   to ground?

23       A.   After we went to ground.

24       Q.   And so as I understand, if I understand you

25   correctly, you're on -- you're on the ground, you have

1    Mr. Muhaymin, and then you went to make the call?

2        A.    That's correct.

3        Q.    Okay.  And what is the call that you made?

4        A.    Need additional -- additional units.

5        Q.    Anything else?

6        A.    No, that's it.

7        Q.    What does that mean when an officer says need

8    additional units?

9        A.    That we do need help.  Whether it could be

10   traffic control, or in this case taking Mr. Muhaymin

11   into custody.

12       Q.    There is no alert of danger here.  It wasn't

13   like -- it's not like an officer, shots fired, or

14   officer in danger?

15       A.    Usually when we give that kind of call out, it

16   could lead to that, yes.

17       Q.    I understand.  But there are different calls

18   when there's a threat to an officer or a threat to

19   other people in the community, correct?

20       A.    You mean is there another phrase for that?

21       Q.    A different type of call when there is a

22   threat to an officer.

23       A.    A threat to an officer.  'Cause technically

24   basically if there was -- we would actually say what

25   the actual threat is.  If the subject had a gun, we

```
 1   would say that.
 2        Q.   Okay.
 3        A.   Additional officers can -- it's pretty
 4   ambiguous.
 5        Q.   Just means additional officers?
 6        A.   Yes.
 7        Q.   Okay.  About how long did it take the first
 8   unit to arrive after you made the call?
 9        A.   I think the officer -- it took maybe
10   30 seconds.  There was another officer on scene.
11        Q.   Do you recall who that officer is?
12        A.   I believe it was Sue Heimbigner, a female
13   officer.
14        Q.   Was Mr. -- were you all and Mr. Muhaymin still
15   in the same position --
16        A.   Yes.
17        Q.   -- on the ground?
18        A.   Yes.  We were pretty much frozen, restraining
19   him right there.
20        Q.   Any -- any -- anything said by any of the
21   officers to Mr. Muhaymin?
22        A.   By me that I can recollect, I kept on telling
23   him to stop.
24        Q.   Okay.  Did Mr. Muhaymin say anything?
25        A.   Not that I can recollect.
```

```
1        Q.   Did he continue to ask for his sensei?
2        A.   At that point no, I don't -- I don't think he
3   did at that point.
4        Q.   Okay.  Any recollection of him asking to call
5   his sister at any time at that point or before?
6        A.   No, not at that time.
7        Q.   When the next officer arrives on the scene, is
8   there any conversation with that officer?
9        A.   I did not have a conversation with that
10  officer.
11       Q.   What did she do when she arrived?
12       A.   I believe she tried to -- oh, she assisted
13  with the legs, to restrain the legs, either by
14  retrieving a RIPP restraint or something to that
15  nature.  I can't recall exactly what she was doing.
16  Again, I was facing in a direction where I could not
17  see the lower half of Mr. Muhaymin or what was being
18  done there.
19       Q.   During the 30 or so seconds between you made
20  the call and the arrival of the next officer, --
21       A.   Mm-hm.
22       Q.   -- did you move in any sort of way so that you
23  were able to now see where Officer Grenier is located?
24       A.   No.  I was still on his arm, Mr. Muhaymin's.
25       Q.   And so your testimony is you never saw where
```

1  Officer Grenier's -- where Officer Grenier was located

2  with respect to Mr. Muhaymin's body besides being bent

3  over?

4      A.   All I can remember is just seeing Officer

5  Grenier's profile.

6      Q.   Okay.

7      A.   That's all I can recall on that.

8      Q.   What's a RIPP restraint, please?

9      A.   What is a RIPP restraint?

10     Q.   Yes.

11     A.   It is a nylon -- a restraining device.  It's

12 about 5 feet in length.  It has a snap on the end.  And

13 basically it's almost like a belt.  And what it does

14 it's -- it has a cinch so you can tighten it like a

15 noose to wrap around a limb or an appendage and to

16 restrain it.  Basically, we use that restraint to put

17 feet together so they can't move.

18     Q.   Did you manage to put on the RIPP restraint?

19     A.   I can't recall.  I wasn't, again, working on

20 the lower half.  And I really can't tell you if I seen

21 him do it or not.

22     Q.   Okay.  Just so I understand, you're not sure

23 if the RIPP restraint ever went on?

24     A.   That's correct.

25     Q.   Okay.  What's the next thing that happens?

1      A.   More officers arrive on scene.

2      Q.   Okay.  Do you know who?

3      A.   I believe Officer McGowan, Nielsen, and

4  Sergeant Wong arrive on scene.

5      Q.   All right.  And then what?  What happened

6  next?

7      A.   So that we come up with another plan, a course

8  of action to move his arms, his hands back to towards

9  his back again.  And officers were helping me uncuff

10  him, and then finally move the cuffs back to his --

11  towards his rear.

12      Q.   Okay.  Is he on his side still?

13      A.   He is.

14      Q.   Is he ever on his stomach --

15      A.   No, --

16      Q.   -- or his chest?

17      A.   -- not that I know of.

18      Q.   How did you manage to get the arm closest to

19  the ground behind his back again?

20      A.   We left the cuff on that arm.  And I was able

21  to restrain that arm and then pass it over to other

22  officers who were next to me and closer to his rear so

23  they can move it towards his rear.

24      Q.   So I get how the arm that is not closest to

25  the ground would go back, because there's no friction?

```
 1      A.   Right.

 2      Q.   He's on his side?

 3      A.   Right.

 4      Q.   How do you get that arm back behind his back?

 5      A.   I'm able to pin it with the cuff.  I'm still

 6  holding the cuff pinning his arm.

 7      Q.   Okay.

 8      A.   And officers, I was able to pass it over to

 9  officers.  And they were able to slide it through or

10  slide it.

11      Q.   So they slid under his body --

12      A.   Yes, sir.  Yes, sir.

13      Q.   -- as he's laying there with officers sort of

14  on his legs --

15      A.   That's correct.

16      Q.   -- as you described it?

17      A.   Yes, sir.

18      Q.   I just want to be clear.  It's your testimony

19  that he was never on his stomach?

20      A.   That's correct.  From what I can recollect he

21  was never on his stomach.

22      Q.   And if he was never on his stomach, it would

23  also stand to reason that there was never anybody on

24  his back while he was on his stomach?

25      A.   That's from what I can recollect or see,
```

```
 1   actually see, no one was on his back.
 2       Q.   Was anybody on his upper torso while he was in
 3   the position you described?
 4       A.   Not that I can see.
 5       Q.   And what I mean -- I'm sorry.  Go ahead.
 6       A.   I'm sorry.  Go ahead.
 7       Q.   What I mean by upper torso, is anyone that was
 8   putting his weight on his upper torso as he was laying
 9   on his side?
10       A.   Not that I could see.
11       Q.   Was he ever on his facedown?
12       A.   No, not that I could see.  No, not that I can
13   recollect.
14       Q.   And so again, similar question.  It stands to
15   reason if he was never facedown, you don't -- you
16   didn't see anyone on top of him while he was facedown
17   while his chest was on the ground?
18       A.   That's correct.  I didn't see anybody.
19       Q.   Based on your training and experience, would
20   it be inappropriate to place a suspect on -- on the
21   ground facedown in a prone position and have officers
22   on top of his -- on top of his body on his upper -- on
23   his upper torso?
24       A.   I'm sorry.  Can you --
25       Q.   It was a terrible way to ask the question
```

```
 1   because it was broken up.  Let me see if I can get the
 2   court reporter to read it back.
 3                  (The requested portion was read by the
 4   reporter as follows:
 5                  "QUESTION:  Based on your training and
 6                  experience, would it be inappropriate to
 7                  place a suspect on -- on the ground
 8                  facedown in a prone position and have
 9                  officers on top of his -- on top of his
10                  body on his upper -- on his upper torso?"
11                  THE WITNESS:  Based on my training, would
12   it be inappropriate?  There's certain circumstances;
13   so, no, not necessarily.
14   BY MR. FARAJ:
15       Q.   Okay.  Is there a danger to that type of
16   maneuver?
17                  MR. SCARBROUGH:  Objection, vague.
18   BY MR. FARAJ:
19       Q.   You can answer.
20       A.   Not necessarily.
21       Q.   Okay.  Okay.  So now you've got the handcuffs
22   back on the way you want them?
23       A.   Yes, sir.
24       Q.   You're not sure if the RIPP restraint is on or
25   not?
```

1        A.    Not that I know.

2        Q.    Okay.

3        A.    My involvement with the handcuffs, once I

4   passed them off, I came off of Mr. Muhaymin and --

5        Q.    Okay.  And what do you see when you came off?

6        A.    I observed the other officers trying to cuff

7   his hands behind him, but one of the cuffs would not go

8   on his wrist due to his wristbands.

9        Q.    Okay.  Fair to say that you're looking at the

10  scene now, you're not just turned away?

11       A.    Yes, sir.  Yes, sir.

12       Q.    Okay.  Describe what you're seeing.

13       A.    I'm seeing I believe Sergeant Wong and I

14  believe either Officer Nielsen and McGowan start to put

15  the cuffs on.  At that point they're cutting away the

16  cloth band or wristband to make room for the cuff to go

17  on his wrist.

18       Q.    Well, how did the cuff go on in the first

19  place?

20       A.    The cuffs went on pretty loosely.  Pretty

21  quick, loosely and -- initially when we put them on.

22       Q.    Okay.  So -- and he's still on his side?

23       A.    Yes, sir.

24       Q.    So here's what I would like you to do, please.

25  And you can move that chair out of the way.  I would

```
 1   like you to stand up.  See that screen?
 2      A.   Yes.
 3      Q.   I want you to imagine that's the ground.
 4      A.   Okay.
 5      Q.   Okay.  And I want you to the best of your
 6   recollection orient yourself the way you remember
 7   Mr. Muhaymin being on the ground.  And let's --
 8      A.   Sure.
 9      Q.   See what I'm saying?
10      A.   Yes.  Yes.  So if this is the ground,
11   Mr. Muhaymin I believe was on his left side.  So he
12   would be on the ground like this.
13      Q.   So hold on.
14      A.   And this is the --
15      Q.   Because you got the -- turn the other way so
16   we don't --
17      A.   Okay.  Here we go.  So this will be the
18   ground.  This is Mr. Muhaymin on his left side like
19   this.  And from what I can recollect.  And they were
20   able to get the hands -- this arm back this way and
21   this one this way.
22      Q.   Okay.  And so at this point --
23      A.   He's still.
24      Q.   All right.
25      A.   Yes.
```

```
1        Q.   And if he's laying on the ground that way, if
2   you could point, where would you be, where are you
3   standing?
4        A.   I was towards the rear upper torso.
5        Q.   Okay.  And so fair to say that you would be
6   able to see his neck and head area?
7        A.   Yes.  At the front, yes.
8        Q.   Do you recall anyone kneeling on his neck or
9   head, using their neck to subdue his neck or head?
10       A.   Not at that point, no.
11       Q.   Okay.  At any point was there someone at any
12  point on his neck or head?
13       A.   Not that I can recollect.
14       Q.   Okay.  So please stay there for a minute.
15       A.   Okay.
16       Q.   So the handcuffs are back on.  They're back on
17  the way you all want them?
18       A.   Yes.
19       Q.   Correct?
20       A.   Correct.
21       Q.   And he's in this position at this point?  Yes,
22  okay.
23       A.   Oh, I'm sorry.  You know what, I believe --
24  yes, they moved them -- we moved him to the rear, yes.
25  They moved him to the rear.
```

1     Q.   Yes.  I want to see the way he was after you

2  moved it to the rear, because you told me you helped

3  them --

4     A.   Yes.

5     Q.   -- bring his arm back.

6            THE REPORTER:  I'm sorry.  One at a time,

7  please.

8            THE WITNESS:  Oh, I'm sorry.  Yes, like

9  this.

10  BY MR. FARAJ:

11     Q.   Okay.  All right.  You can resume your seat.

12  Thank you, sir.

13     A.   Okay.

14     Q.   So what happened next?  The handcuffs are back

15  on.  Now what?

16     A.   The handcuffs are back on.  I'm towards his

17  rear, Sergeant Wong is towards the front.  There's --

18  they're getting the handcuffs on.  I observe

19  Mr. Muhaymin vomit.  He starts to vomit.  And I alert

20  Sergeant Wong that the vomit's going towards him.  And

21  I warn him about that.  And from there I believe he

22  vomits again.

23            And let's see, I'm not exactly sure how

24  he's oriented at that point.  And as he vomits and

25  Sergeant Wong and the other officers come off of him,

1   he rolls on to his stomach, I believe.

2       Q.   Okay.

3       A.   And I see his hands go limp.

4       Q.   Did you ever hear him say "I can't breathe"?

5       A.   I think I heard him say that once, yes.

6       Q.   Okay.  Before he vomited?

7       A.   Yes.

8       Q.   Now, if a suspect says "I can't breathe,"

9   what, if anything, should a police officer in the

10  Phoenix Police Department do?

11      A.   Reassess.  You know, it's the same thing as if

12  the officer -- or a suspect says, "Oh, my handcuffs are

13  too tight," we will readjust them.  So that --

14      Q.   You agree that too tight is a lot different

15  than "I can't breathe"?  "I can't breathe" is pretty

16  serious, too tight, you know?

17      A.   If someone can talk, they're usually

18  breathing.

19      Q.   Was Mr. Muhaymin talking?

20      A.   If he's saying that, yes.

21      Q.   Okay.

22      A.   So --

23      Q.   So if he's having a difficulty breathing and

24  he says "I can't breathe," you discount that, because

25  he actually said "I can't breathe"?

1      A.    Pretty much.  The thing is too like at that

2    point there's nobody on his -- that I could see was on

3    his torso.  So --

4      Q.    And your recollection is he said "I can't" --

5    "I can't breathe" only once?

6      A.    That's -- I believe, yes.

7      Q.    About how long before he started to vomit did

8    he say "I can't breathe"?

9      A.    It was maybe a minute or so.

10      Q.    Did you ever recall him saying "I can't

11    breathe" before -- I forget the name of the officer,

12    the first officer on the scene after you called for

13    need assistance.  Who was that?  Sue?

14      A.    Heimbigner, Officer Heimbigner.

15      Q.    Okay.

16      A.    Can I recall --

17      Q.    Do you recall him saying "I can't breathe"

18    before she arrived?

19      A.    No.

20      Q.    Once he starts to vomit, what happens?

21      A.    Sergeant Wong I believe rolls him on to his

22    back, assesses him for a pulse or whatnot.  And from

23    there we go into CPR.  Start administering CPR.  And I

24    do remember that we decided, hey, the key right now is

25    to get his arms in front of him.  So he's not laying on

1  his arms while we're trying to do a proper CPR.

2      Q.   So I would like to -- I would like to

3  understand a little bit of the sort of state of mind at

4  that point.  So we have this man who is wanted for a

5  failure to show type of warrant in Mesa.  He hasn't

6  harmed any officers.  He never harmed any officers.

7      A.   No.

8      Q.   Never threatened any officers.  Did not have

9  any weapons.  What are you thinking, I mean, based

10 on -- you've heard of escalation, how things escalate?

11     A.   Yes.

12     Q.   You are a Marine?

13     A.   I am.

14     Q.   Yeah.  So -- and I think police departments

15 teach it also, escalation of force depending on the

16 threat level?

17     A.   That's correct.

18     Q.   What's happening as far as that concept,

19 escalation of force, escalation of use of restraints,

20 escalation of the number of officers for this incident?

21          MR. SCARBROUGH:  Objection, compound and

22 ambiguous.

23          THE WITNESS:  Escalation to?

24 BY MR. FARAJ:

25     Q.   You've got so many officers on.  They're -- I

```
 1   don't know how many officers at this point.  Is it
 2   merited?  Is it something required based on what we
 3   have?
 4              MR. SCARBROUGH:  Objection, compound and
 5   ambiguous.
 6              THE WITNESS:  Okay.  I don't understand
 7   the -- the context of that question.
 8   BY MR. FARAJ:
 9      Q.   Okay.
10      A.   Do you --
11      Q.   I guess the context is this.  So this man is
12   wanted for a warrant.  Mesa could have -- you
13   understand that these types of warrants are just
14   issued.  And sometimes, you know, when people show up
15   in court, they say, "Hey, you've got a warrant.  Go
16   deal with it."  You're aware of that, right?
17      A.   Oh, definitely.
18      Q.   You all don't go around to people's houses
19   saying, "Hey, you got a warrant.  I'm going to arrest
20   you for it," if you know the address, right?
21      A.   Actually, we do.
22      Q.   For those type of warrants?
23      A.   It depends.
24      Q.   Okay.
25      A.   It really depends.  So --
```

```
 1        Q.   Okay.  Well, Mesa didn't bother to go find
 2   him, right?
 3        A.   No.
 4        Q.   Okay.  When he brings his arms forward, is
 5   there any reason why you say, "Hey, I'm going to remove
 6   these cuffs.  Put them back on correctly, stop
 7   resisting"?  Any kind of conversation of that sort?
 8        A.   He didn't give us the opportunity to ask him.
 9        Q.   What do you mean, he didn't give you the
10   opportunity?  What did he do to prevent you from having
11   that opportunity?
12        A.   Again, the passive resistance.
13        Q.   He didn't run, right?
14        A.   Well, we're not going to let him run.
15        Q.   I understand.  But he didn't run?
16        A.   No, he did not.
17        Q.   He didn't attempt to run?
18        A.   Well, not unless we -- we weren't going to
19   give him the opportunity to do so.
20        Q.   I understand you weren't going to let him.  My
21   point is, he didn't attempt to.  When you stop him at
22   the community center he doesn't try to turn and run,
23   he's there?
24        A.   Yes.
25        Q.   He's resisting, but he's there, --
```

1      A.   Yes.

2      Q.   -- right?

3           And when he brings his arms forward at

4  the vehicle, he's not complying with your orders, but

5  he doesn't attempt to flee, he's there, correct?

6      A.   That's correct.

7      Q.   Okay.  So you begin to do CPR, not you?

8      A.   Actually, I do.  I do chest compressions.

9      Q.   Okay.

10      A.   We all --

11      Q.   Took turns?

12      A.   Took turns to do chest compressions.

13      Q.   Called the fire department?

14      A.   That's correct.

15      Q.   They respond and then they pronounce him dead,

16  or at some point he's pronounced dead?

17      A.   Yes.

18      Q.   Thinking back on that experience do you feel

19  like you should have done something differently in how

20  you handled this interaction with Mr. Muhaymin?

21      A.   Not -- not really, no.  There's nothing else I

22  could do.  In that position, no.

23      Q.   Okay.

24      A.   No.

25      Q.   It would be accurate to say that you

1   personally never learned why there was a warrant out

2   for his arrest?

3       A.   No, I didn't know why there was a warrant out

4   for his arrest.

5       Q.   And during that interaction from the time you

6   first came in contact until he died, you personally

7   never verified that there was even a warrant?

8       A.   I did not, no.

9       Q.   Okay.  And to your knowledge no other officer

10  did?

11      A.   No.  We didn't verify except that we knew

12  there was one.

13      Q.   You personally never verified if the guy that

14  works at the community center is a liar or someone who

15  is telling the truth?

16      A.   No, I did not.

17      Q.   And now you know he's a liar?

18              MR. SCARBROUGH:  Objection.

19              THE WITNESS:  I don't know about that.

20  BY MR. FARAJ:

21      Q.   You didn't find out that he called and said

22  that the man assaulted him, and then said he didn't

23  assault him?

24      A.   I don't know any part of that conversation.

25      Q.   You're aware that making a false claim of a

1   crime is a crime in Phoenix?

2       A.   That's correct.  False reporting, yes.

3       Q.   And so if you learn that Tarango actually lied

4   about being assaulted by Mr. Muhaymin assaulting him,

5   that would be a crime?

6            MR. SCARBROUGH:  Objection, assumes facts

7   not in evidence.

8   BY MR. FARAJ:

9       Q.   True?

10      A.   Yeah, I don't know any of those facts.

11      Q.   I know you don't.  I'm saying if you learned.

12  Hypothetically if he did that, that would be a crime?

13      A.   Yes, it would be.

14      Q.   Why didn't you arrest Tarango -- you all never

15  found out that Tarango was lying about this?

16      A.   I didn't know.

17      Q.   Did you ever find out why he was trespassing

18  on a property owned by the public?

19      A.   I did find out what the trespassing involved,

20  yes.

21      Q.   What did it involve?

22      A.   Him on scene, Mr. Muhaymin was in the

23  community center prior with his dog and letting his dog

24  run freely to do whatever, whether defecate or whatnot

25  on the property.

```
1       Q.    Someone reported that the dog defecated?

2       A.    That's what I was told, yes.

3       Q.    Okay.  Now you're aware that -- that

4  Mr. Muhaymin was never formally trespassed by the

5  community center?

6       A.    No, I did not know that information either.

7       Q.    And that would be important, would it not?

8       A.    Yes, it would be.

9       Q.    You get what I'm saying?

10      A.    No, I understand.

11      Q.    It's a community center open to the public?

12      A.    Right.

13      Q.    You have a right to use it until you violate a

14  rule?

15      A.    Yes.

16      Q.    And once -- but you don't know if you violate

17  it until you're told you can't do this.  You're

18  trespassing if you come back, right?

19      A.    Right.

20            MR. SCARBROUGH:  Objection.

21            THE WITNESS:  I didn't talk to

22  Mr. Tarango or any other staff member so I don't --

23  BY MR. FARAJ:

24      Q.    You understand the process?

25      A.    Oh, absolutely, yes.
```

1    Q.   Okay.  And then once that person trespasses,

2  once they're told they can't come on, then the

3  community center can call the police and have them take

4  action?

5    A.   Absolutely.

6    Q.   You're aware that Mr. Muhaymin has never been

7  trespassed?

8    A.   No, I am not aware of that at all.

9    Q.   Okay.  Well, if I represent to you that he was

10  never trespassed, would that something -- would that be

11  something you would want to find out before you decide

12  that he's trespassing when you respond to a call?

13    A.   Absolutely, absolutely.

14    Q.   What did you all do to determine whether

15  Mr. Tarango is a truthful person or a liar?

16    A.   Again, I did not speak to Mr. Tarango.  So I

17  don't know those facts, --

18    Q.   Okay.

19    A.   -- or those details.

20    Q.   An investigation was commenced, correct?

21    A.   Yes.

22    Q.   And as you know, there were a lot of videos?

23    A.   Yes.

24    Q.   Okay.  Have you ever seen the videos from the

25  community center?

1        A.    No, I have not.

2        Q.    Has anyone spoken to you about the videos from

3     the community center?

4        A.    From the -- no, not about those videos.

5        Q.    Have you spoken to Officer Grenier about this

6     case after -- after Mr. Muhaymin died?

7        A.    Yes.  Initially after it happened, yes.

8        Q.    And did -- what did you talk about?

9        A.    What I can recollect about the community

10    having a meeting with police.  And that at that meeting

11    there were people in the public saying that

12    Mr. Muhaymin was a menace to the public.

13       Q.    Okay.

14       A.    That's what I was told.  And that's what I

15    heard.

16       Q.    The community said he's a menace?

17       A.    Yes, quote-unquote.

18       Q.    Is there a specific person that said this?

19       A.    No.  I was told that.

20       Q.    So I just want to understand.  So there was a

21    community meeting?

22       A.    That's what we -- I was told, yes.

23       Q.    Okay.

24       A.    That involved this incident.

25       Q.    Do you know where this community meeting took

```
 1  place?
 2      A.   Not that, I don't.
 3      Q.   What does the word menace mean to you?
 4      A.   To me, someone that -- not necessarily
 5  terrorizing, but going around the neighborhood and
 6  basically frightening people in the community.
 7      Q.   Did you talk with Officer Grenier about
 8  anything else?
 9      A.   No, that's it.
10      Q.   Did Officer Grenier ever share with you what
11  Tarango told them when he arrived at the community
12  center on January 4, 2017?
13      A.   No, he has not.
14              MR. FARAJ:  It's a good time to take a
15  break.
16              MR. SCARBROUGH:  Yes.
17              MR. FARAJ:  All right.  We're going to
18  take maybe 10 minutes.  Is that enough?
19              MR. SCARBROUGH:  Fine with me.
20              MR. FARAJ:  All right.
21              THE VIDEOGRAPHER:  Going off the record.
22  The time is 12:18 p.m.
23              (Recess taken from 12:18 p.m. to
24  12:39 p.m.)
25              THE VIDEOGRAPHER:  We are back on the
```

1   record.  The time is 12:39 p.m.  Thank you.

2   BY MR. FARAJ:

3       Q.   So I would like you to refer to the page COP

4   187, and those are sequential there.  Do you recognize

5   this printout of these -- this information?

6       A.   Yes, I do.

7       Q.   What do you recognize it to be?

8       A.   It looks like the calls or the radio traffic

9   regarding the incident.

10      Q.   Is this a log of the radio traffic for

11  January 4, 2017?  And I would direct you to -- well,

12  it's kind of obvious at the left there, left upper part

13  of the page, and then at the right side top of the

14  page.  Do you see that?

15      A.   Yes.

16      Q.   And if you go to the entry at 9:29:46 on 1/04,

17  which is the first entry, it states, "Physical, male

18  shoving SUPV."  Now I understand that to mean male

19  shoving supervisor.

20      A.   Yes, I see that.

21      Q.   Is this the call that you all received and you

22  responded to on January 4, 2017?

23      A.   Yes, it is.

24      Q.   Okay.  I need some help with some of the

25  coding.

1     A.   Yes.

2     Q.   What does E50 mean?

3     A.   E50.

4     Q.   Very first line.

5     A.   Right here, the E50?

6     Q.   Yes.

7     A.   I believe that is the dispatcher's assigned

8  desk, --

9     Q.   Okay.

10    A.   -- or she's receiving a call from.

11    Q.   Okay.  And what does the A4969 mean?

12    A.   That is the dispatcher's employee number, I

13 believe.

14    Q.   And the words physical, comma, comma, male

15 shoving SUPV, is that something that pops up on your

16 screen in the vehicle?

17    A.   If it's added to the call, it will show up.

18    Q.   Okay.  Do you know if this would have popped

19 up on your screen in the vehicle?

20    A.   I did not see this, though, for my --

21    Q.   I'm not suggesting you did.  I'm saying would

22 it be in the vehicle?

23    A.   It can be, yes.

24    Q.   If you could explain how the system works, if

25 you know.  So --

```
 1      A.    Yes.

 2      Q.    -- a call comes in, 911 or to dispatch?

 3      A.    That's correct.

 4      Q.    They call out to you?

 5      A.    Yes.

 6      Q.    Is that call by radio?

 7      A.    It usually is, yes.

 8      Q.    Okay.  And can you tell me if that call's

 9   followed up by some sort of entry that you see on a

10   screen if you're looking for it?

11      A.    Yeah, it is.  Usually it is.

12      Q.    Okay.  Is it automatic?

13      A.    No, not necessarily.  The -- like, for

14   instance, this physical, male shoving supervisor, some

15   of those details are sometimes lost.

16      Q.    Okay.

17      A.    Because it's not typed in by the dispatcher

18   receiving the call.  Some of those details, to tell you

19   truth, are not always typed in.

20      Q.    Okay.  So can you tell me if the information,

21   if you know, where it says -- there is a lot of

22   information on this page.  I'm just focused on physical

23   male shoving supervisor because it's the first one.

24      A.    Yes.

25      Q.    Okay.  I'm sorry.  There is one before that.
```

1    I'm not -- I ignored it.  If you look to the very

2    top, --

3         A.    Yes.

4         Q.    -- 921 -- 9:29:03.

5         A.    Yes.

6         Q.    It just says, position 50, Phoenix?

7         A.    Okay.

8         Q.    I don't know if that meant anything.

9         A.    So the priority, it's a 1, received by 911,

10   that type actually determines the call, or it types the

11   call.  Which is 239 means a fight, actually.  So that's

12   the initial call.

13        Q.    And that would have popped up on your screen?

14        A.    Yes, yes.

15        Q.    And is it -- do you understand that this

16   information is inputted by the dispatcher or operator

17   contemporaneously with the information she or he

18   receives?

19        A.    Yes, usually, yes.

20        Q.    Okay.  And so 239 is some sort of fight.  And

21   then we get at 9:29:46, a few seconds later, it says,

22   "physical, male shoving supervisor."

23        A.    Yes.

24        Q.    All right.  Are these, what we're looking at,

25   does that pop up on every vehicle screen, do you know?

1     A.   Yes, usually when they -- it's added to the

2  call.

3     Q.   Okay.

4     A.   It's usually added to the call.

5     Q.   When you say "added to the call," would you

6  explain, please?

7     A.   Like I said, when that information comes in,

8  they usually type that information in.  Like, for

9  example, the complainant or the person calling police

10 would call that in to the dispatcher.  She would add

11 that, the physical, now male shoving --

12    Q.   Okay.

13    A.   -- the supervisor.

14    Q.   Okay.  Here's what I need to understand.

15    A.   Mm-hm.

16    Q.   Would it pop up on every screen and every

17 vehicle that's on the road, or does it get directed to

18 specific officers, if you know?

19    A.   If you're not assigned to the call, you will

20 not see this.

21    Q.   Got it.  And how do you get assigned to the

22 call?

23    A.   You either add yourself physically through the

24 mobile data terminal, through the radio.  Say I'm

25 responding or whatnot.  And then you would receive all

1   that information on your screen.

2       Q.   So when you're added to the call, you get the

3   -- all the information about that call before and after

4   you're added?

5       A.   That's -- or before -- or I'm sorry, after

6   you're added to the call, they send that to you.

7       Q.   Do you not see what happened before?

8       A.   No.

9       Q.   Okay.  So once you're -- once you and Officer

10  Hobel are added to the call, then you would start to

11  see the entries; is that correct?

12      A.   Yes, that's correct.  These entries would be

13  -- there's a function on our data terminal that you can

14  actually go back in and reference the notes.  But you

15  would have to take that time to do that.

16      Q.   Okay.  So you would have to go back and look

17  for it?

18      A.   Right, through the log on that call.

19      Q.   Maybe if you're writing a report and you want

20  to know the history, you can go back and forth?

21      A.   Yes, sir.  That's correct.

22      Q.   But if you're sort of in the car responding

23  and you're added, you just begin to see the things that

24  happened after you're added?

25      A.   Yes, sir.  Yes, sir.

```
 1        Q.   Okay.  I understand.  When the call first went
 2   out, which triggered Officer Grenier to respond, did
 3   you hear dispatch call it out?
 4        A.   As far as I can recollect, yes.
 5        Q.   And what caused you to respond?
 6        A.   The -- since we're in the area, and it was a
 7   number 1 call, which was a priority call.
 8        Q.   Okay.
 9        A.   Emergency call basically.
10        Q.   And then you and Officer Hobel would have
11   realized, okay, we're in the area, this is ours?
12        A.   Yes.  Yes.
13        Q.   Grenier just happened to get there first?
14        A.   Yes, sir.
15        Q.   All right.  And so you would have known that
16   his was -- forget shoving.  Let's focus on a 239.  This
17   was a fight?
18        A.   Okay.
19        Q.   You would have known that?
20        A.   Yes.  When that call appears on, it tells us
21   what -- what's the context or the type of call, and
22   then the details to that call.
23        Q.   Okay.  If you go down to right below the "male
24   shoving supervisor, call redirected TW," what does that
25   mean?
```

```
 1        A.    "Redirected TW."  To tell you the truth, I do
 2   not know.
 3        Q.    That's fine.  But the next one at 9:30:14, I
 4   assume the "B/M" is black male?
 5        A.    Yes, sir.
 6        Q.    "Dark jeans, oversized sweatshirt with small
 7   dog"?
 8        A.    Yes, sir.
 9        Q.    And then the next line says, "KNW's," S,
10   apostrophe S; what does that mean?
11        A.    No known weapons, --
12        Q.    Okay.
13        A.    -- KNW.
14        Q.    "Shoved supervisor when asked to leave with
15   dog."
16        A.    And now the dispatcher is adding what they're
17   being told from the person on the phone.
18        Q.    I understand.  Now this is -- this is a
19   battery?
20        A.    Yes, at this point, yes.
21        Q.    He's -- whether he's trespassing or not, the
22   report is someone is assaulting someone else?
23        A.    That's correct at this point.
24        Q.    Okay.  Do you know if any of the officers that
25   responded to the Maryvale Community Center in response
```

1  to this call ever determined whether the initial call

2  to the police reporting an assault, shoving, was

3  actually true or it actually occurred?

4           MR. SCARBROUGH:  Objection, calls for

5  speculation.

6           THE WITNESS:  Yeah, I don't recall any of

7  that.

8  BY MR. FARAJ:

9    Q.   Okay.  I'm asking you if you know.  I'm not

10 asking you to speculate.  Remember that's an early

11 rule.

12   A.   Right, right.

13   Q.   Do you know if you, or do you know if any of

14 the other officers verified that there was, in fact, a

15 shove, an assault of sorts?

16   A.   No, I don't know.

17   Q.   From a police procedures point of view, isn't

18 it true that when you respond to a call -- let's

19 hypothetically go with a domestic violence.  You get a

20 call that a woman reporting her husband shoved her.

21 You all show up and you try to investigate what

22 happened?

23   A.   Yes.

24   Q.   You've been involved in something like that on

25 a personal level?

1      A.   Yes.

2      Q.   And as a result of police asking what happened

3   of both parties, they found out what happened?

4      A.   Yes.

5      Q.   They didn't just assume one side was truthful

6   in your case?

7      A.   No, we don't assume any of that.

8      Q.   Well, was there an assumption made here that

9   this man was trespassing and that he had assaulted the

10  supervisor?

11     A.   Was it assumed?

12          MR. SCARBROUGH:   Objection, calls for

13  speculation.

14          THE WITNESS:   I don't know.  I don't know

15  that.  I didn't get any of that information.

16  BY MR. FARAJ:

17     Q.   You just did testify here that no one verified

18  whether it's -- what the other man's story was.  Did

19  anybody ask Mr. Muhaymin if he shoved the supervisor?

20          MR. SCARBROUGH:   Objection, calls for

21  speculation.

22          THE WITNESS:   I didn't ask him.  I can

23  only tell you what I know, and what I asked or what

24  didn't I ask.

25  BY MR. FARAJ:

1      Q.   From the time you got there to the time the
2   man died, did anyone ever ask him, did you shove the
3   supervisor?
4      A.   I don't know what the other officers said or
5   did not say.  I can only tell you what I said or asked;
6   which I did not ask him that.
7      Q.   Okay.  I'm not asking you to speculate on what
8   you don't know.  I'm saying from the time you were
9   present, whether you did it or someone else, isn't it
10  true that no one ever asked in your presence where you
11  could hear, no one ever asked Mr. Muhaymin whether he
12  had shoved or assaulted someone?
13     A.   That's correct.  I did not hear anybody ask or
14  at that point, no.
15     Q.   Why not?  Why didn't you all ask him, hey,
16  man, we got a call that you shoved this guy and what
17  happened here?
18              MR. SCARBROUGH:  Objection, calls for
19  speculation.
20              THE WITNESS:  Okay.  At that point an
21  officer usually takes a lead on an investigation.  I
22  don't want to talk over that officer or ask questions
23  that he might already have known.
24  BY MR. FARAJ:
25     Q.   Okay.

1      A.   So just like, you know, too many chefs in the

2  kitchen or too many chiefs on scene, we will go off of

3  information from each other.

4      Q.   I understand that.

5      A.   So I didn't ask the other officers, or did I

6  ask Mr. Muhaymin if he assaulted anybody.

7      Q.   Did you assume Grenier had already decided

8  what at least one version of the facts is, whether it's

9  true or not, and he was going to take action?

10      A.   No, I don't assume that either.  I just ask

11  him if he needs the help with anything in particular.

12  At that point Officer Grenier took the lead, got the

13  information that he needed from Mr. Muhaymin like, you

14  know, name, date of birth.  He advised me to stand by

15  Mr. Muhaymin from there.  And that's where that

16  information is from.

17      Q.   Well, let's go with hypothetical.  Okay.  You

18  show up, and rather than a dishevelled black man, you

19  see someone who is white, dressed up in nice clothes,

20  and he's being accused of this by this community center

21  guy of shoving him.  You all would say what happened

22  here.

23              MR. SCARBROUGH:   Objection, inappropriate

24  hypothetical.

25  BY MR. FARAJ:

1      Q.   True?

2      A.   No.  Like again, I don't assume anything.  If

3   there was an officer on scene, he's got the initial

4   investigation, and I stood by.  And I'll stand by and

5   do the same thing again.

6      Q.   So when you all respond to a domestic

7   violence -- again, I want to go to a domestic violence

8   example.

9      A.   Sure.

10      Q.   And you respond 10 minutes after the call

11   comes in.

12      A.   Sure.

13      Q.   Isn't it true that officers talk to one other;

14   hey, he's saying this, she is saying this, can't figure

15   it out.  We need to separate them.  Don't you have

16   those kinds of conversations?

17      A.   When the opportunity presents itself, yes.

18      Q.   You all had -- he was in the bathroom for at

19   least 10 minutes, right?

20      A.   Yes.  Or yeah, around that.

21      Q.   That's what the report says.

22      A.   Sure.

23      Q.   That he was in the stall for a long time --

24      A.   Sure.

25      Q.   -- and he decided to wipe down after himself?

```
 1      A.    Sure.
 2      Q.    You all never had, never took the time to
 3  discuss amongst yourselves and with this guy at the
 4  community center what exactly happened, who saw it?
 5      A.    I did not.
 6              MR. SCARBROUGH:  Objection, calls for
 7  speculation.
 8              THE WITNESS:  Yeah, I did not.  Officer
 9  Hobel I believe did.
10  BY MR. FARAJ:
11      Q.    And Hobel did?
12      A.    Yeah.  He spoke to the community center rep.
13  So I did not.
14      Q.    I know you all spoke to the community's, not
15  Hobel did.  I am talking about Mr. Muhaymin.  No one
16  spoke to Mr. Muhaymin, correct?
17      A.    No.
18              MR. SCARBROUGH:  Objection, calls for
19  speculation.
20              THE WITNESS:  No, I did not.
21  BY MR. FARAJ:
22      Q.    I mean, is there a level of -- is there a
23  decency into asking a man, look, there is an accusation
24  against you.  How do you -- what do you say?  Do you
25  agree that police officers should do that?
```

1      A.    Okay.  In regards to decency I don't know.

2      Q.    Do you see yourself as a public servant?

3      A.    I am.

4      Q.    Do you have something on your car, does it say

5   something like protect and serve?

6      A.    Yes.

7      Q.    Do you agree that your salary is paid by the

8   people of the city?

9      A.    Yes.

10      Q.    All the people of the city?

11      A.    Yes.

12      Q.    Do you agree that you owe the courtesy of at

13   least discovering a person's story as a public servant

14   in this city before you take action against someone?

15      A.    Absolutely.

16      Q.    Did anyone ever do that, to your knowledge,

17   with Mr. Muhaymin?

18      A.    Yes, I believe so.

19      Q.    Who?

20      A.    Officer Hobel and Officer Grenier.

21      Q.    You believe that they -- you believe that they

22   spoke to him to understand --

23      A.    Mr. Muhaymin, no, not necessarily

24   Mr. Muhaymin.

25      Q.    Yeah.  I'm only talking about Mr. Muhaymin.

```
 1      A.   Okay, yeah.
 2      Q.   I know everybody else --
 3      A.   I can't -- I did not see that.
 4      Q.   Okay.
 5      A.   That's what I can tell you.
 6      Q.   All right.  Let's talk about your training and
 7  experience and background.  You joined the Phoenix
 8  Police Department 17 years ago?
 9      A.   Yes, sir.
10      Q.   Where did you go to the academy?
11      A.   Back then it was ALEA, Arizona Law Enforcement
12  Academy at south Phoenix.
13      Q.   Six months or three months?
14      A.   Three months.
15      Q.   Okay.  And were you already a Marine at that
16  time?
17      A.   Yes, I was.
18      Q.   Are you retired?
19      A.   No.  I'm going to be in a year or two.
20      Q.   Were you a sergeant at that time?
21      A.   No.  I was a staff sergeant.
22      Q.   What are you now?
23      A.   I am a master sergeant.
24      Q.   Oh, master sergeant.  Are you sure you were a
25  staff sergeant?
```

1      A.    Yeah.

2      Q.    What's your MOS?

3      A.    8056, 0629 -- I have multiple MOS's.

4      Q.    What was it when you were still a sergeant or

5    below?

6      A.    0629.  Or sergeant below; I was 625 when I was

7    a sergeant.

8      Q.    At the time that you joined the Phoenix -- at

9    the time you went to the academy, did you already know

10   that you were going to be offered a position with the

11   police department?

12     A.    Yes.

13     Q.    So the application -- I'll represent to you

14   that in the discovery process -- do you know what

15   discovery is?

16     A.    Yes.

17     Q.    We received your application.  Was that

18   application prepared before you entered the academy, or

19   after you left the academy?

20     A.    Oh, before I entered.

21     Q.    Okay.  And so you get accepted.  When you get

22   accepted to the academy, do you understand that as also

23   acceptance into the police force?

24     A.    Yes, that's correct.

25     Q.    Are there any other requirements to, besides

```
 1   completing the academy, to enter as a probationary
 2   officer?
 3       A.   No, not that I know of.
 4       Q.   And you do enter as a probationary officer,
 5   right?
 6       A.   That's correct.
 7       Q.   For how long?
 8       A.   One year.
 9       Q.   How was the Phoenix Police Department
10   organized?  Is it divisions, sections, how?
11       A.   It's divisions.
12       Q.   What division do you begin in?
13       A.   Oh, patrol.
14       Q.   Are you still in patrol?
15       A.   Yes, sir.  I am.
16       Q.   And are the divisions subdivided?
17       A.   Yes, sir.  They are.
18       Q.   Into what?
19       A.   Patrol.
20       Q.   I'm sorry.
21       A.   Training.
22       Q.   Is patrol division subdivided?
23       A.   Yes, they are.
24       Q.   How is it subdivided?
25       A.   Subdivided into precincts, yes, sir, and
```

1    beats.

2         Q.    What is a precinct?

3         A.    Precinct is a general area divided into beats,

4    and throughout the city.

5         Q.    When you're assigned to a precinct, does that

6    mean that you're assigned to a specific police station?

7         A.    Yes, sir.

8         Q.    What precinct were you first assigned to when

9    you graduated from the academy?

10        A.    Desert Horizon precinct, Desert Horizon.

11        Q.    Desert Horizon.  Is there a number?

12        A.    600; six zero zero.

13        Q.    How long did you remain at Desert Horizon?

14        A.    Let's see.  10 years; 10, 12 years.

15        Q.    Were you the subject -- to your knowledge were

16   you the subject of any citizens' complaints against you

17   during these 10 years?

18        A.    Not that I can recollect, no.

19        Q.    To your knowledge how are complaints from

20   members of the public handled?

21        A.    You mean in general how are they -- how does

22   the precincts handle those complaints?

23        Q.    Let me ask you a better question.  So, for

24   example, if someone does make a complaint against you,

25   would you always know about it, or is it sometimes

1    investigated and you would never find out?

2        A.   The latter.  Sometimes they're investigated

3    and I wouldn't find out.

4        Q.   So to your knowledge you haven't been the

5    subject of any complaints in the first 10 years on the

6    police force?

7        A.   That is correct.

8        Q.   After Desert Horizon, where did you go?

9        A.   I went to Black Mountain precinct.

10       Q.   And how long were you there?

11       A.   I was there for a few years.

12       Q.   Did you leave Black Mountain?

13       A.   Yes, sir, I did.

14       Q.   And where did you go after Black Mountain?

15       A.   Went to Maryvale precinct.

16       Q.   Are you still there now?

17       A.   Yes, sir, I am.

18       Q.   What is the reason you left Desert Horizon, if

19   any?

20       A.   To see more of the city.

21       Q.   Did you ask to be transferred?

22       A.   Yes, I did.

23       Q.   When you went to Black Mountain, what were

24   your -- were you still doing patrol?

25       A.   Yes, sir, I was.

1      Q.   What is the number at Black Mountain?

2      A.   Oh, it is 200; two zero zero.

3      Q.   And Maryvale?

4      A.   Is 800; eight zero zero.

5      Q.   How long have you been at Maryvale?

6      A.   About three years now, sir.

7      Q.   So you spent about four years at Black

8  Mountain?

9      A.   Yes, sir.

10     Q.   The officers that we've talked about today, or

11  we mentioned Hobel, Head -- Hobel, Head and Grenier,

12  Sergeant Wong, a couple of the others that responded.

13  Did you know them before you arrived at Maryvale

14  precinct?

15     A.   I knew some of them, yes, sir.

16     Q.   Who did you know -- who is the person you've

17  known the longest?

18     A.   Sergeant Wong.

19     Q.   Okay.  Where do you know Sergeant Wong from?

20     A.   Six -- from Desert Horizon precinct.

21     Q.   How is it that you knew him at that time?

22     A.   We -- before he was a sergeant he -- we were

23  partners together on the street.

24     Q.   And so did he leave Desert Horizon and go to

25  Maryvale as well?

```
1       A.   He did, yes.

2       Q.   Did he go to Black Mountain first?

3       A.   I believe he went straight to -- to tell you

4   the truth, I don't know.

5       Q.   What about Grenier?

6       A.   Grenier, he used to work in Central City

7   precinct 500.  And then he moved to Maryvale precinct.

8       Q.   Okay.  And sergeant -- or not sergeant,

9   Officer Head?

10      A.   Officer Head, never worked with him until I

11  got to that squad.

12      Q.   Okay.  And Officer Hobel?

13      A.   The same with Officer Hobel.

14      Q.   Would you say that -- would you consider

15  Sergeant Wong a friend?

16      A.   Yes.

17      Q.   I know you're acquainted with all of them.

18  Are there any -- would you consider any of the other

19  officers friends?

20      A.   Yes, all of them.

21      Q.   I want to -- sometimes you have acquaintances,

22  sometimes you hang out with guys, friends or people you

23  hang out with.  You know what a friend is.  So all of

24  them are friends?

25      A.   So let's just say if they invited me to a
```

```
 1   barbecue, yes.
 2       Q.   Okay.  Since you've joined the force after you
 3   left the academy, have you undergone any additional
 4   formal training?  I'm not talking about occasional
 5   classes, reviewing things, maybe modules on a computer,
 6   but formal training, formal schooling?
 7       A.   Yes.
 8       Q.   What formal schooling have you attended?
 9       A.   Formal schooling in regards to law
10   enforcement?
11       Q.   Yes.
12       A.   Yes.  Counter surveillance through the
13   military.
14       Q.   Explain.  So you said you went to counter
15   surveillance for law enforcement through the military?
16       A.   Yes, yes.
17       Q.   Explain that.
18       A.   That kind of training helps us identify those
19   who would infiltrate a base, that kind of training.
20   That training was through NCIS as well.
21       Q.   Did Phoenix PD send you to a course, to a
22   military course, or did the Marine Corps send you to a
23   military course?
24       A.   The Marine Corps did.
25       Q.   Okay.  So if I understand correctly, you went
```

1   to that course, but it spills over into your job

2   duties --

3        A.   Yes, sir.

4        Q.   -- as a law enforcement officer?

5        A.   Yes, sir.

6        Q.   Okay.

7             MR. SCARBROUGH:  Try to wait for him to

8   finish.

9             THE WITNESS:  Sorry, sorry.

10  BY MR. FARAJ:

11       Q.   Any other formal schooling?

12       A.   I can't recollect, but there are a couple of

13  other courses, yes.

14       Q.   Are you a member of any special subunits on

15  the police force?

16       A.   No, I'm not.

17       Q.   What is the critical incident team?

18       A.   Crisis or intervention team.

19       Q.   Aren't you a member of that team?

20       A.   There is an assigned team strictly assigned to

21  that.  There are also officers that have that

22  certification, which I do.  And I could become part of

23  that team, yes.  But I'm not assigned to that team.

24       Q.   Okay.  What is the critical incident team?

25       A.   They deal with mental health, primarily mental

 1    health subjects or individuals.

 2        Q.   Although you're not assigned to it, you have

 3    the qualifications to be assigned to it?

 4        A.   Yes, sir.

 5        Q.   And tell me about the qualifications, please.

 6        A.   The initial qualification is a completion of a

 7    40-hour course that is either held in Tempe or in

 8    Glendale.  And that certification --

 9        Q.   What is it called, the course?

10        A.   It is crisis intervention, and enables that

11    subject to be part of a network of mental health

12    providers.  That enables us help individuals that are

13    seeking that type of help.

14        Q.   When did you go to that course?

15        A.   I believe two, three years ago; three years

16    ago.

17        Q.   Did -- were you selected to go?

18        A.   I volunteered.

19        Q.   Why?

20        A.   Gave me -- it helped with my people skills and

21    helped me to understand more of the -- try to find more

22    of the background of the people we help.

23        Q.   Is it competitive to go?

24        A.   No, it is not.

25        Q.   So if any officer wants to go, they can just

```
 1   say I want to go, and they'll be allowed to or --
 2        A.   Yes, sir.  Yes, sir.
 3        Q.   Any other courses like that, not necessarily,
 4   it doesn't have to be mental health, but that's formal
 5   training?
 6        A.   Yes, sir, it is.
 7        Q.   Any other courses like that, that you've
 8   attended during your career?
 9        A.   Not that I can remember.
10        Q.   Did you attend the course in Tempe or
11   Glendale?
12        A.   Glendale.
13        Q.   What is the facility that puts on the course,
14   what is it called?
15        A.   I can't remember the facility, but it is the
16   Glendale firefighters' headquarters, I believe.
17        Q.   Who teaches in it?
18        A.   There's a mix of personnel from Phoenix,
19   Glendale and behavioral health agencies that are there
20   that teach it.
21        Q.   Is it eight hours a day for five days?
22        A.   It is.
23        Q.   Who attends the course?
24        A.   It -- in my course there was even EMTs,
25   different agencies.
```

```
 1      Q.   Other police officers like you?
 2      A.   Yes, sir, the majority.
 3      Q.   The majority are police officers?
 4      A.   Yes, sir.
 5      Q.   What type of -- you described the curriculum
 6   in general.  Could you be more specific about the type
 7   of modules they have?
 8      A.   Yes.  One module is actually focused on
 9   veterans, PTSD, what's PTSD, and how to get them help.
10   Another module focused on medications.  So --
11      Q.   Drugs?
12      A.   Yes, sir.
13      Q.   Besides medications, do they -- do they have
14   illicit drugs?
15      A.   Yes.  Even substance abuse, yes.  So other
16   modules, that pretty much summed it up.
17      Q.   Okay.  Do they have some training on how to
18   interact with those types of people?
19      A.   Yes, they did.
20      Q.   Did they have parts of the course where you're
21   modeling how to interact where they have -- get you on
22   your feet and say, okay, we're going to do
23   demonstrations, that kind of thing?
24      A.   Yes.  They had actual actors come out and do a
25   simulation.
```

1     Q.   Is there a retraining for that, is there --

2     A.   There's advanced training.

3     Q.   Okay.

4     A.   You could move on to, which I have not taken.

5     Q.   My question is different.  Is there retraining

6  that you go through to stay sort of up to date?

7     A.   Like a refresher --

8     Q.   Yeah.

9     A.   -- kind of?  No, there isn't any.  No.

10    Q.   Okay.  Well, let me ask you a couple questions

11 about this.  So how does a police officer when they

12 come on -- lots of veterans are homeless.

13    A.   Yes.

14    Q.   PTSD, TBI, you're probably familiar with it.

15 How does a police officer who sees someone, maybe a

16 veteran, maybe not, but let's assume it's a veteran,

17 how do you discover their history?  I mean, you don't

18 have their mental health records.  What do you -- what

19 do you -- what did you learn about how to interact with

20 these people to uncover that information?

21    A.   One indicator or one feature especially about

22 the mobile data terminal and about -- is that it

23 actually when we run somebody's information, especially

24 in Arizona, a lot of times we will get that mental

25 health hit or indicator that they are -- have an SMI,

```
 1   or serious mental illness or whatnot.  And that's one
 2   way we can get that information.
 3       Q.   That's if they've --
 4       A.   Provide their name and date of birth.
 5       Q.   Well, and that's if they -- if they have that
 6   information, if they've had some interaction with law
 7   enforcement in the past?
 8       A.   Or what happens too through the mental health,
 9   behavioral health system, especially here in Arizona,
10   certain individuals will be flagged.  And their
11   information will be added.  If, let's say, we run a
12   certain individual's information, that information will
13   be added to their, so to speak, like rap sheet or
14   something.
15       Q.   Okay.  What did you call the code, what was
16   the code, serious what?
17       A.   Oh, SMI; serious mental illness.
18       Q.   And what do you understand that code to mean?
19       A.   For us?
20       Q.   Yeah.
21       A.   An individual would either be -- there's a
22   myriad of, you know, mental health or behavioral health
23   issues like schizophrenia.  Even substance abuse is in
24   that as well.  So we get an SMI hit or anything like
25   that on an individual, it would tell us the behavioral
```

1  -- the ailment, what that subject, whether he's

2  schizophrenia, hearing voices, things like that.

3      Q.   Okay.  Besides -- besides the mobile data

4  terminal, what other tools did you learn, or do you

5  know about to be able to discover whether someone is

6  laboring with some mental health issue?

7      A.   One of the best ways to find that information

8  is through family.  We -- you know, let's say we go on

9  scene, domestic or family fight or anywhere, if a

10 family member is present, that's some of the best

11 information we can get about someone.

12     Q.   Are police officers taught to ask?  And

13 sometimes family members don't just reveal that

14 someone --

15     A.   Yes, absolutely.

16     Q.   -- is schizophrenic?

17     A.   Absolutely.  Oh, I'm sorry.  Yes.

18     Q.   You're doing great.

19     A.   We're taught to ask.

20     Q.   All right.  All right.  So I'm going to step

21 back a little bit.  You got special training.  Do you

22 know if all law enforcement, are all police officers

23 taught to ask, or is that something you learned in this

24 special training?

25     A.   I actually learned to be more open to ask that

1   kind of -- for that information.

2        Q.   Okay.  But in general police officers are

3   generally taught to ask, but you developed some better

4   skills about asking, it sounds like?

5        A.   Yes.  Yes.

6        Q.   Why is it important to know if someone is

7   laboring under some mental, serious mental illness?

8        A.   Why is it important?  For us that are CIT

9   trained, we're -- the statistics show and we're also

10  learning that a lot of -- about 90 percent of the

11  individuals we contact do have SMI or some behavioral

12  health issue.

13       Q.   I actually didn't know that statistic.

14  90 percent of individuals?

15       A.   Here in our area.  So --

16       Q.   And when you say SMI, you're also -- you're

17  also including that substance abuse issues?

18       A.   Yes, sir.

19       Q.   Which might be --

20       A.   Which sometimes they go hand in hand.

21       Q.   Yeah.  If -- if a police officer, whether it's

22  you or someone else, I know you have the training, but

23  someone doesn't have the training discovers that

24  someone has a mental health issue, a serious mental

25  health issue, is there a process for handling that

1   person?

2        A.   Yes, there is.

3        Q.   What is it?

4        A.   The initial process would to actually call for

5   a CIT member, or a team, or the squad, and they would

6   respond and make contact with that person.

7        Q.   Okay.  So just to be clear, even though you

8   have the training, you're qualified, you would still

9   have to call, or could you do it on your own?

10       A.   I could do it on my own.

11       Q.   Okay.  But for those that don't have the

12  training, they would be able to call --

13       A.   Yes.

14       Q.   -- this team or somebody from this team?

15       A.   Yes, sir.

16       Q.   Are members of this team police officers?

17       A.   They are.

18       Q.   Okay.  And they have the same training you do?

19       A.   Yes, sir.

20       Q.   Tell me, please, if you were to come upon

21  someone that you discover that has a serious mental

22  illness, how do you change the way you interact with

23  that person from the norm?

24       A.   Definitely.  Um --

25       Q.   And let me -- before you answer, I know that's

```
 1   a -- could be as varied as the number of people you
 2   come across, but in general just to give me an idea.
 3   You know what I'm saying?
 4       A.   So if I were to find information that that
 5   subject or individual had?
 6       Q.   Yes.
 7       A.   My or -- the approach to talk to that person
 8   would be different.
 9       Q.   Okay.  Again, general explanation.
10       A.   Yes.
11       Q.   I know --
12       A.   Yes.
13       Q.   -- that it can be as different as the people
14   you come across, but generally what is different?
15       A.   Non-aggressive.
16       Q.   So let me explore that a little bit.  Not
17   every encounter with the police is aggressive.
18       A.   Yes.
19       Q.   I've been stopped for whatever, tickets, and
20   it hasn't been aggressive.  So would you explain what
21   you mean by that, by non-aggressive, because not every
22   encounter is aggressive.
23       A.   Absolutely.  When it deals with mental health,
24   an example would be no yelling maybe.  In some cases,
25   no yelling at the individual.  Also, the distance
```

1   you're talking to that individual also makes a

2   difference to someone with SMI.  I have been in

3   situations where I sat right next to the person and

4   that subject was able to open up, and I was able to get

5   them help.

6                 And then in the same context, someone

7   with SMI could have a weapon.  And now I'm standoff.

8   And no matter how I try to talk that person down, or to

9   come out, or to try to get help, we would sometimes

10  call our SWAT team, our SAU, unfortunately, to go and

11  get them.

12      Q.   So I think what I'm understanding is, it's not

13  that you're not aggressive, it's that they don't

14  perceive you as aggressive?

15      A.   That's correct.

16      Q.   Because their perceptions are off?

17      A.   Yes, yes.

18      Q.   Is that right?

19      A.   That's correct.

20      Q.   So it's not just how -- how you're presenting

21  yourself, but it's you're thinking about how they're

22  perceiving you as well?

23      A.   Yes.

24      Q.   Okay.  You're aware that Mr. Muhaymin suffers

25  from schizophrenia, severe schizophrenia, or suffered

1   from severe schizophrenia and bipolar disorder?

2              MR. SCARBROUGH:  Objection.

3              THE WITNESS:  No, I'm not.

4   BY MR. FARAJ:

5      Q.   Are you aware now?

6      A.   I am now, yes, as of today.  I had no --

7      Q.   You only learned today?

8      A.   Yes, sir.

9      Q.   Okay.  Would you have -- knowing what you know

10  today, would you have handled, not -- you as a group,

11  the plural you, would you have all handled that

12  situation differently or recommended it be handled

13  differently?

14             MR. SCARBROUGH:  Objection, calls for

15  speculation.

16  BY MR. FARAJ:

17     Q.   You can answer.

18     A.   I don't know.

19     Q.   Just 'cause he says it calls for speculation,

20  remember the --

21     A.   Oh, possibly.

22     Q.   He gets to make those objections.

23     A.   Possibly, yes.

24     Q.   Okay.  How would you have handled it

25  differently?

1      A.   Let's see.  Knowing what I know now about him,

2   be more patient with him.

3      Q.   Okay.  We talked a little bit about

4   asphyxiation.  Have you received any training to

5   prevent custodial death?

6      A.   Yes, I have.

7      Q.   Tell me about that type of training.

8      A.   That type of training starts from the

9   beginning in the academy.  Certain positions, like I

10  said, like they would give examples too of actual

11  incidents that happened where a subject was hogtied,

12  put in the back of a patrol car, and that subject would

13  pass away -- or passed away.  Examples like that.

14     Q.   Okay.  So -- so based on those examples, what

15  did you learn, whether in the academy or after the

16  academy, that you believe helps to prevent those types

17  of incidents?

18     A.   I'm sorry.  Can you --

19     Q.   We're talking about custodial death and

20  preventing custodial death.  What is the training?  You

21  told me about the example.  What is the training you

22  received to prevent custodial death?

23     A.   The training, the training is not put that

24  subject in that situation or in that position.  Like I

25  said, the training I received was not to put the

1  subject on his stomach, and so, quote-unquote,

2  "hogtie."  We don't do that.

3      Q.    And when you say hogtie, I think I imagine

4  what it might be, but I would like you to tell me what

5  it means.

6      A.    Absolutely.  The -- that hogtie or in

7  reference to that is having the subject hands and feet

8  bound behind their back where they cannot make any kind

9  of movement or anything whatsoever.

10     Q.    Okay.  Is it true that another example that

11  you were taught is not to place someone on their chest

12  on their -- on their chest or stomach prone and to pile

13  on top of that person?

14     A.    That's partially true.  The pile, depending on

15  the situation -- now to pile on somebody, I have

16  actually never used that.  We never -- they don't teach

17  us to pile on top of somebody.

18     Q.    My point is, one of the things that you're

19  taught not to do is that, not to do that, --

20     A.    Yes, sir.

21     Q.    -- right?

22          I know suspects are sometimes in the

23  prone, they're handcuffed and then stood up.  I'm

24  talking about when you put the suspect in a prone and

25  someone gets on top of them, specifically on the upper

```
 1   torso; you were taught not to do that, true?
 2       A.   I have never learned that technique.
 3       Q.   Let me say it differently.  You were taught in
 4   the academy or after to specifically not do that; not
 5   that you were taught to do it, but you were taught not
 6   to do it, you were told not to do it, correct?
 7       A.   That for me, yes.
 8       Q.   Okay.  Are you instructed or advised to
 9   monitor your prisoners once you put them into custody?
10       A.   Yes.
11       Q.   Tell me about that.
12       A.   Once someone's in custody, whether on the
13   street or in a patrol vehicle, we are to stand by them
14   at all times.
15       Q.   Okay.  And when I say to look out for, because
16   they're in your custody, you're responsible for them,
17   correct?
18       A.   Correct.
19       Q.   You're responsible for their safety?
20       A.   Yes.
21       Q.   And I go back to the previous questions about
22   "I can't breathe."  If there's evidence --
23   hypothetically if there's evidence that Mr. Muhaymin
24   repeatedly says "I can't breathe," then as your
25   prisoner, collectively the police department, you and
```

1    the other officers, you would be required then to find

2    out if he really cannot breathe or if he's lying?

3        A.   Yes.

4        Q.   And no one took any action to determine if he

5    could breathe, at least the time that you heard it?

6        A.   Yes, we did.

7        Q.   What did you do?

8        A.   Well, when Mr. Muhaymin was still resisting,

9    that gave me an indicator that he's still breathing.

10       Q.   Okay.  Now, again, hypothetically speaking, if

11   someone is in distress because they can't breathe, they

12   can't take a breath, you understand that that person

13   would struggle, the struggle is to take a breath,

14   right?

15            MR. SCARBROUGH:  Objection, calls for

16   speculation.

17            THE WITNESS:  Regarding that, like I

18   said, if the subject was still resisting, actively

19   resisting then or even passive resistance, it shows, of

20   course, to flex the muscles you would have to breathe

21   to provide blood to those muscles to resist.  So --

22   BY MR. FARAJ:

23       Q.   So if I asked you to hold your breath now, you

24   could probably do it for a minute, you're in pretty

25   good shape.  But at some point you would start to feel

1   a need to breathe, right?

2       A.   Yes.

3       Q.   That doesn't mean you can't move.  You might

4   start to struggle to breathe if someone is preventing

5   you from breathing, right?

6       A.   Yes.

7       Q.   So when Mr. Muhaymin was struggling and said

8   "I can't breathe," what I understand from you is you

9   decided that because he's still struggling, he must be

10  able to breathe?

11      A.   Yes.

12      Q.   Okay.  As a master sergeant, do you ever

13  oversee a combat, Marine Corps combat training events?

14      A.   Yes.

15      Q.   You're familiar with the -- with the holds and

16  blows that the Marine Corps uses?

17      A.   Yes.

18      Q.   And you understand that you've seen young

19  Marines do holds on other Marines where they might

20  constrict the airway?

21      A.   Yes.

22      Q.   And so if someone doesn't let go, you would

23  expect that Marine to struggle, even though they

24  usually let go, right?

25      A.   If that Marine doesn't let go, that other

 1    Marine will black out.

 2         Q.    Until he blacks out.   Now they don't black out

 3    from a lack oxygen, they black out from a lack of blood

 4    flow?

 5         A.    There's -- sorry.   There's two type of holds.

 6    So whether you do a blood choke or an air choke, that

 7    individual will black out.

 8         Q.    Struggle until they black out?

 9         A.    Yes.

10         Q.    Okay.   We talked about your formal training.

11    Do you have regular informal training?

12         A.    No, I don't.

13         Q.    Do you have weapons firing events?

14         A.    We do.

15         Q.    Okay.   So that's -- do you have classes on

16    developments in the law, developments in law

17    enforcement tactics that might be presented maybe on a

18    computer where you go in and you read about it, or

19    somebody briefs you on it, anything like that?

20         A.    Yes, sir, we do.

21         Q.    Okay.   That's the informal training I'm

22    talking about.   Is that -- is that done on a regular

23    basis?

24         A.    It is.

25         Q.    Okay.   How often?

1     A.    Every quarter.

2     Q.    Okay.  And how many hours per quarter?

3     A.    One -- or a few hours actually.

4     Q.    Okay.  Give me a general sense of the type of

5  things that are covered in that informal training?

6     A.    Yes.  Let's see.  In fact, I was looking at

7  some today.  Patrol tactics, patrol negotiations; those

8  are online courses we take throughout the quarter.  And

9  it involves videos with those online courses as well.

10 And they're up to an hour and a half to two hours per

11 course.

12    Q.    Do you get tickets of completion --

13    A.    Yes, sir.

14    Q.    -- when you do them?

15    A.    Yes, we do.

16    Q.    Okay.  Besides the online training, do you

17 have any presentations by people within the department

18 on developments and whatever new developments there

19 are?

20    A.    Yes, we do.

21    Q.    Okay.  Is that part of the quarterly training?

22    A.    Yes, sir, it is.

23    Q.    Okay.  When you do the -- when you attend a

24 live presentation, do you sign an attendance sheet, --

25    A.    Yes.

1      Q.   -- or a completion sheet?

2      A.   Yes, we do.

3      Q.   Okay.  Do you know who keeps those?

4      A.   The training bureau.

5      Q.   Okay.  Is the training bureau a Phoenix PD

6   agency, or is it within the division or within the

7   precinct?

8      A.   Within the division.  It is Phoenix PD, yes.

9      Q.   So, for example, if I wanted to see what

10   classes you've attended in the last -- in the years

11   before the 2017 event, would that be with the training

12   bureau of your -- of your division or is that a Phoenix

13   PD?

14      A.   That's Phoenix PD.

15      Q.   Okay.  As part of that training, the informal

16   training, have you received instruction before 2017,

17   before January 4, 2017, on dealing with people who

18   suffer from mental health, other than the 40 hours we

19   talked about already?

20      A.   Not that I can recollect.

21      Q.   Okay.  Have you received any instruction on

22   service animals?

23      A.   No, I have not.

24      Q.   Okay.  Do you know what a service animal is

25   when I say service animal?

1       A.   Yes.  I do know that a lot of times behavioral

2  health -- subjects with behavioral health need service

3  animals, yes.

4       Q.   You learned that from the 40 hours?

5       A.   Yes, sir.

6       Q.   Okay.  I'm talking about the informal things

7  that other police officers would have learned as well.

8       A.   About service animals?

9       Q.   Yeah.

10      A.   No.

11      Q.   Okay.  Have you gotten any instruction about

12  the Americans with Disabilities Act?

13      A.   Yes.

14      Q.   Other than the 40 hours?

15      A.   No, I have not.

16      Q.   Okay.  All right.  What did you learn about

17  the ADA in the 40-hour course that you attended?

18      A.   Americans with Disabilities Act is that

19  certain individuals, you know, they -- from what I can

20  recollect, besides the service animals as well, they

21  are afforded certain laws that apply to them, that we

22  need to adhere to, everyone needs to adhere to.

23      Q.   So I understand you got that in the 40 hours.

24  Is it -- is it your memory, your recollection that the

25  Phoenix Police Department does not train other officers

1  on that?

2      A.    Not that I can recollect.

3                  MR. FARAJ:  Okay.  All right.  I think --

4  I think I'm done.  I'll need to review my notes.  Why

5  don't we take another short break, maybe five minutes,

6  and then we can wrap it up.  And wow, okay, let's go

7  off the record.

8                  THE VIDEOGRAPHER:  Yes, sir.  Going off

9  the record.  The time is 1:36 p.m.

10                 (Recess taken from 1:36 p.m. to

11  1:43 p.m.)

12                 THE VIDEOGRAPHER:  We are back on the

13  record.  The time is 1:43 p.m.  Thank you.

14                 MR. FARAJ:  All right.  I don't have any

15  more questions for you.

16                 THE WITNESS:  Yes, sir.

17                 MR. FARAJ:  I will advise you that you

18  have a right to review your transcript of this

19  deposition, make corrections.  Any corrections you make

20  you should notify your attorney, they'll provide you

21  with an errata sheet.  You just make, you know,

22  whatever correction you want to make.

23                 I will admonish you, however, that any

24  substantive changes you make may be used to call your

25  credibility into question in the future at trial.  Do

1   you understand that?

2                   THE WITNESS:  Yes, sir.

3                   MR. FARAJ:  Okay.  So we will -- from the

4   date that the court reporter finishes the transcript,

5   you will have 30 days to notify us through your lawyer

6   of any changes that need to be made to the transcript.

7   Okay.  That's all I have.

8                   THE WITNESS:  Yes, sir.

9                   MR. SCARBROUGH:  No questions.

10                  MR. FARAJ:  Okay.

11                  THE VIDEOGRAPHER:  This concludes the

12  deposition of Officer Ronaldo Canilao.  The time

13  is 1:44 p.m.

14                  THE REPORTER:  And counsel, is a PDF okay

15  for you?  Does that work?

16                  MR. FARAJ:  Sure.  Can you generate an

17  E-tran?

18                  THE REPORTER:  Yes, I can do an E-tran.

19                  MR. FARAJ:  I need one of those also.

20                  THE REPORTER:  Okay.  E-trans for both of

21  you?

22                  MR. SCARBROUGH:  I want one.

23                  THE REPORTER:  Thank you.

24                  (The deposition concluded at 1:44 p.m.)

25

1

2

3

_____

RONALDO FERNANDEZ CANILAO

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF ARIZONA        )
                             ) ss.
2    COUNTY OF MARICOPA      )

3          BE IT KNOWN that the foregoing proceedings
     were taken before me, SHERYL L. HENKE, Certified
4    Reporter No. 50745, that the witness before testifying
     was duly sworn by me to testify to the whole truth;
5    that the foregoing pages are a full, true and accurate
     record of the proceedings, all done to the best of my
6    skill and ability; that the proceedings were taken down
     by me in shorthand and thereafter reduced to print
7    under my direction.

8          [X]   Review and signature was requested.
           [ ]   Review and signature was waived.
9          [ ]   Review and signature not required.

10         I CERTIFY that I am in no way related to any
     of the parties hereto nor am I in any way interested in
11   the outcome hereof.

12         I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in ACJA 7-206, DATED
13   at Phoenix, Arizona, this 8th day of August, 2019.

14


15

                   _____
16                 Sheryl L. Henke, RPR
                   Certified Reporter
17                 Certificate No. 50745

18
            *      *      *      *      *      *
19


20         I CERTIFY that VALLEY COURT REPORTING, LLC
     has complied with the ethical obligations set forth in
21   ACJA 7-206.

22


23

                   _____
24                 Valley Court Reporting, LLC
                   Arizona RRF No. R1054
25