David A. Chami, AZ #027585
PRICE LAW GROUP, APC
8245 N. 85th Way
Scottsdale, AZ 85258
T: (818) 600-5515
F: (818) 600-5415
david@pricelawgroup.com

Haytham Faraj
LAW OFFICES OF HAYTHAM FARAJ
1935 W Belmont Ave.
Chicago, IL 60657
T: (312) 635-0800
F: (202) 280-1039
haytham@farajlaw.com
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mussalina Muhaymin as Personal Representative of the Estate of Muhammad Abdul Muhaymin Jr., <br><br> Plaintiff, <br><br> v. <br><br> City of Phoenix, an Arizona Municipal Corporation, *et al.*, <br><br> Defendants. | Case No.: CV-17-04565-PHX-SMB <br><br> **PLAINTIFF'S MOTION TO EXCLUDE OPINION TESTIMONY BY GARY M. VILKE M.D. AS OUTSIDE THE SCOPE OF FED. R. EVID. 702 PURSUANT TO *DAUBERT*** |

Pursuant to Federal Rules of Evidence 104(a), Plaintiff Mussalina Muhaymin ("Plaintiff" or "Ms. Muhaymin"), by and through undersigned counsel, respectfully moves to exclude testimony by Gary M. Vilke, M.D. ("Dr. Vilke") from admission at trial pursuant to Fed. R. Evid. 702 and *Daubert*. In support, Ms. Muhaymin incorporates Plaintiff's Memorandum below.

**<u>TABLE OF CONTENTS</u>**

I.        INTRODUCTION ....................................................................................... 1

II.       LEGAL STANDARD ................................................................................. 3

III.      ARGUMENT .............................................................................................. 5

A. DR. VILKE IS NOT QUALIFIED TO OPINE AS TO THE CAUSE OF MR. MUHAYMIN'S DEATH ................................................................................. 5

     1.     Dr. Vilke Has No Independent Qualifications To Make Cause Of Death Determinations In Cases Of Unnatural Death .......................................... 5

     2.     Dr. Vilke Does Not Have Enough Specific Scientific Information In This Case To Make Determinations Regarding Mr. Muhaymin's Cause Of Death.............................. 7

     3.     Dr. Vilke's Own Description Of The Physical Requirements For Positional Asphyxia Relies Upon Measurements To Which Dr. Vilke Could Not Possibly Have Had Access From Body Camera Footage ....................................... 8

B. THE REPORT FAILS TO IDENTIFY BASES FOR DR. VILKE'S CONCLUSIONS ............................................................................ 10

C. DR. VILKE'S RESEARCH IS BOTH UNRELIABLE AND INAPPLICABLE TO THIS CASE ...................................................................... 12

     1.     Dr. Vilke's Research Is Irrelevant To This Case ............................... 12

     2.     Dr. Vilke's Research Is Unreliable................................................. 15

D. DR. VILKE IS NOT QUALIFIED TO REBUT PLAINTIFF'S EXPERT WITNESS ............................................................................ 16

IV.      CONCLUSION....................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. City of Los Angeles*,
   No. CV 17-4382-CBM-MRW, 2018 WL 10017349 (C.D. Cal. Oct. 2, 2018) ........................ 7

*Apple, Inc. v. Samsung Elecs. Co.*,
   No. 11-CV-01846-LHK, 2013 WL 5955666 (N.D. Cal. Nov. 6, 2013) ................................... 6

*Bourjaily v. United States*,
   483 U.S. 171 (1987) ............................................................................................................. 5

*Brouillette v. Weymouth Shoe Co.*,
   157 Me. 143, 145 (Me. 1961) ............................................................................................. 8

*Claar v. Burlington Northern R. Co.*,
   29 F.3d 499 (9th Cir. 1994) ............................................................................................... 17

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ...................................................................................... passim

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ................................................................................................... passim

*Davis v. McKesson Corp.*,
   No. CV-18-1157-PHX-DGC, 2019 WL 3532179 (D. Ariz. Aug. 2, 2019) ........................... 10

*Estate of Lynott by & through Moen v. Luckovich*,
   No. C14-0503RSL, 2018 WL 501577 (W.D. Wash. Jan. 22, 2018), reconsideration denied,
   No. C14-0503RSL, 2018 WL 655509 (W.D. Wash. Feb. 1, 2018) ...................................... 6

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ................................................................................... 4, 10, 11, 14

*Harvey v. State*,
   207 So. 2d 108, 118 (Miss. 1968) ..................................................................................... 8

*Kumho Tire Co. v. Carmichael,*

   526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ............................ 12, 15, 16

*Lust By & Through Lust v. Merrell Dow Pharm., Inc.,*

   89 F.3d 594 (9th Cir. 1996) ...................................................................... 2, 4, 15

*Moussouris v. Microsoft Corp.,*

   311 F. Supp. 3d 1223 (W.D. Wash. 2018) ................................................................ 7

*Parrish v. State,*

   139 Ala. 16, 36 So. 1012 (1904) ................................................................................ 8

*Smith v. Pac. Bell Tel. Co., Inc.,*

   649 F.Supp.2d 1073 (E.D. Cal. 2009) ....................................................................... 7

*U.S. v. Crumby* ............................................................................................................... 16

*United States v. Scop,*

   846 F.2d 135 (2d Cir. 1988) ....................................................................................... 8

*United States v. W.R. Grace,*

   504 F.3d 745 (9th Cir. 2007) ......................................................................... 4, 6, 13

*YKK Corp. v. Jungwoo Zipper Co.,*

   213 F. Supp. 2d 1195 (C.D. Cal. 2002) ..................................................................... 6

**Rules**

Fed. R. Civ. P. 26(a)(2)(B)(i) ............................................................................................ 4

Fed. R. Evid. 702 ......................................................................................................... 3, 7

## I.  **INTRODUCTION**

Defendants City of Phoenix, *et al.* ("Defendants"), retained a Gary M. Vilke, M.D., to testify as an expert witness on their behalf at trial. Dr. Vilke's intended testimony and purported opinions are set forth in a seventeen-page report (the "Report") (attached hereto as Exhibit A), his deposition testimony taken on October 30, 2020 ("October Deposition") (attached hereto as Exhibit B) and on November 19, 2020 ("November Deposition") (attached hereto as Exhibit C), and a twelve-page rebuttal report (the "Rebuttal Report) (attached hereto as Exhibit D). (A copy of Dr. Vilke's curriculum vitae is also attached hereto as Exhibit E.)

According to Dr. Vilke's Report, he was retained to "provide expert opinion [...] on whether the actions of the police officers caused or contributed to the cardiac arrest and death of Mr. Muhaymin Jr." Report, p. 1. In reaching his ultimate conclusion, Dr. Vilke's opines that (1) "Mr. Muhaymin's cardiac arrest was most likely caused by his underlying coronary artery disease coupled with an intramuscular left anterior descending coronary artery, methamphetamine use and his agitation," and that (2) the "actions of the officers to control and restrain Mr. Muhaymin did not cause or contribute to his cardiac arrest and death." Report, p. 7.

Dr. Vilke is an emergency room doctor. He is not a pathologist and has had no training in conducting autopsies. In his position as an E.R. physician, Dr. Vilke's vocation and expertise is in the area of saving lives. Dr. Vilke is facially unqualified to provide an expert opinion as to the cause of Mr. Muhaymin death, as Dr. Vilke's area of expertise is not in making cause of death determinations. Furthermore, and more specifically to this case, Dr. Vilke did not perform an autopsy on Mr. Muhaymin. Dr. Vilke did not review any tissue samples. Dr. Vilke did not even examine Mr. Muhaymin's body. Even further, Dr. Vilke's entire Report and Rebuttal are based

on the premise that it was not possible for the officers' use of weight and position to have caused Mr. Muhaymin to asphyxiate, but he expressly admits that this premise rests on specific calculations of weight and time that he cannot possibly have. Defendants simply cannot show that Dr. Vilke possesses the requisite scientific expertise or necessary information to provide an educated expert opinion as to the cause of Mr. Muhaymin's death.

Moreover, although Dr. Vilke is also a self-described "independent researcher on the physiologic effects of restraints, weight force and body position," (Report, p. 1), his purported opinions and conclusions are not scientifically supported by his own research, which involved studies and publications wherein test subjects were subjected to situations and factors wholly dissimilar to the events leading up to Mr. Muhaymin's death. Simply put, there is a massive analytical gap between Dr. Vilke's unsupportable assumptions in Mr. Muhaymin's case and the "scientific research" that Dr. Vilke relies upon in determining that the officers involved did not contribute to Mr. Muhaymin's death.

Furthermore, even if his conclusions were supported by his own research – which they are not – Dr. Vilke's research and publications regarding positional asphyxia coincided directly with his being retained by municipalities and police forces in cases involving asphyxia. Indeed, for the past two decades, Dr. Vilke has regularly and almost exclusively testified on behalf of defendants in civil cases alleging wrongful death by asphyxia. This alone is enough to raise serious doubt as to the admissibility of Dr. Vilke's testimony in the Ninth Circuit, which has emphasized that "a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Lust By & Through Lust*, 89 F.3d at 597.

Finally, it cannot possibly be shown that Dr. Vilke possesses the scientific expertise or information necessary to rebut Ms. Muhaymin's expert witness, a fully qualified pathologist who, unlike Dr. Vilke, personally reviewed tissue samples prior to preparing his report.

Because Dr. Vilke's purported expert opinions are unsubstantiated by relevant scientific data, and because Dr. Vilke goes well beyond his field of actual, vocational expertise, Mr. Muhaymin respectfully requests that the Court exclude Dr. Vilke's report, testimony, and rebuttal opinions from trial pursuant to *Daubert*.

## II. <u>LEGAL STANDARD</u>

In order to submit expert testimony to the jury, Defendants must establish that the testimony from their expert satisfies the four Rule 702 admissibility criteria: (1) the witness must be "qualified as an expert by knowledge, skill, expertise, training, or education"; (2) the testimony must be "based upon sufficient facts or data"; (3) the testimony must be "the product of reliable principles and methods"; and (4) the witness must "appl[y] the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. An expert's report and testimony must provide the method, facts, and experience relied upon in reaching a conclusion. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-593 (1993) ("*Daubert I*").

Rule 702 imposes a special gate-keeping obligation upon the Court to ensure that any proffered expert testimony is both "reliable" and "relevant." *See Daubert I.*, 509 U.S. at 589. "Under *Daubert*, [the Court] must engage in a difficult, two-part analysis." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"). "First, [the Court] must determine nothing less than whether the experts' testimony reflects "scientific knowledge," whether their findings are "derived by the scientific method," and whether their work product

amounts to "good science." *Id.* "Second, [the Court] must ensure that the proposed expert testimony is "relevant to the task at hand," […] i.e., that it logically advances a material aspect of the proposing party's case. *Id.*

"[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive…" *Daubert II*, 43 F.3d at 1315–16 (9th Cir. 1995). "[The Court's] task, then, is to analyze not what the experts say, but what basis they have for saying it." *Id.* at 1316. "[T]he party presenting the expert must show that the expert's findings are based on sound science…" *Id.*

The Court is therefore required to engage in a "holistic" analysis of the expert's testimony. *See United States v. W.R. Grace*, 504 F.3d 745, 762 (9th Cir. 2007). In doing so, the expert's opinion testimony (and report) must be reviewed for "overall sufficiency of the underlying facts and data, and the reliability of the methods, as well as the fit of the methods to the facts of the case." *Id.* If a large analytical gap exists between the data and the opinion proffered, the trial court may properly exclude the testimony as unreliable. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Another "'very significant fact' [in determining reliability] is whether the expert has 'developed [his] opinions expressly for purposes of testifying,' since 'a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office.'" *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) (quoting *Daubert II*, 43 F.3d at 1317).

It should be noted that the Supreme Court has described the Court's gatekeeper role regarding expert testimony as especially important because such testimony introduces special dangers to the factfinding process. Expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert I*, 509 U.S. at 595. Therefore, federal judges must exclude proffered scientific evidence under Fed. R. Evid. 702 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury. *Daubert II*, 43 F.3d at 1321.

Finally, the proponent of expert testimony has the burden of establishing that the admissibility requirements are met by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

### III.   <u>ARGUMENT</u>

#### A. DR. VILKE IS NOT QUALIFIED TO OPINE AS TO THE CAUSE OF MR. MUHAYMIN'S DEATH

##### 1. Dr. Vilke Has No Independent Qualifications To Make Cause Of Death Determinations In Cases Of Unnatural Death.

Dr. Vilke opines that "Mr. Muhaymin's cardiac arrest was most likely caused by his underlying coronary artery disease coupled with an intramuscular left anterior descending coronary artery, methamphetamine use and his agitation," and that the "actions of the officers to control and restrain Mr. Muhaymin did not cause or contribute to his cardiac arrest and death." Report, p. 7. In short, Dr. Vilke opines on the cause of Mr. Muhaymin's death. However, Dr. Vilke is not qualified generally to make determinations as to the cause of death, particularly where the deceased did not die of natural causes. Although Dr. Vilke may have been qualified to diagnose Mr. Muhaymin with coronary artery disease had he presented symptoms at the E.R. and

appropriate tests were run to verify any initial diagnosis, Dr. Vilke is patently unqualified to render an opinion that coronary artery disease, methamphetamine use, or "agitation" caused his death.

Dr. Vilke does not specialize in pathology, and in fact has no training in pathology. November Deposition, p. 7:14-18. Dr. Vilke has never performed an autopsy. *Id.*, at p. 7:19-21. In his position as an E.R. physician, Dr. Vilke's experience with "determining" cause of death is almost exclusively limited to the signing of death certificates in which the deceased died of natural causes in an emergency room. *Id.*, at pp. 7:22-8:9. In sum, Dr. Vilke's area of expertise is saving lives in an emergency situation, not determining cause of death, and especially not determining unnatural causes of death. This area of expertise is exclusively covered by the field of pathology, in which, again, Dr. Vilke has no training.

As multiple Ninth Circuit district courts have noted, "[e]xpert testimony is required to be within the scope of the proffered expert's expertise." *YKK Corp. v. Jungwoo Zipper Co.*, 213 F. Supp. 2d 1195, 1203 (C.D. Cal. 2002); *See Also W.R. Grace,* 455 F. Sup. 2d at 1188; *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2013 WL 5955666, at *2 (N.D. Cal. Nov. 6, 2013); *Estate of Lynott by & through Moen v. Luckovich*, No. C14-0503RSL, 2018 WL 501577, at *2 (W.D. Wash. Jan. 22, 2018), reconsideration denied, No. C14-0503RSL, 2018 WL 655509 (W.D. Wash. Feb. 1, 2018). Dr. Vilke is therefore not qualified to opine to an impressionable jury as to the cause of Mr. Muhaymin's unnatural death, having no training or expertise in determining the same.

### 2. Dr. Vilke Does Not Have Enough Specific Scientific Information In This Case To Make Determinations Regarding Mr. Muhaymin's Cause Of Death.

Furthermore, even if Dr. Vilke did possess the requisite expertise and training to qualify him to determine cause of death in police interactions (he does not), he possesses absolutely none of the necessary information to make such a determination. It is undisputed that Dr. Vilke has had absolutely no personal contact with Mr. Muhaymin's body. He did not perform an autopsy, nor did he ever even nominally examine the body. Further, Dr. Vilke admits that he never reviewed the available brain, heart, and lung tissue samples, either in preparation of his original Report or the Rebuttal Report (rebutting Ms. Muhaymin's expert pathologist who did review the tissue samples). November Deposition, p. 73:13-25.

As an aside, this is not the first time Dr. Vilke has attempted to opine on the cause of death in a wrongful death suit without actually examining the decedent's body. In *Aguilar v. City of Los Angeles*, the Central District of California precluded Dr. Vilke from testifying that the existence of controlled substances in the decedent's body contributed to his death because Dr. Vilke "did not examine Decedent, and did not interpret the coroner's toxicology test of Decedent..." No. CV 17-4382-CBM-MRW, 2018 WL 10017349, at *1 (C.D. Cal. Oct. 2, 2018).

As has been stressed by district courts throughout the Ninth Circuit, "[r]elevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion." *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1244 (W.D. Wash. 2018) (citing *Smith v. Pac. Bell Tel. Co., Inc.*, 649 F.Supp.2d 1073, 1096 (E.D. Cal. 2009); Fed. R. Evid. 702).

Dr. Vilke's determination of the cause of death has no basis in any objective scientific testing or observation of Mr. Muhaymin's body. His entire testimony is based exclusively on his perceptions of the video footage. As described in the following section, according to Dr. Vilke's own description of the requirements for positional asphyxia, the information possessed by Dr. Vilke is inadequate to enable him to make the determinations he did in his Report.

### 3. Dr. Vilke's Own Description Of The Physical Requirements For Positional Asphyxia Relies Upon Measurements To Which Dr. Vilke Could Not Possibly Have Had Access From Body Camera Footage.

The scientific opinions set forth in Dr. Vilke's expert report cannot be based on witness testimony, because the same would necessitate credibility determinations that are within the sole purview of the finder of fact.[1] Therefore, Dr. Vilke's opinion that the officers did not contribute to Mr. Muhaymin's death by positional asphyxiation must be grounded in his own observations of the body camera footage. However, by Dr. Vilke's own description, this is simply not possible. When asked "what would need to happen physiologically for a person who is being restrained by the police for them to suffer from asphyxiation," Dr. Vilke responded as follows:

> A. They'd have to be put into a position in which they are unable to ventilate. […] that could be putting enough weight […] onto a position that restricts ventilations significantly enough, meaning blocking the ability to move air in and out, for a long enough period of time that physiologically you would retain carbon dioxide, drop your oxygen level, and then go into cardiac arrest. You'd have to look -- you know, **it's going to be based on weight, position, timing, and what's going on with the individual during that episode.**

---

[1] It is standard judicial practice in both federal and state courts throughout the United States to exclude expert opinion that is intertwined inextricably with, and rests on, improper credibility determinations. *See e.g., United States v. Scop,* 846 F.2d 135, 142 (2d Cir. 1988); *Parrish v. State,* 139 Ala. 16, 36 So. 1012 (1904); *Harvey v. State*, 207 So. 2d 108, 118 (Miss. 1968); *Brouillette v. Weymouth Shoe Co.*, 157 Me. 143, 145 (Me. 1961).

October Deposition, pp. 24:18-25:9 (emphasis added). When asked specifically about how long it would take for someone to asphyxiate, Dr. Vilke explained:

> A. So if you're having – if you're having complete ventilation blockages, meaning there is no air moving whatsoever, which is not the case here, then it's about five minutes, most people will sort of quote as a time period to cause asphyxiation. If there is movement of air in and out, then it takes much longer because you are still ventilating. So that's the marker of time there.
>
> Q. (Continued by MR. CHAMI:) **So it depends on how much area is moving in and out, right?**
>
> A. **How much air movement is moving in and out or the restrictions on that. Yes.**

November Deposition, pp. 64:18-65:4 (emphasis added).

To summarize, in order for Dr. Vilke to determine whether asphyxiation was the cause of Mr. Muhaymin's death, he would need to know (1) the weight being placed on Mr. Muhaymin's back, (2) the position of the weight (i.e., where on Mr. Muhaymin's back the force was applied), (3) exactly how long the weight was placed on Mr. Muhaymin's back, and (4) how much air Mr. Muhaymin was able to inhale and exhale throughout the entire ordeal.

Ms. Muhaymin and her counsel respectfully request that the Court watch the body camera footage and attempt to acquire the information that Dr. Vilke himself states is necessary to determine whether asphyxiation was the cause of death. There is no possible way to watch the body camera footage and determine with any level of accuracy the amount of weight being placed, where exactly that weight was placed at all times during the encounter, how long the weight was placed, or how much the weight impacted Mr. Muhaymin's ability to inhale or exhale. Beyond the simple fact that most of these variables require measurement equipment to determine, even as to the one variable that might be ascertainable without equipment, length of time, the

constant and erratic movement in the video make it incredibly difficult to tell how long the weight was applied.

Either (1) Dr. Vilke is making credibility determinations and relying upon the testimony of Defendant Officers in making the necessary measurements (a completely inappropriate basis for an expert report), or (2) he is simply guessing the information necessary to form his "expert" opinion. As this Court noted last year, "an opinion that is an insightful, or even inspired, hunch is not admissible if it lacks scientific rigor." *Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *7 (D. Ariz. Aug. 2, 2019).

In the current situation, where Dr. Vilke will be telling an impressionable jury, with limited medical background, that he knows to a medical certainty that Mr. Muhaymin did not die of positional asphyxiation, reliance on either (1) determinations of Defendant Officers' testimony, or (2) a guess is not permissible. *Gen. Elec. Co.*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Daubert II*, 43 F.3d at 1321 ("federal judges must exclude proffered scientific evidence under Fed. R. Evid. 702 unless they are convinced that it [...] will not mislead the jury.").

### B. THE REPORT FAILS TO IDENTIFY SUFFICIENT BASES FOR DR. VILKE'S CONCLUSIONS

After a review of the facts in a light most favorable to the Defendants, Dr. Vilke opines that police conduct did not cause or contribute to the death of Mr. Muhaymin. Report, pp. 11-14. Dr. Vilke states that "the weight of the officers holding Mr. Muhaymin's legs, lower back, arms, head, neck and hair would not have had any impact on breathing or the ability for Mr. Muhaymin

to ventilate effectively" and ultimately concludes that "there is no evidence that position, restraint or body weight caused or contributed to Mr. Muhaymin's cardiac arrest and death." *Id.*, at p. 14.

These broad statements present multiple inexplicable assumptions. Dr. Vilke's report never identifies the exact amount of weight he is assuming is on Mr. Muhaymin's back. He never provides the estimated time that he is assuming passed during which pressure was placed upon Mr. Muhaymin, nor an estimation of the location of the pressure throughout the incident. Dr. Vilke expressly admits that "other factors like agitation, struggle, or underlying medical conditions may result in respiratory compromise" (November Deposition, pg. 97:6-12) and that a determination of asphyxiation depends upon "what's going on with the individual during [the] episode" (October Deposition, p. 25:8-9), yet his Report completely fails to explore the possibility that such factors may have been involved. The incident wherein officers focused their body weight onto Mr. Muhaymin's back for a prolonged period of time occurred without any sort of vitals monitoring or weight measurements. Despite this fact, Dr. Vilke simply concludes, solely from watching body camera footage (or by making inappropriate credibility determinations of the Defendant Officers' testimony), that the officers did not contribute to Mr. Muhaymin's death. This is a medical conclusion for which no support is offered.

An expert's report must provide the method, facts and experience relied upon in reaching a conclusion. *Daubert I*, 509 U.S. at 592-593. As the United States Supreme Court made clear, "conclusions and methodology are not entirely distinct from one another" and nothing "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 522 U.S. at 146. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Dr. Vilke's report and

opinion constitute exactly what these principles aspire to sequester from a jury's consideration: "Expert" conclusions which are not clearly and scientifically connected to the facts of the case. Due to the large analytical gap between the lack of actual data gathered by Dr. Vilke in his extremely broad determination that there is no possibility that the officer's weight contributed to Mr. Muhaymin's asphyxiation, the court should exclude Dr. Vilke's testimony and Report. *Id.*

## C. DR. VILKE'S RESEARCH IS BOTH UNRELIABLE AND INAPPLICABLE TO THIS CASE

The Federal Rule of Evidence 702 imposes upon the Court an obligation to ensure that scientific testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999) (citing *Daubert I*, 509 U.S. at 589) In supporting his broad conclusions that (1) Mr. Muhaymin did not die of asphyxiation, and that (2) the officers did not contribute to Mr. Muhaymin's death, Dr. Vilke cites to a number of studies, both practical and epidemiological, approximately 65% of which were published by Dr. Vilke himself. November Deposition, pp. 33:10-34:16. These studies are both irrelevant to this case due to their inherently dissimilar fact patterns, and unreliable due to the obvious conflict of interest that exists when a scientist conducts "science" for the sole purpose of testifying for a specific side in civil litigation.

### 1. Dr. Vilke's Research Is Irrelevant To This Case.

Exactly zero of Dr. Vilke's studies include examinations of fact patterns that are in any way similar to the manner of Mr. Muhaymin's death. None of the studies involved the placement of weights onto the backs of test subjects in amounts heavier than two hundred and twenty-five pounds. November Deposition, p. 28:10-13. The test subjects in all of the studies involving

weights heavier than twenty-five pounds were explicitly screened for any recreational drug use (*Id.*, at p. 30:8-13) and subjects in studies involving weights heavier than fifty pounds were generally screened for serious underlying health concerns (*Id.*, at p. 29:6-30:3).[2] Furthermore, none of the studies were designed to emulate the stress and fear naturally existing when a human is being arrested, restrained and tied up by his arms and legs with a "hobble," and sat upon by half a dozen armed individuals. *Id.*, at pg. 94:13-15.

In sum, in reaching his conclusion that there was not enough weight on Mr. Muhaymin's back to cause asphyxiation, Dr. Vilke relies exclusively on studies which measured the ability to inhale and exhale in relatively healthy, drug-free individuals who were laying safely in a controlled environment with no stressors added (other than previous exercise) and bearing weight no greater than two hundred and twenty-five pounds. It is difficult to imagine a set of facts more dissimilar to the incident which resulted in Mr. Muhaymin's death.

"[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive…" *Daubert II*, 43 F.3d at 1315–16. "[The Court's] task, then, is to analyze not what the experts say, but what basis they have for saying it." *Id.* at 1316. "[T]he party presenting the expert must show that the expert's findings are based on sound science…" *Id.* As the gatekeeper, the Court reviews an expert's opinion testimony for "overall sufficiency

---

[2] Dr. Vilke references only one study, involving weights from twenty-five to fifty pounds, wherein participants were not screened for underlying health concerns.

of the underlying facts and data, and the reliability of the methods, as well as the fit of the methods to the facts of the case." *W.R. Grace*, 504 F.3d at 762.

It is not possible for Defendants to show that Dr. Vilke's conclusions are based on "sound science" or that the underlying research methodology "fits" in this case. The **most** that Dr. Vilke could testify to is that healthy, drug-free individuals do not usually asphyxiate under weights lighter than two hundred and twenty-six pounds when lying in controlled, stress-free environments. However, this is not the case before the Court, nor the case to be put to the jury. Mr. Muhaymin was homeless, suffered from mental illness and drug addiction, was under the influence of methamphetamine, and in the process of being physically manhandled by multiple armed police officers. How the officers' actions, specifically the applying of weight to Mr. Muhaymin's back, affected his ability to breath in conjunction with other compounding factors is simply not answered by any of the research conducted by Dr. Vilke. There is, yet again, a massive "analytical gap" between the conclusions reached by Dr. Vilke and the information available to him. *Gen. Elec. Co.*, 522 U.S. at 146.

The Court should not permit Dr. Vilke to opine to a medically unsophisticated jury that it is not possible for the officer's actions to have caused Mr. Muhaymin's death based solely upon scientific studies that could not be more dissimilar to the facts of this case. Doing so carries the significant danger that the jury will be misled by Dr. Vilke's "expert" representations, when the same are based on nothing more that wholly irrelevant scientific studies. *Daubert II*, 43 F.3d at 1321.

### 2. Dr. Vilke's Research Is Unreliable.

"Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony ... is not only relevant, but reliable.'" *Kumho Tire Co.*, 526 U.S. at 147 (quoting *Daubert I*, 509 U.S. at 589). In considering the reliability of an expert's testimony, a "'very significant fact'" is whether the expert has 'developed [his] opinions expressly for purposes of testifying,' since 'a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office.'" *Lust By & Through Lust*, 89 F.3d at 597 (quoting *Daubert II*, 43 F.3d at 1317).

For the past two decades, Dr. Vilke has regularly, and almost exclusively, testified on behalf of defendants in civil cases where wrongful death by asphyxia was alleged against police officers. October Deposition, pp. 21:21-25; 22:11-17. Dr. Vilke's research and publications regarding positional asphyxia began, not-so-coincidently, roughly when Dr. Vilke began testifying as an expert, and continued on while municipalities and police forces continued to retain his services. November Deposition, pp. 80:8-82:15. Despite Dr. Vilke's protestations that he has testified for plaintiffs before, he admits that only one such case involved asphyxia, and that case occurred so long ago that he no longer recalls the name. October Deposition, p. 22:6-17.

Dr. Vilke's research began with, and has continued alongside, his two-decade career of testifying for police departments and municipalities in wrongful death lawsuits. All of his studies in the area were conducted during this time period, where every incentive weighed in the direction of determining that positional asphyxiation is not generally possible during police encounters. As this Court has noted, "the most persuasive reason for concluding that an expert's

testimony is derived from scientific method is that 'the testimony . . . is based directly on legitimate, **preexisting research unrelated to the litigation**." *U.S. v. Crumby*, 895 F. Supp. 1354, 1361 (D. Ariz. 1995) (quoting *Daubert II*, 43 F.3d at 1317) (emphasis added) (internal quotation marks omitted). It cannot reasonably be contended that the research relied upon by Dr. Vilke's testimony and Report was unrelated to this litigation. It was undertaken precisely because Dr. Vilke was being retained as an expert in wrongful death cases for police and municipalities such as Ms. Muhaymin's instant case. It is therefore not reliable scientific evidence and should be excluded. *Kumho Tire Co.*, 526 U.S. at 147.

### D. DR. VILKE IS NOT QUALIFIED TO REBUT PLAINTIFF'S EXPERT WITNESS

In his Rebuttal Report, Dr. Vilke lays out his disagreement with Plaintiff's expert witness, Dr. Bennet Omalu, regarding the cause of Mr. Muhaymin's death. As Plaintiff has already explained why Dr. Vilke is utterly unqualified, both in general and specifically in this case, to make cause of death determinations, Plaintiff will not belabor the point. However, a couple of points are worth noting. First, unlike Dr. Vilke, Dr. Omalu is a pathologist whose regular practice includes autopsy and anatomic pathology, clinical pathology and toxicology, forensic pathology, and neuropathology. Dr. Vilke is an emergency room physician. He is facially unqualified to "rebut" a pathologist's opinion regarding cause of death.

Second, unlike Dr. Vilke's report, Dr. Omalu's expert opinion is based upon his own examination and testing of actual lung, heart, and brain tissue samples taken from Mr. Muhaymin's body. His ultimate conclusions are founded, in part, upon the levels of oxygen and carbon dioxide present in those tissue samples. Because he engaged in no actual review of Mr.

Muhaymin's body, Dr. Vilke does not possess information sufficient to rebut Dr. Omalu's findings.

Dr. Vilke is simply not qualified, in general or specifically to this case, to rebut Dr. Omalu's methods or findings. The Court should preclude Dr. Vilke from testifying in rebuttal to Dr. Omalu's expert report.

## IV.   **CONCLUSION**

Dr. Vilke's Report, Rebuttal Report, and anticipated testimony are comprised of a collection of unsupported conclusions and opinions in violation of Fed. R. Civ. P. 26, Fed. R. Evid. 702, and *Daubert*. Dr. Vilke's baseless opinions are not accompanied or supported by reliable experience or scientific methods and procedures. Dr. Vilke has no qualifications to make cause of death determinations, being neither a trained pathologist nor a medical examiner, and he failed to actually examine Mr. Muhaymin's body, regardless. Further, the analytical gap between Dr. Vilke's conclusions and the factors implicated in an asphyxiation case is insurmountable, and all of Dr. Vilke's opinions are based on irrelevant and unreliable studies performed by Dr. Vilke in anticipation of testifying for defendants in wrongful death cases. Dr. Vilke's opinions are therefore an assortment of "mere subjective beliefs of unsupported speculation." *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 501 (9th Cir. 1994). The obvious deviation from the long-held requirements of Fed. R. Civ. P. 26, Fed. R. Evid. 702, and *Daubert* warrant the preclusion at trial of Dr. Vilke, his Report, his Rebuttal Report, and any of his opinions.

Date: April 2, 2021                    **PRICE LAW GROUP, APC**

                                       By: /s/ David A. Chami
                                       David A. Chami, AZ #027585
                                       david@pricelawgroup.com
                                       Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

*/s/ Florence Lirato*