**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mussalina Muhaymin,<br><br>        Plaintiffs,<br><br>v.<br><br>City of Phoenix, et al.,<br><br>        Defendants. | No. CV-17-04565-PHX-SMB<br><br>**SEALED ORDER** |

Pending before this Court is Defendants City of Phoenix, Antonio Tarango ("Tarango"), Officer Oswald Grenier, Officer Kevin McGowan, Officer Jason Hobel, Officer Ronaldo Canilao, Officer David Head, Officer Susan Heimbigner, Officer James Clark, Officer Dennis Leroux, Officer Ryan Nielsen, and Sergeant Steven Wong's (collectively "Defendants") sealed Motion for Summary Judgment, (Doc. 273), which is supported by Defendants' sealed Statement of Facts in Support of their Motion for Summary Judgment. (Doc. 274.) Plaintiff Mussalina Muhaymin filed her opposition to the motion, (Doc. 291), and filed a sealed Statement of Disputed Facts and Statement of Facts in Support of Opposition to Defendants' Motion for Summary Judgment. (Doc. 292.) Defendants filed a reply. (Doc. 298.) Oral argument was held on May 4, 2021. The Court has considered the pleadings, evidence, and relevant law and now grants in part and denies in part Defendants' Motion for Summary Judgment for the reasons explained below.

## I. BACKGROUND

### A. Factual Background

This case arises out of the death of Muhammed Muhaymin Jr. ("Muhaymin") while he was being taken into custody by Phoenix Police Department. The facts of this case are as follows:

On January 4, 2017, Muhaymin entered the Maryvale Community Center in Phoenix, Arizona, to use the restroom. (Doc. 274 ¶ 1.) Muhaymin had a chihuahua with him named "Chiquita" which was not on a leash. (*Id.* ¶ 2.) Defendant Tarango, the supervisor of the community center, told Muhaymin to leave because Chiquita was not leashed and not under his control. (Doc. 292 at 3-4, ¶ 6.) As Tarango and Muhaymin argued about the dog, Muhaymin walked towards the restroom. (Doc. 274 ¶ 8.) Tarango stepped in front of Muhaymin and the two bumped into each other. (Doc. 292 at 4, ¶ 8.) Tarango then directed another employee, Hannah Glemba, to call the police. (Doc. 274 ¶ 9.) Phoenix police officers responded to the center. (Doc. 274 ¶ 10.) The call was dispatched as an assault. (*Id.*) When the officers arrived, Muhaymin was holding Chiquita. (*Id.* ¶ 11.) Officers Oswald Grenier, Jason Hobel, Ronaldo Canilao, and David Head arrived at the center and agreed to allow Muhaymin to use the restroom if he held Chiquita. (Doc. 274 ¶¶ 12-13.) Before entering the restroom, Muhaymin gave his identification information to the officers. (*Id.* ¶ 14.) While Muhaymin was in the restroom for approximately six minutes, the officers discovered that Muhaymin had an outstanding misdemeanor warrant from the Mesa Police Department. (*Id.* ¶ 15.) Officer Hobel remarked to Officers Grenier and Head that Muhaymin was "a little 918." (Doc. 292 ¶ 23.) "918" is a common phrase used by police officers to describe "people that are mentally unstable."[1] (Doc. 292 at 29, ¶ 24.) When Muhaymin exited the restroom, all four officers walked him outside the center. (Doc. 274 ¶ 19.) Once outside, officers Grenier and Canilao informed Muhaymin of the existence of the warrant and advised him that he was under arrest. (*Id.*)

The remaining facts are largely disputed by the parties. However, the Court has gleaned the following from the evidence presented by the parties and the bodycam footage

---

[1] In fact, the evidence reveals that Muhaymin suffered from Schizophrenia (Disorganized Type). (Doc. 292 ¶ 2.)

of the officers: Upon being advised that he was under arrest, Muhaymin asked what the warrant was for and expressed concern that no one would look after Chiquita. An officer told him that they would "find someone" to watch Chiquita. (Doc. 292 at 7, ¶ 24.) Muhaymin continued to hold Chiquita and ignored commands from the officers to put his hands behind his back. Instead, he asked to be able to call his "sensei" first. (Doc. 292 at 30, ¶ 29.) Despite repeated commands to put his hands behind his back, Muhaymin refused to drop his dog and present his arms for arrest. Officers warned Muhaymin that they would have to take him to the ground if he didn't comply. As Muhaymin continued to refuse to comply with the officers' orders, the officers placed Muhaymin against a glass wall to get him to let go of the dog so that his hands could be handcuffed behind his back. (Doc. 274 ¶ 27.) Officer Canilao, with Officer Hobel's assistance, used a baton under Muhaymin's right arm as leverage to pry his interlocked hands free and to release Chiquita. (*Id.* ¶ 28.) Once the officers released Chiquita from Muhaymin's hold, Muhaymin continued to resist officers' attempt to handcuff him. (Doc. 274 ¶ 29.) The four officers took him to the ground and eventually "double-cuffed" his hands behind his back after a struggle that lasted approximately two minutes. (Doc. 274 ¶ 29.) Muhaymin yelled "Ok!" multiple and times as the four officers forced him to the ground. (Doc. 292 ¶ 33.) One of the officers can be heard on the bodycam footage saying, "Now you're gonna be going for a felony now, dumbass. Now it's a felony. You understand?" (Doc. 292 at 31, ¶ 34.) The interlocked pair of handcuffs gave Muhaymin a few extra inches than he would have had if he was restrained using only one pair of handcuffs. During the scuffle, Officer Grenier delivered an elbow strike to the rear lateral muscle in Muhaymin's left shoulder to release his arms from under his body so that he could be handcuffed. (*Id.* at 30, ¶ 30; 31, ¶ 35.) As Muhaymin was laying prone on the sidewalk being handcuffed, Officer Hobel placed his knee on Muhaymin's head where it remained for about forty seconds. (Doc. 292 at 31, ¶ 38.)

After they had handcuffed him, Muhaymin was walked to the parking lot as some of the officers lifted him by his arms. (Doc. 292 at 30-31, ¶ 33.) About halfway to the police

SUV, the officers lifted Muhaymin by his arms and told him, "Stand your ass up." (Doc. 292 at 32, ¶ 42.) Upon arriving at the police SUV, the officers attempted to search him. (Doc. 274 ¶ 34.) Officers Canilao and Hobel put Muhaymin's body against the hood of the police SUV. During the search officers Canilao and Hobel push up on Muhaymin's double-cuffed arms and his arms end up over his head so that his hands went from behind his body to in front of his body. Muhaymin can be heard yelling as his arms go up and over his head and in front of his body. (Doc. 292 at 10, ¶ 38.) It is disputed as to whether the officers forced Muhaymin's arms over his head or whether Muhaymin raised his arms over his head on his own. (Doc. 274 ¶ 38.)

Officers then took Muhaymin to the ground a second time to re-handcuff him. (Doc. 274 ¶ 39.) As officers take him to the ground, Muhaymin states, "Please stop." (Doc. 292 at 32, ¶ 48.) Additional officers were dispatched for assistance and several arrived at the scene while Muhaymin was on his side with multiple officers holding him down.[2] (Doc. 274 ¶ 41.) Muhaymin engaged in "passive" resistance during the ensuing struggle, meaning that he resisted arrest without attempting to assault the officers. (Doc. 274 ¶ 43.) Bodycam footage shows that as many as four or five officers at a time place their body weight on Muhaymin during this struggle to counteract his resistance. (Doc. 292 at 13, ¶ 44.) Muhaymin yelled three times during the struggle that he couldn't breathe. (Doc. 292 at 36, ¶ 52.) Nonetheless, officers continued to place their weight on Muhaymin as they struggled to get his hands behind his back. Muhaymin was moved from his side to the prone position during the struggle, and officers were continually adjusting their weight and position on him throughout the struggle. (Doc. 292 at 36, ¶ 51.) Officer Grenier's knee was on Muhaymin for a total of around three minutes during the struggle, with his knee placed on Muhaymin's shoulders and neck area for a substantial portion of that time. (*Id.* at 33, ¶ 50.) With additional officers assisting, the double set of handcuffs were disconnected from the front of Muhaymin, and the officers were able to re-handcuff Muhaymin with a single pair

---

[2] While Plaintiff disputes that Muhaymin was on his side and claims that he was laying prone, the bodycam footage cited by Plaintiff proves otherwise.

of cuffs behind his back. (Doc. 274 ¶ 53.) As officer's secured the handcuffs behind Muhaymin's back, Muhaymin vomited, and all officers removed their bodyweight from his back. (Doc. 292 at 17, ¶ 58.) Immediately after he vomited, an officer on the bodycam footage can be heard saying "call fire." (Doc. 274 Ex. 68.) About 25 seconds after he vomited, officers rolled Muhaymin over onto his side and initiated resuscitative efforts since he had stopped breathing. (Doc. 292 at 37, ¶¶ 59-60.) After paramedics arrived, Muhaymin was transported to Maryvale Hospital and pronounced deceased at 10:39 A.M. (Doc. 274 ¶ 63.) The autopsy pathologist determined that Muhaymin died of "cardiac arrest in the setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual." (Doc. 274 ¶ 66.) Muhaymin's cause of death is disputed by the parties. While Defendants' expert agreed with the autopsy, Plaintiffs' expert instead opined that Muhaymin died from asphyxiation. (Doc. 292 at 19, ¶ 66.) The toxicology results showed Muhaymin had over five times the toxic level of methamphetamine in his system at his death. (Doc. 274 ¶ 68.) Methamphetamines are known for their stimulant effects, including increased energy, endurance, strength, and aggression. (*Id.* ¶ 71.) Defendants noted occasions that Muhaymin displayed incredible strength during the struggle. (*Id.* ¶¶ 31, 40, 42, 44, 46, 50.) Officers in the bodycam footage can be heard on several occasions noting Muhaymin's exceptional strength. (*Id.*, Ex. 73 at 24:10, 25:00.)

After review of the officers' actions, the Phoenix Police Department's Use of Force Board recommended that the officers' actions "be designated as in accordance with the Department's policy." (Doc. 292 at 23, ¶ 80.)

### B. Procedural Background

On February 20, 2019, the Court granted in part and denied in part Defendants' Motion to Dismiss, which dismissed four claims from Plaintiff's First Amended Complaint. (Doc. 67.) On October 31, 2019, the Court granted the parties stipulation to dismiss Plaintiff's loss of income claims against all Defendants. (Doc. 96.) Plaintiff's remaining claims are: Count I: § 1983 Claim for Excessive Force; Count II: § 1983 Claim

for Failure to Protect and Intervene; Count III: 42 U.S.C. § 12131 Claim for ADA Discrimination; Count VII: Wrongful Death and Survival Action-Excessive Use of Force (A.R.S. § 13-410); Count VIII: Wrongful Death and Survival Action-Battery; Count IX: Wrongful Death and Survival Action-Intentional Infliction of Emotional Distress; Count X-Wrongful Death and Survival Action-Negligent Infliction of Emotional Distress; Count XI: Wrongful Death and Survival Action: Negligence; Count XII: Wrongful Death and Survival Action-Gross Negligence; Count XIII: Arizona Civil Rights Act Discrimination; and Count XIV: Wrongful Death and Survival Action-Negligent Hiring, Supervision, Retention, and/or Training.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). The court need only consider the cited materials, but it may also consider any other materials in the record. *Id.* 56(c)(3). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If the movant fails to carry its initial burden, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz*

*Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If the movant meets its initial responsibility, the burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact. *Id*. at 1103. The nonmovant need not establish a material issue of fact conclusively in its favor, but it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247–48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). However, in the summary judgment context, the Court believes the nonmovant's evidence, *id.* at 255, and construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If "the evidence yields conflicting inferences [regarding material facts], summary judgment is improper, and the action must proceed to trial." *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002). Where there is video evidence of a disputed incident and a parties' version of the facts differs from that video at the summary judgment stage, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. PLAINTIFF'S STATEMENT OF FACTS

Defendants, in their reply, argue that Court should disregard Plaintiff's statement of facts because it includes explanation and argument about Plaintiff's position. LRCiv 56.1 "'does not permit explanation and argument supporting the party's position to be included in the…statement of facts." *Marceau v. Int'l Bhd. Of Elec. Workers*, 618 F. Supp. 2d 1127, 1141 (D. Ariz. 2009) (quoting *Pruett v. State*, 606 F. Supp. 2d 1065, 1075 (D. Ariz. 2009)). A court may disregard paragraphs in a party's statement of facts where improper argument is present. *See Pruett*, 606 F. Supp. 2d at 1075. Defendants' argument has merit. Plaintiff's Statement of Disputed Facts and Statement of Facts in Support of Opposition to

Defendant's Motion for Summary Judgment contains explanation and argument.[3] As a remedy, the Court will disregard any explanation or argument made in Plaintiff's statement of facts and will only consider factual citations from Plaintiff.

## IV.     ANALYSIS

### A. Qualified Immunity

#### 1.     Qualified Immunity Rule of Law

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When this test is properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132-33 (9th Cir. 2018) (quoting *al-Kidd*, 563 U.S. at 743)). A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear such that "every 'reasonable official would [have understood] that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 (citations omitted). Where excessive force is at issue, police officers "are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138

---

[3] For example, paragraph 2 of Plaintiff's disputed statement of facts contains ample explanation and even cites to caselaw. This is clearly improper. There are many other examples where Plaintiff utilizes explanation and argument in her statement of facts. (Doc. 292 at 2-3, ¶ 2.)

S.Ct. 1148, 1153 (2018) (citing *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)). To be clearly established, the court must identify a case "'where an officer acting under similar circumstances'" was held to have violated the constitutional right at issue. *S.B. v. Cty. of San Diego*, 864 F.3d 1010 (9th Cir. 2017). Thus, liability will not attach unless there is "'a case where an officer acting under similar circumstances … was held to have violated the Fourth Amendment.'" *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019) (quoting *White v. Pauly*, 137 S.Ct. 548, 552 (2017)). The plaintiff bears the burden of showing that the rights allegedly violated were clearly established. *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (citation omitted).

The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citations omitted). The trend of the Supreme Court's qualified immunity jurisprudence is "toward resolving qualified immunity as a legal issue before trial whenever possible." *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017). Where disputed facts exist, courts can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct. *Bingue v. Prunchak*, 512 F.3d 1169, 1172-73 (9th Cir. 2008) (citing *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001)). "[I]n resolving a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual defendant (in a light most favorable to the plaintiff)." *Cunningham v. Gates*, 229 F.3d 1271, 1287 (9th Cir. 2000).

### 2. Fourth/Fourteenth Amendment Excessive Force Rule of Law

Claims of excessive force are analyzed under the reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Determining whether the force used to effect a seizure is "reasonable" under the Fourth Amendment requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks and citations omitted). The test of reasonableness under the Fourth

Amendment requires "careful attention to the facts and circumstances of each particular case." *Id.* Reasonableness is assessed by weighing the type and amount of force used with: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003) (citing *Graham*, 490 U.S. at 396). "Of all these factors, the 'most important' one is 'whether the suspect posed an immediate threat to safety of the officers or others.'" *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). "'Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed.'" *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (quoting *Glenn v. Washington Cty.*, 673 F.3d 864, 870 (9th Cir. 2011)). Reasonableness of a particular use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

### 3. Reasonableness of the Officers' Actions under the Fourth Amendment

For the purposes of this motion, considering the facts in the light most favorable to the Plaintiff, a reasonable jury could find that the use of force the officers used to effect the arrest of Muhaymin was excessive. The initial use of a baton to free Chiquita from Muhaymin's clutches was reasonable given the fact that Muhaymin was refusing to comply with officers' request to let go of the dog and present his hands to be handcuffed. Likewise, the initial takedown of Muhaymin seemed to be warranted given that Muhaymin was not complying the commands of officers. Although one officer did elbow Muhaymin, even this did not seem to be unreasonable since it was an attempt to pull Muhaymin's arm behind

his back to handcuff him. However, upon arrival at the police SUV once Muhaymin was in custody, there are factual disputes that make it questionable if the officers' use of force escalated to an unreasonable level. After laying Muhaymin on the hood the vehicle,[4] officers Hobel and Canilao appear from the video a to lift Muhaymin's handcuffed hands and arms while Muhaymin yelled. (Doc. 274, Ex. 64 at 3:05.) It's not completely apparent from the bodycam footage that Officers Canilao and Hobel lifted Muhaymin's handcuffed hands over his head and in front of his body or if Muhaymin performed this act himself. There is a factual dispute about how far apart Muhaymin's hands were with Plaintiff claiming they were only 4 inches apart and Defendants claiming they were 8 inches apart. It would not be excessive force for the officers to merely lift Muhaymin's arms a couple of inches to complete their search, while it would be unreasonable if they forced his arms over his head and to the front of his body. With this factual dispute, the Court cannot grant summary judgment.

Now, with Muhaymin's hands in front of his body, the officers took him to the ground a second time to re-handcuff his hands behind his back. Although Muhaymin was resisting during the second struggle, his resistance was passive—he did not appear to be trying to hurt the officers. During the struggle, multiple officers kneeled with their body weight on Muhaymin, including stints where at least one officer, Officer Grenier, kneeled with his bodyweight on Muhaymin's neck for an extended period. Officers did not relent despite the fact that Muhaymin exclaimed that he could not breathe at least three times. Officers continued to press their weight on Muhaymin and restrain him against the ground so that they could remove the double cuffs from his hands, which were now in front of his body, and re-cuff his hands behind his back. Viewing the totality of the evidence in the light most favorable to the Plaintiff, a finder of fact could find that officers used excessive force under the Fourth Amendment analysis in arresting Muhaymin both for lifting his

---

[4] Although Plaintiff claims that officers slammed Muhaymin against the hood of the police SUV, that claim is unsubstantiated by Officer Hobel's bodycam footage. (Doc. 292, Ex. 64 at 3:05.) Instead, officers appear to merely have placed Muhaymin against the hood of the vehicle. (*Id.*)

handcuffed arms from behind his back and over his head and for applying bodyweight to his neck while he was on his side and while he was in the prone position exclaiming that he could not breathe.

Analyzing these facts under the *Graham* factors in the light most favorable to the Plaintiff further supports Plaintiff's claim for excessive force under the Fourth Amendment. The crime at issue was hardly severe. Officers initially responded to a call for assault, but after arrival, the officers did not arrest Muhaymin for assault. Instead, the officers arrested Muhaymin for the misdemeanor warrant from Mesa. Although Defendants contend that Muhaymin was being arrested for a felony because he was resisting arrest, that is incorrect. (Doc. 273 at 23.) Instead, Muhaymin was being arrested for a misdemeanor warrant and engaged in passive resistance in response.[5] As to the second *Graham* factor, Muhaymin did not appear to pose an immediate threat to the officers or others. There is no evidence in the record for the officers to fear that Muhaymin would try to harm them.[6] There is no evidence that Muhaymin had weapons or attempted to threaten the officers or others. As to the third factor, Muhaymin clearly did passively resist arrest. However, there is no evidence that Muhaymin attempted to run or engage in threatening behavior. Accordingly, the Court finds the *Graham* factors favor a finding of excessive force under the Fourth Amendment.

Defendants argue that the Court must individually examine the actions of each officer to determine whether the officers' actions violated Muhaymin's constitutional rights. Conversely, Plaintiff argues that in the Ninth Circuit, multiple law enforcement officers may be held liable on an integral participant theory of liability when at least one officer violates a plaintiff's constitutional rights. *See, e.g., Garlick v. Cty of Kern*, 167 F.

---

[5] In Arizona, if a person merely prevents officers from effecting an arrest using "passive resistance", then the resistance constitutes a class 1 misdemeanor. A.R.S. § 13-2508(B). The statute defines "passive resistance" as "a nonviolent physical act or failure to act that is intended to impede, hinder or delay the effecting of an arrest." A.R.S. § 13-2508(C).

[6] Defendants attempt to claim that the officers feared that Muhaymin knew martial arts because he asked to call his "sensei." However, no other facts gave them reason to fear they would be harmed.

Supp. 3d 1117, 1158 (E.D. Cal. 2016) (citing *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996)). Defendants take exception to this argument on a few grounds. First, they point out that Plaintiff never pled an integral participant theory and failed to disclose the claim. (Doc. 298 at 12.) Indeed, in *Garlick*, the plaintiff had pled integral participation as a claim in the complaint. 167 F. Supp. 3d at 1161. Here, Plaintiff has not pled such a theory. In addition, Ninth Circuit jurisprudence requires the Court to examine each Defendants' "specific factual allegations" even if Plaintiff pled or disclosed the integral participation theory. *See Cunningham v. Gates*, 229 F.3d 1271, 1287 (9th Cir. 2000). Accordingly, the Court will examine the specific actions of each of the officers to determine whether those actions were reasonable under the Fourth Amendment analysis.

### i. Officer Oswald Grenier

Officer Grenier was the first officer on the scene. He was involved in the initial takedown and handcuffing of Muhaymin and delivered an elbow strike to Muhaymin's left lateral rear muscle to release his arms from underneath his body to be handcuffed. Later, after the second takedown of Muhaymin, Officer Grenier can clearly be seen on the bodycam footage placing his knee on Muhaymin's shoulder/neck area for more than three minutes as Muhaymin is on his side. (Doc. 292 at 33, ¶ 50(a).) At times in the bodycam footage, Officer Grenier can clearly be seen kneeling with bodyweight directly on Muhaymin's neck. (*Id.*) When Muhaymin is moved to the prone position, Officer Grenier continued to kneel with a substantial portion of his weight on Muhaymin. (*Id.*) The Court finds that evidence in the record clearly creates a dispute of material fact as to whether Officer Grenier used excessive force under the Fourth Amendment during the arrest of Muhaymin. Applying bodyweight to an individual's neck while the individual is handcuffed on the ground, especially when that individual has stated multiple times that he cannot breathe, could constitute excessive force under the Fourth Amendment.

### ii. Officer Jason Hobel

Officer Hobel was the second officer on the scene. He assisted in the first takedown of Muhaymin. When Muhaymin was searched at the police SUV, Officer Hobel and

Officer Canilao lifted Muhaymin's handcuffed arms in an upward direction. (Doc. 292 at 10, ¶ 37.) Officer Hobel kneeled on or near Muhaymin's legs during the second takedown. (Doc. 292 at 34, ¶ 50(c).) He also appears to have held up Muhaymin's pants during the struggle. (*Id.*) Due to the fact that Officer Hobel is accused of lifting Muhaymin's handcuffed hands over his head from back to front and it is unclear from the video, the Court finds that there is a dispute of fact as to whether Officer Hobel engaged in excessive force.

### iii.    Officer Ronaldo Canilao

Officer Canilao was one of the first four officers on the scene. After officers told Muhaymin that he was under arrest, Officer Canilao used his baton in the crease of Muhaymin's elbow to pry his arms free of Chiquita and to use it as leverage to move Muhaymin's arm so that the officers could handcuff him. (Doc. 274 ¶ 28.) Once officers moved Muhaymin to the police SUV to search him, Officer Canilao was holding onto Muhaymin's arms when they went from back to front. (Doc. 274, Ex. 64 at 3:05.) After officers took Muhaymin to the ground a second time, Officer Canilao secured Muhaymin's double-cuffed hands to the ground as they waited for additional officers to arrive. (Doc. 274 ¶¶ 39-44.) After more officers arrived, Canilao applied some body weight on Muhaymin's right forearm while another officer disconnected the first set of handcuffs and moved Muhaymin's left arm behind his back. Because there is a factual dispute as to how Muhaymin's arms got from behind his body to the front, the Court concludes that there is a dispute of fact as to whether Officer Canilao engaged in excessive force.

### iv.    Officer David Head

Officer Head was one of the first four officers on the scene. He assisted in the first takedown of Muhaymin. After Muhaymin was initially secured in handcuffs, Officer Head remained behind picking up the officers' belongings while other officers moved Muhaymin to be searched. Officer Head was not involved in moving Muhaymin to the police SUV to be searched or in lifting his handcuffed hands. (Doc. 274, Ex. 67.) Instead, he collected the officers' cameras and keys and Muhaymin's belongings which were left behind after the

first takedown. (*Id.*) He arrived at the police SUV right around the time that officers attempted to search Muhaymin, but he did not personally assist the other officers. (*Id.*) He was involved in the second takedown and laid across Muhaymin's legs during the second struggle to help restrain him. (*Id.*) He stayed there until Officer McGowan arrived and secured the hobble. (Doc. 274, Ex. 72.) Under these facts, there is no dispute as to any material fact as to whether Officer Head was involved in any of the facts that constituted excessive force. Although he was a participant in the interaction, he did not commit any of the acts that could constitute excessive force.

### v.   Officer Susan Heimbigner

Officer Heimbigner arrived on the scene after Muhaymin had been taken to the ground the second time. Upon arriving on the scene, she asks, "What do you need, guys?" (Doc. 274, Ex. 64 at 7:34.) An officer instructs her, "Hold right there!" (*Id.*) Officer Heimbigner then placed her hand on Muhaymin's mid torso. (*Id.*) She instructed Muhaymin to "Stop!" (presumably resisting) and then laid across his mid to lower torso for approximately fifty-two seconds before getting up and standing near Muhaymin. (*Id.*) Several minutes later, Muhaymin vomited. The Court finds that Officer Heimbigner there is no dispute of any material fact as to whether Officer Heimbigner engaged in the use of excessive force. She arrived at the scene late in the interaction and simply tried to control Muhaymin's movements while he was on the ground struggling with officers.

### vi.   Officer Ryan Nielsen

Officer Nieslen arrived on the scene during the officers' second struggle with Muhaymin while Muhaymin was on his side. Upon arrival, Officer Nielson helped to get the handcuffs off Muhaymin's hands which were stretched over his head as officers held him on his side. (Doc. 274, Ex. 68.) He then instructed another unidentified officer to step on Muhaymin's wrist "as hard as you can there." (*Id.*) After he helped secure Muhaymin's left arm behind his back in handcuffs, he held Muhaymin's hair, presumably to keep his face from rubbing against the pavement. (*Id.*) He continued to hold Muhaymin's hair until shortly after he vomited. (*Id.*) Phoenix Officers are trained to control a subject's head to

prevent injury in such situations. (*Id.* ¶ 45.) The Court finds that there is not dispute of fact as to Officer Nielsen's actions, and the Court finds that he did not engage in the use of excessive force.

### vii. Sergeant Steven Wong

Sergeant Wong arrived at the scene during the second struggle. When Officer Aker arrived, Sergeant Wong can be seen on Officer Aker's bodycam kneeling next to where the other officers were struggling with Muhaymin. (Doc. 274, Ex. 73 at 23:51.) He appears to simply watch the struggle and any other actions are not clearly ascertainable from the bodycam footage. (*Id.*) Sergeant Wong does not appear to engage much in the struggle. It's unclear from the bodycam footage whether he even ever put his hands on Muhaymin at all. (Doc. 274, Ex. 73 at 23:45-26:15.) The Court finds that there is not dispute as to any material fact and Sergeant Wong did not engage in excessive force.

### viii. Officer Dennis Leroux

Officer Leroux arrived during the second struggle with Muhaymin. Upon arrival, he took the place of Officer Grenier. It is difficult to ascertain Officer Leroux's exact position on Muhaymin from the bodycam footage. However, in an interview afterward, Officer Leroux says that he put his knee on his upper right shoulder blade to keep Muhaymin down as he attempted to bring his arm around back to be handcuffed. (Doc. 274, Ex. 36 at 7.) Her remained there for around 39 seconds before shifting his bodyweight on Muhaymin. (*Id.*, Ex. 73 at 24:45.) It is difficult at that point to tell where Officer Leroux's bodyweight is on Muhaymin. Approximately 38 seconds later, Officer Leroux stood up and offered some general assistance in handcuffing Muhaymin for the next 55 seconds. (*Id.*, Ex. 73 at 26:15.) He stood and completely disengaged just before Muhaymin vomited. (Doc. 274, Ex. 73 at 26:15.) The Court finds that there is a dispute of material fact as to whether Officer Leroux engaged in excessive force. Therefore, summary judgment is not appropriate as to his actions.

### ix. Officer James Clark

Plaintiff's Opposition and Statement of Facts in Support of her Opposition do not

specifically analyze the actions of Officer Clark. However, according to Defendants' cited evidence, Officer Clark responded during the second struggle approximately two minutes before Muhaymin vomited. (Doc. 274 ¶ 41.) While officers attempted to reposition Muhaymin's handcuffs, Officer Clark applied a portion of his body weight with his left knee/shin on Muhaymin's lower back for less than a minute. (*Id.* ¶¶ 44, 54.) Officer Clark assisted another officer in bringing Muhaymin's left arm behind his back and applying the "hobble" restraint. (*Id.* ¶ 53.) The Court finds that there is no dispute of any material fact and Officer Clark did not engage in the use of excessive force.

### x. Officer Kevin McGowan

Officer McGowan arrived at the scene after Muhaymin had been taken down for the second time. (Doc. 292 at 35, ¶ 50(f).) His involvement consisted merely of applying the hobble to Muhaymin's legs. (Doc. 274, Ex. 72.) Accordingly, the Court finds that there is no dispute of any material fact and Officer McGowan did not engage in excessive force.

### 4. Whether the Violations were Clearly Established

### i. Placing Bodyweight on Muhaymin's Neck

Defendants argue that "Plaintiff can point to no violation of 'clearly established law' that occurred. Plaintiff, in response, argues that it is well settled in the Ninth Circuit that "keeping an individual who is in a state of excited delirium restrained with his chest to the ground while applying pressure to his back and ignoring pleas that he cannot breathe" constitutes excessive force under the Fourth Amendment. *Acre v. Blackwell*, 294 F. App'x 259, 261 (9th Cir. 2008) (citing *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056-57 (9th Cir. 2003)); *Drummond*, 343 F.3d at 1056-57 (9th Cir. 2003) ("The officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable."); *Abston v. City of Merced*, 506 F. App'x 650, 653 (9th Cir. 2013) ("It was clearly established that defendants' use of body compression to restrain a prone and bound suspect, who was in no position to offer any meaningful resistance would violated the rule established by *Drummond* nearly five years

- 17 -

earlier, in 2003.").

"The Supreme Court has repeatedly instructed that we examine 'whether the violative nature of particular conduct is clearly established' by controlling precedent, not whether the conduct violates a general principle of law." *Sharp v. Cty. of Orange*, 871 F.3d 901, 910 (9th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 136 S.Ct. 305, 308 (2015)). To achieve that kind of notice, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.* at 911 (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). Defendants argue that, besides *Drummond*, the cases relied upon by Plaintiff are either unpublished, non-binding decisions or a decision from a district court. Additionally, Defendants argue that *Drummond* is factually distinguishable from this case.

In *Drummond*, officers responded to a call at a 7-Eleven parking lot where a man was hallucinating and in an agitated state as a result of his failure to take his medication for schizophrenia. *Drummond*, 343 F.3d at 1054. The three officers decided to take him into custody "for his own safety." *Id.* The officers took Drummond to the ground and handcuffed him with Drummond laying on his stomach. *Id.* Although he offered no resistance, one of the officers put his knee on Drummond's back and placed the weight of his body on him. *Id.* Relevant to the case at issue, one of the officers also had a knee on Drummond's neck. *Id.* The officers did not relent even though Drummond mentioned that he was having trouble breathing. *Id.* at 1055-56. Officers were on Drummond for about twenty minutes before Drummond lost consciousness and eventually went into a permanent vegetative state. *Id.* at 1055.

Defendants attempts to distinguish *Drummond* by pointing out that Drummond offered no resistance and that police restrained him for over twenty minutes despite the fact that his hands were cuffed behind his back. However, the Court finds that *Drummond* is sufficiently close factually to the present case for the constitutional violation to be clearly established for qualified immunity purposes. Here, although his hands were now in front of his body, Muhaymin was cuffed when officers took him to the ground a second time.

As in *Drummond*, Muhaymin yelled that he could not breathe at least three times while officers restrained him against the ground with their bodyweight on his torso and neck. His pleas were ignored by the officers. Most importantly, here, Officer Grenier, as in *Drummond*, kneeled on Muhaymin's neck. Although Muhaymin did appear to be putting up some resistance to the officers' attempt to re-handcuff him behind his back, his resistance was merely passive—it did not appear that he was a threat to harm the officers. Lastly, as in *Drummond*, Muhaymin was not being arrested for a serious crime; officers were merely taking him in on a misdemeanor warrant. Accordingly, the Court finds that the law is clearly established that the officers' conduct at issue of applying weight to Muhaymin's neck area while he was in the prone position could constitute excessive force.

### ii. Physically Manhandling

Plaintiff also argues that "physically manhandling" an individual while effecting an arrest is considered excessive force in the Ninth Circuit if the *Graham* factors do not support the use of force. However, Plaintiff has only produced one unpublished Ninth Circuit opinion to support that argument. *See Bushell-McIntyre v. City of San Jose*, 252 F. App'x 810 (9th Cir. 2007). As stated above, Plaintiff bears the burden of showing that there is "controlling" precedent either from the Ninth Circuit or the Supreme Court that shows that the violation of constitutional rights was clearly established. Accordingly, the Court finds that this alleged constitutional violation was not clearly established.

### iii. Leaving a Person Face down in Vomit

Plaintiff next argues that leaving a person facedown in their own vomit is a clearly established violation of an arrestee's constitutional rights. However, Plaintiff cites to only one case from the Eastern District of California to support his argument. *See Gabales v. Cty. of San Joaquin*, No. CIV. S-07-1346LKKDAD, 2009 WL 2923037, at *11 (E.D. Cal. Sept. 4, 2009). Once again, since this precedent is not from the Ninth Circuit or United States Supreme Court, it is not controlling. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a

different case."); *S.B. v. County of San Diego*, 864 F.3d 1010, 1016 (9th Cir. 2017); *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016); *Marsh v. County of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012). Thus, the Court rejects this argument.

### iv.  Shoving a Person's Handcuffed Hands Over their Head

Even if it does not violate clearly established law, the Court finds that shoving a person's handcuffed hands up over his head to the front of his body constitutes a rare case of an "'obvious' instance of constitutional misconduct." *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (quoting *White v. Pauly*,  --- U.S. ---, 137 S.Ct. 548, 552 (2017)) ("[I]n a sufficiently 'obvious' case of constitutional misconduct, we do not require a precise factual analogue in our judicial precedents."); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) ("Of course, in an obvious case, these standards can "clearly establish" the answer, even without a body of relevant case law.") Here, although Plaintiff has identified no case showing that pushing a person's handcuffed hands from behind his or her back up over his or her head to the front of his or her body is a clearly established constitutional violation, the Court finds that it is an obvious constitutional violation in light of the *Graham* factors. Examining the *Graham* factors, while giving Plaintiff's version of the facts the benefit of the doubt, (1) the crime at issue was an arrest for a misdemeanor warrant and therefore was not severe; (2) Muhaymin was handcuffed and posed virtually no threat to the safety of officers when his arms were lifted up and over his head to the front of his body; and (3) Muhaymin seemed to be mostly cooperative with officers at the time when his hands were lifted over his head due to the fact that his hands were cuffed behind his back with multiple officers around him. Thus, if the officers did indeed force Muhaymin's hands up and over his head, the Court finds that this is a rare case where a constitutional violation is so obvious that it need not be clearly established by existing precedent. Accordingly, there is a question of fact as to whether this act constituted excessive force.

### 5.  Qualified Immunity Conclusion

The Court finds that Officers Grenier, Hobel, Canilao, and Leroux are not entitled

to qualified immunity because there is a question of fact as to whether they engaged in excessive force. The evidence shows that officers engaged in acts that may have constituted unreasonable force under the Fourth Amendment by forcing Muhaymin's double-handcuffed hands up and over his head to the front of his body and by putting bodyweight on his back, shoulders, and neck while he was on his side and in the prone position despite the fact that he stated he could not breathe on at least three occasions. The remaining officers are entitled to qualified immunity on this claim.

### B. Plaintiff's Failure to Intervene Claim

Defendants argue that Plaintiff's failure to intervene claim fails as a matter of law because the arrest was not unjustifiable and excessive force was not utilized. Plaintiff argues that, "Defendants' argument for dismissal on Plaintiff's failure to intervene claims rests entirely on their erroneous conclusion that the offending officers did not use excessive or unreasonable force in attempting to effect Muhaymin's arrest." (Resp. at 30.) Plaintiff further argues that Defendants have not argued that the officers did not have a reasonable opportunity to intervene, and thus, their failure to intervene claim must survive summary judgment. The Court agrees with Plaintiff.

"'Police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen.'" *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447, n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81, 116 S.Ct. 2035 (1996)). It is clearly established that it violates the Fourth Amendment for a police officer not to intercede to prevent another officer from using excessive force if an officer has a reasonable opportunity to do so. *Fernandez v. Virgillo*, No. 2:12-CV-02475 JWS, 2014 WL 2930749, at *6 (D. Ariz. June 30, 2014), *aff'd*, 651 F. App'x 692 (9th Cir. 2016) ("If an officer merely stands by without trying to assist the victim, that officer may be held liable as a tacit collaborator."). However, the officer must have had an opportunity to intercede. *Cunningham*, 229 F.3d at 1289.

Plaintiff's failure to intervene claim will survive summary judgment. Defendants

have only argued that Plaintiff's failure to intervene claim fails because no excessive force was used. However, the Court has decided to the contrary and that there is a dispute of fact as to some of the officers' actions. Since the Court denied summary judgment finding that there is a question of fact as to whether excessive force was utilized during the arrest, Defendants' request for summary judgment on this claim must fail.

### C. Plaintiff's ADA Claim

Defendants argue that summary judgment is appropriate for Plaintiff's Americans with Disabilities Act ("ADA") claim because there is no evidence that Muhaymin was disabled under the ADA or that Chiquita was a service dog. Further, Defendants argue that even if Chiquita was a service animal, Chiquita was required to be on a leash and the handler must have effective control of the animal. Under federal ADA regulations, service animal means:

> any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. . . The crime deterrent effects of an animal's presence and the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition.

28 C.F.R. § 36.104.

Here, the record is devoid of any evidence from which a reasonable jury could conclude that Chiquita was a service animal. Specifically, Plaintiff must present evidence that Chiquita was trained to do work or preform tasks for the benefit of Muhaymin's disability. Plaintiff has presented no evidence that Chiquita was trained. Instead, Plaintiff points only to conclusory statements made by Muhaymin shortly before his arrest that Chiquita was his service dog, that she was "disciplined," and various statements from his mental health records indicating that Chiquita helped him mentally. (Doc. 292 ¶ 3.) Plaintiffs have failed to meet their burden of showing some evidence that Chiquita was trained as a service animal. Even if they had, a public entity can ask a service animal to be taken off the premise if it is not under the control of the handler. 28 C.F.R. § 35.136(b).

Defendant Tarango testified during this deposition that the dog was walking freely in the center. (Doc. 274, Ex. 3 at 27.) Although police footage shows Chiquita in Muhaymin's arms when they arrived, Mr. Tarango's testimony shows that Chiquita was not controlled when Muhaymin entered the center. Accordingly, summary judgment for the Defendants is appropriate for Plaintiff's ADA claim. Likewise, summary judgment is appropriate for Plaintiff's Arizona Civil Rights Act claim because that statute only requires compliance with the ADA. *See* A.R.S. § 41-1492.01(A) (requiring public entities to conform to the ADA).

### D. Supplemental Jurisdiction over Plaintiff's State Law Claims

Defendants next argue that if the Court grants summary judgment on Plaintiff's § 1983 and ADA claims, then the Court can use its discretion not to grant supplemental jurisdiction over Plaintiff's state law claims. (Doc. 273 at 30.) "Under 28 U.S.C. § 1367(c)(3), a district court has discretion to elect not to exercise supplemental jurisdiction over state claims if it has dismissed the federal claims over which it had original jurisdiction." *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1189 (9th Cir. 2001) (citing *Voigt v. Savell*, 70 F.3d 1552, 1565 (9th Cir. 1995)). However, as explained above, the Court has determined that not all the Phoenix officers are entitled to qualified immunity on Plaintiff's § 1983 claims. Additionally, Plaintiff's failure to intervene claim survives summary judgment. Therefore, Defendants' request that the Court refuse to exercise supplemental jurisdiction over Plaintiff's state law claims is denied.

### E. Officers' Liability under Arizona Law

#### 1. Phoenix Officers Immunity under Arizona Law

##### i. A.R.S. § 13-409

Defendants contend that the Phoenix officers are immune from liability under Arizona law. Under A.R.S. § 13-409:

> A person is justified in threatening or using physical force against another if in making or assisting in making an arrest or detention or in preventing or assisting in preventing the escape after arrest or detention of that person, such person uses or threatens to use physical force and all of the following exist:

- 23 -

1

2    1. A reasonable person would believe that such force is immediately
         necessary to effect the arrest or detention or prevent the escape.
3

4    2. Such person makes known the purpose of the arrest or detention or
         believes that it is otherwise known or cannot reasonably be made known
5        to the person to be arrested or detained.

6
     3. A reasonable person would believe the arrest or detention to be lawful.
7

8    A.R.S. § 13-409. "No person in this state shall be subject to civil liability for engaging in

9    conduct otherwise justified pursuant to the provisions of this chapter." A.R.S. § 13-413.

10   "Importantly, although the use of force can be justified at its commencement, it loses legal

11   justification at the point the force becomes unnecessary." *Ryan v. Napier*, 425 P.3d 230,

12   239 (Ariz. 2018).

13       The Court finds that the Arizona immunity statute is not applicable in the current

14   case. Specifically, the statute requires a reasonable person to believe that "such force is

15   immediately necessary to effect the arrest or detention or prevent the escape." A.R.S. § 13-

16   409(1). For the acts that the Court has identified as potential excessive force under the

17   Fourth Amendment, the Court does not believe that a reasonable person would believe that

18   such force is necessary to effect the arrest or detention of Muhaymin. Further, as *Ryan v.

19   Napier* makes clear, even if the use of force is justified at its commencement, officers lose

20   the justification at the point the force becomes unnecessary. 425 P.3d at 239. Here, a jury

21   could find the force became unnecessary when officers lifted Muhaymin's arms up and

22   over his head and when officers applied bodyweight to Muhaymin's neck area for a

23   prolonged amount of time despite the fact that Muhaymin was only offering passive

24   resistance and complaining that he could not breathe. Thus, Arizona's immunity statute is

25   not applicable in this case and the Court denies Defendants' request for summary judgment

26   on this point.

27       ii.   **A.R.S. § 12-716**

28       Next Defendants argue that the officers' conduct was justified under A.R.S. § 12-

716. That statute states:

    A. If the court finds by a preponderance of the evidence that a plaintiff is harmed while the plaintiff is attempting to commit, committing or fleeing after having committed or attempted to commit a felony criminal act or if a person intentionally or knowingly caused temporary but substantial disfigurement or temporary but substantial impairment of any body organ or part or a fracture of any body part of another person, the following presumptions apply to any civil liability action or claim:

    1. A victim or peace officer is presumed to be acting reasonably if the victim or peace officer threatens to use or uses physical force or deadly physical force or a police tool product to either:

    (a) Protect himself or another person's use or attempted use of physical force or deadly force.
    (b) Effect an arrest or prevent or assist in preventing plaintiff's escape.

A.R.S. § 12-716(A). Defendants argue that this statute applies because Muhaymin was engaged in the commission of a felony by resisting arrest and was intoxicated on drugs with over five times the fatal level of methamphetamine in his system at the time of his arrest.

    Under A.R.S. § 13-2508, resisting arrest is a class 6 felony in Arizona if a person prevents a peace officer from effecting an arrest by "[u]sing or threatening to use physical force against the peace officer or another." A.R.S. § 13-2508(A)(1), (B). If the person merely prevents the officer from effecting an arrest using "passive resistance", then the resistance constitutes class 1 misdemeanor. A.R.S. § 13-2508(B). The statute defines "passive resistance" as "a nonviolent physical act or failure to act that is intended to impede, hinder or delay the effecting of an arrest." A.R.S. § 13-2508(C). Here, Muhaymin's resistant falls under the definition of passive resistance when viewing the evidence in the light most favorable to the non-moving party. Multiple officers described Muhaymin's resistance as passive. Further, when viewing the bodycam footage, Muhaymin never threatens to use force against the officers or attempts to use physical force. Instead, he simply resisted arrest by tensing his body to prevent the officers from

handcuffing him. The Court finds that this constituted a "non-violent physical act or failure to act." Accordingly, his resisting arrest constituted a misdemeanor offense, not a felony.

Similarly, the fact that Muhaymin was intoxicated with methamphetamine upon his death also does not constitute a felony offense. In Arizona, the possession or use of a dangerous drug is a class 4 felony. A.R.S. § 13-3407(A)(1), (B)(1). Here, there is no evidence that Muhaymin possessed methamphetamine on his person when he was being arrested. The evidence only suggests that he used methamphetamine at some time before he was arrested. Based on these facts, the Court finds that Defendants have not shown by a preponderance of the evidence that Muhaymin was in the process of using methamphetamine or fleeing after having used it. It is unclear from the evidence presented when Muhaymin used the methamphetamine. Although Defendants suggest that he used methamphetamine while in the bathroom of the community center, he could just have easily used it a few hours earlier. Regardless, he was not using it during his arrest. Therefore, the Court finds that A.R.S. § 12-716 is not applicable here because there is no evidence that Muhaymin committed a felony during the arrest.

## 2. Plaintiff's Negligence Claims

Defendants argue that Plaintiff's negligence claims[7] fail because Arizona does not recognize claims for negligent use of intentionally inflicted force. Defendants rely on the Arizona Supreme Court's decision in *Ryan v. Napier* for this argument. 425 P.3d 230 (Ariz. 2018). As such, Defendants argue that Plaintiff cannot simultaneously claim that the Phoenix Officers' use of force was both intentional and negligent, and Plaintiff's claims for negligence fail as a matter of law. Plaintiff contends that Defendants misconstrue *Ryan*, and that she is allowed to present multiple theories of liability under the decision.

In *Ryan*, the Arizona Supreme Court concluded that "negligence and intent are mutually exclusive grounds for liability." 425 P.3d at 236. Therefore, the court found that there is no such thing as negligent use of intentionally inflicted force. *Id.* However, the

---

[7] Plaintiff's negligence claims are Count XI (Negligence), Count XII (Gross Negligence), Count XIV (Negligent Hiring, Supervision, and/or Training), and Count X (Negligent Infliction of Emotional Distress).

court ruled that plaintiffs could "plead a negligence claim for conduct that is independent of the intentional use of force or plead negligence and battery as alternate theories if the evidence supports each theory." *Id.* at 238. Since the evidence showed that the police officer's actions in *Ryan* were intentional, the officer could not be liable for negligence. *Id.*

Here, Plaintiff's negligence claims are not supported by the evidence. Although Plaintiff is entitled to plead the alternative theory of liability of negligence under *Ryan*, they are only able to do so if the evidence supports a theory of negligence. The evidence plainly does not support Plaintiff's negligence claims. Plaintiff can point to no evidence on which a negligence claim can rest. Further, after viewing the evidence in the light most favorable to the Plaintiff, there are no facts on which negligence claims can rest. All the officers' acts were intentional, and there appear to be no independent facts on which the negligence claims can be based. Accordingly, the Court will grant Defendants' request for summary judgment as to Plaintiff's negligence claims. Thus, the Court grants summary judgment on Plaintiff's negligence and gross negligence claims.[8]

Plaintiff's claim for negligent hiring, supervision, retention, and/or training against the City of Phoenix is based on different facts warranting a separate discussion. "In order for the employer to be held liable for negligent hiring, retention or supervision, the employee must have committed a tort." *Mulhern v. City of Scottsdale*, 799 P.2d 15, 18 (Ariz. Ct. App. 1990). Thus, in *Mulhern*, since the theory of the employee's underlying negligence failed, the court found that the employer was not negligent in hiring or retaining the employee as a matter of law. *Id*. Here, there is a question of fact as to whether the Defendant officers committed torts. Not only are Plaintiff's § 1983 excessive force claims surviving summary judgment, but Plaintiff's wrongful death claim based on battery against the Phoenix officers survives as well. Defendants have not advanced any other arguments why Plaintiff's claim for negligent hiring, supervision, retention, and/or training fails. Thus, there is still a question of fact as to whether the Defendant officers have committed

---

[8] Plaintiff's claim for negligent infliction of emotional distress will be discussed in the next subsection.

a tort, and Plaintiff's claim against the City of Phoenix will survive summary judgment. Accordingly, Defendants' request for summary judgment is denied for Plaintiff's claim for negligent hiring, supervision, retention, and/or training.

### 3. Plaintiff's Infliction of Emotional Distress Claims

Defendants next argue that Plaintiff's Intentional and Negligent Infliction of Emotional Distress claims both fail as a matter of law because Plaintiff has not shown that she or Muhaymin's children were present when he died. (Mot. at 34-35.) The tort of intentional infliction of emotional distress requires a plaintiff to prove: (1) the conduct by the defendant is "extreme" and "outrageous"; (2) the defendants either intends to cause emotional distress or recklessly disregards the near certainty that such distress will result from the conduct; and (3) severe emotional distress occurs as a result of defendant's conduct. *Mckee v. State*, 388 P.3d 14, 20 ¶ 25 (Ariz. Ct. App. 2016) (citations omitted). "For one to recover for intentional infliction of emotional distress arising from death or injury to a family member, the plaintiff must allege she was present at the time of the extreme and outrageous conduct." *Id.* (citing Restatement (Second) of Torts § 46(2) & cmt. l). Likewise, "[n]egligent infliction of emotional distress requires that the plaintiff witness an injury to a closely related person, suffer mental anguish that manifests itself as a physical injury, and be within the zone of danger so as to be subject to an unreasonable risk of bodily harm created by the defendant." *Villareal v. State Dep't of Transp.*, 774 P.2d 213, 221 (Ariz. 1989) (citations omitted).

Here, there is no evidence that Plaintiff or Muhaymin's children were at the scene when Muhaymin was arrested and eventually died. Thus, Plaintiff's claims for intentional and negligent infliction of emotional distress fail under Arizona law. Accordingly, the Court will grant Defendants' motion for summary judgment for the intentional infliction of emotional distress and negligent infliction of emotional distress claims.

### 4. Compensatory Damages

Defendants argue, "Plaintiff has presented no evidence to support an award of compensatory damages." (Mot. at 35.) Specifically, Defendants argue that Muhaymin's

children, the statutory beneficiaries in this case, have not shown that they are entitled to compensatory damages due to their inconsistent relationship with their father. Defendants contend, "Any emotional harm suffered by Muhaymin's children occurred long before Muhaymin's death as a result of their father's absence – which was a direct consequence of his choices and lifestyle." (Mot. at 38.) Plaintiff contends that there is sufficient evidence in the record to support compensatory damages for Muhaymin's two children.

"A wrongful death action must 'be brought by and in the name of the surviving husband or wife, child, parent or guardian, or personal representative of the deceased person for and on behalf of the surviving husband or wife, children or parents, or if none of these survive, on behalf of the decedent's estate.'" *Est. of Decamacho ex rel. Guthrie v. La Solana Care & Rehab, Inc.*, 316 P.3d 607, 613 ¶ 24 (Ariz. Ct. App. 2014) (citing A.R.S. § 12-612(A)). "The damages that may be recovered are the beneficiaries', not the decedent's." *Duenas v. Life Care Centers of Am., Inc.*, 336 P.3d 763, 771 (Ariz. Ct. App. 2014) (citing *Est. of Decamacho*, 316 P.3d at 613). The amount recovered is distributed to those parties in proportion to their damages. *Id.* (citing A.R.S. § 12-612(C)). "The potential damages include the loss of love, affection, companionship, consortium, personal anguish and suffering." *Id.* (quoting *Vasquez v. State*, 206 P.3d 753, 759 (Ariz. Ct. App. 2008) (internal quotation marks omitted)).

The Court finds that there is sufficient evidence of damages for both of Muhaymin's children. AM (Muhaymin's daughter) was 10 years old when her father died. (Doc. 292, Ex. S at 34:24-25.) AM visited her father at a park two days before his death for four hours. (*Id.* at 24:18-29.) Although AM testified that she felt "[h]appy" during the visit with her father shortly before his death, she testified that she became depressed, started cutting herself, and tried to commit suicide after learning of her father's death. (*Id.* at 36:5-12.) She also testified that she went to the hospital for about three weeks due to depression, anxiety, and self-harm issues. (*Id.* at 36:22-37:1.) AM testified that she never had issues with self-harm before learning of her father's death. (*Id.* at 37:2-4.) AM is still in treatment with a therapist due to the issues. (*Id.* at 40:8-17.) The Court finds that this constitutes

sufficient evidence of personal anguish and suffering for AM due to her father's death.

Likewise, there is sufficient evidence of damages for Muhaymin's son, Muhammed. During his deposition, Muhammed testified that he had not seen his dad in a number of years. (Doc. 292, Ex. T at 56:19-21.) However, he also testified about his desire to have more time with his father. (*Id.* at 91:8-18.) He also testified that he was "traumatized" after the funeral and that he was traumatized by the fact that he could watch footage of his father's death online. (*Id.* at 96:19-20, 97:5-11.) The evidence is sufficient to constitute a dispute of material fact as to whether damages should be awarded. Specifically, there is evidence in the record that he experienced personal anguish and suffering because of his father's death. Accordingly, the Court will allow the jury to weigh the evidence and determine whether compensatory damages should be awarded for both of Muhaymin's children.

### 5. Punitive Damages

Defendants argue that Plaintiff cannot be awarded punitive damages for a few reasons. First, Defendants ask the Court to deny Plaintiff's punitive damages request because it is not adequately pled. (Mot. at 38.) Specifically, Defendants argue that it is unclear in the Amended Complaint whether Defendants are asking for punitive damages for their state or federal claims. Next, Defendants argue that they are immune from punitive damages claims under A.R.S. § 12-820.04 because the officers were acting within the scope of their employment when arresting Muhaymin. Lastly, Defendants argue that Plaintiff is not entitled to damages on her federal claims because there is no evidence that the Defendant officers acted with an evil motive or intent or a reckless or callous indifference to the constitutional rights of others. Plaintiff seems to concede that she is not entitled to punitive damages for her state claim but argues that she is entitled to such damages under federal law.

To start, Defendants' argument that Plaintiff has inadequately pled its punitive damages claim must be rejected. The failure to state a claim in a complaint is plainly not a motion for summary judgment issue. *See In re Apple iPhone Antitrust Litig.*, 846 F.3d 313,

318-19 (9th Cir. 2017), *aff'd sub nom. Apple Inc. v. Pepper*, 139 S.Ct. 1514 (2019) (finding that under Rule 12(g)(2) and Rule 12(h)(2), a party may raise 12(b)(6) defenses after filing a motion to dismiss in a late-filed 12(b)(6) motion, in any pleading allowed under Rule 7(a), in a Rule 12(c) motion, or at trial). Even if Defendants had properly raised the defense, it is fairly clear from the pleadings that Plaintiff requested punitive damages for both its state and federal claims.[9] Accordingly, the Court rejects this argument and will construe Plaintiff's pleading as requesting punitive damages for both its state and federal claims.[10]

Likewise, the jury should be allowed to consider punitive damages for Plaintiff's § 1983 claims. "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Viewing the evidence in the light most favorable to the Plaintiff, there is some evidence that officers Grenier, Hobel, Canilao, and Leroux acted with a callous or reckless indifference to Muhaymin's constitutional rights. Specifically, there is evidence that these officers lifted Muhaymin's handcuffed hands and arms from behind his back, over his head, and to the front of his body and applied bodyweight to his neck for an extended period. Accordingly, the Court will allow the jury to consider Plaintiff's punitive damages claims only against officers Grenier, Hobel, Canilao, and Leroux. Thus, punitive damages will only be available if the jury finds liability on Plaintiff's federal claims.

### F. Vicarious Liability

Defendants argue that the *respondeat superior* claims against the City of Phoenix

---

[9] The prayer for relief section of Plaintiff's Amended Complaint states that Plaintiff is demanding a judgment against Defendants for "violations of MUHAYMIN'S Constitutional and statutory rights." (Doc. 16 at 24.) Below this heading, Plaintiff demands "punitive damages against the individual Defendants in an amount to be determined at trial." (*Id.*)

[10] As the Court noted in its previous paragraph, Plaintiff seems to concede that punitive damages are not allowed for her state law claims under A.R.S. § 12-820.04. Thus, the Court will not address that issue.

fail because the City of Phoenix cannot be held vicariously liable under Plaintiff's federal § 1983 claims. Further, Defendants argue that Plaintiff's remaining state law claims against the City of Phoenix fail because the officers are not liable for the underlying torts. In response, Plaintiff argues, "Plaintiff's state law claims against the individual Defendants survive summary judgment, therefore, Plaintiff's state law claims against the City of Phoenix likewise survive summary judgment."

"There is no respondeat superior liability under section 1983." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680-81 (9th Cir. 1984)); *Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001). A plaintiff may establish municipal liability by demonstrating "(1) the constitutional tort was the result of a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity;' (2) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (3) an official with final policy-making authority 'delegated that authority to, or ratified the decision of, a subordinate.'" *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (quoting *Ulrich v. County of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002)).

The Court agrees that the City of Phoenix cannot be held vicariously liable for Plaintiff's § 1983 claims because Plaintiff has not alleged any *Monell* claims as outlined by Ninth Circuit caselaw.[11] However, Plaintiff's state law claims for battery and for negligent hiring, supervision, retention, and/or training survive summary judgment. Therefore, the City of Phoenix must remain a defendant in this case only as to the state law claims.

## V.    CONCLUSION

Defendants' Motion for Summary Judgment is granted in part and denied in part as outlined above. Summary judgment is granted as to Plaintiff's Excessive Force claims

---

[11] Although Plaintiff previously filed a Motion for Leave to File a Seconded Amended Complaint, the Court denied that motion. (Doc. 301.)

under § 1983 survive except the claims against Defendants Grenier, Hobel, Canilao, and Leroux. Summary judgment is granted on Plaintiff's claims under the ADA and Arizona Civil Rights Act. Summary judgment is also granted on Plaintiff's claims for intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, and gross negligence. Plaintiff's remaining claims survive summary judgment.

Accordingly,

**IT IS ORDERED** granting in part and denying in part Defendants' Motion for Summary Judgment, (Doc. 273), as explained above.

**IT IS FURTHER ORDERED** that the Clerk of Court file this order under seal.

Dated this 31st day of August, 2021.

Honorable Susan M. Brnovich
United States District Judge

cc: All counsel