LODGED
PROPOSED
Doc. 274
(redacted)

Daniel J. O'Connor, Jr., Bar No. 010081
Karen J. Stillwell, Bar No. 022711
Travis B. Hill, Bar No. 021133
**O'CONNOR & DYET, P.C.**
7955 South Priest Drive
Tempe, Arizona 85284
daniel.oconnor@occlaw.com
karen.stillwell@occlaw.com
travis.hill@occlaw.com
(602) 241-7000

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mussalina Muhaymin as Personal Representative of the Estate of Muhammad Abdul Muhaymin Jr., | Case No.: 17-cv-04565-PHX-SMB |
| Plaintiff, | **DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| City of Phoenix, an Arizona Municipal Corporation; Antonio Tarango; Officer Oswald Grenier; Officer Kevin McGowan; Officer Jason Hobe; Officer Ronaldo Canilao; Officer David Head; Officer Susan Heimbinger; Officer James Clark; Officer Dennis Lerous; Officer Ryan Nielson; Officer Steven Wong; and Doe Supervisors 1-5, | **(TO BE FILED UNDER SEAL)** **Oral Argument Requested** Assigned to the Honorable Susan B. Brnovich |
| Defendants. | |

Pursuant to Rule 56, Federal Rules of Civil Procedure, Defendants City of Phoenix

("City of Phoenix"), Antonio Tarango ("Tarango"), Officer Oswald Grenier, Officer Kevin

McGowan, Officer Jason Hobel, Officer Ronaldo Canilao, Officer David Head, Officer

Susan Heimbigner, Officer James Clark, Officer Dennis Leroux, Officer Ryan Nielsen and Sergeant Steven Wong ("Phoenix Defendants" or "Phoenix Officers"), submit the following Statement of Facts ("SOF") in support of their Motion for Summary Judgment.

## DEFENDANTS' SEPARATE STATEMENT OF FACTS

1.      On January 4, 2017, Muhammad Muhaymin ("Muhaymin"), entered the Maryvale Community Center ("Center") in Phoenix, Arizona. (**Exhibit 1, Recorded Interview of Antonio Tarango dated January 4, 2017**, pp. 12-13, ll. 18-3.  **Exhibit 2, Recorded Interview of Hannah Glemba dated January 4, 2017**, pp. 4-5, ll. 14-1).

2.      Muhaymin had a Chihuahua dog with him named "Chiquita," which was unleashed and not under his control.  (**Exhibit 1,** p. 13, ll. 17-18; and p. 16, ll. 14-16. **Exhibit 2,** p. 5, ll. 3-4.  **Exhibit 3, Deposition of Antonio Tarango,** p. 27, ll. 5-10; and pp. 109-110, ll. 18-6. **Exhibit 5, Interview of Hannah Glemba dated February 16, 2017,** at COP 011522.  **Exhibit 6, Incident Report prepared by Antonio Tarango,** at COP 011239. **Exhibit 8, Written Statement of Hannah Glemba dated January 4, 2017,** at COP 011521. **Exhibit 9, Notice of Inquiry and Response of Antonio Tarango,** at COP 011511-011512. **Exhibit 61, portion of video from exterior of Maryvale Community Center**).

3.      Arizona Law requires all dogs over the age of three months to be licensed and vaccinated against rabies.  (**Exhibit 10, ARS § 11-1008, and ARS § 11-1010**).

4.       Chiquita was not licensed and records from Maricopa County Animal Care and Control show no animals registered to Muhaymin. (**Exhibit 11, Correspondence from Maricopa County Animal Care and Control**).

5.      Muhaymin brought Chiquita unleashed to the Center before and, on those occasions, Chiquita was aggressive, uncontrolled, and even attempted to bite staff members. (**Exhibit 1,** p. 4, ll. 9-11; and p. 14, ll. 4-15.  **Exhibit 2,** p. 5, ll. 4-7.  **Exhibit 3,** p. 110, ll. 7-23.  **Exhibit 6,** at COP 011239-011241.  **Exhibit 8,** at COP 011521. **Exhibit**

**9,** at ¶5, 7, 8 and 9 of COP 011511 and 011512. **Exhibit 12, Written Statement of Hannah Glemba,** at COP 011520. **Exhibit 63, Body Camera Video "BCV" from Officer Jason Hobel,[1]** at 7:06-7:44).

6.    When Muhaymin and his dog entered the Center that morning, Tarango, the Center manager, told Muhaymin that he could use the restroom if he left the dog outside. (**Exhibit 1,** pp. 18-19, ll. 20-3.  **Exhibit 3,** p. 27, ll. 9-24. **Exhibit 5,** at COP 011522. **Exhibit 6,** at COP 011239-012240.  **Exhibit 8,** at COP 011521.  **Exhibit 9,** at ¶1 and 9 of COP 011511 and 011512. **Exhibit 63,** at 5:20-6:26).

7.    Tarango had previous interactions with Muhaymin where Muhaymin threatened physical harm. (**Exhibit 1,** pp. 3-5, ll. 19-4.  **Exhibit 3,** pp. 37-39, ll. 12-10; and pp. 111-112, ll. 19-18. **Exhibit 6,** at COP 011239-012241.  **Exhibit 9,** at ¶6 and 7 of COP 011511 and 011512. **Exhibit 12,** at COP 011520).

8.    Tarango and Muhaymin argued about the dog as Muhaymin tried to force his way past Tarango toward the restroom and Muhaymin made physical contact with Tarango. (**Exhibit 1,** pp. 17-18, ll. 9-13.  **Exhibit 2,** p. 8, ll. 17-23.  **Exhibit 6,** at COP 011239-011240. **Exhibit 8,** at COP 011521).

9.    Tarango directed an employee, Hannah Glemba, to call the police. (**Exhibit 3,** pp. 36-37, ll. 25-6, and p. 111, ll. 4-17. **Exhibit 8,** at COP 011521).

10.    The Phoenix Officers responded to the call identified as an assault at the Center.  Ms. Glemba called 911 and reported that Muhaymin had pushed Tarango. The call was dispatched as an assault. When asked by the officers at the scene, and later by Plaintiff's counsel in this case, if he was "assaulted," Tarango explained that it was a "bump." (**Exhibit 1,** pp. 17-18, ll. 9-13; and p. 39, ll. 1-21.  **Exhibit 3,** pp. 33-34, ll. 15-1;

---

[1] There are 13 body camera videos related to this incident.  The 13 body cameras, in their entirety, are included as Exhibits 61-74 for the Court's consideration. However, specific time references are also provided for the Court's convenience.

pp. 36-37, ll. 25-10; pp. 57-58, ll. 1-25; pp. 64, ll. 6-24; pp. 66-67, ll. 17-7; and p. 114, ll. 1-9.  **Exhibit 4, Deposition of Officer Jason Hobel,** p. 28, ll. 18-25; p. 31, ll. 3-11; p. 35, ll. 2-10; and p. 133, ll. 11-18. **Exhibit 6,** at COP 011239-011240.  **Exhibit 8,** at COP 011521. **Exhibit 9,** at ¶10 of COP 011511-011513. **Exhibit 14, Deposition of Officer Oswald Grenier,** p. 11, ll. 8-16; and p. 117, ll. 2-9. **Exhibit 16, Recorded Interview of Officer Oswald Grenier dated January 4, 2017,** p. 3, ll. 4-12. **Exhibit 62, BCV from Officer Oswald Grenier,** at 1:00-2:24, 7:34-9:54, and 16:10-16:25. **Exhibit 63,** at 5:05-6:26 and 9:25-9:36).

11.    Immediately before the Phoenix Officers arrived, Muhaymin picked up the dog and was holding Chiquita in his arms.  (**Exhibit 13, Interview of Antonio Tarango dated February 7, 2017,** at COP 011516).

12.    Officer Grenier, Officer Hobel, Officer Canilao and Officer Head, began arriving at 9:32 a.m. (**Exhibit 2,** pp. 11-12, ll. 7-7. **Exhibit 14,** p. 10, ll. 4-8; and pp. 116-117, ll. 1-1).

13.    The officers and Tarango agreed to permit Muhaymin to use the restroom, provided that Muhaymin held his dog. (**Exhibit 6,** at COP 011240.  **Exhibit 9,** at ¶11 of COP 011511-011513. **Exhibit 13,** at COP 011516. **Exhibit 14,** p. 117, ll. 10-15. **Exhibit 62,** at 10:16-11:45).

14.    Before entering the restroom, Muhaymin gave his identification information to the officers.  (**Exhibit 4,** p. 35, ll. 2-10. **Exhibit 7, Recorded Interview of Officer Jason Hobel dated January 11, 2017,** pp. 17-18, ll. 13-9. **Exhibit 17, Recorded Interview of Officer Oswald Grenier dated January 11, 2017,** p. 21, ll. 18-20. **Exhibit 62,** at 10:16-11:45).

15.    While he was in the restroom for over six (6) minutes, the officers discovered Muhaymin had an outstanding misdemeanor warrant. (**Exhibit 7,** pp. 11-12, ll. 18-3. **Exhibit 14,** p. 29, ll. 16-25. **Exhibit 22, Recorded Interview of Officer David Head**

**dated January 11, 2017,** p. 12, ll. 17-19. **Exhibit 24, Recorded Interview of Officer Ronaldo Canilao dated January 11, 2017,** p. 13, ll. 10-13. **Exhibit 62,** at 11:45-16:24).

16.    Absent exceptional circumstances, the Phoenix Officers were required to arrest Muhaymin on the warrant. (**Exhibit 4,** p. 135, ll. 7-23).

17.    Plaintiff's expert, Scott DeFoe, testified that the Phoenix Officers had a lawful right to take Muhaymin into custody, and that the Phoenix Officers were, in fact, detaining Muhaymin for the warrant. (**Exhibit 47, Deposition of Scott DeFoe,** p. 147, ll. 4-6; p. 147, ll. 13-16; p. 161, ll. 4-11; and p. 161, ll. 15-23).

18.    While Muhaymin was in the restroom, the officers discussed how to care for the dog and transport Muhaymin for the warrant. (**Exhibit 62,** at 15:01-16:00; **Exhibit 63,** at 8:08-9:05).

19.    When Muhaymin exited the restroom, the Phoenix Officers walked with him outside the Center.  Once outside, Officer Grenier and Officer Canilao informed Muhaymin about the warrant and advised him he was under arrest.  (**Exhibit 4,** p. 43, ll. 2-10; and p. 109, ll. 22-25.  **Exhibit 14,** p. 33, ll. 4-9; p. 38, ll. 14-25; p. 108, ll. 4-9; and pp. 108-109, ll. 21-3. **Exhibit 22,** pp. 23-24, ll. 22-1. **Exhibit 23, Deposition of Officer David Head,** pp. 37-38, ll. 14-1. **Exhibit 24,** pp. 27-28, ll. 2-6. **Exhibit 62,** at 17:55-18:50. **Exhibit 63,** at 11:00-12:00. **Exhibit 65, BCV from Officer Ronaldo Canilao,** at 8:48-9:42. **Exhibit 66, BCV from Officer David Head,** at 11:00-11:57).

20.    Officer Ronaldo Canilao is crisis intervention trained ("CIT"), which means he has training on identifying and interacting with individuals with mental health concerns. Officer Canilao testified he did not know Muhaymin had any mental health concerns. (**Exhibit 14,** p. 122, ll. 4-21. **Exhibit 20, Deposition of Officer Ronaldo Canilao,** p. 43, ll. 7-15; pp. 115-116, ll. 17-22; and pp. 125-126, ll. 24-8. **Exhibit 23,** p. 78, ll. 8-24. **Exhibit 24,** p. 15, ll. 2-18; and p. 16, ll. 18-23).

21.     Plaintiff's experts, Dr. Bennet Omalu and Dr. Ali Taqi, testified the body camera videos do not show that Muhaymin was experiencing a mental health crisis; rather, he appears calm, stable and conversed intellectually. (**Exhibit 48, Deposition of Dr. Bennet Omalu,** p. 122, ll. 4-21. **Exhibit 49, Deposition of Dr. Ali Taqi,** p. 118, ll. 5-14).

22.     Muhaymin immediately resisted arrest, refused to put Chiquita down, refused to put his hands behind his back, and told the officers to call his "sensei", i.e., a martial arts instructor.  (**Exhibit 7,** p. 20, ll. 8-16; and p. 26, ll. 13-17.  **Exhibit 14,** p. 128, ll. 21-22. **Exhibit 18, Recorded Interview of Officer Jason Hobel dated January 4, 2017,** p. 17, ll. 2-5. **Exhibit 19, Recorded Interview of Officer Ronaldo Canilao dated January 4, 2017,** p. 18, ll. 4-20; and p. 43, ll. 7-15. **Exhibit 20,** p. 33, ll. 7-24. **Exhibit 22,** p. 24, ll. 3-22; and pp. 38-39, ll. 24-20. **Exhibit 24,** p. 27, ll. 10-24. **Exhibit 62,** at 18:30-19:29. **Exhibit 63,** at 11:50-12:30. **Exhibit 65,** at 9:24-10:00. **Exhibit 66,** at 11:30-12:16).

23.     When the officers heard Muhaymin ask for his "sensei," they grew concerned Muhaymin had martial arts training. (**Exhibit 14,** pp. 128-129, ll. 21-9. **Exhibit 19,** pp. 16-17, ll. 25-6. **Exhibit 24,** pp. 27-28, ll. 23-4).

24.     When Muhaymin expressed concern over Chiquita, the officers told him they would take care of the dog. (**Exhibit 7**, p. 31, ll. 3-6. **Exhibit 62,** at 18:40-18:50. **Exhibit 63,** at 11:55-12:30).

25.     Muhaymin still refused to comply with the officers' orders to put Chiquita down and place his hands behind his back. Instead, he locked his hands together, tensed, and stiffened his body, flailed his extremities, twisted, thrashed back and forth, pulled left and right, squatted and otherwise resisted the arrest, including grabbing onto the officers' hands and squeezing with tremendous strength. (**Exhibit 2,** pp. 13-15, ll. 11-10. **Exhibit 4,** p. 42, ll. 14-16. **Exhibit 7,** pp. 26-27, ll. 13-21.  **Exhibit 14,** pp. 125-126, ll. 2-18. **Exhibit 16,** pp. 14-15, ll. 7-17; and pp. 32-33, ll. 8-12. **Exhibit 18,** p. 15, ll. 7-25. **Exhibit 23,** pp.

35-36, ll. 16-7; and p. 37, ll. 2-3. **Exhibit 24,** pp. 12-13, ll. 12-3. **Exhibit 62,** at 18:30-19:30. **Exhibit 63,** at 11:50-12:58).

26.　　Although he did not punch, kick or strike the officers, Muhaymin was actively and defensively resisting arrest and repeatedly struggled against the officers' efforts to detain him. (**Exhibit 4,** p. 115, ll. 17-23. **Exhibit 19,** pp. 21-22, ll. 19-12; and p. 43, ll. 18-25).

27.　　Muhaymin refused to comply with the officers' orders and continued to resist arrest. The officers placed Muhaymin against a glass wall in an effort to get him to let go of the dog so that his hands could be handcuffed behind his back. (**Exhibit 4,** p. 100, ll. 10-23. **Exhibit 17,** pp. 22-25, ll. 18-2. **Exhibit 18,** pp. 14-15, ll. 15-3. **Exhibit 19,** pp. 18-21, ll. 21-5. **Exhibit 24,** p. 30, ll. 10-18. **Exhibit 63,** at 12:30-12:50. **Exhibit 65,** at 10:05-10:33. **Exhibit 66,** at 12:15-12:47).

28.　　Officer Canilao, with Officer Hobel's assistance, was forced to use a baton under Muhaymin's right arm as leverage to pry his interlocked hands free and to release the dog. (**Exhibit 7,** pp. 20-21, ll. 8-2. **Exhibit 14,** p. 128, ll. 9-15. **Exhibit 17,** pp. 23-24, ll. 16-9. **Exhibit 18,** pp. 14-15, ll. 15-13. **Exhibit 19,** pp. 15-16, ll. 20-25. **Exhibit 20**, pp. 18-24, ll. 4-5. **Exhibit 24,** pp. 28-30, ll. 11-8. **Exhibit 65,** at 9:40-10:30).

29.　　Once the dog was freed, Muhaymin continued to resist and refused to put his hands behind his back, which forced the officers to take him to the ground where he was eventually "double-cuffed," behind his back (i.e., using two sets of handcuffs with one set of handcuffs on each wrist and the two sets linked together in the middle) after a brief struggle that lasted approximately two (2) minutes. The interlocked sets of handcuffs gave Muhaymin an extra eight inches of space between his wrists, which gave him an opportunity to move his arms more freely. (**Exhibit 4,** pp. 48-49, ll. 18-22. **Exhibit 7,** pp. 21-22, ll. 3-12. **Exhibit 14,** pp. 126-127, ll. 11-9. **Exhibit 17,** pp. 33-34, ll. 6-2. **Exhibit 18,** pp. 15-16, ll. 8-19. **Exhibit 22,** pp. 24-26, ll. 3-18. **Exhibit 50, Expert Report of Greg**

**Meyer,** p. 12. **Exhibit 52, Rebuttal Expert Report of Greg Meyer**, pp. 4-5. **Exhibit 64, BCV from Officer Jason Hobel,** at 0:00-1:50. **Exhibit 66,** at 12:00-14:24).

30. During this initial encounter, Officer Grenier delivered one elbow strike to the rear lateral muscle in Muhaymin's left shoulder to release his arms from underneath his body so he could be handcuffed. (**Exhibit 14,** p. 61, ll. 4-23. **Exhibit 17,** p. 28, ll. 13-24).

31. In resisting the detention, Muhaymin displayed incredible strength and it took four officers to finally gain control of Muhaymin and get him into the double-cuffs. (**Exhibit 1,** p. 22, ll. 11-13; p. 22, ll. 17-18; and p. 50, ll. 3-22. **Exhibit 8,** at COP 011521. **Exhibit 14,** pp. 127-128, ll. 8-3; and pp. 131-132, ll. 22-23. **Exhibit 19,** p. 45, ll. 11-25. **Exhibit 22,** pp. 27-28, ll. 9-8. **Exhibit 23,** p. 82, ll. 6-17. **Exhibit 24,** pp. 12-13, ll. 12-1. **Exhibit 25, Recorded Interview of Anthony Williamson dated January 5, 2017,** p. 4, ll. 13-19; p. 8, ll. 9-18; pp. 9-10, ll. 9-4; pp. 10-11, ll. 19-18; p. 15, ll. 19-24; and p. 16, ll. 12-24. **Exhibit 63,** at 11:29-12:58. **Exhibit 64,** at 0:00-1:10. **Exhibit 66,** at 14:55 for the double hand cuffs on Muhaymin).

32. Once Muhaymin was double-cuffed, the officers assisted Muhaymin to his feet and escorted him to a police SUV. (**Exhibit 8,** at COP 011521. **Exhibit 17,** p. 25, ll. 4-23. **Exhibit 64,** at 2:10-3:00).

33. He continued to resist. At one point, Muhaymin refused to walk, and the officers lifted him to his feet to encourage him to walk. (**Exhibit 2,** p. 16, ll. 8-19. **Exhibit 4,** pp. 48-50, ll. 18-16. **Exhibit 7,** pp. 30-31, ll. 1-1. **Exhibit 17,** pp. 34-35, ll. 8-2. **Exhibit 19,** pp. 23-24, ll. 12-24. **Exhibit 22,** p. 29, ll. 1-21. **Exhibit 24,** p. 37, ll. 2-21. **Exhibit 25,** p. 14, ll. 4-10. **Exhibit 26, Recorded Interview of Jimmy Yee dated January 4, 2017,** pp. 9-12, ll. 6-2. **Exhibit 27, Recorded Interview of Juan Lara dated January 4, 2017,** pp. 2-4, ll. 20-3; pp. 8-10, ll. 18-12; and pp. 12-13, ll. 20-3. **Exhibit 64,** at 2:15-2:40. **Exhibit 66,** at 15:25-16:05. **Exhibit 74**, **BCV from Officer Miller,** at 00:00-02:07).

34.     Before placing Muhaymin into the police SUV, the officers attempted to search him for drugs or weapons. (**Exhibit 17,** p. 36, ll. 1-20. **Exhibit 18,** pp. 17-18, ll. 25-9. **Exhibit 20,** pp. 51-52, ll. 9-17. **Exhibit 24,** pp. 37-38; ll. 22-12. **Exhibit 64,** at 2:55-3:03).

35.     Officer Hobel had prior encounters with Muhaymin, including an incident when Muhaymin was in possession of a knife. The dog chased Hobel during an encounter with Muhaymin the month before. (**Exhibit 4,** p. 16, ll. 2-9; and pp. 18-28, ll. 22-17. **Exhibit 63,** at 7:06-7:44 and 9:37-10:00).

36.     While being searched, Muhaymin actively attempted to prevent the officers from searching his back pants pockets. (**Exhibit 4,** p. 112, ll. 8-9. **Exhibit 14,** p. 36, ll. 1-25. **Exhibit 17,** pp. 36-37, ll. 1-20. **Exhibit 24,** pp. 37-38, ll. 22-12).

37.     Muhaymin was obstructing the search, so Officer Hobel slightly raised Muhaymin's arms to allow for the search of his back pockets. (**Exhibit 4,** pp. 52-53, ll. 7-17; and p. 112, ll. 8-24. **Exhibit 19,** p. 26, ll. 11-14. **Exhibit 27,** p. 12, ll. 6-19).

38.     During this search, Muhaymin raised his double-cuffed arms, up and over his head, and positioned his cuffed hands in front of his body, which presented a safety concern to the officers. (**Exhibit 4,** pp. 52-53, ll. 7-23; and p. 114, ll. 1-15. **Exhibit 7,** pp. 23-24, ll. 3-4; and pp. 33-36, ll. 21-21. **Exhibit 14,** p. 73, ll. 3-8; and p. 135, ll. 3-12. **Exhibit 17,** pp. 37-38, ll. 22-9. **Exhibit 19,** pp. 26-27, ll. 11-5. **Exhibit 24,** pp. 38-39, ll. 12-14. **Exhibit 64,** at 3:00-3:22. **Exhibit 66,** at 16:10-16:25).

39.     Muhaymin then used his hands to push away from the police SUV and the officers had to take him to the ground a second time. (**Exhibit 4,** pp. 54-55, ll. 6-20. **Exhibit 14,** p. 73, ll. 3-14; and pp. 136-137, ll. 14-8. **Exhibit 16,** pp. 19-20, ll. 19-8. **Exhibit 17,** p. 37, ll. 3-23; and pp. 39-41, ll. 12-16. **Exhibit 19,** pp. 27-28, ll. 6-21. **Exhibit 20,** 55-56, ll. 1-15; and pp. 57-58, ll. 2-12. **Exhibit 22,** pp. 31-32, ll. 19-24. **Exhibit 26,** pp. 10-12, ll. 13-2. **Exhibit 64,** at 3:25-4:27. **Exhibit 66,** at 16:25-17:10).

40.     Muhaymin exhibited extreme strength and resistance to the officers' attempts to secure him.  (**Exhibit 7,** p. 24, ll. 2-23; and pp. 39-40, ll. 18-13. **Exhibit 14,** p. 138, ll. 3-7. **Exhibit 17,** p. 26, ll. 4-11. **Exhibit 19,** p. 30, ll. 9-16; and p. 31, ll. 1-12. **Exhibit 20,** pp. 59-63, ll. 6-22. **Exhibit 21, Recorded Interview of Officer David Head dated January 4, 2017,** pp. 9-10, ll. 5-7. **Exhibit 22,** pp. 45-46, ll. 3-12; p. 46, ll. 20-24; and pp. 47-48, ll. 3-22. **Exhibit 24,** pp. 45-46, ll. 3-3; and p. 60, ll. 5-21. **Exhibit 66,** at 17:15-18:00).

41.     Additional officers were dispatched for assistance and several arrived at the scene while Muhaymin was on his side and on the ground. (**Exhibit 7,** p. 24, ll. 18-23. **Exhibit 14,** pp. 127-128, ll. 12-3; p. 138, ll. 8-18. **Exhibit 20,** pp. 67-68, ll. 11-11; p. 69, ll. 7-19; and pp. 71-72, ll. 25-4. **Exhibit 21,** p. 10, ll. 16-19. **Exhibit 23,** pp. 83-84, ll. 22-7. **Exhibit 28, Recorded Interview of Officer Susan Heimbigner dated January 13, 2017,** pp. 15-16, ll. 2-20. **Exhibit 30, Recorded Interview of Officer Ryan Nielsen dated January 13, 2017,** p. 14, ll. 13-13; p. 18, ll. 3-8; and pp. 20-21, ll. 12-9. **Exhibit 32, Recorded Interview of Officer Susan Heimbigner dated January 4, 2017,** p. 2, ll. 16-24. **Exhibit 33, Recorded Interview of Sgt. Steven Wong dated January 4, 2017,** p. 3, ll. 4-14; pp. 7-8, ll. 17-3; and p. 8, ll. 13-21. **Exhibit 34, Recorded Interview of Sgt. Steven Wong dated January 10, 2017,** pp. 17-18, ll. 24-12. **Exhibit 37, Recorded Interview of Officer Dennis Leroux dated January 12, 2017,** pp. 15-16, ll. 22-18; and p. 21, ll. 10-25. **Exhibit 38, Recorded Interview of Officer James Clark dated January 11, 2017,** p. 25, ll. 3-18; and pp. 27-28, ll. 15-4. **Exhibit 41, Recorded Interview of Officer Kevin McGowan dated January 4, 2017,** p. 2, ll. 11-15; and p. 11, ll. 6-14. **Exhibit 64,** at 7:37-9:14. **Exhibit 66,** at 17:15-18:00. **Exhibit 68, BCV from Officer Ryan Nielsen,** at 0:00-0:32. **Exhibit 73, BCV from Officer Mark Aker,** at 23:47-24:00).

42.     Muhaymin continued to actively resist arrest and flailed his body around, attempted to roll over onto his back, tensed, thrashed, twisted, kicked his legs, pulled,

pushed back against the officers, and showed incredible strength that prevented officers from repositioning his arms and handcuffs behind his back. Most officers described Muhaymin's resistance as "defensive resistance" or "active resistance" and felt he was under the influence of drugs. (**Exhibit 4,** p. 39, ll. 3-15; p. 42, ll. 14-16; p. 57, ll. 2-25; p. 59, ll. 18-21; and pp. 62-64, ll. 19-14. **Exhibit 7,** pp. 45-46, ll. 8-22. **Exhibit 17,** p. 28, ll. 13-24; and p. 50, ll. 3-9. **Exhibit 19,** pp. 40-41, ll. 8-2. **Exhibit 21,** pp. 13-14, ll. 13-19; and p. 16, ll. 14-20. **Exhibit 22,** pp. 32-33, ll. 9-7; and p. 33, ll. 15-23. **Exhibit 23,** p. 80, ll. 16-22; and pp. 82-84, ll. 9-7. **Exhibit 27,** pp. 15-16, ll. 11-7. **Exhibit 28,** pp. 21-24, ll. 1-1; pp. 24-25, ll. 15-5; and pp. 45, ll. 13-17. **Exhibit 29, Recorded Interview of Officer Ryan Nielsen dated January 4, 2017,** p. 8, ll. 13-21. **Exhibit 31, Deposition of Officer Ryan Nielsen,** p. 44, ll. 5-14; pp. 45-46, ll. 13-1; p. 46, ll. 10-11; p. 49, ll. 15-22; p. 54, ll. 11-19; p. 113, ll. 1-16; p. 114, ll. 2-5; p. 120, ll. 1-7; and p. 124, ll. 17-23. **Exhibit 32,** p. 9, ll. 1-3. **Exhibit 33,** pp. 13-14, ll. 7-1; pp. 15-16, ll. 20-18; and pp. 19-20, ll. 14-5. **Exhibit 34,** p. 13, ll. 14-18; pp. 18-19, ll. 14-22; pp. 31-32, ll. 23-24; and p. 34, ll. 4-14. **Exhibit 35, Deposition of Sergeant Steven Wong,** pp. 12-13, ll. 13-4; p. 32, ll. 10-23; p. 38, ll. 4-13; p. 40, ll. 2-7; p. 40, ll. 21-24; pp. 45-46, ll. 3-6; and pp. 60-61, ll. 18-23. **Exhibit 36, Recorded Interview of Officer Dennis Leroux dated January 4, 2017,** pp. 2-4, ll. 18-3. **Exhibit 37,** pp. 17-18, ll. 3-3; pp. 25-26, ll. 8-24; and p. 28, ll. 8-18. **Exhibit 38,** pp. 19-21, ll. 1-22. **Exhibit 39, Recorded Interview of Officer Kevin McGowan dated January 27, 2017,** p. 24, ll. 5-20).

43. A few officers testified that Muhaymin's resistance was "passive;" meaning that he was not trying to assault the officers. (**Exhibit 14**, p. 31, ll. 1-17; and p. 145, ll. 11-15. **Exhibit 20**, p. 37, ll. 17-21; and p. 54, ll. 6-12).

44. A few officers used a portion of their body weight, for brief periods of time, adjusting their weight often, and placing it on extremities, the hip area, the shoulders, the legs, etc., in response to Muhaymin's resistance and the strength he displayed throughout

the encounter. (**Exhibit 4,** p. 57, ll. 2-25; pp. 58-60, ll. 16-1; pp. 68-69, ll. 1-25; p. 80, ll. 4-24; and pp. 120-121, ll. 5-6. **Exhibit 7,** pp. 37-39, ll. 9-17. **Exhibit 14,** pp. 75-78, ll. 14-3; pp. 94-96, ll. 11-7; pp. 138-140, ll. 19-25; and p. 142, ll. 10-15. **Exhibit 18,** p. 23, ll. 1-24. **Exhibit 19,** pp. 29-30, ll. 2-3; and p. 32, ll. 12-24. **Exhibit 20,** p. 74, ll. 1-18; and p. 78, ll. 1-13. **Exhibit 23,** pp. 38-39, ll. 21-6; and pp. 40-43, ll. 6-20. **Exhibit 24,** pp. 45-46, ll. 3-3; and p. 60, ll. 5-21. **Exhibit 28,** pp. 27-29, ll. 5-16; and pp. 41-42, ll. 23-6. **Exhibit 30,** p. 23, ll. 8-19. **Exhibit 31,** pp. 57-59, ll. 3-5; p. 114, ll. 15-20; pp. 115-116, ll. 23-20; p. 118, ll. 19-24; and p. 154, ll. 5-12. **Exhibit 33,** p. 19, ll. 1-9. **Exhibit 34,** pp. 27-28, ll. 11-24; and pp. 31-32, ll. 23-3. **Exhibit 35,** p. 13, ll. 16-23; pp. 43-44, ll. 20-15; and pp. 54-55, ll. 14-12. **Exhibit 36,** pp. 7-8, ll. 9-25. **Exhibit 37,** p. 7, ll. 14-20; pp. 18-20, ll. 21-3; and pp. 28-30, ll. 21-1. **Exhibit 39,** p. 22, ll. 7-11. **Exhibit 40, Recorded Interview of Officer James Clark dated January 4, 2017,** pp. 5-6, ll. 13-10. **Exhibit 64,** at 3:40-9:46. **Exhibit 66,** at 16:40-18:00. **Exhibit 68,** at 0:20-2:20. **Exhibit 73,** at 24:00-25:41).

45.     Phoenix Officers also held onto Muhaymin's hair and/or head to prevent him from injuring himself or using his head to gain more resistance against the officers. Phoenix Officers are trained to control a subject's head in this situation. (**Exhibit 4,** pp. 68-69, ll. 18-12; and p. 71, ll. 4-19. **Exhibit 14,** p. 77, ll. 15-17 and p. 96, ll. 5-7. **Exhibit 16,** pp. 32-33, ll. 8-12. **Exhibit 23,** p. 44, ll. 12-21. **Exhibit 31,** pp. 57-59, ll. 3-5; pp. 115-116, ll. 23-20; and p. 154, ll. 5-12. **Exhibit 68,** at 2:00-2:15).

46.     The officers pleaded with Muhaymin to stop resisting, but he refused and continued to resist with extreme strength. (**Exhibit 17,** p. 50, ll. 3-9. **Exhibit 18,** p. 15, ll. 21-25. **Exhibit 24,** p. 30, ll. 6-8; and p. 45, ll. 6-7. **Exhibit 28,** p. 24, ll. 15-23. **Exhibit 30,** p. 42, ll. 21-23. **Exhibit 33,** p. 3, ll. 14-25; pp. 15-16, ll. 20-12; and p. 24, ll. 13-23. **Exhibit 34,** p. 32, ll. 6-11; and pp. 39-40, ll. 15-1. **Exhibit 35,** p. 38, ll. 4-13; p. 40, ll. 2-7; and p. 40, ll. 21-24. **Exhibit 68,** at 00:20-2:20. **Exhibit 73,** at 24:00-25:41).

47.     Muhaymin's dog repeatedly barked and lunged at the Phoenix Officers. (**Exhibit 4,** p. 100, ll. 10-23.  **Exhibit 22,** p. 51, ll. 3-17. **Exhibit 26,** p. 15, ll. 16-21).

48.     Officer Head removed his Taser and "cycled" it (or "sparked" it) to scare Chiquita away. (**Exhibit 4,** p. 117, ll. 3-9. **Exhibit 21,** p. 10, ll. 8-14. **Exhibit 22,** p. 33, ll. 10-14. **Exhibit 66,** at 18:37-18:55).

49.     The Taser was <u>not</u> deployed against either Muhaymin or the dog. (**Exhibit 22,** p. 51, ll. 18-21).

50.     Although Muhaymin yelled "I can't breathe," he was still exerting tremendous strength in his resistance and the officers assessed his breathing, observed that he was breathing, and/or there was nothing obstructing his ability to breathe. (**Exhibit 4,** p. 77; **Exhibit 14,** p. 141, ll. 1-13. **Exhibit 20,** pp. 129-130, ll. 21-21. **Exhibit 31,** pp. 113-114, ll. 17-5).

51.     Throughout this second encounter, not only were the officers continuously adjusting their weight and position, Muhaymin was also adjusted from his side to his stomach. (**Exhibit 64,** at 3:40-9:47. **Exhibit 66,** at 16:40-18:00. **Exhibit 68,** at 00:00-2:20).

52.     Plaintiff's police practices expert, Scott DeFoe testified that in his experience as a police officer, he has personally applied his own body weight on subjects in a prone position while securing handcuffs. In fact, he noted that *some* type of force is used to handcuff a subject. Mr. DeFoe further testified using some force is within policy and if the subject physically resists, officers must use reasonable force to overcome the resistance displayed by the subject. (**Exhibit 47,** pp. 203-204, ll. 23-21).

53.     With the assistance of the additional officers, the double set of handcuffs were disconnected from in front of his body, and the officers were able to re-handcuff Muhaymin with a single pair of cuffs behind his back. (**Exhibit 15, Deposition of Officer James Clark,** p. 21, ll. 4-24. **Exhibit 18,** pp. 23-25, ll. 1-9. **Exhibit 19,** pp. 32-34, ll. 24-14. **Exhibit 20,** pp. 75-76, ll. 21-17. **Exhibit 21,** pp. 10-11, ll. 20-16. **Exhibit 29,** pp. 5-6,

ll. 2-24. **Exhibit 30,** pp. 23-24, ll. 20-25.  **Exhibit 31,** pp. 114-115, ll. 15-22. **Exhibit 35,** p. 57, ll. 7-15. **Exhibit 37,** pp. 13-14, ll. 4-22; and p. 22, ll. 18-23. **Exhibit 40,** p. 3, ll. 1-24; and p. 9, ll. 1-14. **Exhibit 41,** pp. 6-7, ll. 19-13. **Exhibit 68,** at 0:18-2:20. **Exhibit 73,** at 23:48-25:41).

54.    A RIPP restraint (also referred to as a "hobble") was utilized to restrain Muhaymin's feet to prevent him from kicking. (**Exhibit 4,** pp. 75-77, ll. 17-5. **Exhibit 40,** pp. 9-10, ll. 22-15. **Exhibit 41,** p. 5, ll. 1-13. **Exhibit 72, BCV from Officer Kevin McGowan,** at 0:20-0:37 with the RIPP restraint at 0:37).

55.    A RIPP restraint is a nylon material with a loop that goes around the ankles, and a hook on the other end to attach to the handcuffs. An individual can still stand and walk (with assistance) while a RIPP restraint is applied. (**Exhibit 4,** pp. 136-137, ll. 2-15. **Exhibit 20,** p. 71, ll. 8-24. **Exhibit 23,** p. 84, ll. 9-22. **Exhibit 31,** pp. 118-119, ll. 3-19. **Exhibit 35,** pp. 22-23, ll. 1-20; and pp. 24-25, ll. 24-22).

56.    The officers did <u>not</u> hog-tie Muhaymin - the application of a RIPP restraint is not considered a hog tie or a "use of force."  (**Exhibit 4,** pp. 76-77, ll. 20-5. **Exhibit 15,** p. 36, ll. 9-25. **Exhibit 20,** pp. 127-128, ll. 23-9. **Exhibit 23,** pp. 84-85, ll. 12-9. **Exhibit 31,** p. 65, ll. 11-25; and pp. 117-118, ll. 24-2. **Exhibit 35,** p. 21, ll. 3-22).

57.    Plaintiff's expert, Mr. DeFoe, agrees that Muhaymin was not placed in a hog-tie position. (**Exhibit 47,** pp. 189-190, ll. 20-2).

58.    Once Muhaymin was secured with the handcuffs behind his back, the Phoenix Officers immediately ceased contact. It was at this point that Muhaymin simultaneously vomited. (**Exhibit 7,** p. 44, ll. 8-16. **Exhibit 15,** pp. 23-24, ll. 19-3. **Exhibit 18,** p. 25, ll. 14-17. **Exhibit 20,** p. 76, ll. 3-11; pp. 79-80, ll. 14-3. **Exhibit 21,** p. 11, ll. 17-25. **Exhibit 22,** p. 52, ll. 2-23. **Exhibit 30,** p. 26, ll. 18-25; and pp. 27-28, ll. 22-6. **Exhibit 34,** pp. 19-20, ll. 1-6; and p. 35, ll. 13-17.  **Exhibit 38,** pp. 21-

22, ll. 23-24. **Exhibit 40,** p. 10, ll. 13-23. **Exhibit 68,** at 3:10-3:25. **Exhibit 73,** at 26:00-26:30).

59.     The officers quickly rolled Muhaymin onto his side to clear his airway, but he had stopped breathing. (**Exhibit 18,** p. 25, ll. 22-25. **Exhibit 19,** p. 35, ll. 2-8. **Exhibit 30,** p. 26, ll. 23-25. **Exhibit 73,** at 26:30-27:15).

60.     The officers immediately requested medical support and initiated resuscitative efforts. (**Exhibit 21,** pp. 11-12, ll. 25-2. **Exhibit 30,** p. 46, ll. 3-17. **Exhibit 33,** pp. 23-24, ll. 23-3. **Exhibit 41,** p. 8, ll. 2-14. **Exhibit 68,** at 3:10-3:25. **Exhibit 73,** at 26:15-27:15).

61.     The officers continued to clear Muhaymin's airway and perform chest compressions until paramedics arrived. (**Exhibit 18,** p. 27, ll. 7-9. **Exhibit 28,** pp. 38-39, ll. 14-5; and p. 39, ll. 14-15. **Exhibit 33,** p. 23, ll. 2-16. **Exhibit 67, BCV from Officer David Head,** at 00:00-0:35. **Exhibit 69, BCV from Officer Ryan Nielsen,** at 00:00-00:56. **Exhibit 71, BCV from Officer James Clark,** at 00:00-04:55. **Exhibit 73,** at 27:15-33:14).

62.     Paramedics arrived and took over Muhaymin's care. (**Exhibit 17,** pp. 27-28, ll. 21-5. **Exhibit 70, BCV from Officer Ryan Nielsen,** at 2:39-3:43. **Exhibit 74,** at 2:27-3:24).

63.     He was transported to Maryvale Hospital where he was pronounced deceased at 10:39 a.m. (**Exhibit 28,** pp. 17-18, ll. 22-2).

64.     With the exception of the one elbow strike to a rear lateral muscle during the initial encounter, none of the Phoenix Officers used any additional force. None of the Phoenix Officers punched, struck, or kicked Muhaymin. (**Exhibit 1,** p. 49, ll. 8-14. **Exhibit 4,** p. 64, ll. 4-6.  **Exhibit 7,** p. 8, ll. 2-9. **Exhibit 14,** p. 128, ll. 9-18. **Exhibit 19,** p. 22, ll. 19-21; and p. 23, ll. 6-9. **Exhibit 21,** p. 13, ll. 1-4. **Exhibit 22,** pp. 8-9, ll. 18-3. **Exhibit 24,** p. 8, ll. 8-13. **Exhibit 25,** p. 8, ll. 20-23; and pp. 17-18, ll. 23-3. **Exhibit 26,** p. 14, ll. 3-7; and pp. 24-25, ll. 20-2. **Exhibit 27,** pp. 24-25, ll. 19-1. **Exhibit 28,** p. 18, ll. 18-23.

**Exhibit 30,** p. 35, ll. 10-28; and p. 43, ll. 14-15. **Exhibit 32,** p. 5, ll. 15-17. **Exhibit 33,** p. 19-20, ll. 1-15. **Exhibit 34,** p. 18, ll. 16-23. **Exhibit 36,** p. 11, ll. 7-20. **Exhibit 38,** pp. 6-7, ll. 18-8; and p. 25, ll. 19-24. **Exhibit 41,** p. 10, ll. 1-15).

65. No Tasers, pepper spray, or electrical restraints were used against Muhaymin. (**Exhibit 26,** p. 14, ll. 3-7; and p. 15, ll. 6-21. **Exhibit 30,** p. 35, ll. 14-18. **Exhibit 33,** p. 19, ll. 11-13).

66. The autopsy pathologist determined that Muhaymin died of "cardiac arrest in the setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual." (**Exhibit 43, Medical Examiner's Report**).

67. Phoenix Defendants' expert, Dr. Michael Graham, concurred with the autopsy findings, and opined Muhaymin died of cardiac asystole precipitated by marked agitation and physical exertion on a background of methamphetamine use and schizophrenia. He further noted methamphetamine use and schizophrenia are each associated with an increased risk of sudden death. (**Exhibit 51, Expert Report of Dr. Michael Graham**, at COP 015835-015836).

68. The toxicology results showed Muhaymin had over five (5) times the toxic (potentially fatal) level of methamphetamine in his system at his death. (**Exhibit 44, Toxicology Report**. **Exhibit 49,** pp. 69-70, ll. 16-24, p. 110, ll.4-7).

69. Dr. Amanda Maskovyak, the Maricopa County Medical Examiner/Pathologist, testified there is no "safe" level of methamphetamine because it has unpredictable effects and always has a potential of being fatal. (**Exhibit 53, Deposition of Dr. Amanda Maskovyak,** p. 30, ll. 7-15; and p. 31, ll. 6-9).

70. Plaintiff's expert, Dr. Omalu, testified that, although he disagreed with the Medical Examiner's findings, Muhaymin ingested methamphetamines within hours of his death, as his levels were "high." (**Exhibit 48,** p. 166, ll. 18-21).

71. Phoenix Defendants' toxicology expert, Dr. Binh Ly, opined that the concentrations detected in Muhaymin were within the range of being fatal according to medical literature, and that Muhaymin may have ingested additional methamphetamines while in the restroom in an effort to conceal the drugs from the officers. Methamphetamines are known for their stimulant effects – increased energy, endurance, strength, and aggression. (**Exhibit 54, Expert Report of Dr. Binh Ly,** pp. 9-10, ¶4, 6, 8).

72. While Muhaymin was on his side, Officer Grenier testified that because of Muhaymin's continuous movement and resistance, his shin slipped from Muhaymin's shoulder to near the side of his neck for a brief period of time. Officer Grenier maintained his other foot on the ground to distribute weight off of Muhaymin, and applied very little weight just to hold Muhaymin in place, as Muhaymin continued fighting, screaming and yelling. (**Exhibit 14,** pp. 75-78, ll. 23-3; and pp. 140-141, ll. 7-13).

73. Phoenix Defendants' medical expert, Dr. Gary Vilke, opined this would not have affected Muhaymin's ventilation and would not cause asphyxiation. (**Exhibit 55, Expert Report of Dr. Gary Vilke,** at COP 015488).

74. Dr. Vilke opined that none of the officers' actions would have caused asphyxiation or death. (**Exhibit 55,** at COP 015475, COP 015485-015488).

75. Plaintiff's expert, Mr. DeFoe testified that Muhaymin physically resisted arrest. (**Exhibit 47,** p. 150, ll. 6-10).

76. Phoenix Police Department Operating Order 4.10 provides that, absent extraordinary circumstances, a Phoenix Officer must execute the warrant. Accordingly, it was the Phoenix Officers' duty and responsibility to arrest Muhaymin pursuant to the warrant. (**Exhibit 4,** p. 43, ll. 14-22; p. 47-48, ll. 9-6; and pp. 134-136, ll. 8-1. **Exhibit 14,** pp. 123-124, ll. 7-17. **Exhibit 23,** pp. 31-32, ll. 10-7. **Exhibit 42, Phoenix Police Department Operations Order 4.10,** at COP 011474-011475).

77. On the body camera videos, the Phoenix Officers can be heard repeatedly pleading with Muhaymin to "calm down," to "stop resisting," and "give [his] hands." (**Exhibit 64,** at 6:00-6:30).

78. Plaintiff's expert, Dr. Omalu testified he could not quantify how much weight was placed on Muhaymin in each and every exposure; that he was not paying attention to that because it was of "no significant forensic consequence" because in his opinion it is about a spectrum of cumulative exposure, despite the Phoenix Officers and Muhaymin changing positions dynamically. (**Exhibit 56, Deposition of Dr. Bennet Omalu, Vol. 2,** pp. 202-204, ll. 24-19).

79. Plaintiff's expert, Mr. DeFoe testified he did not know how long Muhaymin was in prone position, did not time the length of any application of body weight, that he could not tell how long and how much weight was applied. (**Exhibit 47,** p. 211, ll. 19-24; and pp. 198-199, ll. 15-20).

80. The Phoenix Police Department conducted both an internal and criminal investigation into this encounter. This matter was investigated by the Phoenix Police Department's Professional Standards Bureau and was reviewed by the Department's Use of Force Board. The Board determined each of the ten officers involved acted in accordance with Department policy. (**Exhibit 57, Use of Force Board Incident Review Results**).

81. Maricopa County Attorney's Office reviewed this incident for potential criminal prosecution of the officers. On February 22, 2018, the Maricopa County Attorney's Office announced its decision, that the officers did not commit any act that warranted criminal prosecution. (**Exhibit 58, Correspondence from Maricopa County Attorneys' Office**).

82. Plaintiff's expert, Mr. DeFoe, conceded if no excessive or unreasonable force was used, there is no duty to intervene. (**Exhibit 47,** p. 217, ll. 3-8).

83.     Plaintiff alleges in her Complaint that Muhaymin was denied access to the Maryvale Community Center because of his "service dog," a Chihuahua named "Chiquita." (**Dkt No. 16, ¶5**).

84.     Plaintiff's expert, Mr. DeFoe, testified that he was aware of no evidence to show that Chiquita was a "service animal" and, instead, merely relied based that erroneous conclusion on what Muhaymin said to the officers. (**Exhibit 47,** pp. 107-109, ll. 22-3).

85.     Plaintiff is Muhaymin's sister and the Personal Representative of Muhaymin's Estate. (**Plaintiff's First Amended Complaint, Dkt. No. 16, ¶7**).

86.     When asked directly to provide the factual basis and all supporting documents for Muhaymin's daughter's claimed damages in this lawsuit, Plaintiff responded that such information was not within Plaintiff's "knowledge" and, moreover, argued that "[p]ursuant to Arizona law, the only aspect of this case that the statutory plaintiff necessarily establishes for the represented statutory beneficiaries is liability, not their damages." (**Exhibit 59, Plaintiff's responses to Defendants' Second Set of Non-Uniform Interrogatories,** p. 4).

87.     Muhaymin spent several years in prison.[2] (**Exhibit 60, Arizona Department of Corrections Inmate Summary).**

---

[2] a) Muhaymin was sentenced to prison on 05/25/2011 for one (1) year, for first degree criminal trespassing, a Class 6 Felony that occurred on 03/20/2010, Maricopa Superior Court, CR2010-115235;

b) Muhaymin was sentenced to prison on 05/25/2011 for one and a half (1.5) years, for aggravated assault, a Class 5 Felony that occurred on 10/09/2010, and he was released from prison on 03/22/2012, Maricopa Superior Court, CR2010-154704;

c) Muhaymin was sentenced to prison on 07/02/2012 for one (1) year, for resisting arrest, a Class 6 Felony that occurred on 05/04/2012, and he was released from prison on 03/14/2013, Maricopa Superior Court, CR2012-123479; and

d) Muhaymin was sentenced to prison on 07/15/2013 for two and half (2.5) years, for dangerous drug violation, a Class 4 Felony that occurred on 04/18/2013, and he was released from prison on 02/03/2016, Maricopa Superior Court, CR2013-417410.

88.     Muhaymin's daughter (currently 14 years old) has spent the majority of her life in foster care due to her father's absence (and her mother's).  The last time she lived with Muhaymin was nine (9) years ago, in 2011, for a period of approximately three months.  She testified that she rarely, if ever, saw her father from 2011 to the time of his death.  She testified that she spent a few hours with Muhaymin at the park a few days before his death. (**Exhibit 46, Deposition of** ███ A.M. ███**,** pp. 19-20, ll. 24-5; and pp. 25-29, ll. 21-25).

89.     Muhaymin's adult son (currently 27 years old) did not see his father once in the ten (10) years prior to his death and testified that he had no relationship with his father. (**Exhibit 45,** p. 48, ll. 1-13; and p. 56, ll. 19-21).

90.     Officer Grenier did not believe Muhaymin was suffering from any mental health crisis. (**Exhibit 14,** p. 116, ll. 1-18. **Exhibit 17,** pp. 15-16, ll. 20-25).

91.     Plaintiff's expert, Dr. Taqi, testified that the most prevalent cause of death in methamphetamine overdoses is cardiac-related issues, and that methamphetamine can kill a healthy person. (**Exhibit 49,** pp. 83-84, ll. 14-16).

Dated: December 17, 2020.

**O'CONNOR & DYET, P.C.**


By: _/s/ Karen J. Stillwell_
    Daniel J. O'Connor, Jr.
    Karen J. Stillwell
    Travis B. Hill
    *Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2020, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court, District of Arizona, using the CM/ECF System.   A Notice of Electronic Filing will be served to the following registered participants:

| | |
|---|---|
| David A. Chami | Haytham Faraj |
| PRICE LAW GROUP, APC | LAW OFFICES OF HAYTHAM FARAJ |
| 8245 N. 85th Way | 1935 W Belmont Ave. |
| Scottsdale, AZ 85258 | Chicago, IL 60657 |
| *Attorney for Plaintiff* | *Attorney for Plaintiff* |

Brian J. Theut
THEUT, THEUT & THEUT
5150 North 16th Street
Phoenix, AZ 85016
*Guardian Ad Litem and Statutory*
*Representative for A. M.*


By: /s/ Dara J. Wilson