# LODGED
# PROPOSED
# Doc. 292-2
# (redacted)

# EXHIBIT A

# In The Matter Of:

*Mussalina Muhaymin v.*
*City of Phoenix*

---

*Antonio Tarango*
*July 31, 2019*

---

*Valley Court Reporting, LLC*
*4802 East Ray Road, Suite 23-200*
*Phoenix, AZ 85044*
*(602) 710-1148*
*www.valleycr.com*

**Min-U-Script®**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Mussalina Muhaymin,                    )
                                       )
      Plaintiff,                       )
                                       )
vs.                                    ) Civil Action No.
                                       ) CV-17-04565-PHX-SMB
City of Phoenix, et al.,               )
                                       )
      Defendants.                      )
_____ )


VIDEOTAPED DEPOSITION OF ANTONIO TARANGO

Scottsdale, Arizona
July 31, 2019
2:17 p.m.


PREPARED FOR:
(COPY)


PREPARED BY:
SHERYL L. HENKE, RPR
Arizona CCR No. 50745

**Valley Court Reporting, LLC**
**www.valleycr.com**

2

```
 1                    I N D E X

 2                E X A M I N A T I O N

 3                                              PAGE
     ANTONIO TARANGO

 4
          EXAMINATION BY MR. FARAJ                5

 5
          EXAMINATION BY MS. STILLWELL           97

 6
          FURTHER EXAMINATION BY MR. FARAJ      119

 7
          FURTHER EXAMINATION BY MS. STILLWELL  125

 8
          FURTHER EXAMINATION BY MR. FARAJ      129

 9


10


11                    E X H I B I T S

12


13    1    Officer Grenier's body cam video      80

14    2    Diagram, Bates stamped COP 000147      80

15    3    Diagram, Bates stamped COP 000148      80

16    4    City of Phoenix, Arizona Notice of     80
           Inquiry dated 1/24/17, Bates stamped
17         COP 011510 - COP 011517

18    5    City of Phoenix, Arizona Notice of     80
           Inquiry dated 2/7/17, Bates stamped
19         COP 011514 - COP 011517

20    6    Brochure entitled "Phoenix Mayor's     92
           Commission On Disability Issues,"
21         Bates stamped COP 011518 - COP 011519

22    7    Incident Report, Bates stamped        101
           COP 011239 - COP 011246

23


24


25
```

**Valley Court Reporting, LLC**
**www.valleycr.com**

3

1           THE VIDEOTAPED DEPOSITION OF ANTONIO TARANGO

2

3   taken at 2:17 p.m. on July 31, 2019, at the law offices

4   of Price Law Group, APC, 8245 North 85th Way,

5   Scottsdale, Arizona, 85258, before SHERYL L. HENKE, a

6   Certified Reporter, #50745, in and for the State of

7   Arizona.

8

9                  A P P E A R A N C E S

10

11  FOR THE PLAINTIFF:

12  PRICE LAW GROUP, APC
      BY:  DAVID CHAMI, ESQ.
13         BETH K. FINDSEN, ESQ.
      8245 North 85th Way
14  Scottsdale, Arizona  85258

15  THE LAW OFFICE OF HAYTHAM FARAJ
      BY:  HAYTHAM FARAJ, Esq.
16  1935 W. Belmont Avenue
      Chicago, Illinois  60657

17

18  FOR THE DEFENDANTS:

19  O'CONNOR & CAMPBELL
      BY:  KAREN STILLWELL, ESQ.
20  7955 South Priest Drive
      Tempe, Arizona  85285

21

      Also present:  William Marinakis, Videographer
22                   Tiffany Gill

23

24

25

```
 1              THE VIDEOGRAPHER:  We are on the record.
 2   Today's date is Wednesday, July 31, 2019.  The time on
 3   the video monitor is 2:17 p.m.
 4              This is the video-recorded deposition of
 5   Antonio Tarango noticed by counsel for the plaintiff in
 6   the matter of Mussalina Muhaymin versus City of
 7   Phoenix, et al., in the United States District Court,
 8   excuse me, for the District For Arizona, Case No.
 9   CV-17-04565-PHX-SMB.
10              The location today is the Price Law Group
11   in Scottsdale, Arizona.
12              The certified court reporter is Sheryl
13   Henke of Valley Court Reporters located at 4802 East
14   Ray Road, Suite 23-200, Phoenix, Arizona, 85044.
15              My name is William Marinakis.  I'm the
16   certified legal video specialist for the firm of
17   VideoDep, Incorporated, also located in Phoenix,
18   Arizona.
19              Counsel, will you please identify
20   yourselves and state whom you represent for the record
21   at this time, please, starting with plaintiff's
22   counsel.
23              MR. FARAJ:  Good afternoon.  My name is
24   Haytham Faraj, and I'm here on behalf of the plaintiff.
25              MR. CHAMI:  David Chami also here on
```

 1  behalf of the plaintiff.

 2             MS. FINDSEN:  Beth Findsen on behalf of

 3  the plaintiff.

 4             MS. STILLWELL:  Karen Stillwell on behalf

 5  of City of Phoenix and Antonio Tarango.

 6             THE VIDEOGRAPHER:  Thank you, counsel.

 7  For the record also in attendance today is Tiffany

 8  Gill.

 9             The witness may be sworn in at this time,

10  please.

11

12                  ANTONIO TARANGO,

13  a witness herein, having been first duly sworn by the

14  Certified Reporter to speak the truth and nothing but

15  the truth, was examined and testified as follows:

16

17                    EXAMINATION

18  BY MR. FARAJ:

19      Q.   Good afternoon, Mr. Tarango.

20      A.   Good afternoon.

21      Q.   Are you represented by counsel?

22      A.   Yes.

23      Q.   And is this your counsel?

24      A.   Yes.

25      Q.   Okay.  Ms. Stillwell?

1      A.    Yes.

2      Q.    Are you represented by anyone else?

3      A.    No.

4      Q.    Okay.  You don't have an independent lawyer?

5      A.    No.

6            MS. STILLWELL:  And Mr. Faraj, I'm sorry

7    to throw you off.  Similar to our other depositions, I

8    just want to get on the record that we are going to

9    tentatively label this as confidential under the

10   protective order that we have in place.  And you will

11   give us the 30 days to designate.

12           MR. FARAJ:  Okay.  So I agree that the

13   protective order applies to all -- to everything we're

14   doing in this case.  It's on you to label things

15   confidential.  I don't think you can label the entire

16   deposition confidential.

17           MS. STILLWELL:  No.  And Mr. Faraj,

18   consistent with our previous depositions, this is now

19   number 4, we have agreed that we will tentatively hold

20   that and you'll give us the 30 days to identify,

21   correct?

22           MR. FARAJ:  I don't object to that.  I

23   thought you said we're going to label it confidential

24   which creates a problem.  You'll have an opportunity to

25   look at it and label the portions that you deem are

1    confidential, confidential.

2                    MS. STILLWELL:  Yes, sir.

3                    MR. FARAJ:  Thank you.

4    BY MR. FARAJ:

5        Q.    With that, sir, I'm sure you've been

6    instructed on what a deposition is by Ms. Stillwell?

7        A.    Yes.

8        Q.    And she's probably provided you some

9    procedural rules?

10       A.    Yes.

11                   MS. STILLWELL:  Objection to the extent

12   you're getting into our conversations, sir.

13   BY MR. FARAJ:

14       Q.    Okay.  Do you feel like you would like me to

15   cover, to tell you the rules of the deposition, or do

16   you feel like you can proceed without those

17   admonitions?

18       A.    I feel like I can proceed.

19       Q.    Great.  One of the things that you can do at

20   the end of this deposition is you'll have a chance to

21   review the transcript.  The court reporter is taking

22   everything we say down.  You'll have a chance to review

23   it, and you'll have a chance to make corrections.

24       A.    How much time do I get for that?

25       Q.    30 days from the time it's produced.  Okay.

```
 1   Most people don't have corrections.  Sometimes they
 2   miss a word here and there.  Sometimes people decide to
 3   change their testimony.  You can do whatever you want.
 4   I will admonish you that any substantive changes, big
 5   changes to your testimony, for example, if this was
 6   about whether a light was green or red, and you testify
 7   it's green, and then you change your testimony to red
 8   later, that could call your credibility into question.
 9   Do you understand?
10       A.   Yes.
11       Q.   Okay.  So you have a right to make changes,
12   but I just wanted to give you that admonishment.  And I
13   say that so that you are giving us your best testimony
14   today.  So that you don't have to change it later.
15   Does that make sense?
16       A.   Mm-hm.  Yes.
17       Q.   With that, if I ask a question that you're not
18   absolutely sure about what I mean, just say can you
19   repeat it, or restate it, or however you want to say
20   that.  Okay?
21       A.   Okay.
22       Q.   Once you answer, I will assume that you
23   understood my question, and I'll also assume that your
24   answer is the correct one for my question.  Okay?
25       A.   Okay.
```

```
 1        Q.   Not trying to be complicated.

 2        A.   Yeah.

 3        Q.   Just because everything is getting taken down,

 4   I wanted to give you some overview of the deposition.

 5   Okay?

 6        A.   Okay.

 7        Q.   All right.  How old are you today?

 8        A.   47.

 9        Q.   What is your date of birth?

10        A.   ████████.

11        Q.   Are you married?

12        A.   Yes.

13        Q.   How long have you been married?

14        A.   Nine years.

15        Q.   Is this your first marriage?

16        A.   Yes.

17        Q.   Do you have children?

18        A.   Yes.

19        Q.   How many children do you have?

20             MS. STILLWELL:  Objection, relevance.

21   BY MR. FARAJ:

22        Q.   You can answer.

23        A.   Two.

24        Q.   Okay.  I don't need to know their names, but

25   what are their ages?
```

 1      A.    Seven and five.

 2      Q.    Okay.   Have you always been a resident of

 3 Arizona?

 4      A.    I moved to Arizona when I was two years old,

 5 or my parents moved but --

 6      Q.    Where did you move from, sir?

 7      A.    Lordsburg, New Mexico.

 8      Q.    Okay.   Did your parents when they moved here,

 9 do you know if they moved to the Phoenix general area

10 or was it somewhere else?

11      A.    Thatcher, Arizona.

12      Q.    Okay.   Do you recall when you moved to the

13 Phoenix general area the first time?

14      A.    1990.

15      Q.    Okay.   Have you ever been arrested?

16      A.    Yes.

17      Q.    How many times have you been arrested?

18      A.    Um, three.

19      Q.    Tell me the reasons you were arrested those

20 three times.

21                MS. STILLWELL:   Objection, relevance.

22                MR. FARAJ:   You --

23                MS. STILLWELL:   Form.   I know you have

24 a --

25 BY MR. FARAJ:

1     Q.   The lawyers -- the lawyers will make

2   objections and that's their right to create a record.

3   You will still answer unless she says do not answer.

4   Okay, so you'll hear an objection, continue to wait for

5   her to be done to make the record.  Okay.  But then you

6   can answer after that, unless you're instructed not to

7   answer.

8                MS. STILLWELL:  You may answer.

9                THE WITNESS:  Okay.  Once for a DUI and

10  then once for -- I don't remember exactly what the

11  charge was for, but we went to a bar.  And some of my

12  friends and I got into a fight.  And then the third

13  time was we had -- we were walking.  We had went to a

14  party and we slapped a sign.  The police officer saw us

15  and came up and questioned us.

16  BY MR. FARAJ:

17     Q.   Questioned or arrested you?

18     A.   We were placed in a paddy wagon or whatever

19  it's called.

20     Q.   For slapping a sign?

21     A.   Yes.  Well, we had been drinking.

22     Q.   Okay.

23     A.   Yeah.

24     Q.   More than that?

25     A.   No.

1      Q.   That's it?

2      A.   Yeah.  To my knowledge, yes.

3      Q.   Okay.

4      A.   What I remember.

5      Q.   And so you were put in a paddy wagon.  Were

6   you taken to the police station?

7      A.   Yes.

8      Q.   And you were booked?

9      A.   I don't remember if we were booked.

10     Q.   All right.  Was that in Phoenix?

11     A.   Tempe.

12     Q.   Okay.  When was the last time you were

13   arrested?

14     A.   I don't remember when those two other

15   incidents happened, but I do remember that the DUI was

16   in 1990.

17     Q.   Is that the last time?

18     A.   That I remember, yes.

19     Q.   Okay.  So the two other incidents were before

20   that?

21     A.   Either before or around that time in 1990.

22     Q.   Okay.  Have you ever been sued before?

23             MS. STILLWELL:  Form.  Go ahead.

24             THE WITNESS:  Not to my knowledge, no.

25   BY MR. FARAJ:

1        Q.   Okay.  You are -- you have a bachelor's

2   degree --

3        A.   Yes.

4        Q.   -- from ASU; is that right?

5        A.   Yes.

6        Q.   And it's in social work, right?

7        A.   Yes.

8        Q.   Do you have any social work certifications,

9   like licensed clinical social worker, anything of that

10  nature?

11       A.   I do not.

12       Q.   Do you have any certifications related to

13  social work whatsoever?

14       A.   I do not.

15       Q.   When did you graduate?

16       A.   2004.

17       Q.   Do you have some post-secondary, post-graduate

18  education too, or just a BA?

19       A.   Just a BA.

20       Q.   Okay.  Do you have any formal education aside

21  from university-type education?

22                  MS. STILLWELL:  Form.

23                  THE WITNESS:  Can you repeat the

24  question.  I'm sorry.

25  BY MR. FARAJ:

1       Q.   Yeah.  Do you have any formal education

2  besides the university-type education?  Have you been

3  -- have you undergone any training for trades, or

4  certificates, or licenses, anything of that nature,

5  besides a driver's license?

6       A.   No.

7       Q.   Sir, you understand that we're here because of

8  the incident that took place on January -- January 4,

9  2017, correct?

10      A.   Yes.

11      Q.   With Mr. Muhaymin, an African American

12 gentleman that you interacted with that day.  Are you

13 aware of that?

14      A.   Yes.

15      Q.   Okay.  And you're aware that we've named you

16 -- we've named you in a lawsuit in that case?

17      A.   Yes.

18      Q.   Okay.  The location where this incident took

19 place, what is that known as?

20      A.   The Maryvale Community Center.

21      Q.   Okay.  And you're aware that the gentleman

22 died later?

23      A.   Yes.

24      Q.   I'm primarily going to be concerned with your

25 involvement, which was mainly inside, okay.  So when I

1   say the place, I'm referring to the location where you

2   work, okay?

3        A.   Okay.

4        Q.   I'm not going to ask you questions about what

5   happened outside.  You had nothing to do with that as I

6   understand.  Right?

7        A.   Yes.

8        Q.   Okay.  So Maryvale Community Center, does

9   Maryvale Community Center also include the library?

10                MS. STILLWELL:  Foundation.

11   BY MR. FARAJ:

12        Q.   Is there a library?

13        A.   There is.

14        Q.   Does that include -- is that part of the

15   Maryvale Community Center?

16                MS. STILLWELL:  Form and foundation.

17                THE WITNESS:  It is not.

18   BY MR. FARAJ:

19        Q.   Okay.  What is your role at the Maryvale

20   Community Center?

21        A.   I'm a recreation coordinator 3.

22        Q.   What does that mean?

23        A.   It means I supervise the facility, the staff.

24        Q.   Are you the most senior person in charge of

25   the center?

1        A.   Yes.

2        Q.   And did you say 3, recreation coordinator 3?

3        A.   Yes.

4        Q.   What does the 3 stand for?

5        A.   It's just a step.  So a full-time position

6   that the parks and rec department have are, the entry

7   level's a programmer, and then a recreation coordinator

8   2, and a recreation coordinator 3, and a deputy, then

9   assistant deputy and then the director.

10       Q.   Okay.  But just to be clear, at the Maryvale

11  Community Center you are the highest person in the

12  chain, --

13            MS. STILLWELL:  Form and foundation.

14  BY MR. FARAJ:

15       Q.   -- correct?

16       A.   Yes.

17       Q.   Okay.  Who do you report to?

18       A.   My recreation supervisor.

19       Q.   Okay.  And who is the recreation supervisor?

20       A.   Jan Sherwood.

21       Q.   Was Jan Sherwood the recreation supervisor in

22  January of 2017?

23       A.   Yes.

24       Q.   Where does Jan Sherwood work?

25       A.   She offices out of La Prada park or yard.

1    Q.   Could you spell that, please?

2    A.   It's L-A, P-R-A-D-A.  So it's La Prada.

3    Q.   Okay.  Park?

4    A.   So it's at the park, but it's the northwest

5    division office.

6    Q.   Got it.  Is it true that you were hired by the

7    rec -- parks and recreation department in 2010?

8    A.   Yes.  I can't remember exactly, 'cause I

9    worked and then left and came back.

10   Q.   Got it.  Well, let me correct that.  Were you

11   a level -- were you just a recreation coordinator at

12   some point, not a level 2 or 3?

13   A.   It would be a recreation coordinator 2.

14   Q.   2.  Okay.  And when you were a recreation

15   coordinator 2, where were you -- where did you work,

16   where were you located?

17   A.   The South Mountain Community Center.

18   Q.   So when you were hired at Maryvale, were you

19   hired as a level 2 or level 3?

20   A.   I was just promoted to a recreation

21   coordinator 3.

22   Q.   When you say "just," you mean recently?

23   A.   Yes.

24   Q.   Okay.  When, do you recall?

25   A.   I think it was in August of that year.

1      Q.   Okay.  So 2017?

2      A.   Yes.

3      Q.   Okay.  I'm trying to understand.  So when you

4   were a recreation coordinator 2, was someone in charge

5   of you at the Maryvale center or were you still the

6   most senior person in charge?

7      A.   I was the recreation coordinator 2 at the

8   South Mountain Community Center.

9      Q.   Okay.

10     A.   And there was a rec coordinator 3 that

11  supervised me.

12     Q.   Okay.

13     A.   And I was promoted to the Maryvale Community

14  Center.  And then I was the rec coordinator 3 at the

15  Maryvale Community Center.

16     Q.   Okay.  I think I understand.  So you got the

17  promotion and went over to take Maryvale Community

18  Center?

19     A.   Yes.

20     Q.   Okay.  That would have had to have happened

21  before January 2017 if you were there in 2017 for this

22  incident, right?

23     A.   Yes.

24     Q.   Okay.  What are your job duties, or what were

25  your job duties as a recreation coordinator 3 in

```
 1   January of 2017?
 2       A.   Supervise the staff, the facility, the
 3   programs that are being offered.
 4       Q.   Okay.  What type of programs do they offer, or
 5   do you offer?
 6               MS. STILLWELL:  Form.
 7               THE WITNESS:  Ballet, karate, basketball,
 8   tumbling.
 9   BY MR. FARAJ:
10       Q.   Is there any AA meetings?
11       A.   There's not, or there was not.
12       Q.   Any type of counseling programs that are
13   offered at the center?
14       A.   Not that I can recall.
15       Q.   Is the center free, or is it a membership fee
16   for membership-type facility?
17       A.   It's a fee for a membership.
18       Q.   What is the fee for a membership?
19       A.   It's $20 for the year for an adult.
20       Q.   And for the $20 what does the person get?
21       A.   They're able to use -- well, they're able to
22   register for classes that are offered in the community
23   center, or by the community center for another charge.
24   So it's just the membership card.
25       Q.   Do they have a gym, do you all have a gym?
```

```
 1        A.    Yes, we do have a gym.
 2        Q.    And would members be able to access the gym
 3    for the $20?
 4        A.    During the designated times.
 5        Q.    Okay.  Do you have a program where indigent
 6    members of the community can get access without paying
 7    a fee?
 8        A.    Can you explain to me what indigent means.
 9        Q.    Yes.  If someone is unable to pay the $20 fee
10    because of their financial circumstances, they're poor
11    or they're under -- you know, underemployed, is there a
12    program where people can get membership for a nominal
13    or no fee?  I guess $20 for a year is pretty nominal,
14    but is there a no fee option?
15        A.    There is not.
16        Q.    Would you characterize the center as a public
17    facility?
18              MS. STILLWELL:  Form, foundation.
19    BY MR. FARAJ:
20        Q.    You can answer.
21        A.    Yes.
22        Q.    Is it owned by the City of Phoenix?
23              MS. STILLWELL:  Same objections.
24              THE WITNESS:  I don't -- I'm assuming
25    that it is.  I don't --
```

Antonio Tarango - July 31, 2019          21

```
1    BY MR. FARAJ:

2        Q.    Who do you get paid by?

3        A.    The City of Phoenix.

4        Q.    And you're not sure who owns the center?

5        A.    No, I don't.

6        Q.    Are your supervisors employees of the City of

7    Phoenix as well?

8        A.    Yes.

9        Q.    Are you an employee of the City of Phoenix?

10       A.    I am.

11       Q.    On January 4, 2017 do you -- do you recall

12   what time you started work?

13       A.    I don't remember.

14       Q.    Were you working when Mr. Muhaymin first

15   walked into the center?

16       A.    Yes.

17       Q.    Do you recall seeing him when he walked in?

18       A.    No.

19       Q.    When is the first time that you noted visually

20   Mr. Muhaymin's presence in the center --

21       A.    The day --

22       Q.    -- on January 4, 2017?

23       A.    When I came out of my office, I was told that

24   he was -- or he had entered, and I came out of my

25   office.
```

1      Q.   What exactly were you told?

2      A.   That he was here with the dog.

3      Q.   Who told you that?

4      A.   I can't remember.

5      Q.   Male or female?

6      A.   It was a female.

7      Q.   Employee or non-employee?

8      A.   I think it was one of the maintenance or

9  cleaning staff.

10      Q.   So is she an employee?

11           MS. STILLWELL:  Form and foundation.

12           THE WITNESS:  It's a contracted employee.

13  BY MR. FARAJ:

14      Q.   Okay.  And as you were thinking back on it, do

15  you have the image of that person in mind?

16      A.   I can't remember 100 percent.

17      Q.   Okay.  Who are the female maintenance staff?

18  Who is the --

19      A.   Isabel.

20      Q.   Okay.  Anyone else?

21      A.   As far as maintenance staff, no.

22      Q.   Okay.  So as you sit here today, it may have

23  been Isabel; is that your recollection?

24      A.   I'm not 100 percent sure, but yes.

25      Q.   Okay.  When you sit in your office, are you

 1  able to view the monitors that provide the image that

 2  the cameras see in the center?

 3                 MS. STILLWELL:  Form.

 4                 THE WITNESS:  No.

 5  BY MR. FARAJ:

 6      Q.   Where are -- where are the images communicated

 7  to?

 8      A.   They're not communicated.

 9      Q.   Where are the images stored?

10      A.   They're not stored.

11                 MS. STILLWELL:  Foundation.

12  BY MR. FARAJ:

13      Q.   What happens to the -- you do have cameras at

14  the Maryvale Community Center?

15                 MS. STILLWELL:  Form, foundation.  Go

16  ahead.  Go ahead.

17                 THE WITNESS:  There are cameras there,

18  but they don't work.

19  BY MR. FARAJ:

20      Q.   How do you know they don't work?

21      A.   Because they don't work.  And I've -- or we

22  have looked into getting them repaired.

23      Q.   When were the cameras installed, if you know?

24      A.   I don't know.

25      Q.   Did the cameras ever work when you were there?

1      A.   No.

2      Q.   If you know, when the cameras did work, where

3   would the images be displayed or stored?

4      A.   I couldn't say, because they weren't working

5   when I got there.

6      Q.   As the -- as the director of the center, why

7   didn't you just take them down if they don't work?

8                MS. STILLWELL:  Form.

9                THE WITNESS:  I didn't -- I wouldn't have

10   anything to do with that.

11   BY MR. FARAJ:

12      Q.   Is there a reason why you didn't get them

13   repaired, to call a repair facility and have them

14   repaired, or looked into at least?

15                MS. STILLWELL:  Same objection.

16   BY MR. FARAJ:

17      Q.   You can answer everything unless she says

18   don't answer.

19      A.   Okay.  Sorry.  So we got a quote.  I gave it

20   to my supervisor, and they weren't repaired.

21      Q.   Okay.  Just to be clear, my questions all at

22   this point refer to 2017, January 2017.  Right.  So

23   we're talking about January 2017.  And as I understand

24   your testimony, they did not work at that time?

25      A.   The cameras at the community center did not.

1      Q.   Yes.  When Isabel communicated whatever she
2    did to you that caused you to come out of your office,
3    do you remember that testimony you just gave me?
4      A.   Yes.
5      Q.   What specifically did she say?
6      A.   The guy with the dog is here.
7      Q.   And what did that mean to you?
8      A.   It meant that the guy with the dog was there.
9      Q.   Okay.  I asked a bad question, and I got a
10   response that wasn't much better.  The guy, how did you
11   know, how would you know who the guy is?
12                MS. STILLWELL:  Form.
13                THE WITNESS:  From the incidents prior to
14   that.
15   BY MR. FARAJ:
16     Q.   Okay.  And so when she said "the guy with the
17   dog," did that mean something to you?
18                MS. STILLWELL:  Form.
19                THE WITNESS:  It meant that he was there.
20   BY MR. FARAJ:
21     Q.   Okay.  "He" being Mr. Muhaymin?
22     A.   Yes.
23     Q.   Before that day, can you estimate for me how
24   many times you recall Mr. Muhaymin coming to your
25   center?

1      A.   That I saw him and spoke to him, probably

2   eight.

3      Q.   Okay.  And during those eight times would he

4   come in to either -- to mainly use the bathroom?

5              MS. STILLWELL:  Form, foundation.

6              THE WITNESS:  I -- I don't know exactly,

7   but most of the time, yes.

8   BY MR. FARAJ:

9      Q.   Okay.

10      A.   And also ask for ice.

11      Q.   Okay.  The times he asked for ice, you all

12   turned him away saying we don't give ice to members of

13   the public, true?

14      A.   Yes, we don't give --

15              MS. STILLWELL:  Form.

16              THE WITNESS:  -- any ice to members of

17   the public.

18   BY MR. FARAJ:

19      Q.   And other than asking for ice, he would go in

20   to use the bathroom?

21      A.   Yes.

22              MS. STILLWELL:  Form and foundation.

23   BY MR. FARAJ:

24      Q.   He didn't take classes, for example?

25      A.   No.

1     Q.   Okay.  He didn't work out at the gym?

2               MS. STILLWELL:  Foundation.

3               THE WITNESS:  No.

4    BY MR. FARAJ:

5     Q.   When she -- when whoever said it to you that

6    the man with the dog, or the guy with the dog is here,

7    when you walked out of your office, based on that

8    comment, what did you see?

9     A.   I saw the dog sweeping back and forth down the

10   hall and Mr. Muhaymin walking behind it.

11    Q.   What did you do?

12    A.   At that point he was already by the front

13   desk.  And I told him that he needed to take his dog

14   outside.

15    Q.   What did he say?

16    A.   That he needed to use the bathroom.

17    Q.   Was -- was your comment to him, you need to

18   take the dog outside in a conversational tone?

19               MS. STILLWELL:  Form.

20               THE WITNESS:  Yes.

21   BY MR. FARAJ:

22    Q.   And was his response in a conversational tone?

23               MS. STILLWELL:  Form.

24               THE WITNESS:  At the beginning, yes.

25   BY MR. FARAJ:

1      Q.   I'll represent to you that we saw some video

2   from officers' body cam.  And both you and he, at least

3   in the initial exchange near the bathroom, seemed to

4   have a conversation at a conversational tone.  Now

5   later it elevated by Mr. Muhaymin, but at that point it

6   was conversational.  You follow what I'm saying?  I'm

7   telling you what happened on the video.

8      A.   Mm-hm.

9      Q.   Do you recall that conversation near the

10  bathroom after the officers arrive?

11     A.   Yes.

12     Q.   Okay.  Was the conversation before the

13  officers arrived at about the same tone as when they

14  arrived?

15              MS. STILLWELL:  Form.

16              THE WITNESS:  At the beginning, yes.

17  BY MR. FARAJ:

18     Q.   Okay.  And so when he said, "I need to use the

19  bathroom," did you say anything back?

20     A.   I told him that he could use the bathroom, but

21  he needed to take the dog outside.

22     Q.   Okay.  At some point he picked up his dog,

23  true?

24     A.   He didn't pick up the dog until Officer

25  Grenier showed up, or right before he showed up.

1      Q.   And that's what I said.  At some point he
2  picked up the dog, true?
3      A.   Yes.
4              MS. STILLWELL:  Form.
5  BY MR. FARAJ:
6      Q.   Okay.  And so at that point the dog was under
7  control?
8              MS. STILLWELL:  Form, foundation.
9              THE WITNESS:  He was holding the dog,
10  yes.
11  BY MR. FARAJ:
12     Q.   Sir, you've seen dogs that small before,
13  haven't you?
14             MS. STILLWELL:  Form.
15             THE WITNESS:  Yes.
16  BY MR. FARAJ:
17     Q.   And a lot of the owners of those types of
18  dogs, not just Chihuahuas, but those little tiny dogs,
19  oftentimes they're carried either in hands or bags.
20  You're familiar with that?
21             MS. STILLWELL:  Objection, form.
22             THE WITNESS:  I've seen it before, yes.
23  BY MR. FARAJ:
24     Q.   Okay.  So at the point that his dog is now
25  under control in his hands, is there any reason why he

```
 1  would not be able to use the bathroom?
 2      A.   Well, at that point he had pushed me.
 3      Q.   Okay.
 4      A.   And so -- no, wait.  He had pushed me.  So can
 5  you repeat the question again.
 6      Q.   I said is there a reason why he wouldn't use
 7  the bathroom, and you said at that point he pushed me.
 8      A.   Yes.
 9      Q.   Is that your recollection?
10      A.   Yes.
11      Q.   Okay.
12      A.   When he picked up the dog, he had pushed me
13  already.  So at that point I asked him to leave as
14  well.
15      Q.   At what point were the police, was 911 called?
16      A.   Just right after he pushed me.
17      Q.   Who called 911?
18      A.   My staff, Hannah.
19      Q.   How did she know to call 911?
20              MS. STILLWELL:   Form.
21              THE WITNESS:   She was at the front desk
22  where she could see everything, and I just asked her to
23  call 911.
24  BY MR. FARAJ:
25      Q.   What else did you say to her when you asked
```

1   her to call 911?

2       A.   That was it.

3       Q.   When you say he pushed you, describe exactly

4   where you were standing and where he was standing in

5   the center.

6       A.   I was standing by the vending machines in

7   front of the entranceway to both bathrooms.  And he was

8   standing in front of me.

9       Q.   I'm referring to COP 000148.  I'm not going to

10  mark it as an exhibit just yet.  Are you familiar with

11  this diagram, sir?

12              MS. STILLWELL:  Form.

13              THE WITNESS:  It appears to be someone's

14  layout of the actual restroom, but not the front desk

15  or the front area.

16  BY MR. FARAJ:

17      Q.   Take a look at COP 000147.  Sorry.  Does that

18  represent the front desk and hallway area?

19              MS. STILLWELL:  Form.

20              THE WITNESS:  Yes.

21  BY MR. FARAJ:

22      Q.   Sir, I'm going to hand you a blue pen.  I

23  would like you to draw a line.  I want you to use a dot

24  and then draw a line to one of the blank -- or blank

25  areas of the page so we can label it as where you were

1    standing.  So lets begin by putting -- placing a dot at

2    where you were standing when Mr. Muhaymin -- when you

3    say he pushed you, or pushed you, right?

4        A.   Yes.

5        Q.   Okay.  And so you can use either one to best

6    accurately depict where you were standing.

7               MS. STILLWELL:  Form.

8    BY MR. FARAJ:

9        Q.   All right, sir.  And I see what you did here

10   on 147.  Do you see the -- on the diagram where it says

11   storage room right there?

12       A.   Yes.

13       Q.   Right next to it do you see what is

14   represented as the restrooms?

15       A.   Yes.

16       Q.   And is that -- is this a blow up of those

17   restrooms -- is 148 a blow up of the restrooms on 147?

18               MS. STILLWELL:  Form and foundation.

19               THE WITNESS:  Yes.

20   BY MR. FARAJ:

21       Q.   And so if you would estimate for me, sir, from

22   the entrance -- let me show you what I'm talking about.

23   Actually, you can keep that.  From the entrance here to

24   the restrooms, to both sides, how far away were you

25   from this area in feet where Mr. Muhaymin pushed you?

1            MS. STILLWELL:  Form, foundation.

2            THE WITNESS:  I mean, I was in this area

3    right here.  So you're saying from the entrance to

4    there?

5    BY MR. FARAJ:

6        Q.   Yeah, approximately.

7        A.   Five feet.

8        Q.   Okay.  And so, again, if -- hypothetically, if

9    this were -- if this is the blow up, you would be in

10   this area here; is that right?

11       A.   Yes.

12       Q.   Where you got pushed?  I'm going to put an X

13   there.  That's just an estimate so we can have some

14   reference.

15            Now using the blue pen, sir, show me

16   where Mr. Muhaymin was located when he pushed you.

17       A.   He was right in front of me.

18            MS. STILLWELL:  Form.

19   BY MR. FARAJ:

20       Q.   Where was his dog?

21       A.   It was on the floor.  I wasn't paying

22   attention to the dog.  I was --

23       Q.   Okay.

24       A.   -- paying attention to him.

25       Q.   How did he push you?

1      A.    With his two hands.

2      Q.    So I'm going to come around.  I would like you

3  to show me on video exactly how that -- how that

4  occurred.  Okay?

5               MS. STILLWELL:  Form.

6  BY MR. FARAJ:

7      Q.    So I'm going to stand here.  I'm going to

8  represent Mr. Muhaymin.

9               THE VIDEOGRAPHER:  Loud and clear.

10  BY MR. FARAJ:

11     Q.    I'm sorry.  I'm going to be you and you do

12  what Mr. Muhaymin did.

13               MS. STILLWELL:  And just for the record,

14  there won't be any pressure or --

15               MR. FARAJ:  No, I want to know --

16               MS. STILLWELL:  -- force.

17               MR. FARAJ:  I want to know exactly how

18  Mr. Muhaymin did it.  So you can use the same amount of

19  pressure.

20               MS. STILLWELL:  And I'm going to ask him

21  not to use that same amount of pressure.

22               THE WITNESS:  I don't feel comfortable

23  doing that.

24               MS. STILLWELL:  No. No. No.

25               MR. FARAJ:  Stop.  Stop.  You can't do

 1   that.  You can't do that.  I have a right to take the

 2   deposition, and I want to understand exactly how he did

 3   it.

 4                  MS. STILLWELL:  You were asking him to

 5   push you in the manner and with the same force that

 6   Mr. Muhaymin pushed Mr. Tarango; is that my

 7   understanding?

 8   BY MR. FARAJ:

 9        Q.   Would you come and stand behind me.  That way

10   I don't fall back in case it's hard.  So I'm giving you

11   permission to do the same thing, sir, okay.  Go ahead.

12                  (The witness pushes Mr. Faraj.)

13        Q.   Okay.  Thank you.  The witness has done as

14   directed.  That describes exactly how Mr. Muhaymin did

15   it, right?

16                  MS. STILLWELL:  I'm going to object again

17   to this whole demonstration.  Oh, boy.

18                  MR. FARAJ:  Don't hurt the witness.

19                  THE WITNESS:  Sorry.  Did I do something?

20                  MR. FARAJ:  No, you didn't do anything.

21   You're fine.

22                  THE WITNESS:  Is it?

23                  MS. STILLWELL:  Can we go off the record

24   for one second?

25                  MR. FARAJ:  Sure.

```
 1                   THE VIDEOGRAPHER:  Going off the record.
 2   The time is 2:56 p.m.
 3                   (Recess taken from 2:56 p.m. to
 4   2:57 p.m.)
 5                   THE VIDEOGRAPHER:  We're back on the
 6   record.  The time is 2:57 p.m.  Thank you.
 7                   MS. STILLWELL:  Thank you.  We just
 8   needed to adjust the background.  Again, I do object to
 9   that whole demonstration that you had requested him to
10   do.
11   BY MR. FARAJ:
12       Q.   I would like you to think, to remember how you
13   were oriented inside the Maryvale Community Center when
14   you say Mr. Muhaymin pushed you.  Okay?
15       A.   Okay.
16       Q.   Now would your back have been to the entrance
17   of the restrooms?
18                   MS. STILLWELL:  Form.
19                   THE WITNESS:  Yes.
20   BY MR. FARAJ:
21       Q.   And would he have been --
22       A.   Excuse me.
23       Q.   -- facing the restrooms and you, obviously?
24       A.   Yes.
25       Q.   Okay.  When, as you say he pushed you, what
```

```
 1   did you do and what did you say?
 2       A.   I stepped back to get away from him.  And then
 3   just kind of walked backwards as he kept coming forward
 4   trying to push past me with his shoulders.  I didn't
 5   say anything to him.  I just told Hannah to call the
 6   police.
 7       Q.   Okay.  How were you feeling at the time?
 8               MS. STILLWELL:  Form.
 9               THE WITNESS:  Well, he had just pushed
10   me.  So worried what else he was going to do.
11   BY MR. FARAJ:
12       Q.   Okay.  He had never expressed any kind of
13   intent to hurt anyone before, true?
14       A.   He had threatened me before.
15       Q.   Okay.  How did he threaten you before?
16       A.   Um, he had told me that at one point, one of
17   the incidents that I told him that he needed to leave,
18   or I was going to call the police.  And he said go
19   ahead and call the police.  What are they going to do?
20   And you better watch out.
21       Q.   When he said "you better watch out," what did
22   you think that meant?
23               MS. STILLWELL:  Form.
24               THE WITNESS:  As -- I took it as a
25   threat.
```

```
1   BY MR. FARAJ:

2       Q.   It sounds like a serious threat, right?

3       A.   I took it as a threat.

4       Q.   Yeah.  Did you take it as a serious threat or

5   a joking threat?

6       A.   I didn't think he was joking.

7       Q.   Okay.  And so because you took it seriously,

8   how were you feeling when he said that?

9                MS. STILLWELL:  Form.

10               THE WITNESS:  I was worried about what

11  could possibly happen.

12  BY MR. FARAJ:

13      Q.   Are there kids at the center?

14      A.   Sometimes, yes.

15      Q.   I'm assuming you would be concerned about the

16  kids at the center also if he's making threats, right?

17      A.   I would be concerned about anybody that's at

18  the center, my staff, patrons.

19      Q.   But especially kids, wouldn't you agree?

20               MS. STILLWELL:  Form.

21               THE WITNESS:  I don't think there is a

22  different level whether they're kids or not.  It's any

23  patron or any staff, anybody would be at the same level

24  of concern.

25  BY MR. FARAJ:
```

```
 1      Q.   Okay.  And so -- and do you drive to work?
 2      A.   I do.
 3               MS. STILLWELL:  Form.
 4   BY MR. FARAJ:
 5      Q.   Okay.  Were you concerned that he would note
 6   the kind of car you have, because he threatened you to
 7   maybe ambush you when you're not looking?
 8               MS. STILLWELL:  Form.
 9               THE WITNESS:  I don't know exactly what
10   he would do, but I was worried.
11   BY MR. FARAJ:
12      Q.   Okay.  About how many patrons do you have at
13   the center on a daily basis?
14      A.   I can't recall, or I don't know exactly.  I
15   mean, it varies from day-to-day.
16      Q.   Do people check in?
17      A.   They're supposed to.
18      Q.   And you keep track of that?
19      A.   When they check in, yes.
20      Q.   And you report that?
21               MS. STILLWELL:  Form.
22               THE WITNESS:  Sometimes, yes.
23   BY MR. FARAJ:
24      Q.   You report it -- you have a reporting
25   requirement.  Your supervisor wants to know how often
```

```
 1   people are using the center; isn't that true?
 2              MS. STILLWELL:  Form, foundation.
 3              THE WITNESS:  If it's requested, yes.
 4   BY MR. FARAJ:
 5      Q.   Okay.  And so at that time, about how many
 6   people were coming to the center every month?
 7      A.   I don't remember or I don't recall.
 8      Q.   More than 100 a day?
 9      A.   I don't recall.
10      Q.   How many employees do you have?  How many did
11   you have at the time?
12              MS. STILLWELL:  Form.
13              THE WITNESS:  I -- maybe 10 to 12, or 8
14   to 10.  I don't remember.
15   BY MR. FARAJ:
16      Q.   Okay.  And so based on this threat that was
17   made to you at the time you told Mr. Muhaymin you would
18   call the police if he didn't leave, isn't it true that
19   you did nothing?
20              MS. STILLWELL:  Form.
21              THE WITNESS:  I don't understand your
22   question.
23   BY MR. FARAJ:
24      Q.   Let me take it step by step.  You didn't call
25   the police?
```

1     A.   The time that he threatened me?

2     Q.   Yeah.

3     A.   No.

4     Q.   You didn't create a report?

5     A.   No.

6     Q.   You didn't tell anybody?

7     A.   Mm-hm.  I think I did talk to my supervisor

8  about it or mentioned it.

9     Q.   Okay.

10    A.   Possibly.

11    Q.   Your supervisor is Jan Sherwood?

12    A.   Yes.

13    Q.   What's her number?

14              MS. STILLWELL:  Form.

15              THE WITNESS:  (602) 262-5051.

16              MS. STILLWELL:  And you will contact her

17  through our --

18              MR. FARAJ:  No, I'm not.  She's not

19  represented.

20              MS. STILLWELL:  She works for the City of

21  Phoenix.

22              MR. CHAMI:  She's not a defendant.

23              MS. STILLWELL:  Yes, it is.

24              MR. CHAMI:  It was dismissed.

25              MR. FARAJ:  You guys filed a motion and

1   got the City dismissed.

2                   MS. STILLWELL:  No.  I am going to ask

3   that you do not contact her.

4                   MR. FARAJ:  I don't have a letter of

5   representation from you.

6                   MS. STILLWELL:  Okay.  We're going to

7   stop the deposition.  We'll get the court on the phone.

8                   MR. CHAMI:  I'm not going to stop the

9   deposition.

10                  MR. FARAJ:  We're not stopping the

11  deposition.  And show me something where the City is

12  represented and that you're representing Jan Sherwood.

13                  MS. STILLWELL:  She is a City employee.

14  I ask that you do not contact her.

15                  MR. FARAJ:  You represent --

16                  MS. STILLWELL:  And if you need to, we

17  will get the court on the phone to address this.

18                  MR. FARAJ:  You represent every person in

19  the City of Phoenix?

20                  MS. STILLWELL:  You will not talk to one

21  of our employees.  I do represent City of Phoenix.

22                  MR. FARAJ:  Who do you represent?

23                  MS. STILLWELL:  She is a City of Phoenix

24  employee.

25                  MR. FARAJ:  Show me on --

1                 MS. STILLWELL:  The City of Phoenix has

2     been dismissed from this lawsuit, but I do represent

3     the City.  So I am asking that you not contact her

4     directly.

5                 MR. FARAJ:  I'm not suing the City.

6                 MS. STILLWELL:  If you need to, again, we

7     can stop the deposition and get the court on the phone.

8                 MR. FARAJ:  I don't need to stop the

9     deposition.  I don't need to get the court on the

10    phone.  You're welcome to do whatever you want.  But

11    I'm not stopping the deposition.  I'm not getting the

12    court on the phone.  And until you get me a letter of

13    representation formally that you represent Jan

14    Sherwood, I'm not, not calling her.  So we're going to

15    call her today.  You want to get your office to send me

16    a letter of representation, I'll wait.

17                MS. STILLWELL:  We will do that.  Let's

18    take a break.

19                MR. FARAJ:  No, no.  You can -- you can

20    get on the --

21                MS. STILLWELL:  No.  I would like to take

22    a break.

23                MR. FARAJ:  When we take a break, we'll

24    do it.  But I'm not going to do it before you -- I'm

25    not going to do it before you have an opportunity to

1  give me your notice.

2              MS. STILLWELL:  No.  There is no question

3  pending.  I would like to take a break.

4              MR. FARAJ:  Go ahead.  Go ahead.  I'm not

5  going to stop you from taking a break.

6              THE VIDEOGRAPHER:  Going off the record.

7  The time is 3:05 p.m.

8              MR. FARAJ:  Hold on.  Get back on the

9  record.

10             THE VIDEOGRAPHER:  We're on the record

11 still.

12             THE WITNESS:  I thought I was able -- or

13 I can't take a break?

14             MR. FARAJ:  Hold on.  You can take a

15 break at any time.  We're going to.

16             Just to be clear on the record,

17 Mr. Tarango give me the number for Ms. Sherwood.  I was

18 beginning to call her and everyone lost their mind,

19 because apparently she's some secret witness that has

20 never been -- we've never been told about.

21             And suddenly this law office represents

22 Ms. Sherwood.  And so we've been told by counsel that

23 they represent her.  Because counsel has made that

24 representation, I have to give her the benefit of the

25 doubt.  I'm going to give them an opportunity before

 1    the end of the day today to get me something, e-mail or
 2    letter, that not only do they represent the City of
 3    Phoenix, but that they represent Jan Sherwood obviously
 4    in this matter.  Okay.
 5                    And so now we'll take -- unless you put
 6    to put something on.
 7                    MS. STILLWELL:  No, no, of course.  And
 8    I, of course, take offense to your idea that I lost my
 9    mind.  Mr. Tarango should not have given you that
10    number.
11                    MR. FARAJ:  Why not?
12                    MS. STILLWELL:  She is a City employee.
13    No, sorry, Mr. Chami --
14                    MR. CHAMI:  I'm attorney of record.
15                    MS. STILLWELL:  I understand that.  But,
16    you know, sir, you are not the one asking the questions
17    in the earlier deposition or in this deposition.  And
18    it's so far beyond, your facial expressions, sir.  I
19    mean --
20                    MR. CHAMI:  I don't care.
21                    MS. STILLWELL:  -- it is unprofessional.
22                    MR. CHAMI:  I will be clear that my
23    facial expressions will not be controlled to your
24    liking.  And here's what I'm going to tell you.  The
25    City of Phoenix is not a defendant in this case.  If

| | |
|---|---|
| 1 | you have a separate representation agreement with the |
| 2 | City, it doesn't give you some sort of umbrella to |
| 3 | protect every employee in the City from discussions |
| 4 | with attorneys in cases that they're not a party to. |
| 5 | And the fact that you want to make those |
| 6 | claims on the record, by all means, supply the letter |
| 7 | of representation that you represent not only Ms. |
| 8 | Sherwood but the City in this case.  And when you do |
| 9 | that, the issues are resolved. |
| 10 | MS. STILLWELL:  It is far beyond your |
| 11 | facial recognitions, Mr. Chami.  It is unprofessional. |
| 12 | MR. CHAMI:  I'm -- your comments are duly |
| 13 | noted. |
| 14 | MS. STILLWELL:  You're laughing, you're |
| 15 | making snide remarks, and you are not miked so it's not |
| 16 | being caught on any of the record. |
| 17 | MR. CHAMI:  Well, you're trying to put it |
| 18 | on the record, but it is actually -- |
| 19 | MS. STILLWELL:  No.  Let me finish, |
| 20 | Mr. Chami. |
| 21 | MR. CHAMI:  No, I'm not going to let you |
| 22 | finish and make false representations about me. |
| 23 | MS. STILLWELL:  It's not -- |
| 24 | MR. CHAMI:  And if I have -- if your |
| 25 | client wants to make a false statement under oath, and |

1  I find that to be offensive, and I smirk in a way

2  that's offended by his lie, then you can take offense

3  to that.  But I don't care, because it's offensive that

4  he sits under oath and lies.

5              MS. STILLWELL:  Mr. Chami, you are so far

6  out of line.

7              MR. CHAMI:  All right.  Well, I'm glad.

8  You're --

9              MS. STILLWELL:  Let's take a break.

10             MR. FARAJ:  Guys --

11             MR. CHAMI:  Let's take a break.

12             MR. FARAJ:  -- yeah, we need -- let's

13  take a break.  We need to finish this deposition.

14             THE VIDEOGRAPHER:  Going off the record.

15  The time is 3:08 p.m.

16             (Recess taken from 3:08 p.m. to

17  3:27 p.m.)

18             THE VIDEOGRAPHER:  We're back on the

19  record.  The time is 3:27 p.m.  Thank you.

20  BY MR. FARAJ:

21    Q.   Mr. Tarango, we were discussing your report to

22  Ms. Sherwood of being threatened by Mr. Muhaymin; do

23  you recall that?

24             MS. STILLWELL:  Form.

25             THE WITNESS:  The discussion that we were

```
1    having?
2    BY MR. FARAJ:
3        Q.   Yes, just 10 minutes ago.
4        A.   Yes.
5        Q.   Okay.  Now, how did you communicate the threat
6    made to you by Mr. Muhaymin to Ms. Sherwood?
7                    MS. STILLWELL:  Form.
8                    THE WITNESS:  Well, I had said that I
9    might have informed her of it.  But I don't remember if
10   it would have been through conversation if it happened.
11   BY MR. FARAJ:
12       Q.   So when you say you might have, what led you
13   to say that?
14       A.   'Cause I can't remember if I did or if I
15   didn't.  I might have said it, but I don't remember if
16   I did.
17       Q.   Okay.  You're aware that we requested
18   documents in this litigation that have been produced by
19   your lawyer and the other people that work at your
20   lawyer's office?  You're aware of that?
21                   MS. STILLWELL:  Form and foundation.
22                   THE WITNESS:  Yes.
23   BY MR. FARAJ:
24       Q.   You've responded, you've answered something
25   called interrogatories.  Do you remember those
```

1  questions that you were provided and provided answers?

2              MS. STILLWELL:  Form.

3              THE WITNESS:  Yes.

4  BY MR. FARAJ:

5      Q.   Okay.  And I'll also represent to you that we

6  have not received a shred of evidence, either

7  documentary or otherwise, that you ever reported that

8  Mr. Muhaymin threatened you in the past.  Do you

9  believe there is a record that contradicts that, that

10 there was never a threat made?

11     A.   Can you repeat the question.  Sorry.

12     Q.   Is there a record -- do you know, have you

13 ever created a report, sent an e-mail, wrote a note,

14 placed it in a log, created some document of -- or

15 memorializing the threat made by Mr. Muhaymin?

16     A.   After the incident, there was an IRMA report

17 that was submitted.

18     Q.   After what?

19     A.   After the incident of -- the day that the

20 incident happened.

21     Q.   Are you talking about January 4th?

22     A.   Yes.

23     Q.   Okay.  I'm sorry.  I wasn't very clear.  You

24 told me earlier that before that incident, before the

25 January 4th incident, he threatened you.  Do you recall

1   that?

2       A.   Yes.

3       Q.   Do you know of any document, either whether

4   you created or someone else created, that shows a

5   report of that threat?

6       A.   No.

7       Q.   Is it true that you never created a report of

8   that threat?

9               MS. STILLWELL:  Form.

10              THE WITNESS:  I don't remember.

11  BY MR. FARAJ:

12      Q.   Is it true that you never e-mailed anyone

13  communicating that you had been threatened?

14              MS. STILLWELL:  Form.

15              THE WITNESS:  I don't remember.

16  BY MR. FARAJ:

17      Q.   If you told Ms. Sherwood, how do you believe

18  you would have communicated that to her?

19      A.   Through conversation.

20      Q.   When did that conversation take place?

21              MS. STILLWELL:  Form.

22              THE WITNESS:  I don't remember.

23  BY MR. FARAJ:

24      Q.   What -- what would refresh your memory as to

25  when that conversation took place?

```
 1              MS. STILLWELL:  Same objection.
 2              THE WITNESS:  I don't remember when it
 3    would have happened.
 4    BY MR. FARAJ:
 5       Q.   Based on your -- what you understand your
 6    duties to be, would it be fair to say, sir, that you
 7    have an obligation, you're duty bound to report serious
 8    threats that are made that you believe are real threats
 9    to your employees or to members of the public that
10    patronize the center?
11              MS. STILLWELL:  Form, foundation.
12              THE WITNESS:  Yes.
13    BY MR. FARAJ:
14       Q.   And you did not -- you did not report the
15    supposed threat that was made to you by Mr. Muhaymin
16    either on that day or after?
17              MS. STILLWELL:  Same objections.
18              THE WITNESS:  I don't remember if I did
19    or not.
20    BY MR. FARAJ:
21       Q.   In fact, sir, you were asked by the detective
22    after the January 4th incident -- remember you were
23    interviewed by a detective, and the detective audio
24    recorded it; do you remember that?
25       A.   Yes.
```

1      Q.   And he asked you if you had ever been

2   threatened, if you had any -- any type of issues with

3   him before, confrontations, and you said no.  He would

4   just come in, use the bathroom and leave.  And you said

5   a couple of times he came in and asked for ice.  And we

6   don't -- we told him we don't give ice to members of

7   the public.  Isn't that true?

8                MS. STILLWELL:  Form.

9                THE WITNESS:  If that's what's on the

10  recording.

11  BY MR. FARAJ:

12     Q.   I'll represent to you, sir, that that's where

13  I learned about the ice.  Remember we were talking

14  about the ice.  I listened to that audio recording.

15  And that's where I learned about him asking for ice,

16  and either you or a member of your staff saying we

17  don't give ice to members of the public.  True?

18                MS. STILLWELL:  Form.

19                THE WITNESS:  Yes.

20  BY MR. FARAJ:

21     Q.   Isn't that what happened?

22     A.   That's what I told him, yes.

23     Q.   Okay.  And he asked you if you had any

24  confrontations with him, if he had ever threatened you,

25  and you said no.

 1                  MS. STILLWELL:  Form.

 2                  THE WITNESS:  At the time I was -- the

 3     incident had just happened.  I -- there was a lot of

 4     things going on.  So I don't remember.  If it's on the

 5     recording, then yes, that's what I probably told him.

 6     BY MR. FARAJ:

 7         Q.   If you'd like, I can play the whole thing for

 8     you, or I'll let Ms. Stillwell play it for you when

 9     you're done.

10         A.   Is that a question?

11         Q.   Yeah.

12         A.   Okay.  What was the question?

13         Q.   Isn't it true that you never reported a

14     threat, you've never mentioned a threat before today?

15                  MS. STILLWELL:  Form.

16     BY MR. FARAJ:

17         Q.   Isn't that true?

18         A.   It's on my IRMA report after the incident that

19     happened on the -- the day of the incident on the

20     report.

21         Q.   Is this the IRMA report?

22         A.   No.

23         Q.   What is the IRMA report?  Describe it for me.

24     If you explain it, I might be able to find it.

25         A.   It's -- it's a report that we have to go in to

```
 1   -- to the -- it's our -- it's our reporting system that
 2   we use for incidents.  I apologize.  I can't think of
 3   what it stands for.
 4                 MS. STILLWELL:  Would you like it?
 5                 MR. FARAJ:  Sure.
 6                 MS. STILLWELL:  It's COP 011239 through
 7   COP 011246.  If you want a hard copy.  That's my copy,
 8   but if you need to look at it.
 9                 MR. FARAJ:  I'm familiar with this.  It's
10   the one with the text messages.
11                 MS. STILLWELL:  Yes, sir.
12                 MR. FARAJ:  Okay.  I'm familiar with
13   this.
14                 MR. CHAMI:  Do you want a copy of it?
15                 MR. FARAJ:  No.  I know what this is.
16   BY MR. FARAJ:
17       Q.   Okay.  That was created after the January 4th
18   incident, true?
19       A.   Yes.
20       Q.   Now, how do you create those reports?  What is
21   the system that you use?
22       A.   There's a system that we go in and we type in
23   the information.
24       Q.   Where is it located?  In a computer?
25                 MS. STILLWELL:  Form.
```

1              THE WITNESS:  Yes.  It's in our system

2    that we -- when you log in, you're able to go into the

3    IRMA system which is -- I can't think of it off the top

4    of my head.  I apologize.  I don't know if it's on

5    there.

6    BY MR. FARAJ:

7        Q.   Was the IRMA system --

8        A.   It's a reporting system, incident management

9    -- sorry.  I can't remember what it is, but the acronym

10   is IRMA.

11       Q.   That's okay.  Is it accessible from a terminal

12   in your office?

13       A.   From my computer or any computer that we log

14   into.

15       Q.   Okay.  Was is accessible when you started work

16   at the Maryvale Community Center?

17       A.   Yes.

18              MS. STILLWELL:  Form.

19   BY MR. FARAJ:

20       Q.   And so, sir, you had that -- an opportunity to

21   make a report almost contemporaneously with, at the

22   time that the threat was made by Mr. Muhaymin, and you

23   did not, correct?

24       A.   Yes.

25       Q.   And the entire reason that system exists is so

1  you can make reports about threats, true?

2              MS. STILLWELL:  Form and foundation.

3  BY MR. FARAJ:

4      Q.   Among other things?

5      A.   Yes, incidents.

6      Q.   And you could have, had you decided to, you

7  could have trespassed Mr. Muhaymin at the time he made

8  that serious threat to you, your employees and the

9  patrons, true?

10     A.   Yes.

11             MS. STILLWELL:  Form.

12  BY MR. FARAJ:

13     Q.   But you did not, true?

14             MS. STILLWELL:  Same objection.

15             THE WITNESS:  True.

16  BY MR. FARAJ:

17     Q.   Now, on the date of this incident, sir, and

18  you were describing for me the positioning where you

19  say Mr. Muhaymin pushed you.  About how much after --

20  well, would you agree that the officer arrived a very

21  short time after the call is made?

22             MS. STILLWELL:  Form.

23             THE WITNESS:  I don't remember what the

24  timeline was, but --

25  BY MR. FARAJ:

```
 1        Q.   Okay.  What -- what did Mr. Muhaymin do after
 2   he pushed you?
 3                MS. STILLWELL:  Form.
 4                THE WITNESS:  He tried to get past me to
 5   get to the restroom.
 6   BY MR. FARAJ:
 7        Q.   Okay.  So he pushed you, then tried to get
 8   past you, true?  Is that what I understand?
 9        A.   Yes.
10        Q.   And what did you do when he did that?
11        A.   I just kept backing up.
12        Q.   Okay.  And at some point you kept backing up
13   and stood by the entrance to the bathroom; is that
14   right?
15        A.   That's where we ended up.
16                MS. STILLWELL:  Form.
17   BY MR. FARAJ:
18        Q.   Okay.  And that's when -- where you were when
19   the officer arrived?
20        A.   Yes.
21        Q.   And so just to be clear, he pushes you, tries
22   to get past you, you keep backing up, right?
23                MS. STILLWELL:  Form.
24                THE WITNESS:  Yes.
25   BY MR. FARAJ:
```

```
 1        Q.   And so you end up in that position that you're
 2    in when the first officer arrives on the scene.  I'm
 3    going to show you the first portion of the clip from
 4    that.  I want to make sure that I understand your
 5    positioning.  Is that right, you did not move positions
 6    again before the officer arrived?
 7        A.   Not that I can recall.
 8        Q.   Get to the start.  So I'm going to show you,
 9    sir, video that is labelled COP 00001.  Let's go back
10    to 1:05.  I want to stop.  Let's go back further.
11                   (Video played.)
12        Q.   Mr. Tarango, do you recognize the image on the
13    screen?
14        A.   Yes.
15        Q.   Is that the community center?
16                   MS. STILLWELL:  Form and foundation.
17                   THE WITNESS:  Yes.
18    BY MR. FARAJ:
19        Q.   Have you ever seen this video before?
20                   MS. STILLWELL:  Form.
21                   THE WITNESS:  Once from that point and
22    another time from when we were standing.
23    BY MR. FARAJ:
24        Q.   Okay.  The only reason I started here is to
25    orient you to where you're at, so you understand.  So
```

1   you're oriented to where this is.  You recognize this?

2       A.   Yes.

3       Q.   Is that the entrance to the community center?

4       A.   Yes.

5               MS. STILLWELL:  Form.

6               MR. FARAJ:  Okay.  So let's run it.

7   Please put it back there.

8               (Video played.)

9   BY MR. FARAJ:

10      Q.   Is this the walk down the hallway towards the

11  desk?

12      A.   Yes.

13      Q.   This is the front desk, that reddish thing?

14      A.   Yes.

15      Q.   And we're at 1:05 of the video COP 0001.  We

16  just saw a Christmas tree.  Do you remember that was

17  still up in January of 2017?

18      A.   Yes.

19      Q.   And you recognize yourself?

20      A.   I do.

21      Q.   Okay.  And so just a few minutes ago you

22  described being pushed.  He tried to get past you.  You

23  kept backing up.  And you told me you wound up in a

24  certain position, true?

25              MS. STILLWELL:  Form.

```
 1                    THE WITNESS:  Yes.
 2   BY MR. FARAJ:
 3      Q.   Is this the position you wound up in, which is
 4   the position you're in when the officer arrives?
 5                    MS. STILLWELL:  Same objection.
 6                    THE WITNESS:  Yes.
 7                    MR. FARAJ:  Okay.  No, it doesn't matter.
 8   BY MR. FARAJ:
 9      Q.   Between the time that Mr. Muhaymin pushes you
10   and the time the officer arrives, he didn't go
11   anywhere, did he?
12      A.   Mr. Muhaymin?
13                    MS. STILLWELL:  Form.
14   BY MR. FARAJ:
15      Q.   Yes.  He stayed -- he stayed facing you?
16                    MS. STILLWELL:  Form.
17                    THE WITNESS:  That I can remember, yes.
18   BY MR. FARAJ:
19      Q.   So, again, he pushes you, attempts to go
20   through, you keep backing up, you wind up in this
21   position, and neither of you really moves away from
22   this position before the officer arrives?
23      A.   Yes.
24      Q.   You essentially have eyes on him the entire
25   time?
```

```
 1                    MS. STILLWELL:  Form.
 2                    THE WITNESS:  Yes.
 3   BY MR. FARAJ:
 4        Q.   Okay.  So explain this to me, sir.
 5                    (Video played.)
 6        Q.   I want to stop it.  I'm stopping the video at
 7   1:15.  You see that brown thing in the image?
 8        A.   Yes.
 9        Q.   That's the dog, --
10                    MS. STILLWELL:  Form.
11   BY MR. FARAJ:
12        Q.   -- right?
13        A.   It is.
14        Q.   Now you told me that he pushed you, right?
15        A.   He pushed me before that.
16        Q.   Okay.  I said he pushed you, right?
17        A.   Yes.
18        Q.   So if he pushed you, the dog wasn't in his
19   hands?
20                    MS. STILLWELL:  Form.
21                    THE WITNESS:  No.
22   BY MR. FARAJ:
23        Q.   And in this image, when the officer arrives
24   the dog is in his hands?
25        A.   Yes.
```

1       Q.   And between the time he pushed you and the
2   time the officer arrives, he advanced at you, and you
3   remained in the same position, which is what we said
4   earlier, true?
5                MS. STILLWELL:   Form.
6                THE WITNESS:   I was backing up, like
7   backing up to kind of get away when he was walking,
8   pushing past -- trying to push past me to get --
9   BY MR. FARAJ:
10      Q.   I understand.
11      A.   Okay.  Well, I just want to clarify.
12      Q.   Okay.  So did he push you with the dog in his
13  hands?
14      A.   He did not.  He didn't have the dog in his
15  hands when he pushed me.
16      Q.   So he went to get the dog and came back?
17      A.   The dog was around his feet or around the area
18  right there.  And when he got in that position and he
19  was leaning against the wall, the dog was between his
20  legs.  And he reached down and picked it up.
21      Q.   I see.  And this is the same dog that you have
22  alleged in the past tried to bite some of your staff?
23      A.   Yes.
24      Q.   Has it ever tried to bite you?
25      A.   No.

```
 1        Q.   On that day when there was a contact between
 2   you two, the dog didn't try to bite you?
 3               MS. STILLWELL:  Form.
 4               THE WITNESS:  I don't know if the dog
 5   tried to bite me.  I wasn't focusing on the dog.  I was
 6   looking at Mr. Muhaymin because he had pushed me.
 7   BY MR. FARAJ:
 8        Q.   Okay.  Now, do you understand what it is to
 9   tell the truth and tell a lie?
10               MS. STILLWELL:  Form.
11   BY MR. FARAJ:
12        Q.   You know the difference?
13        A.   I do.
14        Q.   Would you agree that the truth doesn't change?
15               MS. STILLWELL:  Form.
16               THE WITNESS:  Yes.
17   BY MR. FARAJ:
18        Q.   It doesn't change with the circumstances,
19   right?
20        A.   It depends on the circumstances.  Yeah.
21        Q.   Okay.  Assume you're having a conversation
22   with your seven-year old to explain what it is to tell
23   the truth and what it is to lie.  Would it be fair of
24   me to assume that when you speak to your
25   seven-year-old, you say, say things like they are.
```

1    Always tell me the truth.  Do you do that?

2                    MS. STILLWELL:  Form.

3                    THE WITNESS:  I've had conversations with

4    my children, yes, about telling the truth.

5    BY MR. FARAJ:

6        Q.   Okay.  And you -- you agree, sir, that you

7    have a duty to tell the truth?  In fact, that's the

8    law, not to lie to a law enforcement officer?

9        A.   Yes.

10       Q.   You're required to tell the truth to law

11   enforcement, right?

12       A.   Yes.

13       Q.   You're aware, based on your review of videos

14   in this case, that you were asked by a police officer,

15   did this man assault you, and you said no.  Isn't that

16   -- didn't that happen?

17                   MS. STILLWELL:  Form.

18                   THE WITNESS:  I said --

19                   MS. STILLWELL:  Go ahead.

20                   THE WITNESS:  I said that he didn't

21   assault me, but that he pushed me; and so, yes, he

22   pushed me.

23                   MR. FARAJ:  Okay.  9:30.

24                   MR. CHAMI:  Got it.

25   BY MR. FARAJ:

```
 1       Q.   We're going to play COP 01, which is the
 2   video, the dash cam video of -- I'm sorry, the body cam
 3   video off Officer Grenier starting at 9:28.
 4                   (Video played.)
 5       Q.   Stop.  Did he assault you?  No.  That was your
 6   answer, right?
 7                   MS. STILLWELL:  Form.
 8                   THE WITNESS:  Not my --
 9   BY MR. FARAJ:
10       Q.   Hold on, sir.  That was your answer in this
11   video, true?
12                   MS. STILLWELL:  That's a portion of his
13   answer.
14                   MR. FARAJ:  I'm going to get to it.
15   Would you like to testify instead of him?  You can sit
16   in his chair.  I'm happy to depose you.
17                   MS. STILLWELL:  I can certainly object
18   when you're saying that that's his answer.
19                   MR. FARAJ:  You can't say what it is.  I
20   asked him, was that your -- you said no.  Was that your
21   answer?  That was my question.  Isn't that true?  You
22   can clean up when I'm done.  I get to ask the
23   questions.  You're welcome to be deposed if you like.
24                   MS. STILLWELL:  Objection.
25                   MR. FARAJ:  Okay.  We can talk later.
```

 1  BY MR. FARAJ:

 2      Q.   You said no when he asked you if he assaulted

 3  you, true?

 4      A.   Yes, but that was not my full answer.

 5      Q.   I'm going to get to it, I promise you.

 6      A.   Okay.

 7              MR. CHAMI:  Play.

 8              MR. FARAJ:  Let's play the rest.

 9              MR. CHAMI:  I will turn it back a little

10  bit.

11              (Video played.)

12  BY MR. FARAJ:

13      Q.   Stop.  I was trying to get in.  I didn't want

14  to let him in.  So we bumped into each other.  That's

15  your full answer; isn't that true?

16              MS. STILLWELL:  Form.

17              THE WITNESS:  That's what I said on the

18  video.  But what isn't on the video is that with the

19  vicinity that we were in and trying to deescalate, I

20  was trying to deescalate the situation with him, I

21  didn't -- he had already pushed me.  So I wasn't sure

22  what else he was capable of.

23  BY MR. FARAJ:

24      Q.   You got to --

25      A.   And I have to be at the center.  I supervise

```
 1   the center.  And Mr. Muhaymin was going to be at the
 2   center.  So I was trying to deescalate the situation.
 3   And I was worried about what type of retaliation was
 4   going to come back.  So when the officer put me --
 5   pointed right at me when I was standing in close
 6   proximity of him, I was worried.  And so I was trying
 7   to downplay it.
 8       Q.   Let me give you a scenario.
 9       A.   Okay.
10       Q.   An officer testifies that, you know, this man
11   said he wasn't pushed, but, you know, maybe he was
12   scared.  And then you learn that that's what the
13   officer said.  And you decide that's not a bad story.
14   So what I'll -- the position I'll take today is that
15   wasn't the full story in the video.  The reason I
16   didn't say everything that happened is because I was
17   scared.  Does that sound about right?
18                  MS. STILLWELL:  Form.
19                  THE WITNESS:  I was worried about the
20   retaliation possibly, yes.
21   BY MR. FARAJ:
22       Q.   Does my question sound about right?
23       A.   Can you repeat the question.
24                  MS. STILLWELL:  Form.
25                  MR. FARAJ:  Would you repeat the -- I'll
```

1   try it.

2                   THE WITNESS:  Okay.

3   BY MR. FARAJ:

4       Q.   You learn that an officer testified today.

5   You know there was an officer testifying here today,

6   you saw him walk out?

7       A.   I did see the officer.

8       Q.   And you realize that the officer said, you

9   know, even though he said he wasn't assaulted, I didn't

10  take that at face value from Mr. Tarango because maybe

11  he was afraid.  And you learn that, and you think

12  that's not a bad story.  The way I fix what I said is

13  by embracing that story that the officer told it.  The

14  reason I didn't say everything is I was scared.  Is

15  that about right?

16                  MS. STILLWELL:  I object to those

17  insinuations.

18                  THE WITNESS:  So I could tell you that I

19  don't know what the officer said.  I don't know

20  anything to his testimony, or what was -- he was told.

21  All I know is how I was feeling and what I'm saying.

22  BY MR. FARAJ:

23      Q.   At the time that we -- at the scene.  At this

24  point we have three officers, true?

25                  MS. STILLWELL:  Form.

 1                    THE WITNESS:  I don't know.  I'm not
 2   100 percent sure in the video, but I'm assuming that
 3   there was three officers there --
 4   BY MR. FARAJ:
 5        Q.   Well, --
 6        A.   -- at that time.  I don't know.
 7        Q.   -- Mr. -- Mr. Muhaymin is talking to you for a
 8   while, while an officer is standing there and the
 9   officer does nothing.  Isn't that true?
10                    MS. STILLWELL:  Form, foundation.
11                    THE WITNESS:  Yes.
12   BY MR. FARAJ:
13        Q.   And then a couple more officers arrive, and
14   that's when they begin to engage you in conversation;
15   isn't that true?
16                    MS. STILLWELL:  Form.
17                    THE WITNESS:  Yes.
18   BY MR. FARAJ:
19        Q.   And your testimony today, sir, is that you had
20   no fear whatsoever of Mr. Muhaymin when the officers
21   weren't there.  You would stand in his way, you blocked
22   his access, you had no problem standing in this man's
23   way.  But when three officers arrived and began to
24   interject themselves and interrogate him and ask you
25   essentially what happened, are you okay, you decided

```
 1   then that you became scared, that's what you're telling
 2   us?
 3                 MS. STILLWELL:  Form.
 4                 THE WITNESS:  No.  I wasn't -- that's not
 5   when I became scared.  What I was thinking of is after
 6   the fact when the officers aren't there, and I'm there
 7   by myself when Mr. Muhaymin would come back.
 8   BY MR. FARAJ:
 9       Q.   At the time --
10       A.   That's what I was worried about.
11       Q.   At the time of this incident in 2017, you had
12   been with the parks district for since 2004, true?
13                 MS. STILLWELL:  Form.  Go ahead.
14                 THE WITNESS:  If I -- yes, I think so.
15   Like I said, I left and I came back, but yes.
16   BY MR. FARAJ:
17       Q.   Fine.  You started in 2002 at the City of --
18   not the City of Glendale.  You started in 2004 the City
19   of Phoenix Parks and Recreation Department.  And this
20   is 2017.  13 years you've been in this type of job?
21       A.   Yes.
22       Q.   Fair to say that you understood how things
23   work in this job?
24                 MS. STILLWELL:  Form.
25   BY MR. FARAJ:
```

```
 1        Q.   Let me ask it --
 2        A.   Yeah, --
 3        Q.   -- more specifically.
 4        A.   -- it depends on what you're talking about.
 5        Q.   You understood that you could trespass people?
 6                  MS. STILLWELL:  Form.
 7                  THE WITNESS:  Yes.
 8   BY MR. FARAJ:
 9        Q.   And you could have trespassed Mr. Muhaymin
10   long before January 2017?
11                  MS. STILLWELL:  Form.
12                  THE WITNESS:  I -- yes, I could have, but
13   I was again trying to work with Mr. Muhaymin.  You
14   know, again, he was there at the park, and I'm there at
15   the park -- or at the center.  And I was trying to work
16   with Mr. Muhaymin.  In the video I repeatedly say, what
17   are we going to do?  How are we going to figure this
18   out?  And I even state that to him, I tell him, you're
19   here, I'm here.  How are we going to figure this out?
20   I wanted to work with him.
21   BY MR. FARAJ:
22        Q.   And then the officers pulled you aside to talk
23   to you away from Mr. Muhaymin; isn't that true?
24                  MS. STILLWELL:  Form.
25                  THE WITNESS:  Yes.
```

```
 1  BY MR. FARAJ:
 2      Q.   And when they pulled you away, you didn't tell
 3  them you'd been assaulted?
 4      A.   I'd --
 5               MS. STILLWELL:  Form.
 6               THE WITNESS:  -- have to look at the
 7  video.  I don't remember what I told the officer.
 8  BY MR. FARAJ:
 9      Q.   Well, I'll represent to you that the officers
10  arrested him because he had a warrant out for his
11  arrest from the City of Tempe or Mesa.
12               MS. STILLWELL:  Form.
13               THE WITNESS:  Okay.
14  BY MR. FARAJ:
15      Q.   Not because you said he assaulted me.
16      A.   Okay.
17      Q.   I'll represent to you that no officer that
18  we've deposed was going to arrest him because of an
19  assault.  It was because of a warrant.
20      A.   Okay.
21               MS. STILLWELL:  Form, foundation.
22  BY MR. FARAJ:
23      Q.   And so your testimony, as you sit here today,
24  is you were feeling fear and that's why you didn't say
25  assault?
```

1      A.   Yes.

2                MS. STILLWELL:  Form.

3    BY MR. FARAJ:

4      Q.   Okay.  And so you made up a story that you

5    bumped into each other?

6      A.   I did not make up a story.

7                MS. STILLWELL:  Form.

8                THE WITNESS:  It's the truth.

9    BY MR. FARAJ:

10     Q.   Well, which is the truth?  Did he --

11     A.   He --

12     Q.   Let me finish my question, sir.

13     A.   Okay.

14     Q.   You told me that he pushed you.  And then you

15   tell the officer that you bumped into each other

16   because you stood in his way.  You got in his way as he

17   was walking in and you bumped into each other.  Which

18   is the truth?

19     A.   He pushed me.

20     Q.   So why did you lie to the officer?

21                MS. STILLWELL:  Form.

22                THE WITNESS:  Again, at the time I was

23   worried about what was going to possibly happen after

24   the fact.

25   BY MR. FARAJ:

```
 1      Q.   And so when you worry about things you tend to
 2  lie?
 3               MS. STILLWELL:  Form.
 4               THE WITNESS:  I -- I wasn't lying.
 5  BY MR. FARAJ:
 6      Q.   Okay.  Well, you weren't telling the truth,
 7  right?
 8      A.   The truth is that he pushed me.
 9      Q.   To the officer, you were not telling the
10  truth; --
11               MS. STILLWELL:  Form.
12  BY MR. FARAJ:
13      Q.   -- isn't that true?
14      A.   Yes.  Because he pushed me.
15      Q.   Because he pushed you, you weren't going to
16  tell them that he pushed you?
17      A.   No.  I wasn't going to tell them that he
18  pushed me in front of Mr. Muhaymin because I didn't
19  want Mr. Muhaymin to know that.
20      Q.   Okay.
21      A.   Because I was worried about the retaliation.
22      Q.   When they took you aside, you did not tell
23  them that he pushed you?
24      A.   Again, it's not when the officers were there
25  or when the situation was happening.  I mean, I was
```

1  worried, but I was also thinking beyond when the

2  officers aren't there, and the next time Mr. Muhaymin

3  comes in and there's no officers there.

4      Q.   Okay.  And you could have trespassed him,

5  true?

6              MS. STILLWELL:  Form.

7              THE WITNESS:  I could have, yes.

8  BY MR. FARAJ:

9      Q.   And you could have gotten a restraining order,

10  true?

11              MS. STILLWELL:  Form.

12              THE WITNESS:  Yes.

13  BY MR. FARAJ:

14      Q.   You understand that those are things you can

15  do as the director of the center?  You understood that

16  at the time; isn't that true?

17              MS. STILLWELL:  Form.

18              THE WITNESS:  Yes.  But I can also -- I

19  mean, even not do it at that time, but I can do it

20  after the fact as well too.

21  BY MR. FARAJ:

22      Q.   Sure.  Sure.  And you could have done it when

23  the officers pulled you aside to talk to you quietly

24  away from him.  To say, hey, man, I didn't want to tell

25  you what happened in front of him, because I was

```
 1  worried, but look, he assaulted me.  You didn't say
 2  that?
 3                MS. STILLWELL:  Form.
 4                THE WITNESS:  No, I don't think that's on
 5  the video.
 6  BY MR. FARAJ:
 7      Q.  It's not anywhere.  It's not in any of their
 8  reports.  I can give you the -- I'll come back
 9  tomorrow.  I'll let you read this tonight.  But I'll
10  represent to you that no officer that appeared that day
11  ever said that when you reported later that you assault
12  -- that you reported that you had been assaulted.
13                MS. STILLWELL:  Form.
14                THE WITNESS:  Okay.
15  BY MR. FARAJ:
16      Q.  Do you believe that?
17      A.  If that's what you're saying, I don't.
18      Q.  I'll let Mr. Stillwell -- Ms. Stillwell go
19  through it with you, but that's the evidence in this
20  case.  Okay.
21                MS. STILLWELL:  Form, foundation.
22  BY MR. FARAJ:
23      Q.  All right.  So let's get back to this.  I just
24  want to understand your state of mind.  You're worried,
25  therefore you don't tell them the truth?
```

```
 1                    MS. STILLWELL:  Form.
 2                    THE WITNESS:  I was worried, yes.
 3    BY MR. FARAJ:
 4        Q.   You're worried about this lawsuit, aren't you?
 5                    MS. STILLWELL:  Form.
 6                    THE WITNESS:  Um --
 7                    MS. STILLWELL:  No, you don't.
 8                    MR. FARAJ:  No, no, no.  You do not even
 9    begin to try and tell him what to say.
10                    MS. STILLWELL:  I'm not telling him what
11    to say.  And I'm really --
12                    MR. FARAJ:  Stop.
13                    MS. STILLWELL:  -- borderline on the
14    accusations of this.
15                    MR. FARAJ:  Stop, stop.
16    BY MR. FARAJ:
17        Q.   Are you worried about this lawsuit?
18                    MS. STILLWELL:  Form.
19                    THE WITNESS:  I think anybody would be
20    worried about this lawsuit.
21    BY MR. FARAJ:
22        Q.   Okay.  Well, look the jurors in the eye
23    through this camera and tell them why they should
24    believe you when we understand now that you tend to lie
25    when you're worried.
```

```
1                    MS. STILLWELL:  Form.  That is completely
2    inappropriate, Mr. Faraj.
3                    THE WITNESS:  I'm not lying.  He pushed
4    me.
5                    MS. STILLWELL:  Okay.  There's no pending
6    question.  Let's take a break.
7                    MR. FARAJ:  We just took a break.  We got
8    to finish this up today.
9                    MS. STILLWELL:  We're going to take a
10   break.
11                   MR. FARAJ:  No, we're not going to take a
12   break.  You just finished a break.  What do you need a
13   break for?
14                   MS. STILLWELL:  When did we last finish a
15   break, sir?
16                   MR. FARAJ:  It hasn't even been
17   30 minutes.
18                   MS. STILLWELL:  It has been over
19   30 minutes.
20                   MR. FARAJ:  We're going to move on to a
21   new topic.
22                   MS. STILLWELL:  No, I would like to take
23   a break, please.
24                   MR. FARAJ:  All right.
25                   MS. STILLWELL:  Thank you.
```

 1                  THE VIDEOGRAPHER:  Going off the record.
 2      The time is 4:01 p.m.
 3                  (Recess taken from 4:01 p.m. to
 4      4:11 p.m.)
 5                  THE VIDEOGRAPHER:  We're back on the
 6      record.  The time is 4:11 p.m.  Thank you.
 7                  MS. STILLWELL:  Over the break counsel
 8      had a chance to discuss our representation of the City
 9      of Phoenix and its employees.  Plaintiff's counsel is
10      under the impression that the City had been dismissed
11      from the lawsuit.  However, we have reviewed the orders
12      as well as plaintiff's complaint.
13                  The City of Phoenix is still named a
14      defendant, and therefore, our firm does represent its
15      employees, including Jan Sherwood.  Plaintiff's counsel
16      has agreed to not have direct contact with any City
17      employee, but rather address any communications to our
18      office.
19                  Did I misrepresent any of that, sir?
20                  MR. FARAJ:  No.
21                  MR. CHAMI:  I will just say that I know
22      some City employees.  So I will not have any City
23      employee contact in relation to the case.
24                  MS. STILLWELL:  Thank you.
25      BY MR. FARAJ:

1      Q.   Sir, I'm going to hand you what we'll mark as

2   Exhibit 1.  Did we label anything?  Exhibit 1 is going

3   to be the Grenier video.  Exhibit 2 is going to be the

4   document labelled as notice of inquiry.

5              MS. STILLWELL:  Mr. Faraj, I just want

6   some correction, because we had talked before about

7   numbering everything sequentially for all of the

8   depositions.

9              MR. FARAJ:  Fine.  We can do that.

10              MS. STILLWELL:  And so did you still want

11   to do that, or do you want to start a whole new one for

12   Mr. Tarango?

13              MR. FARAJ:  Let's go off the record real

14   quick.

15              THE VIDEOGRAPHER:  Going off the record.

16   The time is 4:12 p.m.

17              (Recess taken from 4:12 p.m. to

18   4:18 p.m.)

19              (Deposition Exhibit No. 1 will be marked

20   for identification by the reporter subsequent to the

21   deposition.)

22              (Deposition Exhibit Nos. 2-5 were marked

23   for identification by the reporter.)

24              THE VIDEOGRAPHER:  We're back on the

25   record.  The time is 4:18 p.m.  Thank you.

 1   BY MR. FARAJ:

 2       Q.   Okay.  Sir, you were interviewed after

 3   Mr. Muhaymin's death on or about January 24, 2017.  Do

 4   you recall giving an interview to a detective?

 5                 MS. STILLWELL:  Form.

 6                 THE WITNESS:  Yes.

 7   BY MR. FARAJ:

 8       Q.   And at the time you were interviewed, you were

 9   aware that Mr. Muhaymin had passed?

10                 MS. STILLWELL:  Form.

11                 THE WITNESS:  Yes.

12   BY MR. FARAJ:

13       Q.   Any apprehension you might have felt when

14   Mr. Muhaymin was alive would have gone -- would have

15   disappeared by this point?

16       A.   What do you mean by that?

17                 MS. STILLWELL:  Form.

18   BY MR. FARAJ:

19       Q.   Any fear of retaliation, any apprehension as a

20   result of Mr. Muhaymin living basically in the park

21   behind the community center would have disappeared,

22   because he was dead at this point?

23       A.   Yes.

24       Q.   I mean, you weren't afraid of him anymore,

25   he's dead, --

1      A.   Yes.

2      Q.   -- true?

3           Okay.  And so when you gave us -- when

4  you gave responses to some questions that were posed to

5  you, I'll direct your attention to number -- paragraphs

6  number 7 and number 10 of Exhibit 4.  You never

7  mentioned -- on Exhibit 4 you never mentioned to the

8  detective that Mr. Muhaymin had threatened you in the

9  past, true?

10          MS. STILLWELL:  Form.

11          THE WITNESS:  I mean, I would have to

12  read through the whole thing.  But what you have

13  highlighted -- let me see.  Yes.  Yeah.  It states on

14  there that I was trying to work with Mr. Muhaymin to

15  resolve the situation without trespassing him during

16  these past incidents.

17  BY MR. FARAJ:

18      Q.   Okay.  The incidents were about his dog.  And

19  to be fair, sir, I'm not suggesting there were no

20  incidents.  You mentioned a few of them in your

21  recorded interview with the police officer.  I'm

22  specifically referring to an allegation of a threat.

23  My point is, you never said that -- you never wrote

24  that in the statement?

25      A.   It's not written here, no.

```
 1        Q.   Okay.  And when you reported about the
 2   interaction with Mr. Muhaymin, you don't say that he
 3   pushed you, you say that he bumped you?
 4        A.   Is that on here?
 5        Q.   Number 10.
 6        A.   Can I see what the question was?
 7        Q.   I believe the questions --
 8        A.   It's on the other page.
 9        Q.   Yeah.  You can review the document.
10        A.   And then what was the question again?
11        Q.   In your written response to the question, "You
12   stated that Mr. Muhaymin lunged and bumped you to try
13   to get into the restroom.  Please explain why you did
14   not move from the door to allow him to use the restroom
15   and wait until the police arrived."  That's the
16   question that was posed to you, sir.
17             And you responded, "Prior interactions
18   with Mr. Muhaymin had never become physical.  It took
19   me by surprise when he bumped me on this day.  I was
20   having" conversation -- "a conversation with him in the
21   lobby outside of the restroom hallway reminding him
22   about his dog being off leash.  At that point,
23   Mr. Muhaymin bumped me in an aggressive manner
24   unexpectedly and proceeded to head towards the
25   bathroom."  Did I read that correctly?
```

1      A.   Yes.

2      Q.   Okay.  And that was your response to the

3   question -- to question 10, correct?

4      A.   Yes.

5      Q.   And the bumping incident, is also the response

6   you gave to the officer when he said, did he assault

7   you, and you said no, we bumped; true?

8      A.   That's what I --

9                MS. STILLWELL:  Form.

10                THE WITNESS: -- told the officer.

11   BY MR. FARAJ:

12      Q.   And that's what you wrote in your statement

13   after Mr. Muhaymin died?

14                MS. STILLWELL:  Form.

15                THE WITNESS:  Yes.  But I mean, he pushed

16   me.  And bumping or pushing, he pushed me.

17   BY MR. FARAJ:

18      Q.   Okay.  Sir, pushing is what you demonstrated.

19   Bumping is bumping when you said I got in his way and

20   we bumped, right?

21                MS. STILLWELL:  Form.

22                THE WITNESS:  But that's not what

23   happened.  What happened is that he pushed me.

24   BY MR. FARAJ:

25      Q.   I want to be clear.  I'm just asking you about

```
 1    what you wrote.  And I'm asking you if that's what you
 2    wrote, if that was your statement, sir.
 3        A.   If that's --
 4        Q.   And I think you said --
 5        A.   If that's what's on here, then yes.
 6        Q.   Okay.  This is your signature, right?
 7        A.   Yes.
 8        Q.   Okay.  So that's Exhibit 4.  You recall --
 9    isn't it true, sir, that when you were interviewed
10    orally, not written statements, you were interviewed
11    orally by a detective, right?
12        A.   Yes.
13        Q.   And that was audio recorded, right?
14        A.   Yes.
15        Q.   You told the detective that you -- he pushed
16    you, Mr. Muhaymin pushed you, and you pushed him back?
17        A.   That's what the detective -- well, I'll say
18    this; that's what I read on his --
19        Q.   Summary?
20        A.   -- summary.  I haven't listened to the audio,
21    so I don't know what was on the audio.
22        Q.   Okay.  Now, if your -- the audio recording
23    actually states in your own voice that he pushed you
24    and you pushed him, would that be true or untrue?
25        A.   Well --
```

```
 1                    MS. STILLWELL:  Are you asking about
 2    this?
 3                    MR. FARAJ:  No.  It's an audio recording.
 4    I don't want to play it.  I'm just asking if that's
 5    what happened on the audio, would that be true or
 6    untrue.
 7                    THE WITNESS:  Can you repeat the
 8    question.  I'm sorry.
 9                    MS. STILLWELL:  Okay.
10                    MR. FARAJ:  What clarification do you
11    want?
12                    MS. STILLWELL:  No. I was just asking
13    because this is the -- is this the same recording?
14    Because it has interviewer, interviewee.
15                    MR. FARAJ:  No.  That is in response to a
16    request for clarification from the first incident
17    report.
18                    MS. STILLWELL:  I see.  Thank you.  I was
19    trying to figure out which one you were talking about.
20    BY MR. FARAJ:
21        Q.   Sequentially you gave an interview, correct?
22        A.   Yes.
23        Q.   And then you were provided some questions,
24    right?
25        A.   Yes.
```

```
1        Q.   And then you were asked to give some
2   clarifications.  And that's Exhibit 5, right?
3        A.   Yes.
4        Q.   Okay.  I'm talking about the initial
5   interview.  Isn't it true -- forget that.  Let me
6   rephrase the question.  If in your own voice you said
7   if he pushed me, I pushed him, would that be true or
8   untrue?
9                  MS. STILLWELL:  Form.
10                 THE WITNESS:  If that's what is on the
11  audiotape or -- but I don't recall, because I haven't
12  heard it.
13  BY MR. FARAJ:
14       Q.   Okay.  Did that actually happen?  Did he push
15  you and you push him back?  Forget the audio.  Did you
16  push him and him push you back?
17       A.   I didn't push him back.  I -- when I went to
18  -- it was more a reflex to go back --
19       Q.   Okay.
20       A.   -- from his advances.
21       Q.   Now you have -- is it your understanding, sir,
22  that someone with a service animal must have a leash?
23                 MS. STILLWELL:  Form, foundation.
24                 THE WITNESS:  If they do not have control
25  of the animal verbally, or yeah, they would have to be
```

1    on a leash.

2    BY MR. FARAJ:

3        Q.   So I think what you're saying is if they can't

4    control -- if they don't have control verbally, they

5    must control them with a leash, control it with a

6    leash?

7                    MS. STILLWELL:  Form.

8                    THE WITNESS:  That's my understanding.

9    BY MR. FARAJ:

10       Q.   Okay.  And you understand that you can't deny

11   people -- you can't treat people with service animals

12   differently than people that do not have service

13   animals?

14       A.   Yes.

15       Q.   Okay.  And you understand that even if an

16   animal is not under control, if you direct the master

17   of the animal to bring it under control and they do,

18   then they've complied with what the law requires?

19                   MS. STILLWELL:  Form.

20   BY MR. FARAJ:

21       Q.   Or what the ADA rules require?

22                   MS. STILLWELL:  Form and foundation.

23                   THE WITNESS:  Yes.

24   BY MR. FARAJ:

25       Q.   So just because someone -- tell me if you

1   agree this.  Just because someone may not have had

2   control of his animal on a certain day, if they have

3   control of their animal on a different day, then you

4   cannot deny them access to a facility based on the

5   previous conduct?

6       A.   From my understanding is if -- yes, if they

7   don't have the control of their animal on prior

8   incidents, then -- and it showed aggressive nature

9   towards the staff, then yes.

10      Q.   Okay.  And if an animal shows an aggressive

11  nature towards the staff, I'm assuming you would

12  trespass that person for a couple of reasons.  Would

13  you agree that one of the reasons you trespass someone

14  is to let that person know you can't come here anymore,

15  to put that person on notice?  That's fair, right?

16              MS. STILLWELL:  Form.

17              THE WITNESS:  Yes.

18  BY MR. FARAJ:

19      Q.   The other person (sic) is you can make a

20  record of it to let the staff know people who may not

21  be there that, look, this person should not access our

22  facility again, right?

23              MS. STILLWELL:  Form.

24              THE WITNESS:  Yes.

25  BY MR. FARAJ:

1    Q.   Now, that did not happen in this case.  He was
2    never trespassed before?
3    A.   Not from the center, no.
4    Q.   Now at the time at the point Mr. Muhaymin
5    finally had control of the animal before the police
6    arrived, why wasn't he allowed to use the bathroom?
7    A.   Because he had pushed me.
8    Q.   Okay.  And you pushed him back or no?
9    A.   No, I didn't push him back.  I pushed away to
10   try to get away from him.
11   Q.   Okay.  And so what were you waiting for at
12   that time?
13   A.   What do you mean?
14   Q.   You said he pushed me.  You didn't tell him to
15   leave.  You said I want to work with you and words to
16   that effect.  You didn't say, hey, you pushed me.
17   That's aggressive behavior, however you want to put it.
18   I want you to leave now.  You didn't say anything like
19   that?
20              MS. STILLWELL:  Form.
21              THE WITNESS:  I had asked him to leave.
22   BY MR. FARAJ:
23   Q.   Okay.  Why did you allow him to use the
24   bathroom after the police arrived?
25   A.   Because he needed to use the bathroom.  And at

1    that point the officers agreed that it was fine that he

2    could use the bathroom.

3        Q.   Why wasn't it fine for him to use the bathroom

4    before?  What changed?

5                 MS. STILLWELL:  Form.

6                 THE WITNESS:  The reason why he wasn't

7    able to use the bathroom is because he had pushed me

8    and the dog was off leash.

9    BY MR. FARAJ:

10       Q.   I understand.

11       A.   And he didn't have control of the dog.  And I

12   told him that he could use the restroom, but he would

13   just need to leave the dog outside, or with somebody

14   else.  I never told him that he couldn't -- that I

15   remember, I don't remember directly telling him that he

16   couldn't use the restroom.

17       Q.   And I think I remember that.  And I guess

18   that's my question is, once he had control of the dog

19   and since you were willing to let him use the bathroom,

20   why did you make it a condition that he leave the dog

21   outside?

22                 MS. STILLWELL:  Form.

23                 THE WITNESS:  Because the dog had been

24   aggressive towards the staff.

25   BY MR. FARAJ:

1      Q.   Okay.  But it was under control now, right?

2      A.   But that was after he had pushed me.  The dog

3  wasn't in control prior to him pushing me.  He didn't

4  get control of the dog until like right before the

5  officer arrived.

6      Q.   Sir, I'm going to show you an exhibit that

7  we'll mark as Exhibit 6.

8               (Deposition Exhibit No. 6 was marked for

9  identification by the reporter.)

10 BY MR. FARAJ:

11     Q.   I call your attention to the highlighted

12 portion.  Under the Americans with Disabilities Act,

13 sir, and more specifically under the policy put out in

14 this brochure by the City of Phoenix, you understood

15 that a business may ask an individual with a disability

16 to remove a service animal from the premise if the

17 animal is out of control and the animal's handler does

18 not take effective action to control it.  You

19 understand that to be true?

20     A.   That's what's stated on here.

21     Q.   Okay.  And so in this case, the handler had

22 taken effective control of the animal?

23     A.   He was holding it, but at that point --

24               MS. STILLWELL:  Form.

25               THE WITNESS:  -- that wasn't the reason.

```
 1   He had pushed me at that point.
 2   BY MR. FARAJ:
 3        Q.   I understand, sir.  My question is, you said
 4   you were willing to let him use the bathroom, but you
 5   wanted the dog outside.  And my question to you is,
 6   based on your understanding of the policy by your
 7   employer, once the handler of the animal takes control
 8   of it, you shouldn't ask the person to remove the
 9   animal from the premise, right?
10               MS. STILLWELL:  Form, foundation.
11               THE WITNESS:  That's what it says there,
12   yes.
13   BY MR. FARAJ:
14        Q.   And you understood the ADA rules, correct?
15        A.   Somewhat, yes.
16        Q.   Well, when you applied for the position as the
17   recreation coordinator at the Parks and Recreation
18   Department, one of the things that you communicated to
19   the Parks and Recreation Department for the City of
20   Phoenix is that you monitor and track ADA compliance
21   standards to meet state and federal guidelines for
22   program participants.
23        A.   Yes.
24        Q.   You represent -- you represented that to the
25   City of Phoenix when they hired you, correct?
```

```
 1      A.   Yes.  So what typically happens is if --
 2      Q.   Hold on, sir.  Isn't that true?
 3               MS. STILLWELL:  Form.
 4               THE WITNESS:  If you're telling me that's
 5   one of the requirements on there, yes.
 6   BY MR. FARAJ:
 7      Q.   No.  I can -- I guess I can print it out for
 8   you.  I'm looking at your CV.
 9      A.   What does CV mean?
10               MR. CHAMI:  Resume.
11   BY MR. FARAJ:
12      Q.   Your resume.
13      A.   Okay.
14      Q.   Isn't it true that you wrote on your resume
15   that you monitor and track ADA compliance standards to
16   meet state and federal guidelines for program
17   participants?
18      A.   Yes, for program participants.
19      Q.   Okay.  And you are a program participant?
20      A.   Me personally?
21               MS. STILLWELL:  Form, foundation.
22   BY MR. FARAJ:
23      Q.   The center.
24      A.   Well, it would be -- what happens is if people
25   are registered, they are able to put on there whether
```

1   there is ADA accommodations needed.  And then at that

2   point we contact the individual.  And then come up with

3   a plan to see how we're going to meet those if we're

4   able to, if it's a reasonable accommodation.

5       Q.   When you represented to the City of Phoenix,

6   sir, that you monitor and track ADA compliance

7   standards, isn't it true that you are representing that

8   you have experience and expertise that allows you to

9   monitor and track Americans with Disabilities Act

10  compliance?

11              MS. STILLWELL:  Form.

12              THE WITNESS:  It allows me to track

13  somebody that has marked yes, they want some type of

14  accommodation.

15  BY MR. FARAJ:

16      Q.   Okay.  But in order -- go ahead.

17      A.   Go ahead.

18      Q.   And in order for you to be able to track, you

19  must have the foundational knowledge and experience of

20  the ADA guidelines that permits you to do that, true?

21      A.   I do not.  I just --

22              MS. STILLWELL:  Form.

23              THE WITNESS:  If they have marked those

24  things, then we meet with those individuals.  And if we

25  need to bring in a representative that has that

 1   knowledge, then we do.

 2   BY MR. FARAJ:

 3       Q.   I don't think I understand what you're saying.

 4   Let me just -- let me just make it simple.  Is it true

 5   that you represented to your employer that you monitor

 6   and track ADA compliance standards to meet state and

 7   federal guidelines for program participants?

 8                   MS. STILLWELL:  Form.

 9                   THE WITNESS:  Yes.  And we do that

10   through their registration when they register for the

11   programs.  And that's followed up with a question -- or

12   with a call, and then a question to sit down and see

13   what type of reasonable accommodations are needed.

14   Excuse me.

15                   MR. FARAJ:  I believe that's all I have.

16   Do you have any questions?

17                   MS. STILLWELL:  I do have a few

18   questions.

19                   MR. FARAJ:  You have questions?

20                   MS. STILLWELL:  Yes.  I know you have a

21   flight to catch so I'll try to --

22                   MR. FARAJ:  Go ahead.

23                   MS. STILLWELL:  -- be very quick --

24                   MR. FARAJ:  Go ahead.

25                   MS. STILLWELL:  -- for you.

```
 1                    EXAMINATION
 2  BY MS. STILLWELL:
 3      Q.   Mr. Tarango, I just have a few quick
 4  questions.  Mr. Faraj had asked you, and you mentioned
 5  that you were the most senior person at the community
 6  center when you were there, correct?
 7      A.   Yes.
 8      Q.   And I believe you said you started there in
 9  August 2017; is that correct?
10              MR. FARAJ:  He corrected it.
11              MS. STILLWELL:  Oh, I'm sorry.
12  August 2016.
13              MR. FARAJ:  '16.
14              MS. STILLWELL:  Thank you, sir.
15  BY MS. STILLWELL:
16      Q.   If you remember.
17      A.   It was the August right before, but --
18      Q.   Okay.
19      A.   -- yes.
20      Q.   And when you say "right before," you're
21  talking about right before the January 4, 2017
22  incident, correct?
23      A.   Yes.
24      Q.   Okay.  So you had been there approximately
25  four months, five months; is that right?
```

 1      A.   Yes.

 2      Q.   And so in that time period had you had time to

 3  really address any camera situations?

 4      A.   I looked into why the cameras -- or trying to

 5  figure out why the cameras weren't working.  Somebody

 6  that was there prior to me at one point had tried to

 7  get a quote to get them fixed.

 8      Q.   Okay.  And do you know if some of those

 9  cameras were working?  Do you know?

10      A.   I don't know.

11      Q.   Were you privy or did you receive -- if any of

12  the cameras were working, did you receive any of those

13  videos?

14      A.   I did not.

15      Q.   Did you ever review any videos that may have

16  been caught in a camera at the community center?

17      A.   Not at the center, no.

18      Q.   Do you know, as you sit here today, whether

19  all of the cameras were operable or inoperable?

20      A.   From my understanding is that they did not

21  work.

22      Q.   All of them, or some of them?

23      A.   At the center, all of them.

24      Q.   Okay.  And I'm going to jump around a bit.  So

25  I'm trying to be respectful of Mr. Faraj's time as

```
 1  well.
 2              Now, you had prior instances with Mr. --
 3  and I guess I've been saying it Muhaymin; is that
 4  right?  No.  You're making a face.
 5              MR. FARAJ:  Let him answer.  I thought it
 6  was Muhaymin.
 7              MR. CHAMI:  Muhaymin.
 8              MR. FARAJ:  Okay, Muhaymin.  I've been
 9  saying it wrong.
10              MS. STILLWELL:  Okay.  We've been saying
11  Muhaymin.
12              MR. CHAMI:  It's not Muhaymin.
13              MS. STILLWELL:  Muhaymin?
14              MR. CHAMI:  Yes.
15              MS. STILLWELL:  Okay.  So Mr. Muhaymin.
16  I want to make sure I say it correctly.
17  BY MS. STILLWELL:
18     Q.   You had several occasions when you saw
19  Mr. Muhaymin, correct?
20     A.   Yes.
21     Q.   And those occasions there was some discussion
22  about an IRMA, an incident report, correct?
23     A.   Yes.
24     Q.   And that was an incident report that you had
25  filled out at some point after the incident?
```

```
 1                    MR. FARAJ:  Objection, form.
 2                    THE WITNESS:  Yes.
 3   BY MS. STILLWELL:
 4       Q.   Do you recall how soon after you filled out
 5   this incident report?
 6                    MR. FARAJ:  If you will please refer to
 7   the document.
 8                    THE WITNESS:  I --
 9                    MR. FARAJ:  Hold on.  The date of the
10   incident report.
11                    MS. STILLWELL:  I'm sorry.  The date --
12   well, I don't have a date of the incident report.
13                    MR. FARAJ:  Or Bates, either way.
14   BY MS. STILLWELL:
15       Q.   The Bates number is COP 011239 through COP,
16   there's some text messages, 011246.  This is something
17   that Mr. Faraj had mentioned in his examination of you.
18   Do you recall that?
19       A.   Yes.
20       Q.   And how soon after the January 4, 2017
21   incident did you prepare this, these notes?
22       A.   I don't remember exactly, but it wasn't long
23   after.
24       Q.   And when you say "not long after," can you
25   guess whether it was a day, or a week, or two weeks?
```

```
 1        A.    Probably within two weeks.
 2        Q.    Okay.  And in the incident report, if you
 3   recall, you listed several incidents involving
 4   Mr. Muhaymin and his dog, correct?
 5                  MR. FARAJ:  Form.
 6                  THE WITNESS:  Yes.
 7                  MS. STILLWELL:  And Mr. Faraj, I know you
 8   said that you have a copy of this, but I'll have a copy
 9   made and have it marked.  We're on Exhibit 7?
10                  THE REPORTER:  Yes.  Should I mark that
11   now?
12                  MS. STILLWELL:  Sure.
13                  (Deposition Exhibit No. 7 was marked for
14   identification by the reporter.)
15   BY MS. STILLWELL:
16        Q.    And I'm going to have to kind of peek at it.
17   This is our copy here.  You talked about how the dog
18   had been aggressive toward the staff.  Do you remember
19   that?
20        A.    Yes.
21        Q.    And in the -- in the notes section, and I'm
22   going to show it to you, you have several instances
23   starting with August 31st; is that correct?
24        A.    Yes.
25        Q.    And what was your recollection of
```

 1  Mr. Muhaymin?

 2      A.   As far as what?

 3      Q.   As far as his frequency in the community

 4  center.

 5      A.   The times that are listed on there were

 6  probably most of the time that I had contact with him.

 7      Q.   Okay.  And so on each of these instances, for

 8  instance August 31, 2016, you mention an instance where

 9  Mr. Muhaymin got visibly upset and used some curse

10  words.  Do you recall that?

11      A.   Yes.

12      Q.   And in September 2016 there was an issue with

13  his dog off the leash; is that correct?

14      A.   Yes.

15              MR. FARAJ:  What's the date, please?

16              MS. STILLWELL:  Yes.  It's September 12,

17  2016.  It's on COP 001240 at the bottom of the page.

18  BY MS. STILLWELL:

19      Q.   And on that date, sir, on COP 011240 at the

20  very end or bottom, it talks about late September

21  morning.  Do you see that, sir?

22      A.   Yes.

23      Q.   And this appears like he had come for ice

24  again?

25      A.   Mm-hm.

 1      Q.   Is that right?
 2                 MR. FARAJ:  Objection; leading, form.
 3                 THE WITNESS:  Yes.
 4   BY MS. STILLWELL:
 5      Q.   And the following sentence you make a comment
 6   there.
 7      A.   I do.
 8      Q.   Can you read that for me?
 9      A.   "The individual became upset and threatened me
10   by saying, 'Don't let me see you out on the street.'"
11      Q.   And so you asked him to leave the facility,
12   correct?
13      A.   Yes.
14      Q.   And was there also an instance with the dog
15   and the staff?
16      A.   Yes, the dog was barking and being aggressive
17   towards the staff.
18      Q.   Okay.  And it appears here that you also have
19   written down that he attempted to bite recreation
20   leader Hannah Glemba?
21      A.   Yes.
22      Q.   Does that sound right?
23      A.   Yes.
24      Q.   And that's what this reflects, correct?
25      A.   Yes.

1      Q.   And I don't want to go through this whole

2   incident report.  But in November 2014 -- I'm sorry,

3   November 14, 2016, you indicated he made another

4   threat?

5      A.   Yes.

6      Q.   And what does that say?

7      A.   "Go ahead and call the police what the fuck

8   are they going to do and if you do, you better watch

9   your back."

10     Q.   And is that the threat that you were referring

11  to earlier when Mr. Faraj had asked you some questions?

12     A.   Yes.

13     Q.   And do you recall, as you sit here today, you

14  know, almost three years later, do you recall whether

15  you reported that to your supervisor at the time?

16     A.   I'm not 100 percent sure.

17     Q.   Okay.  Do you recall if perhaps you talked to

18  your staff or the employees at the community center

19  about it?

20     A.   I probably had conversation with them to

21  letting them know the situation and what was going on.

22     Q.   Okay.  And attached to that incident report

23  you have a couple still shots.  And on COP 011243, this

24  is a still shot, correct?

25     A.   It is.

1       Q.   And how is that described at the bottom?

2       A.   "Disruptive customer bringing his dog into

3    library and Rec. Center."

4       Q.   And what date is that, sir?

5       A.   There's a timestamp and date stamp on it that

6    says 10/26/2016.

7       Q.   And to the best of your knowledge and ability

8    to tell from this copy, is that Mr. Muhaymin?

9       A.   Yes.

10      Q.   And this -- the COP 011244, that is also

11   another depiction, correct?

12      A.   Yes.

13                MR. FARAJ:  Form.

14   BY MS. STILLWELL:

15      Q.   And do you know where these video still shots

16   had come from?

17      A.   From the entrance of the library.

18      Q.   And you said I think earlier that the library

19   was not a part of the community center, but close to or

20   connected to?

21      A.   The buildings are connected through a walkway.

22   There's -- but they're not connected like by doors, or

23   there's probably maybe 10, 15 feet in between them.

24      Q.   Okay.  In between the --

25      A.   The entrance to the library and the entrance

1   to the community center.

2        Q.   Okay.  Now hold that thought about

3   Mr. Muhaymin and his dog.  But I want to go back to Mr.

4   Faraj's diagrams, Exhibit 2 and Exhibit 3.  Do you

5   recall these diagrams, sir?

6        A.   Yes.

7        Q.   And you recall Mr. Faraj's questions about it

8   and his request for you to mark on those diagrams where

9   you were at the time that you had an interaction with

10  Mr. Muhaymin; is that correct?

11       A.   Yes.

12       Q.   And you indicated on a blue dot, I believe

13  where you were standing when Mr. Muhaymin pushed you or

14  bumped you, correct?

15       A.   It's actually more of a dash that -- but, yes.

16  I put a dot, but it was kind of elongated to look like

17  a dash, and I labelled the other one.

18       Q.   Have you ever seen these diagrams before

19  today, to the best of your knowledge?

20       A.   I have not, no.

21       Q.   And it is difficult to tell on Exhibit 2, it

22  appears there's two little rooms next to a storage room

23  with some lettering, correct?

24            MR. FARAJ:  Objection, form.  I'm just

25  going to have a standing objection to leading questions

 1  as to form.

 2              MS. STILLWELL:  Sure.

 3              THE WITNESS:  Yes.

 4              MS. STILLWELL:  And I'm trying to speed

 5  along --

 6              MR. FARAJ:  I understand.

 7              MS. STILLWELL:  -- so you can go.

 8              MR. FARAJ:  So I don't want to keep

 9  interrupting.  So I'm just going to have a standing

10  objection.

11              MS. STILLWELL:  Okay.

12  BY MS. STILLWELL:

13      Q.   And to the best of your knowledge are those

14  the restrooms?

15      A.   Yes, the ones that you're pointing at.

16      Q.   The ones next to the storage room, there's two

17  smaller?

18      A.   Yes.

19      Q.   And then Exhibit 3 is a diagram of the women's

20  restroom, correct?

21      A.   It's actually both the women's and the men's.

22      Q.   How is this the women's and the men's?  Is the

23  men's identical to this only mirrored --

24      A.   No, --

25      Q.   -- next to it?

```
 1      A.    -- there's a wall separating the two.
 2      Q.    Okay.  But this indicates women's restroom,
 3  correct?
 4      A.    There's one entrance.
 5      Q.    Uh-huh.
 6      A.    And this way is the men's and that way is the
 7  women's.
 8      Q.    I see.
 9      A.    And this is the wall that separates them.
10      Q.    For purposes of the record, when you say
11  "this way," you're pointing to the south of the paper,
12  correct?
13      A.    Yes, the south side is the men's restroom.
14            MR. FARAJ:  The one with the urinals is
15  men.
16  BY MS. STILLWELL:
17      Q.    So --
18            MR. FARAJ:  Sorry.
19            MS. STILLWELL:  Thank you for that
20  clarification, Mr. Faraj.
21            MR. FARAJ:  I am just stating the
22  obvious.
23            MS. STILLWELL:  I will have to have a
24  quick look at the exhibit.
25            MR. FARAJ:  They just labelled women's
```

```
 1   restroom on one side, and didn't label the other side.
 2              MS. STILLWELL:  So looking at the picture
 3   you would not know that those were urinals.
 4              MR. FARAJ:  I spent hours studying it to
 5   understand what it is.
 6   BY MS. STILLWELL:
 7       Q.   Anyhow, you have never seen these diagrams,
 8   correct, sir?
 9       A.   I have not.
10       Q.   Okay.
11       A.   Or had not, no.
12       Q.   Now, after -- when Mr. Muhaymin came to the
13   facility, were you -- you didn't first observe him,
14   correct?  Somebody told you he was present?
15       A.   The day of the incident?
16       Q.   Yes.
17       A.   Yes.  Somebody came to my office and told me.
18       Q.   And when you first saw Mr. Muhaymin, was his
19   dog off the leash?
20       A.   Yes.
21       Q.   And I think you said he was --
22       A.   Sweeping back and forth.
23       Q.   -- sweeping?
24       A.   Running up the hall going from one end to the
25   other, two feet in front of Mr. Muhaymin.
```

```
 1        Q.   And when you say "sweeping," you're just
 2   saying side to side; is that correct?
 3        A.   Side to side, yes.
 4        Q.   And was his dog acting aggressive at any point
 5   on that date that you saw?
 6        A.   That I saw or that I remember, no.
 7        Q.   What was your concern about the dog?
 8        A.   That it had been aggressive on prior occasions
 9   towards the staff.  And I wasn't sure what was going to
10   happen.  So I wasn't sure if it was going to be
11   aggressive again or not.
12        Q.   And were you fearful that it would be
13   aggressive to the staff or to the public?
14        A.   Yes.
15        Q.   And Mr. Muhaymin, when you first approached,
16   did he pick up his dog?
17        A.   No.
18        Q.   Did he offer to put her on the leash?
19        A.   No.
20        Q.   And I think your testimony was that
21   Mr. Muhaymin did not pick up the dog until right before
22   Officer Grenier arrived; is that correct?
23        A.   Yes.
24        Q.   Now Mr. -- Mr. Tarango, are you aware of --
25   you mentioned that you're aware an officer had
```

1   testified in this case, but are you aware of any of

2   their testimony?

3       A.   No.  I just saw him walk out.

4       Q.   When you -- after Mr. Muhaymin had pushed or

5   bumped you, who did you tell to call the police, if you

6   recall?

7       A.   Hannah.

8       Q.   And so Hannah is the one that called it in,

9   correct?

10      A.   Yes.

11      Q.   Did you have any involvement in the initial

12  call or report to the police officers?

13      A.   I did not.

14      Q.   Or I'm assuming she called 911, correct?

15      A.   Yes, she called 911.

16      Q.   And did you tell Hannah what to say?

17      A.   No.

18      Q.   And -- okay.  Strike that.

19           Why didn't you trespass Mr. Muhaymin on

20  all those prior occasions?

21      A.   Again, I wanted -- I wanted to work with him.

22  He was there at the park.  He lived at the park.  And I

23  wanted to work with him to make things better.  I mean,

24  I was going to have to see him.  We were going to have

25  to see each other.  And I said it repeatedly in the

1    video that, you know, what -- let's figure this out.

2    How are we going to try to figure this out.

3        Q.   And when you're talking about the video,

4    you're talking about the -- the camera video that's

5    been attached as Exhibit 1; is that right?

6        A.   Yes.

7        Q.   From one of the officers?

8        A.   From Officer -- I think it was Officer

9    Grenier's.

10       Q.   Okay.  And so you tried to work with

11   Mr. Muhaymin, correct?

12       A.   Yes.  I was trying to figure out how we were

13   going to be able to work together to try to figure out

14   without trying to escalate it any further.

15       Q.   And was that so he could continue to have

16   access to the community center?

17       A.   Yes.  It was for that.  And then also just so

18   we didn't have to go back and forth any longer.

19       Q.   Now, in all of your prior instances with

20   Mr. Muhaymin, did you have any concerns about his

21   mental health?

22       A.   I didn't -- that wasn't the concern.  The

23   concern was him getting upset and cussing and

24   threatening me because I didn't give him ice, or I

25   didn't let him do whatever it is that he wanted to do.

1      Q.   Now, Mr. Faraj had asked you a question that
2  Mr. Muhaymin in the video is holding the dog, and
3  Mr. Faraj had asked, why didn't you let him use the
4  restroom at that time.  Was the officer already there
5  at that time?
6      A.   Yes.
7      Q.   And do you recall that the officer had engaged
8  in a conversation or started the conversation and said
9  hang on, wait a minute?
10     A.   The first officer that showed?
11     Q.   Yes, sir.
12     A.   He didn't say anything.
13     Q.   Okay.  If the video were to depict
14  Mr. Muhaymin, that he wanted to use the restroom, and
15  the officer said hold on a minute; do you recall that?
16     A.   Yes.  There was an officer that told him to
17  hold on.
18     Q.   Okay.  And by that time, at least, that's when
19  Mr. Muhaymin had picked up the dog, right?  He didn't
20  have the dog in his hands before then?
21     A.   Yes, he didn't have the dog in his hands
22  before.  He picked it up right before the first officer
23  arrived on -- which I think was Officer Grenier.  He
24  had picked it up like right before that.
25     Q.   You know, Mr. Faraj spent a lot of time on the

```
 1    semantics of wording, whether it's a push or whether
 2    it's a bump.  At any point did you -- were you
 3    untruthful?
 4        A.    No.
 5        Q.    Does a bump or a push mean the same to you?
 6        A.    They're both physical contact, yes.
 7        Q.    And is that what you were trying to relay by
 8    saying bump or push?
 9        A.    Yes.
10        Q.    And when Mr. Faraj wanted the demonstration
11    earlier of how Mr. Muhaymin had pushed you or bumped
12    you, you didn't indicate your reaction to that; is that
13    correct?
14        A.    I did not.
15        Q.    And you weren't asked to indicate your
16    reaction to that, correct?
17        A.    Yeah, I wasn't asked to.
18        Q.    And in Exhibit 5, which is your notice of
19    inquiry with follow-up questions, on COP 011517 the
20    interviewer reads to you from the police department
21    incident report that Tony responded by pushing Muhammad
22    back?
23        A.    Yes.
24        Q.    Now in this interview -- and this interview is
25    conducted with the City of Phoenix, correct?
```

1       A.    Yes, it's with the human resources department.

2       Q.    Okay.  And so during this interview they

3  wanted you to clarify, and you said, I didn't quite

4  agree with that, correct?

5       A.    Yes, I didn't agree with what the police

6  officer had put in that report.

7       Q.    And you actually demonstrated the conduct of

8  your actions when you were in that interview; is that

9  correct?

10      A.    I did.

11      Q.    And that description is, "While sitting, the

12 employee demonstrated the following:  He put up both

13 his hands, opened and faced away from himself in front

14 of his chest as if to protect himself from the push.

15 He demonstrated a slight and short push forward and

16 simultaneously backed up as if to give space between

17 himself and another person.  It was not aggressive."

18 Is that accurate, sir?

19      A.    Yes.

20      Q.    And in this notice of inquiry, in Exhibit 5,

21 you indicated that the only thing that you disagreed

22 with on the incident report was not that Muhammad

23 pushed you, but that you responded by pushing back; is

24 that correct?

25      A.    Yes.

1        Q.   That was a horrible question.  So I hope you

2   followed it.

3        A.   Yes.  He -- yes.

4        Q.   Did that make sense?  So the only -- you read

5   what the police incident report said, that Mr. Muhaymin

6   had pushed you and you responded by pushing back.  The

7   only thing you disagreed with was that you didn't push

8   him back; is that correct?

9        A.   That's what jumped out at me or stood out --

10       Q.   Okay.

11       A.   -- to me on that.

12       Q.   And on January 4, 2017 was it your position

13   that Mr. Muhaymin had bumped or pushed you with some

14   physical contact?

15       A.   Yes.

16       Q.   And today is it your position that

17   Mr. Muhaymin had pushed or bumped you?

18       A.   Yes.

19       Q.   Now in your incident report that we have

20   labelled as Exhibit 7 you talk about various threats by

21   Mr. Muhaymin from August 2016 through January 2017.

22   You recall that?

23       A.   Yes.

24       Q.   And in Exhibit 4, which is also the first

25   notice of inquiry, there are several questions.  And on

1    COP 011512 it documents again that Mr. Muhaymin had

2    threatened you; is that correct?  Do you recall reading

3    that with Mr. Faraj?

4         A.   Yes.

5         Q.   And so whether it was in the -- when you were

6    in -- I think you saw in the video the proximity that

7    you were with, with Mr. Muhaymin.  Is it your testimony

8    today that based on your previous encounters and the

9    previous threats, you were trying to deescalate the

10   situation and downplay it; is that correct?

11        A.   Yes.  I was trying to deescalate the

12   situation.  Try to figure out how we would be able to

13   work together to not get to this point.

14        Q.   And to get to this point, you're talking about

15   getting police involvement; is that correct?

16        A.   Yes.

17        Q.   And part of that as well was, I think you

18   testified earlier, you were afraid of retaliation?

19        A.   Yes.

20        Q.   And is that based on these previous threats

21   about seeing you on the street?

22        A.   Yes.

23        Q.   Or watching your back?

24        A.   Yes.

25        Q.   Mr. Faraj had asked you about Exhibit No. 6.

1   Do you recall this exhibit, sir?

2        A.   Yes.

3        Q.   And is that a pamphlet or brochure that's --

4   where is this?

5        A.   It's a pamphlet or a brochure that was given

6   to us.

7        Q.   And do you remember when you received that

8   brochure?

9        A.   It was after the incident.

10       Q.   After January 4, 2017, correct?

11       A.   Yes.

12       Q.   And the -- you're aware of the ADA and the

13  obligations, correct?

14       A.   Yes.

15       Q.   And under the ADA, do you have an

16  understanding of what you need to do, what your -- what

17  your requirements are?

18       A.   I mean, somewhat.  I'm not an expert, but --

19       Q.   Mm-hm.  And I think you said earlier about

20  accommodation, correct?

21       A.   Yes.  If -- yes.

22            MS. STILLWELL:  Okay.  Give me one

23  second.  Okay.  I have no further questions.

24  ////

25  ////

```
 1                    FURTHER EXAMINATION
 2   BY MR. FARAJ:
 3       Q.   That IRMA system, Mr. Muhaymin doesn't have
 4   access to it, right?
 5       A.   No.
 6       Q.   And according to your IRMA report, he
 7   threatened you twice?
 8       A.   Yes.
 9               MS. STILLWELL:  Form.
10               MR. FARAJ:  What?
11               MS. STILLWELL:  Are you going to give it
12   to him?
13   BY MR. FARAJ:
14       Q.   Well, I remember you being -- saying that he
15   threatened you on 11/4 and some other date.  I
16   remembered sometime in September.  Yeah.  September 12
17   and 11/4.  There were two threats made.
18       A.   Yes.
19       Q.   Okay.  And this report was not prepared until
20   after the man died?
21       A.   Yes.
22       Q.   You could have put -- made the IRMA reports at
23   the time they happened?
24               MS. STILLWELL:  Form.
25   BY MR. FARAJ:
```

1       Q.   At the time the threats were made, right?

2                  MS. STILLWELL:   Form.

3                  THE WITNESS:   Yes.

4    BY MR. FARAJ:

5       Q.   The power was on, the computer was working,

6    you had access to your office.   You could have gotten

7    on the terminal and reported the terrible threats that

8    were causing you to be afraid for yourself --

9       A.   Yes.

10      Q.   -- made by Mr. Muhaymin, right?

11                 MS. STILLWELL:   Form.

12   BY MR. FARAJ:

13      Q.   Correct?

14      A.   Yes.

15      Q.   And you chose not to?

16      A.   Yes.

17      Q.   And you understood that Mr. Muhaymin was

18   mentally ill?

19      A.   I didn't know that.

20      Q.   I'm not asking you to diagnose him, but he

21   lived in a park?

22      A.   I --

23                 MS. STILLWELL:   Form and foundation.

24                 THE WITNESS:   I don't -- I'm not a

25   doctor.   So I don't know whether he was mentally ill or

1   not.  So I can't draw conclusion to that, no.

2   BY MR. FARAJ:

3       Q.   He lived in a park?

4               MS. STILLWELL:  Form, foundation.

5               THE WITNESS:  He was there at the park

6   all the time, yes.

7   BY MR. FARAJ:

8       Q.   Well, you said he lived at the park?

9       A.   Okay.

10      Q.   I just wrote down what you wrote.  You said he

11  lived at the park?

12      A.   That's what I said, yes.

13      Q.   And when you were having that conversation

14  with him at the bathroom door, he started to go on a

15  rant saying things like this is from the master

16  builder, the master builder knows mathematics.  You as

17  a human being and a parent.  My son is a graduate of

18  ASU.  I have a beard, you should respect me.  I mean,

19  that's not -- those aren't the statements of a normal

20  person; --

21              MS. STILLWELL:  Form, foundation.

22  BY MR. FARAJ:

23      Q.   -- would you agree?

24      A.   Again, I can't say yes, because I'm not a

25  physician.  I don't know.  But that's the first time

 1  that I had ever heard him talk that way.

 2      Q.   Okay.  And sir, you -- your location draws a

 3  lot of homeless people?

 4      A.   There are individuals out at the park, yes.

 5      Q.   And many of them are, for lack of a better

 6  word, don't always behave appropriately?

 7               MS. STILLWELL:  Form, foundation.

 8               THE WITNESS:  I mean, there are

 9  situations where we have to, yes, take care of whatever

10  situation or incident that occurs.

11  BY MR. FARAJ:

12      Q.   I understand that there are written

13  statements, sir, but you're aware there's a recorded

14  statement?  You're aware of that, right?

15               MS. STILLWELL:  Form, foundation.

16  BY MR. FARAJ:

17      Q.   There is an audio-recorded statement that you

18  provided to a detective?

19      A.   Yes.

20      Q.   Okay.  And that occurred very soon after the

21  incident, within a day or two, correct?

22      A.   Yes.

23      Q.   And your memory at that time would have been

24  most fresh for what occurred, true?

25               MS. STILLWELL:  Form.

```
1                    THE WITNESS:  I would assume so, yes.
2    BY MR. FARAJ:
3        Q.   And when you -- when the detective was
4    interviewing you, it was a -- he was pleasant?
5                    MS. STILLWELL:  Form.
6                    THE WITNESS:  Yes.
7    BY MR. FARAJ:
8        Q.   I mean, he wasn't threatening you, he wasn't
9    causing you to be afraid?  He was pleasant with you,
10   the detective?
11       A.   I mean, yes.  He was interviewing me.  He
12   wasn't aggressive or --
13       Q.   You guys laughed a few times together?
14                   THE REPORTER:  I'm sorry.
15   BY MR. FARAJ:
16       Q.   True?
17                   THE REPORTER:  I didn't hear your
18   question.
19   BY MR. FARAJ:
20       Q.   You guys laughed a few times together?
21                   MS. STILLWELL:  Form.
22                   THE WITNESS:  I have not heard the
23   recording, and I don't remember.  But if you're saying
24   that, then yes.
25   BY MR. FARAJ:
```

1       Q.   Okay.  I want you to think back.  We don't
2    always remember facts, but we remember how things make
3    us feel, how experiences make us feel.  Thinking back
4    on that experience with the detective, you weren't
5    afraid?
6                   MS. STILLWELL:  Form.
7                   THE WITNESS:  I don't think afraid was
8    the thing, but it's not every day you talk to a
9    homicide detective.  So it wasn't fun, or it wasn't
10    jolly or anything like that.
11    BY MR. FARAJ:
12       Q.   Well, he didn't make it sound like you're
13    suspected of a homicide?
14       A.   No.  But again -- no, he did not.
15       Q.   Okay.  He asked you to recollect what happened
16    and you gave your best rendition of the events that you
17    could recollect within essentially hours of the
18    incident; isn't that true?
19                   MS. STILLWELL:  Form.
20                   THE WITNESS:  Yes.
21                   MR. FARAJ:  That's all I have.
22                   MS. STILLWELL:  Okay.  I just have a
23    couple follow-ups.
24    ////
25    ////

```
 1                    FURTHER EXAMINATION
 2   BY MS. STILLWELL:
 3      Q.   After the incident you said you've never had
 4   to be interviewed by a homicide detective; is that
 5   correct?
 6      A.   Yes, I have never been interviewed by a
 7   homicide detective.
 8      Q.   Was the mere fact, although Mr. Faraj had
 9   pointed out that you weren't pointed as a suspect, the
10   mere fact that you had that interview with the homicide
11   detective, how did that make you feel?
12      A.   Uncomfortable, scared.
13      Q.   Nervous?
14      A.   Nervous.  I mean, it wasn't comfortable.
15      Q.   And the mere fact of a lawsuit being filed
16   against you personally, how does that make you feel?
17      A.   Terrifying.
18      Q.   Nervous?
19      A.   Nervous.
20      Q.   Do you believe you did anything wrong?
21      A.   No.
22      Q.   Now, Mr. Faraj had focused on the IRMA being
23   filled out after -- or I'm sorry, the interview
24   happening after Mr. Muhaymin had passed away.  Do you
25   recall that testimony, or the question?
```

1       A.    Yes.

2       Q.    And Mr. Faraj's point was, well, if

3   Mr. Muhaymin passed away, you didn't have anything to

4   fear; do you remember that?

5       A.    Yes.

6       Q.    Did you see any -- anyone who knew

7   Mr. Muhaymin after this event?

8       A.    I did.

9       Q.    Who did you see?

10      A.    Well, I can't remember exactly if it was a

11  week or two after.  It was shortly after.  I was in my

12  office.  And one of the staff had come up and told me

13  that the dog was in the building.  And I kind of --

14  like I got chills, and I was like what.  So I go to the

15  bathroom and I say, you know, this is the staff.  Is

16  anyone in here, 'cause I see the dog.

17      Q.    And when you are referring to "the dog," are

18  you referring to Mr. Muhaymin's dog?

19      A.    Yes.

20      Q.    Go ahead.

21      A.    And so when I ask if anybody's in there, there

22  was a gentleman that said yes, I'm in here.  And I

23  asked him, is that your dog?  And he said no, I'm

24  taking care of it for a friend.

25      Q.    Mm-hm.

1        A.    And so I told him -- I said okay.  Well, you

2    know, I'll be out here.  Can we just -- when you get

3    out, can we just have, you know, a few minutes to talk?

4    So he came out and he was holding the dog.  And so I

5    asked him, I was like, hey, is that your dog?  And he

6    said no, I'm taking care of it for a friend and his

7    sister because she can't take care of it.  And so at

8    the time I just -- I asked him if it was a service

9    animal.  And he said no, it's just a dog that she can't

10   take care of, and so she asked me to take care of it.

11       Q.    And is it your belief that this was

12   Mr. Muhaymin's dog?

13                   MR. FARAJ:  Form.

14                   THE WITNESS:  It looked -- yes.  It

15   looked just like it was the dog, yes.

16   BY MS. STILLWELL:

17       Q.    And did the gentleman indicate at all whether

18   it was Mr. Muhaymin's dog?

19       A.    Yes, he said it was his dog.  That he was

20   taking care of it, because he had died.

21       Q.    In all of the interactions that you had with

22   Mr. Muhaymin prior to the January 2017 incident, did

23   Mr. Muhaymin at any time tell you that his dog was a

24   service dog?

25       A.    No, not prior to that incident.

```
 1        Q.   Was January 4, 2017 the first time he said
 2    that this was a service dog?
 3        A.   Yes.
 4        Q.   Mr. Faraj asked you why you didn't fill out an
 5    incident report, an IRMA for each incident, each threat
 6    with Mr. Muhaymin.  Why didn't you?
 7        A.   I mean, again, you know, trying to work with
 8    people and trying to make sure that, you know, to see
 9    what we could find a common ground, so it doesn't get
10    to a certain point.  I didn't want him not to come in.
11    I just didn't want his dog to be biting anybody.
12        Q.   And as part of the community, do you know for
13    certain that Mr. Muhaymin lived at the park?
14        A.   I'm not 100 percent certain, but he was there
15    a lot.
16        Q.   And is that a conclusion that you jumped to or
17    came to based on his frequency?
18        A.   I mean, it was based on him and how he looked
19    and where I would see him.
20                  MS. STILLWELL:  Okay.  I have no further
21    questions.
22                  THE VIDEOGRAPHER:  This concludes the
23    deposition --
24                  MR. FARAJ:  Hold on.  Hold on.
25                  THE VIDEOGRAPHER:  I'm sorry.
```

```
 1                    FURTHER EXAMINATION
 2   BY MR. FARAJ:
 3       Q.   Just to be clear, just to be clear.  So you
 4   were terrified when the homicide detective is
 5   interviewing you?
 6       A.   Yeah, I was worried about -- yeah, I was
 7   worried.
 8       Q.   And I just want to understand.  Does -- does
 9   your ability to tell the truth change when you're
10   feeling afraid?
11                MS. STILLWELL:  Objection, form.
12                THE WITNESS:  I didn't -- I didn't lie.
13   BY MR. FARAJ:
14       Q.   Okay.  We keep going around in circles.  I
15   just want to make sure that when you spoke with the
16   detective -- and you didn't hear it, and I'm going to
17   go back to hear it to make sure I have it right -- but
18   I just want to understand from you, at that time you
19   told the truth?
20                MS. STILLWELL:  Form.
21                THE WITNESS:  Yes, whatever I told the
22   detective.
23                MR. FARAJ:  Okay.  That's all.
24                So, again, I'll remind you that you get
25   to review this, make changes.  If you make any
```

```
 1   substantive changes, something -- you know, for
 2   example, you said previously my recollection is he
 3   lived in the park, and then if you change it and say he
 4   didn't live in the park, that could be used to call
 5   into question your credibility.  But you are free to
 6   change whatever you want, okay, if you need to.  All
 7   right.
 8                   THE WITNESS:  Okay.
 9                   MR. FARAJ:  And you'll have 30 days from
10   the date Ms. Stillwell receives it to notify her of any
11   changes, and she'll notify us of changes, if any.
12   Okay.  That's all.
13                   MR. CHAMI:  So in Arizona we do --
14                   MS. STILLWELL:  We'll read and sign.
15   Thank you.
16                   MR. CHAMI:  There you go.
17                   THE VIDEOGRAPHER:  This concludes the
18   deposition of Antonio Tarango.  The time is 5:18 p.m.
19                   (The deposition concluded at 5:18 p.m.)
20
21
22                   _____
                     ANTONIO TARANGO
23
24
25
```

```
1    STATE OF ARIZONA        )
                             ) ss.
2    COUNTY OF MARICOPA      )

3            BE IT KNOWN that the foregoing proceedings
     were taken before me, SHERYL L. HENKE, Certified
4    Reporter No. 50745, that the witness before testifying
     was duly sworn by me to testify to the whole truth;
5    that the foregoing pages are a full, true and accurate
     record of the proceedings, all done to the best of my
6    skill and ability; that the proceedings were taken down
     by me in shorthand and thereafter reduced to print
7    under my direction.

8            [X]  Review and signature was requested.
             [ ]  Review and signature was waived.
9            [ ]  Review and signature not required.

10           I CERTIFY that I am in no way related to any
     of the parties hereto nor am I in any way interested in
11   the outcome hereof.

12           I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in ACJA 7-206, DATED
13   at Phoenix, Arizona, this 8th day of August, 2019.

14

15

16   _____
                 Sheryl L. Henke, RPR
                 Certified Reporter
17               Certificate No. 50745

18       *      *      *      *      *      *

19

20           I CERTIFY that VALLEY COURT REPORTING, LLC
     has complied with the ethical obligations set forth in
21   ACJA 7-206.

22

23

24   _____
                 Valley Court Reporting, LLC
                 Arizona RRF No. R1054
25
```