# LODGED PROPOSED Doc. 292-6 (redacted)

# EXHIBIT E

# In The Matter Of:

*Mussalina Muhaymin v.*
*City of Phoenix*

---

*Oswald Grenier*
*July 31, 2019*

---

*Valley Court Reporting, LLC*
*4802 East Ray Road, Suite 23-200*
*Phoenix, AZ 85044*
*(602) 710-1148*
*www.valleycr.com*

Min-U-Script®

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Mussalina Muhaymin,                )
                                   )
        Plaintiff,                 )
                                   )
vs.                                ) Civil Action No.
                                   ) CV-17-04565-PHX-SMB
City of Phoenix, et al.,           )
                                   )
        Defendants.                )
_____)

VIDEOTAPED DEPOSITION OF OSWALD GRENIER

Scottsdale, Arizona
July 31, 2019
9:37 a.m.

PREPARED FOR:
(COPY)

PREPARED BY:
SHERYL L. HENKE, RPR
Arizona CCR No. 50745

**Valley Court Reporting, LLC**
**www.valleycr.com**

1                    I N D E X

2                E X A M I N A T I O N

3                                              PAGE
   OSWALD GRENIER
4
         EXAMINATION BY MR. FARAJ              8
5
         EXAMINATION BY MS. STILLWELL          113
6
         FURTHER EXAMINATION BY MR. FARAJ      144
7

8

9                  E X H I B I T S

10

11   1     Officer Grenier's body cam video      13

12   2     Document entitled "Definitions,       55
           Phoenix Police Department, Operations
13         Order 1.3," Bates stamped COP 011449 -
           - 011508
14
     3     Officer Hobel's body cam video        69
15
     4     Officer Nielsen's body cam video      82
16
     5     Document entitled "In Custody Death,  98
17         Garrity Protected Statement, Employee
           Involved," Bates stamped COP 010900 -
18         COP 010901

19

20

21

22

23

24

25

**Valley Court Reporting, LLC**
**www.valleycr.com**

THE VIDEOTAPED DEPOSITION OF OSWALD GRENIER


taken at 9:37 a.m. on July 31, 2019, at the law offices

of Price Law Group, APC, 8245 North 85th Way,

Scottsdale, Arizona, 85258, before SHERYL L. HENKE, a

Certified Reporter, #50745, in and for the State of

Arizona.


A P P E A R A N C E S


FOR THE PLAINTIFF:

PRICE LAW GROUP, APC
BY:  DAVID CHAMI, ESQ.
8245 North 85th Way
Scottsdale, Arizona  85258

THE LAW OFFICE OF HAYTHAM FARAJ
BY:  HAYTHAM FARAJ, Esq.
1935 W. Belmont Avenue
Chicago, Illinois  60657


FOR THE DEFENDANTS:

O'CONNOR & CAMPBELL
BY:  KAREN STILLWELL, ESQ.
7955 South Priest Drive
Tempe, Arizona  85285

Also present:  William Marinakis, Videographer
               Tiffany Gill
               Jacey Gutierrez


**Valley Court Reporting, LLC**
**www.valleycr.com**

THE VIDEOGRAPHER:  We are on the record.
Today's date is Wednesday, July 31, 2019.  The time on
the video monitor is 9:37 a.m.  This is the
video-recorded deposition of Officer Oswald Grenier
noticed by counsel for the plaintiff in the matter of
Mussalina Muhaymin versus City of Phoenix, et al., in
the United States District Court for the District Of
Arizona, Case No. CV-17-04565-PHX-SMB.

The location today is the Price Law Group
in Scottsdale, Arizona.

The certified court reporter is Sheryl
Henke of Valley Court Reporting, located at 4802 East
Ray Road, Suite 23-200, Phoenix, Arizona, 85044.

My name is William Marinakis.  I'm the
certified legal video specialist for the firm of
VideoDep, Incorporated, also located in Phoenix,
Arizona.

Counsel, will you please identify
yourselves and state whom you represent for the record
at this time, please, starting with plaintiff's
counsel.

MR. FARAJ:  Good morning.  My name is
Haytham Faraj, and I'm here on behalf of the plaintiff.

MR. CHAMI:  David Chami also here on
behalf of the plaintiff.

1          MS. STILLWELL:  Karen Stillwell on behalf

2    of the City of Phoenix and defendant officers.

3          THE VIDEOGRAPHER:  Thank you, counsel.

4    For the record also in attendance today is Tiffany Gill

5    and Jacey Gutierrez.

6          The witness may be sworn in at this time,

7    please.

8

9          OSWALD GRENIER,

10   a witness herein, having been first duly sworn by the

11   Certified Reporter to speak the truth and nothing but

12   the truth, was examined and testified as follows:

13

14         MS. STILLWELL:  And I'm sorry, before we

15   begin, Mr. Faraj, I understand that yesterday during

16   the depositions there was some discussion and agreement

17   that these depositions, the videotape and the

18   transcript, would be considered confidential under the

19   protective order.

20         MR. FARAJ:  That wasn't the agreement.

21   The agreement was that the protective order is in

22   effect.  You can designate certain things confidential

23   consistent with the protective order, not that the

24   whole thing would be confidential.

25         MS. STILLWELL:  Okay.  And I ask that the

1   transcript and videotape remain confidential until

2   we're able to designate those portions.

3                  MR. FARAJ:  Okay.  So you need to have a

4   reasonable amount of time to do that.  How long would

5   you like to do that?

6                  MS. STILLWELL:  At least 30 days.

7                  MR. FARAJ:  Okay.  So we've been -- we've

8   been -- you know, the same 30 days that applies for the

9   officer to review and correct --

10                  MS. STILLWELL:  Yes.

11                  MR. FARAJ:  -- will be granted to counsel

12   to designate those portions that they believe are

13   confidential.  I would remind counsel that, and I was

14   made aware of it last night, that the videos were

15   obtained through a FOIA request, which vitiates any

16   argument that they're confidential.

17                  As well as the -- the medical examiner's

18   report is obviously a public record and that's not

19   confidential.  To the extent that something is

20   confidential, for example, personal information, those

21   things that are clearly confidential, then we're just

22   going to meet and confer and agree to them rather than

23   waste paper with the court.

24                  MS. STILLWELL:  Okay.

25                  MR. FARAJ:  Is that fair?

```
 1                    MS. STILLWELL:  That's fair.

 2                    MR. FARAJ:  Do you agree that the videos

 3    are not confidential?

 4                    MS. STILLWELL:  I'm not going to agree to

 5    that at this point, but we can certainly discuss it in

 6    the future once the deposition --

 7                    MR. FARAJ:  Okay.

 8                    MS. STILLWELL:  -- transcript and video

 9    comes back.  My main concern, Mr. Faraj, is that there

10    is some form of public dissemination of the videotapes

11    of the officers' depositions, which I understand you've

12    already agreed not to do.

13                    MR. FARAJ:  I mean, it's not our -- you

14    know, I think the professional rules of responsibility

15    prevent us from trying this in the public sphere.  So

16    we're going to abide by the rules of court, the rules

17    of professional practice.  No one has a plan to go and

18    publish the transcripts.

19                    I mean, you know, that's -- we've never

20    even talked about such a thing.  We just don't do that.

21    Now, if things have to be filed in court and videos are

22    going to be attached as exhibits, that's a whole other

23    story.

24                    MS. STILLWELL:  Okay.  And we can

25    certainly discuss that in the future.  Thank you,
```

 1  Mr. Faraj.

 2              MR. FARAJ:  Okay.  All right.

 3

 4                     EXAMINATION

 5  BY MR. FARAJ:

 6      Q.   Good morning, Officer Grenier.

 7      A.   Good morning.

 8      Q.   Am I saying your name right?

 9      A.   Yes, sir.

10      Q.   I'm sure that your lawyers have discussed the

11  process of a deposition with you.  Have you ever been

12  deposed before?

13      A.   No, sir.

14      Q.   Okay.  I'm confident that you've been told

15  what a deposition is and given some instructions.

16  Would you like me to go over some ground rules, or do

17  you feel ready to start and understand the rules?

18      A.   I feel ready.

19      Q.   Okay.  The only thing I would -- I would

20  caution you about is, as we get rolling, you begin to

21  anticipate what question I'm going to ask.  It's normal

22  human response, and you begin to answer before the

23  question is over.  I will perfectly understand that.

24  But the court reporter cannot catch both people

25  speaking at the same time.  So I would just remind you

1   to keep that in mind.  Okay?

2       A.   Yes.

3       Q.   So we're here for the event that occurred on

4   January 14, 2017.  You're aware of that?

5       A.   Yes, sir.

6               MR. CHAMI:   January 4th.

7   BY MR. FARAJ:

8       Q.   January 4th, I apologize.  January 4, 2017.

9   Is it true that you were the first officer on the scene

10  at the Maryvale Community Center that day?

11      A.   Yes, sir.

12      Q.   Is it true that when you responded you were

13  under the belief that a fight or an altercation had

14  taken place?

15      A.   Yes.

16      Q.   And that was pursuant to a code 239 call that

17  you received over the radio?

18      A.   Yes.

19      Q.   The description over the radio is that the

20  supervisor at the Maryvale Community Center had been

21  pushed or assaulted by another person?

22      A.   Yes.

23      Q.   And the description of the other person is

24  something to the effect of a black male, baggy pants,

25  maybe wearing a hat.  I don't remember the specific --

1      A.   Yes.

2      Q.   -- words, but something to that effect?

3      A.   Yes.

4      Q.   When you arrived at the Maryvale Community

5  Center, you stood by to observe the conversation

6  between the person that you believed is the suspect and

7  the person you believe to be the supervisor, correct?

8      A.   Yes.

9      Q.   At that time you did not observe any

10 disorderly conduct, --

11     A.   No.

12     Q.   -- true?

13     A.   Yes.

14     Q.   You did not believe there were any exigent

15 circumstances?

16     A.   No.

17     Q.   You did not see any weapons?

18     A.   No.

19     Q.   You did not see the person who you believe to

20 be the suspect advance in such a way, or behave in such

21 a way as to create a threat to the other person?

22     A.   Correct.

23     Q.   Or to yourself?

24     A.   Correct.

25     Q.   And so you remain there to observe the

```
 1   conversation, but you also called for additional units?
 2       A.   No.  Additional units were coming.
 3       Q.   Okay.  Did the additional units, if you know,
 4   come in response to the first call?
 5       A.   Yes.
 6       Q.   Did you know additional units were coming?
 7       A.   Yes.
 8       Q.   Okay.  After a few minutes of conversation you
 9   engaged the person you believe to be the supervisor in
10   conversation, correct?
11       A.   Yes.
12       Q.   And you asked that man if he had, in fact,
13   been assaulted?
14       A.   Yes.
15       Q.   And he denied that he had been assaulted?
16       A.   No.  He said he got bumped.
17       Q.   Okay.  He told you that as he was moving, or
18   as the suspect was moving into the bathroom, the
19   supervisor got into his way which caused them to bump,
20   true?
21       A.   Yes.
22       Q.   Now, based on your experience, your many years
23   as a police officer, your formal training, the
24   aggressor in that situation would be the person who was
25   creating the blockage, would you not agree?
```

 1      A.   No.

 2                MS. STILLWELL:  Objection.  Go ahead.

 3                THE WITNESS:  No, I don't agree to that.

 4   BY MR. FARAJ:

 5      Q.   So if you were walking through this room and I

 6   suddenly jumped in front of you which caused you to

 7   bump me, you believe that you would be responsible?

 8      A.   I wouldn't bump you.  I would actually stop

 9   and ask you what you were doing.

10      Q.   Okay.

11      A.   But no, I wouldn't use any physical force on

12   you.

13      Q.   So if I again -- if you're walking and I

14   stepped in such a way as to cause you to bump me, who

15   would be the aggressor?

16                MS. STILLWELL:  Objection; argumentative,

17   misleading.

18   BY MR. FARAJ:

19      Q.   You can answer.

20      A.   No.  I -- you're putting me on it.  No, I

21   wouldn't do that.

22      Q.   I'm not saying you would do it.  I'm saying I

23   caused you to bump me.

24      A.   That doesn't make any sense to me.

25                MS. STILLWELL:  Same objection.

```
 1   BY MR. FARAJ:
 2       Q.   All right.  Well, do you want to play the
 3   video and see what the man told you?
 4       A.   No.
 5       Q.   Let's do that.  I'm going to the Officer
 6   Grenier video, which is labelled as COP 000001 starting
 7   at 9:30.  What we are going to do is attach this entire
 8   video of Officer Grenier's body cam as Exhibit No. 1 to
 9   this deposition.  And we will append it by way of a
10   thumb drive.  Is that -- will that work?
11               THE REPORTER:  Sure.
12               MR. FARAJ:  Is that okay with you?
13               MS. STILLWELL:  Yes.
14               MR. FARAJ:  Thank you.
15               (Deposition Exhibit No. 1 will be marked
16   for identification by the reporter subsequent to the
17   deposition.)
18               MR. FARAJ:  I'm going to turn the video
19   around or the screen around so that counsel and the
20   deponent can observe the video.
21               MS. STILLWELL:  I should say that's okay
22   as long as we have the proper foundation for this.
23               MR. FARAJ:  What foundation would you
24   like?
25   BY MR. FARAJ:
```

```
1      Q.   Do you recognize this scene?

2      A.   Yes.

3      Q.   Did you have a body cam VIEVU?

4      A.   VIEVU.

5      Q.   VIEVU.

6      A.   Yes.

7      Q.   Okay.  And was that collected from you at the

8  end of the day that day?

9      A.   It was collected right after this happened by

10 our homicide unit.

11     Q.   And you've had an opportunity to review this

12 video --

13     A.   Yes.

14     Q.   -- perhaps with your lawyer or some other

15 person?

16          MS. STILLWELL:  Objection.  To the extent

17 that's getting into our conversations.

18          MR. FARAJ:  I'm not asking if he had a

19 conversation.

20 BY MR. FARAJ:

21     Q.   You reviewed this video before, right?

22     A.   Yes.

23     Q.   Do you recognize this to be your body cam

24 video?

25     A.   Yes.
```

1      Q.   Okay.

2                (Video played.)

3      Q.   I'm going to start at 9:30.  I have lost audio

4  again.  COP 00001.

5                MR. CHAMI:  I'll play it.

6                (Video played.)

7                MR. CHAMI:  9 minutes 30 seconds.

8                MR. FARAJ:  9 minutes 30 seconds.

9                MR. CHAMI:  I will take care of it.

10               (Video played.)

11  BY MR. FARAJ:

12     Q.   That's you speaking?

13     A.   No.  It's Officer Hobel.

14     Q.   Okay.  But it is your body cam?

15     A.   With his voice, I couldn't tell you if that

16  was mine or his.

17     Q.   All right.  You were there for this, however?

18     A.   Yes.

19     Q.   All right.  You're hearing this conversation

20  at the time, you were present for it?

21     A.   Yes.

22     Q.   Okay.

23               (Video played.)

24     Q.   You heard him say, "We bumped into each

25  other"?

1      A.   Yes.

2      Q.   Okay.  He didn't say, "He bumped into me,"

3   right?

4      A.   No.  He said, "We bumped into each other."

5      Q.   Okay.  What do those words mean to you when

6   someone says, "We bumped into each other"?

7                MS. STILLWELL:  Objection.

8                MR. FARAJ:  You can answer when she says

9   objection.  It's just for the record.

10                THE WITNESS:  Oh.  Bump into each other.

11   Bump into him.

12   BY MR. FARAJ:

13      Q.   Okay.  Does that mean to you that the man, the

14   black man in the red shirt assaulted the white man in

15   the blue or black shirt?

16      A.   Could have been.

17                MS. STILLWELL:  Argumentative.  Just give

18   me a minute.

19   BY MR. FARAJ:

20      Q.   Okay.  If it could have been, could it also

21   have been that the white man in the black or blue shirt

22   actually assaulted the black man in the red shirt?

23                MS. STILLWELL:  Objection; argumentative

24   and speculative.

25   BY MR. FARAJ:

 1      Q.   You can answer.

 2      A.   No.

 3      Q.   Why is it your opinion that the man in the

 4   black shirt if he says, "We bumped into each other,"

 5   would be the person assaulted, could be the person

 6   assaulted, but not the other way around?

 7              MS. STILLWELL:  Same objections.

 8              THE WITNESS:  I don't understand the

 9   question.

10   BY MR. FARAJ:

11      Q.   Well, you told me that based on that comment,

12   your opinion is that the black man in the video

13   assaulted the white man with his arm crossed in the

14   video?

15      A.   Correct.

16      Q.   Now the -- the man with the crossed arms, who

17   you believe to be the community supervisor, right?

18      A.   Correct.

19      Q.   Maryvale Community Center supervisor?

20      A.   Mm-hm.  Or yes.  I'm sorry.

21      Q.   Says -- said that we bumped into each other?

22      A.   Yes.

23      Q.   Okay.  And so if your testimony here today is

24   that that leads you to believe that the black man

25   bumped into the community center supervisor, my

1  question to you is why can't it be the other way

2  around?

3                    MS. STILLWELL:  Objection, misstates the

4  testimony.

5                    THE WITNESS:  I haven't been able to

6  determine that.  I've not been able to talk to the

7  supervisor or Mr. Muhaymin.

8  BY MR. FARAJ:

9      Q.   Okay.  Now let me back up a little bit.  You

10 told me that -- I want to be clear.  Do you believe

11 this is your video or Officer Hobel's video?

12     A.   It might be mine, it might be Officer Hobel's.

13 I couldn't tell you.

14     Q.   I'll represent to you that it's labelled as

15 COP 0001 Grenier.

16     A.   Okay.

17     Q.   Do you believe, is that the video you viewed

18 before in preparation for your testimony today?

19                    MS. STILLWELL:  Objection.

20                    THE WITNESS:  It's a number you're

21 reading.  Oh, sorry.

22                    MS. STILLWELL:  It's okay.  Objection.

23 He wouldn't know that information.

24                    THE WITNESS:  Okay.

25 BY MR. FARAJ:

1       Q.   So is it your testimony then that at that
2  point you're not sure who assaulted whom?
3       A.   I've got to go by the radio call, the
4  emergency radio call that we're going on.  And when I
5  get out there, and like I said, I haven't been able to
6  talk to either one of them.  So I couldn't make the
7  determination as far as from what I got on the radio
8  and from the way he said they bumped into each other.
9  That's why I have to do an interview and find out
10 exactly what happened.
11      Q.   Okay.
12      A.   So I'm basing it off the emergency radio call,
13 and my observations, and him saying they bumped into
14 each other.  But also when he's talking, the supervisor
15 guy's a little bit hesitant.
16      Q.   The supervisor is hesitant about what?
17      A.   When he's asked "Did he bump you," and it
18 takes him a little bit to answer.  "Did he assault
19 you?"  Officer Hobel says, "Did he assault you?"  And
20 then he waits a couple minutes -- or waits about a
21 minute and then says, "No, we just bumped into each
22 other."
23      Q.   Let's hear that again, because either you or
24 another officer asks, "Did he assault you?"
25      A.   That's Jason Hobel.

 1       Q.   The question is, "Did he assault you?"

 2       A.   Correct.

 3       Q.   Very clearly.  And so let's listen to that and

 4   see how long that takes for him to respond.

 5                MS. STILLWELL:  Objection.

 6                (Video played.)

 7   BY MR. FARAJ:

 8       Q.   Did he assault you, sir?

 9       A.   No.  How many times -- he asked that question

10   three times, and the man didn't answer him.  So there's

11   a delay in it.

12       Q.   Well, I don't want to argue with you.  But it

13   seems to me that the black man responded because he was

14   surprised that there was a claim of assault, right?

15                MS. STILLWELL:  Objection; misleading,

16   argumentative.

17                THE WITNESS:  I couldn't tell you.

18   BY MR. FARAJ:

19       Q.   Well, let's talk about that.  You're reading

20   people here, right?

21       A.   Oh, I'm sorry.

22                MS. STILLWELL:  Just give me a minute so

23   I can have a chance to object.

24                THE WITNESS:  Okay.  I'm sorry.

25   BY MR. FARAJ:

1      Q.   You're -- you're reading the -- the -- the

2   community center supervisor's body language, right?

3      A.   No.  He's just got his arms crossed.

4      Q.   Well, you said he's hesitating?

5      A.   He hesitated to answer.

6      Q.   Okay.  You take that into consideration?

7      A.   Correct.

8      Q.   That's important for you?

9      A.   Correct.

10             MS. STILLWELL:  Speculative.  Go ahead.

11   BY MR. FARAJ:

12      Q.   Is it important for you that this African

13   American man, the suspect, is also surprised that there

14   is a claim of assault?

15             MS. STILLWELL:  Objection, argumentative.

16             THE WITNESS:  I couldn't -- I went for

17   the call.  So I haven't been able to determine

18   anything.

19   BY MR. FARAJ:

20      Q.   I mean, I'm kind of trying to understand why

21   you're able to determine when a white man says

22   something to you, but not a black man says something to

23   you.

24             MS. STILLWELL:  Objection, argumentative.

25   BY MR. FARAJ:

```
 1      Q.   Do you know?
 2      A.   Race wasn't an issue on this.
 3      Q.   Okay.  Great.  So if it's not an issue, you
 4  have this man saying, "What?  Who got assaulted?"  What
 5  does that say to you as a police officer with your
 6  years of experience?
 7               MS. STILLWELL:  Same objection.
 8               THE WITNESS:  Not a whole lot, because
 9  people lie to us all the time.
10               MR. FARAJ:  Okay.  So let me just stop
11  here for a minute.  I'm going to -- let's do this.  I'm
12  going to propose or stipulate that you preserve every
13  objection that you can ever make for the rest of the
14  world during this deposition, whether you think of it
15  today or later, for the record.  Is that fair just so
16  we can get along?
17               MS. STILLWELL:  I understand your
18  suggested stipulation, and I will accept it for most
19  questions.  But understand I may interject on some.
20               MR. FARAJ:  You can certainly interject
21  if you believe I'm getting into some sort of privilege.
22  Okay.
23               MS. STILLWELL:  Yes.
24               MR. FARAJ:  I'm going to do my best not
25  to do that, but you'll know when to stop me.  But as
```

 1  far as the standard evidentiary objections, they're

 2  really improper in federal court.  The only -- the only

 3  proper objection is form.

 4              And so to the extent that you feel that

 5  you need to make evidentiary objections, I'll stipulate

 6  that you'll have a right to make those objections if we

 7  ever have to use this -- this deposition in trial.

 8              MS. STILLWELL:  Understood, Mr. Faraj.

 9              MR. FARAJ:  Thank you.

10  BY MR. FARAJ:

11      Q.   So whoever makes that last statement, whether

12  it's Officer Hobel or you, says "Have you been

13  assaulted," and the supervisor says "No," true?

14      A.   Correct.

15      Q.   Now that contradicts the call that you

16  received, true?

17      A.   I don't -- I don't understand the question.

18      Q.   The call you received led you to believe that

19  an assault had occurred?

20      A.   Correct.

21      Q.   And the person who allegedly made the call, or

22  caused the call to be made claiming an assault, just

23  told you that he was not assaulted?

24      A.   I don't know who made the phone call.  I don't

25  know who called 911.  So I couldn't say it was the

```
 1   supervisor.
 2       Q.   Okay.  Needless to say that the man that you
 3   believe had been assaulted just denied that he had been
 4   assaulted, true?
 5       A.   Correct.  Correct.
 6       Q.   Okay.  And my understanding of your testimony,
 7   sir, that at this point you would want to speak to the
 8   people to see exactly what's going on?
 9       A.   I would have to separate them, yes.
10       Q.   Okay.  Did you ever take the time, you or any
11   of the other officers that were there that day, to move
12   Mr. Muhaymin to the side, whether before he came out of
13   the bathroom or after, to say, "Hey, man, what's going
14   on with you?  Are you okay?"
15       A.   We were asked -- we asked him to walk out.
16       Q.   You asked him to walk out to arrest him, true?
17       A.   Correct.
18       Q.   And you knew Mr. Muhaymin, you've seen him
19   before?
20       A.   I've seen him, yes.
21       Q.   You -- were you the one that's booked him
22   before?
23       A.   No.
24       Q.   Now the officer that's talking who you believe
25   to be is Officer Hobel says, "I don't want to have to
```

1   book you again."  Do you remember that?

2      A.   Yes.

3      Q.   That means he's been booked before?

4      A.   From -- yeah, with -- he said he's been booked

5   before, then yeah.

6      Q.   And you've -- you've had interactions with

7   Mr. Muhaymin?

8      A.   Yes.

9      Q.   All right.  Is there a reason why you chose as

10  the senior officer on the scene -- you were the senior

11  officer on the scene, right?

12     A.   No.

13     Q.   Who was the senior officer on the scene?

14     A.   I believe it was Officer Head.

15     Q.   Okay.  Were you the first one on the scene?

16     A.   Yes.

17     Q.   As the first officer on the scene, is it your

18  operating procedure to take over, to be in charge of

19  the scene until someone takes over from you?

20     A.   No.

21     Q.   That's not your procedure?

22     A.   No.  The first person there takes the call.

23     Q.   Okay.  When did Officer Head arrive?

24     A.   I couldn't tell you.

25     Q.   Was he there when this -- when this portion of

1  the interaction was taking place?

2      A.   Yes.

3      Q.   Did you, Officer Head, Officer Hobel, Officer

4  Canilao, any of you ever choose to take Mr. Muhaymin

5  aside and speak with him calmly?

6      A.   I wasn't -- I didn't -- wasn't yelling at him

7  or anything.  I told him to step outside.  Ran his

8  name, he had a warrant.  We're going to arrest him.  We

9  took him outside so there wouldn't be a fight.

10     Q.   I understand, sir.  I'm not talking about the

11 portion about the warrant, I'm talking about before

12 then.

13     A.   But we didn't have the opportunity to.

14     Q.   Now you -- you were there also when

15 Mr. Muhaymin was asked his name?

16     A.   Yes.

17     Q.   You knew at the time that Mr. Muhaymin is

18 homeless, correct?

19     A.   No.

20     Q.   You knew he was a transient, correct?

21     A.   No.

22     Q.   Why did you choose not to ask him his address?

23     A.   I just need to get his name, date of birth so

24 that I can be able to do a records check on him.

25     Q.   You normally ask somebody where they live too

```
 1   besides their --
 2       A.   No, I don't.
 3       Q.   What is your name and where do you live?
 4       A.   No.
 5       Q.   You don't -- you don't ask that?
 6       A.   No.  Just their name and date of birth.
 7       Q.   Okay.  Now, you agree, sir, that based on your
 8   own procedures or SOPs, you should always try to
 9   diffuse a situation if a situation is developing, true?
10       A.   True.
11       Q.   In fact you had -- you're the squad leader for
12   your squad?
13       A.   We don't have a squad leader.
14       Q.   Were you some sort of -- were you in charge of
15   82?  What is 82?  Is that your squad?
16       A.   That was a part of a squad.
17       Q.   Okay.
18       A.   Our leader is a sergeant.
19       Q.   At the time in 20 -- around 2017, were you in
20   charge of that squad?
21       A.   No.  I've never been in charge of a squad.
22   I'm not a sergeant.
23       Q.   Did you prepare weekly reports?
24       A.   No.
25       Q.   Okay.  During -- you have had -- you have seen
```

1  weekly reports?

2       A.   Yes.

3       Q.   Of -- reports of squad activities?

4       A.   Yes.

5       Q.   And is it true that on several occasions you

6  all were commended, not formally, informally, commended

7  for essentially diffusing situations by good

8  communications?

9       A.   Me personally, no.

10      Q.   As a squad?

11      A.   Yes.

12      Q.   And you would agree that's just good police

13  practice; if you can diffuse situations by

14  communications rather than escalating, that's just good

15  police practice?

16      A.   Yes.

17      Q.   It's also required under your own operating

18  manual, correct?

19      A.   As far as like in my ops orders?

20      Q.   Yeah.

21      A.   I couldn't tell you.

22      Q.   Well, common sense would tell you that if you

23  can diffuse a situation through just good

24  communication, it's better than beginning to escalate;

25  would you agree?

1    A.   Yes.

2    Q.   Okay.  Now at no time before you all decided

3  to put your hands on Mr. Muhaymin outside the community

4  center, did he ever communicate a threat to anyone,

5  true?

6    A.   True.

7    Q.   At no time before you all decided to lay your

8  hands on Mr. Muhaymin did he ever physically express a

9  threat, true?

10    A.   True.

11    Q.   The warrant that came back on Mr. Muhaymin,

12  you understand was a warrant for failure to appear as a

13  result of some paraphernalia that he had which he was

14  cited for, true?

15    A.   No.

16    Q.   What is your understanding of the arrest

17  warrant?

18    A.   The arrest warrant that I -- information that

19  I got was I cleared on the radio.  And they told me he

20  had a 1052, which is our term for misdemeanor warrant.

21  I wasn't able to go and verify the warrant yet.

22    Q.   Okay.  Isn't it true, sir, that based on your

23  own operating procedures, you must verify a warrant

24  with the issuing agency before you act on it?

25    A.   No.

1      Q.   Isn't it true that when you told Mr. -- when

2  you informed Mr. Muhaymin outside the community center

3  that he had a warrant, he expressed -- he did not

4  understand what you were talking about?

5      A.   He said he didn't know what the warrant was

6  for.

7      Q.   Which means he was disputing the warrant?

8      A.   Correct.

9      Q.   Okay.  And so isn't it true, sir, that when a

10 -- when there's a disputed warrant, you're required to

11 verify it?

12     A.   I didn't have a chance to.

13     Q.   Tell me why you didn't have a chance to.

14     A.   I wasn't able to go to my car and confirm the

15 warrant.

16     Q.   All right.  So you just laid hands on this

17 man, right?

18     A.   Correct.

19     Q.   You said you got a warrant?

20     A.   I was advised he had a warrant.

21     Q.   Okay.

22     A.   Then we went to place him under arrest with

23 the warrant.

24     Q.   So he acts -- he acts like he doesn't know,

25 right?

```
 1      A.    No.  He just acts -- starts to get violent.

 2      Q.    Okay.  Well, you just -- do you agree that at

 3  no time did he assault anybody?

 4      A.    Correct.

 5      Q.    So what violence did he engage in?

 6      A.    As soon as we laid hands on him, he went

 7  violent.

 8      Q.    Okay.  But he didn't assault anybody, right?

 9      A.    No.

10      Q.    I will represent to you that your fellow

11  officers that I deposed yesterday called it passive

12  resistance.  Do you agree with that?

13      A.    Yes.

14      Q.    Okay.  And in your opinion passive resistance

15  is violence?

16      A.    No.  Passive resistance is one thing, violence

17  is another.

18      Q.    But again, under your own procedures you have

19  different classifications for behavior when someone is

20  about to be arrested, right?

21      A.    No, not when they're about to be arrested, no.

22      Q.    Okay.  Maybe I'm using the wrong terminology.

23  You have passive resistance?

24      A.    Correct.

25      Q.    You have active resistance?
```

1       A.    Correct.

2       Q.    And in this case you agree that it was passive

3  resistance?

4       A.    Correct.

5       Q.    Then you have active aggression?

6       A.    Correct.

7       Q.    And aggravated active aggression?

8       A.    Correct.

9       Q.    That's the type of resistance that your

10  department recognizes, true?

11      A.    The four that you say or just the last one?

12      Q.    No, there's more, but --

13      A.    Oh, yes, mm-hm.

14      Q.    -- you recognize those --

15      A.    Yes.

16      Q.    -- types of resistance?

17            To be fair to you that you also have --

18  your department also recognizes psychological

19  intimidation as a type of resistance, true?

20      A.    Correct.

21      Q.    Verbal non-compliance, --

22      A.    Correct.

23      Q.    -- that's the other category?

24      A.    Yes.

25      Q.    Okay.  Now, at the point that you notify --

1   let me restate that.  At the point that Mr. Muhaymin is

2   notified of the warrant, you are present, right?

3       A.   Correct.

4       Q.   Now did you do that, or did some other officer

5   notify him?

6       A.   I told him he had a warrant.

7       Q.   Okay.  When you notified him, he protested?

8       A.   He didn't protest.  He put his arms around his

9   chest.  He wouldn't let us handcuff him.

10      Q.   Okay.  But verbally he acted like -- I'm going

11  to assume that he didn't know, or he is acting like he

12  doesn't know, that hey, what's the warrant about,

13  things of that --

14      A.   Well, that's your assumption.  But no, I told

15  him he had a warrant, and he was going to jail.

16      Q.   Did he verbally protest --

17      A.   No.

18      Q.   -- the warrant?

19      A.   No.

20      Q.   Let's hear the video.

21              MR. FARAJ:  And where are we at?

22              MR. CHAMI:  Same video.

23              MR. FARAJ:  So we're referring to COP

24  000001 at 18 -- beginning at 18:12.

25              (Video played.)

1   BY MR. FARAJ:

2       Q.   You hear him begin to say, "A warrant for

3   what?"

4       A.   After -- I really didn't hear that, because I

5   heard the other -- whatever he said prior to that,

6   "What, what, what, what?"

7       Q.   He said, "What, what, what, what?  A warrant

8   for what?"

9       A.   No.  " What, what, what, what?"  He said,

10  "What, what, what, what?"  That doesn't mean anything

11  about a warrant.  He just said, "What, what, what,

12  what?"

13      Q.   Are you -- are you saying that you did not

14  hear him say, "A warrant for what?"

15      A.   No, I didn't.  All I heard was "What, what,

16  what?"

17      Q.   Let's do it again.

18              (Video played.)

19              MR. CHAMI:  Same clip.

20              MR. FARAJ:  Same clip being repeated.

21              (Video played.)

22  BY MR. FARAJ:

23      Q.   Now, sir, that interaction, when somebody does

24  that, based on your many years of experience and

25  knowing the situation, that this man never posed a

 1  threat to anybody at that point.  You agree with that,
 2  right?
 3      A.   No.  He was a -- that's the reason we were
 4  there, because he had -- the radio call came out that
 5  he assaulted somebody.
 6      Q.   All right.
 7      A.   We weren't able to determine anything, because
 8  we didn't have an opportunity to.  I didn't have the
 9  opportunity to speak to a manager, nor did I have to
10  speak to Mr. Muhaymin.
11      Q.   Okay.  So let me understand this right.  A
12  call comes in that someone had been assaulted?
13      A.   Correct.
14      Q.   Your testimony today is you didn't get a
15  chance to talk to anybody?
16      A.   Correct.
17      Q.   You just decided to pick up the first black
18  man you see?
19              THE WITNESS:  No.
20              MS. STILLWELL:  Objection.
21  BY MR. FARAJ:
22      Q.   Well, how did you know this was the guy?
23      A.   Standing right there.  They're arguing.  Has
24  nothing to do with race.
25      Q.   How did you know that this is the right guy if

1   you didn't ask anybody, "Hey, is this the guy you all
2   called about?"  How would you know -- how do you know
3   it's the right guy?
4       A.   They're standing --
5               MS. STILLWELL:  Objection.
6               THE WITNESS:  They're standing right
7   there and we were told they were right there.
8   BY MR. FARAJ:
9       Q.   Who is "they"?
10      A.   I didn't make an assumption.
11      Q.   Who is "they are"?
12      A.   The -- one of the workers that was there.
13  When I walked in, she told me they were over there.
14      Q.   Well, did she say anything more?
15      A.   No.
16      Q.   You didn't want to verify if the call was true
17  or a lie?
18      A.   I don't have any time to do that.
19      Q.   Why not?
20      A.   They're both going kind of -- I can hear them
21  arguing.  She said they're over there.  So I went over
22  there with the description that was on the call, kind
23  of just put the two and two together.  And it was like
24  this is the guy.  This is the manager, this is the guy.
25      Q.   Okay.  And the manager just told you, "I

1   wasn't assaulted"?

2       A.   He didn't tell me anything.  He told

3   sergeant -- or Officer Hobel that.

4       Q.   Well, you heard him say it?

5       A.   Okay.

6       Q.   "I wasn't assaulted"?

7       A.   Okay.

8       Q.   "I'm just arguing with somebody"?

9       A.   Okay.

10      Q.   So if I argue with Ms. Stillwell and --

11              MS. STILLWELL:  Objection.

12  BY MR. FARAJ:

13      Q.   -- I say -- you're going to object to me if I

14  say I wasn't assaulted?

15      A.   Do what?  I'm sorry.

16      Q.   I'm trying to understand how you get the --

17  how you get from I got a call, I didn't talk to anybody

18  to verify it, but I'm going to arrest this man, because

19  I came to the conclusion that that's what the call's

20  about, and the call is true, even though the person

21  just told me "I wasn't assaulted"?

22              MS. STILLWELL:  Objection.

23              THE WITNESS:  I didn't arrest him for an

24  assault.  I arrested him for a warrant.

25  BY MR. FARAJ:

1      Q.   Okay.  But you still didn't verify why the
2  call was made, right?
3      A.   I didn't have to.  Once you find out
4  somebody's got a warrant, you can arrest for the
5  warrant.  And then I would go back and contact the
6  manager and ask him exactly what happened.  If he
7  wanted to prosecute the -- Mr. Muhaymin for assault.  I
8  didn't have any opportunity to do that.
9      Q.   All right.  I just don't want to go around and
10 around in circles.  Just to be clear, you do agree that
11 you heard a clear statement from the man you believe
12 who had been assaulted, that he was not assaulted?
13     A.   Correct.
14     Q.   Okay.  And you developed information that led
15 you to conclude that there's a warrant --
16     A.   Correct.
17     Q.   -- for Mr. Muhaymin?
18     A.   Correct.
19     Q.   And so you intend -- you developed a plan to
20 arrest him?
21     A.   Correct.
22     Q.   You wanted to do it outside so that maybe you
23 wouldn't cause a commotion inside the center?
24     A.   Yeah.  We didn't want it to escalate to
25 something.

1      Q.   Okay.  And so at the time you walked him

2   outside, Mr. Muhaymin verbally and physically begins to

3   resist?

4      A.   Correct.

5      Q.   Based on your own standard operating

6   procedure, your manual, you are required if someone

7   protests a warrant, to verify that warrant; you agree

8   with that?

9      A.   I'm not able to verify a warrant when I'm

10  putting hands on somebody.

11     Q.   You just agreed with me when we started, one

12  of the first questions I asked you is there was no

13  exigency here, right?

14     A.   Correct.

15     Q.   No one had been shot?

16     A.   Correct.

17     Q.   He wasn't posing an immediate threat to

18  anybody?

19     A.   Correct.

20     Q.   He wasn't posing a -- he wasn't verbally

21  intimidating anybody?

22     A.   Correct.

23     Q.   He had no weapons?

24     A.   Correct.

25     Q.   In fact, even the one thing that could be

1   argued could be used as a weapon, which you all have

2   done in the papers, the dog was restrained at the time,

3   right?

4       A.   Yeah, he was holding onto him.

5       Q.   Okay.  And so based on your own training,

6   especially when you're dealing with people who are

7   mentally ill --

8       A.   I had no idea he was mentally ill.

9       Q.   I'm just going to ask you a question.

10  Especially people who are mentally ill, communication

11  is the first step; would you agree with that?

12      A.   Correct.

13      Q.   Now you had been in contact with Mr. Muhaymin

14  before?

15      A.   Yes.

16      Q.   And collectively the four of you, at least two

17  of you had -- out of the four, at least two of you had

18  contact with Mr. Muhaymin before?

19      A.   I have.  I don't know about the other

20  officers.

21      Q.   The other officer you heard, I think you said

22  Hobel had booked him before, right?

23      A.   I can't speak what Officer Hobel did.

24      Q.   Now, sir, you've been trained in your annual

25  training -- you have annual training, right, at the

1    academy for about a week each --

2        A.   Yes.

3        Q.   -- year?  You've received modules on dealing

4    with people who are mentally ill?

5        A.   Correct.

6        Q.   You've received information on how to engage

7    people to decide or determine whether they have a

8    mental illness?

9        A.   Correct.

10       Q.   You thought that -- you personally thought

11   that asking for his sensei, Mr. Muhaymin asking for his

12   sensei was a strange request?

13       A.   I didn't hear him say -- all I heard was

14   sensei.  That's all I heard him say was sensei.  And I

15   didn't know what he was talking about.

16       Q.   It's a strange request?

17       A.   I wouldn't say it was a request.  But I don't

18   know -- all I heard was sensei.  So I don't know if he

19   was asking for.  All I heard was sensei.

20       Q.   You don't remember him saying, "Please call my

21   sensei"?

22       A.   I don't remember those -- I just remember

23   sensei.

24       Q.   Okay.  Well, I want you to assume for a minute

25   that he was saying -- I can play the video for you.  I

1   don't wasn't to waste too much time.  So let's just

2   assume that he was very -- he said it several times,

3   "Please call my sensei, please call my sensei."

4        A.   I heard it once.

5        Q.   All right.  That's a strange request?

6        A.   Again, I don't know if it was a request or

7   not.  All I heard was sensei.

8        Q.   All right.  Now you did nothing to determine

9   whether this man was suffering from a mental illness?

10       A.   At the start of the investigation I didn't

11  have any time to determine any of that.  I -- the last

12  time I met him he was fine.

13       Q.   Sir, you did nothing on January 4, 2017 to

14  determine whether this man suffered from a mental

15  illness, true?

16       A.   I didn't have -- there was no reason for me to

17  do that.  Like I said, the past contact he was fine.

18       Q.   So you agree that you did nothing to determine

19  if he had a mental illness, true?

20       A.   There was no need for me to.

21            MS. STILLWELL:  Objection.

22  BY MR. FARAJ:

23       Q.   So you didn't do anything to determine if he

24  has a mental illness, true?

25       A.   True.

1      Q.    Okay.  And when you showed up, you could tell
2   by his appearance that he was a bit dishevelled?
3      A.    Yes.
4      Q.    You understood that he is coming in to use the
5   restroom in a community center?
6      A.    He was -- according to the manager, he was in
7   there already.  And the dog, you don't want the dog
8   running around.
9      Q.    I understand.  But that this man had come in a
10   few times, comes in semi-regularly to use the restroom?
11      A.    Oh, I had no idea about that.
12      Q.    Okay.  At least that day you knew that he was
13   coming in to use the restroom?
14      A.    Yes.
15      Q.    And then you learned while you were there that
16   not only to use the restroom, he decided to wash -- to
17   clean the bathroom when he was done?
18      A.    Huh?
19      Q.    You didn't know that he decided to wipe down
20   the bathroom when he was done?
21      A.    No.
22      Q.    You all didn't ask him where he lived?
23      A.    No.
24      Q.    And your testimony today is that you did not
25   develop an understanding or a belief that this man

```
 1   might be transient?

 2       A.   No.

 3       Q.   And your testimony today is you did not

 4   develop a belief that -- or let me restate that.  You

 5   didn't feel that, based on his appearance, you should

 6   ask him whether he had a mental illness?

 7       A.   No.

 8       Q.   And procedurally you all are taught to do

 9   that; just to ask somebody, people, hey, do you have

10   mental health issues?

11       A.   No.

12       Q.   You've never been taught that?

13       A.   No.

14       Q.   You've not been taught to ask people whether

15   they are taking their medications for mental health

16   issues?

17       A.   If I'm just talking to somebody like I'm

18   talking to you, I wouldn't be making a determination if

19   you're mentally ill or not.

20       Q.   Well, that's not the kind of conversation you

21   were having with Mr. -- with Mr. Muhaymin.  Let's go

22   back to the conversation.  You believed he was ranting

23   and raving for the number of minutes you stood there to

24   watch him, right?

25       A.   Correct.
```

1      Q.   He was not speaking in a reasonable way based

2    on what was going on?

3      A.   No.  He was.  If you listen to the tape, he

4    was.

5      Q.   Well, let's go back and listen to it.

6      A.   Okay.

7      Q.   You remember him talking about his dog being a

8    lady and needing to take care of herself?

9      A.   No.

10     Q.   Okay.  We'll go through that.

11          MR. FARAJ:  Let's go right to where

12   Officer Grenier's camera sees the two gentlemen.  I

13   think mine is louder.  Let me try this again.  See if

14   it works.  It doesn't want to work.

15   BY MR. FARAJ:

16     Q.   We're going to start -- this is Exhibit 1 to

17   the deposition, starting at 1:07.

18          (Video played.)

19     Q.   We'll stop.  Brutal honesty.  Let's just be

20   brutally honest with one another.  Listening to that

21   man, do you think he's acting with his full faculties?

22     A.   Yeah, he's just asking to go to the bathroom.

23     Q.   Okay.  This is from --

24          THE WITNESS:  Can I go to the bathroom,

25   is that good?

```
 1                    MR. FARAJ:  What?
 2                    MS. STILLWELL:  Can we take a break,
 3    please.
 4                    THE WITNESS:  Can I go to the bathroom?
 5                    MR. FARAJ:  Oh, yes.  Yeah, yeah.
 6                    THE VIDEOGRAPHER:  Going off the record.
 7    The time is 10:29 a.m.
 8                    (Recess taken from 10:29 a.m. to
 9    10:37 a.m.)
10                    THE VIDEOGRAPHER:  We're back on the
11    record.  The time is 10:37 a.m.  Thank you.
12                    MS. STILLWELL:  And Mr. Faraj, I'm sorry,
13    before you begin asking any questions, I would like to
14    state on the record and request that Mr. Chami stop
15    making facial gestures, or facial expressions, or
16    making statements under his breath throughout the rest
17    of the deposition, please.
18                    MR. CHAMI:  I'll gladly respond for
19    myself.  I have made no facial gestures.  Nobody in
20    this room controls my facial gestures.  If I do make
21    them, they're involuntary.  And I would appreciate it
22    if you defend the deposition and leave it at that.
23                    MS. STILLWELL:  And in all fairness
24    you're making a facial expression now.  I'm just asking
25    that --
```

```
 1              MR. CHAMI:  That's just my face, and I
 2    will continue to have the face until I die.  So that
 3    will be the way it looks the rest of the deposition.
 4    Move on.
 5    BY MR. FARAJ:
 6        Q.   So some of the phrases I picked up just
 7    listening today.  Every time I listen to it I pick up
 8    new phrases, I'll tell you that.  This is from the
 9    master builder, the master builder knows mathematics.
10    That utterance by this man you think is a statement of
11    a person operating without any mental health issues?
12        A.   I don't have the training to actually pick out
13    mental health problems.
14        Q.   You do have training, don't you, sir?  Every
15    year you get training on detecting and engaging people
16    who have mental health issues?
17        A.   Very, very minimal training, because that's
18    why we have CIT officers that come out and do it.
19        Q.   Are you aware that one of your fellow officers
20    testified yesterday that he estimates 90 percent of the
21    people you come in contact with have some mental health
22    issue?  Are you aware of that?
23        A.   I don't know what he said.  I couldn't tell
24    you what -- anything he said.
25        Q.   Would you agree with the large majority,
```

1    overwhelming people that you come in contact with in

2    situations like this, have mental health issues?

3        A.   No.

4        Q.   Mental health -- when I say mental health

5    issues, I'm also talking about people who are maybe

6    using drugs.

7        A.   Drugs isn't a mental health.

8        Q.   People that have mental health issues

9    sometimes abuse drugs, do you agree?

10       A.   Yes.

11       Q.   Okay.  You've learned that in your course?

12       A.   Yes.

13       Q.   And they also sometimes abuse alcohol?

14       A.   Yes.

15       Q.   My son is a graduate of ASU, and I'm a

16   graduate of a high school here.  I'm a veteran.

17       A.   Okay.

18       Q.   Now when he says "I'm a veteran," do you pause

19   there to wonder if maybe he is a veteran?

20       A.   I don't pause at any time.  I just let them

21   keep talking.

22       Q.   Okay.  But I'm asking.  You're a veteran,

23   aren't you?

24       A.   Yes.

25       Q.   Where did you serve?

1        A.    Air Force.

2        Q.    You realize, sir, that many veterans have

3   become homeless?

4        A.    Yes.

5        Q.    It's a serious problem among veterans?

6        A.    Yes.

7        Q.    And there are some instruction to your police

8   department to try and identify and help those people by

9   getting them some of the available community resources,

10  true?

11       A.    When I come in contact with them, yes.

12       Q.    Okay.  Well, this man just told you he's a

13  veteran?

14       A.    Yes.

15       Q.    Do you believe him?

16       A.    I don't believe anything.  I mean, he could

17  say whatever he wants.  I haven't been able to confirm

18  it.

19       Q.    I understand you're not confirming it.  You

20  couldn't confirm -- you couldn't confirm the call that

21  somebody was assaulted.  And we keep coming back to

22  this.  Why is it that when this man says something, you

23  need confirmation, independent confirmation, but when

24  somebody else says it, you're willing to go with --

25  you're willing to run with it?  Can you explain?

1      A.   I don't -- what?

2            MS. STILLWELL:  Objection.

3  BY MR. FARAJ:

4      Q.   When this man says something, you need

5  independent verification?

6      A.   Which man?

7      Q.   The black man, the suspect.

8      A.   Okay.

9      Q.   But when the supervisor at the community

10  center says something, you don't need verification, you

11  just take it at face value.  Why is that?

12      A.   I took both at face value.

13      Q.   Okay.  So when he says he's a veteran, do you

14  take that at face value?

15      A.   Yeah.  But I don't believe -- the majority of

16  the people lie to us.  So until I can confirm he is

17  actually a veteran.  I had no problem helping him out,

18  but I didn't know any of that stuff.  But I'm not going

19  to stop in the middle of my investigation to go find

20  out if he's a vet.

21      Q.   Okay.  Well, very shortly after that, the

22  community center supervisor says, "I wasn't assaulted,"

23  right?

24      A.   He just said he was bumped.  He didn't say

25  anything about being assaulted.  He said he was bumped.

```
 1       Q.   He's testified, he said, "I was not
 2   assaulted," right?
 3       A.   He said he was bumped.
 4       Q.   Sir, you asked him if he was assaulted, he
 5   said no?
 6       A.   I didn't.
 7       Q.   Or Officer Hobel asked him if he was
 8   assaulted, he said no, true?
 9       A.   I only heard him say "bumped."
10       Q.   Okay.  We will let the video speak for itself.
11   Going back to the veteran thing.  You could have and
12   you were required to communicate with this man to
13   understand what's going on, right?
14       A.   No.  I'm not required to, no.
15       Q.   You don't believe that your operating manual
16   requires you to communicate with people to try and
17   investigate and understand what is going on in
18   situations such as the one that was presenting itself
19   on January 4, 2017?
20       A.   Yes.  The way you put it, yes.  But mental
21   health, no.
22       Q.   I just said -- I was just talking about a
23   veteran.  Okay.
24            You do agree that you're supposed to
25   communicate with people to investigate, right?
```

```
 1      A.    Correct.
 2      Q.    All right.  The next interesting sentence he
 3  uses, he says, "You going to tell Santa Claus he can't
 4  use the bathroom?"  No issue?
 5      A.    Are you asking me a question?
 6      Q.    Yes.
 7      A.    What's the question?
 8      Q.    Well, I asked you, no issues with that?
 9      A.    No.
10      Q.    Okay.  And he says, "Are you required to do
11  EMT?"
12      A.    I didn't hear that.
13      Q.    Okay.  Then you also learn that he was never
14  trespassed at this center?
15      A.    Officer Hobel did.  I didn't ask any of those
16  questions.
17      Q.    I said you also learned that he was never
18  trespassed at this center?
19      A.    Yes.
20      Q.    And then he tells you they got TV shows with
21  dogs jumping in the pool.  True?
22      A.    Yes.
23      Q.    Do you remember him saying that?
24      A.    Yes.
25      Q.    And then one of the officers said, "I've just
```

1   been here letting him rant."  Was that you?

2       A.   Yes.

3       Q.   Was that rant of a person who is operating

4   with his full faculties?

5       A.   No.  That was meant, he's going to keep

6   talking.  That's why I'm waiting for other units to

7   show up.  I let him keep talking.

8       Q.   And speaking to one of the officers that we

9   talked to yesterday, he said sometimes with people that

10  have mental health issues, it's just a matter of not

11  being perceived as aggressive.  Sometimes you sit next

12  to them, you start talking and they begin to cooperate.

13  Is that your experience?

14      A.   No.

15      Q.   He also told us that sometimes these people,

16  you just ask them, and they tell you, yeah, they're on

17  medications, or they have some issues.  Is that your

18  experience?

19      A.   No.

20      Q.   So explain to me how it is that you all are

21  supposed to handle or deal with people who have mental

22  health issues, since you never really have access to

23  their records when you engage people in the street,

24  right?

25      A.   Correct.

Oswald Grenier - July 31, 2019                          54

1       Q.   So how are you trained to identify people who
2   might not be -- might not perceive you the way others
3   perceive you?
4       A.   If that was the situation, what we do is we
5   ask for a CIT officer.  And the CIT officer comes out
6   and does it.
7       Q.   I understand that.  But how do you get to that
8   point?  I want to understand and let me be clear in my
9   question just so we're understanding each other.  So
10  I'll give you a scenario.  You come up on somebody,
11  right?  You don't have any information on this person.
12      A.   Okay.
13      Q.   But you do understand that sometimes people
14  have mental health issues.
15      A.   Correct.
16      Q.   Have different perceptions, their reality is
17  different.  You've learned that, right?
18      A.   Yes.
19      Q.   You might be completely passive, but they
20  perceive you as aggressive?
21      A.   Yes.
22      Q.   You've learned that, right?
23      A.   Yes.
24      Q.   And you've learned that those types of people
25  require special handling?

1     A.   Yes.

2     Q.   That's why you have the CIT team?

3     A.   Yes.

4     Q.   And you all get specialized training to try

5  and identify, maybe not deal with it, but try and

6  identify those people early so it can be dealt with,

7  right?

8     A.   Yes.

9     Q.   So this is what I want to understand from you.

10  What tools have you been given to try and identify

11  people who might have mental health issues that you

12  don't know about?

13     A.   I really couldn't answer, because I don't

14  remember some of the training that I took.  So I

15  wouldn't be able to answer that.  It would be in my

16  service records.

17     Q.   Yeah.  I don't want to know the training, you

18  know, what the formal training you received.  I just

19  need to hear from you what, in general, what it might

20  be.  If you don't -- can't remember, that's fine.

21     A.   I don't really remember.

22           MR. FARAJ:  Okay.  We're going to mark

23  this as Exhibit No. 2.

24           (Deposition Exhibit No. 2 was marked for

25  identification by the reporter.)

```
 1                    THE WITNESS:  Oh, is this for me?
 2   BY MR. FARAJ:
 3       Q.   It is.  Now, sir, I would like you -- what
 4   we've handed you, Exhibit 2, is operations order 1.3
 5   labelled in discovery as COP 011449 through 011508.
 6   Please flip to page 011474, sir.
 7       A.   Do what?
 8                    MS. STILLWELL:  It's on the bottom.
 9   BY MR. FARAJ:
10       Q.   Maybe there's a different page number I can
11   give you.
12                    MS. STILLWELL:  Mr. Faraj, that's the
13   operations order 4.10, is that --
14                    MR. FARAJ:  4.10, yes.  Thank you for
15   clarifying.  Page 1.
16                    THE WITNESS:  What is it?
17                    MR. FARAJ:  Right there.
18                    THE WITNESS:  Okay.
19   BY MR. FARAJ:
20       Q.   Okay.  Remember the questions I asked you
21   about verifying warrants?
22       A.   Yes.
23       Q.   I would like you to read paragraph 3 on that
24   page to yourself.
25       A.   Okay.
```

1      Q.   You may already know it.  If you're familiar

2  with it, you can just skim through it quickly.

3      A.   Okay.

4      Q.   And then if you continue, sir, through page 4

5  of 4.10 to subparagraph 3E, disputed warrants.

6      A.   Okay.

7      Q.   You agree, sir, that based on your review of

8  this document, when someone protests or disputes a

9  warrant, you are required to verify the warrant?

10     A.   Correct.

11     Q.   And that's important, because sometimes people

12  will go and take care of a warrant, but in the system

13  it will still show it's outstanding.  You've had that

14  experience before, haven't you?

15     A.   Yes.  But I haven't had a chance to actually

16  confirm the warrant.

17     Q.   I understand.  But I'm just talking through

18  procedurally, because I want to be clear.  Because

19  sometimes even when warrants are taken care of, they

20  might still appear to be as active warrants in your

21  system, right?

22     A.   Correct.

23     Q.   At some point during the initial exchange

24  inside the community center, Mr. Muhaymin was asked for

25  his name.  Do you recall that?

**Oswald Grenier - July 31, 2019**          58

1        A.   I was the one who asked him for his name and

2   date of birth.

3        Q.   And then I heard one of the officers say, "Or

4   an ID"?

5        A.   Yes.

6        Q.   And then another officer says, "He doesn't

7   have an ID"?

8        A.   I didn't hear that.

9        Q.   Okay.  That wasn't you?

10       A.   No.

11       Q.   But one of the officers, if that happened, if

12  -- I want you to assume that one of the officers said,

13  "He doesn't have an ID."  You're saying that that was

14  not you?

15       A.   I -- I don't remember it, so I don't know

16  if -- I don't think it was me, but I mean, it could be.

17  But I don't remember asking for an ID card.  I just

18  asked for his name and date of birth.

19       Q.   I don't know that you asked him.  I said that

20  someone asked him for an ID.  And then I heard someone,

21  maybe the same person or someone else say, "He doesn't

22  have an ID."  What I was trying to understand is

23  whether that was you.

24       A.   I don't remember.

25            MR. FARAJ:  It's right where we stopped.

1    Can we go back to right where we ended if you're still

2    there, where he's asked his name.  I might have that

3    note.  Let's go to -- yeah, 10:30.  And we're going to

4    start the video again at 10:30, which is Exhibit 1 to

5    the deposition.  You've got to turn it up.

6                    THE WITNESS:  Thank you.

7                    (Video played.)

8                    MR. FARAJ:  Stop.

9                    THE WITNESS:  I don't know who that is.

10   BY MR. FARAJ:

11       Q.   Did you hear that?

12       A.   What, "What's your last name?"

13       Q.   No, before that.  The conversation about the

14   ID.

15       A.   No.

16       Q.   That wasn't you?

17       A.   No, that wasn't me.  That's not me.  I don't

18   know who said that.

19       Q.   Okay.  You hear that he doesn't have ID?

20       A.   That was Hobel.

21       Q.   Okay.  Do you know why Officer Hobel knows

22   that he doesn't have ID?

23       A.   No.

24       Q.   Isn't it true, sir, that he knows and you know

25   that he doesn't have an ID, because you all know that

 1    this man is homeless?

 2        A.   No.  I had no -- I didn't even ask him for his

 3    ID.  I just asked for his name and date of birth.

 4        Q.   I wasn't asking you that.  Isn't it true --

 5    and it might be no -- isn't it true that you knew he

 6    was homeless?

 7        A.   No, I didn't know he was homeless.

 8        Q.   All right.  Now, you all decided to arrest

 9    Mr. Muhaymin.  He's outside.  He doesn't cooperate,

10    true?

11        A.   Correct.

12        Q.   And you had to use some level of force to get

13    him to cooperate?

14        A.   Yes.

15        Q.   Did you unsheathe your baton?

16        A.   Did I what?

17        Q.   Did you take your baton out?

18        A.   I don't have a baton.

19        Q.   Okay.  Did you use any tools or equipment to

20    try and subdue Mr. Muhaymin --

21        A.   No.

22        Q.   -- or to get him to cooperate?

23        A.   No.

24        Q.   Did you see anyone else from the officers use

25    any of your equipment to get Mr. Muhaymin to comply?

```
 1      A.   I -- I couldn't tell you.  I know one officer
 2   was to my right, and then there was an officer to my
 3   left.  That's all I --
 4      Q.   So tell me, to the best of your recollection,
 5   what you did to either get Mr. Muhaymin to comply, or
 6   to assist your fellow officers in getting Mr. Muhaymin
 7   to comply.
 8      A.   Trying to pull his left hand out from under
 9   him.  He wouldn't do it.  So I gave him an elbow strike
10   to the -- the lat, or whatever this is, to try to
11   interrupt his biocomputer so that he would let his
12   hands go.
13      Q.   To the what, sir?
14      A.   Biocomputer, to your brain.
15      Q.   Okay.  I don't want the record to read wrong.
16   I'm pretty sure you didn't hit him in the head.
17      A.   No.  It's to interrupt his thought processes.
18   Biocomputer is his brain.
19      Q.   So where did you strike Mr. Muhaymin?
20      A.   To the left, wherever muscle this is, the lat.
21      Q.   Okay.  Why did you pick that area?
22      A.   It's the meaty part.  And it's where we're
23   trained to hit him at.
24      Q.   Is there a reason why you did not attempt to
25   use verbal or negotiated persuasion techniques?
```

1      A.   'Cause once you tell him he's got a warrant,

2   he's under arrest, you lay hands on him to handcuff

3   him.

4      Q.   Is it your testimony that once you tell

5   somebody they're under arrest, the only option

6   available to officers to get a suspect to respond is

7   physical contact?

8      A.   Yes.

9      Q.   Physical violence?

10      A.   No, not physical violence, no.

11      Q.   So let me define what physical violence means

12   to me.  Any time you try and force somebody to do

13   something they don't want to do is physical violence.

14      A.   That's your --

15      Q.   My definition.

16      A.   Okay.  That's your definition.  It's not mine.

17      Q.   If I try to get you to do something right now

18   that you don't want to do, I would be engaged in

19   physical violence against you.

20      A.   Physical violence, what you're saying, no.

21   You physically grabbing on to somebody, there is no

22   violence in it.  You're just putting their hands behind

23   their back.

24      Q.   So the physical option, is it your testimony

25   that the physical option is the only option that

```
 1   officers are supposed to use when someone fails to
 2   comply with the request to put their hands behind their
 3   head?
 4        A.   I'm sorry.  You're going to have to repeat
 5   that again.
 6        Q.   Is it your testimony that physically
 7   manipulating someone, or forcing someone to comply
 8   physically is the only option available to officers
 9   once they decide to arrest someone or tell someone to
10   put their hands behind their head?
11        A.   Yes.
12                  MS. STILLWELL:  Objection.
13                  THE WITNESS:  Sorry.
14                  MS. STILLWELL:  Go ahead.
15                  THE WITNESS:  Yes.
16   BY MR. FARAJ:
17        Q.   Okay.
18        A.   Excuse me.
19        Q.   So after you struck him on the meaty portion
20   of his back, what other actions did you take to get
21   Mr. Muhaymin to comply?
22                  MS. STILLWELL:  Totally misstates what he
23   said.
24   BY MR. FARAJ:
25        Q.   Did I misstate what you said?
```

```
 1      A.   Huh?
 2              MS. STILLWELL:   It misstates what he
 3   said.
 4   BY MR. FARAJ:
 5      Q.   Okay.  Let me see if I misstated what you
 6   said.  I understood that you struck with your elbow
 7   Mr. Muhaymin on his back, on the meaty portion of his
 8   back?
 9      A.   To the left side, yes.
10      Q.   To get him to comply?
11      A.   Yes.
12      Q.   She thought I misstated what you said and I
13   wanted to clarify that --
14              MS. STILLWELL:   He was clarifying that it
15   was on the left side, not indicating on the back.
16   BY MR. FARAJ:
17      Q.   I just said it was the back.  I don't know if
18   it was -- do you remember if it was the left or right?
19      A.   Left.
20      Q.   On the left back?
21      A.   Left lat, whatever muscle that is right there.
22      Q.   All right.  That is still your back, right?
23      A.   It's your lat, it's not your back.  I mean,
24   it's part of your back, but it's not your back.
25      Q.   All right.  That's fine.
```

```
 1                   After you did that, what other actions
 2   did you take to get him to comply?
 3        A.   Just pull him on his left arm to get it from
 4   under his chest.
 5        Q.   Okay.  What else?  Did you succeed?
 6        A.   It took a little bit, but yeah, we did.
 7        Q.   Okay.  And what other actions did you take?
 8        A.   Then putting handcuffs on him and walking to
 9   the car.
10        Q.   All right.  Did you see what the other
11   officers did?
12        A.   No.  I just -- me and Officer Head on the left
13   side.  We were -- it took us all we could to get his
14   arm behind his back.
15        Q.   I understand.  Did you see what the other
16   officers did?
17        A.   No.
18        Q.   Now you're aware that he had a dog with him?
19        A.   Yes.
20        Q.   Did you all develop a plan as to what you
21   would do with the dog?
22        A.   At that particular moment in time, no.  We
23   just wanted the dog away so it wouldn't bite us.
24        Q.   Okay.  I'm going to run you through a
25   hypothetical scenario and tell me it makes sense.
```

1    Okay?

2        A.    Okay.

3        Q.    We're at the academy, you got a bunch of

4    potential police recruits.

5        A.    Okay.

6        Q.    And the scenario is, look, there's this man,

7    he walks into a community center.  He's got a dog.

8    He's a bit agitated.  He's ranting and raving.  He

9    wants to use the bathroom.  There's some allegations

10   that he may have assaulted someone.  And then we run

11   his name, it turns out he's got a misdemeanor.

12             Option A, you take him outside.  You say,

13   "Look, man, there is a warrant out for your arrest.

14   Can we put the dog down or get somebody to take care of

15   the dog?  I got to take you in.  And, you know, if I

16   take you in, I got to handcuff you.  So I would like

17   you to cooperate so we don't have a scene.  And is

18   there anyone to take care of your dog so your dog just

19   isn't let loose?"

20             Option 2, we take him outside, we

21   physically grab him.  We tell him he's under arrest.

22   He's panicking because he doesn't know what's going to

23   happen to his dog.  He starts to resist.  We force him

24   to put his hands behind his back and cuff him.

25             Based on the instructions we received at

1    the academy so far, what is the more prudent option

2    that the SOP, the operations order suggests we do?

3        A.   Well, you said it's hypo --

4        Q.   Hypothetical.

5        A.   Hypothetical.

6        Q.   Imaginary world.

7        A.   Okay.  Well your imaginary world is exactly

8    what happened.  So it's not a hypothetical situation,

9    it's the actual situation.

10       Q.   I get to make the hypotheticals as I want to.

11   This is -- I'm king in this room right now.  So --

12       A.   Putting hands on him and handcuffing him.

13       Q.   So option 1 wouldn't work?

14       A.   No.

15       Q.   All right.  And so you all walk him to the

16   car.  Describe anything noteworthy on your way to the

17   car.

18       A.   He was doing -- and I don't know how to

19   explain it.  But he's got his legs.  And he's -- we're

20   pulling this way and he's doing his legs not to get

21   there.  And then when we get to the car and his

22   handcuffs are now above his head, and I have no idea

23   how he got his hands above his head.

24       Q.    Well, let's look at the video to see what that

25   looks like.  Now isn't it -- isn't it true that you all

1  torqued his arms up so that he was squealing and crying

2  out in pain?

3      A.  That's where --

4      Q.  Hold on.

5      A.  I'm sorry.

6      Q.  I get to ask the question first.  And you

7  continued to torque the arms up all the way up so that

8  they got rotated around and his arms were no longer

9  behind his back, but now in front of him; isn't that

10 true?

11     A.  No.

12            MS. STILLWELL:  Objection.

13            MR. FARAJ:  I know you want to answer,

14 but you don't get to do that.

15            MS. STILLWELL:  No.  I was saying

16 objection.

17            MR. FARAJ:  Okay.  That's fine.

18 BY MR. FARAJ:

19     Q.  Let's go to Hobel video 0003 at 3 minutes.  I

20 have it too, if you don't have it.

21            MR. CHAMI:  Hobel 0003?

22            MR. FARAJ:  I believe that's the one.

23 Hold on.  Yeah.  0003 is the video.

24            MR. CHAMI:  Three minutes.

25            MR. FARAJ:  I have it.  You know, we

1   don't need sound.  Well, yeah, we do need sound.

2                    MR. CHAMI:  I got it.

3                    MR. FARAJ:  You got sound?

4                    MR. CHAMI:  Yeah, I have sound.

5                    MR. FARAJ:  So start it right at 3, about

6   2:55, just so we can get it set up.  Right there is

7   fine.  Hold on.  Don't run it yet, please.  So we're

8   going to start -- the Hobel video is going to be

9   labelled as Exhibit No. 3 --

10                   THE REPORTER:  Yes.

11                   MR. FARAJ:  -- to the deposition.

12                   (Deposition Exhibit No. 3 will be marked

13  for identification by the reporter subsequent to the

14  deposition.)

15                   MR. FARAJ:  This portion will begin at

16  2:55 of that video.  And just to be clear, we're on

17  Hobel 0003.

18                   MR. CHAMI:  COP 0003.

19                   MR. FARAJ:  COP 0003.  Thank you.  All

20  right.  Let's get it started.

21                   (Video played.)

22  BY MR. FARAJ:

23     Q.   You see the arms?

24     A.   Yes.

25     Q.   Somebody's got -- one of you officers has the

1    handcuffs way up there.

2         A.   That's not me.

3         Q.   That's not -- I'm not saying that it was you.

4    But you see where his arms were torqued up?

5         A.   Mm-hm.

6         Q.   And that's what caused the arms to go forward?

7         A.   That I have no idea.  Like I said, we get out

8    to the car and his hands were above his head.

9         Q.   Well, let's go back just a little bit so you

10   can see in context what we're talking about.

11                   (Video played.)

12        Q.   Do you see that?  The officer is grabbing his

13   arms and pulling them up?

14        A.   Yes.

15        Q.   Torquing them up that way?

16        A.   Yes.

17        Q.   Now, that's not a legal move, is it?

18        A.   It is.

19        Q.   That's not a legal move, is it?

20        A.   Yes, it is.

21        Q.   It is?

22        A.   Yes.

23        Q.   It's okay to basically tear somebody's rotator

24   cuff?

25        A.   Didn't --

```
 1                 MS. STILLWELL:  Objection.
 2                 THE WITNESS:  Didn't tear anybody's
 3   rotator cuff.
 4   BY MR. FARAJ:
 5       Q.    It's your testimony that -- do you believe the
 6   body is supposed to naturally move that way where you
 7   tie somebody's -- where you cuff somebody, and then you
 8   move their hands from behind their back all the way to
 9   the front of their body?
10       A.    No, I never said that.
11       Q.    And it's your testimony that this is allowed?
12       A.    From even my interview with the Professional
13   Standards Bureau, I did not -- like I said, I told my
14   attorney, I don't know how his hands got from behind
15   his back over his head.
16       Q.    Yeah.  You told me that --
17       A.    You can show me -- okay.  You can show me that
18   video, but I'm still -- I don't know how his hands got
19   from behind his back over his head.
20       Q.    Well, isn't it true, sir, that you and your
21   fellow officers all told the Professional Standards
22   Bureau and everybody else that asked you what happened
23   that he brought his arms from the back of his -- from
24   his back to the front by himself?  He did it on his
25   own?
```

1      A.   Yes.  That's what I said, because I don't know

2  how his hands got from behind his back over his head.

3      Q.   Let's -- maybe I can answer it for you if

4  you're willing to look at this video.  Are you willing

5  to?

6      A.   You can show me the video.  I'm explaining to

7  you I don't know how his hands got from behind his back

8  to over his head.

9      Q.   Do you believe that if you force somebody

10 to -- force somebody's arms using the handcuffs up and

11 above their head and to the other side that that would

12 be a -- one way to cause someone's hands to go from

13 behind their back to the front?

14     A.   That I couldn't tell you.

15     Q.   Well, let's look at it again.

16           (Video played.)

17     Q.   Those are the screams of agony as the

18 shoulders are being torn at the rotator cuffs to bring

19 the arms forward.  Are you aware of that?

20           MS. STILLWELL:  Objection.

21           THE WITNESS:  No.

22 BY MR. FARAJ:

23     Q.   Does that answer your question as to I wonder

24 how the arms got from behind his back to his front?

25     A.   Yes, now it does.

1      Q.   You all did it?

2      A.   I didn't do it.

3      Q.   Okay.  So now that the arms are in front, you

4  all have a problem; isn't that true?

5      A.   Yes.

6      Q.   Because now he can push off the car and --

7      A.   He can push off the car, he can choke somebody

8  out.

9      Q.   So you got to bring his arms back behind his

10 back?

11     A.   Yes.

12     Q.   And so someone says, "We got to take him to

13 ground"?

14     A.   Yes.

15     Q.   Was that you?

16     A.   I couldn't -- I couldn't tell you.  I have no

17 idea.

18     Q.   Do you think you would recognize your voice if

19 you heard it?

20     A.   Yes.

21     Q.   Let's play that part, please.

22              (Video played.)

23     A.   That's not me.

24     Q.   Okay.  Do you recognize the voice?

25     A.   No.

1      Q.   So you take him to ground.  Describe his

2  positioning on the ground, please.

3      A.   He went down on his back.  We were able to

4  take the handcuffs off him, roll him around to his

5  front, put the handcuffs on him.  And that's when he

6  went limp.

7      Q.   Okay.  Now when you had him prone on his

8  front, --

9      A.   Yes.

10      Q.   -- how was he positioned?

11      A.   What do you mean?

12      Q.   On the ground, how was he positioned?

13      A.   He was --

14      Q.   He was laying flat?

15      A.   Yes.

16            MR. FARAJ:  Okay.  Can we take a break.

17            THE VIDEOGRAPHER:  Going off the record.

18  The time is 11:12 a.m.

19            (Recess taken from 11:12 a.m. to

20  11:19 a.m.)

21            THE VIDEOGRAPHER:  We're back on the

22  record.  The time is 11:19 a.m.  Thank you.

23  BY MR. FARAJ:

24      Q.   We were talking about the portion of the

25  incident where Mr. Muhaymin is now on the ground, flat,

1  lying prone on his front.  You all are attempting to

2  get him handcuffed behind his back.

3      A.   Yes.

4      Q.   Do you recall that?  At that portion, at that

5  time, at that specific time, which officers were on the

6  scene to your knowledge?

7      A.   Myself, Officer Head, Officer Hobel and

8  Canilao.

9      Q.   Place, to the best of your recollection, tell

10 me where the various officers that were on the scene

11 were located, or were doing -- let me restate that.

12 What role did these officers play in the handcuffing of

13 Mr. Muhaymin once he's on the ground lying flat?

14     A.   Me and Officer Head are grabbing his left arm.

15 And I -- Hobel or Canilao were on my right.  And I

16 didn't see what they were doing.  Alls I saw was we

17 were able to get the handcuff on his left arm.  And

18 they brought his right arm and we handcuffed him.

19     Q.   Okay.  Where were your legs?

20     A.   At that time, I think it was laying on the --

21 I think my legs were on the ground when the initial --

22 we were trying to initially put him in handcuffs.

23     Q.   Were your legs at any place other than the

24 ground?

25     A.   Yeah.  At one time my right -- my right was

```
 1  first started on the shoulder, and then it moved down
 2  to his neck area.  And I wasn't using a whole lot of
 3  weight, because I was trying to hold his head up,
 4  because he was smashing his face into the ground.
 5       Q.   Okay.  When you say my neck, my -- it moved
 6  from his shoulder to his neck?
 7       A.   Yes.
 8       Q.   Like without you -- without you wanting to
 9  move it?
10       A.   Right.  During the struggle he's moving around
11  and it went from here to there.
12       Q.   By itself?
13       A.   Yeah, as we were struggling, that's when my
14  leg went.
15       Q.   Your legs always move by themselves without
16  any volition from you?
17       A.   When the body is moving, when I got my foot on
18  there, his body moving, yeah, my legs are going to go
19  where his body is going.
20       Q.   When you say leg, what part of your leg?
21       A.   My right shin -- or my left shin.  It was one
22  of my legs.  I don't remember exactly which side.
23       Q.   So your right shin was on his shoulder?
24       A.   Yes.
25       Q.   Where was your foot?
```

1       A.    On the concrete.

2       Q.    Okay.  And then based on your testimony,

3    without any volition from you, your right shin went to

4    his neck?

5       A.    Because he was moving around, yes.

6       Q.    Okay.  So he caused you --

7       A.    Yes.

8       Q.    -- to put your shin on his neck?

9       A.    Yes.

10      Q.    He did it?

11      A.    Yes.

12      Q.    Okay.  And while your shin was on his neck,

13   your boot was where?

14      A.    On the concrete.

15      Q.    Okay.  And your hands were where?

16      A.    I'm holding his hairs, trying to hold his head

17   up so he wouldn't crush his face on the floor.

18      Q.    At any point were you resting your weight on

19   his head?

20      A.    No.  Because if I had put all my weight on his

21   head, I wouldn't be able to pull his head up.

22      Q.    And that would be illegal?

23      A.    Yes.

24      Q.    Right?

25      A.    Yes.  Ouch.

1      Q.   And also it would be illegal for you to place

2    your weight on his neck?

3      A.   And I didn't put my weight on his neck.

4      Q.   I'm not asking if you did or not.  I'm saying

5    you understand that based on your SOPs, it would be

6    excessive force to place your weight on his neck or

7    head?

8      A.   Yes.

9      Q.   That would be illegal, right?

10           MS. STILLWELL:  Objection.

11   BY MR. FARAJ:

12     Q.   Based on your understanding of your own SOPs,

13   right?

14     A.   My SOPs don't go as far as the law goes.

15     Q.   Okay.  Well, they're based on the law, right?

16     A.   No.  They're based on policies and procedures

17   on how you do your job on a daily basis.

18     Q.   You all get regular briefings on changes in

19   the law, --

20     A.   Yes.

21     Q.   -- don't you?

22     A.   Yes.

23     Q.   And then you modify your procedures to make

24   sure that you comply with the law?

25     A.   I don't know how they do the procedures.  I'm

1    not involved in that anyway.

2         Q.   You've been -- you've sat in on briefings

3    where they would say, okay, there's a new case.  We can

4    do this and we can't do that.  This is how we can

5    search.  This is what we can't search.  You've learned

6    that before, haven't you?

7         A.   Not briefing, no.

8         Q.   You've never had a briefing where they said

9    here's some -- there's a new case that came out and

10   this is what we can do?

11        A.   No, because they're always changing.  They put

12   it out in what we call pumpkin pages.

13        Q.   And that causes you to modify -- that might

14   cause you to modify certain procedures, correct?

15        A.   Yes.

16        Q.   Before I go to the video, tell me about your

17   previous interaction with Mr. Muhaymin.

18        A.   Muhaymin was at the Fry's at 67th and Indian

19   School Road.  He was in going to the bathroom.  For

20   whatever reason, the manager called and said he

21   wouldn't leave.  I showed up, asked him to leave.  He

22   said okay, and walked out the front door.

23        Q.   Okay.  And when you saw him at the community

24   center, you remember him from the Fry's?

25        A.   Yes.

1      Q.   And the same thing with the bathroom?

2      A.   Yes.  But he was -- he had already gone to the

3    bathroom, the manager wanted him to leave.  I asked

4    him -- he walked out.  I asked him to leave, he walked

5    out.

6              MR. FARAJ:  Okay.  Let's go please to --

7    and I have it so I can do it.  It's -- we're going to

8    go to -- this is going to be Exhibit No. 4.  And this

9    is, stand by, this is COP 00009.  The body cam of

10   Officer Nielsen.  And we are going to start at

11   30 seconds.

12             MS. STILLWELL:  I'm assuming you agreed

13   to all the evidentiary objections.

14             MR. FARAJ:  Yeah.

15             MS. STILLWELL:  And the videos.

16             MR. FARAJ:  We would have to go through

17   that in trial anyway.

18             MS. STILLWELL:  Okay.

19             MR. FARAJ:  We're just in deposition.  I

20   don't think you can -- honestly, as an aside, I don't

21   think you can object to foundation in a deposition, but

22   I'll look into it.

23             MS. STILLWELL:  You can.

24             MR. FARAJ:  You can object to it if I try

25   to introduce it later, but it's preserved.

```
 1                    MS. STILLWELL:  It's preserved.
 2                    MR. FARAJ:  Even if you don't object to
 3   it.
 4                    MS. STILLWELL:  I'm objecting to it now.
 5                    MR. FARAJ:  No, no.  It's preserved
 6   anyway.
 7                    MS. STILLWELL:  But I object to it now.
 8                    MR. FARAJ:  I understand.  We're good.
 9                    At 30 seconds, go to 30 seconds.  No?
10   Okay.  Hold on.  Maybe.  Hold on.  I'm sorry.  It's at
11   -- it must be the other one then.  Is that Nielsen?
12   Yeah, what's that one?
13                    MR. CHAMI:  8.
14                    MR. FARAJ:  What was the last exhibit?
15                    THE REPORTER:  Exhibit 3.
16                    MR. FARAJ:  So we're on 4 now, right?
17   The one I just announced?  I did say 8.  I want 0008.
18                    Let go off the record for a minute.
19                    THE VIDEOGRAPHER:  Sure.  Going off the
20   record.  The time is 11:27 a.m.
21                    (Recess taken from 11:27 a.m. to
22   11:28 a.m.)
23                    THE VIDEOGRAPHER:  We're back on the
24   record.  The time is 11:28 a.m.  Thank you, sir.
25                    MR. FARAJ:  Exhibit 4 is Officer Nielsen,
```

1    00008, and we're going to begin it at 30 seconds or

2    29 seconds.

3                    (Deposition Exhibit No. 4 will be marked

4    for identification by the reporter subsequent to the

5    deposition.)

6                    (Video played.)

7    BY MR. FARAJ:

8        Q.   Stop it.  So I'm just going to show it to you

9    on a larger screen.  Same video beginning at

10   30 seconds.

11                   (Video played.)

12       Q.   Do you see the knee on the head?

13       A.   No.  I see it on the neck.

14       Q.   Okay.  Let's go back.

15                   THE VIDEOGRAPHER:  Counsel, you're in the

16   way.

17                   MR. FARAJ:  I'm sorry.

18                   THE VIDEOGRAPHER:  I just wanted you to

19   know.

20                   THE WITNESS:  That's on his neck.

21   BY MR. FARAJ:

22       Q.   You see his head?

23       A.   I see his head, but my knee is on his neck.

24       Q.   Okay.  You do identify that as yourself,

25   though, right?

1      A.   I -- I can't tell you.

2      Q.   Okay.  Now I want you to be -- to pay careful

3   attention, please, sir.  From -- we're going to start

4   the video, same video, same exhibit at 26 seconds.

5               (Video played.)

6      Q.   Is that you?  Is that knee yours?

7      A.   I couldn't tell you.

8      Q.   Okay.  Do you see where that foot is?

9               MS. STILLWELL:  May I see?

10              THE WITNESS:  What foot?

11   BY MR. FARAJ:

12     Q.   I'm sorry.  Do you see this?

13     A.   That's not -- that ain't mine.  I don't have a

14   foot up there.  My foot's on the concrete.  Is that

15   somebody's foot?

16     Q.   Or knee.  I can't tell.  Something on his head

17   is what I see, but I might be wrong.  Do you see that?

18     A.   Yeah.  I have no idea what that is.  If that's

19   a -- that's not my foot.  My foot was on the concrete.

20     Q.   You do recognize that there's something --

21   someone is placing something on that man's head, right?

22              MS. STILLWELL:  Objection.

23              THE WITNESS:  It looks like to me it's on

24   his neck.

25   BY MR. FARAJ:

```
1        Q.   All right.  Well, let's do it this way.  So
2    we're going to run it again, sir.
3                   (Video played.)
4        Q.   That's his hair?
5        A.   Mm-hm.
6        Q.   That was you around the head and neck, right?
7        A.   I --
8        Q.   Around the head and neck, --
9        A.   Um --
10       Q.   -- that was you?
11       A.   I don't know, because I couldn't tell you.  I
12   don't know if it's my knee or not.
13       Q.   And it was your testimony that you were
14   actually lifting his head up?
15       A.   Yes.
16       Q.   You saw that in this video?
17       A.   Yes.
18       Q.   So that's your hand?
19       A.   Yes.
20       Q.   And your testimony is that you're actually
21   lifting?
22       A.   Yes.  He's smushing his face on the floor.
23       Q.   Okay.  Let's do this again.  I'm sorry.  I
24   want your lawyer to see it as well.
25                   Are you able to see?
```

```
 1                    MS. STILLWELL:  Mm-hm.
 2                    (Video played.)
 3                    THE WITNESS:  I'm trying to pull his head
 4    up, because he's smushing his head into the ground.
 5    BY MR. FARAJ:
 6       Q.   So let me get this straight.  You do -- you
 7    do -- you do recognize that someone has their neck in
 8    his -- their knee in his neck, right?
 9       A.   Yes.
10       Q.   And so you're saying that if somebody has
11    their knee in his neck, you're pulling his head up?
12       A.   Yes.
13       Q.   Where did you learn that technique?
14       A.   There isn't a technique.  I didn't want him
15    smashing his face on the ground.
16       Q.   What does that do to a person when someone is
17    putting their neck -- their knee in someone's neck and
18    the other person is trying to lift the head up?  What
19    forces are you applying?
20       A.   I have no idea.  I pulled his hair so he
21    wouldn't smash his face in the ground.
22       Q.   As you sit here -- how many videos have you
23    seen of this incident?
24       A.   Three or four, I think.
25       Q.   Okay.
```

```
 1      A.   I've never actually sat down and watched every
 2   one.  It was the one that they released to the news.
 3      Q.   Of the ones that you actually saw, is there
 4   one that actually captured him where he's banging his
 5   head against the ground?
 6      A.   No, that's what I was trying to -- everybody's
 7   in there.  So I don't think he's actually going to show
 8   that.  But I was trying to hold his head up so he
 9   wouldn't smash his face.
10      Q.   Now we're going to 1:45 of Exhibit 4.  Let me
11   back up just a little bit.  We're going to start at
12   1:42.  You see?
13              MS. STILLWELL:  Mm-hm.
14              (Video played.)
15   BY MR. FARAJ:
16      Q.   Is that still your knee, sir?
17      A.   No.  My Taser is up on my vest, not on my hip.
18              THE REPORTER:  I'm sorry.  Can you repeat
19   that?
20              THE WITNESS:  I'm sorry.  My Taser is not
21   on my hip, it's on my vest.  So whoever's that knee is,
22   is not mine.  You will see his Taser right -- go a
23   little bit faster -- right there.  Right by his
24   magazines there is a Taser right next to that.  Mine is
25   right here.
```

1    BY MR. FARAJ:

2        Q.   Fair enough.  But you do see a knee on the

3    neck or the head, right?

4        A.   I see -- let me -- I would have to see it

5    again.

6        Q.   All right.  Sure thing.  It's hard for me to

7    stop it at the right sequence, but this is as good as I

8    can get it.  Let me try to run it.  Maybe you can see

9    it better while it's running.

10                   (Video played.)

11       Q.   Do you see that?

12       A.   Yeah.  And those aren't even my boots.

13       Q.   All right.  Do you recognize the boots?

14       A.   No.  These are -- those are my boots.  Those

15   aren't the boots.

16                   THE VIDEOGRAPHER:  Can I have a better

17   view of the boots?  That was outside the frame.

18                   MR. FARAJ:  That's all right.

19   BY MR. FARAJ:

20       Q.   You wear Danner's?

21       A.   Yes.

22       Q.   I see Danner's.

23       A.   Where?

24       Q.   I was in the military.  I recognize the boots.

25   I see Danner's in here.  These aren't your Danner's

**Oswald Grenier - July 31, 2019**                    88

1    with the Vibram sole?

2        A.    With the what?

3        Q.    Let's try it again.   Danner is D-A-N-N-E-R.

4        A.    Those right there are not Danner's.   Those are

5    not Danner boots.

6        Q.    Those?

7        A.    Those are not Danner's.

8        Q.    Well, we're not talking about those.   We're

9    talking about the --

10       A.    Are you talking about -- those aren't

11   Danner's.

12       Q.    Okay.   Let's try it again.

13                 (Video played.)

14       A.    That's not a Danner boot.   You can actually --

15   go a little bit forward, you can see it.

16       Q.    That's fine.

17       A.    And also, like I said, that Taser is on his

18   belt, mine's on my vest.

19       Q.    Okay.

20       A.    Am I moving around too much?

21                 THE VIDEOGRAPHER:   That's all right, sir.

22   You're fine.

23   BY MR. FARAJ:

24       Q.    Who is the sergeant?   Is it Sergeant Wong?

25       A.    Yes.

1     Q.   Is this Sergeant Wong?  Is that who has the

2  Taser on his side?

3     A.   I don't know.

4     Q.   Well, that's a sergeant, right?

5     A.   I see it's a sergeant, but I don't know if

6  it's Sergeant Wong, because I don't know how many

7  sergeants responded.  Excuse me.

8     Q.   That's Wong.  All right.  After you managed to

9  get the cuff on either left or right hand, I can't

10  recall, either hand, did you participate any further,

11  or did you get up?

12     A.   At first I got up.  And then, like I said, he

13  went limp.  And then like dark gray black stuff came

14  out of his mouth.

15     Q.   Okay.

16     A.   And then --

17     Q.   Were you still on top of him when he vomited?

18     A.   No.

19     Q.   When whatever came out of his mouth?

20     A.   No.

21     Q.   All right.  So let me do this.  I don't know

22  why mine doesn't play audio.  Can we go to 3:20,

23  please.  Or 3:19, 3:15.

24             MR. CHAMI:  Exhibit 4.

25             MR. FARAJ:  Of Exhibit 4.  Maybe because

1    it's turned all the way down.

2              MR. CHAMI:  You got it.

3              MR. FARAJ:  I think so.  Bonehead move.

4              MS. STILLWELL:  What is the --

5              MR. FARAJ:  I'm going to give it to you

6    in a second.  Let's go -- let's start at -- I'm going

7    to start at 3:10.

8    BY MR. FARAJ:

9        Q.   Is that Sergeant Wong?

10       A.   I don't know.

11       Q.   Okay.  You recognize this as a Danner?

12       A.   It looks like a Danner.  I couldn't tell you,

13   though.  That's the sergeant.

14              (Video played.)

15       Q.   At this point where do you think you were

16   located?  And we're looking at 3:16 on the video?

17       A.   I don't know.  I think I'm to the left.  I'm

18   not 100 percent sure, because I don't know where the

19   guy is.  See the stuff is coming out of his mouth.

20       Q.   Yeah, that's when he's dead.

21       A.   Oh, I don't -- all I saw was stuff coming out,

22   and I asked if that was normal.

23       Q.   Okay.

24       A.   Because I had never seen it before.

25       Q.   About how long before that did he go limp?

1    A.    It was in a matter of minutes, seconds.

2    Q.    In the course of arresting this man, and then

3  later initially trying to put the handcuffs on him, and

4  then later trying to put the handcuffs on him again, do

5  you recall him saying, "I can't breathe"?

6    A.    No.

7    Q.    You never heard him say, "I can't breathe"?

8    A.    No.

9    Q.    If he had said, "I can't breathe," do you

10  agree that, based on your procedure, you are required

11  to stop and inquire to make sure he's okay?

12    A.    Yes.

13    Q.    And if you fail to do that, that violates his

14  rights, --

15    A.    Mm-hm.

16    Q.    -- right?

17    A.    Yes.

18          MS. STILLWELL:  Objection.

19          THE WITNESS:  I didn't hear him say

20  anything.

21  BY MR. FARAJ:

22    Q.    Okay.  In fact, you all are trained that even

23  if a suspect says, "My handcuffs are too tight," which

24  a lot of them do and they may not be too tight, but

25  you're required --

1      A.   You adjust them.

2      Q.   -- to check and make sure that there is some

3  -- not slack, it's not the right word, some space?

4      A.   Yes.

5      Q.   If someone says, "I can't breathe," that's a

6  pretty serious complaint?

7      A.   Yes.

8      Q.   They may not be telling the truth, but you're

9  required to independently verify?

10     A.   Yes.

11     Q.   To your knowledge, sir -- I know you're saying

12  you didn't hear anything -- did any one of the officers

13  on the scene in your presence stop to verify whether

14  Mr. Muhaymin could breathe?

15     A.   That I --

16              MS. STILLWELL:  Foundation.  Go ahead.

17              THE WITNESS:  I don't -- I couldn't tell

18  you, because I don't know.

19  BY MR. FARAJ:

20     Q.   Okay.  So my question is very specific.  I

21  only need -- I only want to know what you know.  Based

22  on your own knowledge, based on your own hearing, based

23  on your own experience at the time -- it could have

24  happened, you didn't see it -- do you recall anyone

25  stopping or attempting to determine whether

1   Mr. Muhaymin was breathing?

2       A.   I believe that was Sergeant Wong.  So he -- I

3   think it was him.  I'm not 100 percent sure.  Somebody

4   said excited delirium.

5       Q.   Okay.  Was that after he died or before?

6       A.   I didn't know he died.  I wasn't told he died

7   until he was at hospital.  So I can't say he was dead.

8       Q.   Was it after the substance came out of his

9   mouth --

10      A.   Yes.

11      Q.   -- or before?  It was after?

12      A.   As soon as it came out.

13      Q.   Okay.  Before that, did anyone attempt, to

14  your knowledge attempt to stop and check whether

15  Mr. Muhaymin was breathing?

16      A.   No.

17            MR. FARAJ:  I'm going to take a little

18  bit of an lengthier break to check my notes.  And I

19  will wrap up.  Okay.

20            MS. STILLWELL:  Okay.

21            MR. FARAJ:  Okay.  So the time is 11:46.

22  How about we come back at 12:00.

23            MS. STILLWELL:  That's fine.

24            MR. FARAJ:  I just want to check all my

25  exhibits and notes, and we'll go back on the record.  I

```
 1    might just wrap up.
 2                    MS. STILLWELL:  Okay.
 3                    MR. FARAJ:  Okay.
 4                    THE VIDEOGRAPHER:  Going off the record.
 5    The time on the video monitor is 11:47 a.m.
 6                    (Recess taken from 11:47 a.m. to
 7    12:09 p.m.)
 8                    THE VIDEOGRAPHER:  We're back on the
 9    record.  The time is 12:09 p.m.  Thank you.
10    BY MR. FARAJ:
11        Q.   Officer Grenier, you described for me earlier
12    how your shin, I believe you said right shin, was on
13    Mr. -- slipped from Mr. Muhaymin's shoulder to
14    Mr. Muhaymin's neck.  Did I describe that correctly?
15        A.   Yes.
16        Q.   Okay.  When your shin was on his neck, where
17    was your knee?
18        A.   My knee was outside of his neck.
19        Q.   Okay.
20        A.   Because if my shin's on it, my knee's right
21    here.
22        Q.   Okay.  And where was your foot?
23        A.   On the concrete.
24        Q.   Okay.  When your shin slipped onto his neck,
25    why didn't you remove it?
```

```
 1        A.    It was in the heat of the moment, stuff was
 2   still going on.
 3        Q.    If there's evidence that one police officer
 4   deliberately put his -- his knee on Mr. Muhaymin's neck
 5   or head, and then another officer switched off to place
 6   his knee or -- on Mr. Muhaymin's neck or head, would
 7   that be something you would agree with?  Do you
 8   recollect that happening?
 9        A.    No.
10        Q.    Let me try that again.  I confused myself
11   saying it.  If there's some evidence that one of the
12   officers placed his knee on Mr. Muhaymin's neck or
13   head, --
14        A.    Okay.
15        Q.    -- and then that person -- that officer
16   switched off with another officer so they kind of
17   tag-teamed.  And that other officer, the second officer
18   placed his knee on Mr. Muhaymin's neck or head.  Would
19   that be something -- is that something that you
20   remember happening?
21        A.    No.
22        Q.    If that had happened, that would be a
23   deliberately placing force on someone's neck or head,
24   which is not allowed, correct?
25                  MS. STILLWELL:  Objection.
```

```
 1              THE WITNESS:  I wouldn't say
 2   deliberately.  I mean, it's all how -- how it's all
 3   moved, it's a fluid motion, so --
 4   BY MR. FARAJ:
 5       Q.   And your recollection is you actually grabbed
 6   his dreadlocks to prevent him from banging his head?
 7       A.   Smashing his head on, yes.
 8       Q.   If Officer -- if Officer Nielsen testified
 9   that he placed his hand on Mr. Muhaymin's neck and head
10   and that he does not recall Mr. Muhaymin attempting to
11   lift his head up, that would be different than your
12   recollection?
13       A.   I don't even know who that guy -- I don't know
14   who Nielsen is.
15       Q.   Well, I'll represent to you that Officer
16   Nielsen made a statement, regardless of who it is, it's
17   a person on the scene, stated he did not know if
18   Muhammad tried to get up when he was holding his head,
19   but did not recall Muhammad attempting to lift his head
20   when Nielsen was holding it down.  That's not your
21   recollection, is it?
22       A.   No, he wasn't trying to raise his head.  He
23   was trying to scrub -- rub his face in the concrete.
24   That's why I was holding his head up.
25       Q.   Okay.  You would agree that somebody -- if
```

1    someone was pushing his head down and rubbing against

2    the concrete, that would appear to be the same thing,

3    right?

4        A.   No, I don't agree with that.

5        Q.   Well let's -- let's see if you and I agree on

6    one thing.  It would be improper, it would be excessive

7    force for an officer to push on Mr. Muhammad's head so

8    that his head -- he would be manipulating the head so

9    it rubs against the concrete.  That would be improper?

10       A.   Yes.

11       Q.   That would be excessive force?

12       A.   I don't know about excessive force, but it's

13   improper.

14       Q.   Okay.  You believe it would be appropriate

15   force for an officer to grab a suspect's head and rub

16   it against the concrete?

17       A.   No.

18       Q.   You've never learned that anywhere?

19       A.   No.

20       Q.   If you heard an officer had done that, what

21   would you think?

22       A.   I couldn't tell you what I would think.  I

23   mean, it's wrong.  I probably would say something to

24   him.  But like I say, it's all fluid.  I don't -- I

25   couldn't tell you everything that happened out there.

1    Q.   You had training on dealing with people with

2   disabilities, other than mental health issues, right?

3    A.   Yes.

4    Q.   And you understand that based on the -- based

5   on your understanding of the ADA, people with service

6   animals aren't required to carry papers around, right?

7    A.   Yes, sir.

8    Q.   They're required to carry papers around?

9    A.   No, they're not.

10   Q.   Okay.

11   A.   At the time I didn't know that.  That's why I

12   asked him for the papers.

13            MR. FARAJ:  The next exhibit is going to

14   be?

15            THE REPORTER:  5.

16            MR. FARAJ:  Are you sure?  Is it 5 or 6?

17            THE REPORTER:  It's 5.

18            MR. FARAJ:  Okay.  The next exhibit is 5.

19            (Deposition Exhibit No. 5 was marked for

20   identification by the reporter.)

21   BY MR. FARAJ:

22   Q.   You recognize the exhibit I just handed you,

23   sir?

24   A.   No.

25   Q.   Are you Oswald Grenier, number 7080?

```
 1      A.   Yes.

 2      Q.   Were you interviewed by detectives after this

 3   incident?

 4      A.   Yes.

 5      Q.   And if you look at -- just review it.  And

 6   tell me, sir, if this correctly -- is this you

 7   basically?

 8      A.   Yes.  Yeah, this part is me.  I don't know

 9   what this form is.

10      Q.   Okay.  You provided a statement on the second

11   page in quotes to the detective that was taking your --

12   that was interviewing you.  Where you said "I might

13   have used an elbow"?

14      A.   Yes.

15      Q.   Officer Grenier, and quote-unquote, "I might

16   have used an elbow," and then he says "Officer," it

17   says "Greniew" but I think he means Grenier, "believes

18   he delivered a right elbow strike to the right rear

19   shoulder blade of the subject in an attempt to make the

20   subject remove his hands from underneath of his body."

21   Do you recall making that statement to a detective?

22      A.   I don't remember saying the right, because I

23   was on his left side.

24      Q.   Okay.

25      A.   So it might be a typo.  But I was on his left
```

```
 1   side, I wasn't on his right side.
 2        Q.   Okay.  As you sit here today, do you -- do you
 3   challenge this statement?
 4        A.   As far as it being -- yeah, it should say left
 5   rear shoulder, not right rear shoulder.
 6        Q.   Okay.  And as far as in order to force him or
 7   in order to -- I'm sorry.  I don't want to use force.
 8   It doesn't say that.  In an attempt to make the subject
 9   remove his hands from underneath of his body?
10        A.   Yes.
11        Q.   That's accurate?
12        A.   Yes.
13        Q.   And then for suspect information, you stated
14   you did not initially recognize him as a subject you
15   have dealt with in the past?
16        A.   At the very, very beginning, yes.
17        Q.   But as you testified here a few minutes ago,
18   you did recognize him?
19        A.   Yes, I did recognize him.
20        Q.   Is there a reason why you chose not to tell
21   the detective that --
22        A.   Because I --
23        Q.   Let me finish the question.
24        A.   Okay.
25        Q.   Is there a reason why you chose not to tell
```

1   the detective that you had recognized him?

2        A.   I didn't choose not to tell the detective.  I

3   just didn't realize I had talked -- said who he was,

4   because really at first I didn't even know who it was.

5        Q.   Okay.  So this investigation happened after

6   the incident, right?

7        A.   This, like I said, I don't know what this is.

8        Q.   Well, okay.  You were interviewed by the

9   detective after the incident?

10       A.   Yes.

11       Q.   And that detective took your statement?

12       A.   Yes.

13       Q.   And that detective asked you if you recognized

14  this suspect from any interactions in the past,

15  correct?

16       A.   Yes.

17       Q.   And at that time you understood that you're

18  required to be truthful with the detective, right?

19       A.   Yes.

20       Q.   And you told the detective if this is -- we'll

21  get the detective.  But if the detective wrote down

22  that you said you did not recognize, initially

23  recognize him as a subject you have dealt with in the

24  past, would that be accurate or inaccurate?

25       A.   That's inaccurate.  Because I did recognize

1    him.  But it really didn't hit me until after the fact

2    when they said it was specifically him.  And then I

3    told him I remembered him from 67th and Indian School.

4        Q.   Yeah.  But you told me today that you actually

5    recognized him when you saw him from Fry's?

6        A.   That's what I said, 67th and Indian School at

7    the Fry's.

8        Q.   Let me be clear.  When you saw him at the

9    community center, --

10       A.   Yes.

11       Q.   -- even though you didn't maybe remember his

12   name, you recognized him as the person who used --

13       A.   No.

14       Q.   -- the bathroom at Fry's?

15       A.   No.  Because the one at Fry's, he wasn't

16   wearing a hat, and he didn't have the long hair.

17       Q.   Is it your testimony now that you did not

18   recognize him at the community center from Fry's?

19       A.   At first, yes.

20       Q.   Okay.  Isn't it true that you recognized him

21   at the community center from Fry's, that he was the

22   person at Fry's, before you all left to go arrest him?

23       A.   No.

24       Q.   When did you recognize him?

25       A.   Like when I was told who he was after the

```
 1   fact.  Everything was done, then I was told who it was.
 2   But I don't remember him from 67th.  At that time I
 3   knew I saw him, but I didn't know where I saw him at.
 4   Then they told me who it was.  And I'm like, okay, he
 5   was at 67th and Indian School at the Fry's.  That's
 6   where he was trying to use the bathroom at.
 7        Q.   Who told you that?
 8        A.   Who told me what?
 9        Q.   That he was at 67th and --
10        A.   I saw him there.
11        Q.   I understand.  I thought you told me that
12   someone told you that he was at the Fry's.
13        A.   No.
14        Q.   Okay.  You weighed -- at the time you weighed
15   220 pounds?
16        A.   Yes.
17        Q.   So have you had any -- how many years have you
18   been a police officer?
19        A.   20.
20        Q.   And in your 20 years have you ever had
21   citizens' complaints against you?
22        A.   Yes.
23        Q.   How many approximately?
24        A.   I don't know.
25        Q.   Over 100?
```

```
 1      A.   No.

 2      Q.   Over 50?

 3      A.   I have no idea.

 4      Q.   You can estimate.

 5      A.   I can't estimate, because I don't know.  I

 6  couldn't tell you.

 7      Q.   More than one?

 8      A.   More than one, yes.

 9      Q.   More than 10?

10      A.   I don't know.

11      Q.   Have you ever -- have any of the complaints

12  against you been determined to be substantiated?

13      A.   Yes.

14      Q.   How many?

15      A.   I don't know.

16      Q.   When was the last time you had a citizen's

17  complaint against you?

18      A.   10 years ago maybe.  I'm not 100 percent sure.

19      Q.   Have you ever been a subject of a lawsuit for

20  violating someone's civil rights?

21      A.   It was a lawsuit for an order of protection, a

22  certain order of protection.  The guy sued us for

23  $50,000.  I don't know exactly what it was for.

24      Q.   Tell me the circumstances that -- from your

25  perspective on that case.
```

1      A.   There was one gentleman.  They lived in a

2   neighborhood.  One gentleman wanted to serve an order

3   of protection against the other man.  We took the order

4   of protection from the caller, drove over to

5   Mr. Gaitor's (phonetics) house, served him the order of

6   protection.

7              In the order of protection the first

8   subject wrote down that he has to turn over his

9   firearms.  He gave us a shotgun and a handgun.  We

10  impounded then.  And then when it was all done, he went

11  and got the firearms back.  And he said the firearms

12  were broken.

13     Q.   Okay.  Do you believe that all people should

14  be treated equally?

15     A.   Yes.

16     Q.   Do you believe that people with disabilities

17  have the same rights as people who do not have

18  disabilities?

19     A.   Yes.

20     Q.   Do you believe that people who have mental

21  health issues have the same rights as people who are

22  not laboring under mental health problems?

23     A.   Yes.

24     Q.   Do you believe that people should be treated

25  equally regardless of race?

1     A.   Yes.

2     Q.   Do you believe that people should be given the

3   benefit of the doubt until you have evidence to prove

4   otherwise?

5     A.   What kind of scenario?  I mean, what are you

6   talking about?  Are you talking about this warrant?  I

7   can't confirm the warrant until I get them to my car.

8   So I wouldn't be able to answer your question.

9     Q.   I'm asking your position.  Maybe you don't

10  have an answer.

11    A.   No.  That's what my position is.

12    Q.   Okay.  Do you believe that as an officer you

13  are required to be fair and neutral --

14    A.   Yes.

15    Q.   -- in your -- in your interaction with members

16  of the public?

17    A.   Yes.

18    Q.   And so based on that, if you're being fair and

19  neutral, do you believe that you are obligated to

20  investigate allegations that you receive?

21    A.   Yes.

22    Q.   And to take action based on your -- after your

23  reasonable exercise of an investigation?

24    A.   Yes.

25    Q.   You agree that you should not apply the law in

1   an unequal fashion based on someone's race or

2   disability?

3        A.   Yeah, I don't do that.

4        Q.   Do you see yourself as a public servant?

5        A.   Yes.

6        Q.   Do you see yourself as an employee of the

7   public that pays your salary?

8        A.   Yes.

9        Q.   You agree that police officers are not above

10   the law?

11        A.   Yes.

12        Q.   You agree that police officers should only use

13   the level of force necessary to accomplish the law

14   enforcement objective they're engaged in?

15        A.   Yes.

16        Q.   Why is that?  Why do you believe that?

17        A.   Why do I believe which one?

18        Q.   The last one, that police officers should only

19   use the force necessary to achieve whatever law --

20        A.   Yes.

21        Q.   -- enforcement objective.

22        A.   Yes.

23        Q.   Why do you feel that that's the right answer?

24        A.   Why I feel it is?  Because it's the force

25   necessary.  I mean, there's times you can talk to

```
 1   somebody.  You can calm them down.  But certain
 2   situations you can do whatever you want to do and
 3   they're just not going to listen to you.
 4              So you got to put them -- like, for
 5   instance, this.  When you tell somebody he's got a
 6   warrant, you've got to grab ahold of him.  Because nine
 7   times out of ten, they're going to -- whenever you tell
 8   somebody, hey, I got a warrant, they're going to take
 9   off running.
10       Q.   Well, you never -- Mr. Muhaymin has never
11   taken off running, right, from you?
12       A.   Never arrested him before.
13       Q.   Well, the time before, he never took off
14   running?
15       A.   There was -- all I asked him to do was leave.
16       Q.   Okay.  You never heard --
17       A.   There was no reason -- there was no reason for
18   me to do anything to him.
19       Q.   You never heard about him taking off running?
20       A.   No.
21       Q.   So based on what you just told me, your
22   experience is nine times out of ten when you tell
23   someone you've got a warrant for their arrest, they
24   take off running?
25       A.   Yup -- or yes.
```

1      Q.   90 percent of the time people take off

2   running?

3      A.   Yes.  In the area I work, yes.

4      Q.   Have you ever read the chapter on individuals

5   with mental or physical disabilities that's part of the

6   operations order -- or operations order 4.15?  Have you

7   ever read that chapter?

8      A.   I don't recall.

9              MR. FARAJ:  I highly recommend you take a

10   look at it, sir.  I don't have any more questions for

11   you.

12              MS. STILLWELL:  I will have some

13   questions, but I ask that we take a quick break,

14   please.

15              MR. FARAJ:  Okay.  We're going to need

16   to.

17              THE VIDEOGRAPHER:  Going off the record.

18   The time is 12:28 p.m.

19              (Recess taken from 12:28 p.m. to

20   12:38 p.m.)

21              THE VIDEOGRAPHER:  We are back on the

22   record.  The time is 12:38 p.m.  Thank you.

23   BY MR. FARAJ:

24      Q.   I represented I was done, but I realize that I

25   wasn't clear on some questions regarding Exhibit 5.  So

```
 1   I'm going to go back over it.
 2              Officer Grenier, on Exhibit 5 which is in
 3   front of you, it appears that at some point you were
 4   asked by the detective whether you recognized
 5   Mr. Muhaymin; is that true?
 6       A.   Yes.
 7       Q.   And you told him essentially that you
 8   initially didn't recognize him as a subject that you
 9   dealt with in the past, true?
10       A.   At that point, yes.
11       Q.   Okay.  But later you did say -- you do say on
12   the bottom, prior knowledge of suspect, yes.  So you
13   didn't recognize him initially, but you recognized him
14   later, correct?
15       A.   Yes.
16       Q.   Now, when did you recognize him specifically?
17       A.   It was after everything was said and done.
18   Everything -- and then after the fire came and picked
19   him up, that's when I realized I remember him from 67th
20   and Indian School at the Fry's.
21       Q.   So just to be clear, you did not recognize him
22   at all until -- if we -- if we call the vomiting as the
23   breaking point between officers and the men where fire
24   now gets involved, you didn't recognize him at any time
25   before he vomited?
```

1     A.   No.  I knew the name.  I just didn't click

2  about where I -- where I -- where I saw him from.  I

3  knew his name as Muhammad, but I didn't really remember

4  where he was at.  And then I realized, wait a minute, I

5  had interaction with him over at 67th and Indian School

6  at the Fry's.

7     Q.   That's after he vomits?

8     A.   Yes.

9     Q.   I'm going to show you, I'm going to refer you

10 to Exhibit 1 at -- Exhibit 1 is the video?

11            THE REPORTER:  Yes.

12 BY MR. FARAJ:

13    Q.   Exhibit 1 is the video cam of Officer Grenier

14 and we're going to start at 12:01.  It's already part

15 of the record.  Now don't start it yet.  You recognize

16 the scene, right?

17    A.   Yes, it's by the bathroom.

18    Q.   Officer Canilao is waiting for him to come out

19 of the bathroom?

20    A.   Yes.

21    Q.   "Him" being Mr. Muhaymin?

22    A.   I believe so, yes.

23    Q.   And I'll represent to you that this footage,

24 we've been told, is from your video cam.  So I know you

25 can't verify that, but you recognize this scene as it

1   is?

2       A.   Yes.

3       Q.   Whether it came from your video camera or not,

4   you recognize this scene?

5       A.   Yes.

6       Q.   Okay.  Let's run it.

7               (Video played.)

8       Q.   What is that when someone says ███████████?

9       A.   His date of birth.

10      Q.   Okay.  Was that you speaking?

11      A.   Yes.

12      Q.   Okay.

13              (Video played.)

14      A.   See, that's when I knew it.

15      Q.   So you say there, "I dealt with him at Fry's

16  before"?

17      A.   Yes.

18      Q.   Okay.  That's -- that's right at the bathroom,

19  not --

20      A.   Yes.

21      Q.   -- after he vomits?

22      A.   Right.

23              MR. FARAJ:  Okay.  That's all.

24  ////

25  ////

```
 1                      EXAMINATION
 2   BY MS. STILLWELL:
 3      Q.   Okay.  Officer Grenier, to kind of piggyback
 4   on that, I just want to clarify.  Because earlier you
 5   had testified that you had not -- or you had not
 6   realized that you had prior dealings with him.  But
 7   obviously in the video you realized it.  Was it after
 8   he got his date of birth and name?
 9      A.   Yes.  After that.  But then when everything
10   happened, I just -- everything kind of went blank.  I
11   just don't remember.  I don't remember saying that.  I
12   mean, obviously, I did say it, but I just don't
13   remember saying that.
14      Q.   Okay.  So you simply don't recall when you
15   realized?
16      A.   No.
17              MR. FARAJ:  Objection, form.
18   BY MS. STILLWELL:
19      Q.   Okay.  Now, I'm going to jump around just a
20   little bit.  And thank you for addressing this.  This
21   was going to be one of my questions.  Yes?
22              MR. FARAJ:  I'm not going to make a bunch
23   of evidentiary objections except form.
24              MS. STILLWELL:  Do you want the
25   stipulation?
```

```
 1              MR. FARAJ:  Yeah, except form.  And if
 2   you run into -- I don't think you will run into any
 3   privilege that I will object to, but --
 4              MS. STILLWELL:  If I do, I'm sure you'll
 5   let me know.
 6              MR. FARAJ:  Same stipulation, yeah.
 7   BY MS. STILLWELL:
 8      Q.   Okay.  Officer Grenier, on January 4, 2017 you
 9   responded to the call, correct?
10      A.   Yes.
11      Q.   And that was the call to the Maryvale
12   Community Center?
13      A.   Yes.
14      Q.   And tell me what the call was about.
15      A.   It came out as an assault.  That there was the
16   manager or an employee of the community center was
17   arguing with a black male.  And that the black male had
18   assaulted the community worker guy.
19      Q.   Okay.  And so when that came over dispatch,
20   did multiple units respond?
21      A.   Yes.
22              MR. FARAJ:  Objection.
23   BY MS. STILLWELL:
24      Q.   And is that a general or a typical thing?
25      A.   Yes.
```

1      Q.   And is that because of the nature of the call?

2      A.   Yes.

3      Q.   And when you arrived you didn't recognize

4  Mr. Muhaymin, correct?

5      A.   At first, no.

6           MR. FARAJ:   Form.  I'm going to object if

7  you lead.  So long as you don't lead, I won't object.

8  BY MS. STILLWELL:

9      Q.   When you arrived, counsel asked you several

10  questions about whether Mr. Tarango, the manager, had

11  lied or had misled you about the nature of the

12  incident.  Do you recall that?

13     A.   Yes.

14     Q.   And what do you recall that Mr. Tarango's

15  response was to your question?

16     A.   To my question?

17     Q.   Mm-hm.

18     A.   I really didn't get into the -- I really

19  didn't ask him, Officer Hobel did.

20     Q.   Mm-hm.

21     A.   But again, I was there waiting for other units

22  to show up, because if it was just something simple

23  that he was going to leave, I had no problem with that.

24     Q.   Okay.

25     A.   But --

1      Q.   And when you talk about you're waiting for

2  other units to arrive, --

3      A.   Yes.

4      Q.   -- that was before anybody else arrived,

5  correct?

6      A.   Yes.

7      Q.   And so you were on your own?

8      A.   Yes.

9      Q.   And when you were on your own, did you

10  interject at all during the conversation between

11  Mr. Tarango and Mr. Muhaymin?

12      A.   No.

13      Q.   Why not?

14      A.   Because they were talking.  And Mr. Tarango

15  seen that he was trying to talk to him.  And neither

16  one were yelling at each other, they were just talking.

17  So I wasn't going to interrupt them and maybe ramp the

18  situation up.

19      Q.   Did you feel the situation was deescalating or

20  was it ramping up?

21      A.   It was -- I wouldn't say either one.  It was

22  just kind of mellow.

23      Q.   Okay.

24      A.   And I mean, mellow, I mean, it was just --

25  there wasn't -- they weren't escalating, they weren't

```
 1   deescalating, they were just talking.
 2        Q.   Okay.  And you recall in the video that
 3   counsel has played for you, Mr. Tarango said that he
 4   had not been assaulted?
 5        A.   Correct.
 6        Q.   But he did say that they bumped?
 7        A.   Yes.
 8        Q.   Is a bump still an assault?
 9        A.   Yes.
10        Q.   Now after -- after that happened, Mr. Muhaymin
11   was able to use the restroom, correct?
12        A.   Yes.
13        Q.   And he used the restroom holding his dog,
14   correct?
15        A.   Yes.
16        Q.   And did you have a viewpoint or ability to see
17   Mr. Muhaymin in the restroom?
18        A.   No.
19        Q.   And while he was in the restroom, is that when
20   you ran his name and his date of birth?
21        A.   Yes.
22        Q.   And in the response to that, you were advised
23   that he had a warrant, correct?
24        A.   Yes.
25        Q.   And during that conversation did you discuss
```

```
1    how you were -- how you were going to handle getting

2    the warrant and detaining Mr. Muhaymin?

3         A.   Yes.

4         Q.   When Mr. Muhaymin was finished using the

5    restroom and you walked outside, is that when you had

6    planned to detain Mr. Muhaymin?

7         A.   Yes.

8         Q.   And did you have an opportunity to ask anyone

9    about Mr. Tarango's claims?

10        A.   No, I didn't have an opportunity to.

11        Q.   Did you talk to Mr. Tarango directly about his

12   claims?

13        A.   No, because I was dealing with him.

14        Q.   Did you talk to Mr. Muhaymin about his claims?

15        A.   I didn't have a chance to.

16        Q.   Did Mr. Tarango indicate that he wanted to

17   prosecute against Mr. Muhaymin?

18        A.   At first yes, but then no.

19        Q.   So when you had left the restroom, Mr. Tarango

20   had said that he did not want to prosecute; is that

21   correct?

22        A.   That I don't remember.

23        Q.   Okay.  When did you plan to speak with

24   Mr. Muhaymin?

25        A.   As soon as we were -- as soon as I was able to
```

1  put him in custody and put him in the back of the

2  car, --

3      Q.   Mm-hm.

4      A.   -- I would be able to verify the warrant.  And

5  then myself, I would stay with him.  And Officer Hobel,

6  Canilao, Head, another officer would go in and

7  interview the manager about what all happened.

8      Q.   Okay.  And when you stepped outside -- and

9  counsel had given you -- and actually, before I get to

10 that, I want to talk to you about your discussions with

11 Mr. Muhaymin in the hallway.  And it wasn't really your

12 discussion, because you were standing there, correct?

13     A.   Yes.

14     Q.   And so it was more a discussion between

15 Mr. Muhaymin and Mr. Tarango, correct?

16     A.   Yes.

17     Q.   And in the video that counsel played, and it

18 was a lengthy portion of that video, counsel honed in

19 on a few statements that he had made.  One was about

20 being a veteran?

21     A.   Yes.

22     Q.   Do you recall that?

23     A.   Yes.

24     Q.   And do you recall immediately preceding that

25 he was talking about his history?

```
 1       A.    Yes.
 2       Q.    And do you remember what he was talking about?
 3       A.    Being a vet, and something about his dog.  I'm
 4  not sure after that.
 5       Q.    Sure.  Do you recall that he was talking about
 6  his son going to ASU?
 7       A.    Yes.
 8       Q.    Do you recall that he was talking about having
 9  been a resident in that area for 20-plus years?
10       A.    Yes.
11       Q.    And then that is when he mentioned being a
12  veteran, correct?
13       A.    Yes.  Yes, he did.
14       Q.    Did you -- did you think one way or another
15  whether it was a military veteran, or an area veteran,
16  a veteran of the area or resident?  Did you have any
17  thoughts about that?
18       A.    No.
19       Q.    Did any of that claim cause you concern?
20       A.    No.
21       Q.    When he discussed his dog and how well
22  disciplined, and compared that to dogs in movies or
23  TV, --
24       A.    Yes.
25       Q.    -- did that cause you any concern?
```

```
 1       A.   No.
 2       Q.   Did it cause you any concern with the analogy
 3   that he had drawn about Santa Claus using a restroom?
 4       A.   No.
 5       Q.   And Officer Grenier, in your 20 years as a law
 6   enforcement officer, you've received training in mental
 7   health awareness or mental health identification,
 8   correct?
 9       A.   Yeah, the basics, yes.
10       Q.   Okay.  And what does that training tell you,
11   or when do you notice that there's an issue?
12       A.   It depends on the situation.  Because I could
13   be out talking to somebody just like I'm talking to
14   you, and you could have mental problems and I wouldn't
15   have any idea.
16       Q.   So in that circumstance when you're observing
17   Mr. Tarango and Mr. Muhaymin have this lengthy
18   conversation, did you have any indication that he had a
19   mental health concern?
20       A.   No.
21       Q.   Was there anything about that encounter that
22   caused you concern?
23       A.   No.
24       Q.   Now earlier you said that you don't have
25   particular training to pick out mental health issues.
```

1   But you just told me you have the general training,

2   correct?

3       A.   Yes, yes.

4       Q.   And is there more specialized training in

5   mental health that is available for officers?

6       A.   Yeah.  The CIT program.

7       Q.   Tell me what the CIT program is.

8       A.   It's basically they are specialized in

9   handling people with mental problems as far as

10  identifying them.  The avenues of what they can do to

11  help them out.  Give them transportation where they

12  need to go.  Get them -- so that if they need to be

13  signed in to urgent psychiatric care, they fill out the

14  paperwork.

15      Q.   Now are you a CIT officer?

16      A.   No.

17      Q.   To the best of your knowledge, was there a CIT

18  officer out there?

19      A.   Yes.

20      Q.   And who was that, sir?

21      A.   Officer Canilao.

22      Q.   And to the best of your knowledge, did Officer

23  Canilao have any concerns regarding mental health?

24      A.   No.

25      Q.   Now counsel had asked you if you could have or

1    you were required to communicate with Mr. Muhaymin

2    about what had happened in terms of his interaction

3    with Mr. Tarango.  And your testimony, sir, is that you

4    wanted -- you were going to test -- talk to him about

5    that once you had him back to the car; is that correct?

6         A.   Yes.

7         Q.   In your experience when you tell someone that

8    they have a warrant, how does that go?

9         A.   In the area that I've worked for probably

10   15 years, if you tell somebody they have a warrant,

11   they're going to run.  It's not like, oh, I have a

12   warrant.  Okay, let me sit here.  And I don't have time

13   to -- that's why I have my radio.

14              I can get on and get on the info channel,

15   give the guy's name, date of birth.  They'll come back

16   and tell me he's got a warrant.  Whether it's a felony

17   warrant, misdemeanor warrant, I still have to confirm

18   the warrant.

19              So I put you in handcuffs, put you in the

20   car.  I'm able to get on the computer and run exactly

21   what the warrant is.  And call up and say, is this a

22   valid warrant?  Yes.  Okay.  Then you got a valid

23   warrant, you're going to jail.

24        Q.   So -- an example, you wouldn't be able to say,

25   hey, you have a warrant.  Stay right here so I can go

1    check out the validity of that warrant?

2        A.   No, they would be gone.

3        Q.   So Officer Grenier, you're saying your

4    practice is to place them into custody?

5        A.   Yes.

6        Q.   And then verify through the computer, correct?

7             MR. FARAJ:  Form.

8             THE WITNESS:  The computer and call them.

9             MR. FARAJ:  I'm sorry.  Objection, form

10   of the question.

11   BY MS. STILLWELL:

12       Q.   To call whom?

13       A.   Whoever the agency that issued the warrant.

14       Q.   To verify the warrant?

15       A.   Yes.

16       Q.   And that's in compliance with policy, correct?

17       A.   Yes.

18       Q.   Okay.

19             MR. FARAJ:  The entire set of last

20   questions are objectionable based on form.

21   BY MS. STILLWELL:

22       Q.   Now when you took Mr. Muhaymin, or when you

23   all walked outside with Mr. Muhaymin, you had made the

24   decision to take him into custody for the warrant at

25   that point, correct?

1      A.   Yes.

2      Q.   And counsel gave you two different options.

3  And he gave you this hypothetical; do you try to talk

4  to the person, do you try to immediately put them in

5  cuffs?  Did you employ either option or both options?

6      A.   Kind of both at the same time.  I told him he

7  had a warrant.  And it was -- as soon as he heard he

8  had a warrant, he started resisting.

9      Q.   Okay.  And tell me how he resisted.

10      A.   I believe he put his hands in between his

11  chest like this and wouldn't let them go.  And he was

12  just holding on.  And his dog was in the right, his

13  right arm and was trying to bite, I think it was

14  Officer Hobel.

15      Q.   And just for the benefit of the written

16  record.  When you say "like this," and you're

17  indicating how his arms were being held, are they being

18  held against his body?

19      A.   Yeah, pulled up against his body, and his -- I

20  don't know how to say this.

21      Q.   Are his fingers, I think, interlocked?

22      A.   Yeah, they're interlocked pushed up against

23  his chest.

24      Q.   Was -- was he tensing at all?

25      A.   Yes.

```
 1        Q.   And you said that he had his dog in his arms,
 2   correct?
 3        A.   Yes.
 4        Q.   And what was the dog's reaction?
 5        A.   He tried to bite, I think it was Officer
 6   Hobel, because Officer Hobel told him that if he bites
 7   any of us, it's going to be a bad day.
 8        Q.   And did somebody ask Mr. Muhaymin to put the
 9   dog down?
10        A.   Yes.
11        Q.   When you told him that he had a warrant and
12   you were placing him under arrest, or placing him in
13   custody, tell me what else happened after he
14   interlocked his arms.
15        A.   We went from a standing position up to a wall,
16   and we were -- the whole time I was telling him to give
17   me his hands, he wouldn't.  We ended up going on to the
18   ground.
19        Q.   You know, I'm going to stop you.  Why do you
20   go on the ground?
21        A.   To control him.  It's a better control than
22   trying to -- when he's standing up.  It's better to
23   control him when he's on the ground.
24        Q.   What risk or safety factors are present if
25   they're standing?
```

1    A.    I mean, he can take off running.  There's a

2  chance he can punch, kick you.  There's just a number

3  of things.  He can also go -- I mean, not saying this

4  extreme, but I mean, he can go assault somebody that's

5  standing there.  Attack somebody that's on the street,

6  run into traffic.  I mean, there's a -- there's a bunch

7  of things that could happen.

8    Q.    And is that why you took him to the ground?

9    A.    Yeah.  Basically to gain his control.

10   Q.    And there were four officers, correct?

11   A.    At the initial, yes.

12   Q.    And you said Mr. Muhaymin was resisting?

13   A.    Yes.

14   Q.    And tell me about Mr. Muhaymin's strength or

15  ability to resist.

16   A.    Well, the strength in 20 years is probably one

17  of the most strong guys I've ever had to deal with.

18  And I've dealt with people that are on PCP.  And his

19  strength was astronomical.

20   Q.    Why do you say astronomical?

21   A.    He didn't have -- it seems like he didn't have

22  any pain receptors.  He wasn't -- he wasn't taking

23  anything that we were doing.  Nothing we were saying.

24  I mean, we were prying on his arms pretty bad to get

25  him in handcuffs.  And we -- it took four of us to do

```
 1   that.
 2        Q.   And you were just using your hands, correct?
 3        A.   Yes.
 4        Q.   Because earlier you testified that you didn't
 5   use your baton?
 6        A.   I don't have a baton.
 7        Q.   You didn't use a Taser?
 8        A.   No.
 9        Q.   To your knowledge, other than Officer Canilao
10   using the baton, I think counsel had said he used the
11   baton to pull Mr. Muhaymin's arm?
12        A.   Yes.
13        Q.   Did anybody else use a baton to your
14   knowledge?
15        A.   No.
16        Q.   To your knowledge did anybody use any other
17   kind of force, any head strikes?
18        A.   No.
19        Q.   Any Tasers?
20        A.   No.
21        Q.   Now Mr. Muhaymin asked for a sensei?
22        A.   Yes.
23        Q.   What does that mean to you?
24        A.   It's like a Kung Fu term, I guess.  It's the
25   person that teaches them, like a sensei at a dojo.
```

1        Q.   And if he had said something about sensei,
2   whether he requested it like counsel had said, or just
3   mentioned the word, did that cause you concern?
4        A.   Yeah, because I don't know if he's got a
5   degree in karate, or jujitsu or Muay Thai boxing.   I
6   had no idea.   Because that's not normal.   I mean,
7   someone wants to put that out, they're probably trying
8   to say that I got some fighting experience so watch
9   out.   That's what I took it as.
10       Q.   Okay.   And given his strength did that cause
11  you more concern?
12       A.   Yes.
13       Q.   And at one point you said that it took all you
14  could to get his arms behind him?
15       A.   Yes.
16       Q.   Tell me why.
17       A.   Because he was so strong.   And if you -- on --
18  it shows it on the video.   When we get him back to the
19  car, --
20       Q.   Mm-hm.
21       A.   -- we're all four of us are out of breath.
22  And it took all of our strength to get both of his
23  hands behind his back.
24       Q.   Okay.   Now when you -- you said before, and I
25  think in Exhibit 5 there was a mention of using an

```
 1   elbow on a lat; --
 2       A.   Yes.
 3       Q.   -- is that correct?
 4       A.   Yes.
 5       Q.   And you already established that the lat is
 6   not the center of the back, it's a big fatty muscle?
 7       A.   Right.
 8       Q.   And why would you use a lat strike?
 9       A.   It's basically to interrupt the bio -- like I
10   told, interrupt the biocomputer; in other words,
11   interrupt the brain.  So the pain receptors, as soon as
12   you hit them, basically interrupts him from holding his
13   arms to where he'll possibly let them go.
14       Q.   Okay.  And so it's kind of a -- is it a
15   distraction maneuver?
16       A.   Yes.
17       Q.   Now, we're going do pull up one of the videos
18   that counsel spent some time on.  Bear with me one
19   minute.  This one.  Did you get that one?
20               MS. GILL:  Yeah, I have it here.
21               MS. STILLWELL:  Okay.  Can I have it real
22   quick?  Thank you.
23               MS. GILL:  You're going to need
24   the mouse.
25               MS. STILLWELL:  Oh, it's okay.  Okay.
```

```
 1   All right.  Now refresh my recollection.  Which exhibit
 2   is this?  It's the Hobel video.
 3                 THE WITNESS:  No, I don't know.  Maybe
 4   Nielsen.
 5                 THE REPORTER:  That's number 3.
 6                 MS. STILLWELL:  Is that number 3?
 7   BY MS. STILLWELL:
 8      Q.   Okay.  So this is Exhibit No. 3.  And you
 9   recognize this as a video that counsel played for you
10   earlier, correct?
11      A.   Yes.
12      Q.   And this is after you were able to gain
13   control, correct?
14      A.   Yes.
15      Q.   And you were walking him back to the car,
16   correct?
17      A.   Yes.
18      Q.   Now what was your plan to do when you got him
19   to the car?
20      A.   Search him, and put him in the back of my car,
21   and then verify the warrant.
22      Q.   Okay.  Now during the first encounter with
23   Mr. Muhaymin at any time did he comply?
24      A.   No.
25      Q.   What did you ask from Mr. Muhaymin during that
```

1   first encounter?

2      A.   Put his hands behind the back, because he had

3   a warrant and he was going to jail.

4      Q.   And did he continue to fight the officers?

5      A.   Yes.

6      Q.   And do you recall -- you were able to

7   eventually handcuff him behind his back, correct?

8      A.   Yes, with two sets of handcuffs.

9      Q.   Now tell me how the two sets of handcuffs were

10  placed.

11     A.   Just behind his back.  Instead of the one,

12  there was two, because the right side and the left

13  side, that's all we could get to hook him up.

14     Q.   So if you have two handcuffs, correct?

15     A.   Mm-hm.

16     Q.   And you're saying one of the handcuffs was

17  then linked to a second one?

18     A.   Yes.

19     Q.   So in a double handcuff position are his arms

20  close together?

21     A.   No, they're further apart.

22     Q.   And how far apart would you estimate?

23     A.   I don't know.  12 inches.

24             MS. STILLWELL:  Okay.  In this video --

25  there's no volume.  Thank you.  Can you see it okay,

```
 1   counsel?
 2              MR. FARAJ:  I have it here.  If you can
 3   just say where you're starting.
 4              MS. STILLWELL:  2:55, maybe.  Give me one
 5   second there.  Oh, too far.
 6              (Video played.)
 7   BY MS. STILLWELL:
 8      Q.   And so Officer, is this when you're taking him
 9   to the car?
10      A.   Yes.
11      Q.   And that is where counsel had stopped the
12   video feed, correct?
13      A.   Yes.
14      Q.   And --
15              MR. FARAJ:  If you could make a record of
16   it, please.  Just so we know when you say where he
17   stopped the video.
18              MS. STILLWELL:  He stopped the video and
19   obviously your questioning had detailed it as well.
20   BY MS. STILLWELL:
21      Q.   But when counsel was talking about this, at
22   3:05 there's an indication that Mr. Muhaymin's arms had
23   somehow come over his head?
24      A.   Yes.
25      Q.   Is that correct?
```

 1       A.   Yes.

 2       Q.   To your knowledge did any officer force his

 3  arms over his head?

 4       A.   At that time, I didn't see that.

 5       Q.   And had you ever seen that before?

 6       A.   No.

 7       Q.   Would you think that there would be any kind

 8  of an injury or an ailment if someone had actually

 9  forced his arms?

10       A.   I think his shoulders would have like blew up

11  or got swollen.

12       Q.   I'm just playing this again so I can get a

13  better angle.

14              (Video played.)

15       Q.   Okay.  And you see the gloves on the arms,

16  correct?

17       A.   Yes.

18       Q.   Now, does that indicate to you that an officer

19  had forced his arms, or that an officer was simply

20  holding him?

21       A.   That looks like he's holding his arms.

22       Q.   Okay.

23              MS. STILLWELL:  Can you get the next one.

24  BY MS. STILLWELL:

25       Q.   And you don't recall at that time, sir,

**Oswald Grenier - July 31, 2019**                    135

1    whether an officer had forced his arms?

2        A.   No.

3        Q.   What did you think or what was your reaction

4    when you saw that Mr. Muhaymin had moved his arms from

5    the low back up to above his head?

6        A.   To me it was holy crap, because I didn't see

7    the -- I just saw his hands behind his back.  We get to

8    the car, they're above his head.  I don't remember any

9    -- anybody forcing his hands or arms up.  I just

10   remember his hands were above his head.

11       Q.   And you had never seen that before, correct?

12       A.   No.

13       Q.   Now given the fact that he had a double

14   locking two handcuffs, would he have had more room to

15   negotiate his arms?

16       A.   I don't think so, because it would have been

17   the same effect as the shoulders would have --

18   something of his shoulders would have swollen up or

19   something.

20       Q.   No.  I'm talking about Mr. Muhaymin.

21       A.   Yeah.

22       Q.   Because you said about 12 inches, correct?

23       A.   Yeah.  It's still going to be extremely

24   difficult for him to bring them over his head.

25       Q.   Okay.  But you didn't see anyone bring them

1   over his head, --

2      A.   No, I didn't.

3      Q.   -- correct?

4              And in that video you can't tell what was

5   happening, correct?

6      A.   Yes.

7      Q.   Okay.  We have another video.

8              MS. STILLWELL:  Which exhibit was this?

9              MS. GILL:  4.

10  BY MS. STILLWELL:

11     Q.   It's Exhibit 4.  And we're going to start it

12  at 21 seconds.  Now counsel had asked you a series of

13  questions about that second encounter when Mr. Muhaymin

14  went on the ground.  During -- after Mr. Muhaymin was

15  on the car and you were trying to search him, --

16     A.   Yes.

17     Q.   -- and he had gotten his arms over his head,

18  correct?

19     A.   Yes.

20     Q.   Why was it important again to take him down --

21     A.   To control him.

22     Q.   -- to the ground?  And was he fighting you?

23     A.   Yes.

24     Q.   And how was he fighting you?

25     A.   It was -- he was trying to put his arms

1    around.  I mean, he was struggling back and forth.  We

2    wouldn't -- again, we couldn't be able to put his hands

3    behind his back.  Even though we were giving commands,

4    he wasn't listening to us.

5         Q.   Okay.  Was he kicking?

6         A.   Yes.  I'm sorry.  David -- or Officer Head had

7    to lay on his feet, or lay on his legs so he wouldn't

8    kick any of us.

9         Q.   Okay.  And was he trying to kick you guys?

10        A.   Yes.

11        Q.   Was he -- what was his body like?

12        A.   He was just tensing up, and wiggling around,

13   and we were just trying to gain control of him.

14        Q.   Was he still exhibiting that strong behavior?

15        A.   Yes.

16        Q.   Was he complying?

17        A.   No.

18        Q.   Was he willingly putting his hands behind his

19   back?

20        A.   No.

21        Q.   When you took him to the ground, again, did

22   anybody use a baton or a Taser?

23        A.   No.

24        Q.   Did anybody use any head strikes?

25        A.   No.

1      Q.   Did anybody use any force beyond your weight?

2      A.   No.

3      Q.   When -- when the officers -- when you guys

4    went down the second time, do you remember how many

5    officers were present?

6      A.   I can -- there was four of us.  I don't know

7    who else came after that.  I know there was four of us.

8      Q.   Do you remember other officers --

9      A.   Yeah, there was --

10     Q.   -- arriving at the scene?

11     A.   There was quite a few officers at the scene.

12     Q.   And do you recall whether those officers also

13   assisted in trying to contain Mr. Muhaymin?

14     A.   Yes.

15     Q.   And why do you believe their assistance was

16   necessary?

17     A.   Because there was four of us and he's still

18   throwing us around like rag dolls.

19     Q.   When you, Officer Grenier, held his arms, or

20   held his head or any other form, did you use your full

21   body weight?

22     A.   No.

23     Q.   There was an instance where you -- you

24   testified, sir, that you had held his -- held his

25   hair, --

1      A.    Yes.

2      Q.    -- correct?

3      A.    Yes.

4      Q.    And were you pulling his head?

5      A.    I wasn't pulling it.  I was just trying to

6  hold his head up so he wouldn't smush his face on the

7  ground.

8      Q.    And how was he trying to smush his face on the

9  ground?

10      A.    Just by his own force.

11      Q.    And was that part of his fighting with the

12  officers?

13      A.    Yes.

14      Q.    And so when you -- you were holding his head

15  back, were you just trying to hold it still?

16      A.    I was trying to keep him -- I was basically

17  holding his head so he wouldn't smush it on the floor,

18  or on the concrete, I should say.

19      Q.    And counsel asked you about, well, if somebody

20  has their knee on his neck and you're pulling it up,

21  what can that do?  Do you have any knowledge of who had

22  the knee on his -- on his body --

23      A.    No.

24      Q.    -- at that time?

25            Do you have any knowledge of how much

```
 1   weight, if any, was applied at that time?
 2       A.   It couldn't have been that much, because I was
 3   holding his head up.
 4       Q.   And you weren't pulling it up, correct?
 5       A.   No, I was just holding it.
 6       Q.   Okay.  Now if somebody has -- and you've
 7   already testified, sir, that you had your knee on his
 8   shoulder and it slipped to, I think you said the neck,
 9   shoulder portion, correct?
10       A.   Yes.
11       Q.   Did you apply your full body weight?
12       A.   No.
13       Q.   Did you put pressure?
14       A.   Yes.
15       Q.   And how much?
16       A.   It was very little, 'cause if I had actually
17   put pressure on his back and my weight, I wouldn't be
18   able to hold his head up.
19       Q.   Okay.  And when you say "very little," what
20   amount was it?
21       A.   30 percent of my body weight.
22       Q.   Just to hold him, correct?
23       A.   Yes.
24       Q.   And he was still fighting, correct?
25       A.   Yes.
```

Oswald Grenier - July 31, 2019                    141

1      Q.   And you testified earlier that you don't
2   recall him saying that he couldn't breathe?
3      A.   Yeah.  I didn't hear that.
4      Q.   During this encounter up until the time he
5   vomited, do you recall him screaming?
6      A.   Yes.
7      Q.   Do you recall him -- recall him yelling?
8      A.   Yes.
9      Q.   Do you recall him fighting?
10     A.   Yes.
11     Q.   Did you have any concerns about his ability to
12  breathe?
13     A.   No.
14     Q.   Did you have any concerns about what any of
15  the officers were doing at that time in an effort to
16  contain him?
17     A.   No.
18     Q.   Now counsel played a video for you.  It's
19  Exhibit 4 and at 21 seconds.
20             (Video played.)
21     Q.   Do you recall this video?
22     A.   Yes.
23     Q.   Okay.  I have stopped the video at 25 seconds.
24  Do you recall counsel asking you whose boot that is on
25  his head?

Oswald Grenier - July 31, 2019          142

```
 1      A.   Yes.
 2      Q.   Do you recall what Mr. Muhaymin was wearing
 3   that day?
 4      A.   A black scarf.
 5      Q.   And in this picture do you see what that black
 6   item is on his head now?
 7      A.   It's his black scarf.
 8      Q.   And as you forward on?
 9      A.   That's his black scarf.
10      Q.   Okay.  Were you all trying to hurt him in any
11   way?
12      A.   No.
13      Q.   Were you trying to do the opposite?
14      A.   Yeah.  We -- like I said, we were just trying
15   to control him.  We weren't trying to hurt anybody.
16      Q.   You said earlier -- back to the can't breathe.
17   You said that was a serious complaint if somebody's
18   making it, correct?
19      A.   Yes.
20      Q.   And if somebody's making that complaint, do
21   people sometimes make those complaints and not mean
22   them?
23      A.   Yes.
24      Q.   How so?
25      A.   Well, we call it jailitis.  Everybody, when
```

```
 1    you get arrested, they've got every disease known to
 2    man.  They can't breathe, they're having chest pains.
 3    You name it, they'll do it, so that we don't arrest
 4    them so they don't go to jail.
 5        Q.   And does that cause concern too?
 6        A.   It depends.  It depends on the situation.
 7        Q.   And in this instance, again you could hear him
 8    yelling?
 9        A.   Yes.
10        Q.   And he was continuing to fight, --
11        A.   Yes.
12        Q.   -- correct?
13        A.   Yes.
14        Q.   Officer Grenier, do you -- were you found to
15    comply with policy in this?
16        A.   Yes.
17        Q.   And it was fully investigated, correct?
18        A.   Yes.
19        Q.   And the -- to your knowledge, did any officer
20    violate policy?
21        A.   No.
22               MS. STILLWELL:  I have no further
23    questions.
24    ////
25    ////
```

```
 1                  FURTHER EXAMINATION
 2   BY MR. FARAJ:
 3       Q.   Let me ask some follow-up.  So I was asking
 4   you earlier some questions.  Then you went outside,
 5   talked to your lawyer, came back in here.  And now you
 6   change your testimony that the boot on his head is a
 7   black scarf, true?
 8       A.   Yes.
 9       Q.   Do you always have people tell you what to
10   say?
11               MS. STILLWELL:  Objection.  That is
12   completely inappropriate.
13   BY MR. FARAJ:
14       Q.   I'm not asking if you told him.  I'm saying do
15   people tell you what to say?
16       A.   She didn't tell me what to say.
17       Q.   I'm not talking about her.  I saying did you
18   all, you and your fellow officers decide how you're
19   going to present your testimony here today?
20       A.   No.
21       Q.   He was throwing you all around like rag dolls?
22       A.   Yes.
23       Q.   Are you aware that the man weighs 145 pounds?
24       A.   It doesn't matter how much he weighs.
25       Q.   Are you aware that he weighs 145 pounds?
```

1      A.   No, I wasn't.

2      Q.   Or he weighed?

3      A.   No.

4      Q.   You weigh, what, 210, 230?

5      A.   At this time, I weigh about 180.

6      Q.   220?

7      A.   At the time of this, yes.

8      Q.   Yeah.  220?

9      A.   Okay.

10     Q.   And you maintained that -- throughout my

11   questioning of you, you maintain that the most that

12   Mr. Muhaymin did was passive resistance, right?

13     A.   You said that.  I didn't.

14     Q.   Yeah.  And you agreed?

15     A.   Yes.

16     Q.   Okay.  Now let me ask you something.  Does

17   that statement, I was holding his head because he was

18   rubbing it against the ground, actually work as a

19   defense?

20              MS. STILLWELL:  Objection.

21              THE WITNESS:  It did.

22   BY MR. FARAJ:

23     Q.   So if you show up to, say, a domestic violence

24   situation and the man says, my wife's face, it's that

25   way because I was just holding it.  She was rubbing it

1   against the ground.  I was just holding her head.  That

2   actually works for you?

3                   MS. STILLWELL:  Objection; form,

4   foundation.

5   BY MR. FARAJ:

6       Q.   Do you want to go to court with that, that you

7   were holding the man's head so that he wouldn't rub it

8   against the ground?

9       A.   Yup.

10      Q.   Would you like to see the video again?

11      A.   There is no need for me to see the video

12  again.

13      Q.   Now, your testimony is the reason that you all

14  didn't stop is because lots of people tell you they

15  can't breathe, and they have all the diseases in the

16  world.  But you understand in this case you and the

17  officers on top of this man killed him?

18      A.   I didn't kill anybody.

19                  MS. STILLWELL:  Objection, form.

20  BY MR. FARAJ:

21      Q.   He died --

22      A.   I didn't kill anybody.

23      Q.   -- because you placed your weight on him;

24  isn't that true?

25      A.   I didn't kill anybody.

```
 1      Q.   And then as soon as you lifted the weight, and
 2  you released the pressure on his chest, all that liquid
 3  that we saw came out of his chest; isn't that true?
 4              MS. STILLWELL:  Form and foundation.
 5              THE WITNESS:  I didn't kill him.
 6  BY MR. FARAJ:
 7      Q.   When he said "I can't breathe" --
 8      A.   Didn't hear it.
 9      Q.   -- and was whining in pain, that was because
10  you all were causing that; --
11      A.   No.
12      Q.   -- isn't that true?
13              MS. STILLWELL:  Objection.
14              THE WITNESS:  No.
15  BY MR. FARAJ:
16      Q.   Well, sir, we can agree on one thing.
17      A.   And what would that be?
18      Q.   He's dead.
19      A.   He's dead, but I didn't kill him.
20      Q.   And you think he deserved to die just because
21  he said --
22      A.   I didn't kill him.
23      Q.   He just died by himself, huh?
24              MS. STILLWELL:  Objection.
25              THE WITNESS:  I didn't kill him.
```

```
 1                    MR. FARAJ:  That's all I have.

 2                    MS. STILLWELL:  I have no further

 3   questions.

 4                    THE VIDEOGRAPHER:  This concludes the

 5   deposition -- is that all, counsel?

 6                    MR. FARAJ:  Yes.

 7                    THE VIDEOGRAPHER:  This concludes the

 8   deposition of Oswald Grenier.  The time is 1:16 p.m.

 9                    (The deposition concluded at 1:16 p.m.)

10

11

12                    _____

13                    OSWALD GRENIER

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   STATE OF ARIZONA        )
                             ) ss.
 2   COUNTY OF MARICOPA      )

 3           BE IT KNOWN that the foregoing proceedings
     were taken before me, SHERYL L. HENKE, Certified
 4   Reporter No. 50745, that the witness before testifying
     was duly sworn by me to testify to the whole truth;
 5   that the foregoing pages are a full, true and accurate
     record of the proceedings, all done to the best of my
 6   skill and ability; that the proceedings were taken down
     by me in shorthand and thereafter reduced to print
 7   under my direction.

 8           [X]  Review and signature was requested.
             [ ]  Review and signature was waived.
 9           [ ]  Review and signature not required.

10           I CERTIFY that I am in no way related to any
     of the parties hereto nor am I in any way interested in
11   the outcome hereof.

12           I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in ACJA 7-206, DATED
13   at Phoenix, Arizona, this 8th day of August, 2019.

14


15

                 _____
16                   Sheryl L. Henke, RPR
                     Certified Reporter
17                   Certificate No. 50745

18           *      *      *      *      *      *

19


20           I CERTIFY that VALLEY COURT REPORTING, LLC
     has complied with the ethical obligations set forth in
21   ACJA 7-206.

22


23

                 _____
24                   Valley Court Reporting, LLC
                     Arizona RRF No. R1054
25
```