# LODGED
# PROPOSED
# Doc. 313-1
# (redacted)

**INDEX OF EXHIBITS**

**Muhaymin v City of Phoenix**
**Case No.: 17-cv-04565-PHX-SMB**

| Exhibit | Description |
|---------|-------------|
| 1 | Dr. Bennet Omalu's Report dated 6/22/2020 |
| 2 | Dr. Bennet Omalu's Deposition Transcript dated 10/26/2020 |
| 3 | Plaintiff's Sixth Supplemental Mandatory Discovery Responses |
| 4 | Maricopa County Office of Medical Examiner Toxicology Report dated 1/5/2017 |
| 5 | Dr. Ali Taqi's Deposition Transcript dated 10/22/2020 |
| 6 | Terros Record dated 12/12/2016 |
| 7 | Terros Record dated 11/14/2016 |
| 8 | Maricopa County Office of Medical Examiner Report dated 1/5/2017 |
| 9 | Dr. Gary M. Vilke's Report dated 6/20/2020 |

# EXHIBIT 1



# Bennet Omalu
### P A T H O L O G Y

**Phone: 209-636-2822**
**Fax: 866-402-6875**
**bennetomalu@bennetomalu.com**

**Autopsy and Anatomic Pathology**
**Clinical Pathology and Toxicology**
**Forensic Pathology**

**Neuropathology**
**Epidemiology**
**Medico-Legal Consultations**

Haytham Faraj, Esq.                                         June 22, 2020
Law Offices of Haytham Faraj
1935 West Belmont Avenue
Chicago, IL 60657

Dear Mr. Faraj,

**Re:   MUHAMMAD ABDUL MUHAYMIN, DECEASED**
**MEDICO-LEGAL REPORT**

**Summary of Education, Training and Experience**

I completed medical school in 1990 at the University of Nigeria, Enugu, Nigeria. Upon graduating from medical school, I completed a one-year clinical housemanship at the University of Nigeria Teaching Hospital in the fields of pediatrics, internal medicine, general surgery, obstetrics, and gynecology. After housemanship, I worked as an emergency room physician at a university hospital in Nigeria for approximately three years. I sat for and passed my United States Medical Licensing Examinations [USMLE] while I worked as an emergency room physician. I came to the United States in 1994 through a World Health Organization scholarship to become a visiting research scholar for eight months at the Department of Epidemiology, Graduate School of Public Health, University of Washington, Seattle, Washington.

In 1995, I proceeded to the College of Physicians and Surgeons of Columbia University, New York, New York, at Harlem Hospital Center, to complete residency training in Anatomic Pathology and Clinical Pathology. In 1999 I proceeded to the University of Pittsburgh, Pittsburgh, Pennsylvania to complete residency training in forensic pathology and neuropathology. I hold four board-certifications in Anatomic Pathology, Clinical Pathology, Forensic Pathology and Neuropathology. I also hold a Masters in Public Health [MPH] degree in Epidemiology from the Graduate School of Public Health, University of Pittsburgh, Pittsburgh, Pennsylvania. I also hold a Masters in Business Administration [MBA] degree from the Tepper School of Business, Carnegie Mellon University, Pittsburgh, Pennsylvania, one of the leading business schools in the world. I am a Certified Physician Executive and an honorary fellow of the American Association of Physician Leadership [AAPL]. I also hold a fifth board-certification in medical management from the AAPL. I am licensed to practice medicine and surgery in four states in the United States namely Hawaii, California, Indiana, and Pennsylvania.

I am currently the President and Medical Director of Bennet Omalu Pathology [BOP], a California medico-legal consulting firm, and a Clinical Professor at the Department of Medical Pathology and Laboratory Medicine, University of California, Davis. In my capacity as the Medical Director of BOP, I am a consulting forensic pathologist and neuropathologist to many hospitals in central California and to several counties in northern California. There are less than

a few dozen practicing forensic pathologists-neuropathologists in the United States who are board-certified in both forensic pathology and neuropathology.

For over nineteen years, I have been involved in over nine thousand death and injury investigations in my career as a forensic pathologist and neuropathologist, which began in 1999. I have personally conducted and performed over eight thousand autopsies and death investigations and examined over nine thousand brain tissue specimens. I also perform trauma pattern analysis in both living patients and deceased patients to determine causes and mechanisms of sustenance of injuries and death. I am also involved in the evaluation of living victims of all types of injuries and trauma, including but not limited to victims of assault, traumatic falls, industrial and accidental injuries, medical complications and misadventures, rape, child abuse and sports-related injuries. I have been consulted and retained as an expert witness in one to two thousand cases involving all types of medico-legal cases across all jurisdictions in the United States including federal, state, county and municipal courts and arbitration panels; in both civil and criminal cases, for the plaintiff, defense, district attorneys and public defenders. I have been involved as an expert witness in complex class action and industrial lawsuits involving thousands of individuals and major corporations.

My areas of interest and focus include brain patho-physiology, brain injuries and brain trauma, in both living and deceased patients. I identified Chronic Traumatic Encephalopathy [CTE] in a retired football player when I performed an autopsy and examined the brain of Mike Webster in 2002. Subsequently, I identified CTE in other high-impact, high-contact sports athletes and in military veterans suffering from Post-Traumatic Stress Disorder [PTSD]. Since 2002 CTE has received international attention from the sports industry, sports medicine, and neuroscience. My work has been featured extensively in all media platforms across the world. My work and life were featured in a major Hollywood film, "Concussion" released in December 2015 by Sony Motion Pictures, in which the renowned actor, Will Smith, played me as Dr. Omalu. Several New York Times best-selling books have also been published on my life and work including "The League of Denial" and "Concussion". I have published several books including my memoir, "Truth Doesn't Have a Side", which was published in August 2017. My latest book, "Brain Damage in Contact Sports" was published in February 2018. I have published extensively in the medical and scientific literature authoring many scientific papers and book chapters.

I have received three honorary PhD degrees from two universities in the United States, and from the Royal College of Surgeons of Ireland in recognition of my work and expertise. I have also received numerous awards from across the world in recognition for my work and expertise in both living and deceased patients. I have received the "Distinguished Service Award" from the American Medical Association [AMA], which is the most prestigious award of the AMA. I have been honored by the United States Congress and I have appeared on multiple occasions before committees of the United States Congress and committees of State Legislatures across the Unites States advising them on matters relating to trauma. In 2019 I was appointed to the Traumatic Brain Injury Board of the State of California to advise the state on matters relating to traumatic brain injuries.

Since 1999 I have testified as an expert witness in matters relating to all types of injuries and deaths in over 500 court proceedings across the United States. I have attached a copy of my curriculum vitae, which enumerates my body of work and experience in greater detail. I have also attached my fee schedule. The cases I have testified in, beginning in 2009, are enumerated at the end of my curriculum vitae.



Pursuant upon your request, I have reviewed the following materials in the case of Muhammad Abdul Muhaymin, Deceased:
1.   Autopsy and Medical Examiner Reports
2.   Body Camera Videos
3.   Deposition Transcripts and Recorded Interviews
4.   Complaints and Other Miscellaneous Legal Documents
5.   Incident Report from the Phoenix Police Department
6.   Trip sheet from the Phoenix Fire Department

**Summary of Prevailing Forensic Scenario**
At the time of his death on January 4, 2017, Muhammad Abdul Muhaymin [Muhammad] was a 43-year-old African-American male who was born on ▮▮▮▮▮▮▮ He suffered from Post-Traumatic Stress Disorder, Claustrophobia and Schizophrenia. He always carried a service dog with him to alleviate his mental disabilities and symptoms. The dog was named "Chiquita".

Anthony Tarago, the manager of the Maryvale Community Center, called for the police on January 4, 2017 at approximately 09:28 a.m. for an assault and for the police to escort Muhammad from the center and instruct him never to return. Allegedly Muhammad was at the center with his service dog that was off-leash. Muhammad wanted to use the public bathrooms to defecate. Mr. Tarago stood in Muhammad's way and would not permit him to use the bathroom because his dog was not restrained. Allegedly an argument ensued, and Muhammad and Mr. Tarago bumped into each other without any assault.

After the police arrived at the center at approximately 09:32 a.m. Muhammad was allowed to use the bathroom. Officers discovered that there was a misdemeanor warrant for the arrest of Muhammad out of the city of Mesa. The police officers planned to arrest Muhammad after he used the bathroom. Officers walked behind Muhammad as he exited the center carrying his dog in his right arm. An officer grabbed Muhammad's left wrist from the back in an attempt to place him under arrest. A struggle ensued. Muhammad was taken to the ground by the officers at approximately 9:45 a.m. Muhammad clasped his hands together locking them. He did not punch or hit any officer. At least three officers were on top of Muhammad or holding him down, as they pressed him to the ground while attempting to release his hands and handcuff them. The officers placed the weight of their bodies on Muhammad's head, trunk, arms, and legs. Muhammad was heard yelling "Okay!". Two handcuffs were placed, one on each wrist and were linked together behind Muhammad's back.

The officers stood Muhammad up after he was detained at approximately 09:47 a.m. and walked him to a police vehicle at the parking lot. At the police vehicle, Muhammad's handcuffed upper extremities were lifted from behind above his head to the front, while he screamed. Then Muhammad was again taken to the ground by officers at approximately 09:56 a.m. He was placed face down on the sidewalk while officers were on top of him pressing him to the ground, including an officer who used his entire body and laid perpendicularly across Muhammad's right and left calves to keep his legs from moving. Another office knelt on Muhammad's trunk applying his body weight on Muhammad. Muhammad was heard yelling "I can't breathe" several times. A call was made requesting additional officers in order to hold down Muhammad. A RIP [leg] restraint was applied to his feet and around his ankles and then attached to the handcuffs. The officers placed the weight of their bodies on Muhammad's head, trunk, arms, and legs. After Muhammad was re-handcuffed, his body became limp and he began to vomit,



and was moved away from the vomit. He stopped breathing and no pulse was detected at approximately 10:04 a.m. The RIP restraints were removed from his handcuffs and CPR was initiated. Muhammad never struck or kicked any officer. No conducted electrical devices were utilized by any officer and no strikes were deployed by any officer. There were at least six officers who were on top of Muhammad or pressed Muhamad prone on the sidewalk.

Muhammad was emergently transported to the Maryvale Hospital and arrived at approximately 10:23 a.m. Muhammad was unresponsive, had no pulse and was foaming in his mouth. Muhammad was pronounced dead at 10:39 a.m.

**Autopsy**

A full autopsy [17-00095] was performed on the body of Muhammad Abdul Muhaymin on January 5, 2017 by Dr. Amanda E. Maskovyak at the Maricopa County Office of the Medical Examiner beginning at approximately 10:12 a.m.

Dr. Maskovyak stated the cause of death to be the following: "Cardiac arrest in the setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual". The manner of death was stated to be a homicide. Under the heading "How Injury Occurred", Dr. Maskovyak stated the following: "Cardiac arrest in the setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual".

The autopsy findings were stated as follows:

I.   Cardiac arrest in the setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual.
    A.   Coronary artery disease.
        1.   40 to 50 percent atheromatous stenosis of left anterior descending artery.
        2.   lntramyocardial segment, left anterior descending artery (2 cm in length x 0.1 cm depth).
    B.   Reported history of schizophrenia and bipolar disorder.
    C.   Acute methamphetamine intoxication.
        1.   0.81 mg/L methamphetamine in iliac blood.
        2.   0.24 mg/L amphetamine in iliac blood.
    D.   History of subdual by law enforcement.
        1.   Physical exertion/struggle with officers during law enforcement subdual.
        2.   Placement in prone position with hand, knee, foot, and/or body weight force applied by multiple officers to decedent's head, arms, wrists, shoulders, torso, and/or legs.
        3.   Physical restraints applied to decedent while in prone position.
        4.   Sudden unresponsiveness while in prone position.
        5.   Blunt force injuries of head, torso, and extremities.
            i.   Multifocal cutaneous abrasions of face.
            ii.   Bilateral temporalis muscle contusions (right = 2 cm, left = 0.5 cm).
            iii.   No internal head or neck injuries are identified.
            iv.   Intramuscular contusion of left upper back.
            v.   Subcutaneous hemorrhage of left mid back.


Bennet Omalu
PATHOLOGY

      vi.    Mildly hemorrhagic fractures of anterolateral right and left ribs 2 through 6 and parasternal left ribs 3 through 6 and parasternal right ribs 2 through 6 (possibly representing perimortem artifact due to cardiopulmonary resuscitation with chest compressions).

      vii.   Multifocal contusions and abrasions of bilateral elbows and wrists.

      viii.  Subcutaneous and intramuscular hemorrhage of left posterior upper arm and left elbow.

      ix.    Bilateral anterior knee abrasions.

II.    Reported history of asthma.

    A   No significant histologic evidence of acute asthma exacerbation on histologic examination of lung tissue.

At autopsy Muhammad weighed 164 pounds and measured 67 inches. Vomitus was noted in his nostrils and mouth. The body revealed the following evidence of trauma:

I.    Blunt Force Trauma of the Head and Neck:

1. There was a 3 x 1.5 cm orange-pink abrasion of the right lateral frontal scalp.
2. There was a 0.8 cm thin partial thickness linear laceration of the right forehead, just above the right lateral supraorbital ridge.
3. There were 3 x 1.5 cm and 1.2 x 0.8 cm pink contusion and pink-white abrasion of the right lateral supraorbital ridge, respectively.
4. There were two 0.3 cm shallow abrasions of the right upper middle and lateral eyelid.
5. There were 4 x 3 cm clustered and overlapping pink-orange linear abrasions of the right cheek.
6. There was a 0.5 cm laceration of the medial left nare.
7. There was a 2 x 1.5 cm irregular brown abrasion of the left frontal scalp at the hairline.
8. There was a 1.5 cm linear abrasion of the right frontal scalp.
9. There was a 2 x 0.5 cm red-brown abrasion of the left temple.
10. There was a 7 x 1.5 cm cluster of overlapping pink-tan linear abrasions of the left cheek.
11. There was a 2 cm intramuscular contusion of the right temporalis muscle.
12. There was a 0.5 cm intramuscular contusion of the left temporalis muscle.

II.    Blunt Force Trauma of the Trunk:

1. There were mildly hemorrhagic fractures of the anterolateral right and left 2nd to 6th ribs and the parasternal left 3rd to 6th ribs, and right 2nd to 6th ribs.
2. There was a 2 cm intramuscular contusion of the left paraspinal upper back.
3. There was a 1.0 cm contusion of the left paraspinal mid back.

III.   Blunt Force Trauma of the Extremities:

1. There was a 2.5 x 2 cm red-brown abrasion of the superior left shoulder.
2. There was a 2 x 1.5 cm irregular red-pink abrasion of the left elbow.
3. There was a 2 x 2 cm discontinuous cluster of pink-brown abrasions of the left medial elbow.
4. There was a 2 x 1.5 cm red-brown-pink abrasion of the left posterolateral proximal forearm.



Muhammad Abdul Muhaymin, Deceased
Medico-Legal Report

Page 6 of 27

5.  There was a 1.0 x 0.9 cm pink-white abrasion of the left lateral wrist.
6.  There was a 4.5 x 1.5 cm cluster of irregular pink contusions and abrasions of the left medial wrist.
7.  There was a 3.5 x 1.5 cm faint pink contusion of the left volar wrist.
8.  There was an 8.0 cm area of ill-defined subcutaneous and intramuscular hemorrhage in the left posterior upper arm.
9.  There was a 1.2 x 1 cm red-brown abrasion of the superior right shoulder.
10. There was a 4 x 3 cm cluster of red-brown punctate abrasions of the right medial elbow.
11. There was a 3 x 2.5 cm discontinuous tan-pink abrasion of the proximal right forearm.
12. There was a 2 x 0.5 cm cluster of red-brown abrasions of the right lateral elbow.
13. There were three linear abrasions of the right distal and lateral upper arm measuring 0.3 cm, 0.5 cm, and 1.5 cm.
14. There were 9 x 4 cm discontinuous clusters of pink contusions of the right dorsolateral proximal to mid forearm situated in a vaguely Y-shaped distribution.
15. There was a 4.5 x 4 cm area of faint pink contusions of the right lateral wrist.
16. There was a 3.5 x 3 cm irregular area of pink contusions and abrasions of the right medial wrist.
17. There was a cluster of three irregular abrasions of the proximal medial right forearm measuring between 0.2 cm and 0.7 cm.
18. There were patchy subcutaneous and intramuscular hemorrhages in the right elbow.
19. There was a 1.2 x 0.5 cm irregular red-brown abrasion of the left knee.
20. There was a 0.3 cm red-brown abrasion of the medial left knee.
21. There is a cluster of red-brown abrasions of the right medial and inferior knee measuring between 0.2 cm and 0.8 cm.

The skull revealed no fractures. There were no intracranial hemorrhages. The brain weighed 1300 grams. the heart weighed 325 grams. The left anterior descending coronary artery revealed atherosclerosis with focal 40-50% stenosis. There was tunneling of the left anterior descending coronary artery for a distance of 2 cm and a maximum depth of only 0.1 cm. The right and left lungs each weigh 475 grams. The liver weighed 1425 grams.

Toxicologic analysis of iliac blood obtained during the autopsy revealed the presence of Methamphetamine [0.81 mg/L] and Amphetamine [0.24 mg/L].

**Histology Tissue Slides**
Seven Hematoxylin and Eosin [H/E] stained tissue histology slides were sent to me from the Maricopa County Office of the Medical Examiner. These were the histology slides prepared after the autopsy and reported in the autopsy report. Based on my education and experience, these seven slides were grossly inadequate and insufficient for accurate pathology diagnoses and conclusions. I therefore requested permission to visit the medical examiner's office and examine the archival autopsy stock tissues in order to prepare additional histology tissue slides. Oddly, the archival autopsy stock tissues fixed in formalin were sent to my office in California. I examined them and made a total of 39 new and additional H/E stained tissue histology slides on this case. I examined all the H/E stained tissue slides, a total of 46 histology tissue slides.



The following tissue slides were examined:

<u>Maricopa County Slides[1]: Seven H/E stained slides[2] without any numbers.</u>
The slide labeled "LAD" reveals a coronary artery with surrounding epicardial adipose tissues and myocardium. The artery shows no significant atherosclerosis with none to minimal eccentric fibrous hyperplasia of the tunica intima. The myocardium shows scattered myofibrillary hypertrophy with box-car nucleomegaly without any inflammation. There is multifocal myofiber hypereosinophilia with myofiber waviness. Another slide shows three small sections of lung tissue, which show diffuse marked congestion without any bronchial or bronchiolar, or alveolar inflammation. There are large amounts of intraluminal aspirated gastric contents and foreign matter in bronchioles. Another slide shows a section of the mesial temporal lobe and cornu ammonis showing diffuse marked congestion of the arachnoidal and penetrating parenchymal blood vessels with perivascular microextravasates in the Virchow Robin spaces. There are many pyknotic and amphophilic to eosinophilic pyramidal neurons in the stratum pyramidalis especially in the Sommer's sector and accentuated in the Sommer's sector. The fascia dentata shows many pyknotic, amphophilic to eosinophilic granule neurons. The inferior temporal cortex also shows many scattered pyknotic, amphophilic to eosinophilic neurons. Another slide shows three small sections of myocardium. The myocardium shows severe vascular congestion with multifocal microextravasates. There are few scattered hypertrophic myofibers with box-car nucleomegaly. There are multifocal and sparse wavy fibers and hypereosinophilic myofibers without any inflammation. Another histology slide shows two small sections of the myocardium and the myocardium shows similar findings described above. Another histology slide shows a small section of the liver and a small section of the kidney. Both sections show diffuse marked parenchymal congestion. The liver section shows no inflammation of the portal triads or lobules and no hepatocellular steatosis or necrosis. The kidney sections show no glomerulosclerosis, interstitial nephritis, or tubular necrosis. Another histology tissue section shows two small sections of lung tissue and both sections reveal diffuse marked congestion without any bronchial or bronchiolar, or alveolar inflammation. There are large amounts of intraluminal aspirated gastric contents and foreign matter in bronchi and bronchioles.

<u>Bennet Omalu Pathology Slides: Thirty-Nine H/E Stained Histology Slides</u>
Slide #1: Two sections of the liver
The liver sections show diffuse parenchymal congestion with no hepatocellular steatosis or necrosis. There is no chronic inflammation of the hepatic portal triads or lobules.
Slide #2: Two sections of the liver
There is focal and sparse lobular hepatocellular infiltration by lymphocytes, Diffuse parenchymal congestion is noted, accentuated in lobular zones 3 in a centrilobular fashion.
Slide #3: Two sections of kidney
There is acute parenchymal congestion with focal micronephrolithiasis in few collecting tubules in the medulla. There is no glomerulosclerosis, interstitial nephritis, or tubular necrosis.
Slide #4: Two sections of kidney
These sections show findings that are similar to what has been described above.
Slide #5: Two sections of lung

---

[1] The slides were not labeled with any numbers. The inscriptions on all the slides are the following: "17-0095 SUBPOENA AEM Maricopa County Forensic Science Center". Only one slide is also labeled LAD.
[2] The staining of the tissue sections is very faint and faded and are suboptimal for diagnosis.



There is diffuse marked pulmonary parenchymal congestion with focal and sparse mucosa-associated lymphoid tissue without any significant inflammation. There are large amounts of intraluminal aspirated gastric contents in the bronchi and bronchioles.

Slide #6: Two sections of lung
There is diffuse marked pulmonary parenchymal congestion with focal and sparse mucosa-associated lymphoid tissue without any significant inflammation. There are large amounts of intraluminal aspirated gastric contents in the bronchi and bronchioles. Multifocal to patchy to diffuse intra-alveolar eosinophilic edema fluid is noted. Multifocal and sparse intra-alveolar pigment-laden histiocytes are noted.

Slide #7: Two sections of lung
These sections reveal findings similar to what have been described above.

Slide #8: One section of lung; one section of right ventricle
The section of the lung reveals changes, which have been described above. The right ventricle reveals scattered hypertrophied myofibers with box-car nucleomegaly. There is multifocal myofiber waviness and hypereosinophilia [myocytolysis] without any inflammation. There is diffuse congestion of the myocardium.

Slide #9: Two sections of lung
These sections of lung tissue reveal findings, which have been described above.

Slide #10: Two sections of left ventricle
These sections of the left ventricle reveal scattered myofiber hypertrophy with box-car nucleomegaly. There is multifocal myocytolysis with myofiber waviness and hypereosinophilia, with focal contraction band necrosis, without any inflammation.

Slide #11: Two sections of the left ventricle
These sections reveal findings that are similar to what have been described above. There is no inflammation of the endocardium or epicardium.

Slide #12: One section of left ventricle; one section of right ventricle and one section of aorta
The sections of the right and left ventricles show findings which have been described above. Coronary vessels in the epicardium reveal no atherosclerosis. There is no inflammation of the epicardium or endocardium. The aorta shows marked adventitial congestion without any intimal or medial inflammation or necrosis or sclerosis.

Slide #13: One section of the spleen; one section of an adrenal gland
The spleen and adrenal gland show diffuse parenchymal congestion. There is no acute splenitis or adrenalitis. There are no secondary follicles in the splenic white pulp. The adrenal gland shows no hyperplasia or adenoma. There are no adrenocortical or medullary hemorrhages.

Slide #14: One section of pancreas; one section of esophagus and stomach
The pancreas shows early autolysis without any acute or chronic pancreatitis, interstitial fibrosis, or lobular atrophy. The esophagus and stomach show no esophagitis or gastritis.

Slide #15: One section of tongue; one section of cerebellar cortex
The tongue reveals no inflammation and no diffuse myofiber atrophy. The cerebellum reveals diffuse congestion of the arachnoidal and penetrating parenchymal blood vessels with multifocal perivascular microextravasates. The molecular layer shows no necrosis or infarction. The Purkinje neuron layer shows many pyknotic, amphophilic to eosinophilic Purkinje neurons without significant neuronal dropout. The internal granule cell layer shows no autolysis. The cerebellar white matter shows no necrosis, infarct, or demyelination.

Slide #16: One section of interventricular septum; one section of cerebellum
The interventricular septum shows focal myocytolysis with many subendocardial myofibers showing marked hypereosinophilia, myocytolysis and contraction band necrosis without any inflammation. The valvular leaflet attached to the basal interventricular septum shows no inflammation. The cerebellum shows findings, which have been described above in addition to



many scattered pyknotic, amphophilic to eosinophilic neurons in the subcortical nucleus. There is no marked neuronal dropout in the subcortical nucleus. The cerebellar white matter shows marked vascular congestion without any focal necrosis, infarct, or demyelination.

Slide #17: One section of pons; one section of spinal cord:
The section of the spinal cord reveals no inflammation of the meninges or neuropil. The spinal funiculi reveal no degeneration, necrosis, or demyelination. The pons is described below.

Slide #18: One section of pons
The pons is described below.

Slide #19: One section of pons
The pons reveals congestion of the arachnoidal and penetrating parenchymal blood vessels. The basis pontis and pontine nuclei reveal no central myelinolysis. The pontine nuclei reveal scattered pyknotic and amphophilic neurons. The tegmental nuclei and locus ceruleus reveal scattered pyknotic and amphophilic neurons. There is no dorsolateral hemorrhage or necrosis.

Slide #20: One section of medulla oblongata; one section of medulla oblongata-spinal medulla junction
The medulla oblongata reveals no focal neuropil necrosis or hemorrhage. The inferior olivary nuclei reveal mild neuronal dropout with scattered pyknotic and amphophilic neurons. The medullary tegmentum reveals scattered pyknotic and amphophilic neurons without neuropil necrosis. The medullary pyramids show no atrophy, necrosis, or infarct.

Slide #21: One section of medulla oblongata; one section of left ventricle
The medulla oblongata reveals findings, which have been described above. The left ventricle reveals findings, which have been described above.

Slide #22: One section of interventricular septum; one section of prostate gland
The interventricular septum reveals findings, which have been described above. The prostate gland shows sparse and focal acute and chronic prostatitis with neutrophilic and lymphocytic infiltrates. There is no glandular or fibromuscular hyperplasia.

Slide #23: Four sections of spinal cord
There is congestion of the spinal meninges and neuropil without any inflammation. The white matter funiculi, including the anterior and lateral funiculi and the fasciculus cuneatus and gracilis, reveal neuropil edema without focal necrosis, inflammation, or demyelination. The central gray matter shows no hemorrhage and no necrosis. The spinal neurons show no degeneration. The spinal canal is central.

Slide #24: One section of mesial temporal lobe and hippocampus
See description below.

Section #25: One section of neocortex
See description below.

Slide #26: One section of mesial temporal lobe and hippocampus
The dentate gyrus and cornu ammonis of the hippocampus reveal no focal dysplasia or sclerosis. The stratum pyramidalis of the Sommer's sector (CA1), CA2, CA3 and CA4 regions of the cornu ammonis reveal many scattered pyknotic, amphophilic to eosinophilic pyramidal neurons especially in the Sommer's sector. The fascia dentata reveals scattered pyknotic, amphophilic to eosinophilic granule neurons. The entorhinal cortex and the alveus reveal no focal neuropil necrosis. The choroid plexus is congested. The penetrating vessels of the strata radiatum, lacunosum and moleculare reveal mural mineralization.

Slide #27: One section of neocortex
See description below.

Slide #28: One section of neocortex
Examination of hematoxylin and eosin stained sections of the neocortex reveals a homogenetic cortex with the normal homotypical laminar and columnar organization. There is no cortical



disorganization, diffuse or nodular neuronal heterotopia. There is no significant neuronal drop-out or astrogliosis. There are many scattered pyknotic, amphophilic to eosinophilic neurons. There is diffuse congestion of the arachnoidal and penetrating parenchymal blood vessels with multifocal perivascular microextravasates. There is perineuronal vacuolation, accompanied by expansion of Virchow Robin spaces and neuropil microspongiosis of both the gray and white matter. The arachnoidal mater, pia mater, penetrating vessels and the Virchow Robin's spaces reveal no inflammation. The centrum semiovale reveals neuropil edema and congestion without any focal necrosis, infarct, or hemorrhages. There is no gliding contusional hemorrhage.

Slide #29: Sections of dura mater
See the description below.

Slide #30: Section of dura mater
The dura mater reveals intradural congestion with intradural microextravasates without any inflammation, extradural membranes or pigment-laden histiocytes.

Slide #31: Section of larynx
The larynx reveals sparse mucosa-associated lymphoid infiltrates.

Slide #32: One section of larynx; one section of epicardium with coronary artery
The larynx reveals no inflammation. The coronary artery shows eccentric mild fibrous hyperplasia of the tunica intima with focal intramural cholesterol deposits and vacuolation.

Slide #33: One section of epiglottis; one section of trachea
The epiglottis reveals focal and sparse submucosal lymphocytic infiltrates. the trachea does not reveal any inflammation.

Slide #34: One section of adrenal gland; one section of urinary bladder
The adrenal gland shows diffuse congestion without any necrosis or hemorrhage. There is no adenoma or hyperplasia and no inflammation. The urinary bladder reveals no cystitis.

Slide #35:One section of thyroid gland; one section of heart- SA node
The SA node shows no necrosis, dysplasia, fibrosis, or inflammation. The thyroid gland does not show any thyroiditis or nodular hyperplasia.

Slide #36: One section of lung; one section of AV node
The AV node appears unremarkable. The lung section reveals findings, which have been described above.

Slide #37: One section of heart; one section of gallbladder; two sections of vermiform appendix
The heart reveals findings, which have been described above. The gallbladder reveals diffuse autolysis without any inflammation. The vermiform appendix reveals no inflammation.

Slide #38: One section of bronchus; one section of vermiform appendix and mesoappendix; one section of gallbladder
The gallbladder shows diffuse autolysis without any inflammation. The vermiform appendix shows no inflammation. The mesoappendix shows marked vascular congestion. The bronchus shows marked diffuse, transmural congestion without any inflammation.

Slide #39: Four sections of epicardium and myocardium and coronary vessels
The coronary vessels in these sections do not reveal any inflammation. There is none to minimal fibrous hyperplasia of the tunica intima.



**Medico-Legal Questions**

1. **What were the underlying cause of death, mechanism of death, contributory factor to death and manner of death of Muhammad Abdul Muhaymin [Muhammad]?**

Medicine is a life science, which is evidence based. The practice of medicine is guided by established standards and generally accepted principles, which certified physicians must adhere to. The specialties and the categories of physicians who are proficiently trained, specialized, and competent in the accurate determination of the cause, mechanism and manner of death are the forensic pathologists, especially for deaths involving all types of trauma and bodily injury. The death of Muhammad involved serious bodily injury.

The College of American Pathologists [CAP] describes the specialty of forensic pathology as follows: "Forensic pathology is the subspecialty of pathology that directs its efforts to the examination of living or dead persons in order to provide an opinion concerning the cause, mechanism, and manner of disease, injury or death; the identification of persons; the significance of biological and physical evidence; the correlation and/or reconstruction of wounds, wound patterns, and sequences; and conducting comprehensive medico-legal death investigations. Forensic pathology applies techniques of pathology to the needs and protection of public health, public safety, quality assurance, education in medicine, research, jurisprudence, and the administration of justice. Its highest goal is the development of strategies to prevent injury, disease, and death."

The CAP also describes a forensic pathologist as follows: "A forensic pathologist is a pathologist with special training and experience in forensic pathology who is actively engaged in medico-legal autopsies and death investigations. Forensic pathologists shall be board-certified by the American Board of Pathology or American Osteopathic Board of Pathology after appropriate training and passing a rigorous examination, or a non-USA based pathologist with equivalent certification. The practicing forensic pathologist is licensed in one or more states; he/she is skilled in conducting death investigations, interpreting injuries in both fatal and non-fatal cases, performing medico-legal examinations, determining disease/injury causation to an appropriate degree of medical certainty and determining cause and manner of death."

Trauma pattern recognition, interpretation and analyses are the fundamental methodologies the forensic pathologist adopts in the differential diagnoses of causes and mechanisms of injuries and/or death. Trauma pattern recognition, translation and analysis are commonly applied to forensic differential diagnoses, opinions, and conclusions. It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of injuries, outcomes, and death.

The practice of forensic pathology is guided by very well-established and generally accepted principles, which board-certified forensic pathologists must adhere to while they routinely perform differential diagnoses and determine causes, mechanisms, and manners of death. Objective decisions, conclusions and opinions should be made in all types of trauma case analyses strictly based on objective interpretations of patterns of injuries, prevailing forensic scenarios, and trauma pathophysiology. The prevailing global forensic scenarios, the patterns of trauma and the expected outcomes of trauma exhibited by Muhammad are vividly consistent



with fatal and homicidal trauma as prescribed by the well-established and generally accepted patho-physiology of trauma and disease.

The determination of cause and manner of death are guided by and must adhere to very well-established and generally accepted principles and concepts, standards of practice and common knowledge of science and medicine. In order to determine the cause of death of Muhammad accurately and competently, we may have to review these generally accepted principles and concepts, standards of practice and common knowledge. Forensic pathologists cannot determine cause and manner of death at whim outside these principles, concepts, and standards when they perform differential diagnoses to determine causes, mechanisms, and manners of death. Objective decisions, conclusions and opinions should be made in all types of trauma case analysis strictly based on objective interpretations of patterns of injuries and prevailing forensic scenarios, which should be based on these well-established and generally accepted principles and concepts, standards of practice and common knowledge of science and medicine.

There are four components of cause of death, viz: underlying cause of death, contributory factor to death, mechanism of death and manner of death.

<u>What is an underlying cause of death?</u>
The underlying cause of death is defined as the single factor, event, or disease, which instigates or initiates a terminal chain of events that finally culminates in death. It must not be a single disease. An event like compression of the body, a gunshot wound of the head, an assault or a fall can be a cause of death, when it initiates the terminal chain of events. The chain of events, which occurs between the underlying cause of death and death itself, encompasses the mechanisms of death. Mechanisms of death are typically not written on the death certificate.

An illustration is when an individual is shot in the spine causing quadriplegia. Assuming the individual survives for fifteen years after he was shot and develops the known sequelae of quadriplegia like recurrent bronchopneumonia, recurrent aspiration pneumonia, recurrent urinary tract infections, and decubitus ulcers, and finally develops an overwhelming sepsis and dies from sepsis. The underlying cause of death will be the event, gunshot wound of the spine. The terminal chain of events and the mechanisms of death would include the recurrent infections and the sepsis, which finally preceded death. Although the immediate causes of death in this instance are natural diseases, the traumatic gunshot wound of the spine precipitated the natural diseases and would supersede the natural diseases. The cause of death in the death certificate may be completed as "Gunshot Wound of the Spine".

When unnatural events or diseases, like falls from any height, compression of the body or fractures, co-occur with natural events or diseases, like cancer or heart disease in the cascade of events that precipitate death, the unnatural events or diseases supersede the natural events or diseases and assume the cause and manner of death.

An illustration is a 60-year-old woman who is dying from end-stage cancer and has only several months to live. She is admitted into a hospice care center for comfort care only. She got up from bed one morning to go to the bathroom, slipped, fell on the ground, and impacted her head on the floor. She sustained subdural hemorrhages inside her skull and died several weeks later from complications of cancer and surgery to evacuate the subdural hemorrhage. The cause of death in this instance would be the traumatic brain injury she suffered because it was an unnatural disease or event, although she had suffered advanced cancer for several years and was dying



from terminal cancer, which is a natural disease. The manner of death therefore would be an accident.

For a factor or disease to assume the underlying cause of death, there has to be a contiguous chain of events between the initial occurrence of that factor or disease and the occurrence of death, without any significant breach. The interval between the initiating factor and final demise is immaterial and non-contributory to the determination of an underlying cause of death as far as a contiguous chain of events can be established and competently linked to the initiating factor without any significant breach.

When there is a pre-existing lethal chain of events from any factor or disease, and a novel factor or disease arises, either dependent on, or independent of the pre-existing factor or disease, and successfully disrupts and breaches the contiguity of the chain of events of the pre-existing factor or disease, while initiating a novel lethal chain of events, which culminates in death, the novel factor or disease would assume the underlying cause of death.

An illustration is the instance of a 55-year-old obese man with severe coronary atherosclerotic disease, who has had multiple myocardial infarctions and a triple coronary artery by-pass surgery and has developed and is dying from end-stage congestive cardiac failure from ischemic cardiomyopathy. If this same man falls backwards at home while opening a chest of drawers, which falls on top of him, entraps him and compresses his trunk for about 5 minutes before his 26-year-old son finds him and moves the chest of drawers off him. Unfortunately, by this time he was beginning to lose consciousness. The wife calls 911, paramedics arrive and emergently take him to the hospital where he is successfully resuscitated but had suffered asphyxial brain injury. He is admitted into the intensive care unit where he dies two days later from complications of compression of the trunk and asphyxial brain injury. Although he was suffering and dying from severe and advanced heart disease, the compression of his trunk, which he suffered was a novel and independent factor which instigated a novel chain of events, which successfully interrupted the previously existing chain of events, which culminated in his death. Compression of the trunk would therefore assume the underlying cause of death and determine the manner of death, which in this instance would be an accident. The asphyxial injury of the brain is an unnatural disease and would supersede the natural diseases and assume the cause and manner of death.

For every disease, there are extenuating and aggravating factors, which can either decrease or increase the risk of suffering from or dying from a disease. A contemporaneous or co-morbid disease or factor that increases the risk of a second disease or factor does not denote causation, rather it denotes co-morbidity. Disease or event "A" that is co-morbid with disease or event "B" does not mean disease "A" causes disease "B" and vice versa.

<u>What is a contributory factor to death?</u>
A heading in the death certificate states the following: "Other Conditions Contributing to Death". A contributory factor to death is defined as any factor, disease or event, which occurs contemporaneously with the underlying cause of death, possesses an independent capacity to cause death, however the lethality of this capacity is inferior to the lethality of that of the underlying cause of death. The contributory factor may accentuate or accelerate the lethality of the underlying cause of death.



An illustration is the instance of a man who suffers from end-stage metastatic lung cancer and sustains a fracture of his humerus when he fell in his living room. He is taken to the hospital and he undergoes open reduction and internal fixation with intramedullary rods. He unfortunately suffers a post-traumatic fat embolism following his surgery and dies from acute respiratory failure six days after he sustained his fracture. The underlying cause of death would be acute respiratory failure due to traumatic fat embolism due to fracture of the humerus. The contributory factor to death would be the metastatic lung cancer. The manner of death would be an accident. The lethal capacity of the traumatic fat emboli caused by his fractured humerus is far more superior to the lethal capacity of his lung cancer. This is why the fractured bone killed him within six days while he had survived lung cancer for three years. Traumatic fat embolism from a fractured long bone and metastatic lung cancer independently possess potent lethal capacities, however the lethal capacity of traumatic fat embolism is superior to that of lung cancer; and traumatic fat embolism is an unnatural disease, while lung cancer is a natural disease. Traumatic fat embolism caused by a fracture would therefore become the underlying cause of death and assume the manner of death, which will be an accident. The lung cancer will become the contributory factor to death.

A contributory factor to death may become an underlying cause of death, if and when it instigates a chain of events, which successfully interrupts the pre-existing chain of events of the underlying cause, which has been discussed above. In this instance, the underlying cause of death would become the contributory factor.

<u>What is a manner of death?</u>
The manner of death is a medico-legal terminology, which categorizes the circumstances, which surround death sometimes referred to as "the prevailing terminal forensic scenario". There are two broad categories of manners of deaths:
1. Natural
2. Un-natural

Natural deaths are deaths caused by known natural diseases as have been published in the International Classification of Diseases. Un-natural deaths are classified into four manners of death:
1. Homicide
2. Suicide
3. Accident
4. Undetermined

For this report, only the homicide manner of death will be defined. A death is classified as a medical homicide when a person intentionally, knowingly, recklessly, or negligently causes the death of another human being. A medical homicide may be deemed as a death that occurs, directly or indirectly, as a result of another person's actions.

In the determination of manner of death, whenever an un-natural factor plays a role in the causation and mechanism of death, no matter how infinitesimal, the unnatural factor supersedes the natural factors and assumes the manner of death.



Muhammad Abdul Muhaymin, Deceased
Medico-Legal Report

Page 15 of 27

<u>The case of Muhammad</u>
On January 4, 2017 Muhammad was a 43-year-old male who was alive and well and was not in any imminent death or was dying from any disease before he encountered the police. He suffered from the psychological ailments of Post-Traumatic Stress Disorder, Claustrophobia and Schizophrenia. His autopsy confirmed that he suffered minimal coronary artery disease, which is prevalent in the United States population and was not a disease that was going to kill him. He was not dying and was not expected to die. Although he had a history of what was believed to be bronchial asthma, autopsy confirmed that he was not suffering from bronchial asthma.

Muhammad was a member of the community and was at a community center to use a public bathroom to answer to a normal physiological call of nature, to pass stool. He did not pose any reasonable threat or danger to himself or society, was not wanted for a felony, and was not a felon who posed a danger to society, and had not committed a felony that was punishable by the death penalty, life imprisonment or a long-term imprisonment.

<u>Muhammad did not die from Methamphetamine toxicity</u>
Toxicologic analysis of his central blood obtained during his autopsy revealed the presence of Methamphetamine [0.81 mg/L] and Amphetamine [0.24 mg/L]. This means that Muhammad had consumed Methamphetamine within hours of his death. Every human being who consumes Methamphetamine, even on habitual basis, does not die from Methamphetamine overdose. Majority of human beings who consume Methamphetamine as a recreational drug do not die from Methamphetamine. For example, statistical estimates indicate that about 13 million people, 12 years and older, in the United States have reported using Methamphetamine. Only about 100 thousand people [0.77%] visit the emergency department for Methamphetamine toxicity annually, and only about 3 thousand people [0.02%] die from Methamphetamine toxicity annually[3]. If not for his encounter with the police on January 4, 2017, more likely than not, Muhammad would not have died, and was not expected to die on January 4, 2017.

Methamphetamine was not the underlying cause of death of Muhammad. The presence of a drug in the blood of a deceased person does not equate to causation of death. The toxic effects of a drug cannot be only or fully deciphered solely based on the level of the drug in the blood. This is outside the generally accepted guidelines and standards of practice of clinical pathology and interpretative toxicologic analysis for the determination of cause of death[4]. The toxic effects of a drug are multifactorial and are determined by many independent and sometimes mutually exclusive factors. However, the level of Amphetamine in Muhammad's blood was stated to be 0.24 mg/L which was about the same level with the expected toxic levels of >0.20 mg/L[5,6]. The level of Methamphetamine in the blood of Muhammad was 0.81 mg/L, which was higher than the expected toxic level of Methamphetamine which is 0.15 mg/L[7,8]. This is why a determination

3 https://drugabuse.com/library/methamphetamine-history-and-statistics/#how-dangerous-is-methamphetamine-
4 Ferner RE. Post-mortem clinical pharmacology. British Journal of Clinical Pharmacology, 2008;66(4):430-443.
5 Schulz M et al. Therapeutic and toxic blood concentrations of nearly 1000 drugs and other xenobiotics. Critical Care, 2012;16:R136.
6 Regenthal R et al. Drug levels: therapeutic and toxic serum/plasma concentrations of common drugs. Journal of Clinical Monitoring and Computing, 1999, 15:529-544.
7 Schulz M et al. Therapeutic and toxic blood concentrations of nearly 1000 drugs and other xenobiotics. Critical Care, 2012;16:R136.
8 Regenthal R et al. Drug levels: therapeutic and toxic serum/plasma concentrations of common drugs. Journal of Clinical Monitoring and Computing, 1999, 15:529-544.



of the cause of death of any individual should not be based on only the level of a drug in the blood.

Chronic use of Methamphetamine results in psychologic dependence and tolerance, therefore, the effects of Methamphetamine may be modulated by the drug use history of each individual. Chronic use and exposure result in chronic drug tolerance and resistance. Muhammad was a chronic drug user, and people who use Methamphetamine chronically develop drug tolerance and habituation and as time passes would use and need higher levels of drugs to achieve the same effects. Therefore, such high levels of Methamphetamine and Amphetamine as documented by the autopsy of Muhammad are expected because he was a chronic user of Methamphetamine.

Moreover, following death, high tissue levels of drugs migrate/diffuse into the blood, especially in chronic consumers of the drugs, and create artifactually and markedly elevated levels of drugs in the blood when measured at autopsy. Methamphetamine exhibits a post-mortem tissue redistribution of $0.9 - 2.4$ heart/femoral ratios. Amphetamine exhibits a post-mortem tissue redistribution of $1.2 - 5.6$ central/peripheral ratios[9]. This means that the post-mortem levels of Methamphetamine and Amphetamine reported in the autopsy blood sample of Muhammad were actually much higher than the pre-mortem levels prior to his death. These ratios may be higher in chronic users who have accumulated the drug in their tissues over time.

Therefore, post-mortem levels of 0.81 mg/L of Methamphetamine and 0.24 mg/L of Amphetamine may not be of such a significant forensic consequence as it would have been for an individual who has never used Methamphetamine or who has not attained the level of drug tolerance Muhammad had attained as a chronic recreational user. This is exemplified by some cases reported on page 1320 of the textbook: "Disposition of Toxic Drugs and Chemicals in Man", eleventh edition, by Randall C. Baselt, PhD. This page states that "Two women found by police asleep in a car had blood Methamphetamine concentrations of 1.7 mg/L and 2.1 mg/L, as well as substantial levels of Diazepam. The same book on the same page gives two additional examples as follows: [1] Methamphetamine blood concentrations of $1.4 - 13$ mg/L [average 5.1 mg/L] were found post-mortem in nine drug abusers who died of traumatic injury by violent means; [2] Blood Methamphetamine concentrations of $<0.05 - 2.6$ mg/L were observed in 27 persons arrested for erratic driving."

The toxic levels and effects of drugs that physicians use and apply to case management and analysis are typically related to therapeutic drug levels and toxicities. However, the National Highway Traffic Safety Administration reports a non-toxic range of 0.01 to 2.5 mg/L[10] in individuals who use Methamphetamine for recreational purposes. This further confirms that the level of Methamphetamine detected in the blood of Muhammad was of no significant forensic consequence, was not expected to kill him and did not kill him. He used Methamphetamine recreationally and chronically.

---

[9] Baselt RC, Disposition of Toxic Drugs and Chemicals in Man, 11th edition, Biomedical Publications, Seal Beach, California, 2017.
[10] National Highway Traffic Safety Administration. Drugs and Human Performance Fact Sheets. U.S. Department of Transportation- Methamphetamine [and Amphetamine] www.nhtsa.dot.gov



<u>Muhammad did not die from coronary artery disease</u>
In her autopsy report, Dr. Maskovyak concluded that Muhammad died as a result of coronary artery disease. This is false and grossly inaccurate and goes against the generally accepted principles of cardiology and cardiac pathology. Coronary artery disease causes death through the pathophysiological mechanism of ischemic myocardial injury and myocardial infarction, which can manifest as cardiac arrhythmia and cardiac arrest. According to the international classification of myocardial infarctions[11], there are five types of myocardial infarctions, viz: Types 1, 2, 3, 4 and 5.

Type 1 myocardial infarction is precipitated by an atherosclerotic plaque disruption, rupture, or erosion. The thrombotic component may lead to distal coronary embolization. Plaque rupture is complicated by intraluminal thrombosis and by hemorrhage into the plaque through the disrupted surface. Muhammad did not suffer a Type 1 myocardial infarction.

Type 3 myocardial infarction occurs when a patient presents with myocardial injury or ischemia including presumed new ischemic EKG changes or ventricular fibrillation and dies suddenly and unexpectedly before it is possible to obtain blood or cardiac biomarker determination. Or the patient dies after the onset of symptoms before an elevation of biomarker values has occurred. Autopsy does not show any ruptured or disrupted plaque and no intraluminal thrombosis. Muhammad did not suffer a Type 3 myocardial infarction. Type 3 myocardial infarction allows the separation of fatal myocardial infarction events from the much larger group of sudden death episodes that may be cardiac [non-ischemic] or non-cardiac in origin. Muhammad did not die from a type 3 myocardial infarction.

Type 4 myocardial infarction occurs as a result of cardiac procedural myocardial injury related to percutaneous coronary intervention and revascularization procedures. It may be related to the procedure itself, which may reflect periprocedural issues or complications of a device such as early or late stent thrombosis or in-stent restenosis. Muhammad did not suffer a Type 4 myocardial infarction.

Type 5 myocardial infarction occurs as a result of cardiac procedural myocardial injury related to coronary artery bypass grafting procedures. It may be related to the procedure itself, which may reflect periprocedural issues or complications, graft occlusion or stenosis. Muhammad did not suffer a Type 5 myocardial infarction.

If Muhammad rightfully died as a result of coronary artery disease, he would have suffered a type 2 myocardial infarction. However, it is pertinent to note that Muhammad did not have moderate or severe coronary artery disease. As this scientific article states[12]:
"The pathophysiological mechanism leading to ischemic myocardial injury in the context of a mismatch between oxygen supply and demand has been classified as type 2 myocardial infarction. By definition, acute atherothrombotic plaque disruption is not a feature of type 2 myocardial infarction. In patients with stable known or presumed Coronary Atherosclerotic Disease, an acute stressor such as an acute gastrointestinal bleed with a precipitous drop in

---

[11] Thygesen K et al. Fourth universal definition of myocardial infarction [2018]. European Heart Journal, 2019;40:237-269.
[12] Thygesen K et al. Fourth universal definition of myocardial infarction [2018]. European Heart Journal, 2019;40:237-269.



hemoglobin, or a sustained tachyarrhythmia with clinical manifestations of myocardial ischemia, may result in myocardial injury and a type 2 myocardial infarction. These effects are due to insufficient blood flow to the ischemic myocardium to meet the increased myocardial oxygen demand of the stressor. Ischemic thresholds may vary substantially in individual patients depending on the magnitude of the stressor, the presence of non-cardiac comorbidities, and the extent of underlying Coronary Atherosclerotic Disease and cardiac structural abnormalities."

"The short- and long-term mortality rates for patients with type 2 myocardial infarction are generally higher than for type 1 myocardial infarction patients in most but not all studies due to an increased prevalence of comorbid conditions. Coronary atherosclerosis is a common finding in type 2 myocardial infarction patients selected for coronary angiography."

"The context and mechanisms of type 2 myocardial infarction should be considered when establishing this diagnosis. The myocardial oxygen supply/demand imbalance attributable to acute myocardial ischemia may be multifactorial, related either to: reduced myocardial perfusion due to fixed coronary atherosclerosis without plaque rupture, coronary artery spasm, coronary microvascular dysfunction [which includes endothelial dysfunction, smooth muscle cell dysfunction, and the dysregulation of sympathetic innervation], coronary embolism, coronary artery dissection with or without intramural hematoma, or other mechanisms that reduce oxygen supply such as severe bradyarrhythmia, respiratory failure with severe hypoxemia, severe anemia, hypotension/shock; or to increased myocardial oxygen demand due to sustained tachyarrhythmia or severe hypertension with or without left ventricular hypertrophy".

It becomes vividly obvious that if coronary artery disease played a role in the death of Muhammad, he would have suffered a Type 2 myocardial infarction instigated by a stressor. The stressor in this instance would be mechanical-positional asphyxiation by sustained compression of the trunk and body and compressed prone-positioning on the sidewalk. This acute stressor instigated a cardiac oxygen demand-supply mismatch, which precipitated ischemic myocardial injury. Coronary artery disease, therefore, cannot be a cause of death in this instance of sudden traumatic death, but a mechanism of death. A mechanism of death cannot be classified as an underlying cause of death and should not be listed on the death certificate.

A type 2 myocardial infarction does not require coronary atherosclerotic disease to be present to occur. The fundamental principle and criterion for a type 2 myocardial infarction is the presence of a stressor, which places the heart at an increased demand for oxygen, and when there is a mismatch between the supply of oxygen and the metabolic rate of the heart cells, myocardial injury and infarction occurs. If coronary artery disease is present, the blood vessels supplying the heart may not dilate sufficiently or have luminae that can open wide enough for larger amounts of blood to pass per unit time and per unit mass of the heart. So, the presence of coronary artery disease is not the underlying cause of a type 2 myocardial infarction but a comorbidity that can contribute to the mechanism of injury of myocardial ischemia and infarction.



<u>Muhammad died as a result of Mechanical-Positional Asphyxiation due to Compression of his Trunk and Body</u>
When Muhammad walked out of the community center on January 4, 2017 he was not in any form of distress and was not dying. A novel factor or event occurred unexpectedly and suddenly in his life at approximately 09:45 a.m. He became unconscious at approximately 10:04 a.m., 19 minutes later. He was pronounced dead at the hospital at 10:39 a.m.

Dr. Maskovyak who performed the autopsy stated the following on page 13 of her autopsy report: "No significant pathologic abnormalities" seen upon microscopic examination of the only section of the brain that she examined, the hippocampus. This is grossly inadequate, insufficient and beneath the standards of practice of forensic pathology and forensic neuropathology. I took many more topographically targeted and anatomically selective sections of the brain and examined them, which I have described above. There is no question whatsoever that Muhammad suffered acute asphyxial brain injury [hypoxic-ischemic brain injury] as manifested by the following findings and diagnoses in the brain:
I.     Congestive Brain Swelling, Global, with Diffuse Cerebral Parenchymal Edema, Acute
II.    Selective Neuronal Excitotoxic Injury with Selective Topographic Vulnerability

Dr. Maskovyak is not a certified or credentialed neuropathologist and may lack the prerequisite knowledge and expertise to competently identify and accurately diagnose Asphyxial Brain Injury due to Mechanical-Positional Asphyxiation due to Compression of the Trunk and Body, which Muhammad Abdul Muhaymin, a 43-year-old African-American male died from.

The global evidentiary autopsy findings in this case confirm that Muhammad suffered diffuse and global asphyxial brain injury [hypoxic-ischemic brain injury]. The human brain is a post-mitotic organ and can only survive on oxygen and glucose, which are supplied by blood that come from the heart, primarily in the internal carotid arteries and the vertebral arteries. While the brain is only about 2-3% of the body weight, it receives approximately 15% of the cardiac output at a rate of 750-900 ml/min of blood. The normal range of perfusion of the brain is about 50 to 65 ml/100 g/min [80-100 ml/100g/min for the gray matter and 20—25 ml/100g/min for the white matter, at a rate of oxygen consumption of 3.5 ml/100 g/min. The normal brain tissue partial pressure of oxygen is 35 to 40 mmHg. Brain tissue oxygen levels below 30 mmHg may cause brain tissue injury, and at 20 mmHg, the risk of brain damage becomes exponentially elevated. The threshold for brain infarction is 10-12 ml/100g/min of blood supply with neuronal injury and death beginning in 60 to 180 seconds.

Being a post-mitotic organ, the human brain does not have any reasonable capacity to regenerate itself. This means that when the human brain suffers any type of irreversible injury, that injury is permanent and cannot be reversed or cured by the brain or by medical therapy. There are so many types of brain injuries. Asphyxial brain injury [hypoxic-ischemic brain injury] is only one type of brain injury. For the human brain to suffer irreversible hypoxic-ischemic brain injury, there has to be impaired supply of oxygen and blood to the brain for a relatively long period. The established and generally accepted median or mean reference threshold time for irreversible hypoxic-ischemic brain damage to occur is 3 to 5 minutes in cumulative time. This means that irreversible brain damage can occur in less than 3 minutes or in more than 5 minutes, but with a mean or median time of close to 3 to 5 minutes.

The forensic question that arises at this juncture is what caused Muhammad's diffuse, global hypoxic-ischemic brain injury? Any factor that impairs the entire respiratory functioning of the



human being can result in the deprivation of oxygen to the brain. Absolute deprivation [complete absence of oxygen- anoxia] is not necessary for the brain to suffer brain injury. Any factor that impairs the body's ability to inspire oxygen and expire carbon dioxide, impairs the body's ability to bind oxygen to hemoglobin, impairs the body's ability to transmit oxygenated blood to the brain, impairs the brain's ability to absorb oxygen from oxygenated blood, impairs the brain's ability to utilize oxygen, and to transmit carbon dioxide to the blood and transport it out of the brain tissues can result in hypoxic-ischemic injury to the brain. Diminishing levels of oxygen and increasing levels of carbon dioxide in brain tissue impairs the cerebral vascular autoregulation, which results in impaired vascular perfusion of the brain, which causes combined hypoxic-ischemic injury of the brain. This means that the brain does not have to suffer complete lack of oxygen or blood to suffer brain damage. There are multiple metabolic factors that can ameliorate or aggravate the risk of brain damage at varying levels of oxygen, glucose, and blood supply to the brain.

Compression of the trunk and body also causes neurological compression injury to vital nerves and plexuses in the trunk, head and neck, which decreases respiration and systemic blood pressure, which in turn decreases cerebral perfusion pressure, which accentuates the hypoxic-ischemic injury of the brain. When the motor, sympathetic and parasympathetic innervations and systems of the nerves in the trunk and neck, including but not limited to the vagus nerve, phrenic nerve, glossopharyngeal nerve, hypoglossal nerve, cervical sympathetic trunks and cervical parasympathetic ganglia, undergo sustained compression, there is a combined effect of bradycardia, systemic hypotension, cardiac arrest and respiratory arrest. The higher the scale of the compression, the more sustained the compression is and the longer the compression lasts the greater the risk of attaining irreversible neurological injury and the greater the risk of suffering permanent and irreversible end-organ consequences, like we have in the case of Muhammad.

For normal and optimal respiratory activity to occur the thoracic pressure remains at negative atmospheric pressure to support intricate homeostatic undulations of intrathoracic pressure that allow normal and effortless respiratory movements of the diaphragm, chest, and lungs. Compression of the trunk and body as we have in this case undermines this homeostatic balance and increases the risk of respiratory failure, asphyxial injury of the brain and sudden death.

Muhammad was placed prone on the hard floor of a building beginning at approximately 09:45 a.m. on January 4, 2017. At least three officers were on top of him, held him down and pressed him on the hard floor of a building. The officers placed their weights on his head, trunk, and extremities for at least 2 minutes. He yelled "Okay!". The officers placed handcuffs on Muhammad and stood him up from the ground beginning at approximately 09:47 a.m.

Less than ten minutes later, beginning at approximately 09:56 a.m. Muhammad was again placed prone on the hard ground of a sidewalk while officers were on top of him. At least six officers pressed him down on the ground and placed the weights of their bodies on Muhammad's head, trunk, and extremities. Muhammad yelled "I can't breathe" several times. Muhammad's gastro-esophageal sphincter collapsed in response to the high traumatic stressor levels and he vomited and became unresponsive. The officers observed that he was no longer responsive beginning at approximately 10:04 a.m. His body and trunk were mechanically compressed for about eight minutes before he vomited and became unresponsive. Microscopic examination of all the sections of the lungs shows diffuse and marked occlusion of the bronchial and bronchiolar airways by large amounts of aspirated gastric contents.



When Muhammad vomited in the prone position in response to the traumatic shock he was going into as a result of his asphyxial brain injury, his position and mechanical compression enabled and facilitated aspiration of his vomitus, which accentuated the mechanical-positional asphyxiation by initiating mechanical obstruction of his airways. The mechanical obstruction of his airways contributed and accentuated his spectrum of sustained mechanical-positional asphyxiation, and precipitated sudden and unexpected death.

The prevailing forensic scenario in this case confirms that Muhammad suffered two episodes of sustained compression of his trunk and body and mechanical obstruction of his airways within a short time. Muhammad suffered mechanical-positional asphyxiation for a cumulative period of approximately ten minutes [2 + 8 = 10].

The brain is about the only organ in the human body that exhibits the concept of cumulative injury, cumulative risk exposure to injury, or repetitive cumulative injury. Being a post-mitotic organ, if the brain suffers an injury, and within a relatively short time, suffers a repeat injury, the eventual outcome is an exponential and multiplicative combined effect of the two injuries, which increase the risk of sudden death. In traumatic brain injury, some refer to this concept as the second impact syndrome. This concept does not only apply to injuries suffered within a short time. For example, in football players who suffer Chronic Traumatic Encephalopathy [CTE] their risk of developing CTE is primarily based on their cumulative exposure to mild and seemingly innocuous sub-concussive and concussive blows to the head across time [years]. The risk of permanent and irreversible brain injury and death was exponentially increased when Muhammad suffered two episodes and two variants of asphyxiation within a relatively short time. Each episode and each variant possessed an independent and exclusive capacity and risk of causing permanent brain damage and death.

It is also pertinent to note that human beings who are suffering all forms of asphyxial injuries can perform phonation functions unless there is a direct early or preceding damage to the vocal cords and glottis. Some degrees of phonation may be expected, although impaired, but complete loss of phonation is not expected until there is paralysis of the glottis, directly or neurologically.

In the case of Muhammad, he suffered from Post-Traumatic Stress Disorder, Claustrophobia and Schizophrenia, minimal Coronary Artery Disease and Acute Amphetamine Intoxication in the morning of January 4, 2017. He was not in imminent death; he was not dying from any disease and was not expected to die. However, on January 4, 2017 a novel, independent and mutually exclusive, unnatural event occurred which comprised compression of his head, trunk, and extremities by multiple police officers while he laid prone on the hard ground for a cumulative period of 10 minutes. This high-scale traumatic stressor precipitated relaxation of his gastro-esophageal sphincter, which precipitated vomiting, which resulted in massive aspiration of gastric contents, which aggravated mechanical-positional asphyxiation by mechanical obstruction of the airways, which resulted in asphyxial brain injury and sudden death.

This novel chain of traumatic events successfully interrupted and breached any pre-existing chain of events and precipitated sudden death. The underlying cause of death therefore will be Mechanical-Positional Asphyxiation. The compression of his head, trunk, and extremities and his asphyxial brain injury were directly caused by another person or persons, therefore, the manner of death will be a homicide. There was a contiguous chain of events between the onset of compression of the trunk and body, and death.



In the differential diagnosis of the cause of death of Muhammad, there is no other forensic or medical evidence in this case that may suggest or indicate that Muhammad died from any other probable disease or cause of death outside Asphyxial Brain Injury due to Mechanical-Positional Asphyxiation.

If Muhammad did not encounter the police on January 4, 2017, he would not have died on January 4, 2017 and was not expected to die. The autopsy did not reveal any natural disease that was killing him. There is almost no adult who does not suffer from one form of ailment or the other. An absolutely normal human being is an anomaly. We all suffer from one ailment or the other including drug abuse, which is a disease. However, most of our ailments are treatable and manageable and do not expect to kill us at the young age of 43 years old.

## 2.    Did Muhammad experience conscious pain and suffering before his death?

It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries. The patterns of injuries generated by blunt force trauma and asphyxial trauma, and the mechanisms of sustenance of these patterns of injuries are very well-established in the medical literature and are common knowledge.

Based on the prevailing forensic scenario, and on the generally accepted principles and common knowledge of medicine and science, and based on the global constellation, configurations and anatomic conformations of the multimodal and multifaceted traumas sustained by Muhammad, Muhammad experienced conscious pain and suffering when he sustained multiple blunt force traumas and asphyxial injuries on January 4, 2017 prior to his death.

Conscious pain and suffering are initiated by widespread free nerve endings situated in the skin, soft tissues, and organs. Pain can be elicited by multiple types of stimuli classified into three broad categories: mechanical, thermal, and chemical pain stimuli. Nerve endings for pain sensations generate electrical action potentials following all forms of tissue damage caused by all types of energies including, but not limited to, kinetic and mechanical energy from blunt force impacts, chemical and kinetic energy from mechanical compression of the body and obstruction of the airways from asphyxiation.

Action potentials are the sub-cellular physiologic basis for noxious conscious sensations and originate from voltage gated sodium and potassium electrolyte membrane pumps in the cell membranes of nerve cells, fibers, and synapses. It takes few 10,000[th] of a second to generate action potentials. Action potentials are transmitted through nerve fibers to the brain. They are transmitted in peripheral nerves in the Aδ and C fibers for fast and slow pain respectively at impulse rates of 5-30 meters per second and 0.5-2 meters per second, respectively. There is therefore a double pain sensation, a fast-sharp pain, and a slow pain. The sharp pain apprises the person rapidly of imminent danger and prompts the person to react immediately and remove himself from the painful stimulus or imminent danger. The slow pain becomes greater as time passes resulting in continued intolerable pain and suffering prompting the person to continue to try to relieve the cause of the pain and flee from the imminent danger.



Muhammad Abdul Muhaymin, Deceased
Medico-Legal Report

Page 23 of 27

At autopsy Muhammad measured 67 inches [1.70 meters]. Muhammad felt all types of blunt force, asphyxial and chemical pain within milliseconds of contact with an impacting surface, compression of the body, aspiration of food and asphyxiation. One millisecond is one second divided into 1000 parts. For the slowest nervous mechanisms of pain sensation and consciousness, a man like Muhammad felt pain in less than 100 milliseconds.

Nerve pathways transmitting pain, terminate in the spinal cord. Secondary pathways transmit the pain from the spinal cord to the brainstem and thalamus, especially to the reticular activating system of the brainstem. From the thalamus tertiary pathways transmit pain to other basal ganglia, limbic cortex, and neocortex of the brain. Pain stimuli are transmitted to the reticular nuclei of the midbrain, pons, and medulla; to the tectal midbrain and the periaqueductal gray matter. These lower regions of the brain, i.e. brainstem, are vital for the appreciation of suffering from pain.

Animals with their brains sectioned above the midbrain, to block any impulse reaching the neocortex and cerebral hemispheres, still experience suffering from pain caused by all types of trauma. Complete removal of the somatosensory regions of the cerebral hemispheres does not preclude an animal's ability to perceive and experience pain. Pain impulses entering the brainstem and lower centers of the human brain can cause conscious perception of pain. Pain perception is principally a function of the lower centers of the brain; however, the upper centers and cerebral hemispheres are responsible for the interpretation of the quality of pain.

Blunt force, compression of the body and asphyxiation elicit both the fast and slow pain types. Fast pain is felt within milliseconds while slow pain is felt within about one second. Following mechanical and chemical tissue damages and asphyxial tissue injury, biochemical tissue reactants like bradykinin, serotonin, histamine, prostaglandins, leukotrienes, potassium ions, substance P, acetylcholine, acids and proteolytic enzymes are expressed to elicit sustained secondary chemical pain in addition to the primary fast pain directly caused by tissue damages. The chemical pain elicited by these chemical reactants is a slow type of suffering pain. The intensity of pain is closely correlated with the rate of tissue damage.

The brain is responsible for and sustains consciousness in human beings. The region of the brain responsible for consciousness is the brainstem. The center in the brainstem, which is responsible for consciousness, is the reticular activating system, which is deeply located in the central regions of the brainstem. As long as the reticular activating system remains anatomically and electrochemically intact, an individual like Muhammad will remain conscious and will feel pain and experience suffering. The sensation of pain induces conscious suffering since pain is a noxious sensation, which stimulates the neocortex, limbic cortex, and forebrain to cause mental pain, suffering and anguish, and adrenergic fright and fear. All these neural processes occur in 1000th's of a second [milliseconds]. The human nervous system is one of the most efficient, effective, and optimal operating systems ever known to mankind. After centuries of empirical research mankind has not been able to fully decipher and reproduce the operating systems of the human brain and nervous system.

Muhammad's injury sustenance began when he was encountered by the police, held, pushed, tackled and forced to the ground, impacted by blunt force, held on the ground, with weight placed over him, vomited and aspirated his vomitus, which mechanically occluded his airways. At this time, Muhammad was fully conscious and aware of his surroundings. His reticular



activating center was completely intact and functional. As a 43-year-old male he had the mental capacity to identify the imminent danger and threat of injury and death.

The autopsy described at least 36 distinct blunt force injuries of Muhammad's head, face, trunk, and extremities. Every blunt force impact his body suffered, every kinetic and mechanical energy transferred to his body by the compression of his head, trunk and extremities, and every biochemical tissue response he endured from the asphyxial injury, caused biochemical, anatomic and pathophysiological tissue disruptions, damages and injuries generated action potentials within 10,000th of a second, which were transmitted to the spinal cord and to the brain to precipitate cumulative conscious somatic and mental pain, suffering and anguish. The multimodal nature of the noxious stimuli resulted in synergistic and cumulative conscious experience of very high levels of combined somatic and mental pain, suffering and anguish. The primary injuries initiated secondary tissue injuries, systemic and tissue reactive responses, which elicited novel chemical pain and accentuated the conscious somatic and mental pain, suffering and anguish.

The brainstem nuclei, the frontal cortex, pre-frontal cortex, basal forebrain and limbic cortex of Muhammad's brain initiated, within milliseconds, the primitive human reflexes of fear, fright, and flight. This mental awareness of imminent danger initiated the nor-adrenergic and adrenergic biochemical neural responses of fear, fright, and flight, when the locus ceruleus of the brainstem released large amounts of nor-adrenalin to the cerebral hemispheres. This fear, fright and flight response caused high levels of chemical mental pain, suffering and anguish, which prompted him to try to flee, struggle, yell, and scream, making noises of intense fright and mental anguish. His heart started pumping faster [chronotropic effect] and stronger [ionotrophic effect] due to the nor-adrenergic/adrenergic response. His respiratory rate and general muscle tonicity increased as well due to the nor-adrenergic/adrenergic response. His brain-cells' demands for oxygen increased causing intense cerebral vasodilation and vascular headache. All these patho-physiologic processes culminated in high levels of conscious somatic and mental pain, suffering and anguish.

As Muhammad was in this state of high-scale conscious somatic and mental pain, suffering and anguish, he received even more trauma when he vomited and aspirated his vomitus, which resulted in mechanical obstruction of his airways and aggravated the pre-existing mechanical asphyxiation and accompanying conscious somatic and mental pain and suffering. Additional millions of pain action potentials were generated and transmitted to the spinal cord and brain to cause even higher levels of conscious somatic and mental pain, suffering and anguish, which synergized with the existing somatic and mental pain, suffering and anguish, and even caused increasingly higher levels of conscious pain and suffering. Such high levels of conscious somatic and mental pain, suffering and anguish can impair the functioning of the limbic system and autonomic system of the brain and nervous system to cause an acute confusional and/or delirious state, which may have been exhibited by Muhammad.

As his blood oxygen levels decreased and the carbon dioxide levels increased, while he was on the ground, with his body compressed and pressed to the ground, he began to develop acidosis, became more confused, and afraid, and struggled more. His primary and secondary injuries progressed, more nerve endings in his body, soft tissues and viscerae were recruited, many more action potentials were elicited and caused increasingly higher levels of somatic pain and suffering, still accompanied by extremely high levels of mental pain, suffering and anguish. He gradually and slowly developed hypoxic-ischemic brain injury, which elicited more action



potentials from every brain tissue injury and damage, which resulted in more conscious somatic and mental pain, suffering and anguish as his sensorium diminished progressively.

As Muhammad's brain suffered hypoxic-ischemic injury many types of ions, peptides, proteins, and enzymes were expressed and activated, which enhanced his chemical pain, which synergized with his pre-existing pain to cause progressive somatic and mental pain, suffering and anguish. Following the attainment of irreversible brain damage, he began to lose consciousness progressively passing through the varying broad stages and spectrum of consciousness from fully conscious to varying degrees of diminishing sensorium to loss of consciousness and coma. Consciousness is a continuum with varying levels of consciousness and depths of unconsciousness, which Muhammad passed through before he went into traumatic coma and death.

The autopsy report confirms that Muhammad's brain and brainstem remained anatomically intact without any discernible physical brain damage. These evidentiary autopsy findings confirm that his midbrain, pons, and medulla oblongata remained anatomically intact following all his traumas until his death. The subcortical ganglia and brainstem nuclei of the cranial nerves remained intact. His rostral spinal and cranial reflexes and functioning remained anatomically intact. The reticular activating system remained anatomically intact. He continued to experience increasingly higher and extreme levels of somatic and mental pain, suffering and anguish induced by all his multimodal injuries until he attained irreversible brain injury and lost electrophysiological functioning of the brain cells, became unconscious and died.

It is pertinent to note that the autopsy did not describe any primary anatomic injury of the midbrain, pons, medulla oblongata, cerebral or cerebellar hemispheres. Injuries to these regions of the brain manifest as follows: primary lacerations, primary contusional hemorrhages and necrosis, primary gliding contusional hemorrhages and necrosis, primary concussional hemorrhages, primary diffuse traumatic axonal injury hemorrhages and necrosis. None of these distinctive evidence of primary anatomic trauma to the vital regions of the brainstem were present at autopsy. There was no evidence of instantaneous loss of consciousness at autopsy. There were no Adam's grade III concussional or contusional hemorrhages and necrosis, and no hemorrhages or necrosis of the dorsolateral and tegmental midbrain, pons, and medulla. Loss of consciousness was therefore sustained and progressed over time. After he lost consciousness Muhammad stopped experiencing conscious pain and suffering.

Loss of consciousness and death in this instance could not have been instantaneous since the human brain has an intrinsic ability to survive for a mean of about three to five minutes before suffering irreversible brain damage and brain death from any cause. The brain also has a metabolic reserve of about 5-10 seconds after suffering complete lack of oxygen and glucose before loss of consciousness ensues. Microscopic examination of the H/E stained sections of the brain and lungs confirm that Muhammad had enough time after he began suffering asphyxial injury for his tissues to develop patho-physiological responses to his injuries before he died.

Although death is frequently immediate, it is rarely instantaneous since death is a process that involves a cascade of patho-physiologic events. The adjective "immediate", within a forensic context, and within the prevailing forensic scenario, in this case, should be interpreted as death occurring as a result of mechanical-positional asphyxiation without the intervention of another object, cause, or factor. It should not be forensically construed as instantaneous.



Muhammad experienced conscious pain and suffering for a total composite median duration[13] of less than 15 minutes before he became unconscious on January 4, 2017 and died.

### 3.    Did Methamphetamine prevent or preclude Muhammad from experiencing conscious pain and suffering?

No, Methamphetamine did not prevent or preclude Muhammad from experiencing conscious pain and suffering. The presence of Methamphetamine or Amphetamine at the time he sustained his fatal trauma, is of no significant forensic consequence in the differential diagnosis of his conscious pain and suffering.

Amphetamine is a metabolite of Methamphetamine. Methamphetamine or Amphetamine does not stimulate or inhibit naked nerve endings, which are the receptors that generate action potentials for pain sensation. Methamphetamine does not affect the conduction of action potentials in the central nervous system, to and from the spinal medulla and brain and does not modulate the experience of consciousness pain in any clinically useful manner. Methamphetamine or Amphetamine does not have analgesic properties and is not used as an analgesic drug to reduce or control pain.

The receptors for pain are the free nerve endings. So, the receptors for the mechanisms of generation and sensation of pain and suffering are different from the receptors and cellular sites for the mechanisms of action of Methamphetamine or Amphetamine. The generation and sensation of pain and suffering are complex mechanisms, which involve many different ions, peptides, and enzymes, including but not limited to bradykinin, histamine, potassium ions, acids, serotonin, acetylcholine, proteolytic enzymes, prostaglandins, and substance P.

I have provided all my opinions and conclusions with a reasonable degree of medical certainty.

I reserve the right to amend, supplement, revise and/or modify my opinions and report, up and to the time of trial, should additional information become available.

Thank you.

Very truly yours,

---

[13] Medicine is not an absolute science and these estimated ranges should not be interpreted as absolute quantitative estimations of time. Quantitative ranges of any measurable index are common practice and are the standard of practice in pathology and medicine.



Bennet Omalu
PATHOLOGY

Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Clinical Pathologist, Anatomic Pathologist, Forensic Pathologist, Neuropathologist, Epidemiologist
President and Medical Director, Bennet Omalu Pathology
Clinical Professor of Medical Pathology and Laboratory Medicine, University of California, Davis



# EXHIBIT 2

DEPOSITION OF BENNET OMALU
October 26, 2020

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3                            --o0o--

4

5    Mussalina Muhaymin as Personal
     Representative of the Estate of
6    Muhammad Abdul Muhaymin Jr.,

7                         Plaintiff,

8         vs.                        No. 17-cv-04565-PHX-SMB

9    City of Phoenix, an Arizona            VOLUME I
     Municipal Corporation; Antonio
10   Tarango; Officer Oswald Grenier;
     Officer Kevin McGowan; Officer
11   Jason Hobe; Officer Ronaldo
     Canilao; Officer David Head;
12   Officer Susan Heimbinger;
     Officer James Clark; Officer
13   Dennis Lerous; Officer Ryan
     Nielson; Officer Steven Wong;
14   and Doe Supervisors 1-5,

15                        Defendants.
     _____/
16

17       VIDEO RECORDED DEPOSITION OF BENNET OMALU, MD

18                 Monday, October 26, 2020

19                        10:17 AM

20

21                 Taken in the offices of:

22            California Deposition Reporters
              2453 Grand Canal Boulevard, Suite J
23                 Stockton, California 95207

24

25   REPORTED BY:  VICTORIA R. MARTIN, CSR 12322



DEPOSITION OF BENNET OMALU
October 26, 2020

```
 1    your professorship with UC Davis?

 2         A.   Yes, please.

 3         Q.   What kind of courses do you teach with UC Davis?

 4         A.   I don't -- well, mostly workshops.  Case

 5    sign-outs with medical students.  Every now and then I

 6    give a didactic.  Medical students, residents, pathology,

 7    neurology, neurosurgery, nursing students, physical

 8    rehabilitation students, and then fellows.  And sometimes

 9    other doctors who want some experience in forensic

10    pathology and neuropathology.

11         Q.   So the focus of these workshops or classes are

12    mainly on pathology or neuropathology?

13         A.   Sometimes medical management.

14         Q.   Medical management of a live patient?

15         A.   Yeah, yeah.  Medical of a live patient, and also

16    medical management of the business of medicine.

17         Q.   I see.  And that's more recordkeeping and stuff

18    like that?

19         A.   No, no, no.  Management of patient care and

20    quality control and quality assurance.

21         Q.   Okay.  But in these -- since 1994, do you treat

22    living patients?

23         A.   Oh, so I started in '94 since I came to the

24    United States -- not on a formal basis, no.  Am I involved

25    with the treatment of live patients?  Yes.  Like I had
```

DEPOSITION OF BENNET OMALU
October 26, 2020

1    said earlier, patients with brain tumors, I'm involved in

2    the development of their treatments.

3        Q.    And that is in the context of examining their

4    tissues or determining their --

5        A.    Examining their tissues, making diagnosis, and

6    determining the line of treatment.

7        Q.    But not speaking directly with a patient?

8        A.    No, no.  Then another type of patient contact I

9    have is in people who have suffered trauma and survived a

10   trauma.  So I come in to do risk management analysis.  I

11   meet with the patients.  I talk with them to evaluate how

12   much damage, permanent damage they have, and to develop

13   prognosis.  Such cases I do many times in litigation

14   cases, many times patients who have had brain trauma.  So

15   I do that direct patient.  I talk to them.  I ask them

16   questions.  I monitor them, observe them.  So I do that as

17   well.

18       Q.    So you evaluate the extent of any trauma that

19   they may have experienced?

20       A.    Yes.  Also to confirm what is in the medical

21   records.

22       Q.    Okay.  So you review their medical records?

23       A.    Yes.

24       Q.    And from that meeting, from the review of the

25   medical records, you develop is it a medical plan or a

DEPOSITION OF BENNET OMALU
October 26, 2020

```
1    AM, and we're back on the record.
2         MS. STILLWELL:  Q.  Now, Dr. Omalu, we had taken
3    a break because you had some slides that had to be
4    returned; is that correct?
5         A.  Yes, please.
6         Q.  And you mentioned that those are slides with
7    regard to a live patient; correct?
8         A.  Yes, please.
9         Q.  But that is in the context that you had talked
10   about before where you review the slides.  Is that someone
11   who has suffered trauma?
12        A.  No.  They had a spinal tumor.
13        Q.  Okay.  So that's one of the ones where you look
14   at the slides and the specimen and then --
15        A.  Look at the specimen.
16        Q.  But you are not actually treating that live
17   patient?
18        A.  Not directly, no.
19        Q.  Are you familiar with Arizona POST?
20        A.  What?
21        Q.  Police Officer Standard and Training.  Are you
22   familiar with that at all?
23        A.  No.  I'm aware of it.  Like in California, they
24   have something similar to, yes.
25        Q.  Have you ever attended any training of any kind
```

DEPOSITION OF BENNET OMALU
October 26, 2020

```
1        Q.   And so when you are saying "templates," some of
2   it is, you know, your analysis of medical stuff --
3        A.   No.
4        Q.   -- or -- let me just finish the question.  Or,
5   for instance, with your conscious pain and suffering,
6   there's an opinion in there that you've used in prior
7   reports.  So is it that background that you are using?
8        A.   No, no.  So the templates are scientific facts
9   that I know that I've typed up that do not change.  For
10  example, that the brain begins to suffer injury after 60
11  seconds of asphyxia or that a human brain has a reserve of
12  5 to 10 seconds.  These are scientific facts that do not
13  change.
14          So I have paragraphs of such -- or a paragraph
15  that explains how the brain is postmitotic organ.  So such
16  scientific facts that do not change, depending on the type
17  of case, I'll try and remember, okay, what do I need?
18  I'll go to that, I'll take that, and I'll paste it.
19          But when it comes to the analysis of the -- of
20  the unique information of the case, that is totally
21  generated from scratch.
22       Q.   Okay.  In connection with your work in this case,
23  in Muhaymin v. City of Phoenix, did you specifically
24  review any medical treatise or publications to gain your
25  scientific facts that you relied upon in your opinions?
```

DEPOSITION OF BENNET OMALU
October 26, 2020

1      A.   No.   You know, the scientific question at play in

2   this case is a very elementary concept of science or of

3   neuroscience.

4      Q.   Okay.

5      A.   Like you politely pointed out earlier, I've been

6   doing this now for almost 20 years, which is a surprise to

7   me because I just feel like I'm 20.  Okay.  So over the

8   years I've read hundreds, if not thousands, of published

9   articles or books.  Okay.  Like in my office, I have a

10  whole wall lined of books, and my 13-year-old daughter

11  will ask me once, "Daddy, have you read every book?"

12          I said, "Yes."

13          "Oh, my gosh, Daddy.  You are not smart.  Because

14  if you were smart, you don't need to read all these

15  books."  Okay.

16          So over the years I've had an accumulated college

17  of information and education.  So when I get a case like

18  this with the very basic elementary topic, I pretty much

19  regurgitate what I have learned based on my education,

20  training, and experience.

21          Now, because I know this is a legal case and some

22  attorney may ask me sometimes to provide any published

23  article.  If you notice in my report, I provided some of

24  those references for specific, almost absolute statements

25  with specific values of indices, I-N-D-I-C-E-S, of values.



DEPOSITION OF BENNET OMALU
October 26, 2020

1   thousands of years it doesn't change.  That asphyxial

2   injury can occur without occlusion of the airways is a

3   very basic elementary fact we learn in the first year of

4   medical school.  That has not changed in the past 1,000

5   years.

6           So the topic in this case is very elementary,

7   very fundamental.  And in many of my reports I don't even

8   provide any citations.  I don't.  Why I provided citations

9   in this case?  Because I've not done a case from Arizona,

10  so I just thought you know what?  I don't know how lawyers

11  in Arizona behave.  Let me just add citations so they

12  leave me alone.

13      Q.   Now, Dr. Omalu, in this instance you didn't

14  obviously perform an autopsy of Mr. Muhaymin.  You were

15  retained three years after the incident; is that right?

16      A.   That is not right.  I did not perform the

17  prosection, but I performed a microscopic autopsy.  When I

18  examined the tissues that were sent to me, I examined them

19  on a microscope.  Those were not performed before.

20          So when you use the word "autopsy," it is

21  all-encompassing.  But when you use the word "prosection,"

22  yes, I understand what you mean.  I did not cut open the

23  body, yes.

24      Q.   Now, have you performed any surgery on a living

25  patient in the United States?



DEPOSITION OF BENNET OMALU
October 26, 2020

1      A.    No.

2      Q.    Did you perform surgeries when you were in

3 Nigeria then?

4      A.    Yes.  I did cesarean sections.  I did

5 appendectomies.  I did emergency surgeries like, you know,

6 stab wounds.  And then basic gallbladder surgery.  If

7 there's no surgeon around, rather than watching the

8 patient die, I'll go and take it out.

9      Q.    Okay.  So the last one would have been in 1994

10 then?

11     A.    Yeah.  The last surgery I did was in 1994.

12     Q.    When working with lawyers in cases like this, is

13 it common for you in performing your analysis to obtain

14 the patient's medical records?

15     A.    Is it common?

16     Q.    Uh-huh.

17     A.    No.

18     Q.    Why not?

19     A.    If an autopsy is performed -- because in the

20 gradation of medical evidence, the autopsy is the gold

21 standard.  Every other evidence is inferior in validity to

22 the autopsy.

23          So in a case of sudden and unexpected death, the

24 death is sudden because the medical records did not expect

25 the individual to die.  The death is unexpected because

DEPOSITION OF BENNET OMALU
October 26, 2020

```
 1    on opinions on the medical findings -- on the autopsy
 2    findings with or without the medical records.  Because
 3    like when I perform autopsies for hospitals, in all the
 4    cases the medical records state that the individual died
 5    from something else.  But when I do the autopsy, the
 6    autopsy is inconsistent with the medical records.
 7        Q.   So what about the prior medical records that
 8    would show the life of the decedent?
 9        A.   Because death was sudden and unexpected, the life
10    of the decedent is immaterial.
11        Q.   But if a person is a chronic drug user or refused
12    medical treatment for a heart condition or what have you,
13    wouldn't that be relevant to determining the cause of
14    death?
15        A.   It is irrelevant because not determining the
16    cause of death.  Determining the autopsy findings.  It is
17    irrelevant.  Why?  Because whether the individual was a
18    chronic drug user or not, it doesn't matter.  If the
19    autopsy shows -- like the case I did on -- I signed out on
20    Sunday, the woman, according to the medical records, had
21    end-stage cirrhosis of the liver.  I did the autopsy.  I
22    did not see end-stage cirrhosis of the liver, but I saw
23    very high levels of fentanyl.
24            So the medical records, no matter what they say,
25    is immaterial.  The objective of the medical record is to
```



DEPOSITION OF BENNET OMALU
October 26, 2020

1    treat and manage a living patient.  When that patient
2    dies, that is the end of the role of the medical records.
3           Now, if death wasn't sudden or unexpected and an
4    autopsy is not performed, okay, an autopsy is not
5    performed, it is not a coroner's case.  A medical
6    examiner's case.  Then you go to the medical records,
7    document that the cascade of death.
8           And again, that is why legally in the State of
9    California -- I don't know about other states, but I
10   believe is the same for every state in the United
11   States -- if death is sudden and unexpected, it must fall
12   on that jurisdiction of the coroner to be investigated.
13   And it does not state that, no, you have to rely on the
14   medical records.
15          It's like a man -- a case -- I'll use real-life
16   cases.  A multimillionaire in Oakland was living with his
17   girlfriend.  The girlfriend said he woke up.  He wasn't
18   feeling well.  He had heart disease.  And he died.  Okay.
19   I came and I did the autopsy.  His ethylene glycol level
20   was markedly elevated.  This is a real-life case now.  I
21   could give you the case number.
22          So because his death was sudden and unexpected --
23   even his doctor at Stanford Hospital said, "No, I was not
24   expecting him to die."  He had no reason to die and to die
25   in his sleep, no.  So because his death was sudden and



1   unexpected, his medical records was of no significant

2   forensic consequence.

3        So I did the autopsy and I confirmed that he had

4   no reason to die.  Toxicology came back ethylene glycol.

5   So no matter what the medical records say, it doesn't

6   matter.  It is of no significant forensic consequence --

7   listen to how I'll qualify this.  If death is sudden and

8   unexpected and of unnatural mechanisms, medical records

9   are of no significant forensic consequence.

10       Q.   So along those same lines, if medical records

11  are, as you say, of no forensic significance, criminal

12  records --

13       A.   I didn't say, "of no forensic significance." I

14  said, "of no significant forensic consequence."

15       Q.   So along those same lines, you would feel also

16  that any documentation or records regarding the decedent's

17  life would also be along the same lines.  For instance, if

18  records demonstrated that a decedent had a violent and

19  combative history or a decedent had a history of resisting

20  police officers, you are saying none of that would have a

21  significant forensic value?

22            MR. CHAMI:  Object to form.

23            THE WITNESS:  No.  That wasn't what I said.  So,

24  as part of the autopsy -- remember I told you when you use

25  the word "autopsy," it's all-encompassing, but carving of



DEPOSITION OF BENNET OMALU
October 26, 2020

1   can review family statements, but you wouldn't review

2   medical records?

3       A.   What I said was the medical records are not of

4   significant forensic consequence, meaning with or without

5   medical records, you rely on the autopsy findings.

6           And, in fact, I said in the majority of the over

7   600 autopsies I perform every year, I review medical

8   records -- and they are available because they are not

9   always available -- in only about 20 percent of cases.

10  And there has not been any autopsy I've performed whereby

11  I made a diagnosis based on medical records.  If you do

12  that, it's only a matter of time you'll be sued and maybe

13  you lose your license.

14      Q.   But you certainly review those medical records?

15      A.   Not certainly.  Not certainly.

16      Q.   If they are available.

17      A.   If they are available and if they are of any

18  significant forensic consequence.  Let me give you a good

19  example.  A good example usually applies to natural

20  diseases.  Okay.

21          Somebody has a seizure disorder and dies in his

22  or her sleep.  Okay.  Now I need to establish was this

23  individual born with seizure disorder or did this

24  individual suffer a motor vehicle accident at the age of

25  five and the seizure disorder began after the accident.



DEPOSITION OF BENNET OMALU
October 26, 2020

```
 1    transcripts and recorded interviews, complaints and other
 2    miscellaneous legal documents, incident report from
 3    Phoenix Police, and trip sheet from the Phoenix Fire.
 4             Is that all the materials you listed, sir?
 5        A.   Yes, sir.  Yes, ma'am.  Sorry.
 6        Q.   What I don't see described though is the prior
 7    medical records or counseling records.  Were you ever
 8    provided the records from Terros?
 9        A.   From what?
10        Q.   Terros.
11        A.   No, no.  So when I -- when I began this case --
12    like I told you, my duty as a forensic pathologist is to
13    establish the prevailing forensic scenario.  Okay.  So in
14    reviewing all the records, the coroner investigation
15    reports, the police reports, all the materials in the case
16    file, I discovered that he suffered from PTSD.  He
17    suffered from claustrophobia.  He suffered from
18    schizophrenia, and he suffered from asthma.
19        Q.   Okay.  Let's break this down.  Because I'm really
20    trying to figure out what you actually reviewed in this
21    case based on this vague description.
22             So autopsy and medical examiner reports.  We know
23    that there was a medical examiner report by Dr. Maskovyak;
24    correct?
25        A.   Yes, please.
```



DEPOSITION OF BENNET OMALU
October 26, 2020

1   establish a timeline.

2       Q.   But what you do not reflect in here also is that

3   you have the Abrazo, the medical records from Abrazo where

4   he was declared deceased.

5       A.   Where he went to the hospital?

6       Q.   Yes, sir.  Do you recall reviewing those records?

7       A.   I believe so.  I don't know.  I don't know if I

8   reviewed them or not.  He was -- he didn't receive any

9   medical treatment at the hospital.  He pretty much was

10  dead on arrival.

11      Q.   Well, the medical records obviously had -- had

12  you had them and had you reviewed them, would show you

13  what kind of medical treatment, what kind of resuscitative

14  efforts they would have made, and the time of death;

15  correct?

16      A.   No.

17      Q.   Why not?

18      A.   Because an autopsy was performed.  Say, don't

19  confuse me.  I'm not a clinician.  So the questions you'll

20  be asking me are not the questions you'll ask a clinician.

21  A clinician like a neurologist, a psychiatrist.

22           I'm a forensic pathologist that determines why

23  people die.  I come in after death.  As a forensic

24  pathologist, I don't make diagnosis based on medical

25  records.  The medical record is as important to me as a



DEPOSITION OF BENNET OMALU
October 26, 2020

1      A.   Yes.

2      Q.   Because she had reviewed those records.

3      A.   I don't think so.

4      Q.   Where did she get the information, if you know,

5   sir?

6      A.   In so many ways.  Like I have said, the issue

7   here is not about medical records.  The issue is about the

8   prevailing forensic scenario.  So about forensic

9   pathologists, you establish the prevailing medical

10   scenario through different methods.

11           So in her synopsis, she stated that the police

12   interviewed the family members and documented a history of

13   schizophrenia, bipolar disorder, and I believe asthma.

14      Q.   And, Mr. Omalu -- I'm sorry.  Dr. Omalu, you did

15   not review those records prior to preparing your June 22nd

16   report; correct?

17      A.   Which records?

18      Q.   The Terros records.  Sorry.

19      A.   No.  It was not like -- let me state this.  I

20   said it before.  I'm beginning to lose my patience.  We

21   are going into a cycle here.

22           There was a sudden and unexpected death in this

23   case from unnatural causes.  An autopsy was performed.

24   Autopsy findings were generated.  A determination of cause

25   of death was made.  The medical records in a case like



DEPOSITION OF BENNET OMALU
October 26, 2020

1    this is of no significant forensic consequence, period.

2        Q.    And, Dr. Omalu, I'm trying to narrow down what

3    you had reviewed prior to the preparation of your June

4    2020 report.  Now, earlier we talked about who had

5    contacted you, whether it was Mr. Chami or Mr. Faraj, and

6    you couldn't recall which one.  Had you worked with either

7    of them before this case?

8        A.    To the best of my recollection, no.

9        Q.    Do you know how they came into contact with you?

10       A.    I don't know.

11       Q.    Did somebody refer them to you?  Do you know?

12             MR. CHAMI:  Object to foundation.

13             THE WITNESS:  I don't know.

14             MS. STILLWELL:  Q.  Do you advertise your

15    services, sir?

16       A.    No.  In the State of California I'm not allowed

17    to advertise services, no.

18       Q.    And you don't advertise your services in other

19    states?

20       A.    No.

21       Q.    Now, earlier you said Mr. Hobson got it wrong in

22    his article that you make way more than the 900,000 per

23    year from your business.

24       A.    Not me.  I'm an employee of the corporation.  The

25    corporation makes more than $900,000 a year.  The speeches



DEPOSITION OF BENNET OMALU
October 26, 2020

1  my role as the causation of death expert.

2      Q.   Now, sir, in the bodycam videos that you did

3  review, did you do a breakdown?  So did you calculate how

4  long each officer was in what position?

5      A.   Because my duty wasn't with the officers, my

6  duty -- or my role here was that of causation of death of

7  Mr. Muhammad, so I think I did an analysis of the total

8  cumulated period he was -- he suffered mechanical

9  asphyxia.

10      Q.   So you took -- was it -- we understand now that

11  there are two incidents -- right? -- where Mr. Muhaymin

12  was on the ground?

13      A.   Yes, please.

14      Q.   Did you take the time periods from one of those

15  incidents or did you combine the time periods of both of

16  those incidents together?

17      A.   On page 21 of the report, second paragraph,

18  second paragraph, I did -- I split them into two episodes

19  and then added them.  So the first episode I estimated a

20  duration of 2 minutes and the second episode an

21  approximate duration of 8 minutes, giving a total of 10.

22      Q.   So you totaled those two episodes together for 10

23  minutes without breaking down in what position any officer

24  was in or how long that position was held?

25      A.   No.  Because it is immaterial -- again, this is

DEPOSITION OF BENNET OMALU
October 26, 2020

1   the all -- what is it called?  Each and every exposure
2   model which doesn't apply themselves cumulative exposure.
3   So asphyxial injury, you can't break it down to each and
4   every exposure, meaning how much each officer contributed,
5   no.  So -- because we cannot do that for brain injury.  In
6   brain injury you consider the cumulative and total
7   exposure.  So how much each officer did is immaterial.
8       Q.   So you understand, Dr. Omalu, that plaintiff's
9   experts -- or I'm sorry -- plaintiff's counsel has hired
10  additional experts in addition to you; correct?
11      A.   I believe so.
12      Q.   Do you know who those experts are?
13      A.   No.
14      Q.   Scott DeFoe.  Are you familiar with him?
15      A.   Who?
16      Q.   Scott DeFoe.  He is a police practices expert.
17      A.   No.
18      Q.   Have you both been an expert on a case before for
19  the plaintiff?
20      A.   I wouldn't know.
21      Q.   What about Dr. Taki (phonetic)?  He is an
22  emergency room physician in Michigan.
23      A.   I don't know him.
24      Q.   Did you ever speak with Dr. Taki?
25      A.   No.



DEPOSITION OF BENNET OMALU
October 26, 2020

1        A.   No.  It's a general -- it's general common

2    knowledge.  You can find it in different textbooks like

3    Guyton's Textbook of Physiology.  You could find it in the

4    basic textbook of Gray's Anatomy.  You could find it in

5    any basic textbook of forensic pathology, including Spitz

6    and Fisher.  Spitz and Fisher, S-P-I-T-Z, Fisher,

7    F-I-S-H-E-R.  DiMaio DiMaio, D-I-M-A-I-O.  Then

8    Neuropathology, a reference textbook, and then

9    Greenfield's Neuropathology.  It's a very fundamental,

10   basic definition.

11            And it's in my report I believe -- I will find

12   it, the page where I described it.

13       Q.   Had you ever written --

14       A.   On page 19.

15       Q.   Do you have the reference then?

16       A.   Page 19, beginning from the last paragraph

17   extending into page 20, I defined asphyxia.

18       Q.   And this definition of asphyxia is from your

19   experience --

20       A.   Yes.

21       Q.   -- and knowledge; correct?

22       A.   Yes.

23       Q.   It doesn't provide any specific reference to any

24   particular text then?

25       A.   No.



DEPOSITION OF BENNET OMALU
October 26, 2020

1      Q.    Now, have you personally written any textbook on

2   asphyxiation or on forensic pathology?

3      A.    I've written book chapters.  Not asphyxia as the

4   primary subject, no.

5      Q.    Do you recall what those chapters were?

6      A.    I said I've not written with asphyxia as the

7   primary topic, no.

8      Q.    What about on forensic pathology?

9      A.    Books?

10      Q.    Yes, sir.

11      A.    I don't think so.  Most books I published have

12   been on neuropathology.

13      Q.    That was going to be my next question.

14      A.    Not on forensic pathology generally, no.

15      Q.    What textbooks have you written on

16   neuropathology?

17      A.    Book chapters.  Book chapters.

18      Q.    Do you recall the names of those books?

19      A.    It's all in my CV.  I haven't memorized

20   obviously.

21      Q.    We'll do that on the next break again.

22      A.    And the books I published, I've published What

23   every parent needs to know about traumatic brain injury in

24   sports.  What else?  I published Football Dementia,

25   Depression and Death.  And then I've published A

DEPOSITION OF BENNET OMALU
October 26, 2020

1        Q.    But you can't give me a specific location as to a

2   particular fact and where you learned it from?

3        A.    No.  If I had done this case like two weeks ago

4   or even a month ago, I would have been able to do an

5   exact.  But I did this -- I did this report six months

6   ago.  I cannot.

7        Q.    Okay.  And you did this report in June; right?

8        A.    Yes.  Yes.  When I did the report, I sent it to

9   the attorneys.  I said, "Please check my summary on the

10  report to see if there are any factual inconsistencies."

11  Because the case is bigger than me.  There's other things

12  I understand incorrectly.

13            So the attorneys reviewed it and said, "Yes,

14  Bennet, your facts are correct."

15       Q.    And so here we are four months later and one of

16  the things you conclude is that Mr. Muhaymin, quote,

17  "Always carries a service dog."  So that information you

18  would have obtained somewhere else that was verified by

19  plaintiff's counsel; correct?

20       A.    Yes, yes.

21       Q.    You don't know how long Mr. Muhaymin had that

22  dog?

23       A.    No, I wouldn't know.

24       Q.    You don't know that he had just been released

25  from prison months prior to the incident?

DEPOSITION OF BENNET OMALU
October 26, 2020

```
 1              MR. CHAMI:  Object.  Assumes facts not in
 2    evidence.
 3              THE WITNESS:  I don't know.  But -- but -- but if
 4    you may allow me, such information, whether he came out of
 5    a jail or not, are immaterial to the determination of
 6    cause of death.
 7              MS. STILLWELL:  Q.  And again, we're just trying
 8    to determine what information you had, for instance,
 9    whether the dog was even registered with the county.
10         A.   I wouldn't know that.
11         Q.   Or whether the dog had had any training or had a
12    propensity for aggression.
13         A.   I wouldn't know that.
14         Q.   And in the next paragraph you conclude that Mr.
15    Tarango called for the police.
16         A.   Sorry?
17         Q.   That Mr. Tarango -- it's in the second paragraph
18    in your summary.  That Mr. Tarango had called for the
19    police on January 4th, 2017.  Now, we already talked about
20    how you don't have the CAD report or the 911 call.
21              MR. CHAMI:  Let her finish the question.
22              MS. STILLWELL:  Q.  And I understand what you are
23    about to say.
24         A.   No.  I thought you were done.  Sorry.
25         Q.   No.  I'm not done.  But Mr. Tarango had not made
```

DEPOSITION OF BENNET OMALU
October 26, 2020

1   exhibiting any violent behavior.  Now, this is just what I

2   saw on video.  I'm not opining on the standards of

3   policing.  That is above my pay grade.

4       Q.   So, Dr. Omalu, in your opinion you add the 2

5   minutes in the first instance, plus the 8 minutes to

6   render 10 minutes; correct?

7       A.   Yes, yes.

8       Q.   Do you opine, sir, that he was in a prone

9   position that full 10 minutes?

10      A.   No.  I didn't opine that.  He was -- if you read

11  my report, I said you cannot break apart the terminal

12  events.  So the cumulative exposure period -- and again,

13  please, when I say "10 minutes," don't use it as an

14  absolute.  It's an estimate.  Using scientific methods,

15  you use plus or minus 2 standard deviation, meaning it

16  could be more or less.  Don't mean it's absolute values.

17          So the cumulative exposure to the terminal injury

18  is the time and the year.  You don't use each and every

19  exposure.  Just like in asbestos, you can't say one single

20  fiber causes asbestos.  You say over 30 years his

21  cumulative exposure to asbestos.

22          Same applies to traumatic brain injury because

23  asphyxial brain injury is traumatic brain injury.  So his

24  cumulative exposure beginning from the moment they had him

25  on the ground to the moment he died, including the massive



DEPOSITION OF BENNET OMALU
October 26, 2020

```
1    amounts of vomiting, which he aspirated.  That was also
2    asphyxia.
3           Because when I examined his lung sections, the
4    specific type of airways we call bronchioles were
5    completely occluded.  And so you don't break it up to each
6    and every exposure because even the vomiting is
7    asphyxiation.  And he vomited and it went down into his
8    lungs which also could have caused an acute pulmonary
9    hypertension that will increase his likelihood of death.
10          MS. STILLWELL:  We're going to take a quick
11   break.
12          MR. CHAMI:  That's fine.
13          THE VIDEOGRAPHER:  Counsel, time is now 3:01 PM.
14   We are now off the record.
15                 (Off the record.)
16          THE VIDEOGRAPHER:  Counsel, time is 3:04 PM.  We
17   are back on the record.
18          MS. STILLWELL:  Thank you.  We took a quick
19   break.  I appreciate it.
20      Q.   Now, Dr. Omalu, we talked briefly about the fact
21   that Mr. Muhaymin was not necessarily in a prone position.
22   I'm not holding you to this 10-minute exact mark.  You
23   understand, of course, in your review of the videos that
24   he had been rotated to his side.  That he had been up on
25   his feet in between the two incidents on the ground;
```



DEPOSITION OF BENNET OMALU
October 26, 2020

1    correct?

2        A.    Yes.

3        Q.    Now, you mention in here about Mr. Muhaymin's

4    hands coming from behind his back up over his shoulders.

5    Do you recall seeing that on the video?

6        A.    Yes.   That was when they were -- this was closer

7    to the second episode.

8        Q.    And in your experience with law enforcement

9    agencies, and you've said you've done a few cases,

10   officers generally would prefer the arms be in the back

11   than in the front; correct?

12           MR. CHAMI:   Object to form, foundation.   Outside

13   of experts.

14           Go ahead.

15           THE WITNESS:   Yes.   But what I saw was his hands

16   were in his back were being raised to the level of his

17   shoulders.   That is not a positioning of the body that is

18   compatible with anatomic limitations of the body, and that

19   will be very painful.

20           MS. STILLWELL:   Q.   And you recall reading the

21   officers' testimony that they went from, you know, lifting

22   his hands to search the pockets to try to pull them back

23   down because Mr. Muhaymin was moving them on his own.

24       A.    The video showed that they raise his hand above

25   -- from his back to above the level of his shoulders,

DEPOSITION OF BENNET OMALU
October 26, 2020

1   extensions, and I wouldn't believe that, no.

2      Q.   You would agree with me that Mr. Muhaymin was

3   screaming and yelling and very vocal during his encounter

4   with the police officers that day?

5           MR. CHAMI:  Object to the form, foundation.

6   Mischaracterizes the evidence.

7           THE WITNESS:  I don't know why we should use the

8   word "very vocal" for a human being who was screaming out

9   in pain.  He wasn't very vocal.  He was yelling out.  He

10  was using the typical primitive reflexive noises human

11  beings make when they are in pain.

12          MS. STILLWELL:  Q.  When you are concluding that

13  he's yelling out, in each of those times he's yelling --

14  correct? -- that he is yelling in pain, on what basis or

15  what research are you relying upon to establish that that

16  is similarly a yell in pain?

17     A.   There were times he said, "I can't breathe," many

18  times.  "I can't breathe."  And he did say casually, "I

19  can't breathe," said it in very high-pitched, high-tone

20  voice.  There was at the beginning he said -- he was

21  yelling out, "Okay, okay."  And when his hand was

22  reflexed, he was making the typical reflexive noises human

23  beings make when they are in a state of agitation and

24  pain.

25     Q.   When you say that's typical noises, aside from

DEPOSITION OF BENNET OMALU
October 26, 2020

1   respond to a stimulus.

2          So the brain sends signals within 100 to 200

3   milliseconds to the blood vessels that supply the heart.

4   Given the blood vessels' instructions to dilate, send more

5   blood to the heart, but there's a limit.  And because of

6   the suddenness, the suddenness of the signaling, the blood

7   vessels can go into a spasm.

8          Just like human beings, sometimes you are faced

9   to speak suddenly, you freeze.  So the same happens to the

10  blood vessels.  They go into a spasm and actually shots of

11  blood go into the heart.  And then the -- brain asphyxia,

12  the brain cells are no longer getting more blood and

13  oxygen.  The heart is not -- the heart cells cannot pump

14  because the blood vessels are in spasm.  And what happens?

15  2 or 3 minutes passes, the brain dies.

16         So having that -- and that is type 2 myocardial

17  injury, outside of five types.  So what happens here, an

18  individual is exposed to a high state of stress.  Autopsy

19  showed he had about 40 to 50 percent coronary occlusion,

20  which is clinically insignificant.  At 40, 50 percent you

21  wouldn't be having symptoms.

22      Q.   Why is it clinically insignificant --

23      A.   Because science has established, according to the

24  Harrison's Textbook of Medicine, the Harrison's,

25  Harrison's, H-A-R-R-I-S-S-O-N-S [sic] -- I used to



DEPOSITION OF BENNET OMALU
October 26, 2020

1   instance was the interaction with the police.

2       Somebody could claim:  Dr. Omalu, what about the

3   amphetamines?  Yeah, what about the amphetamines?  Before

4   he encountered the police, he was a normally functioning

5   human being.  He was not in any state of duress.  He was

6   not manifesting any excitotoxicity.  And guess what?  His

7   amphetamine levels were not toxic.

8       Remember, amphetamine is a drug used to treat

9   attention -- hyperactivity attention deficit disorder.  So

10  it does not mean that the mere presence of amphetamine is

11  lethal.

12  Q.   Well, that's the amphetamine.  But he also had

13  methamphetamines in his system which there is no clinical

14  value; correct?

15  A.   Yes.  He had methamphetamine.  But once you take

16  methamphetamine, just like heroin or cocaine, within

17  minutes or hours, most times 2 hours in your body, the

18  methamphetamine is broken down to amphetamine.  So when

19  you look at them, they are two different drugs.  They are

20  two different drugs.

21      In fact, it's been very well-studied.  Like I

22  place in my paper, even the National Highway Traffic

23  Safety Administration has clearly stated that the levels

24  of amphetamine we found in Muhammad are not lethal,

25  especially in people who use amphetamine to recreate



DEPOSITION OF BENNET OMALU
October 26, 2020

1    themselves.

2        Q.    And is that what led you, sir, to your opinion

3    that Mr. Muhaymin, quote, "Did not die from

4    methamphetamine toxicity"?

5        A.    No.    That wasn't what led me to.    What led me was

6    multifactorial.    Like I said, you consider the entire

7    picture.    When it comes to the amphetamine -- if you watch

8    the video -- we have a video here, so there's no competing

9    narrative.

10            When Mr. Muhammad wanted to use the bathroom, he

11    had amphetamine in him.    He was not in impending death.

12    He was not in imminent death.    In fact, after he was in

13    the bathroom, he was walking away.    ==Because as a chronic==

14    ==user of drugs, their body develops resistance and==

15    ==tolerance.==

16            So he was walking away.    But the -- immediately

17    he interacted and encountered the police physically.    It

18    was not a coincidence that 10 minutes later he was dead.

19    It's not.

20            So what it means is without the interaction with

21    the police, more likely than not, Mr. Muhammad would not

22    have died the day he died.

23        Q.    So as long as we're talking about

24    methamphetamines, you opined that a majority of human

25    beings who consume methamphetamine as a recreational drug,



DEPOSITION OF BENNET OMALU
October 26, 2020

1    quote, "Do not die from it"; right?

2        A.   Yes.

3        Q.   And you would agree though, wouldn't you, that

4    some people who do use it as a recreational drug or who

5    use it for the first time or the thousandth time can die

6    from it?

7            MR. CHAMI:  Object to foundation.

8            THE WITNESS:  Yes.  When you perform an autopsy,

9    you see the evidence showing that they died from

10   methamphetamine toxicity.  In this case, even in the

11   autopsy report, there was no indication whatsoever that he

12   died from methamphetamine toxicity.  No.  None whatsoever.

13           And there was a paper published in 2008 by

14   Ferner.  It's on page 15 of my report, "Post-mortem

15   Clinical Pharmacology."

16           MS. STILLWELL:  Q.  What is considered a toxic

17   level of meth?

18       A.   That is what you are saying, that you cannot

19   determine a toxic level of a drug based on just one single

20   measurement at one point in time, especially postmortem.

21   That is beneath the standard of practice.  Why?  Because

22   once you die, and also the agony of death affects the

23   levels of drugs in human beings.  It's called postmortem

24   redistribution of drugs.

25       Q.   Well, and that's why they pull blood from



DEPOSITION OF BENNET OMALU
October 26, 2020

1   statistics, for instance, the National Institute of Health

2   and the U.S. Center for Disease Control statistics.  They

3   represent that approximately 10,000 people or more die

4   from methamphetamine intoxication.

5       A.   It depends on the population base used.

6   Generally no matter where you read, it's usually less than

7   0.5 percent.

8       Q.   How many --

9       A.   Which is insignificant.  I mean, a death rate of

10  0.05 percent.  It's epidemiologically insignificant.  Not

11  that I'm supporting use of drugs, but our stand now on

12  drug abuse is it is a disease that needs to be treated.

13      Q.   How many living patients do you treat or have you

14  treated with who are actively intoxicated on

15  methamphetamine?

16      A.   I don't treat -- I don't treat patients, no.

17      Q.   How many agitated patients, living patients,

18  would you have taken care of in the past years?

19      A.   I don't treat.  That line of question is not -- I

20  don't treat patients who need urgent care.

21      Q.   Can methamphetamines cause a heart attack, for

22  lack of a better word?

23      A.   Sorry?

24      Q.   Can methamphetamine -- the use of methamphetamine

25  -- we agree that you can use methamphetamine and it can



DEPOSITION OF BENNET OMALU
October 26, 2020

1   kill you.  Can it cause a heart attack or a cardiac

2   arrest?

3        A.   It could cause a type 2 myocardial injury.

4        Q.   Can it cause dysrhythmia?

5        A.   Yes.  But there is frequently an instigator.

6        Q.   And what was that instigator?

7        A.   Many times they use -- majority of cases they

8   don't just use methamphetamine.  They use more than

9   methamphetamine.  They use other drugs.  Okay.  Probably

10  pharmacy.  Many times they have an underlying disease.  I

11  mean, sometimes infections.  And many times they have

12  severe -- they have severe coronary artery occlusion, 80

13  percent or more, and you will see the effects of the drug

14  when you do an autopsy.

15       So what makes this case different is that an

16  autopsy was done.  We had the privilege of examining the

17  tissues.  And everything examining, including in the

18  autopsy report, it is speculative to suggest that

19  methamphetamine was the underlying cause of death.

20       Q.   Or one of the contributing factors?

21       A.   It could be.  You could determine is a

22  contributory factor, but it does not in any way undermine

23  or affect the asphyxiation.

24       Q.   What can happen with a schizophrenic if they were

25  to take methamphetamines?  Would it cause psychosis?



```
 1   levels, but both drugs act on the same receptors in the
 2   human brain.  We did an autopsy.  Autopsy ruled out any
 3   other cause of death.
 4         So although the level of the diazepam and the
 5   quetiapine, quetiapine, Q-U-E-T-I-A-P-I-N-E, they were in
 6   therapeutic ranges, the presence of the two at the same
 7   time in a deceased individual will be a combined acute
 8   toxicity in spite of the levels in the body.
 9       Q.   Now, Dr. Omalu, I understand you are board
10   certified in pathology.
11       A.   I'm board certified in anatomic pathology.  I'm
12   board certified in clinical pathology.  I'm board
13   certified in forensic pathology.  I'm board certified in
14   neuropathology.
15       Q.   And I understand that toxicology is a
16   component of --
17       A.   Of clinical pathology.
18       Q.   -- clinical pathology.
19       A.   Clinical chemistry, yes.
20       Q.   But you do not have a separate certification,
21   board certification in toxicology; correct?
22       A.   No.
23       Q.   Now, we talked a little bit about methamphetamine
24   intoxication.  Given your experience and your board
25   certification as a clinical pathologist, can a person
```



DEPOSITION OF BENNET OMALU
October 26, 2020

```
 1   -- it quickly escalated when he was touched.
 2       Q.   Now, on page 17 you touched on it briefly.  You
 3   indicate, "Muhammad did not die from coronary artery
 4   disease."
 5       A.   Yes, please.  On page what?
 6       Q.   17, sir.  And you acknowledge that the prin --
 7   "The fundamental principle and criterion for a type 2
 8   myocardial infarction is the presence of a stressor, which
 9   places the heart at an increased demand for oxygen."
10       A.   Yes, please.
11       Q.   Why would methamphetamine not have been the
12   stressor in this case?
13       A.   Because the methamphetamine preceded the
14   mechanical asphyxiation.  Temporal relationships.  So
15   before he encountered -- before the video started, he had
16   methamphetamine in him.  "I'm coming; I'm coming."  He had
17   methamphetamine in his body.
18       Q.   Can I stop you for a second?  Do you know when he
19   ingested that methamphetamine?
20       A.   Hours prior.  Because the amphetamine level --
21   the methamphetamine and amphetamine were high.  If he had
22   just ingested it in the bathroom, you wouldn't have such
23   high levels of amphetamine because the methamphetamine is
24   broken down to amphetamine.  And it has to pass first
25   through the liver.
```



DEPOSITION OF BENNET OMALU
October 26, 2020

1            So the pharmacokinetics, pharmacokinetics of the

2     drugs indicate that he took it much prior.  He didn't do

3     it in the bathroom because I considered that as well.

4         Q.    And the postmortem level, just so we're clear, is

5     the 0.81 of methamphetamine and the 0.24 of amphetamine;

6     correct?

7         A.    Let me see.

8         Q.    You have it on your page 16 in the middle.

9         A.    Yes.  So you see, there is still an equilibrium

10    conversion.  So what this tells you is that he took it not

11    5 hours prior.  Maybe an hour to 2 hours before his death.

12    Okay.  Or maybe an hour to 2 hours before.  He didn't take

13    it like 6 hours prior, 8 hours prior.  No.  Okay.

14            There was a question I was answering before you

15    cut me short.

16        Q.    Excuse me.  Sorry?

17        A.    There was a question you asked me before you cut

18    me short.  Did I know the time --

19        Q.    I was trying to clarify it, and that was why

20    would methamphetamine not have been the stressor --

21        A.    Good, good.

22        Q.    -- to precipitate the type 2 myocardial --

23        A.    So the temporal effect.  Okay.  So if you read

24    the principles of determining cause of death, so prior to

25    interaction with police, he had amphetamines.  When I say

DEPOSITION OF BENNET OMALU
October 30, 2020

```
 1              IN  THE  UNITED  STATES  DISTRICT  COURT

 2                 FOR  THE  DISTRICT  OF  ARIZONA

 3                           --oOo--

 4

 5     Mussalina Muhaymin as Personal
       Representative of the Estate of
 6     Muhammad Abdul Muhaymin Jr.,

 7                      Plaintiff,

 8          vs.                       No. 17-cv-04565-PHX-SMB

 9     City of Phoenix, an Arizona            VOLUME II
       Municipal Corporation; Antonio
10     Tarango; Officer Oswald Grenier;
       Officer Kevin McGowan; Officer
11     Jason Hobe; Officer Ronaldo
       Canilao; Officer David Head;
12     Officer Susan Heimbinger;
       Officer James Clark; Officer
13     Dennis Lerous; Officer Ryan
       Nielson; Officer Steven Wong;
14     and Doe Supervisors 1-5,

15                     Defendants.
       _____/
16

17            CONTINUED VIDEO RECORDED DEPOSITION OF

18                     BENNET OMALU, MD

19                 Friday, October 30, 2020

20                        7:04 AM

21

22                 Taken in the offices of:
                      Bennet Omalu, MD
23            3031 West March Lane, Suite 323
                  Stockton, California 95219
24

25     REPORTED BY:  VICTORIA R. MARTIN, CSR 12322
```



DEPOSITION OF BENNET OMALU
October 30, 2020

1      A.   So like Ferner, F-E-R-N-E-R, Ferner said, you

2  cannot base diagnostic decisions just on one isolated

3  measurement of blood sample in the human body.

4      Q.   Now, would the -- the estimates of the

5  postmortem, I believe Baselt -- Baselt said that the range

6  is 0.09 to 18, and those are the concentrations that can

7  cause death from methamphetamines; correct?

8      A.   Any level of methamphetamine can cause death.

9      Q.   Okay.

10     A.   So what you now consider is, is the individual a

11  prior user of methamphetamine.  For example, a case I just

12  signed out before I started this deposition, the

13  methamphetamine level was very high, but he died from a

14  motor vehicle accident.  So the mere presence of high

15  levels of methamphetamine does not mean you died from it.

16  That is the point I'm making.

17     Q.   So you would look at the history of

18  methamphetamine use; right?

19     A.   Yes, please.

20     Q.   You would look at other stressors or other

21  factors to determine whether the methamphetamine had some

22  contributing factor to a death; correct?

23     A.   Yes, yes.

24     Q.   Okay.  Now, on your letterhead, Dr. Omalu, you

25  have Autopsy and Anatomic Pathology.  You took the boards



DEPOSITION OF BENNET OMALU
October 30, 2020

1   separate board for toxicology; correct?

2       A.   It's not -- it's not a board that is recognized

3   by the American Board of Pathology.  It doesn't fall under

4   the American Board of Pathology.

5       Q.   So are you saying because you are board

6   certified -- because you are board certified in anatomic

7   pathology and clinical pathology, you are automatically

8   board certified in toxicology?

9       A.   No, no.  That wasn't what I said.  The board

10  certification in toxicology, it's not under the American

11  Board of Pathology.  It's a separate board given by -- I

12  don't know who gives it.  Because there are many board

13  certifications out there that are not recognized by the

14  American -- Graduate Medical Education Certification

15  Board.

16          So there is a PhD -- there are some people with

17  PhDs in toxicology.  Very recently I started hearing of

18  there's board certification in toxicology.  Anybody can

19  get it.  So I don't know --

20      Q.   I'm sorry.  I didn't mean to interrupt you.

21  Medical doctors can get board certified in toxicology;

22  right?

23      A.   Yeah.  I've seen one or two medical doctors that

24  state board certification in toxicology.

25      Q.   Uh-huh.



DEPOSITION OF BENNET OMALU
October 30, 2020

1    A.    Toxicology is not a recognized field of medicine.

2    What we have in medicine is pharmacology.

3    Q.    So -- but medical toxicology is a subspecialty of

4    medicine; correct?

5    A.    Well, medical toxicology, we call it

6    pharmacology.  Pharmacology, P-H-A-R-M-A-C-O-L-G-Y.

7    Because as doctors, we deal with drugs.  Drugs are toxins.

8    So part of my medical school education, I spent one year

9    -- or six months to one year, I've forgotten, starting

10   pharmacology and therapeutics.

11   Q.    Now, earlier we talked about the fact that you

12   don't currently treat living patients and you haven't

13   treated them since Nigeria.  But in your CV, it says you

14   have hospital privileges.  Does that mean that you have

15   privileges to treat living patients?  I just need a little

16   clarification.

17   A.    I have privileges to make decisions on living

18   patients and their medical care and treatment.  Like I

19   have told you, as a pathologist, I advise clinicians on

20   treatments and diagnosis sometimes.  I'm consulted

21   directly to help guide the treatment of patients.

22        Now, can I treat patients in the State of

23   California?  Yes, I can.  But I've chosen not to do that

24   because it's not something I enjoy.

25   Q.    Okay.  Now, earlier when we were talking about



DEPOSITION OF BENNET OMALU
October 30, 2020

1    postmortem redistribution and the factors that you need to

2    consider whether methamphetamine toxicity contributed to

3    death, you said something about tolerance.  Can you give

4    me the elements of tolerance?

5         A.   Okay.  The elements of tolerance.  To begin with,

6    there is what is called pharmaco, pharmacogenetics,

7    pharmacogenetics, and what it means is not every human

8    being responds to the same drug the same way.

9         Q.   Uh-huh.

10         A.   A good example is like alcohol.  I have

11    colleagues of mine, they drink one shot of Johnnie Walker

12    whiskey, they are so loquacious.  They are intoxicated.

13    Myself, I drink one shot of Johnnie Walker, I don't even

14    notice any change.

15              So human beings have genetic variations in the

16    way they tolerate, they metabolize drugs.  That is the

17    first thing to begin with.  So if you find a high level of

18    a drug in an individual, it does not manifest the same way

19    as the same level in another individual.

20              Two, if your body has been exposed to a drug,

21    just like if your body has been exposed to a vaccine in

22    the past, the more recent, the greater the effect.  If

23    your body is exposed to the same drug it has been exposed

24    to, your body is no longer naive to that drug.  Your body

25    is used to that drug, then that drug is more likely to be

DEPOSITION OF BENNET OMALU
October 30, 2020

1    metabolized faster and is less likely to intoxicate you,

2    to kill you.  And the more exposed you are to that drug

3    and the more genetically tolerant you are to that drug,

4    the less likely the drug will have adverse effects on you.

5              So tolerance is a very broad scientific concept.

6    What it simply means -- I go back -- you cannot make a

7    diagnostic decision or conclusion just based on the level

8    of a drug in a human being.

9        Q.   Okay.  And for the purposes of reliance, is there

10   a particular textbook or study that you rely upon for your

11   definition of tolerance, as you just told me?

12       A.   There is a book called the Pharmacological Basis

13   of Therapeutics by --

14       Q.   Okay.

15       A.   It's called -- by Goodman, G-O-O-D-M-A-N.

16       Q.   Okay.

17       A.   It's a very basic, primary textbook of

18   pharmacology.  It's been a while I've read it, but you

19   could find the definition -- those definitions are

20   provided.

21       Q.   Do you happen to know the chapter or anything

22   like that?

23       A.   Oh, no.  For such a broad topic, there is no one

24   single chapter that will address it.  So when you go to

25   the index, you search, and it will refer you to the

DEPOSITION OF BENNET OMALU
October 30, 2020

1    Neuropathology textbook assist in your opinion?

2        A.    No.   Remember, two days ago -- or say two days

3    ago for the first deposition, I said that when I prepared

4    this report, I did not rely specifically on any specific

5    textbook or paper.   I said that.   That the concepts we

6    are -- the scientific concepts we are concerned with in

7    this case are very elementary and basic in medicine.   That

8    and also very elementary and basic for me as an

9    individual.   That I simply wrote all these things without

10   making any references.   But some of the absolute values I

11   provided, which I could not memorize, I had to go to the

12   specific textbook or reference, lift it out.   And when I

13   do -- I do that, I will give you the reference so that

14   absolute values we have references to.

15          But in terms of the scientific principles, I did

16   not refer or rely on any specific published book.

17   relied on the body of knowledge, experience, and work I

18   have done over 20 years.

19       Q.    So, Dr. Omalu, are you going to follow Mr.

20   Chami's direction not to provide the chapter on

21   Greenfield's Neuropathology?

22          MR. CHAMI:   No.   That's not what I said.   I just

23   said what the rules require.   That's all.

24          MS. STILLWELL:   No.   Mr. Chami, you said that he

25   is not going to provide it.   So --



DEPOSITION OF BENNET OMALU
October 30, 2020

1      Q.   Okay.  On page 19, you conclude that Mr.

2  Muhaymin, quote, "Died as a result of

3  mechanical-positional asphyxiation due to the compression

4  of his trunk and body."

5          Did I say that correctly?

6      A.   Yes, please.

7      Q.   And you said -- you start out by saying Mr.

8  Muhaymin, quote, "Was not in any form of distress."

9      A.   I said, "When he walked out of the community

10  center" --

11      Q.   Okay.

12      A.   -- "on January 4, 2017, he was not in any form of

13  distress and was not dying."

14      Q.   How do you make that conclusion in light of the

15  fact that he did have methamphetamines in his system and

16  he was schizophrenic, and he did have -- although you say

17  "clinically insignificant," he did have a blockage in his

18  arteries.

19      A.   No, no.  Why I'm laughing is you said he had a

20  blockage in his arteries.

21      Q.   Yes.

22      A.   I sit here and as you sit here too, you and I

23  could have blockages of 30 to 40 percent.  It is of no

24  clinical significance.  It becomes clinically significant

25  when it is up about 80.  Even with 80 percent, it becomes



DEPOSITION OF BENNET OMALU
October 30, 2020

1    clinically significant if you suffer myofibrillar ischemic

2    injury.  So the presence of blockage of your vessels does

3    not place you in distress.  No.  One.

4              Two, like I have always said earlier, the mere

5    presence of the drug in your blood does not mean that drug

6    is killing you or that drug is toxic.

7              Three, the mere fact that you have schizophrenia

8    does not mean you are in distress.  It's a chronic

9    disease.  It's like saying somebody with high blood

10   pressure like myself, that I'm in distress.  No.  The mere

11   presence of the disease in a human being does not equate

12   to distress or impending death.  And that is what we have

13   here.

14             Like I have pugilistic, and I clearly state that

15   in my report, that the mere presence of a disease or drug

16   in your body does not mean you are dying from the disease

17   or drug.  The video clearly shows a human being who was

18   not in any form of distress or in any form of impending

19   death.  The autopsy confirmed that.

20                   (Videographer gone.)

21        MS. STILLWELL:  Q.  Now, you mentioned in part of

22   your review of the slides, the slides you created, sir,

23   that you were able to conclude that the slides showed

24   brain edema and brain congestion; is that right?

25        A.   Yes, please.

DEPOSITION OF BENNET OMALU
October 30, 2020

```
 1        Q.   You agree with me though that both brain edema
 2   and brain congestion, that you can also see that following
 3   a prolonged period of resuscitation efforts?
 4        A.   Yes.  But -- but let's be very careful.  Let's
 5   not start in a wild-goose chase of hypotheticals.
 6   Anything is possible.  It's possible Dr. Bennet Omalu is a
 7   woman.  Because based on what you see, it is unreasonable
 8   to assume he's woman.
 9             So in this case an autopsy was done.  We have
10   confirmed evidential -- prevailing evidentiary values that
11   nobody is contesting.  And based on the constellation of
12   those evidentiary values or indices, we've made a
13   conclusion.
14             Now, after we've done that and we start
15   hypothesizing:  Is this possible?  Is this possible?
16   Based on the outcomes, there was no evidence to indicate
17   that the changes we saw in his brain were caused by
18   cardiopulmonary resuscitation.
19        Q.   Well, Dr. Omalu, you would agree that there was
20   approximately 30 minutes of cardiopulmonary resuscitation
21   efforts; right?
22        A.   Yes.
23             MR. CHAMI:  Object to foundation.
24             MS. STILLWELL:  Q.  We started talking before on
25   Monday and I asked you if you could tell me how much body
```



DEPOSITION OF BENNET OMALU
October 30, 2020

1     weight was placed on Mr. Muhaymin and by which officer,

2     and I think you had told me that you can't quantify that;

3     is that correct?

4         A.    Yes.   It's the same -- it is tantamount to the

5     all or non-principle, which I'll explain.   That you cannot

6     specify each and every exposure.   No.   Rather, it is a

7     spectrum of cumulative exposure.   And that is why the

8     diagnosis we raise -- everybody just say, "mechanical

9     asphyxia."   We say, "mechanical-positional."

10            Because first in positional, a human being thrown

11    on the ground with his chest and abdomen compressed on the

12    ground, inability of the diaphragm to move up and down, so

13    the cumulative exposure with him on the ground and with

14    him even crying out, "I cannot breathe."   You need to put

15    the entirety of the exposure to injury together, not each

16    and every.

17            And that was what -- I clearly state that in my

18    report, that this is -- this is about the concept of

19    cumulative exposure.   We are dealing with brain injury.

20        Q.    Okay.   Would you agree with me, Dr. Omalu, that

21    the officers' placement was changing?

22        A.    Sorry?

23        Q.    That the officers changed positions in

24    placement --

25            MR. CHAMI:   Objection to form and foundation.



DEPOSITION OF BENNET OMALU
October 30, 2020

1            MS. STILLWELL:  Can I finish the question, Mr.
2    Chami?
3            MR. CHAMI:  That was a question.  I didn't know
4    you weren't done.
5            MS. STILLWELL:  I'm not done.
6        Q.    -- during the encounters with Mr. Muhaymin?
7            MR. CHAMI:  Object to form and foundation.
8            MS. STILLWELL:  Q.  Go ahead, Doctor.
9        A.    My answer to that is yes.  But not unique to this
10   case.  I was not paying to attention to that.  When there
11   is compression of a human being, it's not a static, static
12   phenomenon.  It's a dynamic phenomenon.  So I expect
13   positioning to change, including the body of Muhammad.  So
14   my answer to that is yes.
15       Q.    Yes, they were changing?
16       A.    Not -- my answer is general -- a general answer.
17   I did not pay attention to it in this case because it is
18   of no significant forensic consequence.  You expect their
19   bodies to change, yes.
20       Q.    Does the person's weight on someone's legs impact
21   the ability to ventilate?
22       A.    I don't understand the question.  Sorry.
23       Q.    Sure.  If a person is holding someone's legs,
24   does that impact their ventilation, their ability to
25   breathe?

DEPOSITION OF BENNET OMALU
October 30, 2020

1      A.   So the answer to that is yes.  But you have to

2   consider the entirety of the event, not just holding the

3   person's legs.  Holding somebody's leg -- if I'm sitting

4   down now and my son is holding my leg, it's not going to

5   affect me because I'm sitting down.  My chest can move up

6   and down.

7           So like I have said earlier, we cannot break it

8   up into different parts.  If he was holding his leg, what

9   was the other things going on at that moment.  Were his

10  legs -- his knees being flexed, and were his hips being

11  flexed with the legs?

12          So the totality of the exposure to injury

13  compromise his aspiratory functioning including the

14  aspiration of his vomitus.

15      Q.   So the same -- your opinion would be the same on

16  whether an officer had weight on buttocks or on arms --

17      A.   Yes.

18      Q.   -- or hands?

19      A.   Yes.

20      Q.   Correct?

21      A.   Because it is a concept of cumulative exposure.

22  We cannot engage in each and every, which medically is not

23  acceptable.  And even legally, based on my experience, you

24  can't propound each and every exposure concept.  It is

25  accumulative exposure.



DEPOSITION OF BENNET OMALU
October 30, 2020

```
1        Q.   So your opinion, sir, on cumulated exposure, a
2   cumulated sustained mechanical compression I think is
3   another phrase you had used.  Can you cite to any
4   textbooks or articles that support that concept?
5                    (Videographer returned.)
6             THE WITNESS:  Concept of what?  Can you help me
7   understand?
8             MS. STILLWELL:  Q.  Sure.  You had indicated
9   cumulated exposure or pressure and not breaking it down
10  per officer or per event, but the cumulated -- everybody,
11  regardless of what they were holding or what they were
12  doing.  Is there a textbook or an article or a study that
13  supports that concept?
14        A.   Every basic textbook of medicine will address the
15  issue of cumulated injury to the human brain.  There is no
16  basic textbook of brain disease or brain injury.  This is
17  a very basic and elementary concept, honestly.  It does
18  certain things -- certain generally accepted principles of
19  medicine.  Like a man has XX sex chromosomes.  We don't
20  need a reference for that.  It's a fact of medicine.
21                    (Mr. Faraj joins the depo.)
22             THE WITNESS:  Every basic textbook of medicine
23  you should consider.
24             MS. STILLWELL:  Q.  Dr. Omalu, you've said
25  "basic" and "elementary" quite a few times.  If it's so
```



DEPOSITION OF BENNET OMALU
October 30, 2020

1     Q.   So when we talk about contemporaneous other

2   factors, we can talk about, you know, how much weight was

3   applied or for how long; correct?

4     A.   Yes.  But not just the weight, per se, like I

5   have said.  Because I think we are divergent -- excuse me.

6   You're focusing on the weight as a mutually exclusive

7   factor, and I'm telling you, no, you cannot do that.  It

8   is a totality, a cumulation of multiple contemporaneous

9   factors, including the vomiting.  Because we keep on

10   staying away from it.  Including the vomitus, which -- the

11   vomiting, which occluded all his airways.

12     Q.   We'll get to the vomiting, Dr. Omalu, but you

13   brought up something that reminded me from the Monday.  On

14   Monday you said it wasn't just the weight, and it sounds

15   like right now it doesn't matter how much weight or where

16   it was applied.  But you said on Monday about the knee

17   compression in a vital plexus.  Do you recall that?

18     A.   The what plexus?

19     Q.   I think you said "vital" plexus.

20     A.   No, no, no, no.  I said in the neck and chest.

21   They are vital plexuses, plexuses, P-L-U-X-E-S [sic],

22   plexuses of nerves and ganglia that are very sensitive to

23   compression.

24     Q.   Where are -- I don't mean to interrupt you,

25   Doctor.  I'm sorry.  Where are those nerves that you are

DEPOSITION OF BENNET OMALU
October 30, 2020

1   did not list it.  So if you ask me maybe it was in there,

2   I don't know.  But I could check the autopsy report if you

3   will let me.

4        Q.   Dr. Omalu, if you just want to check the autopsy

5   report really quick to see if it --

6        A.   Yes.  Thank you.  It says there were no petechia

7   in the eyes.

8        Q.   Okay.  Thank you, Doctor.  Do you recall -- well,

9   you told me you don't know exactly when his heart stopped.

10  Is that you true that you don't know also when he stopped

11  breathing?  Can you tell that from the video, sir?

12       A.   I did not watch out for that because it was of no

13  forensic value, so I wasn't watching the video to identify

14  specifically when he stopped breathing.  All I know is my

15  review during the asphyxial event, during the second

16  officer -- the officers noted he was nonresponsive after

17  he said he could not breathe.  I didn't go to find out

18  exactly the time, no.

19       Q.   Okay.  Now, Dr. Omalu, if a person is struggling

20  or resisting, can that increase the amount of lactic acid

21  that they are producing?

22       A.   It is not the struggle that is producing the

23  lactic acid.  It is the metabolic injury which was

24  instigated by the asphyxial injury.  The struggle is a

25  consequence of the asphyxial injury.



DEPOSITION OF BENNET OMALU
October 30, 2020

```
 1        Q.   But they show the encounter.  They are the best
 2   evidence?
 3        A.   Yes, ma'am.
 4             MR. FARAJ:  I'm going to -- I'm going to object
 5   to --
 6             MS. STILLWELL:  Go ahead, Mr. Faraj.
 7             MR. FARAJ:  I'm going to object to lack of
 8   foundation.  Dr. Omalu's opinion as to the best evidence
 9   is not relevant.  That's a legal question.
10             Go ahead though.
11             THE WITNESS:  I'm sorry.  I don't -- I will -- my
12   opinion is not the best evidence.  My opinion is the video
13   speaks for itself.  I did not -- I was not using the word
14   "best."
15             MR. FARAJ:  I didn't say you did, Dr. Omalu.
16             MS. STILLWELL:  I did.
17             MR. FARAJ:  It's a question and response, and I
18   wanted to make sure I'm objecting to the suggestion that
19   that's the best evidence.
20             MS. STILLWELL:  So did you have any more, Mr.
21   Faraj?
22             MR. FARAJ:  No, I didn't.
23             MS. STILLWELL:  I didn't mean to interrupt you.
24        Q.   Now, Dr. Omalu, I'm very curious about this
25   concept of primitive response and that he was acting out
```



DEPOSITION OF BENNET OMALU
October 30, 2020

1    of fear and not resistance, and then he was acting out of

2    asphyxiation and not continued resistance.  With that

3    concept -- where did that concept come from?  Is there a

4    textbook?  Is there a study or an article that supports

5    this idea of the primitive responses?

6        A.   Every basic textbook of medicine.  Again, I give

7    you Guyton's Textbook of Physiology, G-U-Y-T-O-N-S.  Any

8    basic psychiatry textbook.  Every basic textbook of human

9    behavior or -- it's like I said, it's a very basic,

10   elementary generally accepted common knowledge of

11   medicine.

12       Q.   Now, Dr. Omalu, a few things.  No. 1, you are not

13   a psychologist; correct?

14       A.   I'm not a psychologist, no.

15       Q.   And you are not a psychiatrist?

16       A.   As a physician, I'm trained in psychiatry, but

17   I'm not board certified in psychiatry.

18       Q.   And you've never provided mental health treatment

19   to a living patient; correct?

20       A.   I have; I have.  Your question is I have never,

21   and the answer to that is that is not true.  I have.  When

22   I was in Nigeria, I worked for -- how many years? -- five,

23   six years as a physician, and I worked as a general

24   practitioner.  A general practitioner, you provide every

25   spectrum of care.  Like cesarean sections.  I performed

DEPOSITION OF BENNET OMALU
October 30, 2020

1     Q.   Okay.  Dr. Omalu, let's switch gears.  You

2   mentioned before the oxygenation.  And actually on page 24

3   of your report you opine, "As his blood oxygen levels

4   decreased and the carbon dioxide levels increased, while

5   he was on the ground, he began to develop acidosis, became

6   more confused and afraid and struggled more."

7           Do you know, Dr. Omalu, what his oxygen

8   saturation level was when he was walking to the police

9   car?

10    A.   No.  That was why I did not put it in my report

11   because it's a misnomer.  It doesn't matter what his

12   oxygen saturation level was there.  What matters is that

13   he died and an autopsy was performed which showed he

14   suffered an asphyxial injury.  The medical examiner who

15   performed this autopsy ruled it a homicide.  She ruled it

16   a homicide.

17    Q.   So, Dr. Omalu, you just indicated about the blood

18   oxygen levels.  Because you don't know the oxygen

19   saturation, obviously he wasn't wearing a pulse oximeter,

20   so there was no monitoring device to conclude that his

21   blood oxygen levels decreased and the carbon dioxide

22   levels increased.  So I'm trying to find out how did you

23   make that opinion.  What was it based upon other than your

24   final conclusion?

25    A.   Because the brain cells, which I examined --

DEPOSITION OF BENNET OMALU
October 30, 2020

1    Muhaymin; is that correct?

2         A.    Yes, please.

3         Q.    And do you know, as you sit here, Dr. Omalu, what

4    he was cognitively experiencing during any part of his

5    encounter with law enforcement officers?

6         A.    Could you repeat the question?

7         Q.    Yes.  Do you know, Dr. Omalu, as you sit here

8    today, what Mr. Muhaymin was cognitively experiencing

9    during his encounter with the law enforcement officers?

10        A.    He was experiencing mental pain and anguish.  He

11   was experiencing somatic pain.  He was experiencing

12   chemical pain.

13        Q.    Can you base that, sir, off of your review?

14   Obviously you can't interject yourself into Mr. Muhaymin's

15   box or brain that day; correct?

16        A.    No.  I base that on the prevailing avenues and on

17   established scientific principles beginning with the fact

18   that Mr. Muhaymin is a human being and human beings are

19   known to behave and to manifest and exhibit specific types

20   of behaviors which are predictable, predictable in

21   specific circumstances.

22        Q.    And you said they were on scientific methods.

23   Can you tell me which ones?

24        A.    Scientific methods:  observing the video,

25   watching him as a human being, and then what is



DEPOSITION OF BENNET OMALU
October 30, 2020

1    established about the human being's experience of pain and
2    suffering.
3        Q.   So, Dr. Omalu, you agree though if an individual
4    is feeling pain, they would generally modify their
5    behavior to relieve that pain; correct?
6        A.   That is what I have always said is the primitive
7    reflex.
8        Q.   Right.
9        A.   A good example, if your hand touches fire or
10   you're sitting on a hot surface, the moment you experience
11   the heat, you stand up immediately.  That is a primitive
12   reflex.
13       Q.   Given that example.  I'm just trying to figure
14   out, sir, in this instance you just said it's the
15   primitive response to struggle against the officers.  But
16   how is it not a primitive response --
17            MR. FARAJ:  Misstates the testimony.
18            MS. STILLWELL:  Well, I'm not done with my
19   question.
20       Q.   How is it not a primitive response to modify his
21   behavior according to the -- provided?
22       A.   I missed you for like a second.  It went blank.
23   Could you repeat it, please?
24       Q.   Sure.  I'll try to repeat it word-for-word, but I
25   most likely won't.

DEPOSITION OF BENNET OMALU
October 30, 2020

 1   nothing in this case that may indicate or suggest that
 2   Muhammad was in an active psychotic state.  There is no
 3   evidence whatsoever.
 4       Q.    So, Dr. Omalu, then you don't believe based on
 5   your review that he was in an acute mental crisis?
 6       A.    No.   There's no evidence whatsoever.  As a
 7   physician, as somebody who has suffered -- I've struggled
 8   with depression in my life, if you read my book.  I frown
 9   upon anyone painting mental illness in dark light.
10           His schizophrenia was controlled.  He wasn't in a
11   severe advanced state of schizophrenia that makes him a
12   vegetative human being.  He was adequately functioning.
13   And that morning, as the video clearly shows, he was not
14   suffering from an acute form of schizophrenia.
15       Q.    So, sir, how do you quantify the conscious pain
16   and suffering that you've opined that Mr. Muhaymin had?
17       A.    Like I have said, how you quantify it is first
18   performing a differential diagnosis, which is a general
19   accepted methodology physicians use.  How did I apply the
20   forensic diagnosis?  Watching the video.  Reviewing -- I'm
21   answering your question.
22       Q.    Go ahead.  I'm sorry.
23       A.    Reviewing the autopsy findings, the toxicology,
24   and applying the established principles of medicine,
25   putting everything together.  Okay.



DEPOSITION OF BENNET OMALU
October 30, 2020

1           Then I said, given the totality of the evidence,
2    he experience high-scale -- if you notice, I stayed away
3    from one, two, three, four.  I did not quantify it
4    absolutely.  No.  I said he suffered high scales or high
5    levels of conscious pain and suffering.  Why do I use high
6    levels?  Because it is established that the agony of
7    death, especially violent death, causes high levels of
8    conscious pain and suffering.
9           And also his heart showed what we call a
10   catecholaminergic, catecholaminergic -- I spelled it on
11   Monday -- catecholaminergic event.  So on the totality of
12   the case and under proven and established scientific
13   findings, scientific principles.
14          Now, every human being in terms of response to
15   pain, we all respond to pain the same way.  It is not
16   something we have control over.  It's primitive reflex.
17   Now, if you are a normal human being, our cognitive
18   interpretation of pain may vary based on learning
19   behavior.  But cognitive interpretation of pain is not the
20   came as conscious pain and suffering.  Each individual
21   experiences conscious pain and suffering.  Your response
22   to the conscious pain and suffering does not in any way
23   nullify the experience of the pain.
24      Q.   And, Dr. Omalu, I don't -- I don't mean this
25   offensively, but when was the last time you treated a

DEPOSITION OF BENNET OMALU
October 30, 2020

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3                          --o0o--

4

5    Mussalina Muhaymin as Personal
     Representative of the Estate of
6    Muhammad Abdul Muhaymin Jr.,

7                      Plaintiff,

8          vs.                        No. 17-cv-04565-PHX-SMB

9    City of Phoenix, an Arizona          VOLUME II
     Municipal Corporation; Antonio
10   Tarango; Officer Oswald Grenier;
     Officer Kevin McGowan; Officer
11   Jason Hobe; Officer Ronaldo
     Canilao; Officer David Head;
12   Officer Susan Heimbinger;
     Officer James Clark; Officer
13   Dennis Lerous; Officer Ryan
     Nielson; Officer Steven Wong;
14   and Doe Supervisors 1-5,

15                     Defendants.
     _____/
16

17          CONTINUED VIDEO RECORDED DEPOSITION OF

18                    BENNET OMALU, MD

19                 Friday, October 30, 2020

20                         7:04 AM

21

22                  Taken in the offices of:
                      Bennet Omalu, MD
23           3031 West March Lane, Suite 323
                 Stockton, California 95219
24

25   REPORTED BY:  VICTORIA R. MARTIN, CSR 12322
```



DEPOSITION OF BENNET OMALU
October 30, 2020

1    A.   So like Ferner, F-E-R-N-E-R, Ferner said, you

2    cannot base diagnostic decisions just on one isolated

3    measurement of blood sample in the human body.

4    Q.   Now, would the -- the estimates of the

5    postmortem, I believe Baselt -- Baselt said that the range

6    is 0.09 to 18, and those are the concentrations that can

7    cause death from methamphetamines; correct?

8    A.   Any level of methamphetamine can cause death.

9    Q.   Okay.

10   A.   So what you now consider is, is the individual a

11   prior user of methamphetamine.  For example, a case I just

12   signed out before I started this deposition, the

13   methamphetamine level was very high, but he died from a

14   motor vehicle accident.  So the mere presence of high

15   levels of methamphetamine does not mean you died from it.

16   That is the point I'm making.

17   Q.   So you would look at the history of

18   methamphetamine use; right?

19   A.   Yes, please.

20   Q.   You would look at other stressors or other

21   factors to determine whether the methamphetamine had some

22   contributing factor to a death; correct?

23   A.   Yes, yes.

24   Q.   Okay.  Now, on your letterhead, Dr. Omalu, you

25   have Autopsy and Anatomic Pathology.  You took the boards



1    separate board for toxicology; correct?

2        A.   It's not -- it's not a board that is recognized

3    by the American Board of Pathology.  It doesn't fall under

4    the American Board of Pathology.

5        Q.   So are you saying because you are board

6    certified -- because you are board certified in anatomic

7    pathology and clinical pathology, you are automatically

8    board certified in toxicology?

9        A.   No, no.  That wasn't what I said.  The board

10   certification in toxicology, it's not under the American

11   Board of Pathology.  It's a separate board given by -- I

12   don't know who gives it.  Because there are many board

13   certifications out there that are not recognized by the

14   American -- Graduate Medical Education Certification

15   Board.

16           So there is a PhD -- there are some people with

17   PhDs in toxicology.  Very recently I started hearing of

18   there's board certification in toxicology.  Anybody can

19   get it.  So I don't know --

20       Q.   I'm sorry.  I didn't mean to interrupt you.

21   Medical doctors can get board certified in toxicology;

22   right?

23       A.   Yeah.  I've seen one or two medical doctors that

24   state board certification in toxicology.

25       Q.   Uh-huh.



DEPOSITION OF BENNET OMALU
October 30, 2020

1      A.   Toxicology is not a recognized field of medicine.

2   What we have in medicine is pharmacology.

3      Q.   So -- but medical toxicology is a subspecialty of

4   medicine; correct?

5      A.   Well, medical toxicology, we call it

6   pharmacology.  Pharmacology, P-H-A-R-M-A-C-O-L-G-Y.

7   Because as doctors, we deal with drugs.  Drugs are toxins.

8   So part of my medical school education, I spent one year

9   -- or six months to one year, I've forgotten, starting

10  pharmacology and therapeutics.

11     Q.   Now, earlier we talked about the fact that you

12  don't currently treat living patients and you haven't

13  treated them since Nigeria.  But in your CV, it says you

14  have hospital privileges.  Does that mean that you have

15  privileges to treat living patients?  I just need a little

16  clarification.

17     A.   I have privileges to make decisions on living

18  patients and their medical care and treatment.  Like I

19  have told you, as a pathologist, I advise clinicians on

20  treatments and diagnosis sometimes.  I'm consulted

21  directly to help guide the treatment of patients.

22          Now, can I treat patients in the State of

23  California?  Yes, I can.  But I've chosen not to do that

24  because it's not something I enjoy.

25     Q.   Okay.  Now, earlier when we were talking about

DEPOSITION OF BENNET OMALU
October 30, 2020

1    postmortem redistribution and the factors that you need to

2    consider whether methamphetamine toxicity contributed to

3    death, you said something about tolerance.  Can you give

4    me the elements of tolerance?

5        A.   Okay.  The elements of tolerance.  To begin with,

6    there is what is called pharmaco, pharmacogenetics,

7    pharmacogenetics, and what it means is not every human

8    being responds to the same drug the same way.

9        Q.   Uh-huh.

10       A.   A good example is like alcohol.  I have

11   colleagues of mine, they drink one shot of Johnnie Walker

12   whiskey, they are so loquacious.  They are intoxicated.

13   Myself, I drink one shot of Johnnie Walker, I don't even

14   notice any change.

15           So human beings have genetic variations in the

16   way they tolerate, they metabolize drugs.  That is the

17   first thing to begin with.  So if you find a high level of

18   a drug in an individual, it does not manifest the same way

19   as the same level in another individual.

20           Two, if your body has been exposed to a drug,

21   just like if your body has been exposed to a vaccine in

22   the past, the more recent, the greater the effect.  If

23   your body is exposed to the same drug it has been exposed

24   to, your body is no longer naive to that drug.  Your body

25   is used to that drug, then that drug is more likely to be



DEPOSITION OF BENNET OMALU
October 30, 2020

1   metabolized faster and is less likely to intoxicate you,

2   to kill you.  And the more exposed you are to that drug

3   and the more genetically tolerant you are to that drug,

4   the less likely the drug will have adverse effects on you.

5            So tolerance is a very broad scientific concept.

6   What it simply means -- I go back -- you cannot make a

7   diagnostic decision or conclusion just based on the level

8   of a drug in a human being.

9        Q.   Okay.  And for the purposes of reliance, is there

10   a particular textbook or study that you rely upon for your

11   definition of tolerance, as you just told me?

12       A.   There is a book called the Pharmacological Basis

13   of Therapeutics by --

14       Q.   Okay.

15       A.   It's called -- by Goodman, G-O-O-D-M-A-N.

16       Q.   Okay.

17       A.   It's a very basic, primary textbook of

18   pharmacology.  It's been a while I've read it, but you

19   could find the definition -- those definitions are

20   provided.

21       Q.   Do you happen to know the chapter or anything

22   like that?

23       A.   Oh, no.  For such a broad topic, there is no one

24   single chapter that will address it.  So when you go to

25   the index, you search, and it will refer you to the



DEPOSITION OF BENNET OMALU
October 30, 2020

1   Neuropathology textbook assist in your opinion?

2       A.   No.   Remember, two days ago -- or say two days

3   ago for the first deposition, I said that when I prepared

4   this report, I did not rely specifically on any specific

5   textbook or paper.   I said that.   That the concepts we

6   are -- the scientific concepts we are concerned with in

7   this case are very elementary and basic in medicine.   That

8   and also very elementary and basic for me as an

9   individual.   That I simply wrote all these things without

10  making any references.   But some of the absolute values I

11  provided, which I could not memorize, I had to go to the

12  specific textbook or reference, lift it out.   And when I

13  do -- I do that, I will give you the reference so that

14  absolute values we have references to.

15          But in terms of the scientific principles, I did

16  not refer or rely on any specific published book.

17  relied on the body of knowledge, experience, and work I

18  have done over 20 years.

19      Q.   So, Dr. Omalu, are you going to follow Mr.

20  Chami's direction not to provide the chapter on

21  Greenfield's Neuropathology?

22          MR. CHAMI:   No.   That's not what I said.   I just

23  said what the rules require.   That's all.

24          MS. STILLWELL:   No.   Mr. Chami, you said that he

25  is not going to provide it.   So --



DEPOSITION OF BENNET OMALU
October 30, 2020

1      Q.   Okay.  On page 19, you conclude that Mr.

2  Muhaymin, quote, "Died as a result of

3  mechanical-positional asphyxiation due to the compression

4  of his trunk and body."

5           Did I say that correctly?

6      A.   Yes, please.

7      Q.   And you said -- you start out by saying Mr.

8  Muhaymin, quote, "Was not in any form of distress."

9      A.   I said, "When he walked out of the community

10  center" --

11      Q.   Okay.

12      A.   -- "on January 4, 2017, he was not in any form of

13  distress and was not dying."

14      Q.   How do you make that conclusion in light of the

15  fact that he did have methamphetamines in his system and

16  he was schizophrenic, and he did have -- although you say

17  "clinically insignificant," he did have a blockage in his

18  arteries.

19      A.   No, no.  Why I'm laughing is you said he had a

20  blockage in his arteries.

21      Q.   Yes.

22      A.   I sit here and as you sit here too, you and I

23  could have blockages of 30 to 40 percent.  It is of no

24  clinical significance.  It becomes clinically significant

25  when it is up about 80.  Even with 80 percent, it becomes



DEPOSITION OF BENNET OMALU
October 30, 2020

1   clinically significant if you suffer myofibrillar ischemic

2   injury.  So the presence of blockage of your vessels does

3   not place you in distress.  No.  One.

4          Two, like I have always said earlier, the mere

5   presence of the drug in your blood does not mean that drug

6   is killing you or that drug is toxic.

7          Three, the mere fact that you have schizophrenia

8   does not mean you are in distress.  It's a chronic

9   disease.  It's like saying somebody with high blood

10  pressure like myself, that I'm in distress.  No.  The mere

11  presence of the disease in a human being does not equate

12  to distress or impending death.  And that is what we have

13  here.

14         Like I have pugilistic, and I clearly state that

15  in my report, that the mere presence of a disease or drug

16  in your body does not mean you are dying from the disease

17  or drug.  The video clearly shows a human being who was

18  not in any form of distress or in any form of impending

19  death.  The autopsy confirmed that.

20                  (Videographer gone.)

21      MS. STILLWELL:  Q.  Now, you mentioned in part of

22  your review of the slides, the slides you created, sir,

23  that you were able to conclude that the slides showed

24  brain edema and brain congestion; is that right?

25      A.  Yes, please.



DEPOSITION OF BENNET OMALU
October 30, 2020

1        Q.   You agree with me though that both brain edema
2   and brain congestion, that you can also see that following
3   a prolonged period of resuscitation efforts?
4        A.   Yes.  But -- but let's be very careful.  Let's
5   not start in a wild-goose chase of hypotheticals.
6   Anything is possible.  It's possible Dr. Bennet Omalu is a
7   woman.  Because based on what you see, it is unreasonable
8   to assume he's woman.
9             So in this case an autopsy was done.  We have
10  confirmed evidential -- prevailing evidentiary values that
11  nobody is contesting.  And based on the constellation of
12  those evidentiary values or indices, we've made a
13  conclusion.
14            Now, after we've done that and we start
15  hypothesizing:  Is this possible?  Is this possible?
16  Based on the outcomes, there was no evidence to indicate
17  that the changes we saw in his brain were caused by
18  cardiopulmonary resuscitation.
19       Q.   Well, Dr. Omalu, you would agree that there was
20  approximately 30 minutes of cardiopulmonary resuscitation
21  efforts; right?
22       A.   Yes.
23            MR. CHAMI:  Object to foundation.
24            MS. STILLWELL:  Q.  We started talking before on
25  Monday and I asked you if you could tell me how much body



DEPOSITION OF BENNET OMALU
October 30, 2020

1    weight was placed on Mr. Muhaymin and by which officer,

2    and I think you had told me that you can't quantify that;

3    is that correct?

4        A.   Yes.   It's the same -- it is tantamount to the

5    all or non-principle, which I'll explain.   That you cannot

6    specify each and every exposure.   No.   Rather, it is a

7    spectrum of cumulative exposure.   And that is why the

8    diagnosis we raise -- everybody just say, "mechanical

9    asphyxia."   We say, "mechanical-positional."

10           Because first in positional, a human being thrown

11   on the ground with his chest and abdomen compressed on the

12   ground, inability of the diaphragm to move up and down, so

13   the cumulative exposure with him on the ground and with

14   him even crying out, "I cannot breathe."   You need to put

15   the entirety of the exposure to injury together, not each

16   and every.

17           And that was what -- I clearly state that in my

18   report, that this is -- this is about the concept of

19   cumulative exposure.   We are dealing with brain injury.

20       Q.   Okay.   Would you agree with me, Dr. Omalu, that

21   the officers' placement was changing?

22       A.   Sorry?

23       Q.   That the officers changed positions in

24   placement --

25           MR. CHAMI:   Objection to form and foundation.



DEPOSITION OF BENNET OMALU
October 30, 2020

 1            MS. STILLWELL:  Can I finish the question, Mr.
 2   Chami?
 3            MR. CHAMI:  That was a question.  I didn't know
 4   you weren't done.
 5            MS. STILLWELL:  I'm not done.
 6       Q.   -- during the encounters with Mr. Muhaymin?
 7            MR. CHAMI:  Object to form and foundation.
 8            MS. STILLWELL:  Q.  Go ahead, Doctor.
 9       A.   My answer to that is yes.  But not unique to this
10   case.  I was not paying to attention to that.  When there
11   is compression of a human being, it's not a static, static
12   phenomenon.  It's a dynamic phenomenon.  So I expect
13   positioning to change, including the body of Muhammad.  So
14   my answer to that is yes.
15       Q.   Yes, they were changing?
16       A.   Not -- my answer is general -- a general answer.
17   I did not pay attention to it in this case because it is
18   of no significant forensic consequence.  You expect their
19   bodies to change, yes.
20       Q.   Does the person's weight on someone's legs impact
21   the ability to ventilate?
22       A.   I don't understand the question.  Sorry.
23       Q.   Sure.  If a person is holding someone's legs,
24   does that impact their ventilation, their ability to
25   breathe?

DEPOSITION OF BENNET OMALU
October 30, 2020

1        A.    So the answer to that is yes.  But you have to

2   consider the entirety of the event, not just holding the

3   person's legs.  Holding somebody's leg -- if I'm sitting

4   down now and my son is holding my leg, it's not going to

5   affect me because I'm sitting down.  My chest can move up

6   and down.

7           So like I have said earlier, we cannot break it

8   up into different parts.  If he was holding his leg, what

9   was the other things going on at that moment.  Were his

10  legs -- his knees being flexed, and were his hips being

11  flexed with the legs?

12          So the totality of the exposure to injury

13  compromise his aspiratory functioning including the

14  aspiration of his vomitus.

15      Q.    So the same -- your opinion would be the same on

16  whether an officer had weight on buttocks or on arms --

17      A.    Yes.

18      Q.    -- or hands?

19      A.    Yes.

20      Q.    Correct?

21      A.    Because it is a concept of cumulative exposure.

22  We cannot engage in each and every, which medically is not

23  acceptable.  And even legally, based on my experience, you

24  can't propound each and every exposure concept.  It is

25  accumulative exposure.

DEPOSITION OF BENNET OMALU
October 30, 2020

```
 1        Q.   So your opinion, sir, on cumulated exposure, a
 2   cumulated sustained mechanical compression I think is
 3   another phrase you had used.  Can you cite to any
 4   textbooks or articles that support that concept?
 5                    (Videographer returned.)
 6             THE WITNESS:  Concept of what?  Can you help me
 7   understand?
 8             MS. STILLWELL:  Q.  Sure.  You had indicated
 9   cumulated exposure or pressure and not breaking it down
10   per officer or per event, but the cumulated -- everybody,
11   regardless of what they were holding or what they were
12   doing.  Is there a textbook or an article or a study that
13   supports that concept?
14        A.   Every basic textbook of medicine will address the
15   issue of cumulated injury to the human brain.  There is no
16   basic textbook of brain disease or brain injury.  This is
17   a very basic and elementary concept, honestly.  It does
18   certain things -- certain generally accepted principles of
19   medicine.  Like a man has XX sex chromosomes.  We don't
20   need a reference for that.  It's a fact of medicine.
21                         (Mr. Faraj joins the depo.)
22             THE WITNESS:  Every basic textbook of medicine
23   you should consider.
24             MS. STILLWELL:  Q.  Dr. Omalu, you've said
25   "basic" and "elementary" quite a few times.  If it's so
```

DEPOSITION OF BENNET OMALU
October 30, 2020

1    Q.   So when we talk about contemporaneous other

2  factors, we can talk about, you know, how much weight was

3  applied or for how long; correct?

4    A.   Yes.  But not just the weight, per se, like I

5  have said.  Because I think we are divergent -- excuse me.

6  You're focusing on the weight as a mutually exclusive

7  factor, and I'm telling you, no, you cannot do that.  It

8  is a totality, a cumulation of multiple contemporaneous

9  factors, including the vomiting.  Because we keep on

10  staying away from it.  Including the vomitus, which -- the

11  vomiting, which occluded all his airways.

12    Q.   We'll get to the vomiting, Dr. Omalu, but you

13  brought up something that reminded me from the Monday.  On

14  Monday you said it wasn't just the weight, and it sounds

15  like right now it doesn't matter how much weight or where

16  it was applied.  But you said on Monday about the knee

17  compression in a vital plexus.  Do you recall that?

18    A.   The what plexus?

19    Q.   I think you said "vital" plexus.

20    A.   No, no, no, no.  I said in the neck and chest.

21  They are vital plexuses, plexuses, P-L-U-X-E-S [sic],

22  plexuses of nerves and ganglia that are very sensitive to

23  compression.

24    Q.   Where are -- I don't mean to interrupt you,

25  Doctor.  I'm sorry.  Where are those nerves that you are

**DEPOSITION OF BENNET OMALU**
October 30, 2020

1   did not list it.  So if you ask me maybe it was in there,

2   I don't know.  But I could check the autopsy report if you

3   will let me.

4       Q.   Dr. Omalu, if you just want to check the autopsy

5   report really quick to see if it --

6       A.   Yes.  Thank you.  It says there were no petechia

7   in the eyes.

8       Q.   Okay.  Thank you, Doctor.  Do you recall -- well,

9   you told me you don't know exactly when his heart stopped.

10  Is that you true that you don't know also when he stopped

11  breathing?  Can you tell that from the video, sir?

12      A.   I did not watch out for that because it was of no

13  forensic value, so I wasn't watching the video to identify

14  specifically when he stopped breathing.  All I know is my

15  review during the asphyxial event, during the second

16  officer -- the officers noted he was nonresponsive after

17  he said he could not breathe.  I didn't go to find out

18  exactly the time, no.

19      Q.   Okay.  Now, Dr. Omalu, if a person is struggling

20  or resisting, can that increase the amount of lactic acid

21  that they are producing?

22      A.   It is not the struggle that is producing the

23  lactic acid.  It is the metabolic injury which was

24  instigated by the asphyxial injury.  The struggle is a

25  consequence of the asphyxial injury.



DEPOSITION OF BENNET OMALU
October 30, 2020

```
 1      Q.   But they show the encounter.  They are the best
 2   evidence?
 3      A.   Yes, ma'am.
 4           MR. FARAJ:  I'm going to -- I'm going to object
 5   to --
 6           MS. STILLWELL:  Go ahead, Mr. Faraj.
 7           MR. FARAJ:  I'm going to object to lack of
 8   foundation.  Dr. Omalu's opinion as to the best evidence
 9   is not relevant.  That's a legal question.
10           Go ahead though.
11           THE WITNESS:  I'm sorry.  I don't -- I will -- my
12   opinion is not the best evidence.  My opinion is the video
13   speaks for itself.  I did not -- I was not using the word
14   "best."
15           MR. FARAJ:  I didn't say you did, Dr. Omalu.
16           MS. STILLWELL:  I did.
17           MR. FARAJ:  It's a question and response, and I
18   wanted to make sure I'm objecting to the suggestion that
19   that's the best evidence.
20           MS. STILLWELL:  So did you have any more, Mr.
21   Faraj?
22           MR. FARAJ:  No, I didn't.
23           MS. STILLWELL:  I didn't mean to interrupt you.
24      Q.   Now, Dr. Omalu, I'm very curious about this
25   concept of primitive response and that he was acting out
```

DEPOSITION OF BENNET OMALU
October 30, 2020

1    of fear and not resistance, and then he was acting out of

2    asphyxiation and not continued resistance.  With that

3    concept -- where did that concept come from?  Is there a

4    textbook?  Is there a study or an article that supports

5    this idea of the primitive responses?

6        A.   Every basic textbook of medicine.  Again, I give

7    you Guyton's Textbook of Physiology, G-U-Y-T-O-N-S.  Any

8    basic psychiatry textbook.  Every basic textbook of human

9    behavior or -- it's like I said, it's a very basic,

10   elementary generally accepted common knowledge of

11   medicine.

12       Q.   Now, Dr. Omalu, a few things.  No. 1, you are not

13   a psychologist; correct?

14       A.   I'm not a psychologist, no.

15       Q.   And you are not a psychiatrist?

16       A.   As a physician, I'm trained in psychiatry, but

17   I'm not board certified in psychiatry.

18       Q.   And you've never provided mental health treatment

19   to a living patient; correct?

20       A.   I have; I have.  Your question is I have never,

21   and the answer to that is that is not true.  I have.  When

22   I was in Nigeria, I worked for -- how many years? -- five,

23   six years as a physician, and I worked as a general

24   practitioner.  A general practitioner, you provide every

25   spectrum of care.  Like cesarean sections.  I performed



DEPOSITION OF BENNET OMALU
October 30, 2020

```
1        Q.   Okay.  Dr. Omalu, let's switch gears.  You
2    mentioned before the oxygenation.  And actually on page 24
3    of your report you opine, "As his blood oxygen levels
4    decreased and the carbon dioxide levels increased, while
5    he was on the ground, he began to develop acidosis, became
6    more confused and afraid and struggled more."
7             Do you know, Dr. Omalu, what his oxygen
8    saturation level was when he was walking to the police
9    car?
10       A.   No.  That was why I did not put it in my report
11   because it's a misnomer.  It doesn't matter what his
12   oxygen saturation level was there.  What matters is that
13   he died and an autopsy was performed which showed he
14   suffered an asphyxial injury.  The medical examiner who
15   performed this autopsy ruled it a homicide.  She ruled it
16   a homicide.
17       Q.   So, Dr. Omalu, you just indicated about the blood
18   oxygen levels.  Because you don't know the oxygen
19   saturation, obviously he wasn't wearing a pulse oximeter,
20   so there was no monitoring device to conclude that his
21   blood oxygen levels decreased and the carbon dioxide
22   levels increased.  So I'm trying to find out how did you
23   make that opinion.  What was it based upon other than your
24   final conclusion?
25       A.   Because the brain cells, which I examined --
```



DEPOSITION OF BENNET OMALU
October 30, 2020

1    Muhaymin; is that correct?

2        A.    Yes, please.

3        Q.    And do you know, as you sit here, Dr. Omalu, what

4    he was cognitively experiencing during any part of his

5    encounter with law enforcement officers?

6        A.    Could you repeat the question?

7        Q.    Yes.  Do you know, Dr. Omalu, as you sit here

8    today, what Mr. Muhaymin was cognitively experiencing

9    during his encounter with the law enforcement officers?

10       A.    He was experiencing mental pain and anguish.  He

11   was experiencing somatic pain.  He was experiencing

12   chemical pain.

13       Q.    Can you base that, sir, off of your review?

14   Obviously you can't interject yourself into Mr. Muhaymin's

15   box or brain that day; correct?

16       A.    No.  I base that on the prevailing avenues and on

17   established scientific principles beginning with the fact

18   that Mr. Muhaymin is a human being and human beings are

19   known to behave and to manifest and exhibit specific types

20   of behaviors which are predictable, predictable in

21   specific circumstances.

22       Q.    And you said they were on scientific methods.

23   Can you tell me which ones?

24       A.    Scientific methods:  observing the video,

25   watching him as a human being, and then what is



DEPOSITION OF BENNET OMALU
October 30, 2020

1   established about the human being's experience of pain and
2   suffering.
3       Q.   So, Dr. Omalu, you agree though if an individual
4   is feeling pain, they would generally modify their
5   behavior to relieve that pain; correct?
6       A.   That is what I have always said is the primitive
7   reflex.
8       Q.   Right.
9       A.   A good example, if your hand touches fire or
10  you're sitting on a hot surface, the moment you experience
11  the heat, you stand up immediately.  That is a primitive
12  reflex.
13      Q.   Given that example.  I'm just trying to figure
14  out, sir, in this instance you just said it's the
15  primitive response to struggle against the officers.  But
16  how is it not a primitive response --
17          MR. FARAJ:  Misstates the testimony.
18          MS. STILLWELL:  Well, I'm not done with my
19  question.
20      Q.   How is it not a primitive response to modify his
21  behavior according to the -- provided?
22      A.   I missed you for like a second.  It went blank.
23  Could you repeat it, please?
24      Q.   Sure.  I'll try to repeat it word-for-word, but I
25  most likely won't.

### DEPOSITION OF BENNET OMALU
#### October 30, 2020

1  nothing in this case that may indicate or suggest that

2  Muhammad was in an active psychotic state.  There is no

3  evidence whatsoever.

4      Q.   So, Dr. Omalu, then you don't believe based on

5  your review that he was in an acute mental crisis?

6      A.   No.   There's no evidence whatsoever.  As a

7  physician, as somebody who has suffered -- I've struggled

8  with depression in my life, if you read my book.  I frown

9  upon anyone painting mental illness in dark light.

10          His schizophrenia was controlled.  He wasn't in a

11  severe advanced state of schizophrenia that makes him a

12  vegetative human being.  He was adequately functioning.

13  And that morning, as the video clearly shows, he was not

14  suffering from an acute form of schizophrenia.

15      Q.   So, sir, how do you quantify the conscious pain

16  and suffering that you've opined that Mr. Muhaymin had?

17      A.   Like I have said, how you quantify it is first

18  performing a differential diagnosis, which is a general

19  accepted methodology physicians use.  How did I apply the

20  forensic diagnosis?  Watching the video.  Reviewing -- I'm

21  answering your question.

22      Q.   Go ahead.  I'm sorry.

23      A.   Reviewing the autopsy findings, the toxicology,

24  and applying the established principles of medicine,

25  putting everything together.  Okay.



DEPOSITION OF BENNET OMALU
October 30, 2020

1            Then I said, given the totality of the evidence,
2    he experience high-scale -- if you notice, I stayed away
3    from one, two, three, four.  I did not quantify it
4    absolutely.  No.  I said he suffered high scales or high
5    levels of conscious pain and suffering.  Why do I use high
6    levels?  Because it is established that the agony of
7    death, especially violent death, causes high levels of
8    conscious pain and suffering.
9            And also his heart showed what we call a
10   catecholaminergic, catecholaminergic -- I spelled it on
11   Monday -- catecholaminergic event.  So on the totality of
12   the case and under proven and established scientific
13   findings, scientific principles.
14           Now, every human being in terms of response to
15   pain, we all respond to pain the same way.  It is not
16   something we have control over.  It's primitive reflex.
17   Now, if you are a normal human being, our cognitive
18   interpretation of pain may vary based on learning
19   behavior.  But cognitive interpretation of pain is not the
20   came as conscious pain and suffering.  Each individual
21   experiences conscious pain and suffering.  Your response
22   to the conscious pain and suffering does not in any way
23   nullify the experience of the pain.
24      Q.   And, Dr. Omalu, I don't -- I don't mean this
25   offensively, but when was the last time you treated a

# EXHIBIT 3

David A. Chami, AZ #027585
PRICE LAW GROUP, APC
8245 N. 85th Way
Scottsdale, AZ 85258
T: (818) 600-5515
F: (818) 600-5415
david@pricelawgroup.com

Haytham Faraj
LAW OFFICES OF HAYTHAM FARAJ
1935 W Belmont Ave.
Chicago, IL 60657
T: (312) 635-0800
F: (202) 280-1039
haytham@farajlaw.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mussalina Muhaymin as Personal Representative of the Estate of Muhammad Abdul Muhaymin Jr., <br><br> Plaintiff, <br><br> v. <br><br> City of Phoenix, an Arizona Municipal Corporation, et al., <br><br> Defendants. | Case No.: CV-17-04565-PHX-SMB <br><br> **PLAINTIFF'S SIXTH SUPPLEMENTAL MANDATORY DISCOVERY RESPONSES** |

Plaintiff Mussalina Muhaymin as Personal Representative of the Estate of Muhammad Abdul Muhaymin Jr. ("Plaintiff" or "Muhaymin"), hereby makes the following **sixth supplemental** disclosure while reserving the right to seasonably supplement this disclosure statement as additional relevant information becomes available.

as well as the statutory and common law rights as guaranteed by the law and Constitution of the State of Arizona and of the United States.

### D. Computation of damages claimed by disclosing party.

Plaintiff is entitled to compensatory damages recoverable under A.R.S. §§ 12-611, et seq., and 14-311 in an amount of not less than Ten Million Dollars ($10,000,000) or such other amount as may be deemed fair and just by the trier of fact.  The compensatory damages include but are not limited to: special damages including, but not limited to, loss of income and services, medical fees and expenses, and funeral and burial expenses, all incurred on behalf of Muhaymin; and general damages include, but are not limited to, loss of consortium, pain and suffering, loss of enjoyment of life, and wrongful death. Plaintiff is also entitled to punitive damages against the individual Defendants in an amount to be determined by the trier of fact. Plaintiff is entitled to pre-judgment and post-judgment interest. Plaintiff is also entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and for such other and further relief as the Court deems just and proper.

### E. Insurance Agreement

Plaintiff is not aware of any insurance that is relevant to this matter.

Plaintiff provides the above disclosures based on the information currently available. Plaintiff reserves the right to supplement or amend this disclosure statement.

### F. Experts

    1.  Mr. Scott A. DeFoe
       c/o David Chami

Scott Defoe is an expert on police practices and activities throughout the United States, as well as an expert on the use of deadly or excessive force. Scott DeFoe will provide his expert opinions and testimony consistent with the information contained in his report.

    2.  Dr. Bennet Omalu
       c/o David Chami

Dr. Omalu is a Forensic Pathologist, which focuses on forensic and hospital autopsies, causes, mechanisms and manners of death. Dr. Omalu will provide his expert opinions and testimony consistent with the information contained in his report.

///

# EXHIBIT 4



**MARICOPA COUNTY**
**OFFICE OF THE MEDICAL EXAMINER**
**701 W. Jefferson Street**
**Phoenix, AZ 85007**

**TOXICOLOGICAL EXAMINATION REPORT**

**DECEDENT:** MUHAMMAD ABDUL MUHAYMIN        **CASE:** 17-00095

**DATE OF EXAM:** 01/05/2017

**MEDICAL EXAMINER:** AMANDA MASKOVYAK, MD

**Specimens Collected:** GROSS TISSUE, VITREOUS, HISTOLOGY, BLOT/FILTER PAPER, BILE, URINE, ILIAC BLOOD, CARDIAC BLOOD, GASTRIC, LIVER

---

**RESULTS*:**

Vitreous:        None detected for ethanol, methanol, isopropanol and acetone

Iliac Blood:        Positive for:
                    Methamphetamine 0.81 mg/L
                    Amphetamine 0.24 mg/L
                None detected for ethanol, methanol, isopropanol, acetone, phencyclidine, cocaine, benzoylecgonine, methadone, morphine, codeine, oxycodone/oxymorphone, benzodiazepines, barbiturates, fentanyl, antihistamines, phenothiazines, antidepressants, other basic drugs, and acid neutral drugs

*If results are not listed for any specimen(s), that/those specimen(s) is/are deemed to be on "HOLD"

---

2/21/17
**Date Signed**

Diane Mertens Maxham
**Diane Mertens Maxham**
**Toxicology Supervisor**

Jurisdictional Agency:        PHOENIX PD
/jk

COP 003370

# EXHIBIT 5

Ali Taqi, D.O.
October 22, 2020

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Mussalina Muhaymin as Personal
Representative of the Estate of
Muhammad Abdul Muhaymin Jr.,
             Plaintiff,
vs.                              Case No. 17-cv-04565-PHX-SMB
                                 Honorable Susan M. Brnovich

City of Phoenix, an Arizona Municipal
Corporation; Antonio Tarango; Officer
Oswald Grenier; Officer Kevin
McGowan; Officer Jason Hobe; Officer
Ronaldo Canilao; Officer David Head;
Officer Susan Heimbinger; Officer James
Clark; Officer Dennis Lerous; Officer
Ryan Nielson; Officer Steven Wong; and
Doe Supervisors 1-5,

             Defendants.
                                    /
        CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

        VIDEO DEPOSITION OF ALI TAQI, DO,

        Taken at Carroll Court Reporting and Video,

        1861 East Maple Road, Troy, Michigan,

        on Thursday, October 22, 2020,

        commencing at or about 10:08 a.m.

APPEARANCES:

For the Plaintiff:

        MR. HAYTHAM FARAJ
        Law Offices of Haytham Faraj
        1935 West Belmont Avenue
        Chicago, Illinois 60657
        (312) 635-0800

Ali Taqi, D.O.
October 22, 2020

Page 69

1   A   Correct.

2   Q   And do you consider yourself an expert in the area of

3       toxicology?

4   A   I consider myself an expert in patients' drug use and

5       treating patients with drug abuse problems.  I see patients

6       with methamphetamine use, cocaine, and heroin every day.  So

7       I'm an expert in treating patients with drug use disorder;

8       correct.

9   Q   And do you know what has been determined to be the toxic

10      level for meth?

11  A   That is not my expertise.

12  Q   But you recall reviewing that level from pathologist reports

13      -- Dr. Omalu's, for example; correct?

14  A   Correct.  Both -- both the ME and Omalu's report had mention

15      of methamphetamine use.

16  Q   And I'm referring specifically to what the experts have

17      determined to be a toxic level.

18  A   Correct.

19  Q   Okay.  And that's .15 milligrams per liter; correct?

20  A   If that's in the report, then yes.

21  Q   Okay.  And what -- what does -- do you know what "toxic

22      level" means?

23  A   The toxic level in the blood refers to the amount of drug

24      that will cause an adverse outcome in the patient.  "Adverse

25      event" meaning can lead to death, arrhythmia, or another bad

Ali Taqi, D.O.
October 22, 2020

Page 70

1      outcome.

2   Q   Okay.  So --

3   A   What we call morbidity or mortality.

4   Q   Okay.  So "toxic level" means it can lead to death; correct?

5   A   It can cause harm; correct.

6   Q   And it's a potentially fatal amount of the drug in a person's

7       system; correct?

8   A   Correct.

9   Q   And do you know the level of methamphetamine that

10      Mr. Muhaymin had in his system according to the toxicology

11      report that was prepared at the autopsy?

12  A   I would have to refer to the report.

13  Q   Okay.  You can do that if you want, but I'll tell you

14      it's .81 milligrams per liter according to the toxicology

15      report.  If you want to confirm that, you're welcome to.

16  A   I don't have the ME report with me.

17  Q   Okay.  Assuming it's .81 milligrams per liter that was

18      determined as the level of methamphetamine in Mr. Muhaymin's

19      -- with -- in Mr. Muhaymin at the toxicology report at the

20      autopsy, that -- that would be an amount that's more than

21      five times the toxic level; correct?

22          MR. FARAJ:  Incomplete hypothetical.  Assumes fact.

23          Go ahead and answer.

24          THE WITNESS:  I'm sure -- .5 -- .15 to .8; correct.

25      BY MR. HILL, CONTINUING:

Ali Taqi, D.O.
October 22, 2020

Page 110

1    Q    Would you agree that his heart was strained because of the

2         meth intoxication?

3    A    **I would agree with that.**

4    Q    Okay.  Because, again, we are talking about five times the

5         toxic level; correct?

6    A    **The number you mentioned was five times; correct.  About five**

7         **times.**

8    Q    On the first -- first page of your report you say his death

9         was multifactorial.  And you've mentioned, you know, that

10        phrase, I think, a couple of times throughout the deposition

11        today.  What do you mean by "multifactorial"?

12   A    **There were many complications that caused his death.  So, in**

13        **my opinion, it was a respiratory issue or lack of respiration**

14        **that led to the cardiac issue, cardiac arrest, and all that.**

15        **So there's, like, an incidental cause and then the sequelae**

16        **of that so . . .**

17   Q    So basically a number of factors in combination resulted in

18        the death.

19   A    **Correct.**

20   Q    Are you -- do you think you're able to determine what

21        percentage you would assign to each factor?

22   A    **The main factor, in my opinion, was he was not able to**

23        **breathe and that led to all these other issues.**

24   Q    Okay.

25   A    **So that's my -- the opinion that I have.**

# EXHIBIT 6

**PART E: ANNUAL BEHAVIORAL HEALTH UPDATE AND REVIEW SUMMARY**

**Name** Muhammad Muhaymin          **Date of Birth** ▮▮▮▮▮          **Client CIS ID#** 1101103099

**Accompanying Family Member/Significant Other (Note relationship to person):** see generated copy

**Date of Current Assessment/Review** 12/12/2016     **Date of Initial Assessment/Last Review** 12/12/2016

# Initial and or Change in Diagnosis

Modified Date: 12/05/2016 10:50 AM

_____

**Primary Billing Diagnosis: AXIS I : 295.10 - Schizophrenia Disorganized Type**

**Axis I  - DSM -IV                    DSM -V**
**Specifier:**

| 295.10 | Schizophrenia Disorganized Type | F20.9 | Schizophrenia | |
|--------|--------------------------------|-------|---------------|---|
| 305.20 | Cannibus Abuse | F12.10 | Cannabis use disorder, Mild | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Axis II:**

| V71.09 | No diagnosis on Axis II | | | |
|--------|------------------------|---|---|---|

**Axis III:**      30            Chronic Pulmonary Disorders

**Axis IV:**      **Problems with/related to** housing,

               **Significant recent losses as of 09/22/2016:**

**Axis V:**      45

_____

**Modified by:** Lilliam Villalobos MD

**Date:** 12/05/2016

**Terros**
**Medication Log**

**Client::** Muhammad  Muhaymin

**Client ID:** 1101103099          **Date of Birth:** ▮▮▮▮▮

**Date of Log:** 12/12/2016

**Current Provider:**

**Active Meds**

Inactive Meds


Allergies


Client Name: **Muhammad Muhaymin**

*Reminder: Please copy and paste most current diagnosis and medication log from generated documents in Next Gen directly onto generated assessment.*

**Date, start and stop time and location of interview:**

Cm sat down with Muhammad and his step mother Annie Davis to update his assessment and ISP goals on 11/14/16, cm sat down with Muhammad at 2:30pm, cm did get the permission of Muhammad guardian Mussallina (sister). Mussallina is his guardian and sister, Annie Davis is Muhammad step mother and will be helping him attend his appointments. Cm completed Muhammad assessment at Maryvale Park at 9:30am, cm ended the interview at 10:55am.

**Presenting Issues/Concerns/mental status assessment:**

Muhammad said he wanted help with everything had to offered, Muhammad presented okay he was talking and answering questions the best he could. Muhammad is wanting help with housing, medications management, case management.

**History of present illness (progress in recovery over last year):**

Muhammad reports his symptoms are using hand gestures, feeling like he is being followed, talking incoheant about the birds, and people when he was little he would think the adults are telling him to be bad or seeing little girls being bad. Muhammad step mother (Annie) said it could be all day and all night the longest it ever went for was a week. Muhammad reports never being in the hospital Muhammad step mother Annie report they would take him to jail instead of the hospital. Muhammad reports no current SI/HI. Muhammad reports no current stressor at this time. Muhammad report over the last year he has done better he has not been to jail and is getting more help now.

**Past Psychiatric History:**

Muhammad reports his first diagnosed was at the age of 33 after his father death. Muhammad has never been to the hospital for psychiatric only when he got arrested. Muhammad reports past symptoms are hand gestures, not wanting to be inside (i.e. home or apartment) hearing voices, Annie informed cm that Muhammad will talk with the child and see them when there is no children there. Annie informed reported Muhammad said the adults are the ones that make him do bad things.

**Medical History (include PCP contact info, labs ordered):**

Muhammad reports last year when he was in jail they took blood for routine blood work. Muhammad report no current health issues at this time. Muhammad is new to the system and has a PCP but has not seen him at this time. Muhammad reports no barriers to going to the PCP once he knows who he/she is. Muhammad is current going to go to Dr. Allen who can be reached at 602-797-7760 and is located at 3864 N. 27th Ave.

**Cultural Preferences for Treatment:**

Muhammad reports his culture and religion preference is important in his treatment planning, Monotheist Muhamad primary language is English preferred language is English according to guardian, an interpreter is not needed at Muhammad treatment planning or appointments. English is the preferred language.

COP 015244

**Special Assistance assessment (include contact info for Guardian/Advocate if applicable)**

Muhammad has a guardian his sister Mussallina Muhaymin who can be reached at 678-920-0786 Mussallina will also be Muhammad

payee when Muhammad receives his benefits. Muhammad was assessed for special assistance, and it was determined that he did need

it and the form was filled out with his sister and is waiting on permeant guardianship. Therefore, temporary form was filled out.

Muhammad is unable to understand the G&A process. Muhammad fully participated in his treatment plan along with his guardian

Mussallina, and reported that did want his sister (Mussallina) and step mother (Annie Ruth Davis) involved in his treatment planning

and appointments. Mussallina Muhaymin is Muhammad temporary guardianship until she is able to get permeant guardianship,

Mussallina can be reached at 678-920-0786.


**Involvement with other agencies:**

Muhammad is not involved in another agencies at this time, Muhammad is signed up for supportive housing and is on the waiting list.
Muhammad is not on Adult probation, not involved in DCS, DD, or another BH providers at this time. Muhammad is not involved in
counseling services at this time.
**Family status/history:**

Muhammad reports his relationship with his family is distance, Muhammad guardian reports Muhammad has 2 cousin that is verified
with mental illness, one has Schiophinaic and the other is unknown but Muhammad and his guardian. Muhammad reports no sexually
/physical abuse he wants to talk about right now. Muhammad reports he feels is has affected his family relationship worse, he fells his
family aunt got time to help him. Muhammad reports he does not want his family to deal with his mental illness. Muhammad reports
he does have a family mentor his uncle, Muhammad feel he could benefit from community support. Muhammad reports his natural
support is his sister Mussallina, and step mother Annie Ruth Davis.
**Educational status/history:**

Muhammad is not currently involved in any learning activities, Muhammad reports the highest grade he complete he completed was
college where he got his Associate Degree worked toward earning a Bachelor's but need more credit. Muhammad reports
transportation, stable, medications is a factor as well.
**Employment status/history:**

Muhammad is not currently employed at this time, Muhammad is not stable and is living in Maryvale Park, Muhammad is currently not
taking any medications, Muhammad reports the barriers to not working is stability, medication, not eating right.
**Housing or living environment status/history:**

Muhammad currently lives in Maryvale Park with his dog, Muhammad is waiting on the MMIC housing list. Muhammad does not have
income at this time and is not working. Muhammad is not stable on medications. Muhammad does not get SSI/ SSDI and does receives
$19.00 in foods stamps. Muhammad lives in Maryvale Park.
**Social status/history:**

Muhammad reports his social lives involves his friends at the Park, Muhammad reports his dog helps him mentally, and his sister and
step mother will come around to see how he is doing. Muhammad reports he stays at the park and helps his friends around there with
food, Muhammad reports they help each other. Muhammad is homeless and stays in Maryvale Park, Muhammad report his hobbies is
art and crafts, sewing, cooking, hand drawing, studying, wiping shoes, keeping his area clean.
**Legal status/history (include COT and Criminal Justice involvement):**

COP 015245

Muhammad reports no legal or pending litigation at this time. Muhammad reports no custody concerns, Muhammad is not a sex offender, no probation, DCS involvement, Muhammad is not on COT/ COE at this time. Muhammad has no history of COT/COE at this time.

**Substance use status/history:**

Muhammad reports his does use substance; Muhammad reports his drug of choice is meth, Muhammad reports he has used alcohol and marijuana social, Muhammad as reports he used all types of substance and is not ready to say what he has used. Muhammad reports he is still researching his substance use. Muhammad reports he has used synthetic drug. Muhammad reports his longest sobriety was 2 months. Muhammad reports be involved in a drug treatment program, about a decade ago in and out of treatment. Muhammad is not currently involved in any substance abuse treatment program or counseling. Muhammad reports his barriers for not stopping is the privacy act and the right to bear arms (which he means bear his arms).

**Risk Assessment:**

Muhammad is not SI/HI/PAD/GD at this time, Muhammad is at risk of withdrawal or overdose/toxic use. Muhammad nutrition is not good due to his homelessness, Muhammad is at risk to exposure to the elements, exploitation, abuse or neglect due to his substance use and his current homelessness.

**Brief summary/areas of need to be addressed in ISP (what will the ISP goals be addressing?):**

Living Goal: I want own apartment/ Muhammad needs to keep in touch with cm and guardian for updates on his housing.
Learning/Working Goal: I want to work part-time to earn money/ Muhammad will meet with RS for supportive employment
Social Goal: I want attend community groups/ Muhammad will meet with RS to community support services.
Health Goal: I want to visit with PCP yearly for routine check-up/ Muhammad meet with the PCP for intake.

**Strength's**
Muhammad has work history
Muhammad has the support of his family
Muhammad has the support of the clinical team
Muhammad will attend his appointments
Muhammad can cook and clean
Muhammad utilize the transit system
Muhammad has support from his dog
Muhammad does get food stamps
Muhammad car drive
Muhammad has Associate's Degree
**Clinical Team Recommendations:**

**Case Management:** activities may include assisting, maintaining, and monitoring covered services,  finding necessary resources to meet basic needs, coordinating care with family and other agencies involved,  outreach and follow up, and other activities as needed.

**BHMP Services:** Services may include ongoing medication management involving the review of effects, side effects, and adjustment of medications to prevent, stabilize, or ameliorate symptoms of a behavioral health condition.

**RN Services**: as needed through activities that may include the measurement of vital signs, assessment and monitoring of physical/medical status, review of the effects and side effects of medications and administration of medications.

Clinical Coordinator recommends she attend all MD and RN appointments, take all medications as prescribed, counseling referral as needed, engage with RS and FM to increase daily meaningful activity and enhance natural supports. Ensure follow up with PCP and other medical specialists as indicated. CC recommends individual counseling.

**TRANSPORTATION:** CM or ACT specialist will support by assisting in coordinating, arranging, or providing clinically necessary transportation for medically necessary behavioral health services.

**Rehab Specialist:**  Rehab Specialist services may include assessment of level of assistance he/she requires to create, plan, and successfully work towards accomplishing his/her employment/learning and social engagement goals.

**Peer/Family Mentor:**  Services may include group teaching independent living, social, and communications skills to persons and/or their families in order to maximize the person's ability to live and participate in the community and function independently.

Electronically signed by: Kimberly Bryant BHT /s/                          12/12/2016
**Kimberly Bryant BHT - Provider**                                         **Date**

_____                    _____
**Behavioral Health Professional Reviewer Name (print) / Signature**       **Date**

Terros
**Agency**

---

**REMINDER:**  All demographic data reported to ADHS/DBHS must be reviewed during annual update.  Based on this review:
- At a minimum the following demographic/clinical data fields must be reported to ADHS/DBHS regardless of whether they have changed since the last data submittal: Axis I, II and V and GAF/CGAS, behavioral health category, employment and educational status, primary residence, number of arrests since the last data update and primary and secondary substance use; and/or
- All other demographic information that has changed (e.g., other agency involvement, income for non-Title XIX/XXI eligibles).

---

COP 015247

# EXHIBIT 7



# Psychiatric Progress Note

Encounter Date:   11/14/2016
Provider:   Lilliam Villalobos MD
Patient Name:   **Muhammad Muhaymin**   Age: 43 Years

**Submitted Code(s):**
Start Time: 02:00 PM  End Time: 02:30 PM
EM Code: 99214  Unit: 1

**Reason for Treatment:**
Presenting issues/Chief Complaint: I am as ok as I can be.
Patient came accompanied by Stepmother, she brought some paperwork for the Guardianship, we discussed that her daughter was given the same paperwork filled out last appt, patient remains homeless, presented casually dressed, clean, had his dog with him, responded questions when asked, disorganized, moderate FOI, LOA, when asked if he was sleeping he said 'earth", appetite ok, denied any S/H ideations, questionable hall, did not answer accordingly. Drug use hx, drug of choice cannabis.
Recommendations:
Plan reviewed: 11/14/2016
Schedule appt for a Psych Eval.
CSPMP reviewed. No opiates rx'ed.
Once Psych Eval completed I will consider rx meds.
Continue to provide Supportive Therapy.
Contact Case Manager with any concerns.
Practice Sleep Hygiene.
Continue compliance with Clinical Team recommendations.
Encourage proper hydration, nutrition and exercise.  Regular Diet.
Risk factor reduction: Avoid stressful situations;  contact Clinical Team with any concerns.
Contact the Crisis Line if he becomes DTO/DTS.
Follow up with PCP for Medical Concerns. Denied any now.
RTC with Psychiatrist in 4 wks or as needed.
RTC with RN for labs or as needed for triage.


Psychosocial stressors:  Housing stressors are severe.

**Review of Systems:**
Reviewed, NO changes
Ears, Nose, Throat: Negative

Page 1 of 4
Name:  Muhammad Muhaymin   ▆▆▆▆   CIS ID: 1101103099

Constitutional:       Negative
Cardiovascular:       Negative
Endocrine:            Negative
Gastrointestinal:     Negative
Genitourinary:        Negative
Hematological:        Negative
Immunologic:          Negative
Musculoskeletal:      Negative
Respiratory:          Negative
Skin/Breast:          Negative
Eyes:                 Negative
Neurological:         Negative
Psychiatric:          Positive      Additional Detail: psychotic


**Histories:**
Reviewed with NO Changes

**Past Medical History**
Past Medication: Has not taken meds in a long time. Treated while in jail but does not remember name.
Developmental History: Normal
History of injury, illness, and seizures: Denied.
Meds Reported at Intake:

**Family History**
Mental illness in family: Cousin : Schizophrenia
Substance abuse in family :  Unknown
Suicide attempts in family :  Unknown
Violence in family :  Denied
Medical problems in family : Mother died of AIDS
Father died in Surgery
Other comments:

**Social History**
Client is homeless. Living situation is stressful.


**Mental Status:**
Client is a 43 year old,   male.  Dressed appropriately.  Appears age and normal weight.  Client is well-groomed.  Oriented to situation, place, person.  Level of alertness is normal.  Eye contact is good.  Speech quantity is diminished with slow rate and diminished amplitude.  Client has no mannerisms of note..  Thought processes: tangential.  Associations: very loose.  Stream of thought is tangential.  Reports no delusions..  No hallucinations reported.
  Client is not DTS.  Client is not DTO.  Sleep: fair.  Appetite: good.  Mood: congruent.  Affect: flat.  Fund of knowledge: fair.  Memory: fair.  Insight: poor.  Judgement: poor.  Concentration: poor.
Observed Gait : Steady. Muscle Strength and Tone appears: Normal.
Client did not report danger to others (DTO).
Client did not report danger to self (DTS).
Page 2 of 4
Name:  Muhammad Muhaymin     █████    CIS ID: 1101103099

COP 015325

**Medication Effectiveness and Side Effects:** Client or Guardian reports experiencing no side effects to meds.

**Medical Data:**
No accidents, injuries or serious illnesses reported.

**Substance Use:**
Admitted to smoking cannabis

**Current Meds:**

| **Axis I  - DSM -IV** | | **DSM -V** | |
|---|---|---|---|
| 295.90 | Schizophrenia Undifferentiated Type | F20.9 | Schizophrenia |

**Axis II:**

| V71.09 | No diagnosis on Axis II |
|---|---|

**Axis III:** NONE
**Axis III:** NONE
**Axis IV:** Problems with/related to housing,
**Axis V:** NONE

**Treatment Plan:** No progress with Tx plan. Medications were not changed.
The following were discussed with the client:   Client or guardian understood and made an informed decision.
Clt to be seen in 4 weeks.

**MDM - Problem Points**

| Problem | Plan Desc | Problem Detail | NatureDesc |
|---|---|---|---|
| Disorganized | No Plan | New to Examiner | Worsened |

| Problem | Chonic Acute | Workup | Notes |
|---|---|---|---|
| Disorganized | Chronic | No Additional Workup | Needs psych eval |

**Medical Decision Making (data points):**
 _X_ Obtained history from someone other than the patient OR made decision to obtain records
 _X_ Reviewed and summarized records and obtained records and or had a discussion with another health care provider
**Risk:** Moderate Risk

**Electronically Signed By: Lilliam Villalobos MD**

Document generated and completed 11/14/2016 02:36 PM

Page 3 of 4
Name:  Muhammad Muhaymin ▇▇▇▇ CIS ID: 1101103099

# EXHIBIT 8



**MARICOPA COUNTY**
**OFFICE OF THE MEDICAL EXAMINER**
**701 W. Jefferson Street**
**Phoenix, AZ 85007**

### MEDICAL EXAMINER REPORT

**DECEDENT:** Muhammad Abdul Muhaymin

**CASE:** 17-00095

**DATE OF EXAMINATION:** 01/05/2017

**TIME:** 1012 Hours

**PERSONS PRESENT AT EXAMINATION:**
<u>Phoenix Police Department</u>:  Detective Anthony Winter #7952

---

### CAUSE OF DEATH:
Cardiac arrest in the setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual

### MANNER OF DEATH:
Homicide

### HOW INJURY OCCURRED:
Cardiac arrest in the setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual

---

1/3/2018
**Date Signed**

*Amanda Maskovyak, MD*
**AMANDA E. MASKOVYAK, MD**
**MEDICAL EXAMINER**

COP 003356

MUHAMMAD ABDUL MUHAYMIN                                    17-00095

## FINDINGS

I.  Cardiac arrest in the setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual.

    A.  Coronary artery disease.

        1.  40 to 50 percent atheromatous stenosis of left anterior descending artery.

        2.  Intramyocardial segment, left anterior descending artery (2 cm in length x 0.1 cm depth).

    B.  Reported history of schizophrenia and bipolar disorder.

    C.  Acute methamphetamine intoxication.

        1.  0.81 mg/L methamphetamine in iliac blood.
        2.  0.24 mg/L amphetamine in iliac blood.

    D.  History of subdual by law enforcement.

        1.  Physical exertion/struggle with officers during law enforcement subdual.

        2.  Placement in prone position with hand, knee, foot, and/or body weight force applied by multiple officers to decedent's head, arms, wrists, shoulders, torso, and/or legs.

        3.  Physical restraints applied to decedent while in prone position.

        4.  Sudden unresponsiveness while in prone position.

        5.  Blunt force injuries of head, torso, and extremities.
           i.  Multifocal cutaneous abrasions of face.
          ii.  Bilateral temporalis muscle contusions (right = 2 cm, left = 0.5 cm).
         iii.  No internal head or neck injuries are identified.
         iv.  Intramuscular contusion of left upper back.
          v.  Subcutaneous hemorrhage of left mid back.
         vi.  Mildly hemorrhagic fractures of anterolateral right and left ribs 2 through 6 and parasternal left ribs 3 through 6 and parasternal right ribs 2 through 6 (possibly representing perimortem artifact due to cardiopulmonary resuscitation with chest compressions).
        vii.  Multifocal contusions and abrasions of bilateral elbows and wrists.

COP 003357

MUHAMMAD ABDUL MUHAYMIN                                    17-00095

      viii.    Subcutaneous and intramuscular hemorrhage of left posterior upper arm and left elbow.

      ix.    Bilateral anterior knee abrasions.

II.    Reported history of asthma.

    A.    No significant histologic evidence of acute asthma exacerbation on histologic examination of lung tissue.

## SUMMARY AND OPINION

REPORTED CIRCUMSTANCES OF DEATH:

The decedent was a 43-year-old male who became unresponsive following a physical struggle during law enforcement subdual on 1/4/2017. He was transported to a local emergency department and pronounced dead shortly after arrival.

REVIEW OF LAW ENFORCEMENT INCIDENT REPORTS:

Individual officer interviews conducted by law enforcement were reviewed and summarized below:

On January 4, 2017 multiple officers responded to a call at the Maryvale Community Center. On arrival the officers contacted the manager of the community center who reported he was arguing with the decedent, Muhammad Muhaymin, about trespassing and Muhammad letting his dog run around without a leash. Officers observed Muhammad to be "talking incoherently" to the manager when they initially arrived and he continued to be incoherent during the subsequent interactions with officers. Officers attempted to verbally engage Muhammad and asked for his information. Muhammad initially refused to supply his name, but eventually did so. He was then allowed to use the restroom and during this time, officers ran his information and discovered an outstanding warrant for Muhammad's arrest. When Muhammad exited the restroom they escorted him out of the building and told him he was under arrest. An officer asked Muhammad to set down the dog, but Muhammad refused. Officers took Muhammad's left wrist and brought it behind his back. They were unable to bring Muhammad's right wrist behind his back because Muhammad was still holding the dog. Muhammad was placed against a wall while officers used a baton under Muhammad's right arm for leverage to "knock Muhammad's hand free". Officers were able to free Muhammad's right arm.

During the struggle, one officer described using a single "elbow strike" to Muhammad's right shoulder. Officers state Muhammad was "thrashing back and forth and pulling all over the place" and would "tense up repeatedly". Officers struggled to get Muhammad to the ground. Officers continued to tell Muhammad to "stop resisting" and "give us your arms".

COP 003358

MUHAMMAD ABDUL MUHAYMIN 17-00095

Once on the ground, Muhammad was face down with one officer on each side of him and another "on top of him". Officers then were able to restrain Muhammad's wrists behind his back using two sets of handcuffs connected to each other. Officers helped Muhammad to his feet when Muhammad started talking about his "sensei" and "was not acting his normal self". While officers escorted Muhammad to the patrol car he continued to pull and struggle, yell, push back on his feet, and drop into a squatting position, causing officers to "hoist him back up". Officers state that while walking Muhammad to the patrol car they did raise his arms towards his head in a "pain compliance maneuver".

Once at the patrol car, officers placed Muhammad against the patrol car and began to search Muhammad. Officers state Muhammad was "kicking, pulling, yelling, and causing a commotion". Officers pulled Muhammad's arms up level to his shoulders to search his pockets when Muhammad was able to pull his arms from over his head down to his front. Muhammad then used his arms and body to push back against the officers. Officers and Muhammad then went to the ground. Officers state they may have tripped on the way down. Muhammad was initially face down but was "fighting to get on his back". One officer controlled Muhammad's legs, another used his waist over Muhammad's waist, and one officer was on each shoulder. Officers state they were "huffing and puffing" and requested additional units. While waiting for backup, Muhammad was on his left side.

Officers state that Muhammad alternated between periods of calm and active resistance during this time. Officers also stated Muhammad's dog was running around and yipping and barking at the officers. One officer stated he pulled the trigger on his electromechanical device to scare the dog but did not physically make contact with or deploy the weapon on the dog or Muhammad.

Additional units arrived and helped to control Muhammad. Various officers indicated that some amount of weight or pressure was used to control Muhammad during the ensuing subdual. This included body weight over Muhammad's legs and body weight on Muhammad's waist. Officers also used hands, knees, and/or feet to control Muhammad's shoulders, arms, upper back, torso, and head. (Comment: No officers indicated the amount of weight or pressure applied or the duration of the application). One officer observed Muhammad "rubbing his head on the ground" and held Muhammad's hair back to try to prevent Muhammad from hurting himself.

Officers were able to disconnect the pairs of handcuffs that were around Muhammad's wrists. Other officers placed restraints around Muhammad's ankles. Officers state they struggled to bring Muhammad's hands behind his back, but once they did, he was re-handcuffed and the handcuffs were connected to the ankle restraints by a length of rope. An officer described the position of Muhammad's legs at this time as "slightly past 90 degrees". Officers then stood up and noticed Muhammad "went limp" and began to vomit. They removed the rope and ankle restraints and turned Muhammad onto his back. Officers could not feel a pulse so they began chest compressions and requested medical support. During compressions an officer stated he could possibly feel a faint

COP 003359

MUHAMMAD ABDUL MUHAYMIN                               17-00095

pulse. Muhammad's wrist handcuffs were removed and chest compressions were continued until Fire and Rescue arrived.

When emergency personnel arrived Muhammad was in asystole. Emergency personnel noted vomitus in Muhammad airway. They described his skin as cool and pale. No body temperature was taken. Muhammad was intubated and transported to a local emergency department where he was pronounced dead shortly after arrival.

Throughout the struggle officers continued to give commands to Muhammad to "stop fighting" and "stop resisting". One officer who had prior encounters with Muhammad stated Muhammad was previously compliant and never acted like this before. Multiple officers commented on Muhammad's apparent strength. According to all interviewed officers, no other punches, kicks, bites, slaps, pepper spray, or electrical restraint devices were used against Muhammad by officers aside from the single elbow strike described above. Officers further state that Muhammad did not attempt to kick, bite, slap or otherwise harm the officers but that he was "passive aggressive" and resisting arrest.

Additional witness interviews conducted by law enforcement were reviewed and summarized below:

The manager of the community center stated Muhammad would raise and lower his voice as he went on tangents about the human race, human needs, and aliens, and was refusing to comply with requests to leave the premises. He stated at one point later on he could hear Muhammad "squeal" but did not observe what was happening at that time.

Other witnesses observed Muhammad becoming "aggressive and verbal" with the manager prior to officer's arrival and refusing to leave the premises. Muhammad was observed to be "fighting hard" against the officers and appeared to be "on something". One witness stated she observed Muhammad being "dragged" to and "slammed against" the patrol car. One witness heard Muhammad yell "I can't breathe" to which an officer replied "then stop resisting". She then stated officers appeared to have Muhammad under control. While they walked away they could still hear Muhammad yell and then saw officers begin chest compressions. Another witness also heard Muhammad make the statement that he couldn't breathe and then witnessed an officer appear to release pressure from Muhammad's back.

Family members interviewed by law enforcement stated that Muhammad suffered from asthma, bipolar disorder, and schizophrenia. They stated he was prescribed medications but did not know if he was taking them. They further state he has been a transient and has been deteriorating mentally and emotionally since his fathers' death in 2006.

MUHAMMAD ABDUL MUHAYMIN                                      17-00095

REVIEW OF VIDEO FOOTAGE FROM LAW ENFORCEMENT OFFICERS (BODY CAMERAS):

Multiple (12) body camera videos are reviewed which provide multiple perspectives of the above described incident. The videos are identified by numbers only. Some of the videos appear to be a single video recording broken into two parts. Timestamps are visible in each video but do not appear consistent across the multiple video recordings.

Muhammad's behavior initially appears to be relatively calm while talking with the manager, however he is not following requests to leave the premises or place his dog on a leash. After a few minutes of verbal engagement with the manager Muhammad becomes more agitated, raises his voice, and begins to talk tangentially.

Once outside the building Muhammad does refuse to follow officer's commands to place the dog down and bring his hands behind his back. He argues with officers and asks them to "call his sensei". An officer can be seen using his baton under Muhammad's right arm as described above. Once on the ground one officer's knee can be seen on the back of Muhammad's right leg, one officer's knee is on Muhammad's right temple, and another officer can be seen above and parallel with Muhammad's back, but it is unclear if the officer laying on Muhammad or just leaning over him.

During the struggle between Muhammad and officers on the ground by the patrol car the positions of the officers relative to Muhammad is only shown intermittently on any given video recording. It cannot be determined how long each of the following positions are held, nor is it possible to tell how many of the following positions were simultaneous, if any. A sound resembling an electromechanical weapon can be heard but is not visible on screen in any video. Muhammad can be heard yelling once that he cannot breathe in at least two videos. The body positions of Muhammad or officers are not visible in any videos during this statement. Muhammad can be head continuing to yell intermittently after this time. No one video shows the entire encounter, so an accurate length of time over which the event occurred cannot be determined.

The numbers below refer to individual video recording file numbers.

7012: Hands can be seen on Muhammad's torso and near his head. Later a knee appears to be on Muhammad's head which is turned to his side. Later one knee can be seen on Muhammad's upper back while he is face down.

6119: While Muhammad is being taken to the ground an officer can be seen using his elbow to strike Muhammad's right shoulder region. Once on the ground officer's hands can be seen on Muhammad's torso and a knee is on the right side of Muhammad's waist. Later while Muhammad is on his left side, an officer's knee is against Muhammad's upper back, an officer's hands are controlling Muhammad's arms, which are stretched out in front of him, and one officer's hand is on Muhammad's right waist.

MUHAMMAD ABDUL MUHAYMIN                                      17-00095

6778: While Muhammad is face down one officer can be seen laying over Muhammad's feet, one officer has a hand on the back of Muhammad's right thigh, and one officer has a knee on Muhammad's buttocks region.

8028: While Muhammad is on his side an officer's knee can be seen on Muhammad's left temple region and an officer's hand is gripping Muhammad's left sleeve. Later, an officer's foot can be seen on Muhammad's right wrist. Still further in the video an officer's hand can be seen on the back of Muhammad's neck. It is unclear if Muhammad's neck is being gripped or if pressure is being applied. Another officer can be seen gripping Muhammad's hair.

POSTMORTEM EXAMINATION

Postmortem examination (autopsy) showed a well-developed adult male. External trauma consisted of cutaneous contusions and abrasions of the face, elbows, wrists, and knees. Internally there were focal intramuscular and/or subcutaneous hemorrhages of both temporalis muscles, the left mid and upper paraspinal back muscles, the left posterior arm, and surrounding the left elbow. Bilateral minimally hemorrhagic and non-displaced anterolateral rib fractures were identified (may be secondary to cardiopulmonary resuscitation or prone positioning with compression of the torso). Other findings at autopsy consisted of focal 40 to 50 percent atheromatous stenosis of the left anterior descending artery and an incidental intramyocardial segment of the left anterior descending artery. There was congestion and edema of the lungs and mild global edema of the brain. There was no significant histologic evidence of asthma.

Toxicologic analysis was performed and revealed methamphetamine and its metabolite in iliac blood. Postmortem analysis of vitreous fluid was not further contributory. The decedent has reported diagnoses of schizophrenia and bipolar disorder.

In summary, based on the above findings, reported circumstances of death, and all other investigative information received to date and as available to me, my opinion is that Muhammad Abdul Muhaymin, a 43-year-old male, died as a result of cardiac arrest in the setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual.

The decedent had multiple preexisting risk factors for cardiac arrest including coronary artery disease and acute methamphetamine intoxication. Physical exertion during law enforcement subdual further contributed to the development of a fatal cardiac arrythmia. Given all of the above, in my opinion, the manner of death is most appropriately designated as homicide.

*As with all death investigations, opinions expressed herein are amenable to change should new, reliable, and pertinent information come to light.*

*The Maricopa County Medical Examiner's Office is required by statute (A.R.S. § 11-594(A) (2) and (4)) to certify the cause and manner of death following completion of the death investigation of each case over which it assumes jurisdiction, and to promptly execute a death certificate, on a form provided by the state registrar of vital statistics, indicating the cause and manner of death. The form provided by the state*

COP 003362

MUHAMMAD ABDUL MUHAYMIN                                    17-00095

*registrar of vital statistics includes five manners of death: homicide, suicide, accident, natural, and undetermined. The determination of manner of death is a forensic determination by the pathologist predicated upon the totality of all then-known forensic evidence and other circumstances surrounding the cause of death; it is not a legal determination of criminal or civil responsibility of any person(s) for the death.*

## POSTMORTEM EXAMINATION

The body is in a plastic body pouch secured by a seal bearing the number 0001418. The hands are received within brown paper evidence bags.

### Clothing and personal effects

The body is received clad in a gray and red t-shirt previously cut by emergency personnel, black sweatpants, cargo pants with a canvas belt, and undershorts. A sock is on the right foot, and a black cloth necklace with a white metal charm is around the neck (see also separate property inventory list). The bottom of the sweatpants are secured with hair ties. A ring is on the left 5th digit (separately photographed). A black nylon strap is loosely around the torso running diagonally from the right shoulder to the waist.

### Evidence of medical intervention

An endotracheal tube is in the mouth secured around the head with medical tape. An orogastric tube is in the oral cavity, defibrillator pads are affixed to the right anterior chest and left lateral thorax, three electrocardiogram electrode leads are affixed to the left anterior axilla, three are affixed to the left anterolateral lower abdomen, and two are affixed to the right lateral chest, an intravascular catheter is in the right antecubital fossa attached to a clear plastic bag labeled with "0.9% sodium chloride", a pulse oximeter is taped to the distal right 2nd digit, an intravascular catheter is in the right dorsal forearm, and a hospital-issued patient identification band with the decedent's name and medical record number encircles the left wrist.

### General external examination

The body is that of a 67 inch, 164 pound, well-developed, well-nourished adult African American male who appears compatible with the reported age of 43 years.

The scalp is covered by curly black-brown hair with bifrontal alopecia, short on top, and then arranged in braids and loosely arranged in a ponytail. Facial hair consists of a sole black-gray mustache and goatee. The eyes have brown irides with symmetric pupils. The conjunctivae are free of petechiae. The external ears show no acute injury. The facial bones are intact to palpation. A small amount of vomitus is in and about the nares, mouth, and beard. The nasal septum is without perforation. The oral cavity has no visible lesions or foreign objects. The frenula are intact. The teeth are natural and in fair repair.

MUHAMMAD ABDUL MUHAYMIN                                          17-00095

The neck is unremarkable. The thorax and breasts are symmetrical without palpable masses. The abdomen is rounded and firm. The back, buttocks, and anus are unremarkable. The atraumatic external genitalia are those of an adult male. The extremities are well-developed and symmetric without visible deformities or palpable fractures. All digits are present. The intact fingernails are short, irregular, and soiled. The intact toenails are thickened, irregular, and discolored. Multiple 0.1 to 0.3 cm slightly raised, velvety appearing dark brown-black skin lesions are within the folds of the neck

**Postmortem changes**

Rigor mortis is well-developed and symmetric.   There is fixed posterior red-purple lividity.  The body is cold secondary to refrigeration.

**Identifying marks and scars**

A 9 cm curvilinear scar is over the right anterior upper arm. A 2 cm ovoid scar is over the left posterior shoulder.  A monochromatic tattoo of the word "Peace" is just above the right elbow. A faint monochromatic tattoo of apparent lettering extends from the right elbow to the medial wrist. A monochromatic tattoo of a crown, sun, and a black graphic design is over the midline lumbar back. A monochromatic tattoo of the phrase "War" is just above the left elbow. A monochromatic tattoo of a foreign lettering is over the left proximal volar forearm. A multicolored tattoo of two stars and the letters "A, H, L, L, A" is left forearm. Monochromatic tattoos of helmets are over both dorsal hands.  A 3 cm irregular scar is over the right posterior calf.  A 10 cm horizontal scar is over the posterior neck.

**EVIDENCE OF INJURY**

**Head and Neck**:

   i.    3 x 1.5 cm orange-pink abrasion, right lateral frontal scalp.
   ii.   0.8 cm thin partial thickness linear laceration, just above right lateral supraorbital ridge.
   iii.  3 x 1.5 cm pink contusion with a 1.2 x 0.8 cm pink-white abrasion, right lateral supraorbital ridge.
   iv.  Two 0.3 cm shallow abrasions, right upper middle and lateral eyelid.
   v.   4 x 3 cm cluster of overlapping pink-orange linear abrasions, right cheek.
   vi.  0.5 cm laceration, medial left nare.
   vii.  2 x 1.5 cm irregular red-brown abrasion, left frontal scalp at the hairline.
   viii. 1.5 cm linear abrasion, right frontal scalp.
   ix.  2 x 0.5 cm red-brown abrasion, left temple.
   x.   7 x 1.5 cm cluster of overlapping pink-tan linear abrasion, left cheek.
   xi.  2 cm intramuscular contusion, right temporalis muscle.
  **xii.**  0.5 cm intramuscular contusion, left temporalis muscle.
  **xiii.** Anterior and posterior neck dissections are negative for injuries.

COP 003364

MUHAMMAD ABDUL MUHAYMIN                                    17-00095

**Torso**:

   i.   Mildly hemorrhagic fractures of the anterolateral aspect of right and left ribs 2 through 6 and the parasternal aspect of left ribs 3 through 6 and right ribs 2 through 6.

   ii.   2 cm intramuscular contusion, in the left paraspinal upper back.

   iii.   1 cm contusion, left paraspinal mid back.

**Extremities**:

Left upper extremity:

   i.   2.5 x 2 cm red-brown abrasion, superior left shoulder.

   ii.   2 x 1.5 cm irregular red-pink abrasion, left elbow.

   iii.   2 x 2 cm discontinuous cluster of pink-brown abrasions, left medial elbow.

   iv.   2 x 1.5 cm red-brown-pink abrasion, left posterolateral proximal forearm.

   v.   1 x 0.9 cm pink-white abrasion, left lateral wrist.

   vi.   4.5 x 1.5 cm cluster of irregular pink contusions and overlying red-brown abrasions, left medial wrist.

   vii.   3.5 x 1.5 cm area of faint pink contusion, left volar wrist.

   viii.   8 cm area of ill-defined subcutaneous and intramuscular hemorrhage, left posterior upper arm.

Right upper extremity:

   i.   1.2 x 1 cm red-brown abrasion, superior right shoulder.

   ii.   3 x 4 cm cluster of red-brown punctate abrasions, right medial elbow.

   iii.   2.5 x 3 cm discontinuous tan-pink abrasion, proximal right forearm.

   iv.   2 x 0.5 cm cluster of red-brown abrasions, right lateral elbow.

   v.   Three linear abrasions measuring 0.3, 0.5, and 1.5, right distal lateral upper arm.

   vi.   9 x 4 cm discontinuous cluster of pink contusions in a vaguely Y-shaped distribution, right dorsolateral proximal to mid forearm.

   vii.   4 x 4.5 cm area of faint pink contusion, right lateral wrist.

   viii.   3.5 x 3 cm irregular area of pink contusion with overlying red-brown abrasions, right medial wrist.

   ix.   Cluster of three irregular abrasions measuring between 0.2 and 0.7 cm, proximal medial right forearm.

   x.   Patchy subcutaneous and intramuscular hemorrhage, right elbow.

Left lower extremity:

   i.   1.2 x 0.5 cm irregular red-brown abrasion, left knee.

   ii.   0.3 cm red-brown abrasion, medial left knee.

Right lower extremity:

   iii.   Cluster of red-brown abrasions measuring between 0.2 and 0.8 cm, right medial/inferior knee.

MUHAMMAD ABDUL MUHAYMIN                                    17-00095

*The above injuries, having once been described, will not be referred to below.*

## INTERNAL EXAMINATION

### BODY CAVITIES
The organs of the thoracic and abdominal cavities are normally situated. There are no abnormal fluid collections in the pleural, pericardial, or abdominal cavities. There are no pleural, peritoneal, or pelvic adhesions. The subcutaneous fat at the level of the umbilicus measures up to 2 cm in thickness.

### HEAD
The scalp and subscalp tissues are free of injury.  There are no skull fractures. The dura is intact. There is no epidural, subdural, or subarachnoid hemorrhage. The leptomeninges are thin and delicate. The 1300-g brain has symmetric cerebral hemispheres with a normal gyral pattern with mild global edema.  The roots of the cranial nerves are unremarkable. The cerebral vasculature shows no significant atherosclerosis or other lesions. There is no evidence of herniation. The cerebral cortical ribbon is well-demarcated from the grossly normal underlying white matter.  The deep nuclei, mammillary bodies, and hippocampi are unremarkable. The ventricular system is symmetric and of normal configuration. The substantia nigra is normally pigmented.  The pons, medulla, upper cervical cord, and cerebellum are unremarkable. The base of the skull does not demonstrate any fractures.

### NECK
The anterior cervical strap muscles are symmetric and free of hemorrhage.  The tongue is atraumatic. The hyoid bone and laryngeal cartilages are intact. The larynx and trachea are lined with tan-pink mucosa, have a normal caliber, and are patent.   The cervical spine is intact.

### CARDIOVASCULAR SYSTEM
The pericardium, epicardium, and endocardium are smooth and glistening with a usual amount and distribution of epicardial fat. The 325-g heart is normal in configuration. The coronary arteries arise from normally situated ostia and show right dominance.  The left anterior descending artery shows focal 40 to 50 percent stenosis by soft, yellow-orange atheromatous plaque. Additionally, in the midpoint of the left anterior descending artery, there is an area of tunneling measuring 2 cm in greatest length x 0.1 cm in maximum depth. The left circumflex and right coronary arteries are patent without evidence of acute thrombosis.  The cardiac valves leaflets are thin and delicate.   Valve circumferences are as follows:  tricuspid valve = 11.5 cm, pulmonic valve = 6.5 cm, mitral valve = 10.5 cm, aortic valve = 6 cm. The myocardium is uniformly dark red-brown and firm. There are no septal defects. The left and right ventricular free walls and septum measure 1.4 cm, 0.3 cm, and 1.2 cm thick, respectively.

The aorta and its major branches are normally distributed without stenosis.  The intimal surfaces show minimal atherosclerosis.

COP 003366

MUHAMMAD ABDUL MUHAYMIN                              17-00095

## RESPIRATORY SYSTEM
The lungs are 475 g each and have normal lobation. The pleural surfaces are smooth and glistening with scattered anthracotic pigment deposition. The major bronchi are free of obstruction. The lungs are well-expanded with dependent congestion. The cut surfaces exude a small amount of pink-tan frothy fluid. The pulmonary arteries are free of thromboemboli.

## HEPATOBILIARY SYSTEM
The 1425-g liver has a smooth and intact capsule. The liver configuration is normal. The parenchyma is dark red-brown and homogeneous. The gallbladder is normally situated and contains green-brown viscous bile without calculi. The wall is thin and the mucosa is unremarkable.

## LYMPHORETICULAR SYSTEM
The 50-g spleen has a smooth, purple-grey, and intact capsule. The parenchyma is dark maroon-red and of normal consistency. No abnormal lymph nodes are encountered.

## GASTROINTESTINAL SYSTEM
The esophagus is lined by intact smooth white-tan mucosa. The gastroesophageal junction is unremarkable. The stomach contains approximately 20 mL of brown fluid. The gastric mucosa is thrown into rugal folds. There are no areas of ulceration in the stomach or proximal duodenum. The remainder of the small bowel and the colon are opened and the contents are examined and are negative for foreign objects. The appendix is externally unremarkable. The pancreas is normally lobulated and the parenchyma is firm, tan, and without focal lesions.

## GENITOURINARY SYSTEM
The kidneys are 100 g and symmetric. The subcapsular surfaces are smooth and slightly lobated. The cortices are of normal thickness and the corticomedullary junction is distinct. The medullae, pelvicalyceal systems, and ureters are unremarkable. The urinary bladder is of normal configuration. The mucosa is tan and smooth. There is approximately 70 mL of clear yellow urine.

The prostate gland is of normal configuration with firm tan-pink parenchyma. The testes and seminal vesicles are unremarkable.

## ENDOCRINE SYSTEM
The thyroid gland is homogenous red-brown and firm, without nodules or cysts. The parathyroid glands are inconspicuous. The adrenal glands are normally located. The cortices are thin and golden yellow. The underlying medulla is well-demarcated and tan-grey. The pituitary gland is unremarkable.

COP 003367

MUHAMMAD ABDUL MUHAYMIN                                      17-00095

## MUSCULOSKELETAL SYSTEM
The clavicles, sternum, pelvis, and vertebral column have no fractures. There are scattered vertebral osteophytes. The skeletal musculature is normally distributed and dark red. The diaphragm is intact.

## ANCILLARY STUDIES

Full body postmortem radiographs are obtained prior to examination.

## Toxicology
Samples of cardiac blood, iliac blood, vitreous fluid, bile, gastric contents, urine, and liver tissue are collected and submitted for analysis (see also separate toxicology report).

## Vitreous electrolytes
Sodium = 164 mmol/L
Potassium = 12 mmol/L
Chloride = 127 mmol/L
Urea nitrogen = 17 mg/dL
Creatinine = 0.7 mg/dL
Glucose = 14 mg/dL

## Microscopic descriptions

HEART: Section of left anterior descending artery shows overlying incomplete myocardial bridge and eccentric atheromatous plaque formation. Myocytes show patchy enlarged boxy nuclei and hyper-eosinophilia. Multiple sections of both ventricles show capillary congestion, slightly thickened arterioles, areas of interstitial expansion by loose fibrous tissue, and perivascular fibrosis.

LUNGS: Multiple sections show perivascular and peribronchial deposits of dark black granular material (anthracosis), polarizable debris in alveolar spaces; aspirated gastric contents without inflammatory reaction, vascular congestion with extravasation of red blood cells into alveolar spaces, multifocal peribronchial hemorrhage, patchy atelectasis, and scattered thickened alveolar septae.

LIVER: Sinusoidal congestion and rare portal tract showing increased chronic inflammation.

KIDNEY: Thickened small vessels, vascular congestion, and proximal tubules showing eosinophilia and loss of nuclear detail.

HIPPOCAMPUS: No significant pathologic abnormalities.

AEM/jk
D: 01/05/2017; T: 01/19/2017

COP 003368

**Maricopa County Office of the Medical Examiner**
**Forensic Science Center**
701 W. Jefferson St. - Phoenix, AZ 85007 - (602) 506-3322

 

| Hair Color: | Eye Color: |
|---|---|
| Teeth: | Beard (Y/N) |
| Weight: 164 | Mustache (Y/N) |
| Height: | Clothing: |
| Rigor: | |
| Livor: | Seal No.: |

17-00095     01/04/2017
MUHAYMIN, MUHAMMAD

PHOENIX PD

COP 003369

# EXHIBIT 9

*Gary M. Vilke, M.D., FACEP, FAAEM*
*11582 Normanton Way*
*San Diego, California 92131*
*(619) 666-8643*

June 20, 2020

Karen J. Stillwell
O'Connor & Dyet
7955 South Priest Drive
Tempe, Arizona 85284

**RE: *Mussalina Muhaymin v. City of Phoenix, et al.***
**Case No: CV-17-04565-PHX-SPL**

**Introduction**

I am a board-certified emergency department physician with substantial experience in cardiac arrest and sudden death.  I am also an independent researcher on the physiologic effects of restraint, weight force and body position. My specific qualifications will be outlined in more detail at the end of this report.

I have been retained as an expert to review relevant materials and provide expert opinion on this matter on whether the actions of the police officers caused or contributed to the cardiac arrest and death of Mr. Muhammad Muhaymin Jr. when the officers encountered him on January 4, 2017. After careful review, it is my opinion to a reasonable degree of medical certainty that Mr. Muhaymin's cardiac arrest and death was not caused by the actions of the officers but rather was caused by the toxic effects of methamphetamine and continued exertion and resistance causing physiologic stress on his abnormal heart resulting in cardiac arrest. This opinion and related opinions are set forth in the expert report.

CONFIDENTIAL                    COP 015475

**Materials Reviewed**


I have reviewed extensive materials pertaining to the above referenced case.  This includes, but is not limited to:


### A.    Medical and Scientific Literature


Chan TC, Vilke GM, Neuman T, Clausen JL:  Restraint position and positional asphyxia.  Ann Emerg Med 1997;30(5):578-586.

Chan TC, Vilke GM, Neuman T:  Reexamination of custody restraint position and positional asphyxia.  Am J Forensic Med Pathol 1998;19(3):201-205.

Vilke GM, Chan TC, Neuman T, Clausen JL:  Spirometry in normal subjects in sitting, prone, and supine positions.  Respir Care 2000;45(4):407-410.

Chan TC, Vilke GM, Clausen J, Clark RF, Schmidt P, Snowden T, Neuman T:  The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function.  J Forensic Sci 2002; 47(2):299-304.

Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM:  Weight force during prone restraint and respiratory function.  Am J Forensic Med Pathol 2004;25(3):185-189.

Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW.  Ventilatory and metabolic demands during aggressive physical restraint in healthy adults.  J Forensic Sci 2007;52(1):171-175.

Reay DT, Howard JD, Fligner CL, Ward RJ.  Effects of positional restraint on oxygen saturation and heart rate following exercise. Am J Forensic Med Pathol. 1988 Mar;9(1):16-8.

Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. J Emerg Med 1999;17:777-782.

Vilke GM, Sloane C, Castillo EM, Kolkhorst FW, Neuman TS, Chan TC. Evaluation of the Ventilatory Effects of a Restraint Chair on Human Subjects..  J Emerg Med. 2011;40(6):714-8. Epub 2010 Jan 13.

Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen AV, Shah S, Chan TC.  The effect of the prone maximal restrained position with and without weight force on cardiac output and other hemodynamic measures.  J Forens Leg Med. 2013 Nov;20(8):991-5. Epub 2013 Aug 30.

Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM.  Evaluation of the Ventilatory Effects of the Prone Maximum Restraint Position (PMR) on Obese Human Subjects. Forens Sci Int 2014;237:86-9. Epub 2014;46(6):865-72. Epub 2014 Feb 14.

Ho JD, Dawes DM, Moore JC, Caroon LV, Miner JR: Effect of position and weight force on inferior vena cava diameter--implications for arrest-related death. Forensic Sci Int. 2011 Oct 10;212(1-3):256-9.

Kroll MW, Still GK, Neuman TS, Graham MA, Griffin LV.  Acute forces required for fatal compression asphyxia: A biomechanical model and historical comparisons.  Med Sci and the Law. 2017 Jan 1:25802417695711. [Epub ahead of print]

Kroll MW, Brave MA, Kleist SR, Ritter MB, Ross DL, Karch SB.  Applied Force During Prone Restraint: Is Officer Weight a Factor? Am J Forensic Med Pathol. 2018 [Epub ahead of print]

### B.    Case-Specific Materials

01.    Order re Stipulated Protective Order
02.    Confidentiality Agreement

## PLEADINGS

01.    Plaintiff's First Amended Complaint
02.    Defendants' Motion to Dismiss
03.    Plaintiff's response to Motion to Dismiss
04.    Defendants' Reply in Support of Motion to Dismiss
05.    Court's Ruling on Motion to Dismiss
06.    Defendants' Answer to First Amended Complaint
07.    Plaintiff's response to Non-Uniform Interrogatories
08.    Plaintiff's response to Request for Production
09.    Plaintiff's Motion to Amend Complaint w/ exhibits
10.    Defendant City of Phoenix' response to Request for Production
11.    Defendant Canilao's response to Non-Uniform Interrogatories
12.    Defendant Clark's response to Non-Uniform Interrogatories
13.    Defendant Grenier's response to Non-Uniform Interrogatories
14.    Defendant Head's response to Non-Uniform Interrogatories
15.    Defendant Heimbigner's response to Non-Uniform Interrogatories
16.    Defendant Hobel's response to Non-Uniform Interrogatories
17.    Defendant Leroux' response to Non-Uniform Interrogatories
18.    Defendant McGowan's response to Non-Uniform Interrogatories
19.    Defendant Nielsen's response to Non-Uniform Interrogatories
20.    Defendant Tarango's response to Non-Uniform Interrogatories
21.    Defendant Tarango's amended response to Non-Uniform Interrogatories
22.    Defendant Wong's responses to Non-Uniform Interrogatories

**DOCUMENTS AND VIDEOS**

| BATES NUMBERS | DOCUMENTS |
|---|---|
| COP 000001 | Body Camera Video of Officer Grenier |
| COP 000002 | Body Camera Video of Officer Hobel |
| COP 000003 | Body Camera Video of Officer Hobel |
| COP 000004 | Body Camera Video of Officer Canilao |
| COP 000005 | Body Camera Video of Officer Head |
| COP 000006 | Body Camera Video of Officer Head |
| COP 000007 | Body Camera Video of Officer McGowan |
| COP 000008 | Body Camera Video of Officer Nielsen |
| COP 000009 | Body Camera Video of Officer Nielsen |
| COP 000010 | Body Camera Video of Officer Nielsen |
| COP 000011 | Body Camera Video of Officer Acker |
| COP 000012 | Body Camera Video of Officer Clark |
| COP 000013 | Body Camera Video of Officer Miller |
| COP 000014-000238 | Phoenix Police Department Incident Report No. 201700019424 with supplemental notes/diagrams/documents |
| COP 000239 | 911 call at 0928 |
| COP 000251 | Recorded interview of Anthony Tarango |
| COP 000252 | Recorded interview of Anthony Williamson |
| COP 000253 | Recorded interview of Arizona Smith |
| COP 000254 | Recorded interview of David Head |
| COP 000255 | Recorded interview of Dennis Leroux |
| COP 000256 | Recorded interview of Dennis Leroux |
| COP 000257 | Recorded interview of Everett Baeza |
| COP 000258 | Recorded interview of Hanna Glemba |
| COP 000259 | Recorded interview of Jason Hobel |
| COP 000260 | Recorded interview of Jimmy Yee |
| COP 000261 | Recorded interview of Juan Lara |
| COP 000262 | Recorded interview of James Clark |
| COP 000263 | Recorded interview of Kevin McGowan |

CONFIDENTIAL

| BATES NUMBERS | DOCUMENTS |
|---|---|
| COP 000264 | Recorded interview of Mark Acker |
| COP 000265 | Recorded interview of Murray Williamson |
| COP 000266 | Recorded interview of Oswald Grenier |
| COP 000267 | Recorded interview of Ronaldo Canilao |
| COP 000268 | Recorded interview of Ryan Nielsen |
| COP 000269 | Recorded interview of Steven Wong |
| COP 000270 | Recorded interview of Susan Heimbigner |
| COP 000271 | Recorded interview of Tonya Davis |
| COP 000272 | Recorded interview of Tonya Davis |
| COP 000273 | Recorded interview of Tonya Davis |
| COP 000886-000926 | 41 photos taken of items received at autopsy – taken by Phoenix Police Dept. |
| COP 000927-001274 | 348 photos taken of autopsy and scene by Phoenix Police Dept. |
| COP 001275-002277 | Incident Reports pertaining to Mr. Muhaymin |
| COP 002278-002319 | Arrest and Booking Records pertaining to Mr. Muhaymin |
| COP 002320-002334 | Booking Photos for Mr. Muhaymin |
| COP 002335-002747 | Arizona Dept of Correction File pertaining to Mr. Muhaymin |
| COP 002748-003355 | Criminal Court Records pertaining to Mr. Muhaymin |
| COP 003356-003370 | Medical Examiner Report and Toxicology Report |
| COP 003371 | Letter from Maricopa County Attorney |
| COP 003372-003376 | Plaintiff's Notice of Claim |
| COP 003377 | X-Rays taken by medical examiner during autopsy |
| COP 003378-003525 | 148 photos taken by medical examiner during autopsy |
| COP 010809-011021 | PSB17-0004 – final as of 11/02/2018 -COP 010501.1 (re Grenier UOF board) |
| COP 011239-011246 | Incident Report with attachments prepared by Antonio Tarango |
| COP 011445-011448 | Certified copy of pleadings from Mesa Municipal Court, 2016068065 |
| Muhaymin 0001-0038 | Documents produced by Plaintiff in response to Request for Production |

**TRANSCRIPTS OF PREVIOUSLY PROVIDED RECORDED INTERVIEWS**

01. Anthony Williamson's interview on 01/05/2017 (COP 012054-012076)

CONFIDENTIAL   COP 015479

02. Antonio Tarango's interview on 01/04/2017 (COP 012077-012156)
03. Arizona Smith's interview on 01/05/2017 (COP 012157-012183)
04. David Head's interview on 01/04/2017 (COP 012184-012206)
05. David Head's interview on 01/11/2017 (COP 012207-012271)
06. Dennis Leroux' interview on 01/04/2017 (COP 012272-012278 and COP 012279-012295)
07. Dennis Leroux' interview on 01/12/2017 (COP 012996-012234)
08. Everett Baeza's interview on 01/18/2017 (COP 012335-012350)
09. Hannah Glemba's interview on 01/04/2017 (COP 012351-012387)
10. James Clark's interview on 01/04/2017 (COP 012388-012407)
11. James Clark's interview on 01/11/2017 (COP 012408-012444)
12. Jason Hobel's interview on 01/04/2017 (COP 012445-012481)
13. Jason Hobel's interview on 01/11/2017 (COP 012482-012540)
14. Jimmy Yee's interview on 01/04/2017 (COP 012541-012572)
15. Juan Lara's interview on 01/04/2017 (COP 012573-012603)
16. Kevin McGowan's interview on 01/04/2017 (COP 012604-012622)
17. Kevin McGowan's interview on 01/27/2017 (COP 012623-012670)
18. Mark Aker's interview on 01/04/2017 (COP 012671-012695)
19. Matt Murray's interview on 01/04/2017 (COP 012696-012709)
20. Oswald Grenier's interview on 01/04/2017 (COP 012710-012751)
21. Oswald Grenier's interview on 01/11/2017 (COP 012752-012816)
22. Ronaldo Canilao's interview on 01/04/2017 (COP 012817-012872)
23. Ronaldo Canilao's interview on 01/11/2017 (COP 012873-012950)
24. Ryan Nielsen's interview on 01/04/2017 (COP 012951-012967)
25. Ryan Nielsen's interview on 01/13/2017 (COP 012968-013024)
26. Steven Wong's interview on 01/04/2017 (COP 013025-013065)
27. Steven Wong's interview on 01/10/2017 (COP 013066-013114)
28. Susan Heimbigner's interview on 01/04/2017 (COP 013115-013131)
29. Susan Heimbigner's interview on 01/13/2017 (COP 013132-013188)
30. Tonya Davis' interview on 01/04/2017 (COP 013189-013219)
31. Tonya Davis' interview on 01/24/2017 (COP 013220-013225)
32. Tonya Davis' interview on 01/24/2017 (COP 013226-013236)

## DEPOSITIONS

01.   Defendant Antonio Tarango
02.   Defendant Officer Oswald Grenier
03.   Defendant Officer Ronaldo Canilao
04.   Defendant Officer James Clark
05.   Defendant Officer Ryan Nielsen
06.   Defendant Officer Susan Heimbigner
07.   Witness Jimmy Yee
08.   Witness Arizona Smith
09.   Witness Andy Damiano

CONFIDENTIAL          COP 015480

10.     Defendant Officer Jason Hobel
11.     Defendant Officer David Head
12.     Defendant Sgt. Steven Wong
13.     Medical Examiner
14.     Sgt. James Ward
15.     Detective Jemima Schmidt

**MEDICAL RECORDS**

01.     Records from Maricopa County Correctional Health Services (COP 11932-12022)
02.     Records from Phoenix Fire Department (COP 13882-13892)
03.     Records from Community Bridges Integrated Medical Group (COP 13893-13918)
04.     Records from Terros (COP 14724-15221)
05.     Records from Abrazo Community Health Network (COP 14724-15221)

**Overview of Opinions**

**(all opinions within this report are to a reasonable
degree of medical or scientific probability)**

An overview of my opinions is as follows with more description of each below:

*1.   **Mr. Muhaymin's cardiac arrest was most likely caused by his underlying coronary artery disease coupled with an intramuscular left anterior descending coronary artery, methamphetamine use and his agitation.***

*2.   **The actions of the officers to control and restrain Mr. Muhaymin did not cause or contribute to his cardiac arrest and death.***

**Analysis**

After reviewing the above listed materials, it appears that in the morning of January 4, 2017, Mr. Muhaymin attempted to use the men's restroom facilities at the Maryvale Community Center with his dog, Chiquita. Mr. Muhaymin was 43 years old, weighed 164 lbs. and was 5' 7' at the time. Phoenix Police received a call regarding an assault at the Maryvale Community Center and

responded.  While Mr. Muhaymin was using the restroom, officers learned that he had a warrant for his arrest. After Mr. Muhaymin used the restroom, the officers walked him outside and told him he was under arrest for this outstanding warrant.  Mr. Muhaymin refused to put his hands behind his back as instructed and then there was a struggle for a brief period and Mr. Muhaymin was ultimately placed into two sets of interlocking handcuffs with hands behind his back.

The officers were walking Mr. Muhaymin to the parking lot towards one of the police vehicles. When Mr. Muhaymin was at the front of the police vehicle, he brought his double cuffed hands up over his head then in front of his body.  Mr. Muhaymin and officers went to the ground. Other officers arrived to assist getting Mr. Muhaymin re-handcuffed with his hands behind his back. Mr. Muhaymin continued to physically resist. As the officers were getting the handcuffs secured, Mr. Muhaymin vomited.  EMS was called.  Then officers assessed Mr. Muhaymin and then started CPR.  Paramedics attempted resuscitation and transported him to the hospital however Mr. Muhaymin never regained consciousness and was pronounced dead.

The medical examiner performed an autopsy and determined the cause of death was cardiac arrest in the setting of coronary artery disease, psychiatric disease, acute methamphetamine intoxication, and physical exertion during law enforcement subdual.

Given this history, there are several issues that need to be addressed in more detail below. All opinions given are to a reasonable, or higher, degree of medical probability based on the information currently available.

**Detailed discussion and basis of opinions**

1. ***Mr. Muhaymin's cardiac arrest was most likely caused by his underlying coronary artery disease coupled with an intramuscular left anterior descending coronary artery, methamphetamine use and his agitation.***

CONFIDENTIAL

Mr. Muhaymin was noted to have an atheromatous plaque in the left anterior descending (LAD) coronary artery.  The plaque causes a stenosis of 40-50% of the LAD, limiting blood flow through this artery.  This blockage of the heart artery in and of itself can place an individual at increased risk for sudden cardiac arrest and death from an irregular heartbeat.

On top of this blockage of the LAD, Mr. Muhaymin also had an abnormality of an intramuscular LAD coronary artery that involved a 2 cm portion at the midpoint of its distribution.  This is significant.  Normally the coronary arteries, the blood vessels that supply the heart muscle with oxygen and other nutrients, travel on the surface of the heart as depicted in the image below.



In the case of Mr. Muhaymin, a 2 cm portion at the midpoint of the LAD coronary artery tunneled down and was embedded into the cardiac muscle.  The problem with this anatomic anomaly is that when the artery is embedded in the muscle, as the heart muscle contracts, it limits blood flow through that artery and thus limits oxygenation to the heart muscle supplied by that coronary artery.  And in the case of Mr. Muhaymin, the LAD was already narrowed and limited in how much blood could flow by the 40-50% blockage.  It should be noted that the LAD is one of the

CONFIDENTIAL

major coronary arteries, so important that it is nicknamed "the widow maker" because blockage of this vessel will typically result in cardiac arrest and sudden death.

So, Mr. Muhaymin, unbeknownst to him or the officers on scene, had two life threatening cardiac conditions both impacting one of the most important coronary arteries, each with an increased risk for sudden cardiac arrest. When combined, they are even more dangerous. This creates cardiac stress and significantly increases the risk of sudden cardiac arrest.

In addition to this combined cardiac risk, Mr. Muhaymin added methamphetamine to his system. Methamphetamine is an often-unpredictable stimulant that, regardless of the amount ingested, increases the work of the heart. It increases the heart rate and contraction strength of the cardiac muscles. The increased heart rate will increase oxygen demand throughout the body as well as the heart muscle. However, the increased heart rate and contraction strength only compresses the intramuscular LAD more and more, at a time when the heart muscle needs more oxygen than ever. This becomes a vicious cycle. Additionally, methamphetamine will cause the blood to be more acidic, caused by a metabolic acidosis. This increased acidosis (lower pH of the blood) is irritating to the cardiac muscle, increasing the risk of an irregular heartbeat (dysrhythmia) and sudden cardiac arrest.

And finally, Mr. Muhaymin became agitated and resisted physically and exerted himself. This is an additional physiologic stressor on top of the methamphetamine and anatomic anomalies that increases lactic acid production of muscles and demands more oxygen. The lactic acid production is additive to the metabolic acidosis from the methamphetamine use and worsens the irritability of the cardiac muscle, increasing the risk of sudden cardiac arrest.

It should be noted that in the video Mr. Muhaymin could be heard stating loudly "I can't breathe." At face value, one might think this statement means that Mr. Muhaymin could not breathe or ventilate. However, when evaluating the video, Mr. Muhaymin was clearly moving air in and out

COP 015484

of his lungs very well, yelling loudly, and having no clinical evidence of ventilatory restriction at the time he was making this statement. What was likely happening is that Mr. Muhaymin was having a cardiac event not a pulmonary event. Patients who come to the emergency department in the process of having a heart attack often describe the feeling of an elephant sitting on their chest or feeling like they can't breathe.  This is because the heart is not getting enough blood flow and the symptoms feel like loss of breath. In these cardiac patients, their ventilations are fine, and the oxygenation level is normal.  The underlying issue is that the heart is not getting enough blood flow.

So, when Mr. Muhaymin was reporting about not being able to breathe, it is likely that his heart was becoming ischemic by not getting enough blood flow which then led to the sudden cardiac arrest soon after.  There was nothing that the officers could have done to prevent the cardiac arrest.  Changing positions or removing the modest amount of weight placed was not going to change the blood flow issues to Mr. Muhaymin's diseased heart that was being aggravated by the methamphetamine and severe acidosis caused by his exertion and continued resistance.

In summary, Mr. Muhaymin had a heart that was significantly abnormal and at increased risk to go into cardiac arrest.  Added to this increased risk was the methamphetamine he ingested and the physical exertion and resistance which made the heart more volatile and worsened all physiologic parameters.  It was this combination of events that increased the oxygen demand of the heart that was limited in how much blood could flow through the intramuscular "widow maker" and more likely than not, this was the cause of Mr. Muhaymin's sudden cardiac arrest and death.

### 2.  *The actions of the officers to control and restrain Mr. Muhaymin did not cause or contribute to his cardiac arrest and death.*

During the period that officers were repositioning Mr. Muhaymin's handcuffs from his front to his back, he was maintained at times on his side or in a prone position with officers repositioning

COP 015485

and distributing some weight in response to Mr. Muhaymin's physical resistance.  During this time, based on the reports by officers and my review of the body worn camera videos, Mr. Muhaymin was continuing to physically resist and yell.

Based on the review of the video, the approximate timing and weight used on Mr. Muhaymin was as follows: Officer Grenier was holding Mr. Muhaymin's head and hair to prevent Mr. Muhaymin from pressing his head against the ground and injuring himself.  He reported he had his knee or shin on Mr. Muhaymin's shoulder and neck for a brief period of time.  The position was intended to be the shoulder but would slip and move as Mr. Muhaymin moved and continued to physically resist.  Officer Grenier moved away and then Officer Leroux placed his knee onto Mr. Muhaymin's right upper shoulder for a short period of time.  Then Sgt. Wong replaced Officer Leroux and placed his knee on Mr. Muhaymin's upper torso to assist with removing the wrist band from Mr. Muhaymin's wrist so that the cuffing could be completed.  Officer Canilao was holding Mr. Muhaymin's arms.  Officer Hobel had his hands-on Mr. Muhaymin's hips with his knees on the ground to keep Mr. Muhaymin from flipping over.  Officer Heimbigner had her hands on Mr. Muhaymin's lower back to keep him from getting up. Officer Clark had his knee on Mr. Muhaymin's lower back very briefly.  Officer Nielsen had his hands on Mr. Muhaymin's hair and Officer Head was holding Mr. Muhaymin's legs.  The image below from Officer's Nielsen's body worn camera demonstrates some of the positioning, though with Mr. Muhaymin's continued physical resistance, this was a dynamic situation with several intermittent shifting of positions.

CONFIDENTIAL



For over 2 ½ minutes after the arrival of Officer Nielsen, Mr. Muhaymin could be heard on the video yelling and moaning. He was heard grunting and keening, demonstrating that he was moving air in and out of his lungs. This demonstrated that his ventilation was intact.  About 30 seconds later, the re-handcuffing was completed and seconds later, Mr. Muhaymin vomits.  Shortly thereafter Mr. Muhaymin was noted to be in cardiac arrest.

The majority of the body weight was not even on Mr. Muhaymin in such a position that would have created the potential to limit ventilation. The limited period of time that weight was

CONFIDENTIAL

COP 015487

placed intermittently on the upper back during the re-handcuffing would not significantly limit ventilations enough to cause asphyxiation. This was evidenced by Mr. Muhaymin's ability to continue to speak, grunt and breathe very regularly.   As research shows, the limited and intermittent time periods in which any body weight was applied to Mr. Muhaymin's upper back and neck would not cause clinically significant physiologic changes that could cause asphyxiation or significantly limit ventilations.

The weight of the officers holding Mr. Muhaymin's legs, lower back, arms, head, neck and hair would not have had any impact on breathing or the ability for Mr. Muhaymin to ventilate effectively.

Mr. Muhaymin was yelling, grunting, breathing and physically resisting throughout the encounter until less than one minute before he vomits.  If the officers' application of weight had impacted Mr. Muhaymin's ability to ventilate to the point of causing a cardiac arrest and sudden death by asphyxiation, the ventilations would have had to be restricted long enough to where blood oxygen levels would drop because there was not enough oxygen getting into Mr. Muhaymin's lungs.  When this occurs, the low blood oxygen levels will cause the heart to become irritable and eventually slow and then stop causing the subject to go into cardiac arrest.  This takes time and essentially a complete blockage of air movement in and out of the lungs.  There was no evidence that the short periods of weight applied to Mr. Muhaymin caused the cascade of physiologic changes from asphyxia to result in a cardiac arrest.  The weight was simply not enough to significantly restrict ventilations.  In summary, there is no evidence that position, restraint or body weight caused or contributed to Mr. Muhaymin's cardiac arrest and death.

## Background

My background is that I am a full-time faculty member in the department of emergency

CONFIDENTIAL

medicine at the University of California, San Diego Medical Center. I am residency trained and board certified in Emergency Medicine.  I work full time as a practicing clinician in the Emergency Department of a busy urban hospital and serve as the clinical operations chief for our two emergency departments with a combined annual census of approximately 75,000 visits.  I currently serve as the Medical Director for Risk Management for UC San Diego Health.  I also serve as the UCSD Medical Center's Medical Risk Management Committee Chair and Allocation Committee Co-Chair, as well as previously having served as the Chair of the Patient Care and Peer Review Committee, each of which are charged with the task of reviewing medical records and making determinations of standard of care. I am also the former Chief of Staff for UC San Diego Health.

As a physician working at an urban based emergency department at a Level 1 trauma center, I have evaluated hundreds of patients over the last 25 years who have been in cardiac arrest and thousands who have been under the influence of methamphetamine.

I am knowledgeable of peer-reviewed medical and scientific research on the physiological effects of positional restraint and positional asphyxia conducted by others. I have also performed extensive clinical research on human subjects who have been restrained in various positions and with various amounts of weight being placed (articles included in my curriculum vitae) which includes having directly been involved with hundreds of subjects being restrained and studied, hundreds of patients restrained during my work in the emergency department and have personally been restrained with weights placed on me as well.   I have been invited to lecture nationally and internationally on this subject.  Given my own interests in this area, I regularly perform a complete review of the literature regarding restraints and in custody death.

I am knowledgeable of peer-reviewed medical and scientific research for cardiac arrest and CPR practices.   I was the Principle Investigator for San Diego's Resuscitative Outcomes Consortium (ROC) site, a National Institute of Health (NIH) funded study for ten years that

COP 015489

involved over 200,000 cardiac arrest patients to evaluate treatment options for out of-hospital

cardiac arrest and severe traumatic injury.  I have published many peer-reviewed papers on the topic

of cardiac arrest and cardiac resuscitation, including publications in the New England Journal of

Medicine, JAMA, and Circulation.  I also served as the Medical Director of the American Heart

Association Training Center at the University of California, San Diego Center for Resuscitation

Science almost ten years, teaching Advanced Cardiac Life Support (ACLS) both locally and being

asked to give lectures on cardiac arrest internationally.  I had been an ACLS instructor for over 20

years.  I also work at a busy urban comprehensive emergency department where I care for patients

in cardiac arrest on a regular basis.

My Emergency Medical Services (EMS)/prehospital background and experience includes

having been a flight physician with Lifeflight of San Diego and with Mercy Air, taking care of

acutely injured patients at the scene.  My EMS administrative roles include having been the Base

Station Medical Director for UCSD, the Medical Director for the Palomar and Southwestern

Paramedic College Training Programs, and the former Medical Director for the County of San

Diego Emergency Medical Services (EMS) one of the largest EMS systems in the nation. In this

role, I was responsible for protocols and quality assurance of over 1000 paramedics and 4000

EMT's.  I started the UCSD EMS/Disaster Medicine Fellowship Training Program and was the first

Fellowship Director and currently serve as the associate Director of the EMS/Disaster Medicine

Division in the UCSD Department of Emergency Medicine and as the Medical Director for the

North County Fire Protection District.  I have been a paramedic base hospital physician in San

Diego County for over 25 years.  Other previous EMS roles include having been the Medical

Director for the Chula Vista Fire Department, the Carlsbad Fire Department, and the Aeromedevac,

Aviamedix and AirLink USA Air Ambulance Services.  I was also the Medical Director for the San

Diego County Metropolitan Medical Strike Team (MMST) and the UCSD Base Hospital Medical

Director, and I also served as EMS medical back up for many SWAT operations. I have written numerous peer reviewed papers on prehospital medicine and operations as well as many book chapters and have lectured nationally and internationally on prehospital care.  I was also the Principal Investigator for San Diego's Resuscitative Outcomes Consortium (ROC) site, a National Institute of Health (NIH) funded study consortium that evaluated treatment options for out of-hospital cardiac arrest and severe traumatic injury for over a decade.

As per Rule 26 formatting, Appendix A is a copy of my current Curriculum Vitae, which includes a list of all publications authored by me.  Appendix B is a list of all cases in which I have testified as an expert in trial or deposition within the preceding four years.  Appendix C is my fee schedule.   The knowledge base that I utilize has been developed over time from my years of clinical practice and experience, reading and training as well as research.  Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability based on the information currently available to me. The opinions may be updated as additional information is provided for review.


Respectfully submitted,

Gary M. Vilke, M.D., FACEP, FAAEM
Professor of Clinical Emergency Medicine
Vice-Chair, Clinical Operations Emergency Medicine
Medical Director, Risk Management, UC San Diego Health System
Medical Director, North County Dispatch JPA