# LODGED
# PROPOSED
# Doc. 317-1
# (redacted)

# EXHIBIT A

September 18, 2020


Karen Stillwell
O'Connor & Dyet
7955 South Priest Drive
Tempe, AZ 85284


RE:   Estate of Muhammad Abdul Muhaymin v. City of Phoenix *et al*
      United States District Court, District of Arizona
      Case No. CV-17-04565-PHX-SMB

Dear Ms. Stillwell,

You have asked me to review provided material and offer rebuttal opinions regarding the potential causes that may have contributed to the cardiac arrest of Mr. Muhammad Muhaymin and subsequent death in the hospital, specifically the impact of methamphetamines.

As you are aware, I am a physician actively practicing at the University of California San Diego (UCSD) Health System since 1999. As a physician specializing in the fields of medical toxicology and emergency medicine, I routinely evaluate and treat patients with illnesses or injuries resulting from acute or chronic exposure to drugs or chemicals and the complications of these exposures. My primary academic appointment is as a Professor of Emergency Medicine at the UCSD School of Medicine. The Emergency Department at UCSD Medical Center is a level 1 trauma center, regional burn center, and tertiary care center in a major metropolitan city that receives patients from the southernmost region of California including most of the detention centers in the County of San Diego.

Currently, I am the Vice Chair of Education in the Department of Emergency Medicine. I was also formerly the Director of the Medical Toxicology Fellowship and Emergency Medicine Residency training programs at UCSD. In addition to my duties at UCSD, I serve as a staff medical toxicologist at the San Diego Division of the California Poison Control System (CPCS), which provides poisoning treatment advice to the general public and medical community in the State of California as well as law enforcement and fire department personnel. Additional details of my qualifications are included in my *curriculum vita*, which is attached.

My opinions for this matter were formulated after review of the following material provided by your office:

1. Plaintiff's First Amended Complaint
2. Defendants' Motion to Dismiss

Ly Expert File 005929       CONFIDENTIAL       COP 015777

3.  Plaintiff's Response to Motion to Dismiss
4.  Defendants' Reply in support of Motion to Dismiss
5.  Order granting Motion to Dismiss in part
6.  Defendants' Answer to First Amended Complaint
7.  Plaintiff's Motion for Leave to File Second Amended Complaint (currently pending before the Court)
8.  Defendants' response to Motion for Leave to File Second Amended Complaint
9.  Plaintiff's Reply in support of Motion for Leave to File Second Amended Complaint
10. Phoenix Police Department Incident Report (COP 14-238)
11. Audio of 911 call (COP 239)
12. Body Camera Video from Officer Grenier (COP 1)
13. Body Camera Video from Officer Hobel (COP 2)
14. Body Camera Video from Officer Hobel (COP 3)
15. Body Camera Video from Officer Canilao (COP 4)
16. Body Camera Video from Officer Head (COP 5)
17. Body Camera Video from Officer Head (COP 6)
18. Body Camera Video from Officer McGowan (COP 7)
19. Body Camera Video from Officer Nielsen (COP 8)
20. Body Camera Video from Officer Nielsen (COP 9)
21. Body Camera Video from Officer Nielsen (COP 10)
22. Body Camera Video from Officer Aker (COP 11)
23. Body Camera Video from Officer Clark (COP 12)
24. Body Camera Video from Officer Miller (COP 13)
25. Audio of recorded interview of Antonio Tarango (COP 251)
26. Audio of recorded interview of Anthony Williamson (COP 252)
27. Audio of recorded interview of Arizona Smith (COP 253)
28. Audio of recorded interview of David Head (COP 254)
29. Audio of recorded interview of Dennis Leroux (COP 255)
30. Audio of recorded interview of Dennis Leroux (COP 256)
31. Audio of recorded interview of Everett Baeza (COP 257)
32. Audio of recorded interview of Hannah Glemba (COP 258)
33. Audio of recorded interview of Jason Hobel (COP 259)
34. Audio of recorded interview of Jimmy Yee (COP 260)
35. Audio of recorded interview of Juan Lara (COP 261)
36. Audio of recorded interview of James Clark (COP 262)
37. Audio of recorded interview of Kevin McGowan (COP 263)
38. Audio of recorded interview of Mark Aker (COP 264)
39. Audio of recorded interview of Murray Williamson (COP 265)
40. Audio of recorded interview of Oswald Grenier (COP 266)
41. Audio of recorded interview of Ronaldo Canilao (COP 267)
42. Audio of recorded interview of Ryan Nielsen (COP 268)
43. Audio of recorded interview of Steven Wong (COP 269)
44. Audio of recorded interview of Susan Heimbigner (COP 270)
45. Audio of recorded interview of Tonya Davis (COP 271)
46. Audio of recorded interview of Tonya Davis (COP 272)

Ly Expert File 005930          CONFIDENTIAL                    COP 015778

47. Audio of recorded interview of Tonya Davis (COP 273)
48. Transcript of recorded interview of Anthony Williamson (COP 12054-12076)
49. Transcript of recorded interview of Antonio Tarango (COP 12077-012156)
50. Transcript of recorded interview of Arizona Smith (COP 12157-12183)
51. Transcript of recorded interview of David Head (COP 12184-12206)
52. Transcript of recorded interview of Dennis Leroux (COP 12272-12278)
53. Transcript of recorded interview of Dennis Leroux (COP 12279-12295)
54. Transcript of recorded interview of Everett Beaza (COP 12335-12350)
55. Transcript of recorded interview of Hannah Glemba (COP 12351-12387)
56. Transcript of recorded interview of James Clark (COP 12388-12407)
57. Transcript of recorded interview of Jason Hobel (COP 12445-12481)
58. Transcript of recorded interview of Jimmy Yee (COP 12541-12572)
59. Transcript of recorded interview of Juan Lara (COP 12573-12603)
60. Transcript of recorded interview of Kevin McGowan (COP 12604-12622)
61. Transcript of recorded interview of Mark Aker (COP 12671-12695)
62. Transcript of recorded interview of Matt Murray (COP 12696-12709)
63. Transcript of recorded interview of Oswald Grenier (COP 12710-12751)
64. Transcript of recorded interview of Ronaldo Canilao (COP 12817-12872)
65. Transcript of recorded interview of Ryan Nielsen (COP 12951-12967)
66. Transcript of recorded interview of Steven Wong (COP 13025-13065)
67. Transcript of recorded interview of Susan Heimbigner (COP 13115-13131)
68. Transcript of recorded interview of Tonya Davis (COP 13189-13219)
69. Transcript of recorded interview of Tonya Davis (COP 13220-13225)
70. Transcript of recorded interview of Tonya Davis (COP 13226-13236)
71. 50 photos taken at scene (COP 278-327)
72. 394 photos taken at scene (COP 328-721)
73. 164 photos taken of officers (COP 722-885)
74. Photos taken of items received at autopsy (COP 886-926)
75. Photos of autopsy and scene (COP 927-1274)
76. Videos from library player (w/ Pelco Player software)
77. X-rays taken by medical examiner
78. Medical Examiner Report and Toxicology Report (COP 3356-3370)
79. Medical records from Phoenix Fire Department (COP 13882-13892)
80. Medical records from Abrazo Community Health Network (COP 14724-15221)
81. Medical records from Terros (COP 15222-15398)
82. Medical records from Community Bridges (COP 13893-13918)
83. Medical records from Maricopa County Correctional Health (COP 11932-12022)
84. Audio of recorded interview of Dennis Leroux (COP 10809)
85. Audio of recorded interview of David Head (COP 10810)
86. Audio of recorded interview of James Clark (COP 10811)
87. Audio of recorded interview of Jason Hobel (COP 10812)
88. Audio of recorded interview of Kevin McGowan (COP 10813)
89. Audio of recorded interview of Oswald Grenier (COP 10814)
90. Audio of recorded interview of Ronaldo Canilao (COP 10815)
91. Audio of recorded interview of Ryan Nielsen (COP 10816)
92. Audio of recorded interview of Susan Heimbigner (COP 10817)

Ly Expert File 005931     CONFIDENTIAL     COP 015779

93. Audio of recorded interview of Steven Wong (COP 10818)
94. Investigation File (COP 10819-11008)
95. Use of Force Results (COP 11009 and COP 10501.1)
96. COR Affidavit and Summary (COP 11010-11021)
97. Transcript of David Head's recorded interview (COP 012207-012271)
98. Transcript of Dennis Leroux' recorded interview (COP 012296-012334)
99. Transcript of James Clark's recorded interview (COP 012408-012444)
100. Transcript of Jason Hobel's recorded interview (COP 012482-012540)
101. Transcript of Kevin McGowan's recorded interview (COP 012623-012670)
102. Transcript of Oswald Grenier's recorded interview (COP 012752-012816)
103. Transcript of Ronaldo Canilao's recorded interview (COP 012873-012950)
104. Transcript of Ryan Nielsen's recorded interview (COP 012968-013024)
105. Transcript of Steven Wong's recorded interview (COP 013066-013114)
106. Transcript of Susan Heimbigner's recorded interview (COP 013132-013188)
107. Deposition of Defendant Antonio Tarango
108. Deposition of Defendant Officer Oswald Grenier
109. Deposition of Defendant Officer Jason Hobel
110. Deposition of Defendant Officer Ronaldo Canilao
111. Deposition of Defendant Officer David Head
112. Deposition of Defendant Officer Susan Heimbigner
113. Deposition of Defendant Officer Ryan Nielsen
114. Deposition of Defendant Officer James Clark
115. Deposition of Defendant Sgt. Steven Wong
116. Deposition of Witness Andy Damiano
117. Deposition of Witness Jimmy Yee
118. Deposition of Witness Arizona Smith
119. Deposition of Mussalina Muhaymin (sister)
120. Deposition of Muhammad Muhaymin (son)
121. Deposition of ███████ Muhaymin (daughter)
122. Deposition of Sgt. James Ward (30b6 witness from Phoenix Police Department re: training)
123. Deposition of Det. Jemima Schmidt (30b6 witness from Phoenix Police Department re: animals)
124. Deposition of Amanda Maskovyak, MD (medical examiner)
125. Plaintiff's Fourth Mandatory Disclosure
126. Defendants' Tenth Mandatory Disclosure
127. Plaintiff's response to Non-Uniform Interrogatories
128. Plaintiff's response to Request for Production
129. Defendant City of Phoenix' response to Request for Production
130. Defendant Canilao's response to Non-Uniform Interrogatories
131. Defendant Clark's response to Non-Uniform Interrogatories
132. Defendant Grenier's response to Non-Uniform Interrogatories
133. Defendant Head's response to Non-Uniform Interrogatories
134. Defendant Heimbigner's response to Non-Uniform Interrogatories
135. Defendant Hobel's response to Non-Uniform Interrogatories

4

136. Defendant Leroux' response to Non-Uniform Interrogatories
137. Defendant McGowan's response to Non-Uniform Interrogatories
138. Defendant Nielsen's response to Non-Uniform Interrogatories
139. Defendant Tarango's response to Non-Uniform Interrogatories
140. Defendant Tarango's amended response to Non-Uniform Interrogatories
141. Defendant Wong's responses to Non-Uniform Interrogatories
142. Expert Report of Bennet Omalu, MD
143. Expert Report of Scott DeFoe
144. Expert Report of Greg Meyer (COP 15599-15675)
145. Expert Report of Gary Vilke, MD (COP 15475-15598)
146. Letter from Maricopa County Attorney (COP 3371)
147. Plaintiff's Notice of Claim (COP 3372-3376)
148. Incident Report prepared by Antonio Tarango (COP 11239-11246)
149. Memo sent to Antonio Tarango (COP 11509)
150. Notice of Inquiry to Antonio Tarango January 2017 (COP 11510-11513)
151. Notice of Inquiry to Antonio Tarango February 2017 (COP 11514-11517)
152. Brochure on Disability Issues (COP 11518-11519)
153. Statement prepared by Hannah Glemba re Sept 2016 (COP 11520)
154. Statement prepared by Hannah Glemba re Jan. 2017 (COP 11521)
155. Notice of Inquiry/Interview to Hannah Glemba (COP 11522-11523)
156. Phoenix Police Department's Operations Order re Use of Force 2019 (COP 13919-13942)
157. Mesa Police Department Report (COP 15399-15407)
158. Phoenix Police Department's Operations Order re Purpose Statement (COP 15676-15677)
159. Abrazo Maryvale Hospital Incident Report (COP 15680-15683)
160. Maricopa County Animal Care & Control Report (COP15684-15687)
161. Phoenix Police Department Operations Orders (COP 011449-011508)
162. Statements from MCC Employees (COP 015694-015701)
163. Laboratory and Toxicology Data (COP 015702-015757)
164. Statements from Joshua Govan and Isabel Silvas (COP 015688-015693)

The following summary of facts is provided for convenience and is not intended to itemize every fact that I relied upon in formulating my opinions in this matter. The relevant facts of the case pertaining to my analysis are summarized as follows:

1. On 3/9/2013, Muhaymin presented to Maryvale Hospital by EMS after being found by police with an altered level of consciousness. His initial vital signs in the emergency department were unremarkable (COP 015194). Muhaymin was diagnosed with the following (COP 015091-015221):
   a. Toxic encephalopathy with severe agitation
   b. Methamphetamine toxicity with urine drug screen was positive for amphetamine and negative for barbiturates, benzodiazepines, cocaine, methadone, opiates, cannabinoids, phencyclidine.
   c. Rhabdomyolysis with elevated creatinine kinase at 1310 U/L

Ly Expert File 005933          CONFIDENTIAL          COP 015781

2. Muhaymin was incarcerated and assessed on multiple occasions at Maricopa County Correctional Health Services
   a. 3/27/2016
      i. Vital signs are normal (COP 011951)
      ii. Bipolar, paranoid "no medications" (COP 011954)
      iii. Muhaymin denied currently using any drugs or alcohol (COP 01156)
      iv. Muhaymin was overactive, euphoric, not oriented and had impaired judgment and insight (COP 011959-011960)
   b. 6/23/2016
      i. Vital signs are normal (COP 011965)
      ii. Muhaymin reported that he gets treatment for an unknown mental health condition. (COP 011971)
      iii. Muhaymin denied currently using any drugs or alcohol (COP 011973)
      iv. Muyhamin did not exhibit any signs of substance intoxication/withdrawal (COP 011979)
   c. 9/5/2016
      i. Vital signs are normal (COP 011983)
      ii. Muhaymin reports he has schizophrenia but is on "no current meds" (COP 011990)
      iii. Muhaymin denied currently using any drugs or alcohol (COP 011991)
   d. 9/6/2016
      i. Vitals signs are normal (COP 012005)
      ii. Muyhamin denied alcohol or drug use. He appeared paranoid or intoxicated on a psychostimulant (COP 012017)
3. Muhaymin was evaluated on multiple occasions at Terros, Inc
   a. On 10/25/2016, Muhaymin and his sister met with Dr. Villalobos and case manager Shaheed (COP 015346-015353)
      i. When asked, Muhaymin did not state what drugs he uses aside from marijuana
      ii. Sister, Mussalina, reported Muhaymin "has been using drugs: cannabis, questionable meth"
      iii. He reported "aud[itory] and visual hallucinations, some paranoia"
      iv. Dr. Villalobos makes a diagnosis of "schizophrenia, undifferentiated type"
   b. On 11/14/2016, Muhaymin was evaluated by Dr. Villalobos (COP 015324-015326)
      i. He reports drug use history, drug of choice is cannabis.
   c. On 12/5/2016, Muhaymin was evaluated by Dr. Villalobos in the presence of his stepmother and sister (COP 015368-015370)
      i. Symptoms started after his father passed away in 2006
      ii. Muhaymin was arrested multiple times for different reasons
      iii. Muhaymin was previously treated with Risperdal, Wellbutrin SR, Seroquel

6

- iv. Behaviors worsen with drug use. Did not specify drug use.
- v. Admitted to smoking cannabis
- vi. Dr. Villalobos diagnosed Muhaymin with "schizophrenia" and "cannabis use disorder, mild."
    d. On 12/12/2016, provider Bryant meets with Muhaymin (COP 015243-015247)
- i. Drug of choice is meth
- ii. Also "used all types of substances and is not ready to say what he has used"
- iii. Reports longest sobriety was 2 months
- iv. Diagnosed with psychiatric condition at age 33
- v. Muhaymin's "nutrition is not good due to his homelessness"
4. In the morning of 1/4/2017, police were summoned to Maryvale Community Center where they encountered Muhaymin and his dog.
    a. Officers speak briefly with Muhaymin and allow him to use the restroom.
    b. While Muhaymin is in the bathroom, officers discover that Muhaymin has a warrant for his arrest.
    c. After walking Muhaymin out of the community center, officers advise him that he is under arrest and requested that he put the dog down but Muhaymin does not comply. Officers attempt to place him in custody but Muhaymin resists and is taken to the ground by the officers and eventually cuffed behind his back.
    d. Officers then walk Muhaymin to one of the police vehicles. During this time Muhaymin continues to resist.
    e. Muhaymin is somehow able to bring his hands to the front of his body and able to escalate his efforts to resist multiple officers trying to once again place him securely in custody.
    f. Eventually officers are able to restrain Muhaymin on the ground when he suddenly stops moving and vomits.
    g. Officers recognize that Muhaymin is unresponsive and not breathing. They request medical aid and initiate CPR.
5. Phoenix Fire Department medical crew arrived at the scene around 10:08 AM and assumed care of Muhaymin. They found him to be pulseless, apneic with vomit in his airway. CPR was continued and Muhaymin was transported to Abrazo Maryvale Hospital and arrived at 10:21 AM.
6. Despite additional advanced resuscitative measures employed at the hospital, Muhaymin remained pulseless and apneic. He was pronounced dead at 10:39 AM
7. An autopsy was performed 1/5/2017 at 10:12 AM, approximately 24 hours after death. Significant findings include the following:
    a. Height 67 inches, weight 164 pounds
    b. Coronary artery disease with 40-50% stenosis of the left anterior descending artery
    c. Acute methamphetamine intoxication
- i. 0.81 mg/L methamphetamine in iliac blood
- ii. 0.24 mg/L amphetamine in iliac blood
    d. Multiple blunt force injuries

  CONFIDENTIAL

8.  Statements obtained in investigations, inquiries, interviews or depositions:
    a.  Anthony Williamson thought that Muhaymin was "definitely lit up on something…that dude was pretty strong…or he was on something…because those four guys…they were all pretty big…and this guy wasn't that big, and they were having a hard time…it was a major struggle" (COP 012068-012070)
    b.  Juan Lara stated "so then, I saw another police officer running towards that area, and basically they just -- they were struggling with him.··He was really resisting…It looked like the gentleman was Superman, man, he was strong…He looked like he was strong…They were having a hard time with him. (COP 012575)
    c.  Ofc. Leroux stated Ofc. Hobel informed him "hey, this guy is real strong" (COP 012311)
    d.  Ofc. Hobel stated "and once on the ground, we're still struggling to get his arms up, and I'm absolutely shocked that he was putting up as much of a fight as he is because I'm a bit bigger than he is, and I'm fairly strong, and it was everything that I could do to get his hand behind his back" (COP 01249)
    e.  Ofc. Grenier
        i.  "In 18 years, I've never had anything like that in my life…That guy has been the strongest guy I've ever had in my life or my police career…I've never had anybody that strong." (COP 012734)
        ii. "the strength in 20 years is probably one of the most strong guys I've ever had to deal with. And I've dealt with people that are on PCP. And his strength was astronomical…it seems like he didn't have any pain receptors." (Deposition p. 121)
    f.  Ofc. Nielsen stated "for somebody to get that like super human strength, my first thought was there's got to be some sort of drugs on board." (COP 013009)
    g.  Ofc. Canilao stated "I was thinking the baton was going to bend -- the baton was going to bend because this guy's hold was strong…Man, this guy is strong as a mule…He's just very strong. I'm just surprised by how strong he is." (COP 012884, 012902, 012917)
    h.  Ofc. Heimbigner – "I just know that he was extremely strong…I mean, he was causing people to lift up, he was still moving." (COP 013123)
    i.  Sgt. Wong – "I ran across it in my career before, but very, very, few times…And, yeah, this is one of those where I -- he was -- he was definitely a lot stronger than what he should have been." (COP 013104)
    j.  Andy Damiano (Damzano) - Mr. Muhaymin was "fighting hard" and must have been on something extreme. Mr. Damzano added, "I've heard about men being as strong as a bull, but I'd never seen it." Mr. Damzano said Mr. Muhaymin was kicking, twisting and contorting his body to get away and the officers could not control him (COP 010826).
    k.  Tony Tarango – "It took me by surprise when he bumped me on this day…Muhaymin showed signs of unpredictable behavior and was physically aggressive towards me" (COP 011512).

Ly Expert File 005936          CONFIDENTIAL                    COP 015784

l.  Isabel Silvas – "The guy was getting loud and rude...he got mad and pushed Tony...The guy was yelling screaming...then the guy said his dog was a cat." (COP 015691)

My opinions are as follows:

1. Muhaymin was a homeless, poorly nourished, schizophrenic man with coronary artery disease that also used illicit drugs notably marijuana, methamphetamine, and possibly others. On 3/9/2013, he was hospitalized for complications of methamphetamine intoxication. On 1/4/2017, he was also acutely intoxicated with methamphetamine.

2. Despite a purported history of schizophrenia, Muhaymin did not appear to be consistently engaged in treatment for schizophrenia or any medical condition prior to his death.

3. Muhaymin used marijuana. It is used both as an intoxicant and for medicinal purposes. Users describe typical intoxicating effects to include relaxation, alteration in sensory awareness, alteration in time perception, euphoria, among others. There is no evidence that Muhaymin was prescribed marijuana for any medical condition by a qualified healthcare provider.

4. Muhaymin used methamphetamine. The mechanism of action of methamphetamines is to cause the body to release chemical messengers called neurotransmitters (i.e. adrenaline, noradrenalin) that prepare the body to rapidly flee or stay and vigorously fend off a perceived threat. This response is commonly referred to as the "fight or flight" response and happens naturally when people and other mammals are faced with threatening situations. As a result, heart rate and blood pressure increase to provide the body with sufficient alertness, energy, and oxygenation of tissues to respond to the perceived threat. For these reasons, methamphetamine is also used by athletes to enhance performance by increasing speed, strength, and endurance while reducing the perception of fatigue. When used as an intoxicant, methamphetamine causes the body to release these neurotransmitters absent a threat causing the individual to misperceive reality and confuse typical experiences in society as potential threats to life and react in aggressive and bizarre ways that individuals not acutely intoxicated with methamphetamines would typically behave. Methamphetamine is used as medication but there is no evidence that Muhaymin was prescribed methamphetamine for any approved medical indication.

5. Methamphetamine is also capable of producing psychosis in the absence of schizophrenia and this psychosis is indistinguishable from paranoid schizophrenia. In the presence of schizophrenia, methamphetamine may exacerbate psychosis.

6. Muhaymin's aggressive and unpredictable behavior seemed to escalate after using the bathroom. He may have consumed some additional methamphetamine in an effort to conceal the drug while using the bathroom and not under direct observation of the officers. This is known in as "body stuffing" and may have contributed to additional toxicity.

Ly Expert File 005937                    CONFIDENTIAL                    COP 015785

7. Amphetamine was also detected in Muhaymin's blood. Its presence is most likely a result of his body metabolizing methamphetamine to amphetamine rather than independent use of amphetamines. Nevertheless, the effects of amphetamine on the body is very similar to methamphetamine both physiologically and psychologically and its effects on the body is at least additive when methamphetamine is also present. Like methamphetamine, amphetamine also has accepted medical uses but there is no evidence that Muhaymin was prescribed amphetamine for any approved medical indication.

8. Methamphetamine concentrations detected in Muhaymin is well within a range of postmortem levels reported in the medical literature to result in death absent other causes. Muhaymin used methamphetamine as an intoxicant in the several hours prior to his death and was acutely intoxicated with methamphetamine. Acute methamphetamine intoxication also augmented his body's physiology allowing him to summon the strength to resist multiple officers. Because Muhaymin was acutely intoxicated with methamphetamine, he likely did not perceive the discomfort of fatigue which allowed him to continue to resist in a prolonged manner four officers trying to cuff him. The officers were audibly breathing hard during and following the encounter with Muhaymin. The strenuous exertion in resisting officers led Muhaymin to develop severe lactic acidosis which is commonly accompanied by hyperkalemia (high blood potassium). Hyperkalemia may also result from muscle injury (rhabdomyolysis) associated with extreme exertion. Both lactic acidosis and hyperkalemia may independently precipitate cardiac dysrhythmia resulting in sudden death and is the most likely cause of death in this case.

9. If Muhaymin was not intoxicated with methamphetamine he would not have resisted in the manner and extent that he did and would have survived the encounter with police on 1/4/17 like he did in past encounters

You also asked that I comment on Dr. Bennet Omalu's opinion as they migrate into my areas of expertise in medical toxicology:

1. Omalu opines that Muhaymin was alive and well on 1/4/2017. Muhaymin was a homeless, poorly nourished, schizophrenic man with coronary artery disease that was acutely intoxicated with methamphetamine. Muhaymin was alive but he was not well.

2. Omalu opines that Muhaymin "did not die of methamphetamine toxicity."
   a. Omalu acknowledges that Muhaymin consumed methamphetamine within hours of his death. I agree with this opinion.
   b. Omalu states that Muhaymin "was a chronic drug user, and people who use Methamphetamine chronically develop drug tolerance and habituation and as time passes would use and need higher levels of drugs to achieve the same effects." While Muhaymin may be a chronic drug user, it is not clear from the materials available to me that he used methamphetamines in a manner to suggest that he is tolerant to the effects of the drug. Tolerance and habituation occur with long-term, regular use of a drug but invoking tolerance in Muhaymin requires knowledge of the drug types, routine drug

Ly Expert File 005938

CONFIDENTIAL

COP 015786

dose, and escalation of drug dose over time to achieve the same effect. Omalu's opinion that Muhaymin was tolerant to the effects of methamphetamine is not based on the evidence as none of the critical information to suggest tolerance was present in the material I reviewed. Additionally, tolerance is not a durable effect across time. Individuals who have well documented tolerance to drugs will lose that tolerance during periods of abstinence. Muhaymin was abstinent from drug use for at least a 2-month period according to jail records and he was presumably abstinent while in jail as well. The medical records from Terros, Inc is vague and imprecise in detailing type, quantity, and pattern of Muhaymin's drug use in the weeks to months prior to his death. In fact, Dr. Villalobos who evaluated Muhaymin during that period only diagnosed him with schizophrenia and cannabis abuse. Notably absent from the list of diagnoses is methamphetamine abuse or dependence because there was insufficient information for Dr. Villalobos to responsibly make such conclusions, so it is unclear to me how Omalu concludes that Muhaymin was a chronic user of and had achieved tolerance to methamphetamine and amphetamines. While Muhaymin's behavior may be due to methamphetamine intoxication alone or methamphetamine intoxication in a person with schizophrenia, the strength and endurance he exhibited in resisting law enforcement officers is attributable to acute methamphetamine intoxication not schizophrenia.

c. Omalu also discusses postmortem redistribution of drugs which is a very real phenomenon that can result in higher or lower levels of drugs measured from postmortem samples. It is also well accepted that samples obtained from more peripheral sites (distant from the heart), like the iliac vessels in this case, are less likely to be distorted by postmortem redistribution than those obtained centrally (from or near the heart). Omalu also points out that individuals with higher methamphetamine concentrations than found in Muhaymin have survived but ignores numerous reports in peer-reviewed medical literature that individuals with lower methamphetamine concentrations have also died.

d. I believe that Muhaymin used a sufficient amount of methamphetamine in the hours prior to his death to cause acute intoxication leading him to exhibit the extraordinary strength and endurance to resist multiple officers trying to place him in custody and this is irrespective of tolerance and postmortem redistribution.

3. Lastly, Omalu opines that Muhaymin "experienced conscious pain and suffering for a total composite median duration of less than 15 minutes before he became unconscious on January 4, 2017 and died." He further states that "Methamphetamine did not prevent or preclude Muhammad from experiencing conscious pain and suffering." At no time during any video did I hear Muhaymin verbally expressing pain to anyone. If he did experience pain, he did not modify his behavior and actions in a manner that most other humans would do to stop the pain from continuing. In fact, Ofc. Grenier thought that Muhaymin seemed as if he was not feeling any pain. Methamphetamine may independently cause

11

intoxicated individuals to become disconnected from reality and has the ability to exacerbate the psychosis in individuals with schizophrenia. It is not scientifically based that Omalu offers an opinion that suggests he knows the content and manner in which Muhaymin was experiencing reality 15 minutes prior to his death. There are no animal or human models that reasonably approximates the mind of a schizophrenic man that is also highly intoxicated with methamphetamine.

These opinions are based on review of the material noted above and provided to a reasonable degree of medical certainty.

Sincerely yours,

Binh T. Ly, MD, FACMT
Professor of Emergency Medicine
Vice Chair, Education
Assistant Medical Director
California Poison Control System – San Diego Division

12